ACCEPTED
14-10-00708-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
6/12/2015 5:04:25 PM
CHRISTOPHER PRINE
CLERK

# No. 14-10-00708-CV

**IN THE FOURTEENTH COURT OF APPEALS**
**HOUSTON, TEXAS**

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
6/12/2015 5:04:25 PM
CHRISTOPHER A. PRINE

**PORT OF HOUSTON AUTHORITY OF HARRIS COUNTY, TEXAS**

**v.**

**ZACHRY CONSTRUCTION CORPORATION**

On appeal from the 151st Judicial District Court of Harris County, Texas
Trial Court Cause No. 2006-72970

**ZACHRY CONSTRUCTION CORPORATION'S**
**SUPPLEMENTAL BRIEF OF APPELLEE**

**GIBBS & BRUNS, LLP**
Robin C. Gibbs
State Bar No. 0785300
rgibbs@gibbsbruns.com
Jennifer Horan Greer
State Bar No. 00785611
jgreer@gibbsbruns.com
Sydney G. Ballesteros
State Bar No. 24036180
sballesteros@gibbsbruns.com
Michael R. Absmeier
State Bar No. 24050195
mabsmeier@gibbsbruns.com
Amanda B. Nathan
State Bar No. 00784662
anathan@gibbsbruns.com
1100 Louisiana, Suite 5300
Houston, Texas 77002
Phone: (713) 650-8805
Fax: (713) 750-0903

**REYNOLDS FRIZZELL, LLP**
Brandon T. Allen
State Bar No. 24009353
ballen@reynoldsfrizzell.com
1100 Louisiana, Suite 3500
Houston, Texas 77002
Phone: (713) 485-7200
Fax: (713) 485-7520

**ALEXANDER DUBOSE**
**JEFFERSON & TOWNSEND LLP**
Douglas W. Alexander
State Bar No. 00992350
dalexander@adtappellate.com
515 Congress Avenue, Suite 2350
Austin, Texas 78701-3562
Phone: (512) 482-9301
Fax: (512) 482-9303

**ORAL ARGUMENT REQUESTED**

# IDENTITY OF PARTIES AND COUNSEL

**1.    Petitioner:  Zachry Construction Corporation**

<u>**Represented in the trial court and on appeal by**</u>**:**

Robin C. Gibbs
State Bar No. 07853000
rgibbs@gibbsbruns.com
Jennifer Horan Greer
State Bar No. 00785611
jgreer@gibbsbruns.com
Sydney G. Ballesteros
State Bar No. 24036180
sballesteros@gibbsbruns.com
Michael R. Absmeier
State Bar No. 24050195
mabsmeier@gibbsbruns.com
Amanda B. Nathan
State Bar No. 00784662
anathan@gibbsbruns.com
GIBBS & BRUNS L.L.P.
1100 Louisiana, Suite 5300
Houston, Texas  77002
Phone:  (713) 650-8805
Fax:  (713) 750-0903

Brandon T. Allen
State Bar No. 24009353
REYNOLDS FRIZZELL, L.L.P.
1100 Louisiana, Suite 3500
Houston, Texas  77002
Phone:  (713) 485-7200
Fax:  (713) 485-7250
Email:  ballen@reynoldsfrizzell.com

<u>**Represented on appeal by**</u>**:**

Douglas W. Alexander
State Bar No. 00992350
dalexander@adtappellate.com
ALEXANDER DUBOSE
JEFFERSON &
TOWNSEND LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701-3562
Phone: (512) 482-9301
Fax: (512) 482-9303

**2.     Respondent**:  Port of Houston Authority of Harris County, Texas

**Represented in the trial court and on appeal by:**

Marie R. Yeates
State Bar No. 22150700
myeates@velaw.com
Catherine B. Smith
State Bar No. 03319970
csmith@velaw.com
VINSON & ELKINS L.L.P.
1001 Fannin, Suite 2500
Houston, Texas  77002
Phone:  (713) 758-4576
Fax:  (713) 615-5544

Michael A. Heidler
State Bar No. 24059921
mheidler@velaw.com
VINSON & ELKINS L.L.P.
2801 Via Fortuna, Suite 100
Austin, Texas  78746
Phone:  (512) 542-8579
Fax:  (512) 236-3217

Karen L.T. White
State Bar No. 20274500
karen@kltwpc.com
KAREN L.T. WHITE, P.C.
2777 Allen Parkway, Suite 977
Houston, Texas  77019
Phone:  (832) 646-4667

David E. Keltner
State Bar No. 11249500
david.keltner@kellyhart.com
Marianne Auld
State Bar No. 01429910
marianne.auld@kellyhart.com
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas  76102
Phone:  (817) 878-3560
Fax:  (817) 878-9760

Bill Sims
State Bar No. 18429500
bsims@velaw.com
VINSON & ELKINS L.L.P.
2001 Ross Avenue, Suite 3700
Dallas, Texas  75201
Phone:  (214) 220-7703
Fax:  (214) 999-7703

David H. Brown
State Bar No. 03109200
dbrown@bkllp.com
BROWN & KORNEGAY LLP
2777 Allen Parkway, Suite 977
Houston, Texas  77019
Phone:  (713) 528-3703
Fax:  (713) 528-3701

**Represented in the trial court by:**

Lawrence J. Fossi
State Bar No. 97280650
lfossi@fossijewell.com
FOSSI & JEWELL LLP
4203 Yoakum Boulevard, Suite 100
Houston, Texas 77006
Phone: (713) 529-4000
Fax: (713) 529-4094

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ......................................................i

TABLE OF CONTENTS....................................................................iv

INDEX OF AUTHORITIES............................................................ viii

STATEMENT OF THE CASE........................................................xiv

ISSUES PRESENTED...................................................................xvii

STATEMENT OF FACTS ..................................................................1

I.     PHA hires Zachry to construct a wharf and understands Zachry plans to use a freeze-wall means and methods. ...................................................1

II.    The Contract makes Zachry solely responsible for choosing the means and methods of construction and precludes PHA control. ...........................4

III.   PHA belatedly adds an extension to the wharf design and recognizes only Zachry can timely build it and only with the frozen-cutoff wall. ........5

IV.   PHA conceals its unsubstantiated "concerns" about the frozen-cutoff wall to induce Zachry into agreeing to build the extension. ........................8

V.    PHA waits to reject the frozen-cutoff wall until *after* Zachry is bound by CO4, which plainly incorporates the frozen-cutoff wall.......................11

VI.   PHA issues its R&R Order, which everyone understands rejected the frozen-cutoff wall and which Zachry makes clear to PHA constitutes a breach.............................................................................................15

VII.  PHA's rejection of the frozen-cutoff wall forces Zachry to complete construction in the wet.............................................................................16

VIII. Working in the wet causes Zachry substantial damages for which it sues.....................................................................................................21

SUMMARY OF ARGUMENT ........................................................24

ARGUMENT .................................................................................26

I.    Ample evidence supports the jury's breach-of-contract findings. .............26

A.    Section 5.10 prohibited PHA's R&R Order, and no other Contract provision authorized it....................................................26

1.    Section 5.10 forbids PHA control of Zachry's means and methods. ................................................................................26

2.    Section 4.07 forbids PHA control over Zachry's health-and-safety plans...............................................................28

3.    None of PHA's other cited provisions authorize the R&R Order. ...................................................................................29

4.    PHA is not remediless...........................................................32

5.    The drilled-shaft submittal is consistent with Zachry's reading......................................................................................32

B.    PHA's R&R Order breached CO4. ...................................................33

C.    Question 1 was proper........................................................................35

II.   The jury's verdict on causation and damages is supported by the evidence. ..................................................................................................35

A.    Draper's assumptions on damages were supported by the evidence and did not vary materially from undisputed facts. ..........36

1.    Draper's treatment of freeze-pipe removal was supported by the evidence..................................................................37

2.    Draper's treatment of sheet-pile installation was supported by the evidence.....................................................39

B.    The evidence establishes causation...................................................40

1.    Ample evidence supported the jury's causation finding........40

2.    PHA's "Contract completion deadline" argument fails.........41

3.    PHA's "alternative cause" argument fails. ...........................42

C.    PHA's lack-of-authority argument does not defeat causation. ........43

III. Sections 5.41 and 5.42 do not bar Zachry's breach-of-contract claim.......45

    A.    The "changes" clauses are inapplicable by their terms....................45

    B.    Alternatively, common-law and statutory rules preclude application of the "changes" clauses here........................48

        1.    The *Shintech* doctrine. ..........................................................48

            a.    *Green* does not preclude application of *Shintech*........49

            b.    *Technip* does not preclude application of *Shintech*.....50

        2.    The radical-change doctrine....................................................51

        3.    Section §16.071..........................................................52

    C.    The "changes" clauses were not tried. ............................................53

    D.    If the trial court erred, remand—not rendition—is required............54

    E.    Zachry's failure to seek a §5.08 extension was irrelevant. ..............54

IV. The trial court did not abuse its discretion in excluding PHA's $8.6 million in alleged harms claimed as offsets. ............................................55

V. PHA's "open-the-door" theory did not support admission of PHA's alleged harms regarding the no-damages-for-delay exceptions.................58

    A.    The trial court properly excluded PHA's actual-harms evidence under Rule 403. ................................................................58

    B.    Any error was harmless.................................................................60

VI. The trial court did not err in instructing the jury as to fraud......................60

    A.    The Supreme Court approved the recklessness instruction. ............60

    B.    No charge error tainted the no-damages-for-delay exceptions. .......61

VII. The apparent-authority instructions were proper. ......................................62

    A.    Apparent authority is a fact issue..................................................62

    B.    Zachry pleaded apparent authority.................................................63

VIII.  PHA is not entitled to attorneys' fees if Zachry prevails on any theory. ...64

IX.  Zachry's recovery on its pass-through claim should be affirmed. .............67

    A.  Zachry asserts a valid pass-through claim. ......................................67

    B.  The Court correctly charged the jury on pass-through. ...................70

    C.  Waiver of immunity applies to the pass-through claims..................70

PRAYER .......................................................................................................71

CERTIFICATE OF SERVICE .........................................................................72

CERTIFICATE OF COMPLIANCE ................................................................74

# INDEX OF AUTHORITIES

**Cases**

*4901 Main, Inc. v. TAS Automotive*,
187 S.W.3d 627 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ....................65

*Abraxis Petrol Corp. v. Hornburg*,
20 S.W.3d 741 (Tex. App.—El Paso 2000, no pet.) .............................................41

*Allison v. Service Lloyds Ins.*,
437 S.W.3d 589 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ..............64

*Alvarado v. Farah Mfg.*,
830 S.W.2d 911 (Tex. 1992) ................................................................................55

*America's Favorite Chicken Co. v. Samaras*,
929 S.W.2d 617 (Tex. App.—San Antonio 1996, writ denied)................... 39, 40

*American Airlines Employee Federal Credit Union v. Martin*,
29 S.W.3d 86 (Tex. 2000) ....................................................................................52

*Atwood Oceanics v. Zust Bachmeier*,
2007 WL 2766192 (5th Cir. 2007) .......................................................................52

*B.F.&C.M. Davis v. W.E. Callaghan Constr.*,
298 S.W. 273 (Tex. Comm'n App. 1927) ............................................................51

*Beneficial Personnel Servs. v. Rey*,
927 S.W.2d 157 (Tex. App.—El Paso 1996, vac. w.r.m.) ...................................61

*Bhatia v. Woodlands North Houston Heart Center*,
396 S.W.3d 658 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ..............67

*Board of Regents v. S&G Constr. Co.*,
529 S.W.2d 90 (Tex. Civ. App.—Austin 1975, writ ref'd
n.r.e.)........................................................................................ 46, 47, 48, 49, 50

*Burroughs Wellcome v. Crye*,
907 S.W.2d 497 (Tex. 1995) ................................................................................36

*Chapapas v. Delhi Taylor Oil*,
323 S.W.2d 64 (Tex. Civ. App.—San Antonio 1959, writ ref'd n.r.e.) ...............64

*City of San Antonio v. Valemas*,
2012 WL 2126932 (Tex. App.—San Antonio 2012, no pet.)........................ 70, 71

*County of Dallas v. Wiland*,
216 S.W.3d 344 (Tex. 2007) .................................................................54

*Cox v. Humble Oil & Refining*,
16 S.W.2d 285 (Tex. Comm'n App. 1929)............................................64

*Criswell v. European Crossroads Shopping Center*,
792 S.W.2d 945 (Tex. 1990) ...............................................................48

*Douglass v. Panama*,
504 S.W.2d 776 (Tex. 1974) ...............................................................62

*Equitable Life Assur. Society v. Ellis*,
147 S.W. 1152 (Tex. 1912) .................................................................62

*Flagship Hotel. v. City of Galveston*,
117 S.W.3d 552 (Tex. App.—Texarkana 2003, pet. denied)................... 65, 66, 67

*Frost Nat'l Bank v. L&F Distrib'rs*,
165 S.W.3d 310 (Tex. 2005) ........................................................ 26, 47

*Ft. Worth ISD v. City of Ft. Worth*,
22 S.W.3d 831 (Tex. 2000) .................................................................53

*Galveston I.S.D. v. Clear Lake Rehab. Hosp.*,
324 S.W.3d 802 (Tex. App.—Houston [14th Dist.] 2010, no pet.) .......................70

*Gen. Elec. Co. v. Moritz*,
257 S.W.3d 211 (Tex. 2008) .................................................................5

*Green Int'l, Inc. v. Solis*,
951 S.W.2d 384 (Tex. 1997) ...............................................................49

*Hanks v. GAB Bus. Servs.*,
644 S.W.2d 707 (Tex. 1982) ...............................................................50

*Harris Cty. v. Inter Nos, Ltd.*,
199 S.W.3d 363 (Tex. Civ. App.—Houston [1st Dist.] 2006, no pet.)................55

ix

*Hayden v. State*,
  296 S.W.3d 549 (Tex. Crim. App. 2009)..................................................59

*Helena Chemical Co. v. Wilkins*,
  47 S.W.3d 486 (Tex. 2001) ....................................................................40

*Hensel Phelps Constr. v. McCarthy Bld'g*,
  2005 WL 1489932 (N.D. Tex. 2005) ......................................................70

*Horizon/CMS Healthcare. v. Auld*,
  34 S.W.3d 887 (Tex. 2000) .....................................................................59

*In re ADM Inv. Servs.*,
  304 S.W.3d 371 (Tex. 2010) ...................................................................64

*Intercontinental Group Ptnrshp. v. KB Home Lone Star*,
  295 S.W.3d 650 (Tex. 2009) ........................................................... 65, 66

*Interstate Contracting Corp. v. City of Dallas*,
  135 S.W.3d 605 (Tex. 2004) .................................... xxiv, 25, 68, 69, 71

*Iron Mtn. Bison Ranch v. Easley Trailer Mfg.*,
  42 S.W.3d 149 (Tex. App.—Amarillo 2000, no pet.)...........................64

*Kiefer v. Continental Air.*,
  10 S.W.3d 34 (Tex. App.—Houston [14th Dist.] 1999, pet. denied)....35

*Mann v. Fitzhugh-Straus Medina Ranch*,
  640 S.W.2d 367 (Tex. App.—San Antonio 1982, no writ) .................61

*McCreary v. Bay Area Bank & Trust*,
  68 S.W.3d 727 (Tex. App.—Houston [14th Dist.] 2001, pet. dism'd) ................26

*Nat'l Env'l Serv. v. Homeplace Homes*,
  961 S.W.2d 632 (Tex. App.—San Antonio 1998, no writ) .................52

*North Harris County Jr. College Dist. v. Fleetwood Constr. Co.*,
  604 S.W.2d 247 (Tex. Civ. App.—Houston [14th Dist.] 1980, writ ref'd
  n.r.e.).....................................................................................................49

*Pace Concerts v. Resendez*,
  72 S.W.3d 700 (Tex. App.—San Antonio 2002, pet. denied) .............63

*Paramount Nat'l Life Ins. v. Williams*,
772 S.W.2d 255 (Tex. App.—Houston [14th Dist.] 1989, writ denied)...............62

*Prodigy Comms. Corp. v. Agricultural Excess & Surplus Ins.*,
288 S.W.3d 374 (Tex. 2009). ...................................................................................54

*Provident Life & Accident Ins. v. Hazlitt*,
216 S.W.2d 805 (Tex. 1949) ...................................................................................53

*Robinson v. Lubbering*,
2011 WL 749197 (Tex. App.—Austin 2011, no pet.) ...........................................55

*Secure Comm. v. Anderson*,
31 S.W.3d 428 (Tex. App.—Austin 2000, no pet.)................................................55

*SEECO, Inc. v. K.T. Rock*,
416 S.W.3d 664 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ...............67

*Shintech, Inc. v. Group Constructors, Inc.*,
688 S.W.2d 144 (Tex. App.—Houston [14th Dist.] 1985, no writ).............. 46, 49

*Shupe v. Lingafelter*,
192 S.W.3d 577 (Tex. 2006) ...................................................................................35

*Solar Soccer Club v. Prince of Peace Luth. Church*,
234 S.W.3d 814 (Tex. App.—Dallas 2007, pet. denied) .....................................65

*Sprague v. Sprague*,
363 S.W.3d 788 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) ...............57

*State v. F&C Eng'g*,
438 S.W.2d 647 (Tex. Civ. App.—Houston [14th Dist.] 1969, writ ref'd
n.r.e.)........................................................................................................................47

*State v. Martin Bros.*,
160 S.W.2d 58 (Tex. 1942) ......................................................................................47

*Structural Metals, Inc. v. S&C Elec. Co.*,
590 Fed. Appx. 298 (5th Cir. 2014) ......................................................................65

*Taber v. W. Union Tele. Co.*,
137 S.W. 106 (Tex. 1911) ........................................................................................52

*Tennessee Gas Pipeline v. Technip USA Corp.*,
2008 WL 3876141 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) .............50

*The Port of Houston Authority of Harris County v. Zachry Construction Corp.*,
377 S.W.3d 841 (Tex. App.—Houston [14th Dist.] 2012, pet. filed)........... xv, 23

*Thota v. Young*,
366 S.W.3d 678 (Tex. 2012) ....................................................................... 61, 62

*West v. Triple B Servs., LLP*,
264 S.W.3d 440 (Tex. App.—Houston [14th Dist.] 2008, no writ).....................49

*Zachry Construction Corp. v. The Port of Houston Authority of Harris County*,
449 S.W.3d 98 (Tex. 2014) ............... xv, 1, 5, 9, 11, 12, 15, 16, 21, 23, 27, 60, 61

**Statutes**

TEX. CIV. PRAC. & REM. CODE §16.071(a) ............................................................52

TEX. LOC. GOV'T CODE §271.151(2) ....................................................................45

TEX. LOC. GOV'T CODE §271.152 .................................................................. 45, 70

TEX. LOC. GOV'T CODE §271.153(a)(1)................................................................62

TEX. LOC. GOV'T CODE §271.153(a)(2)................................................................62

TEX. WATER CODE §60.408(i) ..............................................................................45

**Rules**

TEX. R. CIV. P. 193.1............................................................................................55

TEX. R. CIV. P. 193.6............................................................................................55

TEX. R. CIV. P. 194.2(c) .......................................................................................55

TEX. R. CIV. P. 194.2(d)........................................................................................55

TEX. R. CIV. P. 403...............................................................................................54

**Other Authorities**

1 BRUNER & O'CONNOR CONSTR. LAW §4.23 ........................................................46

Brown & Rondon, TEXAS RULES OF EVIDENCE HANDBOOK §107 (2015)...............59

Goode, Wellborn & Sharlot, 1 TEX. PRAC.: TEX. RULES OF EVID. 107.1 (3d ed. 2015)........................................................................................................................59

McCormick, *The New Code of Evidence*, TEX. L REV. 661, 673 (June 1942)........60

TEX. P.J.C. BUSINESS §105.2 (2014)........................................................................61

TEX. P.J.C. BUSINESS §105.3B (2014) .....................................................................61

## STATEMENT OF THE CASE

**Nature of Case**: Appellee Zachry Construction Corporation ("Zachry"), a contractor, sued Appellant Port of Houston Authority of Harris County, Texas ("PHA") for damages arising out of PHA's breach of its contract with Zachry, pursuant to which Zachry promised to construct a wharf and PHA promised not to interfere with Zachry's means and methods of construction.

**Trial Court**: Hon. Mike Engelhart, 151st Judicial District, Harris County.

**Jury Verdict**: The jury found PHA breached both §5.10 of the Bayport Terminal Complex Phase 1A Wharf and Dredging Contract ("the Contract") and Change Order 4 thereto. CR59:17390-91(A4).[1] The jury further (1) awarded Zachry $18,602,697 in damages, CR59:17392-93(A4);[2] (2) found that PHA's breach was not excused by waiver, equitable estoppel, quasi-estoppel, release, or fraudulent inducement, CR59:17396-99(A4); (3) found that PHA did not fail to comply with the Contract by withholding $600,000 for dredging from PHA's payment on amounts invoiced by Zachry, CR59:17402(A4); (4) with respect to the trial court's determination that PHA failed to comply with the Contract by failing to pay Zachry $2.36 million that PHA withheld as liquidated damages, found (a) PHA's breach was excused to the extent of $970,000 that PHA withheld from payments to Zachry for allegedly defective fenders, and (b) PHA's breach was not excused based on release, CR59:17405-06(A4); and (5) found the reasonable fees for the necessary services of PHA's attorneys totaled $10,697,750 for all stages of litigation and breach of contract theories, CR59:17407-08(A4).

**Judgment:** Judge Engelhart rendered judgment on the verdict, awarding

---

[1] Abbreviations in this brief are the same as in Zachry's previously filed briefs in this case. "PHASupp." refers to PHA's Post-Remand Supplemental Brief of Appellant.

[2] The jury found 58.13% of these damages to be delay damages, CR59:17394(A4), but the trial court entered an agreed order disregarding the jury's answer, finding that 100% of those damages were conclusively established to have been delay damages, CR60:17526.

Zachry $19,992,697 in damages, which the court calculated by adding the $2.36 million in improperly withheld liquidated damages the court awarded Zachry on directed verdict plus the $18,602,697 jury award for a total of $20,962,697, and then deducting the $970,000 offset found by the jury. CR62:18166(A1). The court declined to award Zachry the $600,000 that Zachry claimed PHA wrongfully withheld from Zachry's payments but that the jury had declined to award to Zachry. *Id.* The court also declined to award PHA attorneys' fees. CR62:18163-67(A1). The court awarded pre- and post-judgment interest and taxable costs. CR62:18166-67(A1).

**Court of Appeals**: PHA appealed, and Zachry cross-appealed. CR64:18706-11; CR64:18925-27. A panel of the Fourteenth Court of Appeals consisting of Justices McCally, Christopher, and Boyce heard oral argument. In an opinion authored by Justice McCally, the Panel reversed and rendered judgment against Zachry, holding that (1) the no-damages-for-delay provision in §5.07 of the Contract precluded Zachry's damages as a matter of law, (2) Zachry unambiguously released its claims for liquidated damages and for $600,000 withheld for dredging (Christopher, J., dissenting), (3) the trial court did not err in offsetting the judgment against PHA by $970,000 for allegedly defective wharf fenders, and (4) PHA should recover its attorneys' fees from Zachry. *The Port of Houston Authority of Harris County v. Zachry Construction Corporation*, 377 S.W.3d 841 (Tex. App.—Houston [14th Dist.] 2012), *rev'd*, 449 S.W.3d 98 (Tex. 2014)(A2).

**Supreme Court:** In a 5-4 decision, the Supreme Court reversed the Fourteenth Court's judgment. *Zachry Construction Corporation v. Port of Houston Authority of Harris County*, 449 S.W.3d 98, 119-20 (Tex. 2014)(A3). In an opinion authored by Justice Hecht, the majority held that Zachry's claim for delay damages was not barred by governmental immunity or by the no-damages-for-delay provision of the Contract. It also held that Zachry was entitled to recover liquidated damages withheld by PHA, but that there was some evidence to support the jury's award of the $970,000 offset for allegedly defective wharf fenders. Finally,

it concluded that PHA was not entitled to attorneys' fees. Because PHA had raised a number of other issues, the Supreme Court remanded the case to the Fourteenth Court for further consideration. *Id.* at 120(A3).

## ISSUES PRESENTED

1.    Breach of §5.10.    The jury's finding in Question 1 that PHA failed to comply with §5.10 of the Contract is supported by factually and legally sufficient evidence, because, *inter alia*,

  (a)    §5.10 provided PHA had no "right to control" Zachry's means and methods,

  (b)    no other provision of the Contract gave PHA such a right of control, and

  (c)    the evidence established that PHA exercised control over Zachry's means and methods by issuing a revise-and-resubmit order ("R&R Order") in response to Zachry's frozen-cutoff wall design.  *See* Argument Part I.A.

2.    Breach of CO4.  The jury's finding that PHA failed to comply with Change Order 4 ("CO4") is supported by factually and legally sufficient evidence, because, *inter alia*, PHA only challenges Zachry's interpretation of the change order—not whether PHA failed to comply with it—and the evidence established that PHA agreed in CO4 that Zachry could use the frozen-cutoff wall embodied in the September 9 design, thereby obviating any purported right PHA had to issue the R&R Order.  *See* Argument Part I.B.

3. <u>Instruction in Question 1</u>. The trial court did not abuse its discretion in instructing the jury in Question 1 that it was "not being asked to decide whether PHA failed to comply with §5.10." *See* Argument Part I.C.

    (a)    The instruction properly clarified that the jury was being asked to decide in Question 1 whether CO4 gave Zachry the right to use the frozen-cutoff wall embodied in the Sept. 9 design, and if so, whether PHA failed to comply with such a right, as distinguished from the question whether PHA complied with §5.10, which the jury considered in Question No. 2. *See* Argument Part I.C.

    (b)    PHA has not shown and cannot show reversible error, because the jury found in Question 2 that PHA failed to comply with §5.10; Zachry was entitled to a directed verdict on its claim for breach of CO4, and Question 1 should not have been submitted; and PHA has not otherwise shown harm. *See* Argument Part I.C.

4. <u>Damages</u>. The evidence was legally and factually sufficient to support the jury's finding of damages in Question 3. *See* Argument Part II.A. And the trial court did not abuse its discretion in refusing to exclude Draper's testimony. *See* Argument Part II.A.

5.    Causation.  The evidence was legally and factually sufficient to support the jury's finding that PHA's failure to comply with §5.10 and/or CO4 caused Zachry's damages.  *See* Argument Part II.B.

    (a)    Zachry offered sufficient evidence to support the jury's finding of causation, and expert testimony was not required.  *See* Argument Part II.B.

    (b)    PHA waived its argument that Zachry was required to prove that, absent PHA's breach, it would have completed all of Milestone-A in the dry before either February 15 or May 15, 2006.  *See* Argument Part II.B.

    (c)    The trial court did not abuse its discretion in charging the jury as to apparent authority, and PHA shows no harm.  *See* Argument Part II.C.

6.    Sections 5.41/5.42.  The trial court did not err in holding that §§5.41/5.42 (and §5.52 to the extent it imposes the same requirements as §5.41) do not bar Zachry's breach-of-contract claim based on the R&R Order.  *See* Argument Part III.

    (a)    The plain language of §§5.41/5.42 applies to changes during the performance of the Contract, not to PHA's breach of contract.  *See* Argument Part III.A.

(b)     The *Shintech* rule precludes application of §§5.41/5.42 to bar Zachry's breach-of-contract claim. *See* Argument Part III.B.1.

(c)     The radical-change doctrine precludes application of §§5.41/5.42 to bar Zachry's breach-of-contract claim. *See* Argument Part III.B.2

(d)     Section 16.071 of the Texas Civil Practice and Remedies Code precludes application of §5.42 to bar Zachry's breach-of-contract claim. *See* Argument Part III.B.3.

(e)     Zachry's compliance with §§5.41/5.42 was not tried to the jury because the trial court ruled before trial that §§5.41/5.42 were invalid and/or inapplicable, the jury was instructed that it could only consider §§5.41/5.42 for state of mind, and no jury question was submitted regarding §§5.41/5.42. Even if §5.42 could be considered to have been tried in such circumstances, there was factually and legally sufficient evidence that Zachry substantially complied with §5.42. *See* Argument Part III.C.

(f)     Because §§5.41/5.42 were inapplicable, the trial court did not abuse its discretion in instructing the jury that, to recover its damages from the R&R Order, Zachry was not required to obtain a §5.41 change order or give §5.42 notice, but could consider these provisions only in

assessing state of mind, and PHA shows no harm. *See* Argument Part III.

(g) Even if PHA could establish error with respect to §§5.41/5.42, the proper remedy is remand, not rendition. *See* Argument Part IV.D.

7. <u>Section 5.08</u>. The trial court did not abuse its discretion in excluding evidence that Zachry did not seek an extension of time under §5.08 for PHA's breach of contract, given that §5.08 does not apply to breaches of contract and is thus irrelevant; any probative value of such evidence is outweighed by the danger of unfair prejudice to Zachry; and PHA has shown no harm, because the evidence is not controlling on a dispositive, material issue, nor did it probably cause the rendition of an improper judgment. *See* Argument Part IV.E.

8. <u>Exclusion of $8.6 Million in Alleged Harms</u>. The trial court did not abuse its discretion in excluding PHA's claimed $8.6 million in alleged "actual harms" claimed as offsets based on PHA's failure to timely disclose any intent to seek these harms as an offset defense to be deducted from Zachry's damages award. PHA is not entitled to a new trial to try an additional offset defense based on the trial court's exclusion of PHA's claimed harms. *See* Argument Part IV.

9. <u>PHA's Open-the-Door Theory</u>. The trial court did not abuse its discretion in excluding a subset of PHA's claimed actual-harms evidence with respect to the

arbitrary-and-capricious and bad-faith no-damages-for-delay exceptions despite finding that the "door" had been "opened." *See* Argument Part V.

(a)     There was no misimpression to correct, because Zachry only argued that PHA promised that it would not charge liquidated damages if the crane-ship could dock when it arrived—not that PHA would not charge LDs if it suffered no harm at all. *See* Argument Part V.A.

(b)     In any event, the probative value of PHA's actual-harms evidence in refuting any minor misimpression would be substantially outweighed by undue delay and the danger of unfair prejudice to Zachry. *See* Argument Part V.A.

(c)     Any error in excluding the evidence was harmless. *See* Argument Part V.B.

10.     <u>Recklessness instruction</u>. The trial court did not err in instructing the jury that recklessness could support fraud based on a promise made with an intent not to perform. And PHA shows no harm. *See* Argument Part VI.

(a)     The Texas Supreme Court held that the trial court properly instructed the jury as to the no-damages-for-delay exceptions, including fraud. *See* Argument Part VI.A.

(b)     The instruction was consistent with Texas law and the pattern charge. *See* Argument Part VI.A.

(c) There is factually and legally sufficient evidence that PHA intentionally defrauded Zachry (as PHA claims it must be defined) by entering into CO4 with no intent to perform. *See* Argument Part VI.B.

(d) Even if error, remand for a new trial is not necessary, because the Court can be reasonably certain that the jury was not significantly influenced by the fraud issue. *See* Argument Part VI.B.

(e) PHA's evidentiary challenge to the fraud finding is limited to the sufficiency of the evidence to show that PHA knew that CO4 included an agreement that Zachry could use the frozen-cutoff wall, because that was the only basis for its evidentiary challenge in its original Brief of Appellant. *See* Aple.Br:48.

11. <u>Apparent Authority Instruction</u>. The trial court did not err in instructing the jury on apparent authority. *See* Argument Part VII.

(a) Apparent authority is a fact issue, and there was factually and legally sufficient evidence that CH2M-Hill had apparent authority. *See* Argument Part VII.A.

(b) The trial court did not abuse its discretion in finding that Zachry pleaded apparent authority. *See* Argument Part VII.B.

(c)    Any error in instructing the jury regarding apparent authority is harmless. Aple.Br:73-74.

12.    <u>Attorneys' fees</u>. PHA is not entitled to attorneys' fees if any judgment is entered for Zachry in this case. *See* Argument Part VIII.

13.    <u>Pass-through damages</u>. The trial court properly entered judgment allowing Zachry to recover damages that were incurred by the subcontractor that it created in a corporate reorganization and that performed some of the Contract work pursuant to a "pass-through agreement" with Zachry, as authorized by *Interstate Contracting Corp. v. City of Dallas*, 135 S.W.3d 605, 610 (Tex. 2004). *See* Argument Part IX.

(a)    Zachry asserted a valid pass-through claim. *See* Argument Part IX.A.

(b)    The trial court did not abuse its discretion in instructing the jury with respect to the pass-through damages. *See* Argument Part IX.B.

(c)    Governmental immunity does not bar Zachry's pass-through claim. *See* Argument Part IX.C.

14.    <u>Waiver</u>. PHA cannot obtain reversal of the judgment based on arguments not raised in the trial court, errors as to which PHA has shown no harm, errors raised for the first time in its supplemental brief, and errors as to which PHA on appeal has provided no meaningful argument and/or has not cited authority or evidence.

**STATEMENT OF FACTS**

In the Supreme Court, PHA and Zachry briefed the facts pertaining to PHA's multiple issues, all of which PHA raises again here. The Court observed the evidence "was hotly disputed" and the standard of review required it to view disputed evidence in Zachry's favor:

> In reviewing any case tried to a jury, we must view the evidence "in the light most favorable to the verdict"—in this case a verdict for [Zachry]—"crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not"....

*Zachry*, 449 S.W.3d at 101 n.3(A3). The Court recited the evidence "in that light."

*Id*.

The same standard applies to this Court's review on remand. Yet PHA never mentions the governing standard and ignores the Supreme Court's factual recitations pursuant to it. As a result, PHA erroneously portrays the evidence in the light most favorable to PHA, not Zachry.

This fact statement comports with the standard governing this Court's review on remand.

**I.    PHA hires Zachry to construct a wharf and understands Zachry plans to use a freeze-wall means and methods.**

In 1999, PHA hired DMJM to design a 1660-foot wharf. 6:8-9, 90. The project was subsequently delayed five years. 67:40-41; PX466.0004. In 2004, PHA hired CH2M-Hill as construction manager—PHA's on-site representative

1

and primary point-of-contact with the project's general contractor (ultimately, Zachry). 6:84-86; 20:38; 44:43-44.

That same year, PHA chose Zachry to build the wharf because, among other reasons, Zachry's unique means and methods of construction—a frozen wall—used fewer emissions credits, as the freeze-wall would enable Zachry to build the wharf primarily on dry land ("in the dry"), rather than in the water ("in the wet"). 7:15-16; 39:46.

Zachry's choice of means and methods was critical to sequencing construction tasks. The project originally entailed installing the following alongside the bay:

* a five-section, concrete wharf deck;

* thousands of under-deck concrete drilled shafts, or piers; and

* concrete revetment blocks protecting the under-deck soil slope. 9:25, 27-28, 59-61.

To accomplish these tasks in the dry, Zachry's unique means and methods entailed building a frozen, u-shaped soil berm around the construction site to hold back the bay. 9:58-61. Zachry would sink pipes into the berm and then freeze it by circulating sub-freezing brine through the pipes. While building the wall, Zachry would simultaneously build the wharf in the dry behind it, drilling concrete piers into the ground and then building the deck on top, using the ground as a concrete form. Zachry would then excavate dirt under the wharf and among the

2

piers using dry-land equipment (*e.g.*, bulldozers). Once the u-shaped berm was frozen, Zachry could excavate even deeper. As it completed excavation, Zachry would place revetment on the under-deck slope. Zachry would then breach the freeze-wall, allowing water to reach the wharf, and then remove the remainder of the freeze-wall in the wet. *See* 9:27-28, 59-73.

This plan depended on using the freeze-wall and—importantly—working in the dry until the freeze-wall was breached: a contractor working in the wet would never build the piers and deck **before** excavating, given the difficulty and cost of excavating and placing revetment underwater, beneath the deck, and among the piers. 9:76-77; 47:34.

By October 2003, PHA began asking Zachry about the effect of freezing soil near piers. 7:24-27; 37:31-32; PX49.0002-3; PX67; PX116. Among other precautions, Zachry and freeze-wall-designer Dan Mageau stated they would keep frozen soils nine feet away from the drilled shafts "wherever possible." PX6.006. Thus, if it were not possible, they would not. 9:149. PHA—which had no soil-freeze expertise—requested the nine-foot distance, which had no scientific basis. 29:62-63. Mageau, the project's only soil-freeze expert, established through tests provided to PHA that "one freeze-thaw cycle does not appear to reduce the shear strength in the soil." PX138.0014; PX7.0010; 29:106-08; *see* 21:112.

PHA and Zachry executed the Contract June 1, 2004. DX1. It was PHA's

form contract. 6:21-24. Given its 5-year delay, PHA imposed a tight, two-year completion deadline. 6:88; 64:22; DX1-1.0002. There was an interim deadline ("Milestone-A") of February 1, 2006 to finish 660 feet of wharf to allow a ship to deliver cranes from China. 9:79.

## II. The Contract makes Zachry solely responsible for choosing the means and methods of construction and precludes PHA control.

The freeze-wall (and later, frozen-cutoff wall) was undisputedly Zachry's construction means and methods. 6:76; 8:90, 94; 26:123; 37:52-53. Contract §5.10 made Zachry solely responsible for its means and methods and barred PHA interference:

> ***The Port Authority shall not have the right to control the manner in which or prescribe the method by which the Contractor performs the Work***. As an independent Contractor, the ***Contractor shall be solely responsible for supervision of and performance of the Work*** and shall prosecute the Work at such time and seasons, in such order or precedence, and ***in such manner, using such methods as Contractor shall choose***....

DX1-1.0214(A13).[3] Nothing in §5.10 permitted PHA to reject Zachry's methods. 27:26-27; pp.26-27.

PHA conceded §5.10's purpose was to "isolat[e] the Port Authority from having any responsibilities for the contract[or]'s means and methods," and "keep the responsibility and liability on [the contractor's] side of the table." 8:91, 93; *see* 6:39-42; 27:6-7. The Supreme Court recognized this "provision benefitted the

---

[3] Emphasis added unless noted otherwise.

4

Port, insulating it from liability to which it would be exposed were it exercising control over Zachry's work." 449 S.W.3d at 102 & n.4(A3)(citing *Gen. Elec. v. Moritz*, 257 S.W.3d 211, 214 (Tex. 2008)).

Consistent with this purpose, nothing in the Contract gave PHA the right to issue the October 11, 2005 revise-and-resubmit order ("R&R Order"). *See* pp.26-34. To avoid any claim of control and attendant liability, PHA did not approve or reject the main freeze-wall, but simply ensured it had been approved by a Texas Professional Engineer ("PE") and "accepted [it] for records." 37:115-16; 44:90; pp.28-29.

### III. PHA belatedly adds an extension to the wharf design and recognizes only Zachry can timely build it and only with the frozen-cutoff wall.

Nine months into the Contract—less than a year before Milestone-A—PHA belatedly realized its 5-year-old wharf design was too short, and added a 332-foot sixth section. PX130.0004; PX141.0016; 7:34-37. PHA concluded only Zachry could timely build the extension within emissions limits. PX3(A28); PX224(A24); 8:22-27; 22:103-07; 45:138-40; *see* 7:37-40, 78; 38:34-35; PX192.002. PHA knew Zachry was pressed to timely finish, and that PHA had to move quickly to avoid delay. PX164, ¶9; PX172 at 3; 7:35-37, 44, 84-85; 25:50-53; 45:79.

To accommodate PHA's belated addition, Zachry would have to modify its methods to add a "frozen-cutoff wall" to ensure it could timely complete Milestone-A to allow the crane-ship to dock and finish the remainder of the wharf

5

in the dry. 7:99-101; 9:138-39; 27:96; 38:51-53; PX8.0011(A20). On April 5, 2005, Zachry's Project Manager Andy Anderson told CH2M-Hill's Construction Manager Andy Thiess and Design Manager Jeff Ely that Zachry's extension proposal was based on using a frozen-cutoff wall, which he sketched and explained would encompass one B-row pier. PX8.0004-5, .0013(A20); 10:18-29; 21:128-30; 38:39, 46, 48-49, 61-62, 130-31. Thiess and Ely understood the frozen-cutoff wall would also be 4.5 feet from two rows of piers, and promptly sketched and described the wall to PHA officials, including Project Manager Jim McQueen and Bayport Engineer Mark Vincent (who reported to Chief Engineer Steve DeWolf, managed the project for him, and was charged with helping administer the Contract correctly on PHA's behalf). 7:32, 104-11; 21:104-08, 128-29; 24:120, 135-39; 38:62-63; 44:83; 45:41-46; 64:34-35; PX61.

PHA contends Thiess and Ely were not concerned about the design at the April 5 meeting because they believed the frozen soil would impact only the single B-row pier entirely encompassed by the frozen-cutoff wall. PHASupp:5. But Ely and Vincent testified they *were* concerned because the 4.5-foot distance between the frozen-cutoff wall and piers was *half* the nine-foot buffer Zachry said it would maintain "whenever possible."[4] 21:110-11, 138-39; 45:63; p.3. Furthermore,

---

[4] PHA's assertion that Thiess was unconcerned because he thought 4.5 feet (1½ pier diameters) was acceptable based on a "rule of thumb" was discredited: nothing documented the "rule," and PHA's geotechnical experts were unaware of it. 27:121-23; 38:68-69, 73-74.

Thiess, Ely, Vincent, and DeWolf knew the "freeze front" would migrate away from the freeze-pipes and "go around" the piers 4.5 feet away (if not stopped). 7:52-53, 106-14; 10:26-27; 21:139; 25:38-39; 29:68; 37:117-18; 45:63; PX138.0018. Ely told Vincent, Thiess, and McQueen that freezing would occur very close to some piers, in his view potentially reducing their capacity. 22:96-97, 128-29; 23:5-8, 24.

PHA also asserts Anderson had considered a frozen-cutoff wall as an *option* to help Zachry timely complete Milestone-A. PHASupp:4. However, PHA understood the frozen-cutoff wall became "***required*** if Zachry were going to do the extension" and still meet the Milestone-A deadline. 7:99-101; *see* 9:138-39; 10:31, 112; 27:96; 28:31-32; 38:51-53; PX8.0011(A20). The reason was simple. With the frozen-cutoff wall, Zachry could timely accommodate the crane-ship's arrival on one side of the cutoff-wall and still finish the remainder of the wharf, including the extension, in the dry on the other. 10:35; 38:38; 7:100-01; 28:31-33; PX172 at 4-5. Without the frozen-cutoff wall, the addition of the sixth wharf section meant Zachry would have to try to complete, excavate, and place revetment under the entirety of the now-20% longer wharf by the Milestone-A deadline; at that time, the main freeze-wall would be breached to dock the crane-ship, and Zachry would have to finish the entire project in the wet. 9:135-36; 21:94; 28:33-34; PX8.0011(A20).

**IV. PHA conceals its unsubstantiated "concerns" about the frozen-cutoff wall to induce Zachry into agreeing to build the extension.**

On April 13, 2005, Zachry sent PHA a proposal to build the wharf extension based on an "[u]ninterrupted work process" and the "[u]se of a freeze wall—cut off wall, encompassing one (1) 'B' row piling." PX9(A21); 10:111. These conditions were unchanged by a May 18 proposal and July 11 supplemental proposal. PX179(A22); PX219(A23).

PHA understood Zachry's price was based on these conditions, and that the frozen-cutoff wall in the proposals was the same one described to Thiess and Ely on April 5. 22:22-25; 25:44-47; 38:96-97; 45:75-76. PHA also knew the frozen-cutoff wall was Zachry's only means and methods to timely complete the wharf. 22:125-26; 26:119-20; 38:112; 45:103-04; 46:40.

Even though PHA knew the frozen-cutoff wall was "required," it never told Zachry its concerns, 11:13; 22:96, 146, despite knowing quick resolution of such concerns was critical to avoid delaying Zachry under the tight schedule. PX46.0001; 7:43-44, 67-68; 20:53-56.

The Supreme Court recognized that PHA—afraid Zachry might decline to build the extension—induced Zachry into entering Change Order 4 ("CO4") to build it by intentionally concealing PHA's concerns about the frozen-cutoff wall:

> As a practical matter, only Zachry could perform the additional work. . . . The Port had reservations about this [frozen-cutoff wall] plan. But the Port was also concerned that if it rejected Zachry's plan, Zachry

might simply refuse to undertake the addition of a sixth section. *So the Port did not raise its concern with Zachry*.

449 S.W.3d at 102-03(A3).

The Supreme Court's conclusion was amply supported. PHA knew only Zachry could build the extension without undue additional cost and delay. *See* p.5. But Zachry was already on a tight schedule. *See* pp.4, 5. Adding the sixth section meant Zachry would have to do 20% more work, p.7, though CO4 would only extend Milestone-A by 15 days, *see* p.4; PX12.0004 (A30).

However, PHA had not signed CO4. 8:36; 27:40. As a result, Zachry could not begin working on the extension, exacerbating the already-tight schedule. PX225 at 4-5; PX226 at 3-6; PX228; PX229; PX232 at 13; 10:52-54, 68, 73; 26:68; 18:84-87; 26:93-94, 102-09. And Zachry was not contractually bound to build it. 27:40. PHA Project Manager McQueen blamed PHA "bureaucrats" for the delay. PX215 at 7.

Aware of Zachry's time-crunch and that Zachry was not yet bound, PHA "management [wa]s afraid ZCC w[ould] back out of the extension agreement." PX280(A29); 27:40; 45:113. PHA therefore acted to keep Zachry on the hook by inducing it into CO4.

First, although PHA knew throughout the summer of 2005 that Zachry projected it would not timely complete Milestone-A (because Zachry was including an extension of time it claimed under Contract §5.08 due to a global-

9

cement shortage), PHA decided to pay Zachry anyway and delay taking any formal action against it—such as demanding a recovery schedule—until *after* CO4's execution. PX159; PX176; PX210; PX280(A29); PX319; 18:143-49; 22:109-11; 27:36-40; 39:17-18; *see* p.17.

Second, PHA allayed Zachry's concerns about the $20,000/day Milestone-A liquidated damages ("LDs"). PHA had denied Zachry's request to extend Milestone-A based on the global-cement shortage. PX159; PX175; PX176; 25:60-61. Zachry thus sought assurances that PHA would not charge LDs if the crane-ship could dock upon arrival. 25:66-67; PX177. In that case, PHA would not be charged demurrage—the basis for Milestone-A's $20,000/day LDs. 45:65-66; *see also* PX935 at 1, PX936 at 4; DX1-1.0021(A17). Recognizing the ship was delayed, PHA's Vincent told McQueen that "[a]lthough we will not put it in writing," McQueen should tell Zachry PHA "will not charge penalties if no expense or loss to PHA occurs…." PX176; 28:71. McQueen complied, telling Anderson PHA would not charge LDs if the ship could dock upon arrival (because PHA would not be charged demurrage). 10:41; *see* 28:74.

Although PHA contends it promised not to charge LDs only if PHA sustained *no harm whatsoever*, McQueen confirmed Zachry's understanding: he testified PHA acted contrary to its promise in charging LDs even though the crane-ship docked upon arrival. 28:74; *see also* PX205.0002. The Supreme Court

10

correctly concluded that "[i]n negotiating [CO4], PHA had promised not to impose [LDs]...as long as the [crane-]ship…could dock when it arrived," but "[n]evertheless, after the ship successfully docked,…began withholding [LDs]." 449 S.W.3d at 103(A3).

Third, despite its "concerns" about the frozen-cutoff wall it knew was "required" to allow Zachry to meet Milestone-A, PHA did not object to it before CO4 was signed.  11:13, 106; 19:80-81; 22:76, 96, 119.  PHA instead *agreed* in CO4 that Zachry could use the frozen-cutoff wall.  *See* pp.12-13, 33-34.

## V. PHA waits to reject the frozen-cutoff wall until *after* Zachry is bound by CO4, which plainly incorporates the frozen-cutoff wall.

On September 9, 2005, soil-freeze expert Mageau sent Zachry the frozen-cutoff-wall design. PX10(A25).  It was identical in all material respects to the wall discussed at the April 5 meeting and incorporated into the proposals.  PX10.0001-.0002, .0005(A25); 8:42-43, 53; 10:94-98, 111; 22:73-77; 29:123-24.

Anderson directed the design be sent to PHA "for review.  Not approval—but review."  PX267; 10:92-93.  On September 12, Zachry labeled the design "Correspondence" (not "Submittal") and uploaded it to PHA, noting PHA could "see what will be happening and gather questions."  PX897; 8:39; 11:33-34; 38:152, 157; 45:143.  PHA knew it was not provided as a Submittal, and that Zachry was not asking for approval, just comments.  38:152-53, 157; 45:143-44.  Like the main freeze-wall, PHA could review it for a Texas PE's approval, but

11

could not approve, reject, or order Zachry to revise and resubmit it. 9:49-50; 11:28; 22:70-72, 93-94; 23:91-92; DX5.002; pp.5, 28-29. CH2M-Hill's Thiess told PHA's McQueen internally, "[t]his isn't going to be an approval-type thing," PX274 at 3(A26); 39:37-38, but recognized PHA "need[ed] due diligence to identify and communicate any technical issues," PX11(A27); 22:93-94.

Based on the September 9 design, PHA's Vincent and McQueen understood the frozen-cutoff wall "was freezing up and near the shafts." 46:5; *see* 26:150-52. CH2M-Hill's Ely noted they needed to "verify the freeze wall won't reduce the capacity of the…piers." PX11(A27). Nevertheless, PHA management on September 14 formally recommended PHA execute CO4. PX3(A28); 26:161-63; 39:44-49; 45:147-48.

PHA finally executed CO4 on September 27. PX12.0002(A30). As the Supreme Court recognized, CO4 gave Zachry the right to use the frozen-cutoff wall embodied in the September 9 design:

> To complete the two sections of the wharf needed by February 2006 and to continue to work 'in the dry,' Zachry proposed to build another freeze-wall—a cutoff wall—through the middle of the project....Change Order 4, ***using Zachry's approach to add a sixth section of the wharf***...was finalized September 27, 2005.

449 S.W.3d at 101, n.3(A3).

CO4 provided Zachry would construct the extension "in accordance with the attached Scope, Time and Price Modifications," which incorporated Zachry's

12

proposals conditioned on an "[u]ninterrupted work process" and the "[u]se of a freeze wall—cutoff wall, encompassing one (1) 'B' row piling." *See* pp.8, 33-34; PX12.0001, .0004(A30); 26:112-14.  PHA had reviewed the September 9 design, which embodied the April 5 design described in the proposals, for *two weeks* before executing CO4.  10:111-16, 118, 8:50-51; 22:92, 119-20; 27:37; 45:147-48; p.34.

Although PHA's Vincent and McQueen had known for two weeks (and really since April 5, p.6-7) that the frozen-cutoff wall design involved freezing near piers, Ely—on the same day PHA signed CO4—reiterated to McQueen that frozen soils would be kept only one foot from piers, allegedly putting 23 piers "at risk for capacity reduction." PX286.  He did so despite freeze-soil expert Mageau's tests proving "one freeze-thaw cycle does not appear to reduce the shear strength in the soil." *See* p.3.

On September 28, Mageau provided PHA more analyses proving that even if soil were frozen *all the way around* the piers, there would be virtually no increase in settlement.  PX14.0001(A31); 22:150-51; 27:66; 29:76-77; 39:66-69.  PHA knew there was no reason for concern.  39:66-69; PX504(A36).  But no one associated with PHA would take responsibility for allowing Zachry to move forward:

\* McQueen told CH2M-Hill "I have a problem and we need an answer ASAP," and that Ely and Thiess had "to take the lead in resolving this

13

problem w/a solution."  PX301.

* CH2M-Hill would not opine on the design, because it did not want to incur liability for Zachry's methods.  23:89; 30:84-85; 46:43.

* Wharf-designer DMJM refused to review the design because it was Zachry's means and methods.  30:63-64; 46:41-42.

* PHA had not yet hired its geotechnical engineer, GeoTest, to review the design, and knew GeoTest would never give a definitive answer anyway. PX1(A32); 23:23, 75-76.

Instead, Ely surveyed CH2M-Hill's geotechnical experts about his "concern," explaining he wanted to "give our client some guidance *without incurring additional liability if possible*."  PX15; 22:157-61; 23:25-28.  Most responders— including some with soil-freeze experience—concluded the design presented no concern.  PX290; PX292; PX293; 23:31-47; 46:19-24.  Nevertheless, Ely disregarded these geotechnical experts, and sent PHA a memo expressing unsubstantiated "concerns" about this geotechnical issue "from a *structural* engineering, not *geotechnical* perspective."  PX301; 23:56-62; *see* PX11(A27).

PHA conceded at trial it had not determined—or even tried to determine— that the frozen-cutoff wall was likely to adversely affect piers,  8:79-80, 89-90; 22:84; 23:97, 101-02; 24:112-14; 27:32, 80-84; 46:30-36, 58-59, although Chief Engineer DeWolf expected his engineers to get GeoTest involved,  6:7, 10; 7:110-14.  PHA's only information consisted of soil-freeze expert Mageau's reports proving freezing would have no adverse effect. 24:112-13; 27:66; 39:96; 46:27,

14

30-31, 57-59; PX14(A31); PX138.0014.

## VI. PHA issues its R&R Order, which everyone understands rejected the frozen-cutoff wall and which Zachry makes clear to PHA constitutes a breach.

Despite knowing the tight schedule and imminent Milestone-A deadline, pp.4, 5, 9, on October 11, 2005, PHA switched the September 9 design's label from "Correspondence" to "Submittal" and issued the R&R Order. PX266(A33); 11:31, 33-34; 27:82, 88-89. The order expressed concern about freezing's effect "on the friction resistance of the piles," and stated "*preliminary indications* are that the design *may* have an *indeterminate affect* [sic] on a significant number of nearby shafts which *may* present unacceptable *risk* to the Port"—a concern Vincent and McQueen admitted was "speculation." PX266(A33); 27:84; 46:49-50.

Everyone knew the R&R Order rejected the frozen-cutoff wall. *See, e.g.*, 39:133-36; PX1(A32); PX2(A35); PX358.0001. PHA conceded this at trial. 4:94; 27:74; 39:135. The frozen-cutoff wall was undisputedly Zachry's means and methods, and Zachry had the right to use it under Contract §5.10 and CO4. *See* pp.4-5, 12-13, 26-34. Yet, as the Supreme Court recognized, "[t]he practical effect of the Port's [R&R] order was to refuse to allow the construction of the cutoff wall." 449 S.W.3d at 103(A3); *see* 8:69-70; 21:58-59; 45:34-35; DX1-1.0219-20, §5.22(A13) (subject of revise-and-resubmit order "may not be used for performance of the Work"). Although PHA now claims Zachry could have offered

15

a means of mitigating the frozen-cutoff wall's "risk," PHA demanded a nonfrozen alternative. PX4.0003 ("The cut-off wall…cannot be constructed using freeze-wall technology."); PX314 at 3-4(A34); 11:56; 23:101; 27:87-88; 68:114.

Although PHA mischaracterizes this as a "secret breach," the Supreme Court correctly concluded Zachry told PHA it was a breach: "Zachry protested that, under [§]5.10…, the Port had no right to determine the method and manner of the work, but the Port would not budge." 449 S.W.3d at 103(A3). At the October 11 meeting where the R&R Order was delivered, Anderson immediately objected that it was contrary to the Contract: he told PHA the design was "not a submittal that requires approval," but "is for information purposes only," and Zachry's risk to accept. PX314 at 4, 6-7(A34); 11:33-34, 39; 18:127-28; 23:102-04; 27:88-89. McQueen responded, "I understand." PX314 at 7(A34). McQueen expressed concern PHA could be liable and admitted he knew Anderson was saying PHA violated the Contract. PX1(A32); PX287; 23:82-85; 27:48-49, 89-90, 93-94; *see also* 44:82-83 (Vincent). Later on October 11, Anderson told Thiess the R&R Order was a breach. 11:40-41. A month later, Thiess acknowledged Zachry had claimed PHA's "rejection of the cutoff-wall design is a breach of the change order contract." PX2(A35); 39:130; 68:122.

## VII. PHA's rejection of the frozen-cutoff wall forces Zachry to complete construction in the wet.

Contrary to PHA's claim that Zachry voluntarily switched to working in the

wet, the evidence establishes PHA forced Zachry to do so. First, PHA barred Zachry from using its frozen-cutoff wall—the means and methods PHA knew was "required" to timely complete the wharf in the dry, given the additional extension work. *See* pp.7, 8, 15. Then, three days later, despite having known for months that Zachry projected a delayed Milestone-A completion, pp.9-10, 18. Chief Engineer DeWolf for the first time sent Zachry a letter demanding a recovery schedule (showing Zachry would finish by the Contract deadlines, which were conditioned on the frozen-cutoff wall) and threatening LDs. PX319; 19:29-31. Higher-ranking PHA officials repeated this demand in October and November. *See, e.g.*, 40:32-33, 38-40; 46:82-83; 66:86-87; DX85; DX205.003; PX373.0003; PX925. *See also* 35:6; 36:5-7.

By demanding a recovery schedule after barring Zachry's frozen-cutoff wall, PHA necessarily forced Zachry to begin working in the wet far earlier than it otherwise would have. 18:115-17, 123-26; 28:31-33; *see* 9:137-38; 11:82-96; 19:33-50; DX404. Without the frozen-cutoff wall, neither Milestone-A nor the remainder of the wharf could be constructed in the dry. 9:137-38; 11:85-86; p.7, 20. There was no viable alternate cutoff wall. 46:83; p.20. This demand constituted a direction to perform additional work, because—as PHA knew, 40:131; 46:133-34; PX373.0003; PX461—building the wharf in the wet would take far more time and money than building it in the dry, *id.*; 10:62; 29:40-42;

33:6; 47:60-61; 52:31, 102; 61:110.

Zachry refuted PHA's assertion that Zachry voluntarily switched to working in the wet because it could not meet the schedule using the freeze-walls. In late September/early October, Zachry was still projecting a March 22 Milestone-A completion. 18:116-18; DX404. But PHA knew—based on reports from PHA's on-site inspectors and Zachry's scheduler—that Zachry could finish Milestone-A by the February 15 deadline and that schedules showing a March 22 completion were a "paperwork trail" preserving Zachry's claim for extension of time based on the global-cement shortage.[5]  PX251; PX252; PX283; 26:100-02; 45:103-05; 65:92-93, 99-100, 105; pp.9-10.

Three days after PHA's rejection, Mageau projected Zachry could finish Milestone-A by the February 15 deadline and certainly by March 22—before the crane-ship's arrival. PX320; 30:115-16; 32:105-06. And Larry Applegate, the freeze-wall subcontractor's president, stated on November 11, 2005 that freeze-down Phase 1 could begin immediately with the remainder starting by Thanksgiving. PX360.0002; 33:47, 50-54. Mageau and Anderson agreed, despite freeze-pipe-related and other challenges Zachry faced. 18:105-11; 30:115-18; 32:100-01; PX320. This would have allowed Zachry to finish Milestone-A before

---

[5] Anderson's comment post-Hurricane Rita that there wasn't "a snowball's chance in hell of having that wharf open by March...'cause the math don't work,'" DX1157A, referred to Zachry's 9-day extension request for hurricane-caused delays. 19:113-15. Adding 9 working days to the projected March 22 date pushed completion into April. *Id.*

the crane-ship arrived.  19:43-45.

PHA points to schedules Zachry created on October 31 purportedly showing Zachry finishing much later than projected in its October 3 schedule.  But the October 31 schedules were unfinished, non-concurrent schedules: they listed tasks end-to-end rather than accurately reflecting concurrent performance, thereby appearing artificially lengthy. 40:45-47, 55. *See* PX779.0005; PX777.0005; PX780.0005; 18:119-23; 19:50-55; 28:11-13, 16.

More importantly, these schedules were brain-storming exercises created *after* PHA's October 11 rejection of the frozen-cutoff wall that PHA knew was "required" to allow Zachry to meet the Milestone-A deadline.  *See* pp.7, 8, 11. Without the frozen-cutoff wall, it was difficult for Zachry to create schedules without knowing its means and methods. 19:38-43; 40:69-79; 46:67.  Zachry created 38 draft schedules in an attempt to determine which construction method to use. 11:83-87; 40:70-71; PX373.  Unlike the pre-October 11 schedules, none used a frozen-cutoff wall under the wharf—thus confirming its rejection. 18:124-25; 35:101; 46:76-82; *see* 28:22, 31-33.

PHA contends the schedules showed Zachry would finish soonest by removing the main freeze-wall and working in the wet.  PHASupp:12.  But these schedules were the result of PHA's rejection of the frozen-cutoff wall—combined with the lack of a viable alternate-cutoff wall.  Zachry's alternate-cutoff-wall

schedule projected a later finish date because the alternative method of building the cutoff wall was still "unidentified," and Zachry had to project extra time to design it, procure materials, and build it. PX779; 40:45, 48; 46:91. Zachry quickly determined an alternate cutoff wall was not viable, because there were serious doubts it could be designed and no time to implement it, given the imminent Milestone-A deadline. 19:38-50; 28:22; 46:78-79, 90-92. Indeed, when Mageau delivered an alternate-cutoff-wall design on November 16, it was unworkable, unsafe, and could have damaged piers. 11:50, 52-58; 19:45-50; 42:64-67, 77-79, 91-98; PX366; PX931 at 19-21; *see* 58:107-08.

PHA's rejection of the frozen-cutoff wall made meeting the Contract deadlines "an impossible task," in light of the wharf extension. 19:57-60. Without the frozen-cutoff wall, Zachry would now have to complete the entire main freeze-wall, freeze it, and excavate the entire 2,000 feet of the now-extended wharf by the Milestone-A deadline, 28:33-34—all of which would take far longer than the prior plan of completing only the Milestone-A area. 11:45-49; 32:131-33. For this reason, someone at Zachry noted on November 3 that—in the absence of the frozen-cutoff wall—the main "freezewall" was "killing [the] baseline schedule." DX82.006; 19:56-58.

Given PHA's rejection and recovery-schedule demands, Zachry's only hope of meeting the Milestone-A deadline was to use the unfrozen berm as a seawall as

long as possible, completing Milestone-A and excavating under the wharf as quickly as possible, then breaching the berm for the crane-ship's arrival and finishing the remainder in the wet. 11:87-89. The Supreme Court correctly concluded that, following the R&R Order, "Zachry's only option was to finish the western-most sections in time for the ship from China to dock, then remove the wall altogether and continue to work 'in the wet,' which would delay completion of the project and increase its cost." 449 S.W.3d at 103(A3).

Having now deprived Zachry of its freeze-wall methods, PHA grew concerned about its liability. 24:70-73. It met with lawyers, and on November 18 told Zachry, "[i]n accordance with...[§]5.10," PHA had no right to interfere with Zachry's methods. PX18; 46:123-24. But PHA did not withdraw its rejection. 46:126. Instead, PHA insisted PHA's lawyers choose from among the schedule options, and they chose an in-the-wet schedule with a May 28 Milestone-A completion date. PX367.002; PX373.0002, PX380; 19:66-71; 40:120-22, 128.

On January 16, 2006, Zachry sent PHA a letter confirming its change to working in the wet was the "direct result" of PHA's rejection of the frozen-cutoff wall, recovery-schedule demands, and LD threats. PX20.0003.

## VIII. Working in the wet causes Zachry substantial damages for which it sues.

Zachry worked in the dry behind the berm as long as possible. 47:47-58. After it was breached, Zachry completed the wharf in the wet under "nightmare"

21

conditions, excavating and placing revetment underwater beneath the deck with almost zero visibility. 29:40-42; 40:131; 47:79.

Zachry sufficiently completed Milestone-A to allow the crane-ship to dock upon arrival May 15, 2006. 11:117; 40:131-33; 47:68-69; PX893.0076. Yet PHA back-charged Zachry $2.36 million in LDs from the Milestone-A deadline forward, although PHA incurred no demurrage. 40:131-32; 45:72-73. McQueen admitted this was contrary to his promise. 28:73-74.

In October 2008, Zachry substantially completed the project. 47:80-81; PX578. Despite heavy losses, Zachry sought only damages caused by PHA's breach—the increased cost of construction as a result of PHA's delays and forcing Zachry to work in the wet earlier than it otherwise would have. 47:86-87.

After a three-month trial, the jury found PHA failed to comply with CO4 and §5.10, causing Zachry $18,602,697 in damages. CR59:17390-93(A4). The judgment awarded those damages, plus $2.36 million PHA withheld as LDs, minus a $970,000 offset for wharf fenders, for a recovery of $19,992,697, plus interest. CR62:18166(A1).

This Court, based on its holdings that the no-damages-for-delay clause precludes Zachry's recovery and that PHA's release defense barred Zachry's recovery of the LDs, reversed and rendered judgment that Zachry take nothing and PHA recover $10,500,000 in attorney's fees, plus contingent appellate fees. 377

22

S.W.3d at 865(A2).

The Supreme Court held governmental immunity did not bar Zachry's claims, reversed this Court's judgment regarding the no-damages-for-delay clause and LDs, and remanded. 449 S.W.3d at 119-20(A3).

## SUMMARY OF ARGUMENT

The Supreme Court rejected PHA's main appellate points—immunity, no-damages-for-delay, and release. PHA is left with a laundry list of second-tier arguments that largely invite this Court to revisit evidentiary disputes resolved by the jury, issues committed to the trial court's discretion, and issues the Supreme Court previously decided against PHA. PHA's invitation should be declined.

In Questions 1 and 2, the jury properly rejected PHA's contrived reading of CO4 and §5.10. Unlike Zachry, PHA offers no interpretation that harmonizes all Contract provisions and satisfies PHA's business purpose—to avoid liability from control of Zachry's methods. PHA's challenge to the damages and causation findings in Question 3 likewise ignores the substantial evidence supporting them.

Nor do Contract §§5.41/5.42 bar Zachry's claims. These "changes" clauses plainly allow PHA to change the scope of the Work during Contract performance. They do not govern Zachry's rights in the event of a PHA *breach*. If they did, they would be inapplicable under common-law and statutory rules.

PHA's remaining arguments are also without merit. The trial court did not abuse its discretion in rejecting PHA's eleventh-hour attempts to inject $8.6 million of claimed "harms" into the case. Furthermore, as the Supreme Court held, the trial court properly instructed the jury on the no-damages-for-delay exceptions, including recklessness. The trial court did not abuse its discretion in finding

24

Zachry pleaded apparent authority, and its instruction was proper. And PHA is not entitled to attorneys' fees so long as the judgment awards Zachry damages. Finally, PHA's attempt to deny Zachry pass-through recovery for the work of its subcontractor—a Zachry entity created during corporate restructuring—contravenes *Interstate Contracting v. City of Dallas*, 135 S.W.3d 605, 610 (Tex. 2004).

**ARGUMENT**

## I.    Ample evidence supports the jury's breach-of-contract findings.

PHA contends the Contract and CO4 unambiguously authorized PHA to issue the R&R Order barring Zachry's freeze-wall means and methods. But PHA fails to "consider the entire writing and…harmonize and give effect to all the provisions…." *Frost Nat'l Bank v. L&F Distrib'rs*, 165 S.W.3d 310, 312 (Tex. 2005). Nor does PHA "construe [the] contract[] from a utilitarian standpoint bearing in mind the particular business activity sought to be served." *Id.* PHA also ignores that specific provisions control over general. *See McCreary v. Bay Area Bank & Trust*, 68 S.W.3d 727, 731-32 (Tex.App.—Houston [14th Dist.] 2001, pet. dism'd).

Applying these principles, there is only one reasonable interpretation: PHA had no right to issue the R&R Order. At a minimum, Zachry's reading is reasonable, and ample evidence supported the jury findings in Questions 1 and 2.

### A.    Section 5.10 prohibited PHA's R&R Order, and no other Contract provision authorized it.

#### 1.    Section 5.10 forbids PHA control of Zachry's means and methods.

Section 5.10 plainly barred PHA from controlling Zachry's means and methods, which undisputedly included the frozen-cutoff wall. *See* p.4. It stated, "*[PHA] shall not have the right to control the manner in which or prescribe the*

***method*** by which the Contractor performs the Work," and that Zachry was "an independent Contractor…***solely*** responsible for the supervision and performance of the Work…in such manner, ***using such methods as Contractor shall choose***." DX1-1.0214(A13).

This prohibition on PHA control was not "***subject to***" the "proviso" at the end of §5.10, PHASupp:1: it merely clarified that Zachry's right to choose its methods did not eliminate its obligation to comply with the Contract. DX1-1.0214, §5.10(A13) ("…provided, however…the order, time, manner and methods of prosecution shall be…in accordance with the Contract Documents"). When the R&R Order was issued, Zachry ***was*** in compliance with the Contract; PHA does not argue otherwise.

As discussed below, some Contract provisions allowed PHA to receive means-and-methods-related submittals. However, none authorized PHA to ***exercise control over Zachry's*** methods by barring Zachry from using them and ordering Zachry to revise them. Arguing these clauses granted PHA such control fails to harmonize all Contract provisions and renders §5.10's prohibition on PHA control meaningless. It also vitiates PHA's business purpose: "insulating [PHA] from liability to which it would be exposed were it exercising control over Zachry's work." 449 S.W.3d at 102 & n.4(A3); *see* pp.4-5. Finally, PHA's

27

argument improperly gives controlling weight to *general* provisions relating to submittals, like §5.22, rather than *specific* provisions, like §5.10.

### 2. Section 4.07 forbids PHA control over Zachry's health-and-safety plans.

Contract §4.07 required Zachry to submit a health-and-safety plan to PHA, but made clear PHA could not control it:

> Notwithstanding the Chief Engineer's review of the health and safety plan, *the Contractor, and not the Port Authority, shall be responsible for and have control over ensuring the safety* of its personnel and its Subcontractors…

DX1-1.0204(A13).

Zachry agreed to submit the main freeze-wall design as a shoring-safety-plan addendum to its previously filed health-and-safety plan, "in accord[] with Technical Specification ['T.S.']02161(1.3)" and "conforming to OSHA standards, with a statement signed and sealed by a registered Professional Engineer licensed in…Texas." PX86; *see* DX1-1.0325, §1.3(A14); PX93.0007; 21:78; 6:60.

T.S.02161 required the shoring-safety plan to include details about the Contractor's means and methods but did not authorize PHA to control them. DX1-1.0325, §1.3(A14). Nor could it: T.S.02161 was expressly "[s]ubject to the General and Special Conditions," which included §5.10 and §4.07. DX1-1.0324, §1.1(A14). Instead of PHA approval, T.S.02161 required Zachry to obtain a Texas PE's approval. *Id.* The purpose of this review was to ensure the shoring plan

28

satisfied OSHA safety rules, so the wall would not harm workers; as PHA witnesses testified, it did not allow PHA to approve or reject the wall based on any purported effect on the wharf. 6:62-67; 7:62; 20:111; 27:19-21; 37:106-07. The Texas PE's approval ensured PHA would not be liable for Zachry's activities. 44:90.

Consistent with §4.07 and §5.10, PHA did not "approve" the original freeze-wall design, but rather "accepted [it] for records" based on the Texas PE's certification. 37:115-16, 120-21; 37:114-16; 38:5-6, 156-57; 44:100-01, 109-11; 45:32; PX88(A19). PHA's witnesses testified PHA did not approve or reject the original freeze-wall or safety submittals to avoid claims it controlled Zachry's methods and any attendant liability. 37:115; 44:95-97. No one contemplated PHA could approve or order Zachry to revise its main freeze-wall plan: Zachry built it and installed freeze-pipes *before* giving PHA the design. 44:110-11.

### 3. None of PHA's other cited provisions authorize the R&R Order.

**Section 5.22.** Although §5.22 allowed PHA to "*review*" Submittals "to determine whether Contractor is complying with…the Contract Documents," it did not authorize PHA to control Zachry's means and methods—contrary to §5.10—by rejecting them.

Consistent with §5.10 and §4.07, §5.22 specifically forbade PHA to approve Zachry's safety plan or means and methods: "The Port Authority's…review and

29

acceptance of the Contractor's Submittals shall not constitute approval of safety precautions or any construction means, methods…." DX1-1.0220(A13); 6:70-71. Thus, §5.22 insulated PHA from liability for Zachry's methods. 6:57, 71.

In contrast, §5.22 did not disclaim PHA's right to approve Submittals relating to matters PHA *was* authorized to control under the Contract: Submittals relating to the "Work." Section 5.22 required Zachry to provide submittals to PHA's Design Consultant, DMJM, "showing all materials and details of **Work** to be incorporated into the Project." DX1-1.0218(A13). "Work" was defined as "the construction" and "services" "required by the Contract" or "pursuant to the Contract." DX1-1.0190, §1.42. Thus, the wharf and any contractually specified means and methods—for example, the Technical Specification requiring a particular method for vibrating concrete pours—would be part of the "Work" and subject to PHA approval. 6:47, 53-55; 9:36-37; 21:33; DX1-10430. This ensured the permanent Work (wharf) was built according to the Contract specifications. 6:58-59; 8:11.

In contrast, Zachry's chosen means and methods—the freeze-walls—were not required by the Contract, 20:96; 37:66, 99; 44:78, would not be part of the Work, 21:33, 63; 27:11, and would not be required Submittals under this clause, 6:54-57, 59, 74-75; 21:71-73; 37:99. In August 2004, Thiess confirmed this: "[r]egarding the freeze wall, we have no requirement for a submittal as it was not

anticipated by the designers." PX84(A18). PHA's designer refused to approve any freeze-wall, because it was *Zachry's* means and methods. 20:110-11; 44:95; PX93.0007. Submittals relating to *Zachry's* safety plan and methods were controlled by §5.22's prohibition on PHA approval.

**T.S.01500.** Although T.S.01500 required Zachry to protect the Work, it did not authorize the R&R Order. DX1-1.0271, §1.1A(A15); 27:29-30. T.S.01500 was "[s]ubject to the General and Special Conditions," DX1-1.0271, §1.1A(A15); *see* DX1-1.0191, §2.02(a)(A13), including §5.10's bar on PHA control, and §4.07 and §5.22's prohibition of PHA approval of Zachry's safety plans and methods. Consistent with PHA's goal of avoiding liability, T.S.01500 required Zachry to fix any damage "***done by, or on account of...the Contractor***." DX1-1.0278, §1.11A.4(A15). PHA's argument grants PHA control, destroying this protection.

**Section 1.39.** Nothing in §1.39 authorized PHA to order Zachry to revise *Zachry's* means and methods. It defined "Submittals" as "information provided by [Zachry] ***for approval*** of proposed Equipment, Materials, means or methods." DX1-1.0189(A13). Critically, §5.22 prohibited PHA from approving *Zachry's* means and methods (as opposed to contractually specified methods). *See* pp.29-31. Thus, any submission of Zachry's methods was not "information provided by [Zachry] ***for approval***." And reading §1.39's ***general*** "Submittal" definition to authorize the R&R Order improperly allows §1.39 to control over §5.10 and

31

§4.07's *specific* prohibitions on PHA control.

### 4. PHA is not remediless.

PHA contends Zachry's argument deprives PHA of any recourse if PHA believed Zachry's means and methods "***could*** cause the Wharf to collapse." PHASupp:25. Even if such a belief could authorize the R&R Order, ample evidence established PHA did not actually or reasonably believe the frozen-cutoff wall could cause wharf collapse. *See* pp.13-15.

Furthermore, the Contract contains numerous provisions allocating to Zachry the risk of damage from Zachry's methods and providing PHA a remedy. *See, e.g.*, DX1-1.0198, .0200, .0223, .0229, .0234, §§ 3.06, 3.08, 5.36, 5.53, 6.14(A13); DX1-1.0278, §1.11A.4(A15); 9:33-35; 27:13-18, 23-25. And if PHA were truly concerned about wharf collapse, it could terminate the Contract without cause. DX1-1.0227, §5.47(A13). The one thing the Contract did ***not*** allow PHA to do was control Zachry's means and methods by issuing the R&R Order. PHA drafted the Contract, pp.3-4, and the Court should not rewrite it to grant PHA rights omitted from it and contrary to PHA's business purpose.

### 5. The drilled-shaft submittal is consistent with Zachry's reading.

PHA suggests Zachry's drilled-shaft submittal shows PHA's right to issue the R&R Order. PHASupp:2. But it related only to piers—which were part of the "Work," which PHA had the right to approve—not Zachry's freeze-wall methods,

which PHA had no right to approve. *See* PX6; PX69; 7:45; pp.26-32. PHA recognized this, warning "any ice…encountered during drilled-shaft construction will be cause for rejecting *the affected work*"—not Zachry's freeze-wall methods. DX133.002

## B.  PHA's R&R Order breached CO4.

PHA argues CO4 did not "delete PHA's §5.22 right to require Zachry to revise and resubmit Zachry's frozen-COW design." PHASupp:25. But §5.22 afforded no such right. *See* pp.29-31.

Even if PHA had such a right, ample evidence supported the jury's finding that PHA agreed in CO4 that Zachry could use the frozen-cutoff wall, and CO4 controls. DX1-1.0191, §2.02(a)(A13).

CO4 incorporated "Proposer's Specifications and Proposal dated April 13, 2005, as amended by Proposals for 330 feet Wharf Extension [the May 18 proposal, 26:110-12] and as further amended by Proposer's Supplemental Proposal dated July 11, 2005…." PX12.0001, .0004(A30). Both the April and May proposals were conditioned on an "[u]ninterrupted work schedule" and the "freeze wall-cutoff wall, encompassing one (1) 'B' row piling"—the same one described to PHA representatives on April 5 and memorialized in the September 9 design. PX9(A21); PX179(A22); pp.8, 11.[6] The July 11 proposal did not delete these

---

[6] PHA's claim it rejected the April 13 proposal is immaterial. The May 18 proposal—which

conditions: it was merely a "[s]upplemental proposal" that offered "additions and clarifications."  PX219(A23); 8:60; 10:116.  PHA signed CO4 after reviewing the September 9 design—which embodied the April 5 design described in the proposals—for *two weeks*.  10:111-16, 118, 8:50-51; 22:92, 119-20; 27:37; 45:148; p.13.[7]  Thus, CO4 included PHA's agreement that Zachry could use the frozen-cutoff wall.  *See* pp.12-13.

PHA concedes CO4 is at least ambiguous as to Zachry's right to use the frozen-cutoff wall, but argues there is "no intent evidence."  PHASupp:27.  CO4's language incorporating the April and May proposals refutes this.  Furthermore, Zachry's Anderson testified CO4 "included language with the frozen-cutoff wall" and "expressly said that we had the right to use it as a result of this change order."  15:61.  PHA cites nothing for its argument CO4 did not bind the parties if it authorized, but did not require, Zachry to use the frozen-cutoff wall.

Thus, the evidence supports the jury's finding that CO4 authorized Zachry to use the frozen-cutoff wall.  PHA does not challenge the sufficiency of the evidence of breach under this interpretation to support Question 1, because it cannot.  *See* pp.15-16.

---

PHA does not claim was rejected—was also conditioned on the frozen-cutoff wall. PX179(A22).  Furthermore, PHA cites nothing holding a previously rejected proposal cannot be incorporated into an agreement.

[7] PHA's irrelevant claim that Zachry changed its theory on CO4 is disproved by PHA's citations. CR31:8541; 1(9/11/09):27, 80.

## C. Question 1 was proper.

The instruction in Question 1 that the jury was "not being asked to decide whether PHA failed to comply with §5.10" was necessary to obtain separate findings on whether CO4 gave Zachry the right to use the frozen-cutoff wall (Question 1) and whether §5.10 barred PHA from issuing the R&R Order (Question 2). CR59:17390(A4). The instruction was within the court's broad discretion. *Kiefer v. Continental Air.*, 10 S.W.3d 34, 37 (Tex.App.—Houston [14th Dist.] 1999, pet. denied).

Any error was harmless. The jury found PHA breached §5.10 in Question 2; thus, deleting the instruction from Question 1 would not have changed anything. *See id.* at 38; *Shupe v. Lingafelter*, 192 S.W.3d 577, 579-80 (Tex. 2006).[8]

## II. The jury's verdict on causation and damages is supported by the evidence.

Given the evidence that PHA's rejection of the frozen-cutoff wall, demands for a recovery schedule, and threats of LDs caused Zachry to switch to working in the wet, pp.16-21, the remaining issue was the *quantification of the effect* of the switch (damages). 51:152-54; 52:4-10. Zachry's damages expert, Gary Draper, testified about that *quantification*; he did not also need to opine on the *cause* of the switch. *Id.*; p.40.

---

[8] Question 1 should never have been submitted: CO4 *unambiguously* authorizes Zachry to use the frozen-cutoff wall, pp.12-13, 33-34, and PHA does not dispute breach under this reading, p.34. Zachry was entitled to a directed verdict. CR59:17299-313.

Draper (a) identified the construction activities the switch impacted; (b) as to each impacted activity, calculated the cost Zachry would have incurred absent PHA's breach working in the dry as long as possible; (c) compared those costs to the costs Zachry reasonably incurred as a result of switching to the wet earlier than it would have absent PHA's breach; and (d) excluded all other costs. 52:4-10, 16, 26, 72-74, 103-111; 117:172, 261. Draper calculated the costs of the switch (after excluding other costs) to be approximately $27 million. 52:7-10, 110-11. After hearing the evidence, the jury awarded Zachry $18,602,697. CR59:17393(A4).

## A. Draper's assumptions on damages were supported by the evidence and did not vary materially from undisputed facts.

PHA incorrectly asserts the assumptions underlying Draper's model failed to comply with *Burroughs Wellcome v. Crye*, which holds that experts may not "assume[] facts that vary materially from the actual, undisputed facts." 907 S.W.2d 497, 499 (Tex. 1995).

PHA ignores the substantial evidence supporting Draper's model, and instead asserts Draper's dry schedule "varies drastically" from "dozens of schedules Zachry prepared around the time of the" Port's rejection. PHASupp:29. But Draper scheduled a frozen-cutoff-wall methodology. 52:8. In contrast, the schedules PHA cites were not based on a frozen-cutoff wall, because they were created *after* the rejection. *See* PHASupp:29; p.19-20. Thus, these schedules did not even attempt to project what Draper projected—a completion schedule using a

36

frozen-cutoff wall. Moreover, because they were drafts, they did not reflect concurrent performance of tasks to accurately project completion dates. 11:49-50, 83-86; 18:124-25, 151-57; 19:32-60; p.19.

PHA's other challenges to Draper's assumptions—regarding freeze-pipe removal and sheet-pile installation—ignore evidence supporting Draper's assumptions and do not show his assumptions vary materially from undisputed evidence.

### 1. Draper's treatment of freeze-pipe removal was supported by the evidence.

PHA incorrectly asserts the "undisputed" evidence showed freeze-pipe removal would occur *prior* to berm removal and in a manner that would add a material amount of time to Draper's overall dry schedule.

First, Draper's dry model—consistent with the evidence—provided for freeze-pipe removal to occur *concurrently* with berm removal. 53:31-32; PX320; 30:106-08, 116-17.

- Zachry's dry approach was to remove the berm and freeze-pipes simultaneously and using the same equipment. 53:31-32; 10:61; DX404.004.

- PHA's own freeze-wall expert at trial, Mageau, concluded at the time of the R&R Order that Zachry could remove the freeze-pipes and perform the remainder of the work by mid-February to mid-March

2006 so the crane-ship could timely dock—even though he was aware of freeze-pipe issues and other challenges Zachry faced. PX320; 30:106-08, 116-17; pp.18-19.

- Draper's schedule was consistent with the contemporaneous frozen-cutoff-wall project schedule created by Zachry shortly before the rejection. DX404; 18:115-18, 124.

Second, even if freeze-pipe removal would occur separately from berm removal, it would account for no more than one day *of the critical path* of the schedule: the day after pipe-removal started, Zachry would begin the more time-consuming critical-path activity of berm removal where the pipes had been removed. After the first day, pipe and berm removal would proceed simultaneously. 53:29-30. Draper included sufficient "float" to accommodate this. *Id.*; 54:91-93.

PHA incorrectly characterizes Draper's testimony as "assum[ing] a thousand freeze-pipes could be removed *in one day*." PHASupp:31 (emphasis original). PHA's suggestion that Draper should have scheduled more than one day to remove pipes incorrectly assumes that pipe and berm removal could not occur concurrently. *See, e.g.*, 53:31-32; 10:61; DX404.004.

Third, PHA cross-examined Draper on this point, and the jury's award—substantially less than Zachry sought—accounted for any weight the jury gave it.

38

53:29-32; *America's Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 629 (Tex.App.—San Antonio 1996, writ denied).

### 2. Draper's treatment of sheet-pile installation was supported by the evidence.

PHA contends "it is undisputed…Zachry was not ready to install…sheet pile until *after* November 15—40 days later than Draper assumed." PHASupp:31.[9] But PHA's citations provide no support. PHA relies on Anderson's testimony referencing a November 15 list of remaining tasks. Neither that list nor Anderson's testimony references sheet-pile-installation timing for the frozen-cutoff wall, because it was rejected a month earlier. *See* DX91; 16:29-31; 14:93-104. PHA nevertheless inserts "frozen" into Anderson's testimony "that there was work to be done before we were ready for the [frozen] cutoff wall." PHASupp:31. But Anderson was discussing the status as of November 15—when Zachry was considering the *alternate-cutoff wall's* viability. *See* p.19-20. PHA's argument incorrectly assumes that, after PHA's October 11 rejection, Zachry proceeded exactly as if PHA had not breached. *See, e.g.*, 16:135-36; 54:91.

Even if Anderson was saying work remained as of October 11, Anderson testified it would take "a couple of days at best." 14:103; *see* 16:30. Although Draper's schedules showed sheet-pile installation starting October 7, it was on

---

[9] "Sheet pile"—steel sheets—would have lined the frozen-cutoff wall berm and would have composed Mageau's alternate-cutoff wall. 10:21-22; 11:52-53.

"early start," meaning it could start later with no impact on his analysis. 53:159-60; 54:91-94; PX580 at 273. Indeed, his schedule's float allowed sheet-pile installation to be delayed until November 15 or later. *Id.* The evidence supports Draper's assumption that—absent the breach—Zachry could have accomplished pre-freeze-down work like sheet-pile installation in time to freeze-down the walls and complete Milestone-A before the crane-ship arrived. *See* pp.18-19; 52:14-15.

Third, PHA raised this issue during Anderson's cross-examination, and the jury's award—less than Zachry sought—accounted for any weight the jury gave it. 16:29-31; *Samaras*, 929 S.W.2d at 629.

### B. The evidence establishes causation.

#### 1. Ample evidence supported the jury's causation finding.

Contrary to PHA's assertion, expert testimony was not required to prove PHA's breach caused Zachry to abandon its dry-construction methodology. *See Helena Chemical Co. v. Wilkins*, 47 S.W.3d 486, 504 (Tex. 2001) (non-expert testimony may establish causation, exclude alternative causes).

Abundant evidence supported the jury's finding that PHA's rejection of the frozen-cutoff wall caused Zachry to switch to a wet-construction methodology. *See* pp.16-21. Anderson and geotechnical expert Hugh Lacy testified that—in the face of PHA's rejection of the frozen-cutoff wall—Zachry had no viable alternative-cutoff wall to bifurcate the project and complete the wharf in the dry

40

while still allowing the crane-ship to dock, and thus had to switch to the wet far earlier than it otherwise would have.  19:32-50; 42:59-104; p.19-20.[10]

### 2. PHA's "Contract completion deadline" argument fails.

PHA asserts Draper did not opine that Zachry could have met the Contract deadlines by working in the dry with the frozen-cutoff wall.  PHASupp:34-35.  But Zachry was not required to show it would have completed *all* its work in the dry by the Contract deadlines to prove the R&R Order caused Zachry's damages.  The jury could have reasonably found a causal connection between PHA's breach and the damages awarded based on evidence showing PHA's breach caused Zachry to use a wet approach for a far greater portion of the work than if Zachry had been allowed to use the frozen-cutoff wall.  52:41-43, 94-97, 102-07; p.17-18; *Abraxis Petrol Corp. v. Hornburg*, 20 S.W.3d 741, 758 (Tex.App.—El Paso 2000, no pet.).  Draper calculated that increased cost, 52:110-11, and excluded the cost of work Zachry would have performed in the wet even with the frozen-cutoff wall, 52:41-43, 94-98; 10:59-62.  PHA's contention that Zachry failed to prove causation because Draper's model assumed a small amount of work in the wet is unfounded.

But even if required, Zachry presented ample evidence it would have completed Milestone-A in the dry by February 15, 2006, if PHA had not rejected the frozen-cutoff wall.  *See, e.g.*, PX320; 30:115-16; PX357; 19:43-45; 18:107-11;

---

[10] PHA's argument that Zachry's schedules showed Zachry finishing faster and cheaper by abandoning its dry methodology was debunked at trial.  *See* pp.19-20, 36-37.

32:100-01; PX893.0055; PX251; PX252; 26:100-02; 45:103-05; *see also* 29:35-36, 115-16; 123-24; pp.18-19.[11] Other evidence showed that absent PHA's breach, Zachry could have completed Milestone-A by May 15, 2006—the crane-ship's actual arrival date, *see, e.g.*, *id.*; 56:96-97; pp.18-19,—and achieved final completion by the Contract deadline, 16:102-04; PX771; 19:86-90; 18:115-18; 27:40-42; 35:57-58. PHA ignores this evidence and that Draper adopted a conservative approach in preparing his analysis. 52:60-63.

### 3. PHA's "alternative cause" argument fails.

PHA incorrectly argues Draper "failed to rule out alternative causes of Zachry's switch to working 'in the wet.'" PHASupp:33. Expert testimony was not required to rule out alternative causes. *See* p.40.

PHA's suggestion Zachry was planning on eliminating the freeze-wall was refuted by evidence establishing that, until the R&R Order, Zachry intended to use the freeze-walls and was building the wharf and freeze-walls consistent with that intent. *See* 10:99-102, 118, 124; 19:33; 35:63. Anderson testified that in the absence of an alternative-cutoff wall, Zachry's only option was to work in the wet. 18:151-57; 19:32-50; *see also* pp.17, 19-21. And geotechnical expert Lacy offered unrebutted expert testimony that the alternative-cutoff wall design was not safe or

---

[11] Anderson also testified about scheduling and construction progress in light of his construction experience and first-hand observation of the work. 9:81-86, 94, 101-02, 109-110; 11:49-50, 82-86, 91-93; 12:111; 18:64-65, 115-25, 151-57; 19:32-76. Anderson testified Zachry would have timely completed the project with the frozen-cutoff wall. 19:43-45.

feasible. 42:59-104. The jury could reasonably have found that—in the absence of a viable alternative method to bifurcate construction and allow the crane-ship to dock—PHA's rejection of the frozen-cutoff wall, demands that Zachry comply with the Contract deadlines, and threats of LDs forced Zachry to switch to a predominantly wet methodology earlier than it otherwise would have. *See* pp.16-21.

Finally, PHA's argument that Anderson offered conclusory testimony lacks merit. Anderson was questioned for days regarding scheduling options he analyzed after PHA's breach. *See, e.g.*, 11:49-50, 83-86; 18:124-25, 151-57; 19:32-45, 50-60. Anderson's contemporaneously prepared schedules showed that, without a frozen-cutoff wall, Zachry could only dock the crane-ship if it moved to wet construction far earlier than planned. *Id.*

### C.     PHA's lack-of-authority argument does not defeat causation.

PHA contends that because "Thiess had no authority [under Special Condition §12(d)] to change Contract terms, Thiess's R&R response could not…have caused Zachry's R&R damages." PHASupp:38-39. However, §12(d) is inapplicable:  the R&R Order was not a ***change*** to the Contract, but a ***breach***. *Cf.* p.45-48.

Furthermore, PHA's argument is based on the incorrect premise that "***Thiess*** issued the R&R response." PHASupp:37.   The R&R Order, which bore PHA's

43

seal, was *PHA's* decision and act; Thiess (with PHA's McQueen) was simply PHA's messenger. 8:16; 46:50-51, 53-54; PX266(A33); PX314(A34); DX1-1.0244, §12(c)(A16). The day before the R&R Order issued, PHA's McQueen told Thiess and Ely, "[t]he cutoff wall was rejected." PX1(A32). Vincent concurred. 46:39.

But even if Thiess made the R&R-Order decision, it would still have been PHA's act. Chief Engineer DeWolf testified he delegated his §5.22 authority to review safety-related Submittals to PHA's Vincent and McQueen, who were responsible for getting CH2M-Hill's assistance. 8:16. Apparent authority is a fact issue. *See* p.62.

Moreover, other PHA acts caused Zachry's damages. Three days after the R&R Order's issuance, Chief Engineer DeWolf sent Zachry a letter demanding Zachry finish by the Contract deadlines (which were conditioned on use of the frozen-cutoff wall) and threatening LDs. PX319; 19:29-31. DeWolf's superiors repeated this demand in October and November. *See* p.17. By demanding a recovery schedule after barring Zachry from using its "required" frozen-cutoff wall, PHA—not Thiess—forced Zachry to spend more money and time building the newly extended wharf in the wet. *See* pp.17-18, 21-22.

The Water Code and Chapter 271 impose no bar: the Contract PHA breached was undisputedly written and properly executed as required by PHA's

44

cited statutes.  *See* PHASupp:37-38 (citing TEX. WATER CODE §60.408(i); TEX. LOC. GOV'T CODE §§271.151(2), 271.152)(A42).

## III.    Sections 5.41 and 5.42 do not bar Zachry's breach-of-contract claim.

### A.    The "changes" clauses are inapplicable by their terms.

By their plain terms, §5.41 and §5.42 do not apply to breach-of-contract claims for damages.  Instead, they set forth procedures allowing PHA to make changes within the scope of the Work during performance of the Contract, either through Change Orders (§5.41) or "Changed Conditions or Contract Interpretations" (§5.42).

Section 5.41 applies to "*changes and modifications* to the Contract Documents within the general scope of the Work," and requires a Change Order to "stipulate the Work to be performed" and "any difference in the Contract Price." DX1-1.0224-25(A13).    Similarly, §5.42 requires five days' notice of any "interpretation of the Contract" by PHA "the Contractor believes...constitutes a *change* to the Contract," "[i]f the Contractor believes it is entitled to an adjustment in the Contract Time [or] Contract Price." DX1-1.0225(A13).    The Chief Engineer's determination as to whether there should be a "modification" or "equitable adjustment" is "final and conclusive," and the Contractor is forbidden to "begin performing that portion of the Work affected by such interpretation" before giving notice.  *Id.*

45

Zachry does not assert that in forbidding Zachry to use the frozen-cutoff wall, PHA effected "changes or modifications to the Contract Documents within the general scope of the Work" as in §5.41, or that PHA made an "***interpretation*** of the Contract" that "constitutes a change to the Contract" as in §5.42. Rather, PHA ***breached*** the Contract and CO4 by rejecting the frozen-cutoff wall. Thus, Zachry never sought the "difference in the Contract Price" under §5.41 nor "an adjustment in the...Contract Price" under §5.42. Rather, Zachry sought—and the jury properly awarded—***damages*** for PHA's ***breach*** of the Contract. CR29:08142-44(A8); CR59:17390-93(A4). Furthermore, §§5.41/5.42 apply only to changes relating to "the Work," which does not include Zachry's means and methods. *See* p.30.

Authorities recognize that "changes" clauses like §§5.41/5.42 do not apply to claims the owner breached and is liable for damages. *See, e.g.*, *Shintech, Inc. v. Group Constructors, Inc.*, 688 S.W.2d 144, 151-52 (Tex.App.—Houston [14th Dist.] 1985, no writ) (delay damages recoverable despite "changes" clause); *Board of Regents v. S&G Constr. Co.*, 529 S.W.2d 90, 97 (Tex.Civ.App.—Austin 1975, writ ref'd n.r.e.). Instead, "changes" clauses are a "vehicle to add or delete work, substitute materials, alter geographic locations, increase or decrease quantities, extend or reduce contract time and adjust contract price...." 1 BRUNER & O'CONNOR CONSTR. LAW §4.23. They "necessarily exclude[] the power to

46

unilaterally change the terms of the contract or its general risk-allocation provisions, as distinguished from the work itself." *Id.* §4:23.

For example, §5.42 would apply if the specifications required "steel," and PHA interpreted that to mean **galvanized** steel, but Zachry believed **black steel** complied. RR16:62. But §5.42 would not allow PHA to unilaterally change the Contract's General Conditions precluding PHA from interfering with Zachry's methods or CO4's frozen-cutoff-wall authorization.

*S&G* rejected the owner's argument that the contractor could recover for breach only under the change-order provision, holding the argument ignored the difference between (1) suits seeking breach-of-contract damages and (2) suits seeking additional compensation in the **absence** of a breach. 529 S.W.2d at 96-97. "Changes" clauses apply only to (2), and *S&G* distinguished cases (cited by PHA) applying "changes" clauses, finding there was no breach in those cases. *Id.* (distinguishing *State v. Martin Bros.*, 160 S.W.2d 58 (Tex. 1942); *State v. F&C Eng'g Co.*, 438 S.W.2d 647 (Tex.Civ.App.—Houston [14th Dist.] 1969, writ ref'd n.r.e.)).

PHA's reading also improperly fails to construe §§5.41/5.42 in light of the entire contract. *Frost*, 165 S.W.3d at 312. PHA knew how to write a condition precedent to filing a *lawsuit*, but did not in §§5.41/5.42. DX1-1.0230, §5.55(A13). Furthermore, according to PHA, every PHA breach would be a "change" PHA's

47

Chief Engineer had the right to make under §5.41 or an "interpretation...constituting a change" for which the Chief Engineer was the final arbiter under §5.42. Zachry could never recover damages, because its remedy would be a "claim for compensation" calculated under §5.43. DX1-1.0225-26, §5.43(A13). PHA's reading fails to give meaning to other contract clauses recognizing PHA could have liability under the contract not only for a "claim for compensation" but also a "claim for damages." DX1-1.0192, §2.03(A13); *see* DX1-1.0217, §5.16(A13); DX1-1.0217, §5.19(A13).

At a minimum, Zachry's reading of §§5.41/5.42 as inapplicable to breach-of-contract claims is reasonable. Any ambiguity should be construed against PHA as the drafter. *See S&G*, 529 S.W.2d at 99; p.3-4. Furthermore, "forfeiture by finding a condition precedent is to be avoided when another reasonable reading… is possible." *Criswell v. European Crossroads Shopping Ctr.*, 792 S.W.2d 945, 948 (Tex. 1990). Even if ambiguous, §§5.41/5.42 should be construed not to impose a condition precedent to breach-of-contract recovery.

> ### B. Alternatively, common-law and statutory rules preclude application of the "changes" clauses here.

> #### 1. The *Shintech* doctrine.

Even if §§5.41/5.42 apply to breach-of-contract claims, the trial court correctly held that they do not bar Zachry's claim. "[W]hen an owner breaches a construction contract, it relinquishes its contractual procedural rights concerning

48

change orders and claims for additional costs." *Shintech*, 688 S.W.2d at 151. This Court and others have held *Shintech* precludes breaching owners like PHA from invoking procedural clauses to bar contractors' claims. *See, e.g.*, *Shintech*, 688 S.W.2d at 151 (written-notice requirement); *West v. Triple B Servs., LLP*, 264 S.W.3d 440, 446-47 & n.4, 449-50 (Tex.App.—Houston [14th Dist.] 2008, no writ) (30-day notice requirement); *North Harris Cty. Jr. College Dist. v. Fleetwood Constr. Co.*, 604 S.W.2d 247, 254 (Tex.Civ.App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.) (change-order requirement); *S&G*, 529 S.W.2d at 96 (same).

### a.  *Green* **does not preclude application of** *Shintech***.**

PHA's argument that *Shintech* does not apply if the contractor continued to perform after the breach is incorrect: in the cases above, the contractors continued to perform after defendants' breaches.

Nor does *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 389 (Tex. 1997), support PHA. In *Green*, the general contractor asserted the subcontractor's lien releases barred its claim for extra work. *Id.* at 388. The Supreme Court disagreed, but for a different reason than the Court of Appeals, which had characterized the question as a *Shintech* problem—whether the general contractor relinquished **procedural** rights by breaching. In dictum, the Supreme Court recognized the question in *Green* was instead whether "the remedy of excuse of performance" applied—that is, whether the breaching defendant was precluded from relying on

49

its *substantive* right to a lien release to bar its subcontractor's claims. The Supreme Court did not address the *Shintech* rule. *See id.* at 389.

*Green's* citation of *Hanks v. GAB Bus. Servs.*, 644 S.W.2d 707 (Tex. 1982), confirms the Court did not reject *Shintech*, but rather recognized its inapplicability to substantive contract rights. Like *Green*, *Hanks* involved a nonbreaching plaintiff's failure to perform a substantive requirement: the defendant-buyer of a business asserted the plaintiff-seller's breach of a covenant-not-to-compete excused the buyer's failure to pay the full price. 644 S.W.2d at 708. *Hanks* relied on *S&G* to hold that the nonbreaching party's performance was not excused because it continued to perform. *Id.* The Court did not disavow *S&G*'s application of the *Shintech* rule to procedural requirements. *Compare id.*, *with S&G*, 529 S.W.2d at 96.

### b.    *Technip* does not preclude application of *Shintech*.

*Tennessee Gas Pipeline v. Technip USA Corp.*, 2008 WL 3876141 (Tex.App.—Houston [1ˢᵗ Dist.] 2008, pet. denied), is distinguishable. It involved a provision requiring the owner to give notice of defective work. *Id.* at *17. As the Court observed, if the contractor's alleged breach based on defective work excused the owner from giving notice of defective work, the provision would never apply, rendering it "meaningless." *Id.* at *23 n.11. The court did not disapprove but distinguished cases—including *Fleetwood*—holding when an owner breaches a

50

building contract, it relinquishes procedural rights concerning change orders and additional-cost claims. *Id. Technip's* refusal to apply the *Shintech* rule turned not on the fact that the provision required notice, but rather that applying the provision as the owner argued would require "circular reasoning" rendering it "without effect." *Id.*

In contrast, applying *Shintech* here would not render §5.42 "without effect," as it would still apply in the absence of a breach to differing Contract interpretations relating to the Work when the contractor seeks an adjustment to the Contract Price/Time. Indeed, this Court has applied *Shintech* to failures to comply with notice provisions. *See, e.g.*, p.49.

### 2. The radical-change doctrine.

The trial court also concluded that §§5.41/5.42 are inapplicable to Zachry's claim by analogy to the radical-change doctrine. Under this doctrine, "changes" clauses do not apply to changes "requir[ing] contractors to perform large quantities of work, radically different in its character, nature, and cost from that originally contemplated...." *B.F.&C.M. Davis v. W.E. Callaghan Constr.*, 298 S.W. 273, 279 (Tex.Comm'nApp. 1927). The trial court's analogy did not turn Zachry's claim for breach of the **written** Contract into an implied-contract claim. Besides, a radical change **can** constitute a breach giving rise to damages (not quantum

51

meruit). *See Nat'l Env'l Serv. v. Homeplace Homes*, 961 S.W.2d 632, 635 & n.3 (Tex.App.—San Antonio 1998, no writ).

### 3. Section §16.071.

According to PHA, §5.42 makes giving 5-days' notice of Zachry's breach-of-contract-damages claim a condition precedent to suit. However, any "contract stipulation that requires a claimant to give notice" "within less than 90 days" "of a claim for damages as a condition precedent to the right to sue on the contract" is "void." TEX. CIV. PRAC. & REM. CODE §16.071(a)(A43); *see Taber v. W. Union Tele. Co.*, 137 S.W. 106, 109 (Tex. 1911); *Atwood Oceanics v. Zust Bachmeier*, 2007 WL 2766192, *1 (5th Cir. 2007).

*American Airlines Emp. Federal Credit Union v. Martin*, 29 S.W.3d 86 (Tex. 2000), is distinguishable. That clause required a bank customer to give notice of unauthorized signatures or be barred from asserting they were unauthorized. *Id.* at 91-92. In contrast, PHA argues §5.42 requires Zachry to give 5-days' notice of its breach-of-contract-damages claim and that failure to do so bars Zachry's claim. Plus, in PHA's view, §5.42 gives PHA the "final and conclusive" right to decide the correct "interpretation" and thus whether there was a breach. Unlike *American*, where the clause's purpose was to inform the bank of unauthorized signatures, §5.42 (under PHA's reading) has no purpose except to bar

52

Zachry's breach-of-contract claim.[12]

## C. The "changes" clauses were not tried.

PHA asserts that whether Zachry complied with §§5.41/5.42 was tried to the jury, that Zachry failed to prove that it obtained a change order or gave notice, and that rendition is appropriate. However, Zachry's compliance with these clauses was expressly ***not*** tried, because the court held pre-trial that §§5.41/5.42 are inapplicable to Zachry's claims. CR46:13299-301, 13305(A5). Zachry was not required to continue litigating these issues. *Provident Life & Accident Ins. v. Hazlitt*, 216 S.W.2d 805, 807 (Tex. 1949). Although the jury was instructed that it ***may*** consider §§5.41/5.42 for state of mind, it was not required. *See, e.g.*, 49:112; CR59:17392(A4).[13] Indeed, the jury was instructed Zachry was not required to obtain a §5.41 Change Order or give §5.42 notice. CR59:17392(A4). Zachry had no obligation to offer evidence on §§5.41/5.42. But if §5.42 notice was tried, Zachry substantially complied. *See* Aple.Br:61 n.54; 11:39-40; PX2(A35); PX314(A34); 27:89-90, 93-94; 35:95-96; p.16.

---

[12] PHA asserts the notice period should be reformed to 90 days under Contract §3.12. PHASupp:46 n.3. However, §3.12 is an unenforceable agreement to agree. *Ft. Worth ISD v. City of Ft. Worth*, 22 S.W.3d 831, 846 (Tex. 2000); CR42:12179. PHA never sought reformation on any other basis.

[13] PHA notes the instruction also concerned §5.52. PHASupp:45 n.2. Zachry's §§5.41/5.42 arguments apply equally to §5.52.

**D. If the trial court erred, remand—not rendition—is required.**

Even if §§5.41/5.42 could reasonably be read to govern Zachry's recovery of breach-of-contract damages—which Zachry disputes—the proper remedy is not rendition, but rather remand to permit Zachry to offer evidence. *County of Dallas v. Wiland*, 216 S.W.3d 344, 357 (Tex. 2007). Zachry's reading—that these clauses do not apply to its damages claim for breach of §5.10/CO4—is at least one reasonable reading. Accordingly, if not resolved by rules of construction in Zachry's favor, a jury should resolve this dispute. Alternatively, a jury should determine whether Zachry substantially complied with §5.42. Finally, PHA must prove prejudice from any lack of notice. *Prodigy Comms. Corp. v. Agricultural Excess & Surplus Ins.*, 288 S.W.3d 374, 377-78 (Tex. 2009).

**E. Zachry's failure to seek a §5.08 extension was irrelevant.**

Zachry's failure to seek a §5.08 time extension for PHA's breach was irrelevant: Zachry sought ***damages***—not a time extension—for PHA's breach. Requesting a §5.08 extension was not a prerequisite to damages.

Furthermore, §5.22 states, "revision and…resubmission of Submittals shall not entitle…Contractor to any extension of time." DX1-1.0219(A13). Zachry's failure to request an extension for PHA's R&R Order thus proves nothing. Additionally, any suggestion Zachry had to request an extension would have caused unfair prejudice. TEX. R. CIV. P. 403. And PHA shows no harm.

54

**IV. The trial court did not abuse its discretion in excluding PHA's $8.6 million in alleged harms claimed as offsets.**

PHA asserts the trial court improperly "denied PHA its offset defense" by excluding PHA's evidence that it allegedly suffered $8.6 million in harms from Zachry's performance. PHASupp:50. Parties must timely disclose their theories of the case and amount of damages—for defenses as well as claims—or face mandatory exclusion. TEX. R. CIV. P. 193.1, 193.6, 194.2(c), (d) & cmt.; *Alvarado v. Farah Mfg.*, 830 S.W.2d 911, 914 (Tex. 1992) ("The rule is mandatory, and its sole sanction—exclusion of evidence—is automatic…."); *Harris Cty. v. Inter Nos, Ltd.*, 199 S.W.3d 363, 367-68 (Tex.Civ.App.—Houston [1st Dist.] 2006, no pet.) (litigant must disclose basis for contesting damages). The interpretation of pleadings and determination of the adequacy of disclosures are within the trial court's discretion. *See Secure Comm. v. Anderson*, 31 S.W.3d 428, 430 n.2 (Tex.App.—Austin 2000, no pet.); *Robinson v. Lubbering*, 2011 WL 749197, *3, 7 (Tex.App.—Austin 2011, no pet.).

The trial court did not abuse its discretion in excluding PHA's alleged $8.6 million in harms, because as shown below, PHA's limited disclosures of alleged harms were made solely in connection with its attempt to prove the LD clauses were reasonable forecasts of just compensation and thus enforceable. They *did not* give Zachry notice that PHA intended to seek an *$8.6 million jury finding* on an offset defense to be deducted from Zachry's damages award. An $8.6-million-

55

offset claim would have required Zachry to conduct substantial discovery into whether PHA sustained the harms, causation, and quantification.

From this suit's beginning in 2006, Zachry sued for sums PHA wrongfully withheld, including the $25,000/day LDs for Milestone-A. CR1:00005; CR4:00934. When PHA disclosed—for the first time on June 3, 2009—that it sustained actual damages, its disclosure was solely in the context of arguing the LD provisions were a "reasonable forecast of just compensation because…the Port Authority sustained actual damages in an amount that was not disproportionate to the [LDs]." CR45:13023, ¶41(A9). The next day, PHA filed its Second Amended Disclosures stating PHA had suffered general categories of actual damages, but again solely in the context of arguing the LD provisions were enforceable:

> The difficulty of quantifying and proving…actual damages is one…reason[] the parties included liquidated damages provisions in the Contract…The [LD] provisions are enforceable….The [LDs] were a reasonable forecast of just compensation because…[PHA] sustained actual damages in an amount that is not disproportionate to the [LDs] ….

CR46:13076(A10).

Zachry immediately sent PHA an interrogatory on June 11 asking it to quantify these harms. CR46:13105(A11). That PHA responded by Zachry's July 24 deadline by quantifying more than $8 million in alleged actual harms does not help PHA: Zachry sent its interrogatory in response to PHA's disclosure that it suffered harm ***proportional to its LDs***, and PHA's response again referenced the

56

difficulty in "know[ing] the precise nature and extent of damages," and did not disclose it sought to offset them against Zachry's damages. CR46:13108(A11); *see* CR46:13105-10(A11). And PHA's general, conclusory pleadings of an offset defense failed to notify Zachry of the amount of damages PHA sought to offset. *See* PHASupp:51 (citing CR47:13428, §57).

Even if these disclosures were not limited to LDs, the trial court did not abuse its discretion in excluding them as untimely. Trial had been scheduled to begin July 20, 2009, and the discovery deadline had lapsed six months earlier, on January 16. CR45:12933; CR17:04679. *See Sprague v. Sprague*, 363 S.W.3d 788, 800 (Tex.App.—Houston [14th Dist.] 2012, pet. denied) (continuance does not nullify scheduling-order deadlines).

PHA later increased its claimed harms to approximately $10.5 million on September 16, but continued to make this disclosure in the LD context. CR46:13117-20. Nothing disclosed PHA intended to submit these harms to the jury as an offset defense to reduce Zachry's damages. Indeed, PHA's September 17 draft charge did not seek any finding as to PHA's actual damages for an offset defense to reduce Zachry's damages award. *See* CR43:12401-20(A12).

Not until the eve of trial did PHA reveal it intended to seek an $8.6 million alleged-harms offset as a defense to reduce Zachry's damages. (10/9/09):19-21. The trial court correctly ruled PHA disclosed the harms only in support of the LD

provision, not as an offset defense.  CR51:14949-51(A6).  It also correctly found PHA failed to show good cause and that injection of the $8.6 million in alleged harms would require extensive discovery and "dramatically change the landscape of what promises to be a lengthy and complicated trial."  CR51:14951-52(A6). The trial court did not abuse its discretion.

## V.   PHA's "open-the-door" theory did not support admission of PHA's alleged harms regarding the no-damages-for-delay exceptions.

### A.   The trial court properly excluded PHA's actual-harms evidence under Rule 403.

PHA contends the trial court erred in refusing to allow PHA to prove—with respect to the bad-faith and arbitrary-and-capricious no-damages-for-delay exceptions—that PHA suffered actual harm to rebut a purported "misimpression" Zachry allegedly gave the jury.  PHASupp:54-56.   But Zachry never opened the door to PHA's claimed harm.

Zachry never argued PHA suffered no harm at all.  Rather, Zachry argued PHA:

(1)    promised not to charge Milestone-A LDs *if the crane-ship was able to dock on arrival*, but

(2)    nevertheless charged LDs *even though the crane-ship was able to dock on arrival*.

*See, e.g.*, 4:51; 25:61-62, 66-68; 71:98; p.10.  Zachry did *not* argue PHA:

(1)    promised it would not charge LDs *if it suffered no harm at all*, but

58

(2)     charged LDs *even though it suffered no harm*.

At most Zachry opened the door to evidence the ship *was not able to dock on arrival*—evidence that did not exist, as the ship was able to dock on arrival. *See* p.22. There was no misleading impression.

Moreover, any probative value of PHA's actual-harms evidence in refuting any minor misimpression would be substantially outweighed by undue delay and the unfair prejudice to Zachry. 1SCR6:1116(A7). The trial court noted direct and cross-examination of PHA witnesses would be lengthy and could devolve into a long battle over the alleged harms, causation, and quantification. *Id*. Plus, requiring Zachry to cross-examine without discovery would be highly prejudicial. *Id*.

PHA incorrectly contends once evidence is deemed admissible under an open-the-door theory, Rule 403 cannot exclude it. But PHA's case reached no such holding. *See* PHASupp:55-56 (citing *Horizon/CMS Healthcare. v. Auld*, 34 S.W.3d 887, 905-07 (Tex. 2000)). Authorities have concluded that "even if a party opens the door to rebuttal evidence, the trial judge still has the discretion to exclude the evidence under Rule 403." *Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009); *accord* Brown & Rondon, TEXAS RULES OF EVIDENCE HANDBOOK §107, at 95 (2015); Goode, Wellborn & Sharlot, 1 TEX. PRACTICE: TEX. RULES OF EVID. 107.1 (3d ed. 2015); McCormick, *The New Code of*

*Evidence*, TEX. L. REV. 661, 673 (June 1942).

**B.     Any error was harmless.**

The case did not turn on actual-harms evidence:  any misimpression was minimal, as Zachry argued only that PHA said it would not charge LDs if the crane-ship docked on arrival—***not*** if PHA suffered no harm at all, p.10; PHA's evidence of harms ***from the Milestone-A delay*** was nonexistent, 26:16-17, 20-21, or weak at best, 67:5-10; 70:15-27; and PHA ***did*** offer actual-harms evidence, 35:24-26; 64:44-45; 65:57-59; DX419; Aplt.Br:68.   Plus, other evidence— including PHA's last-minute rejection of Zachry's methods PHA knew were "required"—supported the arbitrary-and-capricious and bad-faith findings.   *See* pp.5-9, 11-22.

**VI.   The trial court did not err in instructing the jury as to fraud.**

**A.     The Supreme Court approved the recklessness instruction.**

The Supreme Court rejected PHA's argument—briefed in that Court—that recklessness does not support a promise-of-future-performance-made-with-an-intent-not-to-perform fraud:  it quoted the fraud charge in full, and held "[t]he charge correctly described the misconduct that cannot be covered by a no-damages-for-delay provision." *Zachry*, 449 S.W.3d at 104 n.7, 118(A3).   In its rehearing motion, PHA asked the Court to reconsider this holding, PHAMot/Reh'g:25, but it declined.

Authorities confirm a promise with no intent to perform may be based on either knowledge of falsity or recklessness. *See Beneficial Personnel Servs. v. Rey*, 927 S.W.2d 157, 167-70 (Tex.App.—El Paso 1996, vac. w.r.m.); *Mann v. Fitzhugh-Straus Medina Ranch*, 640 S.W.2d 367, 371 (Tex.App.—San Antonio 1982, no writ); TEX. P.J.C. BUSINESS §§105.2, 105.3B. PHA's first four cases do not consider whether promise-with-no-intent-to-perform fraud can be based on recklessness. *See* PHASupp:57. The last three contain no analysis, and cannot overrule the Supreme Court's *Zachry* decision. *Id.*

## B. No charge error tainted the no-damages-for-delay exceptions.

Assuming error, PHA asserts a new trial is required because the jury might have concluded PHA was reckless. PHASupp:57. But there is ample evidence PHA intentionally defrauded Zachry as PHA defines it. *See Zachry*, 449 S.W.3d at 103(A3); pp.10-11; Aple.Br:48-50. Any error was harmless.

Furthermore, *Casteel* would not require retrial, because it is "reasonably certain" the jury was "not significantly influenced" by the allegedly erroneous fraud issue, since PHA never challenged the evidentiary sufficiency of the other no-damages-for-delay exceptions. *See Thota v. Young*, 366 S.W.3d 678, 688 (Tex. 2012); Aple.Br:48-49 n.38.

## VII. The apparent-authority instructions were proper.

### A. Apparent authority is a fact issue.

Section 12(d)'s limits on Thiess's authority to "***change***" the Contract are irrelevant to Zachry's claim PHA ***breached*** it. *Cf.* pp.45-48. PHA's assertion Thiess—not PHA—directed Zachry to work in the wet is likewise incorrect. *See* p.43-44.[14]

Regardless, apparent authority is a fact issue even when limitations are present. *See Equitable Life Assur. Soc'y v. Ellis*, 147 S.W. 1152, 1158 (Tex. 1912); *Paramount Nat'l Life Ins. v. Williams*, 772 S.W.2d 255, 261-62 (Tex.App.—Houston [14th Dist.] 1989, writ denied). PHA's case merely holds that if the ***only*** evidence regarding apparent authority is a limitation, the limit controls. *See Douglass v. Panama*, 504 S.W.2d 776, 779 (Tex. 1974).

CH2M-Hill and Theiss had apparent authority to convey decisions and information to and from Zachry on PHA's behalf:

Q.   And you had designated ***in your dealings with Zachry***, CH2M-Hill to be your representative for those purposes in exchanging information back and forth…?

A.   [DeWolf]: That was one of their roles, yes.

---

[14] PHA's additional-work argument appears limited to its incorrect causation argument. PHA does not challenge damages under TEX. LOC. GOV'T CODE §271.153(a)(2)'s additional-work measure. Nor could it: the Supreme Court confirmed delay damages are recoverable under §271.153(a)(1), and PHA obtained an order finding 100% of Zachry's damages are delay damages. CR60:17517-18; 60:17526. The Court can be "reasonably certain" the jury was "not significantly influenced" by the additional-work measure (which was proper anyway, Aple.Br:50-52). *See Thota*, 366 S.W.3d at 688.

6:86; *see* 6:84-87; 8:44-46; 25:9-12.  Other evidence proved PHA expected Zachry to rely on CH2M-Hill communications, 6:85-86; 8:45-46; 21:34; 44:47-48; CH2M-Hill was DeWolf's representative, 8:45-46; DX1-1.0244, §12(c)(A16); CH2M-Hill was PHA's primary point-of-contact with Zachry, 44:43-44; *see* 37:36; and PHA executives treated CH2M-Hill like PHA staff, 46:74-75.

Additionally, the PHA-approved Construction Management Plan—posted on the Constructware website for Zachry to view—told Zachry CH2M-Hill is "an extension of the PHA staff," would "act as [PHA's] representative on site," and would "have all authority normally attributed to a [construction manager] acting as owner's agent (not at risk)." PX57.0009, §2.2(A39); *see* 9:46-47; 37:37-38; 44:54-58; 47:156-57; *see also* 44:44; 68:101; 69:106.

Thus, even if §5.42 notice was tried, Zachry substantially complied by giving notice to CH2M-Hill's Thiess, whom PHA led Zachry to believe was authorized to accept such information for PHA.  *See* pp.62-63.

## B.    Zachry pleaded apparent authority.

The trial court's determination that Zachry pleaded apparent authority was within its "broad discretion when interpreting pleadings."  *Pace Concerts v. Resendez*, 72 S.W.3d 700, 703 (Tex.App.—San Antonio 2002, pet. denied). Zachry pleaded PHA "expressly charged and designated its Construction Manager, CH2M-Hill, to act on its behalf on this critical cutoff-wall issue." CR29:8137,

¶13(A8); *see id.* at 8138, ¶13 (calling CH2M-Hill "PHA's *designated agent*"). Zachry also alleged PHA took actions a non-human entity like PHA could only take through agents. *See id.* at 8133-46. Because PHA did not specially except, Zachry's pleadings are construed "liberally…to include all claims that reasonably may be inferred…." *Allison v. Service Lloyds Ins.*, 437 S.W.3d 589, 592 n.2 (Tex.App.—Houston [14th Dist.] 2014, pet. denied).

Zachry's agency allegation is not limited to actual authority. Both actual and apparent authority are based on a principal's *designation of authority*; they differ only as to whether the designation is communicated to the agent or a third party. *See In re ADM Inv. Servs.*, 304 S.W.3d 371, 374 (Tex. 2010). Courts have held apparent authority alleged in the absence of those words. *See, e.g.*, *Iron Mtn. Bison Ranch v. Easley Trailer Mfg.*, 42 S.W.3d 149, 157 (Tex.App.—Amarillo 2000, no pet.); *Cox v. Humble Oil & Refining*, 16 S.W.2d 285, 286 (Tex.Comm'n App.1929); *Chapapas v. Delhi Taylor Oil*, 323 S.W.2d 64, 66 (Tex.Civ.App.—San Antonio 1959, writ ref'd n.r.e.).

## VIII. PHA is not entitled to attorneys' fees if Zachry prevails on any theory.

PHA is not entitled to attorneys' fees because judgment for Zachry should be affirmed. *See* DX1-1.0201, §3.10(A13).

Even if Zachry does not prevail on its R&R-Order breach-of-contract theory, PHA is not entitled to attorneys' fees. Contract §3.10 permits PHA to recover fees

64

on the Contractor's claim only "[i]f…Contractor does not prevail with respect to such claim." DX1-1.0201(A13). A party prevails if it recovers some relief on its claim, regardless of the amount. *Intercontinental Grp. Ptnrshp. v. KB Home Lone Star*, 295 S.W.3d 650, 654 (Tex. 2009); *Flagship Hotel. v. City of Galveston*, 117 S.W.3d 552, 564 (Tex.App.—Texarkana 2003, pet. denied). "[I]t is the judgment, not the verdict, that we must consider in determining whether attorneys' fees are proper." *Intercontinental*, 295 S.W.3d at 656.

Zachry brought one claim: breach of contract. CR29:08142-44. Zachry asserted PHA breached the parties' Contract in multiple ways, including by issuing the R&R Order and withholding LDs. The judgment awarded Zachry one lump sum for this breach-of-contract claim, without distinguishing between damages for each underlying theory. CR62:18166(A1).

Indeed, Texas law holds a single claim may include multiple liability theories, and a plaintiff prevails on that single claim if it prevails on any theory. *See, e.g.*, *4901 Main, Inc. v. TAS Automotive*, 187 S.W.3d 627, 633-35 (Tex.App.—Houston [14th Dist.] 2006, no pet.); *Flagship Hotel*, 117 S.W.3d at 564-66; *Solar Soccer Club v. Prince of Peace Luth. Church*, 234 S.W.3d 814, 829 n.2 (Tex.App.—Dallas 2007, pet. denied); *Structural Metals, Inc. v. S&C Elec. Co.*, 590 Fed. Appx. 298, 305 (5th Cir. 2014). PHA's cases defining "claim" as

"demand for compensation" do not address whether a claim can encompass multiple theories. *See* PHASupp:61.[15]

Accordingly, if Zachry obtains relief on ***any*** theory underlying its breach-of-contract claim—for example, its judgment for improperly withheld LDs affirmed by the Supreme Court—then Zachry prevails, and PHA is not entitled to fees.

PHA argues it should recover attorneys' fees if it wins on the R&R claim because it is the "main issue." PHASupp:62-63. But the ***judgment*** determines whether attorneys' fees are proper. *Intercontinental*, 295 S.W.3d at 656. As long as Zachry obtains relief in the judgment on its breach-of-contract claim, regardless of theory, it prevails. *See id.* at 654; *see Flagship*, 117 S.W.3d at 564 (inquiry is whether agreement was breached, "not the extent of the breach."). Furthermore, *Intercontinental* cast doubt on whether the prevailing party should be determined by "main issue" analysis. *See Intercontinental*, 295 S.W.3d at 661; *see also id.* at 659 n.42.

Even if "main–issue" analysis is viable, when only one party receives

---

[15] PHA implies that because the attorneys'-fee question segregated fees between breach-of-contract theories, Zachry does not assert a single claim. PHASupp:61-62. Nothing required Zachry to object to the Charge—which broke out fees by theory to avoid any need for retrial if Zachry was incorrect—to preserve its argument that Zachry prevails if it wins any breach-of-contract theory.

But Zachry did object. 71:72(A41) ("Attorneys' fees should not be submitted at all…."). As here, it argued, "regardless of what happens on the remaining breach-of-contract theories, Zachry will have a net recovery on its breach-of-contract claim, and as a matter of law, [PHA] cannot be the prevailing party." *Id.*

66

judgment in its favor, "regardless of the amount of damages," "courts have concluded that party prevailed on the main issue." *Flagship*, 117 S.W.3d at 564. "Main-issue" analysis applies (if at all) in cases—like those cited by PHA—where the Court must determine who prevails when neither party obtains relief. *See Bhatia v. Woodlands North Houston Heart Ctr.*, 396 S.W.3d 658, 663, 671 (Tex.App.—Houston [14th Dist.] 2013, pet. denied); *SEECO, Inc. v. K.T. Rock*, 416 S.W.3d 664, 666, 674 (Tex.App.—Houston [14th Dist.] 2013, pet. denied).

## IX. Zachry's recovery on its pass-through claim should be affirmed.

On January 1, 2008, Zachry reorganized. PX529; 47:123-29. Under the new structure, Zachry subcontracted with a new Zachry entity, "the Sub," to finish the wharf. *Id.*; 47:129-31; PX643(A37); PX642(A38). The Sub employed the same people that worked on the project pre-reorganization. 47:129. Going forward, the Sub incurred the costs from PHA's breach. PX642(A38); PX643(A37); 47:132-34. Zachry must reimburse the Sub for those costs, including any recovery in this case. *Id.*

### A. Zachry asserts a valid pass-through claim.

PHA contends Zachry cannot assert a pass-through claim because it hired the Sub after PHA's breach, and thus "PHA's…breach…did not cause Zachry to breach the subcontract." PHASupp:65. But nothing in the seminal case approving pass-through agreements requires a breach by Zachry. *See Interstate Contracting*

*Corp. v. City of Dallas*, 135 S.W.3d 605, 619-20 (Tex. 2004) (outlining "requirements"). *Interstate* requires only that Zachry "remain liable to the subcontractor for damages sustained by the subcontractor." *Id.* at 619.

*Interstate* also recognizes a general contractor's decision to hire a sub to perform work necessitated by the owner's breach does not preclude the contractor from recovering the cost for the sub. *Id.* at 611. "Otherwise, the owner could receive a windfall because the subcontractor lacked privity with the owner and the contractor lacked standing to sue the owner for damages suffered by the subcontractor." *Id.* at 615-16.

Here, Zachry established its continuing liability to the Sub for the costs the jury assessed. In the Management Services Agreement ("MSA"), Zachry promised (1) "to pay to [the Sub] the Reimbursable Costs" it incurred while performing Services for Zachry, and (2) to pay to the Sub any payments it received from the owner. PX643.0004, ¶3.1(A37). In the Pass-Through Agreement, Zachry "agree[d]...it is liable to [the Sub], to present the ZCC Claims and remit any recovery from the Port of Houston to [the Sub], in accordance with the terms of this Agreement." PX642, ¶1.1(A38). Testimony confirmed Zachry's continuing liability to the Sub. 47:127, 130-34.

The burden therefore shifted to PHA to negate this continuing liability: "*If the owner disputes that this requirement [of continuing liability] has been met, it*

68

***bears the burden of proving, as an affirmative defense***, that the pass-through arrangement negates the contractor's responsibility for the costs incurred by the subcontractor." 135 S.W.3d at 619-20 ("The owner disproves…contractor's continuing liability only if it can show… contractor is not obligated to remit any recovery to…subcontractor.").

PHA asserts Zachry might not remain liable to the Sub. PHA speculates—incorrectly—that owners on other MSA contracts might have paid Zachry more than the Reimbursable Costs on their contracts, and that any such excess payments limit Zachry's liability for Reimbursable Costs for the PHA Contract. PHA's argument fails to meet its burden.

First, PHA misunderstands the MSA. It unambiguously states, "Zachry agrees to pay to Manager [the Sub] the Reimbursable Costs." PX643.0004, §3.1(A37). PHA incorrectly reads §3.2 to limit Zachry's obligation to pay Reimbursable Costs when Contract Payments exceed Reimbursable Costs. To the contrary, it unambiguously provides the parties shall divide "such excess amounts" in "a mutually satisfactory allocation." *Id.* at §3.2(A37). Nothing in the MSA suggests that allocation of "such excess amounts" limits Reimbursable Costs Zachry must pay to the Sub on other contracts. *Id.*(A37).

Second, even if PHA reads the MSA correctly, PHA proved no other contract "windfall" to negate Zachry's liability for the Sub's Reimbursable Costs

on this Contract.

**B.     The Court correctly charged the jury on pass-through.**

PHA's charge-error arguments likewise fail. Zachry unambiguously agreed to pay the Sub Reimbursable Costs, and PHA failed to negate Zachry's liability to the Sub.     Accordingly, the trial court properly granted a directed verdict recognizing the pass-through agreement's validity and Zachry's right to recover the Sub's damages, and properly declined to charge the jury to include those costs only "to the extent" Zachry agreed to reimburse the Sub for them. 71:11-13(A40); CR59:17365-74.  Nor was the Court's instruction that the jury "should" include in damages any Reimbursable Costs an improper comment.

**C.     Waiver of immunity applies to the pass-through claims.**

Nor does immunity bar pass-through claims.   *City of San Antonio v. Valemas*, 2012 WL 2126932, *7 (Tex.App.—San Antonio 2012, no pet.); *Hensel Phelps Constr. v. McCarthy Bld'g*, 2005 WL 1489932, *4 (N.D. Tex. 2005). *Cf. Galveston I.S.D. v. Clear Lake Rehab. Hosp.*, 324 S.W.3d 802, 810 (Tex.App.— Houston [14th Dist.] 2010, no pet.) ("§271.152's waiver…[applies to] a ***class of suits***—suits for purposes of adjudicating a claim for breach of contract subject to [Chapter 271]—without restricting which parties can bring suit") (emphasis original)).[16]

---

[16] The pass-through did not evade the no-assignment clause. PHASupp:63 n.6.  Zachry expressly did not assign the Contract.  PX643.0001, ¶C (A37).  *Interstate* recognized the validity of pass-

# PRAYER

The trial court's judgment should be affirmed.

Respectfully submitted,

By:   /s/  Robin C. Gibbs

**REYNOLDS FRIZZELL LLP**
Brandon T. Allen
State Bar No. 24009353
ballen@reynoldsfrizzell.com
1100 Louisiana, Suite 3500
Houston, Texas 77002
Phone: (713) 485-7200
Fax: (713) 485-7520

**ALEXANDER DUBOSE JEFFERSON & TOWNSEND LLP**
Douglas W. Alexander
State Bar No. 00992350
dalexander@adtappellate.com
515 Congress Avenue, Suite 2350
Austin, Texas 78701-3562
Phone: (512) 482-9301
Fax: (512) 482-9303

**GIBBS & BRUNS, L.L.P.**
Robin C. Gibbs
State Bar No. 0785300
rgibbs@gibbsbruns.com
Jennifer Horan Greer
State Bar No. 00785611
jgreer@gibbsbruns.com
Sydney G. Ballesteros
State Bar No. 24036180
sballesteros@gibbsbruns.com
Michael R. Absmeier
State Bar No. 24050195
mabsmeier@gibbsbruns.com
Amanda B. Nathan
State Bar No. 00784662
anathan@gibbsbruns.com
1100 Louisiana, Suite 5300
Houston, Texas 77002
Phone: (713) 650-8805
Fax: (713) 750-0903

ATTORNEYS FOR APPELLEE, ZACHRY CONSTRUCTION CORPORATION

---

through agreements as distinct from assignments. 135 S.W.3d at 616; *see also Valemas*, 2012 WL 2126932, *8-9.

71

# CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of June, 2015, a copy of the foregoing instrument was served upon the following counsel by electronically filing with the Clerk of Court using the TexFile electronic filing system which will send notification of such filing to the following and via e-mail:

David E. Keltner
State Bar No. 11249500
david.keltner@kellyhart.com
Marianne Auld
State Bar No. 01429910
marianne.auld@kellyhart.com
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas  76102

David H. Brown
State Bar No. 03109200
dbrown@bkllp.com
BROWN & KORNEGAY LLP
2777 Allen Parkway, Suite 977
Houston, Texas  77019

Karen L.T. White
State Bar No. 20274500
karen@kltwpc.com
KAREN L.T. WHITE, P.C.
2777 Allen Parkway, Suite 977
Houston, Texas  77019

Marie R. Yeates
State Bar No. 22150700
myeates@velaw.com
Catherine B. Smith
State Bar No. 03319970
csmith@velaw.com
VINSON & ELKINS L.L.P.
1001 Fannin, Suite 2500
Houston, Texas  77002

Michael A. Heidler
State Bar No. 24059921
mheidler@velaw.com
VINSON & ELKINS L.L.P.
2801 Via Fortuna, Suite 100
Austin, Texas  78746

Bill Sims
State Bar No. 18429500
bsims@velaw.com
VINSON & ELKINS L.L.P.
2001 Ross Avenue, Suite 3700
Dallas, Texas  75201

*Attorneys for Respondent, The Port of Houston Authority of Harris County, Texas*

Joe F. Canterbury, Jr.
State Bar No. 03761000
jcanterbury@canterburylaw.com
CANTERBURY ELDER GOOCH SURRATT SHAPIRO & STEIN
Occidental Tower
5005 LBJ Freeway, Suite 1000
Dallas, Texas 75244
*Attorneys for Amicus Curiae Associated General Contractors of Texas, Inc.*

Michael Keeley
State Bar No. 11157800
michael.keeley@strasburger.com
STRASBURGER & PRICE, LLP
901 Main Street, Suite 4400
Dallas, Texas 75202
*Attorney for Amicus Curiae Zurich Surety*

/s/ Jennifer Horan Greer
Jennifer Horan Greer

73

# CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), I certify that this brief contains 15,000 words. This word count excludes the words excluded from the word count pursuant to Texas Rule of Appellate Procedure 9.4(i)(l). This is a computer-generated document created in Microsoft Word, using 14-point typeface for all text, except for footnotes, which are in 12-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

/s/ Jennifer Horan Greer
Jennifer Horan Greer

# APPENDIX TO ZACHRY CONSTRUCTION CORPORATION'S
# SUPPLEMENTAL BRIEF OF APPELLEE

## Clerk's Record

1. Final Judgment dated April 28, 2010 (CR62:18163-68)

2. *Port of Houston Authority of Harris County v. Zachry Construction Corporation*, 377 S.W.3d 841 (Tex. App.—Houston [14th Dist.] 2012), *rev'd*, 449 S.W.3d 98 (Tex. 2014).

3. *Zachry Construction Corporation v. Port of Houston Authority of Harris County*, 449 S.W.3d 98 (Tex. 2014).

4. Charge of the Court and Verdict dated January 14, 2010 (CR59:17386-409)

5. Order on Zachry's 11 Part Motion for Pretrial Determination of Issues of Law (Rule 166(g) Motion) dated October 5, 2009 (CR46:13296-309)

6. Order Granting in Part and Denying in Part Plaintiff's Motion to Strike the Port's Offset and Withholding Defenses dated October 16, 2009 (CR51:14948-52)

7. Order on PHA's Request that the Court Reconsider Its November 12, 2009 Open-the-Door Ruling Regarding the Port's Actual Harms (1SCR6:1112-17)

8. Plaintiff's Fourth Amended Petition and First Amended Answer to PHA's Counterclaim for Attorneys' Fees (CR29:08131-48)

9. Third Amended Original Answer and Counterclaim for Attorneys' Fees (CR45:13008-35)

10. Excerpts from The Port of Houston Authority's Second Amended Response to Plaintiff's Request for Disclosure (CR46:13036-77)

11. The Port of Houston Authority's Objections and Responses to Zachry's Fourth Set of Interrogatories and Fourth Request for Production (CR46:13105-16)

12. Defendant Port of Houston Authority's Proposed Draft Jury Charge filed September 9, 2007 (CR43:12401-20)

## Exhibits

13. Contract, General Conditions (DX1-1.0177-235)

14. Contract, Technical Specifications, Section 02161 Trench Excavation and Shoring Safety Plan (DX1-1.0324-29)

15. Contract, Technical Specifications, Section 01500 Temporary Facilities and Controls (DX1-1.0271-82)

16. Contract, Special Conditions, §12 (DX1-1.0244)

17. Contract, Addendum No. 8 (DX1-1.0021)

18. Email from Thiess to Anderson dated August 1, 2004 (PX84)

19. Acceptance for Records of Main Freeze Wall Plan (PX88)

20. Transcript of April 5, 2005 Meeting (PX8)

21. April 13, 2005 Proposal for Wharf Extension (PX9)

22. May 18, 2009 Proposal for Wharf Extension (PX179)

23. July 11, 2005 Proposal for Wharf Extension and Ditch K (PX219)

24. Request for Port Commission Action for Execution of Change Order 4 Signed by Port Facilities Director James Jackson and Chief Engineer Steve DeWolf with origination date of July 18, 2005 (PX224)

25. September 9, 2005 Frozen Cutoff Wall Design (PX10)

26. Transcript of September 13, 2005 Weekly Construction Coordination Meeting (PX274)

27. Email string between Andy Thiess and Jeff Ely and others dated September 14, 2005 (PX11)

28. Memorandum dated September 14, 2005 from Port Facilities Director Jackson to Port Executive Director Kornegay recommending approval of Change Order 4 (PX3)

29. McQueen email to Thiess dated September 15, 2005 (PX280)

30. Change Order 4 (PX12)

31. Mageau Report on Effect of Freezing and Thawing of Cutoff Wall on Drilled Shafts dated September 28, 2005 (PX14)

32. McQueen email to Ely dated October 10, 2005 (PX1)

33. The Port's October 11, 2005 Response to Zachry's September 9, 2005 Frozen Cutoff Wall Design (PX266)

34. Transcript of October 11, 2005 Weekly Construction Coordination Meeting (PX314)

35. Thiess email to Ely dated November 13, 2005 (PX2)

36. Email string between McQueen, Thiess, Ely, and others dated March 21, 22, and 28, 2007 (PX504)

37. Management Services Agreement (PX643)

38. Pass-through Agreement (PX642)

39. Excerpts from Construction Management Agreement (PX57.0001-10, 57.0033)

**Reporter's Record**

40. Court's Ruling on Directed Verdict (71:8-15)

41. Objections to the Charge (71:15-73)

**Statutes**

42. Texas Local Government Code §271.151 through §271.160 (Vernon 2005)

43. Texas Civil Practices and Remedies Code §16.071

3

**TAB 1**

**Final Judgment dated April 28, 2010
(CR62:18163-68)**

CAUSE NO. 2006-72970

| | | |
|---|---|---|
| ZACHRY CONSTRUCTION | § | IN THE DISTRICT COURT OF |
| CORPORATION n/k/a Zachry Industrial, | § | |
| Inc. | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| PORT OF HOUSTON | § | |
| AUTHORITY OF HARRIS | § | |
| COUNTY, TEXAS | § | 151ˢᵗ JUDICIAL DISTRICT |

**FILED**
Loren Jackson
District Clerk

APR 28 2010

Time:

BY

## FINAL JUDGMENT

On October 20, 2009, this case was called for trial. Plaintiff Zachry Construction Corporation, now known as Zachry Industrial, Inc., appeared through its representatives and through its attorneys and announced ready for trial. Defendant, Port of Houston Authority of Harris County, Texas, appeared through its representatives and through its attorneys and announced ready for trial.

After the jury was impaneled and sworn, it heard the evidence and arguments of counsel. After the close of the defendant's case and the close of all evidence, Zachry Construction Corporation moved for a directed verdict. The Court orally granted a directed verdict on certain issues, as stated in open court on January 14, 2009. The Charge of the Court was then submitted to the jury, and in response, the jury made findings that the Court received, filed, and entered of record. The questions submitted to the jury and the jury's findings are attached as Exhibit A to Zachry's Motion for Judgment and Motion to Disregard Jury Findings or for JNOV with Respect to Certain Jury Findings and incorporated by reference.

After the verdict, Zachry Construction Corporation filed its Motion for Judgment and Motion to Disregard Jury Findings or for JNOV with Respect to Certain Jury Findings, specifically asking the Court to disregard the jury's answers to Question Nos. 12.A. and 13.

: 18163

Zachry later filed its Supplemental Motion for Judgment and to Disregard Certain Jury Findings, specifically asking the Court to also disregard the jury's answers to Question Nos. 4 and 9, and to disregard Question No. 5 as a basis for reducing Zachry's damages.

While the parties have extensively briefed myriad issues after the jury rendered its verdict, the Court wishes to write briefly on the central issue on which Defendant Port of Houston Authority seems to have focused, sovereign immunity: The Court has carefully considered the authority that the parties presented on this issue. The Court is not persuaded that Texas law precludes an award to Plaintiff Zachry Construction Corporation for the damages found by the jury. The Court has read and considered, among many other cases, *Tooke v. City of Mexia*, 197 S.W.3d 325 (Tex. 2006), *McKinney & Moore, Inc. v. City of Longview*, No. 14-08-00628-CV, 2009 WL 4577348 (Tex. App.--Houston [14th Dist.] Dec. 8, 2009, pet. filed), and *City of Houston v. Southern Electric Services*, 273 S.W.3d 739 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

The last case, *Southern Electric*, provides guidance for the Court. The Court understands that the case involved a plea to the jurisdiction, *id.* at 744, and that the current matter does not. Nevertheless, the court in *Southern Electric* was still squarely faced with the question of whether a pleading of damages that were not expressly contemplated by the contract at issue, but were instead, *clearly outside* of the contract, deprived the trial court of jurisdiction as being outside of the damages permitted in section 271.153. *Id.* The court in *Southern Electric* seems to have understood what it was dealing with, and could easily have concluded that the pleading of the damages for increased costs to perform the contract, which was unquestionably outside of the four corners of the contract, *id.*, deprived the trial court of jurisdiction. The court did not, and instead essentially found section 271.153 to be a mere limitation on damages (and it was

2

published after the Supreme Court's opinion in *Tooke*). *Id.* Indeed, the court in *Southern Electric* seems to have held that by pleading for damages that were clearly outside the express terms of the contract, the plaintiff in that case nevertheless had "alleg[ed] facts to support their claim that the City has not paid the balance due and owed under the contract." *Id.* (internal quotations omitted). Finally, contrary to the Defendant Port of Houston Authority's arguments, both *Southern Electric*, 273 S.W.3d at 744, and *City of Mesquite v. PKG Contracting, Inc.*, 263 S.W.3d 444, 448 (Tex. App.-Dallas 2008, no pet.) (both written after *Tooke*) seem to conclude that section 271.153 is not jurisdictional, but merely a limitation on damages.

In the end, the Court is unwilling to find that the "balance due and owed" language in 271.153 *et seq.* requires that the types of damages that a contractor sues for after an alleged breach of contract by the owner have to be expressly listed in the contract. The Court believes that despite Defendant Port of Houston Authority's excellent briefing and arguments to the contrary, such a finding would likely lead to absurd results. The Court can imagine contracts expanding to include hundreds of pages of boilerplate and surplussage, drafted by battalions of lawyers (not that the Court has anything against lawyers), that no one reads just to cover any possible contingency, and any permutation or derivation of any such contingency. If that were so, and if Mr. Nixon's statements in the legislative history really carried the day, then such language could have easily been included in section 271.153. It was not.

The Court believes that it understands and appreciates Defendant Port of Houston Authority's position that the limitation on damages contained in Texas Local Gov't Code section 271.153 *et seq.* is part of the limited waiver of sovereign immunity and thus those provisions should be construed narrowly. The bottom line is that, whether that position is correct or not, the Court does not find that this issue to be dispositive. The Court's view is that the answer is in the

3

: 18165

language of sections 271.153(a)(1) and (2). That is, the Court finds that the damages are direct damages and constitute (a) the balance due and owed by the local governmental entity under the contract as it may have been amended, including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration; or (2) the amount owed for change orders or additional work the contractor is directed to perform by a local governmental entity in connection with the contract, or both. That is true whether the section is interpreted narrowly or broadly.[1]

The Court has considered Zachry Construction Corporation's motions, the Port's Motions for JNOV, the parties responses, as well as the parties replies and sur-replies, the record in this matter, and the jury verdict, and RENDERS judgment for Zachry Construction Corporation and against the Port of Houston Authority of Harris County, Texas, as follows:

(1)     It is ORDERED, ADJUDGED, AND DECREED that Zachry Construction Corporation recover damages from the Port of Houston Authority of Harris County, Texas in the sum of $19,992,697.00, which was determined by subtracting the jury's award of $970,000.00 in offset damages in its answer to Question 12(A) from the other amounts awarded to Plaintiff Zachry Construction Corporation. Further, the Court has not awarded the $600,000 withheld for dredging work that the jury refused to award to Plaintiff;

(2)     It is further ORDERED, ADJUDGED, AND DECREED that Zachry Construction Corporation recover from the Defendant Port of Houston Authority of Harris County, Texas prejudgment interest on that sum in the amount of $3,451,022.40, which is

---

[1] The Court is also not persuaded that any narrow reading of section 271.153 relates to the continued existence of common law exceptions to the no-damages-for-delay clause in the Wharf and Dredging Contract. This Court has repeatedly held in this case that those provisions are part of Texas law. And, section 271.151 et seq. does not expressly eliminate these defenses. Indeed, section 271.155 would seem to defeat the Port's argument that such defenses no longer exist. Of course the legislature was aware of the existence of these defenses in Texas case law, and could have easily addressed them in the statutory scheme.

4

: 18188

determined by taking the award of actual damages of $19,992,697.00, and calculating an annual rate of interest of 5% from November 15, 2006 through the day before the entry of judgment, April 28, 2010. The total of these two figures is $23,443,719.00;

(3)    It is ORDERED, ADJUDGED, AND DECREED that Zachry Construction Corporation recover from the Port of Houston Authority of Harris County, Texas postjudgment interest from the date of this Final Judgment on the total sum awarded of $23,443,719.00, at the rate of 5% per annum, compounded annually; and

(4)    It is ORDERED, ADJUDGED, AND DECREED that Zachry Construction Corporation recover all taxable costs of court from the Port of Houston Authority.

The Court ORDERS, ADJUDGES, AND DECREES that execution shall issue for this judgment, and that Zachry Construction Corporation is granted all writs and processes necessary to enforce this final judgment.

All relief not expressly granted herein is DENIED.

This judgment is final, disposes of all parties, and is appealable.

Signed this **APR 2 8 2010** day of April, 2010.

_____
The Honorable Mike Engelhart

5

: 18167

APPROVED AS TO FORM:

GIBBS & BRUNS, LLP

BY:___/s/ Jennifer Horan Greer_____
Robin C. Gibbs
State Bar No. 07853000
Jennifer Horan Greer
Texas Bar No. 00785611
Sydney G. Ballesteros
Texas Bar No. 24036180
Michael R. Absmeier
State Bar No. 24050195
1100 Louisiana, Suite 5300
Houston, Texas 77002
Phone: (713) 650-8805
Fax: (713) 750-0903

REYNOLDS, FRIZZELL, BLACK,
DOYLE, ALLEN & OLDHAM L.L.P.

Brandon T. Allen
State Bar No. 24009353
1100 Louisiana, Suite 3500
Houston, Texas 77002
Phone (713) 485-7200
Fax (713) 456-2651

**ATTORNEYS FOR PLAINTIFF**

: 18168

**TAB 2**

***Port of Houston Authority of Harris County v.***
***Zachry Construction Corporation***,
**377 S.W.3d 841 (Tex. App.—Houston [14[th] Dist.] 2012),**
*rev'd***, 449 S.W.3d 98 (Tex. 2014).**

**377 S.W.3d 841**
**Court of Appeals of Texas,**
**Houston (14th Dist.).**

The PORT OF HOUSTON AUTHORITY OF HARRIS COUNTY, Texas, Appellant

v.

ZACHRY CONSTRUCTION CORPORATION, Appellee.

**No. 14–10–00708–CV. | Aug. 9, 2012.**

**Synopsis**
**Background:** Construction contractor brought action against county port authority for breach of contract. The 151st District Court, Harris County, No.2006–72970, Mike Engelhart, J., entered judgment on jury verdict for contractor. Port authority appealed.

**Holdings:** The Houston Court of Appeals, Sharon McCally, J., held that:

[1] no-damages-for-delay clause barred damages for active interference or bad faith;

[2] contractor released claims to recover withheld funds;

[3] evidence supported finding that contractor breached contract as to epoxy coating of fenders; and

[4] port authority was not required to establish that its expenditure to repair fenders was reasonable.

Reversed.

Tracy Christopher, J., filed dissenting opinion.

West Headnotes (26)

**[1]**      **Contracts**—Intention of Parties

The court's primary concern when it construes a written contract is to ascertain the parties' true intent as expressed in the contract.

Cases that cite this headnote

**[2]**      **Contracts**—Construction as a whole

Courts must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of

a contract so that none will be rendered meaningless.

Cases that cite this headnote

[3]     **Appeal and Error** Cases Triable in Appellate Court

The construction of an unambiguous contract is a question of law for the court, which is reviewed de novo.

Cases that cite this headnote

[4]     **Public Contracts** Delay of government and liability for damages
        **Water Law** Contracts

No-damages-for-delay clause of county port authority's contract with construction company to build wharf barred construction company from recovering damages on its breach of contract claim against port authority for delaying or hindering construction, even if port's conduct constituted arbitrary and capricious conduct, active interference, bad faith, and fraud, where the clause covered "other fault" in addition to negligence and breach of contract, and the clause provided for extension of time as a remedy.

Cases that cite this headnote

[5]     **Contracts** Freedom of contract
        **Contracts** Public Policy in General

Parties are free to contract as they see fit, as long as their agreement does not contravene public policy.

Cases that cite this headnote

[6]     **Contracts** Rewriting, remaking, or revising contract

Courts do not rewrite contracts to insert provisions parties could have included or imply restraints for which they have not bargained.

Cases that cite this headnote

[7]     **Contracts** Freedom of contract

The parties are entitled to select what terms and provisions to include in a contract before executing it and, in so choosing, each is entitled to rely upon the words selected to demarcate their respective obligations and rights.

Cases that cite this headnote

[8]     **Release** Nature and requisites in general

A "release" is a writing that provides that a duty or obligation owed to one party to the release is discharged immediately or upon the occurrence of a condition.

1 Cases that cite this headnote

[9]     **Release** General rules of construction

Releases are subject to the usual rules of contract construction.

Cases that cite this headnote

[10]     **Release** General rules of construction

As in other instances of contract construction, the court's primary concern in interpreting a release is to ascertain the intent of the parties at the time of the execution of the alleged release as expressed in the release.

1 Cases that cite this headnote

[11]     **Release** General rules of construction

To construe a release, courts may examine evidence of the circumstances surrounding the negotiation and execution of the release.

1 Cases that cite this headnote

[12]     **Release** General rules of construction

To construe a release, courts may consider the deletions made by the parties in the course of drafting the instrument

at issue.

Cases that cite this headnote

**[13]**     **Release**⚲General rules of construction

To construe a release, courts may consider the title of the document, but such is not dispositive.

Cases that cite this headnote

**[14]**     **Release**⚲Scope and extent in general

For a release to be effective, it must mention the claim to be released, but the release need not specifically describe a particular cause of action.

Cases that cite this headnote

**[15]**     **Release**⚲General rules of construction
         **Release**⚲General release

Even where the parties' agreement does not contain the term "release," the intent of the parties controls, and the legal effect of the instrument may be a general release.

Cases that cite this headnote

**[16]**     **Release**⚲Release of damages for breach of contract

Documents titled "Partial Release of Lien" were releases of construction contractor's claims against project owner for the entire amounts stated on payment estimates submitted with monthly invoices, even though the body of the documents contained neither the word "release" nor the word "lien," and even though general release language that appeared in an earlier version of the document was omitted from the documents at issue, where the documents stated that contractor "has no further claims against" project owner "for the portion of the Work completed and listed on the Schedule of Costs" in the respective payment estimates.

Cases that cite this headnote

[17]    **Release**—General release

A broad, general release releases every potential cause of action pertaining to the subject matter.

Cases that cite this headnote

[18]    **Release**—Scope and extent in general

Texas law requires identification of the claim to be released, not quantification.

Cases that cite this headnote

[19]    **Appeal and Error**—Total failure of proof

Court of Appeals may not sustain a legal sufficiency, or "no evidence" point unless the record demonstrates that: (1) there is a complete absence of a vital fact; (2) the court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact.

2 Cases that cite this headnote

[20]    **Public Contracts**—Evidence
        **Water Law**—Contracts

Evidence that thickness tests conducted on wharf fenders indicated that the layer of epoxy coating was much thicker than specified by the construction contract presented "some evidence" supporting jury's finding that construction contractor breached its contract with county port authority.

Cases that cite this headnote

[21]    **Public Contracts**—Evidence
        **Water Law**—Contracts

Engineer's report stating that a layer of epoxy coating failed to penetrate into wharf fenders' porous metalized aluminum substrate because the layer was insufficiently thinned, and that the fenders corroded as a result, presented "some evidence" supporting jury's finding that construction contractor's breach of a contract with county port authority that specified the thickness of the coating compromised the sealing of porosity and directly caused the fenders' corrosion.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Cases that cite this headnote

[22]     **Public Contracts**🔑Damages and amount of recovery
         **Water Law**🔑Contracts

Port authority was not required to establish that its expenditure of $978,000 to repair wharf fenders that corroded due to construction contractor's breach of contract reflected the "reasonable and necessary" cost to repair the fenders, where the contract itself did not require that the loss be "reasonable and necessary" for recovery.

Cases that cite this headnote

[23]     **Pretrial Procedure**🔑Facts taken as established or denial precluded; preclusion of evidence or witness

Trial court did not abuse its discretion in ruling that billing attorney's testimony about document production was not expert testimony, in allowing the testimony on the issue of an attorney fee award despite the fact that attorney had not been designated as an expert.

Cases that cite this headnote

[24]     **Costs**🔑Items and amount; hours; rate

Guidelines applicable to an attorney fee award are: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

Cases that cite this headnote

[25]     **Appeal and Error**🔑Fees

Contractor did not waive its challenge on appeal to factual sufficiency of evidence supporting attorney fee award, in allegedly waiving challenges to attorney fees expert's methodology.

Cases that cite this headnote

[26]     **Costs**⚖Contracts

Factually sufficient evidence supported attorney fee award of over $10 million in attorney fees to county port authority to defend contractor's $30 million claims, including evidence that, rather than providing copies of responsive documents to port authority, contractor asked the port authority's attorneys to perform document review at an un-air conditioned, metal container facility, and that the facility was "crammed full of boxes not organized in any manner."

Cases that cite this headnote

**Attorneys and Law Firms**

**\*843** David E. Keltner, Fort Worth, TX, Marie R. Yeates, Houston, TX, for Appellant.

Jennifer Horan Greer, Robin C. Gibbs, Houston, TX, for Appellee.

Panel consists of Justices BOYCE, CHRISTOPHER, and McCALLY.

**\*844 MAJORITY OPINION**

SHARON McCALLY, Justice.

Zachry Construction Corporation (Zachry) sued the Port of Houston Authority of Harris County, Texas (the Port) for breach of contract arising from the Bayport Terminal Complex Phase 1A Wharf and Dredging Contract. Following a three-month jury trial, the trial court entered a final judgment, awarding Zachry damages in the amount $19,992,697, plus pre- and post-judgment interest. The Port appeals the final judgment in eleven issues. Zachry also brings three issue on cross-appeal. We reverse and render.

## I. BACKGROUND

In 2003, the Port solicited bids to construct a wharf at the Bayport Ship Channel. The wharf consisted of five sections, each approximately 330 feet in length. Zachry's bid proposed building the wharf "in the dry" by using a U-shaped, frozen earthen wall to seal out water from Galveston Bay from the construction site. Zachry proposed to freeze the wall by sinking 100–foot pipes into the wall and circulating chilled brine through the pipes. Then, Zachry would install drilled shafts into the ground, pour a concrete deck on top of the drilled shafts and dirt using the ground as the bottom of the concrete form, excavate the dirt under the deck, and place revetment to stabilize the slope. After completing the wharf, Zachry would breach the freeze wall, flooding the area, and remove the remainder of the freeze wall so that ships would be able to dock at the wharf and unload their cargo.

An advantage of working "in the dry" instead of "in the wet" is that fewer "NOx" emission credits would be consumed. The Port accepted Zachry's bid because of the environmental benefits of using the freeze wall. On June 1, 2004, Zachry entered into the Bayport Phase 1A Wharf and Dredging Contract with the Port for the construction of a 1,660–foot wharf. The Port

had concerns about the possible impact of the frozen soil on adjacent structures but provided in the contract that Zachry would control the means and methods. Zachry hired RKK–SoilFreeze Technologies, which, in turn, hired Dan Mageau of GeoEngineers, a geotechnical engineer, to design the freeze wall.

The contract also provided a strict timeline. Specifically, Zachry was to complete construction of the wharf by June 1, 2006. Zachry was also to meet an interim deadline of February 1, 2006—Milestone A—by which a portion of the wharf would be sufficiently complete to allow delivery of large ship-to-shore cranes that were to be shipped from China. The contract also provided that Zachry's sole remedy for any delay on the project was an extension of time.

In March 2005, the Port decided to extend the original wharf Zachry was constructing by 332 feet. Zachry submitted price quotes for the wharf extension on April 13, May 18, and July 11. The Port and Zachry executed Change Order 4 for the wharf extension on September 27, 2005. Change Order 4 extended the dates for Milestone A to February 15, 2006, and final completion to July 15, 2006.

From Zachry's perspective, Change Order 4 incorporated the April 13 proposal as further modified by the May 18 and July 11 proposals. So, Zachry had Mageau design a frozen cutoff wall (frozen COW), a perpendicular wall to the main freeze wall, to split the project into two phases: a west side including Area A, and an east side. Zachry sent that September 9, 2005 frozen COW design to the Port for "review," not "approval." Zachry believed it had the right to use the frozen cutoff wall and to do so with "uninterrupted work process."

**\*845** From the Port's perspective, Zachry's September 9, 2005 frozen cutoff wall design was subject to a contractual technical specification that provided the Port with the right to respond. Because the contract specifically provided the Port a right to respond with a "revise and resubmit" (R & R), and because the Port had serious concerns about the design, that is precisely what it did. The Port provided its R & R response that (1) noted preliminary indications that the design may have an indeterminate effect on up to 14 shafts, (2) directed Zachry either to "present [an] alternative cutoff wall design" or to "present the Port of Houston with an alternate means of mitigating risk" to the shafts, and (3) allowed Zachry to use the frozen COW design if the shafts were protected.

Ultimately, in late November 2005, Zachry abandoned the frozen COW and switched to an "in the wet" scenario. The Port urges the course was Zachry's voluntary change in recognition that the freeze wall was "killing the schedule." Zachry urges that it was due to the Port's rejection of the frozen COW (Zachry's means and methods) and unwillingness to depart from the contract deadlines.

In May 2006, the Port notified Zachry that, due to Zachry's delay, the Port would begin withholding liquidated damages from payments on Zachry's monthly invoices. After withholding $2.36 million in liquidated damages, the Port voluntarily stopped withholding liquidated damages.

In late 2006, Zachry sued the Port for breach of contract, i.e., the R & R response, by failing to comply with Change Order 4 and section 5.10 of the contract, for the difference between the cost that Zachry would have incurred had it been allowed to complete the wharf "in the dry," i.e., using the frozen cutoff wall, and the actual cost Zachry incurred in completing the wharf "in the wet," i.e., without the frozen cutoff wall. Zachry also sued the Port for withholding liquidated damages for delays in the amount of $2.36 million, and for the Port's withholding of $600,000 as a purported offset for alleged defective dredging under Change Order 1. The Port filed a counterclaim for attorney's fees under section 3.10 of the contract, which provides that Zachry is liable for the Port's attorney's fees if Zachry brings a "claim" against the Port and "does not prevail with respect to such claim." Over two years after suing the Port, Zachry declared the wharf complete on January 26, 2009.

After a three-month trial, the case was submitted to the jury. The jury found that the Port had breached the contract by failing to comply with Change Order 4 and section 5.10, and found compensatory damages in the amount of $18,602,697 for the Port's breach of the contract. These damages represented Zachry's increased costs for switching to working in the "wet." The jury found that 58.13% of those damages were for delay or hindrance.

The jury did not find that the Port failed to comply with the contract by withholding $600,000 from the Port's payment on the amounts invoiced by Zachry for defective dredging.

The trial court instructed the jury that the Port had failed to comply with the contract by failing to pay Zachry $2.36 million withheld as liquidated damages. Thus, the jury needed only to determine whether the Port was entitled to offset; the jury found for the Port on the offset defense in the amount of $970,000 for Zachry's defective work on the Wharf fenders.

The jury found reasonable attorney's fees for the Port with respect to Zachry's claim relating to Change Order 4 and/or section 5.10: (1) $10,500,000 for trial; (2) **\*846** $90,000 for appeal to the court of appeals; and (3) $22,500 for appeal to the Texas Supreme Court. The jury found reasonable attorney's fees for the Port as to Zachry's claim for withholding the $2.36 million as liquidated damages and the $600,000 for dredging: (1) $80,250 for trial; (2) $3,750 for appeal to the court of appeals; and (3) $1,250 for appeal to the Texas Supreme Court.

In its final judgment, the trial court awarded Zachry damages in the amount of $19,992,697—$18,602,697 plus $2.36 million in liquidated damages, less the $970,000 offset for the defective fenders, pre-judgment interest in the amount of $3,451,022.40, post-judgment interest on the total sum award of $23,443,719, and taxable costs. The trial court did not award the $600,000 withheld for defective dredging that the jury refused to award to Zachry. The trial court did not award attorney's fees to the Port.

In this appeal, the Port claims that the evidence is legally and factually insufficient to support the jury's findings on breach, causation, and damages; governmental immunity bars Zachry's claim for R & R damages; the no-damages-for-delay clause bars Zachry's delay damages; Zachry's failure to obtain a change order bars its recovery of R & R damages; Zachry's failure to provide written notice of a breach bars its R & R damages; governmental immunity bars Zachry's "pass-through" claim damages incurred by its subcontractor; the trial court abused its discretion by excluding evidence of the Port's harms and losses; the Port's failure to comply with the contract by withholding liquidated damages was excused by release, as a matter of law; the trial court erred by instructing the jury on apparent authority; and the Port is entitled to attorney's fees.

In its cross-appeal, Zachry claims it is entitled to judgment, as a matter of law, for the $600,000 the Port withheld for defective dredging; the evidence is legally and factually insufficient to support to support the jury's findings that the Port did not fail to comply with the contract with respect to the fenders; and the evidence is factually insufficient to support the jury's findings on the amount of the Port's attorney's fees.

## II. ANALYSIS

### A. No–Damages–for–Delay Clause

Because we find the Port's Issue 4A dispositive of the award of R & R damages, we address it first. In Issue 4A, the Port contends that section 5.07's no-damages-for-delay clause bars Zachry's R & R damages. Specifically, the Port complains that the trial court erred by applying a common-law, tort-like "exception" to the contract's no-damages-for-delay clause. Section 5.07—the contract's no-damages-for-delay clause—provides:

> The Contractor shall receive no financial compensation for delay or hindrance of the Work. In no event shall the Port Authority be liable to the Contractor or any Subcontractor or Supplier, any other person or any surety for or any employee or agent of any of them, for any damages arising out of or associated with any delay or hindrance to the Work, regardless of the source of the delay or hindrance, including events of Force Majeure, AND EVEN IF SUCH DELAY OR HINDRANCE RESULTS FROM, ARISES OUT OF OR IS DUE, IN WHOLE OR IN PART, TO THE NEGLIGENCE, BREACH OF CONTRACT OR OTHER FAULT OF THE PORT AUTHORITY. The Contractor's sole remedy in any such case shall be an extension of time.

**\*847** Question No. 3 asked the jury: "What sum of money, if any, if paid now in cash, would fairly compensate Zachry for its damages, if any, that resulted from the Port's failure to comply?" Relevant to this issue, the trial court instructed the jury that the contract's no-damages-for-delay provision precluded Zachry's R & R damages for delay or hindrance unless the jury

found that such damages resulted from the Port's "arbitrary and capricious conduct, active interference, bad faith and/or fraud."[1] The jury found R & R damages in the amount of $18,602,697.

[1]    In Question No. 3, the trial court instructed the jury as follows with respect to section 5.07:
       You are instructed that § 5.07 of the Contract precludes Zachry from recovering delay or hindrance damages, if any, unless you find that the delay or hindrance damages, if any, resulted from a delay or hindrance that was the result of the Port's actions, if any, that constituted arbitrary and capricious conduct, active interference, bad faith and/or fraud.

Question No. 4 asked the jury: "What percentage of the damages that you found in your answer to Question No. 3 was for delay or hindrance damages?" The jury found 58.13% of Zachry's R & R damages resulted from delay or hindrance. However, in an agreed motion, the Port and Zachry asked the trial court to disregard the jury's finding that 58.13% of such damages were the result of delay or hindrance because such finding was not supported by legally and factually evidence and, instead, asked the trial court to find that the evidence conclusively established, as a matter of law, that the answer to Question No. 4 is 100%. The trial court entered an agreed order disregarding the jury's answer of 58.13% to Question No. 4 and found that it was conclusively established, as a matter of law, that the answer to Question No. 4 is 100%.

[1] [2] [3] Our primary concern when we construe a written contract is to ascertain the parties' true intent as expressed in the contract. *In re Serv. Corp. Int'l,* 355 S.W.3d 655, 661 (Tex.2011) (per curiam) (orig. proceeding); *Epps v. Fowler,* 351 S.W.3d 862, 865 (Tex.2011). "We must examine and consider the entire writing 'in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.' " *Grohman v. Kahlig,* 318 S.W.3d 882, 887 (Tex.2010) (per curiam) (quoting *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 662 (Tex.2005)). "We begin this analysis with the contract's express language." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.,* 341 S.W.3d 323, 333 (Tex.2011). The construction of an unambiguous contract is a question of law for the court, which we consider under a de novo standard of review. *Tawes v. Barnes,* 340 S.W.3d 419, 425 (Tex.2011); *see also Exxon Corp. v. Emerald Oil & Gas Co., L.C.,* 348 S.W.3d 194, 214 (Tex.2011) (op. on reh'g) ("Where an ambiguity has not been raised by the parties, the interpretation of a contract is a question of law.").

Zachry alleged that it suffered delay or hindrance damages on the project attributable to conduct by the Port, and the jury agreed. We have long recognized that "[i]n the absence of provision to the contrary, a contractor ... is entitled to recover damages from a contractee ... for losses due to delay and hindrance of work if it proves (1) that its work was delayed or hindered, (2) that it suffered damages because of the delay or hindrance, and (3) that the contractee was responsible for the act or omission which caused the delay or hindrance." **\*848** *City of Houston v. R.F. Ball Constr. Co.,* 570 S.W.2d 75, 77 (Tex.Civ.App.-Houston [14th Dist.] 1978, writ ref'd n.r.e.) (citing *Anderson Dev. Corp. v. Coastal States Crude Gathering Co.,* 543 S.W.2d 402 (Tex.Civ.App.-Houston [14th Dist.] 1976, writ ref'd n.r.e.)).

The Port of Houston alleged that section 5.07 is a "provision to the contrary." The trial court rejected the Port's construction of section 5.07 as a blanket prohibition of delay damages. Instead, through its instruction in Question No. 3, the trial court determined, as a matter of law, that the Port could not enforce section 5.07 to preclude delay or hindrance damages resulting from any action by the Port that constituted arbitrary and capricious conduct, active interference, bad faith, or fraud.

Inasmuch as the delay damages constitute 100% of the damages awarded, a threshold question this court must resolve on appeal is whether the damage award is tainted because the trial court misinterpreted the contract and engrafted common-law exceptions onto the contractual no-damages-for-delay provision.

Generally, courts of many other jurisdictions give only a "restrained approval" of no-damages-for-delay provisions because of their harshness. *See* Maurice T. Brunner, Annotation, *Validity and Constructions of "No Damage Clause" with Respect to Delay in Building or Construction Contract,* 74 A.L.R.3d 187, 201 (1976). Those courts, again generally, construe the provisions strictly against the owner/drafter. *Id.* It is this strict construction that formed the genesis for common-law exceptions to the no-damages-for-delay clause.

It is undisputed that the Texas Supreme Court has not resolved whether Texas recognizes these exceptions. *See Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 387–88 (Tex.1997) ("Assuming that these ... exceptions preclude the enforcement of no-damages-for-delay clauses, these exceptions have not been established in this case."). However, this court is not facing the

application of common-law exceptions to a no-damages-for-delay clause for the first time. *See R.F. Ball Constr. Co.,* 570 S.W.2d at 77–78. Because the parties dispute the application of our precedent,[2] we explore it in depth.

[2]     The Port states that "[t]his Court did not hold in *R.F. Ball* that Texas recognizes common law 'exceptions.' " On the other hand, citing *R.F. Ball,* among others, Zachry states that "Texas courts have repeatedly recognized and applied the [no-damages-for-delay] exceptions."

In *R.F. Ball,* the City of Houston appealed a judgment in favor of its contractor arising from the construction of portions of the Houston Intercontinental Airport. *Id.* at 76. Ball was scheduled to complete the project on April 30, 1967, but did not do so until June 9, 1969. During the project, Ball faced "several hundred 'Change Items' and between eight hundred and nine hundred 'Clarifications.' " *Id.* The City paid direct costs associated with these changes, but did not pay indirect or impact costs associated with the changes. *Id.* The types of indirect costs included disruption to the project and "general hindrance of efficient work which inevitably resulted from the changes." *Id.*

After a two-month trial, the jury awarded substantial damages to Ball and specifically found *inter alia* that (1) the number of changes was greater than foreseen by the parties; (2) the unforeseen changes caused Ball's delay; and (3) such delay was not foreseen when the parties entered into the contract. *Id.*

Thus, on appeal, this court faced these jury findings and a no-damages-for-delay clause that provided, in pertinent part:

> The Contractor shall receive no compensation for delays or hindrances to the **\*849** work, except when direct and unavoidable extra cost to the Contractor is caused by the failure of the City to provide information or material, if any, which is to be furnished by the City.... If delay is caused by specific orders given by the Engineers to stop work, or by the performance of extra work, or by the failure of the City to provide material or necessary instructions for carrying on the work, then such delay will entitle the Contractor to an equivalent extension of time ....

*Id.* at 77.

As a starting point, and citing to other jurisdictions, this court acknowledged that "one of the exceptions to the application of a [no-damages-for-delay] provision is that a delay which was not intended or contemplated by the parties to be within the purview of the provision is not governed by it." *Id.* (citing *Ace Stone, Inc. v. Twp. of Wayne,* 47 N.J. 431, 435, 221 A.2d 515 (1966); *W. Eng'rs, Inc. v. State Rd. Comm'n,* 20 Utah 2d 294, 296, 437 P.2d 216 (1968)). Referring again to other jurisdictions, we also noted three additional generally recognized exceptions to enforcement of no-damages-for-delay clauses.[3]

[3]     The additional exceptions we mentioned are: (1) delay resulting from fraud, misrepresentation, or other bad faith on the part of one seeking the benefit of the provision; (2) delay that has extended such an unreasonable length of time that the party delayed would have been justified in abandoning the contract; and (3) delay not within the specifically enumerated delays to which the no-damages-for-delay clause applies. *R.F. Ball Constr. Co.,* 570 S.W.2d at 77 n. 1 (citing *W. Eng'rs, Inc.,* 20 Utah 2d at 296, 437 P.2d 216).

With this background, we examined the intent of the parties arising from the specific language of the contract. Significantly, we specifically rejected Ball's line of cases that held that "if the delays or their cause were beyond the contemplation of the parties, then the [no-damages-for-delay] clause does not apply." *Id.* at 78 n. 2 ("We disagree with such cases since they preclude operation of the clause in situations where the character of the delay was unforeseen[,] the precise sort of delays the clause is designed to cover."). Ball obtained specific jury findings that the delay it occasioned fell directly within the common-law exception upon which it relied. *Id.* at 77–78. Nonetheless, we determined that, because the no-damages-for-delay clause was unambiguous and did not limit its application to foreseen delays, Ball could not establish a right to compensation for the indirect costs of the delay. *Id.* at 78.

Finally, we specifically addressed the policy underlying some courts' rejection or restriction of no-damages-for-delay clauses: such provisions are very harsh. *Id.* Nevertheless, relying explicitly on the "instructive" language of the United States Supreme Court, we explained:

> "Men who take $1,000,000 contracts for government buildings are neither unsophisticated nor careless. Inexperience and inattention are more likely to be found in other parties to such contracts than the contractors, and the presumption is obvious and strong that the men signing such a contract as we have here protected themselves against such delays as are complained of by the higher price exacted for the work."

*Id.* (quoting *Wells Bros. Co. v. United States,* 254 U.S. 83, 87, 41 S.Ct. 34, 65 L.Ed. 148 (1920)).

Thus, in *R.F. Ball,* we noted that the common-law exceptions to no-damages-for-delay provisions are "generally recognized" and, further, we analyzed one of the exceptions—that the "delay which was not intended or contemplated by the parties to be within the purview of the provision." **\*850** *Id.* at 77. However, we did not apply the exception because the contractor "ha[d] not established that the [no-damages-for-delay] clause was not intended to apply to unforeseen delays and hindrances and that it was only intended to apply to foreseeable ones." *Id.* at 78.

Here, the exceptions applied by the trial court addressed: "delay or hindrance that was the result of the Port's actions, if any, that constituted arbitrary and capricious conduct, active interference, bad faith and/or fraud." Under *R.F. Ball,* then, we must determine whether Zachry established that the no-damages-for-delay clause at issue was not intended to apply to delay or hindrance that was the result of the Port's actions. The plain language of the pertinent portion of the provision is as follows: "arising out of or associated with any delay or hindrance to the Work, regardless of the source of the delay or hindrance including events of Force Majeure, AND EVEN IF SUCH DELAY OR HINDRANCE RESULTS FROM, ARISES OUT OF OR IS DUE, IN WHOLE OR IN PART, TO THE NEGLIGENCE, BREACH OF CONTRACT OR OTHER FAULT OF THE PORT AUTHORITY." Thus, the parties' agreement states there are no damages for delay "regardless of the source."

Further, though the parties had already stated that the source of the delay was immaterial, they gave emphasis to their intent that delay due even in part to conduct by the Port was something they were specifically contemplating. And, as if specific mention might be insufficient, the parties typed the matters regarding conduct by the Port in all capital letters, which set it apart from the remainder of the paragraph. Finally, to give utmost emphasis, the parties described three categories of fault: (1) negligence, (2) breach of contract; or (3) other fault.

[4] We know that the delay or hindrance damages were caused, at least in part, by breach of contract. By its response to Question Nos. 1 and 2, the jury determined that the Port breached the contract—both Change Order 4 and section 5.10 of the contract. The jury answered Question No. 3 by finding damages "that resulted from" the breach in the amount of $18,602,697. By the parties' agreement regarding Question No. 4, the evidence conclusively established that 100% of those damages are delay or hindrance damages. Thus, 100% of the delay or hindrance suffered by Zachry resulted from the conduct of the Port, that is, breach of contract. In accord with *R.F. Ball,* we conclude that Zachry has failed to establish that the no-damages-for-delay clause was not intended to apply to the Port's breach of contract.

The jury was not asked to make a specific finding on whether the Port's conduct "constituted arbitrary and capricious conduct, active interference, bad faith and/or fraud." However, we conclude that even a specific jury finding would not interfere with the application of the no-damages-for-delay clause in this case. By the parties' emphasis on "other fault" to the specific exclusion of "negligence," the parties have communicated their intent that Port conduct that rises above mere negligence or is a departure from the standard of care does not preclude enforcement of the no-damages-for-delay clause. Again, in keeping with *R.F. Ball,* we conclude that Zachry has failed to establish that the no-damages-for-delay clause was not intended to apply to Port conduct including, arbitrary and capricious conduct, active interference, bad faith, or fraud.

As harsh as this result seems, Texas law respects the objective intent of the parties where contract provisions show that the parties contemplated delay when entering **\*851** into the contract. *See United States ex rel. Straus Sys., Inc. v. Associated Indem. Co.,* 969 F.2d 83, 85 (5th Cir.1992) (citing *R.F. Ball Constr. Co.,* 570 S.W.2d at 77). Here, the parties clearly contemplated that delay, even due to the Port's conduct, was a possibility and negotiated accordingly. Moreover, parties to a contract might foresee or consider the possibility of delay and contractually provide for a remedy to be applied upon such

occurrence. *Id.* (citing *R.F. Ball Constr. Co., 570 S.W.2d at 77).* Here, the parties did just that by agreeing that, in case of delay, Zachry's "sole remedy in any such case shall be an extension of time." We need not go so far as to hold, as some courts of other jurisdictions do, that because the parties provided a remedy for delay, such remedy is the exclusive remedy. *See id.* (noting courts that hold a provision in the contract for an extension of time in a case of delay amounts to an exclusive remedy, precluding recovery of damages from the contractor).

[5] [6] [7] "[T]he parties are free to contract as they see fit, as long as their agreement does not contravene public policy." *Tex. State Bd. of Med. Examiners v. Birenbaum,* 891 S.W.2d 333, 336 (Tex.App.-Austin 1995, writ denied) (citing *Scoville v. SpringPark Homeowner's Ass'n, Inc.,* 784 S.W.2d 498, 502 (Tex.App.-Dallas 1990 writ denied)). Courts do not rewrite contracts to insert provisions parties could have included or imply restraints for which they have not bargained. *Tenneco, Inc. v. Enter. Prods. Co.,* 925 S.W.2d 640, 646 (Tex.1996); *see also Am. Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 162 (Tex.2003) ("But we may neither rewrite the parties' contract nor add to its language."). Instead, "[p]arties to a contract are masters of their own choices and are entitled to select what terms and provisions to include in or omit from a contract." *Thedford Crossing, L.P. v. Tyler Rose Nursery, Inc.,* 306 S.W.3d 860, 867 (Tex.App.-Tyler 2010, pet. denied) (citing *Birnbaum v. SWEPI LP,* 48 S.W.3d 254, 257 (Tex.App.-San Antonio 2001, pet. denied)). Specifically, "[the parties] are entitled to select what terms and provisions to include in a contract before executing it. And, in so choosing, each is entitled to rely upon the words selected to demarcate their respective obligations and rights. In short, the parties strike the deal *they* choose to strike and, thus, voluntarily bind themselves in the manner *they* choose." *Natural Gas Clearinghouse v. Midgard Energy Co.,* 113 S.W.3d 400, 407 (Tex.App.-Amarillo 2003, pet. denied) (citing *Cross Timbers Oil Co. v. Exxon Corp.,* 22 S.W.3d 24, 26 (Tex.App.-Amarillo 2000, no pet.)) (emphasis in original).

Zachry argues that if we do not apply the common-law exceptions to the contract's no-damages-for-delay clause, then the contract would be unbreachable and illusory. Zachry asserts, for example, that the Port could force Zachry to switch its means and methods and thereby cause serious delays in Zachry's performance. Zachry also avers that the Port could create a delay that lasts in perpetuity and then grant Zachry an extension of time that lasts in perpetuity, thereby breaching the contract while leaving Zachry with no remedy. However, the parties are free to negotiate and agree upon the conditions under which (1) the contractor will recover damages for delay, and (2) another remedy is available to the contractor for any such delay. In June 2004, Zachry unambiguously agreed that it would perform the contract without the benefit of delay damages, even if the delay was caused by the Port's breach of contract, negligence, or other fault. Zachry faced significant delays; delays it alleged—and the jury agreed—were caused by the Port's breach of contract. In November 2005, Zachry **\*852** proceeded with construction "in the wet," knowing the contract afforded no damages for delay. We cannot rewrite the provision without depriving the Port of the benefit of the bargain the parties reached in June 2004.

Therefore, we conclude that the no-damages-for-delay clause in the parties' contract precludes Zachry's recovery of damages for its R & R claim. We sustain Issue 4A.[4]

---

[4]      In Issue 4B, the Port further asserts that the evidence is legally and factually insufficient to support the jury's finding of any common law "exceptions" included in the court's charge that could be recognized under Texas law. However, we need not address those arguments in light of our disposition of Issue 4A.

## B. Liquidated Damages

By Issue 9A, the Port also seeks reversal of the judgment for liquidated damages. The Port began withholding liquidated damages of $20,000 per day for Zachry's failure to meet Milestone A and the Wharf's final completion pursuant to sections 5.05 and 5.06 of the contract.[5] The trial court determined that the Port's withholding liquidated damages constituted a failure to comply with the contract. The Port does not appeal that ruling. Rather, the Port argues that any failure to comply with the contract by withholding liquidated damages was excused because Zachry released such claims as a matter of law.

---

[5]      Section 5.05 is entitled "Time of Completion and Liquidated Damages," while section 5.06 is entitled "Actual Damages in Lieu of Liquidated Damages." The Port does not appear to complain about the trial court's invalidation of sections 5.05 and 5.06. Zachry

points out that the Port does not appeal the directed verdict that the Port breached the contract by failing to pay Zachry $2.36 million based on an invalid liquidated damages clause. In its October 5, 2009 order, the trial court held that section 5.06—the liquidated damages provision—is an unenforceable penalty because it does not make clear that the liquidated damages are in lieu of other damages.

The trial court charged the jury that the Port had failed to comply with the contract by withholding $2.36 million in liquidated damages. The trial court also charged the jury in Question No. 12 that the failure to comply would be excused to the extent of any dollar amounts as to which Zachry had released its claim for withholding liquidated damages.[6] Specifically, the trial court instructed the jury to determine "the meaning" of the "Affidavit and Partial Release of Lien for Zachry Construction Corporation" pertaining to Payment Estimate Nos. 21–31 in the context of whether the "[f]ailure to comply by the Port is excused" by the doctrine of release. The jury answered "No." Thus, in order to prevail here, the Port must conclusively establish that Zachry released its claim for sums withheld as liquidated damages.

[6]  The trial court instructed the jury in Question No. 12 regarding excuse as to release:
>  You may also find excuse if you find, by a preponderance of the evidence [,] that Zachry released its claim for the failure to comply.

The court also instructed the jury in Question No. 12 regarding excuse as to offset and/or withholding regarding the fenders. The jury's finding that the Port is excused for the withholding to the extent of $970,000 for the fenders is addressed in Zachry's cross-appeal.

Section 6 of the contract governs the parties' rights and responsibilities regarding payments on the agreement. Section 6.01 provides the Contractor's obligation to create a "Schedule of Costs," which includes the unit-price basis for all of the various items of work that "shall be the basis for the preparation of and submission of monthly estimates."

**\*853** The parties' payment exhibits confirm this procedure for payment. Zachry submitted its monthly invoice package, which included a "Payment Estimate—Contract Performance." Each of Zachry's Payment Estimate forms identified items of work completed during the period; represented the percentage of the unit that was complete; and requested payment for the work completed that month. By item 12, each Payment Estimate form was "presented for payment" by a representative of Zachry. By item 13, the construction manager verified the completion status claimed for the period at issue and approved the request for payment. Item 14 set out categories of deductions—A through N—for items such as prior payments, contractual retainage, and "other deductions." Items 14(C) and 14(M) are "previous liquidated damages" and "liquidated damages this period."

On May 10, 2006, the Port faxed a letter to Zachry stating that the Port was (1) "process[ing] [Zachry's] March 2006 ... invoice" and (2) deducting, from payment on that invoice, "[l]iquidated damages total[ing] $820,000, based on 41 calendar days from February 16 through March 28, 2006 at $20,000 per calendar day." Zachry's March 2006 invoice corresponded to Zachry's Payment Estimate No. 23. By that Payment Estimate, Zachry sought a total payment of $1,885,807.26. The Port withheld $820,000 in liquidated damages from payment on Zachry's Payment Estimate No. 23.

Nevertheless, on May 17, 2006, Zachry signed an Affidavit and Partial Release of Lien for Zachry Construction Corporation as follows:

>  ZCC hereby acknowledges and certifies that Port of Houston Authority (PHA) has made partial payment to ZCC on all sums owing on Payment Estimate Number Twenty-three (23) and that it has no further claims against PHA for the portion of the Work completed and listed on the Schedule of Costs in Payment Number Twenty-three (23).

For the period February/March, 2006 through November, 2006, the Port withheld a total of $2.205 million in liquidated damages. In connection with each of these Payment Estimate–Contract Performance forms, Zachry executed an "Affidavit and Partial Release of Lien for Zachry Construction Corporation." The chart that follows depicts the Payment Estimate number, the period covered, the total liquidated damages withheld, and the date of the Affidavit and Partial Release of Lien:

| Payment Estimate No.——[7] | Period Covered | Liquidated Damages Withheld | Affidavit Date |
|---|---|---|---|
| 21 | 1/06 | No | 3/27/06 |
| 22 | 2/06 | No | 4/14/06 |
| 23 | 3/06 | $820,000 | 5/17/06 |
| 24 | 4/06 | $520,000 | 6/7/06 |
| 25 | 5/06 | $220,000 | 7/24/06 |
| 26 | 6/06 | No | 8/21/06 |
| 27 | 7/06 | $ 35,000 | 9/22/06 |
| 28 | 8/06 | $155,000 | 10/23/06 |
| 29 | 9/06 | $150,000 | 11/20/06 |
| 30 | 10/06 | $155,000 | 12/15/06 |
| 31 | 11/06 | $150,000 | 1/31/07 |

7    The Payment Estimate numbers referenced are Zachry's. Subsequent Partial Release and Indemnity documents reflect that the PHA estimate numbers are not the "Payment Estimate" numbers referenced in each release.

The Port argues that, by signing the May 17, 2006 release, as well as releases covering invoices through November 2006 (Payment Estimate Nos. 23–31), Zachry, **\*854** as a matter of law, released its claim to $2.205 million in liquidated damages, which the Port withheld cumulatively from payment on those invoices/Payment Estimates. Therefore, according to the Port, any failure to comply with the contract by withholding $2.36 million in liquidated damages is excused to the extent of $2.205 million. Zachry counters that each release, styled "Affidavit and Partial Release of Lien," unambiguously released nothing

more than liens.

[8] [9] [10] A release is a writing that provides that a duty or obligation owed to one party to the release is discharged immediately or upon the occurrence of a condition. *See Nat'l Union Fire Ins. Co. of Pittsburg, Pa. v. Ins. Co. of N. Am.,* 955 S.W.2d 120, 127 (Tex.App.-Houston [14th Dist.] 1997), *aff'd sub nom., Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburg, Pa.,* 20 S.W.3d 692 (Tex.2000). Releases are subject to the usual rules of contract construction. *Id.* As in other instances of contract construction, our primary concern is to ascertain the intent of the parties at the time of the execution of the alleged release as expressed in the release. *See generally In re Serv. Corp. Int'l,* 355 S.W.3d at 661; *Epps,* 351 S.W.3d at 865.

[11] [12] [13] To construe the release, we may examine evidence of the circumstances surrounding the negotiation and execution of the release. *See Baty v. ProTech Ins. Agency,* 63 S.W.3d 841, 848 (Tex.App.-Houston [14th Dist.] 2001, pet. denied); *see also Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981) (holding the proper rule is that "evidence of surrounding circumstances may be consulted" and, "[i]f in light of the surrounding circumstances, the language of the contract appears to be capable of only a single meaning, the court can then confine itself to the writing"). We may also consider "the deletions made by the parties" in the course of drafting the instrument at issue. *See Houston Pipe Line Co. v. Dwyer,* 374 S.W.2d 662, 664 (Tex.1964). Finally, we may consider the title of the document, but such is not dispositive. *Enter. Leasing Co. of Houston v. Barrios,* 156 S.W.3d 547, 549 (Tex.2004) (per curiam) ("Although we recognize that in certain cases, courts may consider the title of a contract provision or section to interpret a contract, 'the greater weight must be given to the operative contractual clauses of the agreement.' " (quoting *Neece v. A.A.A. Realty Co.,* 159 Tex. 403, 322 S.W.2d 597, 600 (1959))).[8]

[8]     Zachry points out that the word "release" appears only once—in the title, immediately followed by "of lien," and argues that title may be considered in determining intent.

[14] For a release to be effective, it must "mention" the claim to be released. *Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 938 (Tex.1991). However, the release need not specifically describe a particular cause of action. *See Mem'l Med. Ctr. of E. Tex. v. Keszler,* 943 S.W.2d 433, 434–35 (Tex.1997) (per curiam).

[15] [16] We begin with the plain language of the release at issue. Its title is "Affidavit and Partial Release of Lien for Zachry Construction Corporation." It states that Zachry "has no further claims against PHA for the portion of the Work completed and listed on the Schedule of Costs" in the respective Payment Estimate. The body of the document contains neither the word "release" nor the word "lien."[9] Yet, the plain language of the **\*855** sworn statement unambiguously avers that the Port has paid "all sums owing" on the Payment Estimate at issue and that Zachry has "no further claims against PHA for the portion of the Work completed and listed on the Schedule of Costs" in the Payment Estimate at issue. Zachry's proposed interpretation of these words to mean "no liens" rather than "no further claims" is not a reasonable interpretation of the language.

[9]     That the body of the provision does not contain the word "release" or "lien" or traditional boilerplate associated with releases or liens is not dispositive of our analysis. Even where the parties' agreement does not contain the term "release," "the intent of the parties controls, and the legal effect of the instrument may be a general release." *Knutson v. Morton Foods, Inc.,* 603 S.W.2d 805, 811 (Tex.1980) (Denton, J., concurring) (citing W. PROSSER, HANDBOOK OF THE LAW OF TORTS, § 49 at 303 (4th ed. 1971)). Zachry provides and we find no authority for the proposition that an agreement cannot legally release a claim unless it uses the word "release." In fact, if Zachry were correct, then an agreement to "voluntarily relinquish a right known to me" could not operate as a waiver because the magic word is not uttered. We believe such an artificial approach to construing agreements between parties finds no support in Texas law and would be contrary to the primary purpose of contract interpretation-determining the parties' intent.

The parties also rely on surrounding circumstances to construe the release. Specifically, they compare the language of the release at issue to both the prior and subsequent release forms. Even if we accept the invitation to look beyond the four corners of the affidavit at issue, these surrounding circumstances do not support Zachry's proposed interpretation of the language at issue.

Both the prior and subsequent versions are also entitled "Affidavit and Partial Release of Lien for Zachry Construction Corporation." However, the text of the original or first version of the release states:

> ZCC hereby acknowledges and certifies that Port of Houston Authority (PHA) has made partial payment to ZCC on all sums owing on Payment Estimate Number [ ] and that it has no further claims against PHA for the portion of the Work completed and listed on the Schedule of Costs in Payment Number [ ].
>
> In consideration for such partial payment, ZCC ... does hereby waive, release, and relinquish its rights to and discharge, release and acquit Port of Houston Authority ... from any and all causes of action, claims, demand, debts, liabilities, expenses or costs of any kind and every character and nature whatsoever, including but not limited to any lien claims or rights, whether known or unknown, contingent or fixed, either in or arising out of the law of contracts, torts or property rights, whether arising under statutory law or common law, at law or in equity, with respect to the Work for which such partial payment is made....

The third version of the release, used by the parties after the release at issue, states:

> ZCC hereby acknowledges and certifies that Port of Houston Authority (PHA) has made partial payment to ZCC on all sums owing on Payment Estimate Number [ ] and that it has no further claims against PHA for the portion of the Work completed and listed on the Schedule of Costs in Payment Number [ ].
>
> In consideration for such partial payment, Zachry Construction Corporation, on its own behalf and on behalf of any other entity claiming by, through or under Zachry Construction Corporation, does hereby waive, release, and relinquish its rights to and discharge, release and acquit Port of Houston Authority from any and all causes of action, claims, demands, debts, liabilities, expenses or costs of any kind and every character and nature whatsoever with respect to **\*856** the Work accruing or based on events occurring from the commencement of the Work through the date covered by Payment Estimate Number [ ], including by [sic] not limited to any lien claims or rights, whether known or unknown, contingent or fixed, either in or arising out of the law of contracts, tort or property rights, whether arising under statutory law or common law, at law or in equity, less and except only the Outstanding Claims and other matters identified in this Partial Release and Indemnity.
>
> Furthermore, there is pending litigation between the Port of Houston Authority and Zachry Construction Corporation under this contract, namely, the Phase 1A Wharf and Dredging Contract. This litigation is styled Cause No.2006–72970, *Zachry Construction Corporation v. the Port of Houston Authority,* pending in the 151st Judicial District Court of Harris County, Texas (the "Lawsuit"). Each of Zachry Construction Corporation and the Port of Houston Authority agrees that Zachry Construction Corporation's execution of this Lien Release for pay Estimate No. [ ] does not in any way release or modify the parties' rights and obligations under the Phase 1A Wharf and Dredging Contract or constitute a release of any claim or claims that the parties may present in the Lawsuit with respect to Phase 1A Wharf and Dredging Contract.

Thus, the first form included, in addition to the release language at issue here, broad, general release language that purported to cover "all causes of action" including legal or equitable, common-law or statutory claims arising in contract, tort, or property rights. The parties deleted this general release language from the second version of the release at issue here. And, when litigation ensued, the parties revised the form again to reinsert general release language, but to specifically except the claims in this suit. Still, the third version contained the release language at issue here. Thus, the "deletion" gives no support to Zachry's argument that the release was transformed into a mere release of lien.[10]

[10] Zachry stresses that "the second version ***deleted*** the general release language." (emphasis in original). Zachry contends that "[t]he deletion of the general release language in the second lien release version—the version on which the Port relies—shows the second version was not a general release." *Id.* at 70. Zachry's reliance upon *Houston Pipe Line Co.,* 374 S.W.2d at 664, and *Hall v. Lone Star Gas Co.,* 954 S.W.2d 174, 176 (Tex.App.-Austin 1997, pet. denied),* for that argument blurs an important distinction between deletions and omissions in this context. To be precise, the language upon which Zachry focuses was not deleted in the sense of appearing on a preprinted form and then being stricken through using an "x" or some other mark visible on the face of the document. *See, e.g., Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.,* 352 S.W.3d 462, 466 (Tex.2011); *Houston Pipe Line Co.,* 374 S.W.2d at 663; *Gibson v. Turner,* 156 Tex. 289, 294 S.W.2d 781, 782 (1956).* The language upon which Zachry focuses was omitted from the operative version of the document but appeared in other versions. There is reason to question how much weight properly can be given to omitted language from other versions of the document in light of the parol evidence rule. *See, e.g., Fiess v. State Farm Lloyds,* 202 S.W.3d 744, 747 (Tex.2006) ("Evidence of prior policies is extrinsic

evidence, and thus inadmissible unless the policy is ambiguous.... And while we have looked at a prior policy in deciding between reasonable constructions of a current one, we have never done so in lieu of construing the current one at all.")

Further, the parties point to section 6.07 of the contract to guide the interpretation of the release. Section 6.07 required Zachry to release any further "claim[s] for payment" as to Zachry's prior invoice/Payment Estimate.[11] It further provides, in **\*857** pertinent part, that such waivers and releases of liens shall provide, "at a minimum, that all amounts due and payable to the Contractor and each such Subcontractor and Supplier, as of the date of such invoice ... have been paid in full." Zachry relies on the "to the extent set out in the preceding sentence" language as an indication that the contract did not require it to release a *claim* that payment had not been made in full; just a release of any *lien* arising out of the failure to do so. The Port urges that the subject provision unambiguously released any further claim for payment for the work accomplished and billed on the relevant payment estimate and, thus, released any claim that there was no payment in full by virtue of a liquidated damages offset. Zachry argues that the subject provision unambiguously released nothing more than claims for payment to assure an effective release of liens. Once the parties eliminated the "general release language," Zachry insists it no longer released its breach of contract claim with each payment.

[11]     Section 6.07 of the contract states, in pertinent part:
        As a condition precedent to the obligation of the Port Authority to make payment on any invoice, the Contractor shall supply the Port Authority with waivers and releases of liens (including without limitation all mechanics' and materialmens' liens and any other type of security interest), which waivers and releases shall be duly executed and acknowledged by the Contractor and each Subcontractor and Supplier expecting payment from [the] Contractor in respect of such invoice in order to assure an effective release of such liens to the maximum extent permitted by Applicable Law. The waivers and releases of liens shall provide, at a minimum, that all amounts due and payable to the Contractor and each such Subcontractor and Supplier, as of the date of such invoice and as of the date of the last payment received by the Contractor and each such Subcontractor and Supplier have been paid in full and that the Contractor and each such Subcontractor and Supplier waives, releases and relinquishes any lien (including without limitation any mechanic's or materialman's lien), security interest and claim for payment to the extent set out the preceding sentence.

[17] Zachry's construction of version two of the release is inconsistent with the surrounding circumstances. First, as mentioned, the only reference to "lien" is the heading of the affidavit. It cannot be limiting language, however, because it is the same heading for each of the three versions, including the first version that Zachry admits operated as a broad release of claims.[12] Second, section 6.07 does not provide a limiting circumstance. Although section 6.07 may not require Zachry to release anything more than liens arising from failure to make payment, even Zachry acknowledges that it released far more in connection with version one because version one mentions claims, including liens. Similarly, version two mentions claims, not liens, for the portion of the Work completed and listed. As such, any limitation of section 6.07 is not a limitation on our construction of the release provision.

[12]     A broad, general release releases every potential cause of action pertaining to the subject matter. *See Keck, Mahin & Cate,* 20 S.W.3d at 698.

We conclude the provision is subject to one reasonable interpretation, that is: the provision at issue (version two) releases any further claim for payment for work accomplished and billed by the relevant payment estimate, which also operates to release any lien for that same work because payment is made in full. Because the general release language is omitted, the provision does not release:

   • claims arising in tort;

   • claims to adjudicate property rights;

   • claims for any and all causes of action, claims, demand, debts, liabilities, **\*858** expenses, or costs of any kind and every character and nature whatsoever; or

• *all* claims for breach of contract.

But, even without the general release language, the specific release language of version two releases claims for breach of contract predicated upon a failure to make payment for work accomplished, billed, and paid—in whole or in part—on a particular payment estimate.

Our dissenting colleague concludes that the Port has failed to establish release as a matter of law because the documents at issue are, at a minimum, ambiguous. Meticulously comparing the release documents to the Payment Estimates at issue, the dissent urges that the release leaves open the question of what document is referenced in each release. Such asserted ambiguity is not one argued by Zachry, however. Zachry does not urge that the releases do not match the payment estimates. Zachry does not urge that the term Payment Estimate is ambiguous in its reference to Zachry's payment estimates rather than the Port's. Zachry does not urge that the absence of evidence identifying a payment release seeking payment in the same quantity released defeats the release. To the contrary, Zachry urges that the *release is a release to the full extent of the payment estimates;* it simply urges that the release is a full release of lien, rather than a full release of payment.

[18] Moreover, there is no ambiguity in "what exactly has been released" as the dissent suggests. The language of the release goes beyond saying Zachry has no further claims against PHA. The release says "[Zachry] has no further claims against PHA **for the portion of the Work completed and listed on the Schedule of Costs in Payment Number ——.**" (emphasis added). It is undisputed on this record that the Port had already withheld all of the liquidated damages that it ever did withhold by the time Zachry signed the subject release in January 2007. Thus, it released any further claim for the work that had been completed and listed on the Schedule of Costs in Payment Estimate 31. Texas law requires identification of the claim to be released—not quantification.

In summary, we conclude that, when Zachry signed the "Affidavit and Partial Release of Lien," stating that the Port "has made partial payment to ZCC on all sums owing on Payment Estimate Number Thirty (30) and that it has no further claims against PHA for the portion of the Work completed and listed on the Schedule of Costs in Payment Estimate Number 30," Zachry unambiguously discharged or released the Port from any further duty or obligation to pay sums billed through Payment Estimate No. 29. *See Nat'l Union Fire Ins. Co. of Pittsburg, Pa.,* 955 S.W.2d at 127. The "Affidavit and Partial Release of Lien" mentions the claims being released: "claims against PHA for the portion of the Work completed and listed on the Schedule of Costs in Payment Estimate Number 30." *See Victoria Bank & Trust Co.,* 811 S.W.2d at 938. As Payment Estimate No. 30 included offsets for liquidated damages in the sum of $2.205 million, Zachry has no further claims for payment arising from the work completed and listed on that Payment Estimate.

We conclude that if the Port failed to comply with the contract by withholding liquidated damages, such failure was excused, in part, as a matter of law by Zachry's release.[13] We sustain the Port's Issue 9A.

[13] The Port also raises the same release argument in response to Zachry's issue on cross-appeal regarding the $600,000 withheld for dredging. For the same reason we sustain the Port's Issue 9A, we overrule Zachry's Cross–Appeal Issue 1A and B, in which Zachry claims that it is entitled to judgment as a matter of law on the $600,000 withheld for dredging. The jury found in Question No. 9 that the Port did not fail to comply with the contract by withholding $600,000 for dredging. Zachry's claim to recover the $600,000 for dredging is barred by release as a matter of law, just the same as the $2.205 million in liquidated damages withheld from invoice payments addressed above.

### *859 C. $970,000 Offset for Defective Fenders

The Port claimed a right under section 6.05 of the contract to withhold or offset certain liquidated damage amounts because of alleged damages related to Wharf fenders. Question No. 12A asked the jury whether the Port's failure to comply with the contract by withholding $2.36 million in liquidated damages was excused, in whole or part, "by offset and/or withholding" for Zachry's failure to comply with the contract with respect to fender corrosion.[14] The jury found that the Port was entitled to withhold or offset for fender damage in the amount of $970,000. The trial court entered judgment on Zachry's R & R claim, but offset the $970,000 against Zachry's damage award.

[14]     The trial court instructed the jury in Question No. 12 regarding excuse as to offset and/or withholding:
> You may find excuse if you find, by a preponderance of the evidence, that the Port is entitled to withhold for fenders under §
> 6.05 of the General Conditions of the Contract and/or that the Port is entitled to offset for fenders under § 6.17 of the General
> Conditions of the Contract.
> The Port is entitled to withhold and/or offset for fenders under these provisions if you find, by a preponderance of the
> evidence, that, with respect to the fenders, Zachry failed to comply with the Contract resulting in a loss to the Port.

By its Cross–Appeal Issue 2, Zachry contends that it is entitled to judgment rendered in its favor on the $970,000 because the evidence is legally and factually insufficient to support the jury's findings (1) that Zachry breached the contract in constructing the fenders, (2) that any breach caused the fenders' corrosion and the Port's damage, or (3) as to any amount of damages the Port suffered as a result. Although we agree that (a) the presentation of evidence on the fenders was brief and not emphasized with the jury; and (b) there is competing evidence on the subject, we disagree that that evidence is legally or factually insufficient.

[19] In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the fact finding, crediting favorable evidence if reasonable persons could, and disregarding contrary evidence unless reasonable persons could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 822, 827 (Tex.2005). We may not sustain a legal sufficiency, or "no evidence" point unless the record demonstrates that: (1) there is a complete absence of a vital fact; (2) the court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively established the opposite of the vital fact. *Id.* at 810. To evaluate the factual sufficiency of the evidence, we consider all the evidence and will set aside the finding only if the evidence supporting the finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.1998); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam).

The Port's Bayport engineer Mark Vincent testified about the Wharf fenders, **\*860** which had a life expectancy of 30 years but corroded within 90 days. He stated that the Port incurred damages in the approximate amount of $978,000 for "recoating" repairs. He also noted that the Port sent a warranty deficiency notice to Zachry on the fenders but Zachry refused to repair them.

[20] The coating at issue is governed by Technical Specification Section 09950. The jury received evidence that (a) this specification requires Zachry to "apply 2–3 mils of the specified epoxy" coating; and (b) "[t]hickness tests conducted on the upper portion of the fenders ranged from 18 to 26 mils including the seal coat." From this evidence, the jury was entitled to infer that Zachry applied coating well above the 2–3 mils level specified by the contract. Thus, the evidence is legally sufficient to support the jury's finding that Zachry failed to comply with the contract and, specifically, Technical Specification Section 09950.

[21] The jury also heard evidence that the purpose of the above technical specification on coating is "to obtain full continuity of the epoxy and total sealing of porosity." The fenders were to be sealed because a portion of each fender is installed under water. By his report,[15] admitted without objection, Stephen Pinney, an engineer hired by the Port to inspect the fenders, indicated that his personal inspection revealed that the three-foot portion of the fenders submerged "failed down to the bare steel" but that the portion of the fenders "above the splash zone" remained intact. Pinney stated that the most probable cause of the failure is:

[15]     Zachry cites no case, and we find none, to support Zachry's suggestion that if documentary evidence is "not discussed by any
         witness" or "otherwise brought to the jury's attention," it may be discounted or disregarded on appellate review.

   • the seal coat applied to the metalizing was insufficiently thinned;

       • because the seal coat was insufficiently thinned, it was not able to penetrate into the porous metalized aluminum

substrate;

• because the seal coat did not penetrate, it remained on the surface;

• because the seal coat remained on the surface, the aluminum pores remained open;

• because the aluminum pores remained open, they filled with seawater;

• because the aluminum filled with seawater, it corroded.

This evidence is both legally and factually sufficient to support the jury's finding that Zachry's failure to comply with the contract specification regarding coating compromised the sealing of porosity and directly caused the fenders' corrosion.

[22] Vincent also testified that the approximate cost to repair the fenders that corroded "as soon as they were put in the water" was $978,000. Zachry urges that this testimony is legally insufficient[16] because at no point does Vincent or any other witness provide an opinion that $970,000 is the "reasonable and necessary" cost to repair the fenders. The Port counters that the cost to repair the fenders need not be "reasonable and necessary" where, as here, the contract itself does not require that the loss be "reasonable and necessary."

16      Zachry also argues that, even if the damages evidence is sufficient, the court should reverse and remand for a new trial, as the trial court failed to instruct the jury that it could only award "reasonable and necessary" damages. We address these points together.

**\*861** We agree with the Port and conclude that the trial court did not err with regard to the jury charge. For this court to imply a requirement that the costs to repair be "reasonable and necessary" would be tantamount to modifying the contract. *See Aetna Cas. & Sur. Co. v. Marshall,* 699 S.W.2d 896, 902 (Tex.App.-Houston [1st Dist.] 1985), *aff'd,* 724 S.W.2d 770 (Tex.1987); *see also Simien v. Unifund CCR Partners,* 321 S.W.3d 235, 248 (Tex.App.-Houston [1st Dist.] 2010, no pet.). Zachry's authority is inapposite as it pertains to interpreting an oral contract. *See Walker & Assocs. Surveying, Inc. v. Austin,* 301 S.W.3d 909, 919 (Tex.App.-Texarkana 2009, no pet.) (ascertaining the terms of an oral contract where there was "little or no agreement reached about the level of competence of the workers provided"). Therefore, the jury's determination of $970,000 as the cost to repair the fender is supported by Vincent's testimony about $978,000–worth of repairs.

We overrule Zachry's Cross–Appeal Issue 2 regarding the Wharf fender offset award.

### D. Attorney's Fees

In Issue 11, the Port argues that it is entitled to the attorney's fees found by the jury for the R & R and withholding claims because the Port is entitled to judgment on those claims.

Zachry brought multiple claims or theories of the Port's breach of the contract: the R & R claim, i.e., failure to comply with Change Order 4 and section 5.10 of the contract, and claims for withholding $2.36 million in liquidated damages and $600,000 for dredging. The jury determined that a "reasonable fee for necessary services of the Port's attorneys" on "Zachry's Claim Relating to Change Order 4 and/or § 5.10 of the Contract" is $10,500,000 for trial; $90,000 for an appeal to the court of appeals; and $22,500 for an appeal to the Texas Supreme Court. The jury determined that a reasonable fee for "Zachry's Claim for Withholding the $2.36 million as liquidated damages and the $600,000 for dredging" is $80,250 for trial; $3,750 for an appeal to the court of appeals; and $1,250.00 for an appeal to the Texas Supreme Court.

Section 3.10 of the contract makes Zachry liable for the Port's attorney's fees if Zachry brings "a claim" and "does not prevail with respect to such claim."[17] We have determined that Zachry has not prevailed with respect to "Zachry's Claim Relating to Change Order 4 and/or § 5.10 of the Contract." We also have determined that Zachry has not prevailed with respect to "Zachry's Claim for Withholding the $2.36 million as liquidated damages and the $600,000 for dredging," i.e., we have sustained the Port's Issue 9A that the Port's withholding liquidated damages was excused by $2.205 million of the $2.36 million damages awarded, and we have overruled Zachry's Cross–Appeal Issue 2 on the Port's $970,000 offset of the

sum awarded for liquidated damages. Having determined that Zachry did not prevail on the three claims or theories presented to the jury, we need not determine whether Zachry brought one or two or three claims.[18] We need only determine whether **\*862** the sums awarded by the jury for the Port's reasonable and necessary attorney's fees are supported by factually sufficient evidence.

[17]    Section 3.10 states:
>    If Contractor brings any claim against the Port Authority and Contractor does not prevail with respect to such claim, Contractor shall be liable for all attorney's fees incurred by the Port Authority as a result of such claim.

[18]    If the Port had succeeded on appeal on only the judgment for the R & R claim, Zachry claims that the Port would not be entitled to any attorney's fees on the R & R claim because Zachry would still have prevailed on its breach of contract claim. That is, Zachry argues that it brought one breach of contract claim, but different theories of breach: R & R damages and withholding damages. The Port contends that Zachry brought multiple claims, entitling the Port to the segregated attorney's fees on the R & R claim if a take-nothing judgment is rendered on the R & R claim, but not the withholding claims. However, because Zachry has not prevailed on any of its "claims" or "theories," we need not address these arguments.

By Cross–Appeal Issue 3, Zachry contends that in the event that Zachry does not prevail on any theory underlying its breach-of-contract claim, Zachry would still be entitled to a new trial on attorney's fees. In support of its claim for attorney's fees, the Port offered the testimony of its billing attorney, Karen White, and its designated attorney's fees expert, Dan Downey. Zachry claims that (1) the trial court erred by admitting the testimony of White because she was not designated as an attorney's fees expert; and (2) Downey's testimony is factually insufficient to support the jury's finding on the amount of the Port's attorney's fees.

We first address whether the trial court erred in admitting White's testimony. Prior to White's testifying, the trial court ruled that she could testify as a fact witness, but not as an expert because she had not been designated as an expert.[19] That is, White would not be allowed to testify as the reasonableness of the segregation of the attorney's fees. Zachry complains here that White did, in fact, provide expert testimony. The Port urges that Zachry waived any objection to White's testimony by failing to obtain a ruling.

[19]    Specifically, the trial court ordered that White could "testify as a fact witness only and without reference to these billing records, period, the end.... And so no reference to the billing records and no opinions." In response to Zachry's counsel's clarification that White would "only testify as to the methodology by which this segregation and she [will] not be given [sic] any kind of an opinion as to the reasonableness of segregation. That would be Mr. Downey," the trial court responded, "Right."

[23]  During White's testimony, Zachry objected twice that White's testimony was drifting into expert opinions. The first occurred when White, after describing the document production process, stated "[w]e didn't feel that they had produced every document to us that they should have...." Zachry "object[ed] at this point" because White was to be "a very limited fact witness, not an expert," and was being tendered as a witness for the "limited purpose of segregation. That is, to tell us exactly how the segregation of the fees was identified and determined." The trial court overruled the objection, stating that it would "let White testify about these subjects." White provided further testimony on the document-production process, including the huge volume of documents produced by each side and the process for reviewing those documents. We find the trial court did not abuse its discretion in ruling that document-production testimony was not expert testimony.

The second objection occurred during White's response the question: "[W]hat was your role as a billing attorney?" White explained the process of inputting time and then stated that, "as billing attorney, then I review the bills to make sure that everything's properly chargeable to the client, that it's properly...." Zachry's counsel objected, again complaining about the testimony in light of the trial court's expert-opinion ruling. The trial court agreed that when White "talks about whether a particular item was properly billable to the client," she is offering an **\*863** opinion. Therefore, the Port agreed to "ask Ms. White not to add whether something was properly billable to the client." Thus, the trial court did not make a ruling adverse to Zachry or otherwise deny Zachry relief.[20]

[20]     Although Zachry mentions the Port's failure to disclose fee statements as a basis for excluding White's testimony, the trial court did not rule on this objection because the Port's attorney withdrew the pending question. Therefore, we do not address that argument.

We now address Zachry's complaint that the testimony of the Port's expert, Dan Downy, was not factually sufficient to support the jury's findings on attorney's fees.[21] Downey opined that the attorney's fees incurred by the Port were reasonable and necessary, and that the fees were properly segregated. The jury heard about the Port's process for compiling factual data on attorneys' services rendered. Port paralegal Holly Gray searched the computerized records with certain search terms and created a spreadsheet that included all of the hours and times for any entry that "had any of the terms in it." Gray provided that spreadsheet to Downey.

[21]     Downey testified that he had been a Harris County trial judge from 1988 to 1994, and had been a lawyer or judge in Texas for about 33 years. Downey further stated that he had not testified previously as an attorney's fees expert in any cases other than his own and that, as a trial judge, attorney's fees did not frequently come before him as a contested issue.

Downey identified the bases for his opinions as to the reasonableness and necessity of the Port's legal fees. In addition to the spreadsheet, Downey reviewed the pleading and discovery index and requested to see particular pleadings and motions "so [he] could get a handle on what was involved." Downey then conducted separate interviews with individual attorneys involved in the case concerning "what their role was and how they set about performing that task." Downey "was trying to get a handle on how much work is involved in those tasks, to see if it makes sense and matches up with the time that they have logged for those tasks." Downey interviewed the attorneys more than once. Downey also interviewed the legal assistants. The jury saw several exhibits containing Downey's notes as well as compilations of fees by month and attorney.

Zachry's attorney's fees expert, William Junell, agreed that the lawsuit between Zachry and the Port amounted to an "all-out-war between the parties for ... three years."[22] However, Junell disagreed with Downey's opinion on the reasonableness and necessity of the fees incurred by the Port.

[22]     Junell testified that he had been practicing law for over 38 years and had served as an expert witness on attorney's fees approximately a dozen times.

[24] Both Junell and Downey testified about the factors applicable to an attorney's fee award.[23] The jury heard that the **\*864** Port's fees were two-and-a-half times more than Zachry's in October 2008. That "raised red flags in [Junell's] mind." Downey, however, explained that the primary difference related to the review of documents. Downey was satisfied that the work the Port lawyers performed in reviewing documents "was fair and reasonable and necessary."

[23]     The factors are (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 818 (Tex.1997). This court considers those factors to be guidelines rather than elements of proof. *See Academy Corp. v. Interior Buildout & Turnkey Const., Inc.,* 21 S.W.3d 732, 742 (Tex.App.-Houston [14th Dist.] 2000, no pet.).

[25] The jury also heard Junell's criticism that Downey did not review any of the underlying bills for the 44,000 hours of attorney time for which the Port sought recovery.[24] Junell testified that "we do not have the required information that tells you what services were rendered by what lawyers on the occasion in case and at what rate for those services." But Downey explained that he favored individual interviews over the actual bills because he felt it was likely that the bills contained

privileged information and would inadequately explain the activities of the attorneys that he needed to consider. He also explained that he had taken out certain aspects of Port fees that he did not consider appropriate.

[24]     Here, the Port urges that Zachry has waived its sufficiency issue because its complaints are "waived challenges to his methodology." However, Zachry urges a factual sufficiency challenge to fees, not a legal sufficiency challenge. The Port cites no case, and we find none, that holds that failure to challenge a fee expert's methodology waives a factual sufficiency complaint on appeal.

Ultimately, through a thorough cross-examination of Downey, Zachry made the jury aware of the weaknesses in the Port's attorney's fee claim: the Port was seeking $15 million in attorney's fees to defend Zachry's $30 million claims; the Port had four separate law firms defending it; Downey had not documented what tasks were performed by each attorney; and Downey had not used actual bills to form his opinion even though that is the standard practice for attorney's fee witnesses, and though they would have provided some verification of the attorneys' representation of their time spent.

[26] We conclude that the evidence is factually sufficient to support the fee award in this case, though the evidence would also have supported far less. The most significant concern about this award is the relationship between the fee awarded and the amount in controversy, particularly when compared to the fees incurred by Zachry. However, this court has previously determined, albeit on much smaller sums, that a fee award that was two times the amount in controversy was supported by legally and factually sufficient evidence. *See Bencon Mgmt. & Gen. Contracting, Inc. v. Boyer, Inc.,* 178 S.W.3d 198, 209–10 (Tex.App.-Houston [14th Dist.] 2005, no pet.) The relationship between the fee and the amount in controversy is merely a factor that we examine. *See USAA Cnty. Mut. Ins. Co. v. Cook,* 241 S.W.3d 93, 103 (Tex.App.-Houston [1st Dist.] 2007, no pet.). Moreover, the testimony provides sufficient evidence to support this discrepancy. Downey's and White's testimony illustrated that the majority of the differential occurred in the area of discovery and, specifically, the pursuit and review of document production. White testified that rather than provide copies of responsive documents to the Port, Zachry asked the Port's attorneys "to come out to the site facility and review documents there." Thus, two Port attorneys went to an un-air conditioned, metal container facility "crammed full of boxes not organized in any manner." They pulled boxes outside of the container, one at a time, "and sat under a tree in May out at the wharf site **\*865** and reviewed documents searching for things that might be responsive." While Junell testified about the volume of material reviewed by each side, he spoke of electronic documents; thus, the jury was free to believe that the method of document production played a role in the number of hours the Port attorneys needed to spend to accomplish the task. We conclude that the evidence is factually sufficient to support the jury's finding on attorney's fees.

We overrule Zachry's Cross–Appeal Issue 3.

### III. CONCLUSION

To summarize, we hold that the application of the no-damages-for-delay clause precludes Zachry's claim for delay or hindrance damages on its claim for damages on its R & R claim.

We further hold that Zachry released, as a matter of law, $2.205 million of its $2.36 million claim for the Port's withholding liquidated damages. We further hold that the evidence is legally and factually sufficient to support the jury's finding of the Port's offset of $970,000 for defective fenders. Because the amount of liquidated damages that Zachry released and the amount of offset the jury found for defective fenders is greater than the $2.36 million that Zachry sought for the Port's withholding of liquidated damages, we hold that Zachry may not recover on its $2.36 million claim for withholding liquidated damages.

We further hold that the trial court did not err in failing to rule, as a matter of law, that the Port breached the contract by withholding $600,000 for dredging.

We further hold that the Port is entitled to recover attorney's fees as found by the jury with respect to Zachry's R & R claim as follows: (1) $10,500,000 for trial, (2) $90,000 for appeal to the court of appeals, and (3) $22,500 for appeal to the Texas

Supreme Court; and with respect to Zachry's withholding claims as follows: (1) $80,250 for trial, (2) $3,750 for appeal to the court of appeals, and (3) $1,250 for appeal to the Texas Supreme Court.[25]

[25]   Having sustained the Port's Issue 4A regarding Zachry's delay or hindrance damages purportedly sustained as a result of the Port's R & R response, and Issue 9A regarding the Port's withholding of liquidated damages, we need not address the Port's other issues. Further, as we do not reach the Port's Issue 3 asserting that sovereign immunity was not waived, we need not address the concern of *amicus curiae,* The Surety & Fidelity Association of America, regarding whether a local government entity is subject to the same measure of contractual damages as any other contracting party unless such damages fall within the express limitations of Section 271.153(b) of the Texas Local Government Code.

Thus, we reverse the judgment awarding Zachry $18,602,677 in damages on its R & R claim and $2.36 million in liquidated damages and render judgment that Zachry take nothing on those claims. We render judgment that the Port have and recover attorney's fees from Zachry with respect to the R & R claim as follows: (1) $10,500,000 for trial, (2) $90,000 for appeal to the court of appeals, and (3) $22,500 for appeal to the Texas Supreme Court; and with respect to the withholding claims: (1) $80,250 for trial, (2) $3,750 for appeal to the court of appeals, and (3) $1,250 for appeal to the Texas Supreme Court.

Accordingly, we render judgment that the Port recover attorney's fees and reverse and render judgment that Zachry take nothing on its claims.

Justice CHRISTOPHER, J., dissenting

**\*866** TRACY CHRISTOPHER, Justice, dissenting.

I respectfully dissent from Part B of the majority's opinion, in which liquidated damages are addressed. In my opinion, the documents titled "Partial Release of Lien" do not release Zachry's claim for the wrongfully withheld liquidated damages. I would uphold the trial court's decision that the documents are ambiguous and the jury's decision that Zachry did not release those damages.

The majority concludes that the documents at issue are unambiguous. I disagree. Applying the following rules of construction, I would hold that, at most, the documents are ambiguous and that the issue was properly submitted to the jury. I would consider what a release is, how to construe it, and the special provisions related to releases.

## A. Rules of Construction

### 1. A release extinguishes a claim or cause of action.

A release is a writing providing that a duty or obligation owed to one party to the release is discharged immediately or on the occurrence of a condition. *See Nat'l Union Fire Ins. Co. of Pittsburg, Pa. v. Ins. Co. of N. Am.,* 955 S.W.2d 120, 127 (Tex.App.-Houston [14th Dist.] 1997), *aff'd sub nom. Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co.,* 20 S.W.3d 692 (Tex.2000); Restatement (Second) of Contracts § 284 (1981). A release of a claim or cause of action extinguishes the claim or cause of action. *Dresser Indus., Inc. v. Page Petroleum, Inc.,* 853 S.W.2d 505, 508 (Tex.1993).

### 2. A release is subject to the rules governing contract construction.

Under Texas law, a release is a contract and is subject to the rules governing contract construction. *See Williams v. Glash,* 789 S.W.2d 261, 264 (Tex.1990) (holding that a release is a contract subject to avoidance on same grounds as any other contract); *Loy v. Kuykendall,* 347 S.W.2d 726, 728 (Tex.Civ.App.-San Antonio 1961, writ ref'd n.r.e.) (treating a release as a

contract subject to rules governing construction thereof); RESTATEMENT (SECOND) OF CONTRACTSSSSS § 284 cmt. c.

### a. The primary concern is to ascertain the true intent of the parties.

In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983); *Nat'l Union,* 955 S.W.2d at 127. The intention of the parties is discovered primarily by reference to the words used in the contract. *Nat'l Union,* 955 S.W.2d at 127. To determine the parties' intentions, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Coker,* 650 S.W.2d at 393; *Nat'l Union,* 955 S.W.2d at 127. No single provision taken alone will be given controlling effect; rather, all of the provisions must be considered with reference to the entire contract. *Id.*

### b. The court may consider surrounding circumstances.

Evidence of circumstances surrounding the execution of the contract may be considered in the construction of an unambiguous instrument, even though oral statements of the parties' intentions are inadmissible to vary or contradict the terms of the agreement. *Med. Towers, Ltd. v. St. Luke's Episcopal Hosp.,* 750 S.W.2d 820, 823 (Tex.App.-Houston [14th Dist.] 1988, writ denied) (citing **\*867** *Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 731 (Tex.1982)). The circumstances help to illuminate the contractual language chosen by the parties and enable evaluation of " 'the objects and purposes intended to be accomplished by them in entering into the contract.' " *Id.* (quoting *Garcia v. King,* 139 Tex. 578, 585, 164 S.W.2d 509, 512 (1942)). A contract should be construed by determining how the "reasonable person" would have used and understood such language, considering the circumstances surrounding its negotiation and keeping in mind the purposes intended to be accomplished by the parties when entering into the contract. *Nat'l Union,* 955 S.W.2d at 128 (citing *Manzo v. Ford,* 731 S.W.2d 673, 676 (Tex.App.-Houston [14th Dist.] 1987, no writ)).

### c. The court may consider other contracts pertaining to the same transaction.

Instruments pertaining to the same transaction should be read together to ascertain the parties' intent as to the meaning of the release, even if the parties executed them at different times and the instruments do not expressly refer to each other. *See Fort Worth Indep. Sch. Dist. v. City of Fort Worth,* 22 S.W.3d 831, 840 (Tex.2000); *In re Sterling Chems., Inc.,* 261 S.W.3d 805, 810 (Tex.App.-Houston [14th Dist.] 2008, no pet.); *Dorsett v. Cross,* 106 S.W.3d 213, 217 (Tex.App.-Houston [1st Dist.] 2003, pet. denied).

### d. The court may consider deletions made by the parties.

We may also consider "the deletions made by the parties" in the course of drafting the instrument at issue. *See Hous. Exploration Co. v. Wellington Underwriting Agencies, Ltd.,* 352 S.W.3d 462, 470–71 (Tex.2011); *Hous. Pipe Line Co. v. Dwyer,* 374 S.W.2d 662, 664 (Tex.1964).

### e. The court may consider the document's title.

We may consider the title of the document. *Enter. Leasing Co. of Hous. v. Barrios,* 156 S.W.3d 547, 549 (Tex.2004) (per curiam) ("Although we recognize that in certain cases, courts may consider the title of a contract provision or section to interpret a contract, 'the greater weight must be given to the operative contractual clauses of the agreement.' " (quoting *Neece v. A.A.A. Realty Co.,* 159 Tex. 403, 322 S.W.2d 597, 600 (1959))). The title also can create ambiguity when it differs from the body. *See Lone Star Cement Corp. v. Fair,* 467 S.W.2d 402, 404–05 (Tex.1971) (when caption of a judicial order dismisses only one party while the body purports to dismiss an entire cause, the order is ambiguous); *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 138 n. 3 (Tex.1994) (title of insurance contract that is repugnant or misleading as to coverage creates an ambiguity).

### f. The court may not rewrite a contract or add to its language.

A court should not rewrite a contract or add to its language. *Am. Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 162 (Tex.2003); *White Oak Operating Co. v. BLR Constr. Cos.,* 362 S.W.3d 725, 733 (Tex.App.-Houston [14th Dist.] 2011, no pet.).

### 3. Specific rules apply to releases.

In addition to these basic contract construction rules, however, we must take into account the rules that specifically apply to releases.

### a. A release must specifically mention the claim to be released.

To effectively release a claim in Texas, the releasing instrument must mention the claim to be released. *See Victoria Bank &* **\*868** *Trust Co. v. Brady,* 811 S.W.2d 931, 938 (Tex.1991).

### b. General releases are to be narrowly construed.

General, categorical releases are to be narrowly construed. *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 422 (Tex.1984). *See also Victoria Bank,* 811 S.W.2d at 938 (applying this principle in limiting the scope of release so that "any claims not *clearly* within the subject matter of the release are not discharged") (emphasis added); *Baty v. ProTech Ins. Agency,* 63 S.W.3d 841, 850 n. 7 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (collecting cases in which the scope of a general release was narrowly construed).

### c. Typical release language provides that the parties "release, discharge, and relinquish" claims.

Typical release language is "release, discharge, relinquish." *Derr Constr. Co. v. City of Hous.,* 846 S.W.2d 854, 859 (Tex. App.-Houston [14th Dist.] 1992, no writ). *See also Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 387 (Tex.1997) (contract language that "Contractor shall not be liable to the Subcontractor for delay to Subcontractor's work by the act, neglect or default of Owner" is not a release because it does not extinguish a claim or establish an absolute bar to any right of action on the released matter).

## B. Application of the Rules to the Documents at Issue

### 1. There is little evidence about the parties' intent and surrounding circumstances.

There was very little testimony at trial about the Partial Release of Liens. As to the intent of the parties and the surrounding circumstances, we know only the following: Zachry initially signed a document ("Release Form No. 1") containing broad release language in the body of the document. *See* majority opinion, *ante* at 855–56. Beginning in September of 2004, Zachry revised the release agreement, leaving only two paragraphs in the body of the document and deleting the broad release language ("Release Form No. 2").[1] In 2007, after all of the liquidated damages had already been withheld, the Port rejected an invoice from Zachry with the note, "not accepted at this time without proper release of lien form." The lawyers for Zachry and the Port then got together and came up with an acceptable release form, which once again included the broad release language with a carve-out for all claims in this lawsuit ("Release Form No. 3"). *See* majority opinion, *ante* at 856. The Port's witness, Andy Thiess, called the documents "releases" but claimed that he did not know their legal effect. Zachry's witness Jean Abiassi claimed that the releases were only releases of liens, as could be seen by the titles of the documents and section 6.07 of the contract.

[1]    Although I do not think that Release Form No. 2 should be called a release at all, I will refer to it as a release as the majority has done.

### 2. The releases refer to other documents.

The jury was asked to decide whether certain numbered documents released the liquidated-damages claim. Each release refers to another document, and to understand what was being released, it was necessary to know the contents of the referenced document. But, the record contains no testimony matching a release and the document to which it refers. The jury received no charge instructions about how to match a release with the document to which it refers, and the referenced documents are not attached to the exhibits in **\*869** the record. The absence of evidence from which to identify the document referenced in a given release is itself a sufficient basis on which to conclude that the Port has failed to prove anything as a matter of law. While the majority contends that Zachry failed to make these arguments, it is the Port's burden to show exactly what the "releases" released, in order to prevail on its point of error. The evidence presented at trial does not support the Port's claim as to what was released. To illustrate why this is so, I will address the specific releases at issue.

#### a. Release No. 23

I begin by examining the release cited by the majority as an example. Release No. 23 provides as follows:

> ZCC hereby acknowledges and certifies that Port of Houston Authority (PHA) has made partial payment to ZCC on all sums owing on Payment Estimate Number Twenty-[T]hree (23) and that it has no further claims against PHA for the portion of the Work completed and listed on the Schedule of Costs in Payment Number Twenty-[T]hree (23).

This release was signed May 17, 2006.

The majority contends that the language "it has no further claims against PHA" is a release. *See* majority opinion, *ante* at 855. But what exactly has been released? The agreement identifies such claims only as the claims "for the portion of the Work completed and listed on the Schedule of Costs in Payment Estimate Number Twenty–Three (23)." In order to know what was released you must refer to the Schedule of Costs in Payment Estimate Number Twenty–Three.

In the charge, the trial court instructed the jury, "you must decide the meaning of DX1114.012 and PX884.0159 (re Payment

estimate 23)....” As the majority notes, the Payment estimate and schedule of costs were to be prepared by Zachry under the contract. The referenced numbers in the jury charge refer to different copies of the same document. The documents that follow these exhibit numbers differ from one another. DX1114 is a 14–page document starting with DX1114.001 and ending at DX1114.014. It does not include “Payment Estimate Number Twenty-[T]hree (23).” PX884 is a 307–page document, starting with PX884.0001 and ending with PX884.0307. It also does not include “Payment Estimate Number Twenty-[T]hree (23).” It instead includes three copies of Payment Estimate Number Twenty–Two, and then jumps to Payment Estimate Number Twenty–Four.

There is one document, PX884.0145, that *might* be Payment Estimate Number Twenty–Three. Although the first page states “Estimate 22,” the second page states “Estimate 23.” Without knowing exactly what document is referenced in the release, how could that release be unambiguous?

That Estimate contains both typed and handwritten notations. There was no testimony as to who prepared the handwritten notations, or when those notations were made, or whether those notations were communicated to Zachry. The typed document has a stated date of March 25, 2006. At the bottom of the page there is a typed reference to “LIQ. DAMAGES (C + M)” and the number $0.00 is typed in. “C” is listed above as “Previous Liquidated Damages” with a “$0.00” notation. “M” is listed as “Liquidated Damages this period” and the typed “$0.00” is crossed out and the number “820,000” has been written by hand. The document appears to contain the signature of Andy Thiess for the Port and the handwritten date of April 17, 2006. At the bottom of the last page of that estimate there is a handwritten notation “-(820,000) Feb. + March LD’s.”

**\*870** The majority puts together a letter written by the Port dated May 10, 2006[2] and Release No. 23 to somehow link the liquidated-damages deduction with the release. But, the release in question does not mention this letter at all, and the letter itself does not refer to Payment Estimate Number Twenty–Three. The notation at the bottom can hardly be considered an unambiguous description of the Port’s liquidated-damages claim, especially without any testimony that this was even sent to Zachry. Again, this can only raise an ambiguity that the jury resolved against the Port.

[2]     While the majority in footnote 10 contends that other versions of the release may violate the parol evidence rule, they somehow consider this letter as affirmative evidence as to what was released.

### b. Release No. 24

Release No. 24, signed June 7, 2006, suffers from some of the same problems. The jury was told to decide the meaning of “DX1115.017 and PX884.0168 (re Payment Estimate 24).” DX1115 does not contain Payment Estimate Number 24. PX884 appears to contain Payment Estimate 24, but at page 884.0154. That Estimate contains both typed and handwritten notations. There was no testimony as to who prepared the handwritten notations, when those notations were made, or whether those notations were communicated to Zachry. The top of the typed document has a stated date of April 10, 2006. At the bottom of the page there is a typed reference to “LIQ. DAMAGES (C + M)” and the number “$0.00” is typed in. The typed number has been crossed out and the number 600,000[3] is handwritten above it. The “C” line above for previous liquidated damages has the typed amount “$0.00,” but on the “M” line, the typed amount “$0.00” has been crossed out and replaced with the handwritten figure, “820,000.” The document appears to contain the signature of Andy Thiess for the Port and the handwritten date of May 10, 2006.

[3]     This number does not match the majority’s chart.

All of the remaining releases suffer from the same problems. For the releases that contained handwritten notations, there was no testimony as to who prepared the handwritten notations, when those notations were made, or whether those notations were communicated to Zachry. Each release listed below was in the jury charge but did not have the appropriate payment estimate attached, and there was no testimony that the documents that I am referencing below were in fact the appropriate payment estimate.

<div align="center">

c. **Release No. 25,** dated July 24, 2006

</div>

Release No. 25 refers to Payment Estimate No. 25, which I will assume is PX884.0163. It was prepared June 7, 2006 and apparently approved by Thiess on June 16, 2006. The first page contains the typed notation "LIQ. DAMAGES (C + M) $0.00." Both the "C" line and the "M" line above contain the typed amount "$0.00." These were not crossed out.

d. **Release No. 26,** dated August 21, 2006

Release No. 26 refers to Payment Estimate No. 26, which I will assume is PX884.0172. It was prepared July 24, 2006. It does not show an approval date by Thiess. The first page contains the typed notation "LIQ. DAMAGES (C + M) $0.00." Both the "C" line and the "M" line above contain the typed number "$0.00." These were not crossed out.

<div align="center">

e. **Release No. 27,** dated September 22, 2006

</div>

Release No. 27 refers to Payment Estimate No. 27, which I will assume is **\*871** PX884.0180. It was prepared August 21, 2006. It was apparently approved by Thiess on October 9, 2006. The first page contains the typed notation "LIQ. DAMAGES (C + M) $0.00." Both the "C" line and the "M" line above contain the typed number "$0.00." These were not crossed out individually, although a line is drawn through the entire summary.

<div align="center">

f. **Release No. 28,** dated October 23, 2006

</div>

Release No. 28 refers to Payment Estimate No. 28, which I will assume is PX884.0188. It was prepared September 22, 2006. It apparently was approved by Thiess on October 9, 2006. The first page contains the typed notation "LIQ. DAMAGES (C + M) $0.00." The "$0.00" has been crossed out and the number 2,585,291.80[4] has been written by hand. The "C" line contains the typed number figure "$0.00," which is not crossed out, but the number 2,175,291.80 has been handwritten next to it. The "M" line contains the figure "$0.00," which has been crossed out and the number 410,000[5] has been written by hand.

[4]     This number does not match what the Port claimed were the withheld liquidated damages and does not match the majority's chart as to when the liquidated damages were actually deducted from Zachry's payments.

[5]     This number does not match the chart by the majority.

<div align="center">

g. **Release No. 29,** dated November 20, 2006

</div>

Release No. 29 refers to Payment Estimate No. 29, which I will assume is PX884.0197. It was prepared October 23, 2006. It shows no approval by Thiess. The first page contains the typed notation "LIQ. DAMAGES (C + M) $0.00." Both the "C" line and the "M" line above contain the typed number "$0.00." These were not crossed out.

#### h. Release No. 30, dated December 15, 2006

Release No. 30 refers to Payment Estimate No. 30, which I will assume is PX884.0207. It was prepared November 20, 2006. It apparently was approved by Thiess on November 30, 2006. The first page contains the typed notation "LIQ. DAMAGES (C + M) $0.00." The "$0.00" has been crossed out and the number 155,000 has been written by hand. The "C" line contains the typed figure "$0.00," which is not crossed out, while the "M" line contains the typed number "$0.00" with a handwritten number of 155,000 inserted.

#### i. Release No. 31, dated January 31, 2007

Release No. 31 refers to Payment Estimate No. 31, which I will assume is PX884.0217. It was prepared December 15, 2006. It apparently was approved by Thiess on January 1, 2007. The first page contains the typed notation "LIQ. DAMAGES (C + M) $0.00." This is not crossed out. The "C" line above contains the typed amount "$0.00," and it has not been crossed out. The "M" line contains the typed amount "$0.00," but that has been crossed out and the handwritten number 150,000 inserted.

It appears that every time Zachry sent its payment estimate, it listed "$0.00" in the blank for liquidated damages. On this record, we do not know whether the referenced payment estimate that was listed in the release was Zachry's estimate—with zero liquidated damages—or the Port's estimates with its handwritten notations. On this record, the Port cannot prevail as a matter of law.

**\*872** If the handwritten notations were made by Port personnel to refer to the liquidated damages in question here, then the Port was very inconsistent in its treatment of the liquidated damages. On some documents, the Port approved a listing of "$0.00" on Line "C" for "previous liquidated damages," even though the Port had withheld previous liquidated damages. Because the documents do not conclusively establish that a release occurred, I would not hold that a release occurred as a matter of law.

The majority's chart also cannot be supported by the actual releases themselves. Assuming that the handwritten notations indicated a liquidated-damages deduction, those handwritten numbers do not match the amounts that the majority believes were the actual deductions from Zachry's invoices.

Finally, even assuming that the document included a reference to the Port's handwritten notations, the actual release says it has no further claims with respect to the *Schedule of Costs* in the Payment Estimate—in other words, that Zachry has no further claim that the work done cost any more than was listed in its Schedule of Costs for the work done that month. Zachry cannot later contend that the work cost more than listed on the Schedule. The release does not say that Zachry is to be bound by any summary or deductions made by the Port, or that Zachry agrees that the deductions made by the Port are correct. Thus, the releases violate the fundamental rule that they must mention the claim to be released—it is simply missing from the evidence at trial. Under this evidence, we do not know what amount, if any, was allegedly released. While the majority contends that the release does not have to identify the amount released, how else could the majority conclude that a release of $2.205 million occurred as a matter of law?

#### 3. Section 6.07 of the contract supports a release of liens only.

Both sides cite to the contract to support their claims. Section 6.07 of the contract states in pertinent part as follows:

> As a condition precedent to the obligation of the Port Authority to make payment on any invoice, the Contractor shall supply the Port Authority with waivers and releases of liens (including without limitation all mechanics' and materialmens' liens and any other type of security interest), which

> waivers and releases shall be duly executed and acknowledged by the Contractor and each Subcontractor and Supplier expecting payment from [the] Contractor in respect of such invoice in order to assure an effective release of such liens to the maximum extent permitted by Applicable Law. The waivers and releases of liens shall provide, at a minimum, that all amounts due and payable to the Contractor and each such Subcontractor and Supplier, as of the date of such invoice and as of the date of the last payment received by the Contractor and each such Subcontractor and Supplier have been paid in full and that the Contractor and each such Subcontractor and Supplier waives, releases and relinquishes any lien (including without limitation any mechanic's or materialman's lien), security interest and claim for payment to the extent set out the preceding sentence.

I agree with Zachry's interpretation of this section that the two sentences show an intent to release liens and not a release of a claim that payment had been made in full. The second sentence limits the release to the preceding sentence which is clearly limited to liens. Even the majority concedes that this section only required Zachry to release a lien. *See* majority opinion, *ante* at 857. But then the majority uses that against Zachry when it discusses **\*873** the title of the release forms, noting that Release Form No. 1 was a broad release yet was titled "Partial Release of Lien." Section 6.07 shows the parties' intent to release *liens* in connection with this Release Form No. 2.

### 4. The titles and deletions in the various forms show a limited release.

The different forms of the release show an intent by Zachry to provide a very limited release. The deletion of the broad-form release language that was present in Release Form No. 1 shows Zachry's intent to limit its release. The fact that the Port was ultimately unhappy with Release Form No. 2 indicates that the Port knew that this release did not provide them any protection at all. *See Hous. Exploration Co.,* 352 S.W.3d at 470–71 (deletions in a contract can be considered in its construction). While not controlling, a document's title also can create ambiguity. *See Lone Star Cement Corp.,* 467 S.W.2d at 404–05. Here, however, the titles of the documents match up with the contract provision calling only for a release of lien.

### 5. This release violates the general rules of construction for a release.

Under general rules of contract construction, this release is, at most, ambiguous. But when the specific rules of construction concerning releases are incorporated into the analysis, the release fails. To effectively release a claim in Texas, the releasing instrument must mention the claim to be released. *See Victoria Bank,* 811 S.W.2d at 938. The releases here do not do this. Releases must be construed narrowly, *see id.,* yet here, the majority expands the releases' meaning. And unlike typical releases, the releases in this case do not use language that the parties "release, discharge, [and] relinquish" their claims. *Cf. Derr Constr. Co.,* 846 S.W.2d at 859 ("Release language is generally 'release, discharge, relinquish.' "); *MG Bldg. Materials, Ltd. v. Moses Lopez Custom Homes, Inc.,* 179 S.W.3d 51, 64 (Tex.App.-San Antonio 2005, pet. denied) (same); *Wallerstein v. Spirt,* 8 S.W.3d 774, 780 (Tex.App.-Austin 1999, no pet.) (same). Despite footnote 9, the majority is unable to cite any majority opinion in which the court construed a document to be a release where the document lacked such typical release language. *See also Green Int'l,* 951 S.W.2d at 387 (contract language that "Contractor shall not be liable to the Subcontractor for delay to Subcontractor's work by the act, neglect or default of Owner" is not a release because it neither extinguishes a claim nor establishes an absolute bar to any right of action on the released matter).

For all of these reasons I respectfully dissent from the majority's opinion as to the release of the liquidated damages claim.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**TAB 3**

*Zachry Construction Corporation v.*
*Port of Houston Authority of Harris County,*
**449 S.W.3d 98 (Tex. 2014).**

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

**449 S.W.3d 98**
**Supreme Court of Texas.**

ZACHRY CONSTRUCTION CORPORATION, Petitioner,
v.
PORT OF HOUSTON AUTHORITY OF HARRIS COUNTY, Texas, Respondent.

No. 12–0772. | Argued Nov. 6, 2013. | Decided Aug. 29, 2014. | Rehearing Denied Dec. 19, 2014.

**Synopsis**
**Background:** Construction contractor brought action against county port authority for breach of contract. The 151st District Court, Harris County, No. 2006–72970, Mike Engelhart, J., entered judgment on jury verdict for contractor. Port authority and contractor appealed. The Houston Court of Appeals, Sharon McCally, J., 377 S.W.3d 841, reversed and rendered judgment for the port. Contractor sought review.

**Holdings:** The Supreme Court, Hecht, C.J., held that:

[1] local Government Contract Claims Act does not waive immunity from suit on a claim for damages not recoverable under section of Act that defines the scope of the waiver of immunity;

[2] Act waives immunity for a contract claim for delay damages not expressly provided for in the contract;

[3] no-damages-for-delay provision was unenforceable;

[4] releases signed by contractor did not cover contractor's breach of contract claims; and

[5] evidence was sufficient to support verdict that port authority was entitled to an offset of $970,000 as damages for contractor's use of defective wharf fenders.

Reversed and remanded.

Boyd, J., dissented in part and filed opinion in which Johnson, Willett, and Lehrmann, JJ., joined.

West Headnotes (16)

[1]     **Courts**⚷Acts and proceedings without jurisdiction
**Municipal Corporations**⚷Capacity to sue or be sued in general

Governmental immunity implicates a court's subject-matter jurisdiction over pending claims, and, without jurisdiction, the court cannot proceed at all in any cause; it may not assume jurisdiction for the purpose of deciding the merits of the case.

1 Cases that cite this headnote

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

**[2]**   **Public Contracts** Defenses

Local Government Contract Claims Act does not waive immunity from suit on a claim for damages not recoverable under sections of the Act that define the scope of the waiver of immunity. V.T.C.A., Local Government Code § 271.153.

2 Cases that cite this headnote

**[3]**   **Public Contracts** Remedies of Contractors
**Water Law** Contracts

Local Government Contract Claims Act applied to contract between construction contractor and county port authority for construction of a wharf. V.T.C.A., Local Government Code § 271.152.

Cases that cite this headnote

**[4]**   **Statutes** Particular Words and Phrases

As a rule, a modifier like "subject to" applies to the nearest reasonable referent in the statute.

Cases that cite this headnote

**[5]**   **Public Contracts** Defenses

Local Government Contract Claims Act waives immunity for contract claims that meet certain conditions: the existence of a specific type of contract, a demand for certain kinds of damages, a state forum, etc. V.T.C.A., Local Government Code §§ 271.151–271.160.

Cases that cite this headnote

**[6]**   **Public Contracts** Defenses

The waiver of immunity in Local Government Contract Claims Act for contract claims that meet certain conditions does not depend on the outcome, though it does require a showing of a substantial claim that meets the Act's conditions. V.T.C.A., Local Government Code §§ 271.151–271.160.

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

1 Cases that cite this headnote

[7]      **Public Contracts**—Pleading

For a claim to be "substantial," as required to meet pleading requirements for claim brought under Local Government Contract Claims Act, the claimant must plead facts with some evidentiary support that constitute a claim for which immunity is waived, not that the claimant will prevail. Tex. Loc. Gov't Code §§ 271.151–160.

1 Cases that cite this headnote

[8]      **Public Contracts**—Delay of government and liability for damages

Local Government Contract Claims Act waives immunity for a contract claim for delay damages not expressly provided for in the contract. V.T.C.A., Local Government Code § 271.153.

1 Cases that cite this headnote

[9]      **Damages**—Natural and Probable Consequences of Breaches of Contract
**Damages**—Under circumstances within contemplation of parties

"Under the contract" is used to refer generally to damages available on a contract claim; further, parties entering into a contract presumably contemplate that contract damages will be available if that contract is breached.

1 Cases that cite this headnote

[10]     **Damages**—Proximate or Remote Consequences

"Consequential damages" are those damages that result naturally, but not necessarily, from the defendant's wrongful acts.

Cases that cite this headnote

[11]     **Damages**—Under circumstances within contemplation of parties

Delay damages are consequential damages.

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

Cases that cite this headnote

[12]     **Public Contracts**—Delay of government and liability for damages

Generally, under Local Government Contract Claims Act, a contractor has a right to delay damages for breach of contract; the parties are free to modify or exclude it by agreement, but unless they do, the right provided by law is as much a part of the contract as the rights the contract expressly creates. V.T.C.A., Local Government Code § 271.153.

2 Cases that cite this headnote

[13]     **Public Contracts**—Delay of government and liability for damages
**Water Law**—Contracts

No-damages-for-delay provision in contract between construction contractor and county port authority for construction of wharf was unenforceable; pre-injury waivers of future contract liability were void as against public policy. V.T.C.A., Local Government Code § 271.153.

Cases that cite this headnote

[14]     **Contracts**—Freedom of contract
**Contracts**—Contravention of law in general
**Contracts**—Public Policy in General

Freedom of contract has limits; as a rule, parties have the right to contract as they see fit, as long as their agreement does not violate the law or public policy.

Cases that cite this headnote

[15]     **Public Contracts**—Delay of government and liability for damages
**Water Law**—Contracts

Releases signed by construction contractor releasing claims against port authority for the work completed in order for contractor to obtain periodic payments did not cover contractor's breach of contract claims against port authority on the basis that port authority's refused to allow contractor to construct cutoff wall, which resulted in the contractor having to do more work in the wet, thereby delaying completion and increasing its costs, where forms were captioned "Affidavit and Partial Release of Lien," plainly referred only to claims for work completed, not for liquidated damages withheld for delays due to work not completed, and contractor disputed the port authority's right to withhold liquidated damages from the first time it did so.

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

Cases that cite this headnote

[16]     **Public Contracts**⊶Damages
         **Water Law**⊶Contracts

Evidence was sufficient to support verdict that port authority was entitled to an offset of $970,000 as damages for contractor's use of defective wharf fenders, where port authority submitted evidence that the fenders, which were supposed to last for 30 years, became corroded after only 90 days, and expert testified that this occurred because the fenders were improperly sealed, which testimony was corroborated by lab analysis and tests.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*100** R. Wes Johnson, The Gardner Law Firm, San Antonio, TX, for Amicus Curiae, Associated Builders and Contractors of Texas.

Joe F. Canterbury Jr., Canterbury Stuber Elder Gooch, Surratt, Shapiro & Stein P.C., Dallas, TX, for Amicus Curiae, Associated General Contractors of Texas, Inc.

James Corbin Van Arsdale, Vice President & General Counsel, Austin, TX, for Amicus Curiae, Associated General Contractors–Texas Building Branch.

Robert H. Fugate, Assistant City Attorney, Arlington City Attorney's Office, Arlington, TX, for Amicus Curiae, City of Arlington, Texas.

Charles Steven Estee, Office of the Dallas City Attorney, Dallas, TX, Amicus Curiae, City of Dallas, Texas.

Christopher Bedford Mosley, Sr. Assistant City Attorney, Fort Worth, for Amicus Curiae, City of Fort Worth, Texas.

Malinda York Crouch, Sr. Assistant City Attorney, Houston, TX, for Amicus Curiae, City of Houston.

Robert Caput, DFW Airport, TX, for Amicus Curiae, Dallas/Fort Worth International Airport Board.

Vincent L. Marable III, Paul Webb, P.C., Wharton, TX, for Amicus Curiae, Electrical Contractors Association, National Systems Contractors Association.

Bruce S. Powers, Assistant County Attorney, Vincent Reed Ryan Jr., Houston, TX, for Amicus Curiae, Harris County, Texas.

Hugh Rice Kelly, Austin, TX, for Amicus Curiae, Texans for Lawsuit Reform.

Jose E. De La Fuente, Lloyd Gosselink Rochelle & Townsend, P.C., Austin, TX, for Amicus Curiae, Texas Aggregates and Concrete Association.

George S. Christian, Texas Civil Justice League, Austin, TX, for Amicus Curiae, Texas Civil Justice League.

John B. Dahill, Austin, TX, for Amicus Curiae, Texas Conference of Urban Counties.

Heather Mahurin, Austin, TX, for Amicus Curiae, Texas Municipal League.

Richard Gary Thomas, Thomas Feldman & Wilshusen, LLP, Dallas, TX, for Amicus Curiae, The American Subcontractors Association, Inc.

David A. Escamilla, Sherine Elizabeth Thomas, Austin, TX, for Amicus Curiae, Travis County, Texas.

Michael Keeley, Dallas, TX, for Amicus Curiae, Zurich Surety.

**\*101** Amanda Bowman Nathan, Sydney Gibbs Ballesteros, Robin C. Gibbs, Michael Absmeier, Jennifer Horan Greer, Gibbs & Bruns LLP, Brandon Trent Allen, Reynolds, Frizzell, Black, Doyle, Allen & Oldham, L.L.P., Houston, TX, Douglas W. Alexander, Alexander Dubose Jefferson & Townsend LLP, Austin, TX, for Petitioner Zachry Construction Corporation.

David E. Keltner, Marianne M. Auld, Kelly Hart & Hallman LLP, Fort Worth, TX, Catherine B. Smith, Michael A. Heidler, Marie R. Yeates, William D. Sims Jr., Vinson & Elkins LLP, David Hurst Brown, Brown & Kornegay, LLP, Karen Tucker White, Karen T. White, P.C., Lawrence J. Fossi, Fossi & Jewell LLP, Houston, TX, for Respondent Port of Houston Authority of Harris County, Texas.

**Opinion**

Chief Justice HECHT delivered the opinion of the Court, in which Justice GREEN, Justice GUZMAN, Justice DEVINE, and Justice BROWN joined.

The common law permits a contractor to recover damages for construction delays caused by the owner, but the parties are free to contract differently. A contractor may agree to excuse the owner from liability for delay damages, even when the owner is at fault. The contractor thereby assumes the risk of delay from, say, an owner's change of plans, even if the owner is negligent. But can a no-damages-for-delay provision shield the owner from liability for deliberately and wrongfully interfering with the contractor's work? Before this case, a majority of American jurisdictions—including Texas courts of appeals, courts in all but one jurisdiction to consider the issue, and five state legislatures—had answered no. We agree with this overwhelming view and also conclude that the answer is the same if the owner is a local governmental entity for which immunity from suit is waived by the Local Government Contract Claims Act.[1]

---

[1]    TEX. LOC. GOV'T CODEE §§ 271.151–.160.

---

Contractors are usually paid as work progresses and, in exchange for payment, must waive liens and claims related to the work paid for. But does such a general waiver release a claim the contractor has already asserted? Not, we think, unless the claim is specifically mentioned or the intent to do so is clear.

Our conclusions require us to reverse the judgment of the court of appeals[2] and remand the case to that court for further proceedings.

---

[2]    377 S.W.3d 841 (Tex.App.-Houston [14th Dist.] 2012).

---

**I [3]**

---

[3]    The evidence in this case was hotly disputed at almost every turn. We do not pause in this rehearsal of the proceedings to note each disagreement. In reviewing any case tried to a jury, we must view the evidence "in the light most favorable to the verdict"—in this case a verdict for the petitioner—"crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not" and so summarize the evidence in that light. *Cruz v. Andrews Restoration, Inc.,* 364 S.W.3d 817, 819 (Tex.2012) (citing *City of Keller v. Wilson,* 168 S.W.3d 802, 807 (Tex.2005)).

---

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

Petitioner, Zachry Construction Corporation, contracted to construct a wharf on the Bayport Ship Channel for respondent, the Port of Houston Authority of Harris County, Texas. The wharf would be a concrete deck supported by piers, extending out over the water. It would be used for loading and unloading ships carrying containerized goods and would be long enough—1,660 feet—for two ships to dock stern to bow. It would be built in five sections, each 135 feet wide and 332 feet long. The channel was to be dredged to a **\*102** depth of 40 feet beneath the wharf and surrounding area, and revetment placed along the shore beneath the wharf to prevent erosion. The total cost was $62,485,733.

The contract made Zachry an independent contractor in sole charge of choosing the manner in which the work would be conducted. Specifically, Section 5.10 of the contract provided:

> The Port Authority shall not have the right to control the manner in which or prescribe the method by which the Contractor [Zachry] performs the Work. As an independent Contractor, the Contractor shall be solely responsible for supervision of and performance of the Work and shall prosecute the Work at such time and seasons, in such order or precedence, and in such manner, using such methods as Contractor shall choose....

The provision benefitted the Port, insulating it from the liability to which it would be exposed were it exercising control over Zachry's work.[4] Still, the Port was fully engaged in reviewing Zachry's plans and overseeing construction.

[4]    *See, e.g., Gen. Elec. Co. v. Moritz,* 257 S.W.3d 211, 214 (Tex.2008) ("Generally, an owner or occupier does not owe a duty to ensure that independent contractors perform their work in a safe manner. But one who retains a right to control the contractor's work may be held liable for negligence in exercising that right.") (citations omitted).

Zachry's plan was innovative. It would use soil dredged from the channel to construct an 8–foot–wide earthen berm starting from the shore at either end of the worksite, extending out toward the center of the channel, then running parallel to the shore, forming a long, flat U-shaped wall in the channel around the construction area. Zachry would install a refrigerated pipe system in the wall and down into the channel floor that would carry supercooled brine, freezing the wall to make it impenetrable to the water in the channel. Zachry would then remove the water from the area between the wall and the shore. In this way, Zachry could work "in the dry", using bulldozers and other land equipment for the excavation and revetment work. Another advantage to this freeze-wall approach was that it would lower diesel emissions and require fewer nitrous oxide credits under environmental laws, giving the Port more flexibility in other construction projects. Zachry believed this approach would make the work less expensive and allow it to be completed more quickly.

And time was of the essence to the Port. Work began in June 2004 and was to be completed in two years. But two sections of the wharf had to be completed within 20 months—by February 2006—so that a ship from China could dock, delivering cranes to be used on the wharf. Zachry agreed to pay $20,000 per day as liquidated damages for missing the deadlines.

Nine months into the project, the Port realized that it would need two 1,000–foot berths to accommodate the ships it ultimately expected to service. A sixth 332–foot section would have to be added to the wharf. As a practical matter, only Zachry could perform the additional work, and Zachry and the Port began discussions on a change order. To complete the two sections of the wharf needed by February 2006, and to continue to work "in the dry", Zachry proposed to build another freeze-wall—a cutoff wall—though the middle of the project, perpendicular to the shoreline out to the existing wall, splitting the project into two parts. Zachry would finish the west end where the ship from China would dock, remove the wall barricading water from that area, then continue working on the east end "in the dry".

**\*103** The Port had reservations about this plan. Near the shore, the cutoff wall would have to be built through the area where piers had already been driven into the channel floor. The Port's engineers were concerned that freezing the ground near the piers might destabilize them, weakening the wharf and making it unsafe. But the Port was also concerned that if it rejected Zachry's plan, Zachry might simply refuse to undertake the addition of a sixth section. So the Port did not raise its concerns with Zachry. Zachry, for its part, had already identified the issue, but its own engineers had concluded that any piers that might be affected could be insulated from the frozen ground. Change Order 4, using Zachry's approach to add a sixth section of the wharf at a cost of $12,962,800, was finalized September 27, 2005.

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

Two weeks later, the Port ordered Zachry to revise and resubmit its plans without the cutoff wall. The practical effect of the Port's order was to refuse to allow construction of the cutoff wall. Zachry protested that, under Section 5.10 of the contract, the Port had no right to determine the method and manner of the work, but the Port would not budge. Zachry's only option was to finish the westmost sections in time for the ship from China to dock, then remove the wall altogether and continue to work "in the wet", which would delay completion of the project and increase its cost.

In negotiating Change Order 4, the Port had promised not to impose liquidated damages for delay as long as the ship from China could dock when it arrived, though the Port had refused to put its promise in writing. Nevertheless, after the ship successfully docked, the Port began withholding liquidated damages from Zachry's payments. Eventually the Port desisted, but not until it had withheld $2.36 million. Zachry completed the project in January 2009, more than two-and-one-half years after the contract deadline.

In November 2006, several weeks after the Port refused to allow construction of the cutoff wall, Zachry sued. Zachry eventually claimed some $30 million in damages from delays caused by the Port. The Port countered that Section 5.07 of the contract precluded delay damages. That provision states:

> [Zachry] shall receive no financial compensation for delay or hindrance to the Work. In no event shall the Port Authority be liable to [Zachry] or any Subcontractor or Supplier, any other person or any surety for or any employee or agent of any of them, for any damages arising out of or associated with any delay or hindrance to the Work, regardless of the source of the delay or hindrance, including events of Force Majeure, AND EVEN IF SUCH DELAY OR HINDRANCE RESULTS FROM, ARISES OUT OF OR IS DUE, IN WHOLE OR IN PART, TO THE NEGLIGENCE, BREACH OF CONTRACT OR OTHER FAULT OF THE PORT AUTHORITY. [Zachry's] sole remedy in any such case shall be an extension of time.

Zachry argued, and the trial court ultimately agreed, that such a no-delay-damages provision could not be enforced if the Port's intentional misconduct caused the delay.

Zachry also sought recovery of the $2.36 million in delay damages withheld by the Port. The trial court held that the contract's liquidated damages provisions were invalid, and the Port has not challenged that ruling on appeal. But the Port responded that Zachry's claim to the liquidated damages was precluded by the releases it executed to obtain the periodic payments from which liquidated damages were withheld. The releases shared language stating:

> **\*104** [Zachry] hereby acknowledges and certifies that [the Port] has made partial payment to [Zachry] on all sums owing on Payment Estimate Number [——] and that it has no further claims against [the Port] for the portion of the Work completed and listed on the Schedule of Costs in Payment Estimate Number [——].[5] The trial court concluded that this language did not unambiguously release Zachry's claim to the liquidated damages withheld and asked the jury to decide what effect it had.

[5]    There are releases in other forms, at least one of which specifically acknowledged, and excluded any effect on, contract claims at issue in pending litigation between the parties. The release for Payment Estimate Number 35 provided that the parties agreed "that Zachry Construction Corporation's execution of this Lien Release ... does not in any way release or modify the parties' rights and obligations under the Phase 1A Wharf and Dredging Contract or constitute a release of any claim or claims that the parties may present in the Lawsuit with respect to Phase 1A Wharf and Dredging Contract."

After a three-month trial, the jury found that the Port breached the contract by rejecting Zachry's cutoff wall design, causing Zachry to incur $18,602,697 in delay damages.[6] The jury also found that the delay "was the result of the Port's ... arbitrary and capricious conduct, active interference, bad faith and/or fraud."[7] The jury failed to find that Zachry had released its claim to the $2.36 million liquidated damages the Port withheld, but found that the Port was entitled to offset $970,000 for defective wharf fenders. The trial court rendered judgment for Zachry on the verdict.

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

[6]     The jury was asked to find damages for "[t]he balance due and owed by the Port, if any, under the Contract, including any amount owed as compensation for any increased cost to perform the work as a direct result of Port-caused delays, and ... [t]he amount owed, if any, for additional work that Zachry was directed to perform by the Port in connection with the Contract." The jury found that the percentage of damages for hindrance or delay, as opposed to additional work, was 58.13%. The Port and Zachry have since stipulated that 100% of the damages found by the jury were for hindrance or delay.

[7]     In assessing damages, the jury was instructed as follows:

> You are instructed that § 5.07 of the Contract precludes Zachry from recovering delay or hindrance damages, if any, unless you find that the delay or hindrance damages, if any, resulted from a delay or hindrance that was the result of the Port's actions, if any, that constituted arbitrary and capricious conduct, active interference, bad faith and/or fraud.
>
> "Arbitrary and capricious" means willful and unreasoning action without due consideration and in disregard of the facts, circumstances, and rights of other parties involved.
>
> "Active interference" means affirmative, willful action that unreasonably interferes with the other party's compliance with the contract. "Active interference" requires more than a simple mistake, error in judgment, lack of total effort, or lack of complete diligence.
>
> "Bad faith" is conscious doing of a wrong for a dishonest purpose.
>
> "Fraud" occurs when
>
>> 1. a party makes a material misrepresentation,
>> 2. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion,
>> 3. the misrepresentation is made with the intention that it should be acted on by the other party, and
>> 4. the other party suffers injury as a result of its reliance on the misrepresentation.
>
> "Misrepresentation" means a promise of future performance made with an intent, at the time the promise was made, not to perform as promised, and the promise of future performance is that the Port would comply with the terms of Change Order 4.

Both the Port and Zachry appealed. The court of appeals held that the no- **\*105** delay-damages provision of the contract barred Zachry's recovery of delay damages,[8] that Zachry unambiguously released its claims to $2.205 million of the liquidated damages withheld,[9] and that the Port was entitled to the $970,000 found by the jury for defective wharf fenders.[10] The court reversed the judgment for Zachry and rendered judgment for the Port, awarding it the $10,697,750 in attorney fees found by the jury.[11]

[8]     377 S.W.3d 841, 850–851 (Tex.App.-Houston [14th Dist.] 2012).

[9]     *Id.* at 857–858. The court was divided on this issue.

[10]     *Id.* at 861. Since the $155,000 in liquidated damages to which Zachry had not released its claim was completely offset by the $970,000 for the defective fenders, Zachry recovered nothing.

[11]     *Id.* at 865. Section 3.10 of the contracts states: "If [Zachry] brings any claim against the Port Authority and [Zachry] does not prevail with respect to such claim, [Zachry] shall be liable for all attorneys' fees incurred by the Port Authority as a result of such claim."

We granted Zachry's petition for review.[12]

[12]     56 Tex. Sup.Ct. J. 864 (Aug. 23, 2014).

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

## II

[1] Zachry argues that the no-damages-for-delay provision of the contract (Section 5.07) is invalid. The Port disagrees but also argues that even if the provision has no effect, the contract is otherwise silent on the recovery of delay damages, and the Local Government Contract Claims Act ("the Act")[13] does not waive governmental immunity from suit for any recovery a contract does not itself provide for. The court of appeals concluded that the no-damages-for-delay provision is enforceable and thus found it unnecessary to reach the immunity issue.[14] That approach was impermissible. Immunity "implicates a court's subject-matter jurisdiction over pending claims",[15] and " '[w]ithout jurisdiction the court cannot proceed at all in any cause; it may not assume jurisdiction for the purpose of deciding the merits of the case.' "[16] We must consider first whether the Act waives a local governmental entity's immunity from suit on a contract claim for delay damages the contract does not call for.

[13]    Tex. Loc. Gov't Code §§ 271.151–.160.

[14]    377 S.W.3d at 865 n. 25. The Port asserted governmental immunity in the trial court but did not request a ruling.

[15]    *Rusk State Hosp. v. Black,* 392 S.W.3d 88, 95 (Tex.2012).

[16]    *Fin. Comm'n of Tex. v. Norwood,* 418 S.W.3d 566, 578 (Tex.2013) (quoting *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,* 549 U.S. 422, 431, 127 S.Ct. 1184, 167 L.Ed.2d 15 (2007) (internal quotation marks omitted) (citing *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998))).

The issue has two parts. One is whether the Act's limitations on recovery help define and restrict the scope of the waiver of immunity. If not, those limitations have no role in determining a court's jurisdiction over a claim.[17] If so, as we conclude, the second part of the immunity issue is whether the delay damages Zachry seeks are permitted by the Act, so that the **\*106** Port's immunity from suit is waived. We conclude they are.

[17]    The effect of the Act's limitations on recovery is important, though not in this case, in responding to a governmental entity's plea to the jurisdiction, the ruling on which is subject to interlocutory appeal. TEX. CIV. PRAC. & REM.CODE § 51.014(a)(8). If the limitations do not determine the scope of the waiver of immunity, an assertion of a claim on a contract covered by the Act would be enough to defeat the jurisdictional plea. Otherwise, a plaintiff would also be required to show that the damages claimed are permitted by the Act.

## A

[2] [3] The Act waives immunity from contract suits for local governmental entities, such as the Port.[18] Section 271.152 of the Act states:

[18]    The Act defines a "local governmental entity" as "a political subdivision of this state, other than a county or a unit of state government [as that term is defined elsewhere]," "including a ... special-purpose district or authority, including any ... navigation

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

district...." TEX. LOC. GOV'T CODEE § 271.151(3). The Port—known until 1971 as the Harris County Houston Ship Channel Navigation District—is a navigation district created in 1927 under the authority of article XVI, section 59 of the Texas Constitution, with the authority to sue and be sued. *Guillory v. Port of Houston Auth.,* 845 S.W.2d 812, 812–813 (Tex.1993); *see also Jones v. Texas Gulf Sulphur Co.,* 397 S.W.2d 304, 306–307 (Tex.Civ.App.-Houston 1965, writ ref'd n.r.e.) (concluding in part that the Houston Ship Channel's immunity from *tort liability* was not waived by a "sue and be sued" clause). In 1970, the Court held that the same "sue and be sued" clause waived a navigation district's governmental immunity from *suit. Mo. Pac. R.R. Co. v. Brownsville Navigation Dist.,* 453 S.W.2d 812 (Tex.1970). The Port would then have been subject to suit, and possible contract liability, until the *Missouri Pacific* decision was overruled in *Tooke v. City of Mexia,* 197 S.W.3d 325, 328–331 (Tex.2006).

A local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into *a contract subject to this subchapter* waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, *subject to the terms and conditions of this subchapter.*[19]

[19]     TEX. LOC. GOV'T CODEE § 271.152 (emphasis added).

A "contract subject to this subchapter" includes "a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity".[20] The contract between the Port and Zachry qualifies.

[20]     *Id.* § 271.151(2)(A).

The "terms and condition of this subchapter" referred to in Section 271.152 are found in the Act's other nine sections. Section 271.153 states:

(a) Except as provided by Subsection (c), the total amount of money awarded in an adjudication brought against a local governmental entity for breach of a contract subject to this subchapter is limited to the following:

(1) the balance due and owed by the local governmental entity under the contract as it may have been amended, including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration;

(2) the amount owed for change orders or additional work the contractor is directed to perform by a local governmental entity in connection with the contract;

(3) reasonable and necessary attorney's fees that are equitable and just; and

(4) interest as allowed by law, including interest as calculated under Chapter 2251, Government Code.

(b) Damages awarded in an adjudication brought against a local governmental entity arising under a contract subject to this subchapter may not include:

(1) consequential damages, except as expressly allowed under Subsection (a)(1);

(2) exemplary damages; or

**\*107** (3) damages for unabsorbed home office overhead.

(c) Actual damages, specific performance, or injunctive relief may be granted in an adjudication brought against a local governmental entity for breach of a contract described by Section 271.151(2)(B).[21]

[21]     *Id.* § 271.153.

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

Section 271.154 provides for enforcement of contractual adjudication procedures.[22] Section 271.155 preserves defenses other than immunity.[23] Section 271.156 limits the Act's waiver of immunity to suits filed in state court.[24] Section 271.157 makes clear that the waiver of immunity does not extend to tort claims.[25] Section 271.158 provides that the Act only waives immunity and does not grant it.[26] And Section 271.160 precludes a finding of joint enterprise.[27]

[22]    *Id.* § 271.154 ("Adjudication procedures, including requirements for serving notices or engaging in alternative dispute resolution proceedings before bringing a suit or an arbitration proceeding, that are stated in the contract subject to this subchapter or that are established by the local governmental entity and expressly incorporated into the contract or incorporated by reference are enforceable except to the extent those procedures conflict with the terms of this subchapter.").

[23]    *Id.* § 271.155 ("This subchapter does not waive a defense or a limitation on damages available to a party to a contract, other than a bar against suit based on sovereign immunity.").

[24]    *Id.* § 271.156 ("This subchapter does not waive sovereign immunity to suit in federal court.").

[25]    *Id.* § 271.157 ("This subchapter does not waive sovereign immunity to suit for a cause of action for a negligent or intentional tort.").

[26]    *Id.* § 271.158 ("Nothing in this subchapter shall constitute a grant of immunity to suit to a local governmental entity.").

[27]    *Id.* § 271.160 ("A contract entered into by a local government entity is not a joint enterprise for liability purposes.").

[4] Whether the various provisions of the Act define the scope of the waiver of immunity depends on the statutory text. As a rule, a modifier like the last "subject to" phrase in Section 271.152 applies to the nearest reasonable referent.[28] The candidates are "contract", "claim", "adjudicating", and "waives". We do not think the phrase modifies "contract". Earlier in the sentence, the Act is made applicable to any "contract subject to this subchapter", and it would be needlessly redundant to reiterate a few words later that the contract is subject to the Act's terms and conditions.[29] Nor do we think the phrase modifies "claim". Section 271.158,[30] for example, provides only that the Act does not grant immunity and says nothing about the nature of the claim for which immunity is waived. And we do not think the "subject to" phrase modifies "adjudicating". If it did, only the adjudicatory process would be governed by the Act's terms and conditions. This reading might make sense for the recovery limits and preservation of procedures and defenses provided in Sections 271.153,[31] 271.154,[32] and Section 271.155,[33] respectively. Those three sections relate to the litigation and adjudication **\*108** of a claim. But the other four sections, limiting the Act's coverage to suits in state court on contract claims, providing that immunity is not granted, and precluding a finding of joint enterprise, have little, if anything, to do with the adjudication on claims. These sections—271.156,[34] 271.157,[35] 271.158,[36] and 271.160,[37] respectively—relate to the scope of immunity rather than the conduct of litigation.

[28]    *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 152 (2012).

[29]    *Sultan v. Mathew,* 178 S.W.3d 747, 751 (Tex.2005) ("We must avoid, when possible, treating statutory language as surplusage.").

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

30      TEX. LOC. GOV'T CODEE § 271.158.


31      TEX. LOC. GOV'T CODEE § 271.153.


32      *Id.* § 271.154.


33      *Id.* § 271.155.


34      *Id.* § 271.156.


35      *Id.* § 271.157.


36      *Id.* § 271.158.


37      *Id.* § 271.160.


The "subject to the terms and conditions" phrase in Section 271.152 incorporates the other provisions of the Act to define the scope of its waiver of immunity. The waiver does not extend to tort suits, suits in federal court, or allow recovery beyond that permitted by Section 271.153. But Section 271.152, as qualified by this "subject to" phrase also does not preclude other defenses or other contractual procedures, or confer immunity or suggest joint enterprise. The "subject to" phrase most reasonably refers to "waives", thus making the provisions of the Act limitations on the waiver of immunity. Section 271.152 must be read as follows: "A local governmental entity ... waives sovereign immunity to suit ... subject to the terms and conditions" of the Act.

We reached this result in *Tooke v. City of Mexia*[38] without the analysis just laid out because it seemed obvious. The Tookes sued the City of Mexia for breach of contract, "asserting that they had relied on a three-year term in purchasing equipment. They claimed unspecified damages, but requested jury findings only on lost profits and attorney fees".[39] They did not claim that the City failed to pay for work actually performed; rather, they sought recovery only for lost profits they would have made had the contract continued—"consequential damages excluded from recovery under [Section 271.153]."[40] Even though the Tookes' contract claim fell within Section 271.152,[41] we concluded—because they did not "claim damages within [Section 271.153's] limitations"—that "the City's immunity from suit on the Tookes' claim has not been waived."[42] This was true even though the Tookes might have proved that the City breached the contract.

38      197 S.W.3d 325 (Tex.2006).


39      *Id.* at 330.

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

[40]     *Id.* at 346.


[41]     *Id.* at 329–330.


[42]     *Id.* at 346.


The text of Section 271.152 and our decision in *Tooke* ought to have settled the matter, but courts of appeals have read our decision in *Kirby Lake Development, Ltd. v. Clear Lake City Water Authority*[43] to retreat from *Tooke.* There, developers sued an area water authority for reimbursement of part of their costs of building water and sewer facilities, which the authority had agreed to pay out of voter-approved bond funds.[44] No bonds had been approved, but the developers claimed that the water authority had breached the contract by campaigning against approval, thereby forestalling its reimbursement obligation.[45] The water authority argued in **\*109** part that because no bonds had been approved, its obligation to reimburse the developers had not been triggered, nothing was "due and owed" under Section 271.153(a)(1), and *for that reason,* immunity was not waived.[46] In other words, *because* there was no liability, there were no recoverable damages and, therefore, no waiver of immunity. But the premise—no liability—was disputed, and if the water authority had breached the contract by opposing bond approval, then the developers claimed only the reimbursement under the contract as damages. And such damages, we held, were "due and owed" under Section 271.153(a)(1).[47] "The purpose of section 271.153," we explained, "is to limit the amount due by a governmental agency on a contract once liability has been established, not to foreclose the determination of whether liability exists."[48] We did not suggest that Section 271.153 permits a waiver of immunity from suit for a claim for damages this Section prohibits altogether. The developers argued that they had damages recoverable under Section 273.153;[49] they did not address, and we did not consider, whether immunity would have been waived for their claim of breach even if they sought only damages not recoverable under Section 271.153. We would not have engaged in such an analysis without acknowledging the conflict with our opinion in *Tooke.*[50]

[43]     320 S.W.3d 829 (Tex.2010).


[44]     *Id.* at 833–834.


[45]     *Id.* at 834 (re 2006 bond election); *see also Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.,* 321 S.W.3d 1, 5 (Tex.App.— Houston [14th Dist.] 2008) ("*Kirby III* ") (re 1998 elections), *aff'd,* 320 S.W.3d at 843–844.


[46]     320 S.W.3d at 839–840; Brief of Respondent Clear Lake City Water Authority at 38 (No. 08–1003).


[47]     320 S.W.3d at 839–840.


[48]     *Id.* at 840.

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

49      320 S.W.3d 829, *passim;* Reply Brief of Petitioners Kirby Lake Development, Ltd., et al. at 11–14.

50      In *Sharyland Water Supply Corp. v. City of Alton,* 354 S.W.3d 407, 412–413 (Tex.2011), Sharyland contracted to build a water-supply system for the City of Alton. Sharyland sued the City for breach, claiming damages for injury to its system caused by contractors engaged by the City under another contract to build a sanitary sewer system. We concluded that while the claim was covered by Section 271.152 and was therefore one for which immunity was waived, the damages sought had nothing to do with the contract between Sharyland and the City and thus were "not a 'balance due and owed' under *that* contract" recoverable under Section 271.153. *Id.* at 413. As in *Kirby Lake,* however, the issue whether Section 271.153 is jurisdictional did not arise, and we did not consider it.

[5] [6] The Austin Court of Appeals has laid out the case for confining the scope of the Act's waiver to Section 271.152 in its opinion in *City of San Antonio v. Lower Colorado River Authority.*[51] LCRA reasons that immunity from suit and immunity from liability are distinct concepts, that the former may be waived for a claim on which a governmental entity is not liable, and that the Act serves this very purpose.[52] We agree with all but the conclusion. As we have explained, Section 271.153's limitations on recovery are incorporated into Section 271.152 by its last "subject to" clause and are thereby conditions on the Act's waiver of immunity. We disagree with *LCRA* that this reading of the Act makes its waiver of immunity dependent on ultimate liability. The Act waives immunity for contract claims that meet certain conditions: the existence of a specific type of contract, a demand for certain kinds of damages, a state forum, etc. The waiver does not depend on the outcome, though it does require a showing of a substantial claim that meets the Act's conditions. *LCRA* argues that this view of the Act makes Section 271.153 a grant of immunity, a construction precluded by **\*110** Section 271.158. But again, Section 271.153 does not add immunity that Section 271.152 takes away; Section 271.152 uses Section 271.153 to further define to what extent immunity has been waived.

51      369 S.W.3d 231 (Tex.App.-Austin 2011, no pet.).

52      369 S.W.3d at 235–238.

[7] By "substantial" claim we mean, as we held in *Texas Department of Parks and Wildlife v. Miranda,* that the claimant must plead facts with some evidentiary support that constitute a claim for which immunity is waived, not that the claimant will prevail.[53] In *Tooke,* the only damages claimed were precluded by Section 271.153, and therefore immunity was not waived. Had the Tookes claimed payment for work done, immunity would have been waived, regardless of whether the Tookes could prevail, as long as the Tookes had some supporting evidence.

53      133 S.W.3d 217, 226–228 (Tex.2004) ("When a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause. We construe the pleadings liberally in favor of the plaintiffs and look to the pleaders' intent. If ... the issue is one of pleading sufficiency [ ] the plaintiffs should be afforded the opportunity to amend [unless] the pleadings affirmatively negate the existence of jurisdiction.... However, if a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised.... If the evidence creates a fact question ... the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder." (citations omitted)).

We conclude that the Act does not waive immunity from suit on a claim for damages not recoverable under Section 271.153.[54]

54      We disapprove the following cases to the extent they are to the contrary: *Santa Rosa Indep. Sch. Dist. v. Rigney Const. & Dev., LLC,* No. 13–12–00627–CV, 2013 WL 2949566, at *5 (Tex.App.-Corpus Christi June 13, 2013, pet. denied) (mem.op.); *Roma Ind. Sch. Dist. v. Ewing Const. Co.,* No. 04–12–00035–CV, 2012 WL 3025927, at *4 (Tex.App.-San Antonio July 25, 2012, pet.

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

denied) (mem.op.); *Corpus Christi Indep. Sch. Dist. v. TL Mech.,* No. 13–11–00624–CV, 2012 WL 1073299, at *3 (Tex.App.-Corpus Christi Mar. 29, 2012, pet. denied) (mem.op.) (note, however, that the court noted that plaintiff sought only contract damage and expressly did not claim any amount for lost profits); *City of San Antonio ex rel. San Antonio Water Sys. v. Lower Co. River Auth.,* 369 S.W.3d at 236–238; *City of N. Richland Hills v. Home Town Urban Partners, Ltd.,* 340 S.W.3d 900, 909–910 (Tex.App.-Fort Worth 2011, no pet.); *Jones v. City of Dallas,* 310 S.W.3d 523, 527–528 (Tex.App.-Dallas 2010, pet. denied) (note, however, that the court addressed an additional issue arising because the contract specifically provided for "lost profits" damages); *Clear Lake City Water Auth. v. MCR Corp.,* No. 01–08–00955–CV, 2010 WL 1053057, *10–11, (Tex.App.-Houston [1st Dist.] Mar. 11, 2010, pet. denied) (mem.op.); *Dallas Area Rapid Transit v. Monroe Shop Partners, Ltd.,* 293 S.W.3d 839, 842 (Tex.App.-Dallas 2009, pet. denied) (note, however, that there was a dispute over whether there was a "balance due and owed"); *City of Houston v. S. Elec. Servs., Inc.,* 273 S.W.3d 739, 744 (Tex.App.-Houston [1st Dist.] 2008, pet. denied) (note, however, that there was a dispute over whether the "balance due and owed" would include increased labor costs); *City of Mesquite v. PKG Contracting, Inc.,* 263 S.W.3d 444, 448 (Tex.App.-Dallas 2008, pet. denied) (note, however, that the court pointed out that the record did not establish that the claim was solely for damages excluded by the statute, and cited *Tooke* ).

### B

[8] Under Section 271.153(a)(1), the "amount of money awarded ... for breach of contract" includes "the balance due and owed ... under the contract" as amended, "including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays".[55] Section 271.153(b) precludes recovery of consequential damages, "except as expressly allowed under Subsection **\*111** (a)(1)".[56] The Port contends that no balance can be due and owed under a contract unless the contract expressly calls for payment.

[55]    TEX. LOC. GOV'T CODEE § 271.153(a)(1).

[56]    *Id.* § 271.153(b).

No such requirement can be found in the statute's text. The phrase, "balance due and owed/owing", is not defined in the Act, and the Legislature has not used it except in three other statutes waiving governmental immunity, where it is also undefined: the State Contract Claims Act,[57] the County Contract Claims Act,[58] and the State Agency Contract Claims Act.[59] The word "due" simply means "owing or payable"[60] and "owing" means "unpaid".[61] A "balance due and owed ... under the contract" is simply the amount of damages for breach of contract payable and unpaid. Direct damages for breach—"the necessary and usual result of the defendant's wrongful act"[62]—certainly qualify.

[57]    TEX. GOV'T CODE § 2260.003(a) ("The total amount of money recoverable on a claim for breach of contract under this chapter may not ... exceed an amount equal to the sum of: (1) the balance due and owing on the contract price; (2) the amount or fair market value of orders or requests for additional work made by a unit of state government to the extent that the orders or requests for additional work were actually performed; and (3) any delay or labor-related expense incurred by the contractor as a result of an action of or a failure to act by the unit of state government or a party acting under the supervision or control of the unit of state government.").

[58]    TEX. LOC. GOV'T CODEE § 262.007(b) ("The total amount of money recoverable from a county on a claim for breach of the contract is limited to the following: (1) the balance due and owed by the county under the contract as it may have been amended, including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration; (2) the amount owed for change orders or additional work required to carry out the contract; (3) reasonable and necessary attorney's fees that are equitable and just; and (4) interest as allowed by law.").

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

59      TEX. CIV. PRAC. & REM.CODE § 114.004(a) ("The total amount of money awarded in an adjudication brought against a state agency for breach of an express provision of a contract subject to this chapter is limited to the following: (1) the balance due and owed by the state agency under the contract as it may have been amended, including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration if the contract expressly provides for that compensation; (2) the amount owed for written change orders; (3) reasonable and necessary attorney's fees based on an hourly rate that are equitable and just if the contract expressly provides that recovery of attorney's fees is available to all parties to the contract; and (4) interest at the rate specified by the contract or, if a rate is not specified, the rate for postjudgment interest under Section 304.003(c), Finance Code, but not to exceed 10 percent.").

60      *See* BLACK'S LAW DICTIONARY 609 (10th ed.2014).

61      *Id.* at 1279.

62      *Basic Capital Mgmt. v. Dynex Commercial, Inc.,* 348 S.W.3d 894, 901 (Tex.2011) ("Consequential damages are those damages that result naturally, but not necessarily, from the defendant's wrongful acts. They are not recoverable unless the parties contemplated at the time they made the contract that such damages would be a probable result of the breach. Thus, to be recoverable, consequential damages must be foreseeable and directly traceable to the wrongful act and result from it.") (quoting *Stuart v. Bayless,* 964 S.W.2d 920, 921 (Tex.1998) (per curiam)).

Section 271.153(a)(1) does not require the "balance due and owed ... under the contract" to be ascertainable from the contract because, for one thing, this Section expressly includes "any amount owed as compensation ... for owner-caused delays", an amount which cannot be determined in advance, when the contract is executed. To "include" means "[t]o contain **\*112** as a part of something."[63] "[A]mount[s] owed as compensation for ... owner-caused delays", allowed by Subsection (a)(1), are consequential damages that are recoverable by law, not merely contractual right.[64] Delay damages can be a "balance due and owed" only if that phrase is not limited to amounts stated in the contract.[65]

63      *See* BLACK'S LAW DICTIONARY at 880; *Chickasaw Nation v. United States,* 534 U.S. 84, 89, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001) ("To 'include' is to 'contain' or 'comprise as part of a whole.' WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 609 (1985).").

64      *See Jensen Constr. Co. v. Dallas Cnty.,* 920 S.W.2d 761, 770 (Tex.App.-Dallas 1996, writ denied) ("Generally, a contractor is entitled to recover damages for losses due to delay and hindrance of work if the contractor proves: (1) its work was delayed or hindered; (2) it suffered damages because of the delay or hindrance; and (3) the owner of the project was responsible for the act or omission which caused the delay or hindrance. However, no damage for delay provisions may preclude recovery of delay damages by the contractor." (citations and internal quotation marks omitted)), *overruled in part on other grounds by Travis Cnty. v. Pelzel & Assocs., Inc.,* 77 S.W.3d 246, 251 (Tex.2002); *Beaumont v. Excavators & Constructors, Inc.,* 870 S.W.2d 123, 132–134 (Tex.App.-Beaumont 1993, writ denied); *Indus. Constr. Mgmt. v. DeSoto Indep. Sch. Dist.,* 785 S.W.2d 160, 162 (Tex.App.-Dallas 1989, no writ); *Shintech Inc. v. Group Constructors, Inc.,* 688 S.W.2d 144, 148 (Tex.App.-Houston [14th Dist.] 1985, no writ); *City of Houston v. R.F. Ball Constr. Co., Inc.,* 570 S.W.2d 75, 77 (Tex.Civ.App.-Houston [14th Dist.] 1978, writ ref'd n.r.e.); *Housing Auth. of Dallas v. Hubbell,* 325 S.W.2d 880, 884–885, 890–891 (Tex.Civ.App.-Dallas 1959, writ ref'd n.r.e.) (holding NDFD clause did not bar delay damages found to have been caused by owner arbitrarily and capriciously-defined as "willful and unreasoning action without due consideration and in disregard of the facts, circumstances, and the rights of other parties involved"-even though NDFD clause barred delay damages "from any cause"); *U.S. ex rel. Wallace v. Flintco,* 143 F.3d 955, 964–965 (5th Cir.1998) (holding NDFD clause did not preclude recovery of delay damages caused by owner's active interference with the contractor's performance, without considering impact of NDFD language); *see generally* P.V. Smith, Annotation, *Right of Building or Construction Contractor to Recover Damages Resulting from Delay Caused by Default of Contractee,* 115 A.L.R. 65 (1938).

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

[65] The dissent argues that because an amount cannot be "due and owed" unless it is "provided for or contemplated in" the contract, delay damages, which are expressly included in Section 271.153(a)(1), must also be "provided for or contemplated in" the contract. *Post* at 113. If the premise were true, then the conclusion would follow. "A including B" usually means that A is the larger group. But the dissent's "provided for or contemplated in" limitation simply is not in or suggested by the text. The "including" phrase proves the flaw in the dissent's position: "*any* amount as compensation for ... delay damages" (emphasis added), which amount may or may not be provided for in the contract, cannot be included in "the balance due and owed ... under the contract" if that phrase is limited to amounts provided for in the contract. Of course, "any Texas city, including Athens", to use the dissent's example, is limited to one, but the example, like the dissent's statutory construction, assumes a limitation to Texas cities when that is the very issue in dispute. A more apt example is "a city, including *any* named Athens", which is a longer list.

**[9]** Furthermore, Section 271.153(b) excludes from the "[d]amages awarded ... under a contract" consequential damages except as allowed in Subsection (a)(1). If the latter provision limited recovery to amounts stated in the contract, Subsection (b) would be surplusage: a claimant could recover all amounts stated in the contract, and all consequential damages stated in the contract. Read together, Subsections (a)(1) and (b) allow recovery of contract damages, including delay damages, but excluding other consequential damages. Nothing in the rest of Section 271.153 suggests that recoverable damages must be stated in the contract.[66]

[66] The dissent argues that damages "under" a contract are only those "provided for or contemplated in" the contract, but "under the contract" is used to refer generally to damages available on a contract claim. *See, e.g., CVN Group, Inc. v. Delgado,* 95 S.W.3d 234, 244 (Tex.2002) (referring to "liability for money damages under the contract"); *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1,* 950 S.W.2d 371, 373 (Tex.1997) (referring to the need for "extrinsic evidence ... to calculate damages under the contract"). Further, parties entering into a contract presumably contemplate that contract damages will be available if that contract is breached. *See City of Houston v. Williams,* 353 S.W.3d 128, 141 (2011) ("[I]t is 'settled that the laws which subsist at the time and place of the making of a contract ... form a part of it, as if they were expressly referred to or incorporated in its terms.' ") (suit by retired firefighters based in part on city ordinances could be characterized as one for breach of contract under Section 271.152); *Wessely Energy Corp. v. Jennings,* 736 S.W.2d 624, 626 (Tex.1987) ("The law[ ] existing at the time a contract is made becomes a part of the contract and governs the transaction."); *Kerr v. Galloway,* 94 Tex. 641, 64 S.W. 858, 860 (1901) ("Under a familiar rule, frequently announced, the law enters into the contract, and becomes a part of it."); *see also Hardware Dealers Mut. Ins. Co. v. Berglund,* 393 S.W.2d 309, 315 (Tex.1965) ("Contracting parties generally select a judicially construed clause with the intention of adopting the meaning which the courts have given to it."). The dissent argues that limiting recovery to contractual damages is no limit at all, but damages are but one item in a list that includes attorney fees and interest, even if not provided for in the contract. The dissent argues that allowing recovery of contractual damages under Section 271.153(a)(1) renders subsection (2) superfluous, but the latter provision clarifies that change orders can be the basis for recovery, even if it were argued that they were not "under the contract".

**\*113** In support of its argument, the Port cites two sentences from the remarks made by the bill sponsor introducing the Local Government Contract Claims Act during a House committee hearing. But we have repeatedly held that "[s]tatements made during the legislative process by individual legislators or even a unanimous legislative chamber are not evidence of the collective intent of the majorities of both legislative chambers that enacted a statute."[67] The Port also cites our opinion in *Kirby Lake,* where we stated that the reimbursement obligation stated in the contract was "due and owed".[68] But we did not analyze the phrase, and we certainly did not suggest that damages not set out in the contract cannot be "due and owed".[69]

[67] *Molinet v. Kimbrell,* 356 S.W.3d 407, 414 (Tex.2011); *accord In re Allcat Claims Serv., L.P.,* 356 S.W.3d 455, 466–467 (Tex.2011); *Robinson v. Crown Cork & Seal Co., Inc.,* 335 S.W.3d 126, 191–192 (Tex.2010) (Wainwright, J., dissenting); *AT&T Commc'ns of Tex., L.P. v. Sw. Bell Tel. Co.,* 186 S.W.3d 517, 528–529 (Tex.2006); *Gen. Chem. Corp. v. De La Lastra,* 852 S.W.2d 916, 923 (Tex.1993).

[68] *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.,* 320 S.W.3d 829, 840 (Tex.2010).

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

[69]    The dissent also relies on *Sharyland Water Supply Corp. v. City of Alton,* 354 S.W.3d 407 (Tex.2011), for its argument that recoverable damages must be "provided for or contemplated in" the contract. In that case a city contracted for construction of a water supply system, and later the contractor sued for the cost of remediating injury to the system caused by the city's sewer contractors. *Id.* at 410–411. We concluded that the damages sought "were not those provided for or contemplated in the Water Supply Agreement and [were] not a 'balance due and owed' under that contract. Nor [were] these costs the 'direct result of owner-caused delays or acceleration....' " *Id.* at 413. The dissent argues that the phrase, "provided for or contemplated in", was really intended to be a standard for determining whether an amount is "due and owed ... under" a contract. But the Court clearly gave two independent reasons for concluding that the claimed damages were not recoverable: they were not "provided for or contemplated in" the contract, "and" they were not "due and owed under" the contract. Sharyland's claimed damages were not a "balance due and owed" because they were completely unrelated to the Water Supply Agreement. And by adding, "nor" were the damages for delay, referencing the "including" phrase in Section 157.053(a)(1), we suggested that if the damages had been for delay, they would have been recoverable even if neither "due and owed under" nor "provided for or contemplated in" the contract. We treated the "including" phrase in the statutory provision as stating independently that delay damages are recoverable. Instead of supporting the dissent, *Sharyland* contradicts it.

**\*114** [10] [11] [12] More than half a century ago, we observed that "[t]he universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained."[70] While the Legislature clearly intended to limit the recovery of consequential damages on contract claims permitted by the Act,[71] nothing in the Act suggests that the Legislature intended to create a unique and somehow limited standard for measuring direct damages for breach of contract. Generally, a contractor has a right to delay damages for breach of contract. The parties are free to modify or exclude it by agreement, but unless they do, the right provided by law is as much a part of the contract as the rights the contract expressly creates.[72]

[70]    *Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484, 486 (1952).

[71]    "Consequential damages are those damages that result naturally, but not necessarily, from the defendant's wrongful acts." *Basic Capital Mgmt. v. Dynex Commercial, Inc.,* 348 S.W.3d 894, 901 (Tex.2011); *El Paso Mktg., L.P. v. Wolf Hollow I, L.P.,* 383 S.W.3d 138, 144 (Tex.2012). Delay damages are consequential damages.

[72]    *See supra* note 66.

We conclude that the Local Government Contract Claims Act waives immunity for a contract claim for delay damages not expressly provided for in the contract.[73] We now turn to whether Zachry's claim is barred by the no-damages-for-delay provision of the contract.

[73]    The dissent notes that the State Agency Contract Claims Act, enacted in 2013, contains a provision similar to Section 271.153(a)(1) except that the "including" phrase permits recovery of delay damages only "if the contract expressly provides for that compensation". TEX. CIV. PRAC. & REM. CODE § 114.004(a)(1) (Act of May 26, 2013, 83rd Leg., R.S., ch. 1260, H.B. 586, § 1, http://www.legis.state.tx.us/tlodocs/83 R/billtext/pdf/HB00586F.pdf# navpanes=0 (last visited August 25, 2014)). The dissent argues that the proviso states what is implicit in Section 271.153(a)(1). But if anything, the addition of the proviso suggests that it was not intended in the other three statutes waiving immunity from suit on contract claims.

   It should also be noted that the State Contract Claims Act was amended in 2005 (Act of May 27, 2005, 79th Leg., R.S., ch. 988, H.B.1940, § 1, 2005 Tex. Gen. Laws 3292), the same year the Local Government Contract Claims Act was adopted (Act of May 23, 2005, 79th Leg., R.S., ch. 604, H.B.2039, § 1, 2005 Tex. Gen. Laws 1548), to provide for recovery of delay damages, but did so using the word "and" instead of "including". *Supra* note 59. Using the dissent's argument, one might contend that both statutes intended that delay damages be recoverable whether or not provided for by contract.

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

## III

[13] We held in *Green International, Inc. v. Solis* that a contractor may generally agree to assume the risk of construction delays and not seek damages.[74] But we noted that the court of appeals in *City of Houston v. R.F. Ball Construction Co.*[75] **\*115** had listed what it called "generally recognized exceptions" to the enforcement of such agreements

[74]     951 S.W.2d 384, 387 (Tex.1997).

[75]     570 S.W.2d 75 (Tex.Civ.App.-Houston [14th Dist.] 1978, writ ref'd n.r.e.); *see also Shintech Inc.,* 688 S.W.2d 144, 148 (Tex.App.-Houston [14th Dist.] 1985, no writ) ("a contractor is entitled to recover damages from an owner for losses due to delay and hindrance of its work if it proves: (1) that its work was delayed or hindered, (2) that it suffered damages because of the delay or hindrance, and (3) that the owner was responsible for the act or omission which caused the delay or hindrance") (citing *R.F. Ball* ).

when the delay: (1) was not intended or contemplated by the parties to be within the purview of the provision; (2) resulted from fraud, misrepresentation, or other bad faith on the part of one seeking the benefit of the provision; (3) has extended for such an unreasonable length of time that the party delayed would have been justified in abandoning the contract; or (4) is not within the specifically enumerated delays to which the clause applies.[76]

[76]     *Green,* 951 S.W.2d at 387 (citing *Ball,* 570 S.W.2d at 77 & n. 1).

And we also noted[77] that the court of appeals in *Green* had identified a fifth exception "based upon active interference" with the contractor "or other wrongful conduct", including "arbitrary and capricious acts"—" 'willful and unreasoning actions,' 'without due consideration' and 'in disregard of the rights of other parties.' "[78] The issues in *Green* did not require us to determine whether the courts of appeals in that case and *Ball* were correct in their statement of the law. Zachry contends that the second and fifth exceptions apply here.

[77]     *Id.* at 388.

[78]     *Argee Corp. v. Solis,* 932 S.W.2d 39, 63 (Tex.App.-Beaumont 1995), *rev'd on other grounds sub. nom. Green Int'l, Inc. v. Solis,* 951 S.W.2d 384 (Tex.1997); *Housing Auth. of Dallas v. Hubbell,* 325 S.W.2d 880, 891 (Tex.Civ.App.-Dallas 1959, writ ref'd n.r.e.).

The jury found that Zachry's delay damages resulted from the Port's "arbitrary and capricious conduct, active interference, bad faith and/or fraud" as those terms were defined in the charge.[79] The court of appeals concluded that, assuming such conduct fell within the second exception, the exception could not apply if the parties intended the no-damages-for-delay provision to cover the Port's conduct.[80] The provision stated that Zachry could not recover from the Port "any damages arising out of or associated with any delay or hindrance" to its work, even if due to the Port's "negligence, breach of contract or other fault", and that its "sole remedy in any such case" would be "an extension of time." By "other fault", the court concluded, the parties intended to include the kind of misconduct by the Port found by the jury in awarding damages.[81] "As harsh as this result seems," the court explained, the parties must be bound by their agreement.[82] Rejecting Zachry's argument that enforcing the no-damages-for-delay provision made the contract illusory, allowing the Port to delay performance in perpetuity with impunity, the court responded simply that it would not deprive the Port of its bargain.[83]

[79]     *Supra* note 7.

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

80      377 S.W.3d 841, 850 (Tex.App.-Houston [14th Dist.] 2012).

81      *Id.* at 850.

82      *Id.*

83      *Id.* at 851–852.

As a matter of textual interpretation, it is doubtful whether the rule of *ejusdem generis* would allow "other fault", following "negligence" and "breach of contract", to include the kind of deliberate, wrongful conduct the Port was found by the jury to have engaged in.[84] That interpretation is **\*116** especially doubtful, given the context in which no-damages-for-delay provisions are used. An amicus brief explains:

84      *Marks v. St. Luke's Episcopal Hosp.,* 319 S.W.3d 658, 663 (Tex.2010) ("[T]he principle of ejusdem generis warns against expansive interpretations of broad language that immediately follows narrow and specific terms, and counsels us to construe the broad in light of the narrow."); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 199 (2012) ("Where general words follow an enumeration of two or more things, they apply only to persons or things of the same general kind or class specifically mentioned".).

Based on their years of experience, education, and training, [contractors] can assess potential delaying events when estimating and bidding public works. For example, they can make a judgment on the quality and completeness of the plans and specifications, determine potential delays resulting from material shortages, analyze historical weather data for potential delays, and assess possible delays from soil conditions by studying soil testing reports furnished by most owners. However, they cannot assess potential delays that may arise due to an owner's direct interference, willful acts, negligence, bad faith fraudulent acts, and/or omissions.[85]

85      Brief of the Associated General Contractors of Texas, Inc. as Amicus Curiae, at 2. In support of Zachry's petition for review, we received amicus briefs and letters from the Texas Aggregates and Concrete Association; the Texas Civil Justice League; Associated General Contractors of Texas; Texans for Lawsuit Reform; Zurich Surety; Associated Builders and Contractors of Texas; Associated General Contractors—Texas Building Branch; the National Electrical Contractors Association; the National Systems Contractors Association; and the American Subcontractors Association and the American Subcontractors Association of Texas. Amicus briefs in support of the Port have been submitted by The Texas Conference of Urban Counties; the City of Houston; the Texas Municipal League and the Texas City Attorneys Association; Harris County; Travis County; the City of Fort Worth; the City of Arlington; the City of Dallas; and the Dallas/Fort Worth Airport Board.

Regardless, the purpose of the second *Ball* exception is to preclude a party from insulating himself from liability for his own deliberate, wrongful conduct.

[14] We have indicated that pre-injury waivers of future liability for gross negligence are void as against public policy.[86] Generally, a contractual provision "exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy."[87] We think the same may be said of contract liability. To conclude otherwise would incentivize wrongful conduct and damage contractual relations. This conclusion is supported by lower court decisions in Texas[88] and court decisions in at least 28 American jurisdictions.[89] We join this overwhelming consensus. The Port **\*117** argues that the cases from other jurisdictions are inapposite because those jurisdictions all recognize a party's duty of good faith in performing a contract, and Texas does not.[90] But the law need not impose a duty of good faith on a party to prohibit him from attempting to escape liability for his future, deliberate, wrongful conduct. The Port argues that withholding

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

enforcement of a no-damages-for-delay provision is in derogation of freedom of contract. But that freedom has limits. "As a rule, parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy."[91] Enforcing such a provision to allow one party to intentionally injure another with impunity violates the law for the reasons we **\*118** have explained. The Port also argues that Zachry is a sophisticated party, a very large construction company that can protect itself. But the law's protection against intentional injury is not limited to the helpless. Finally, the Port argues that the conduct found by the jury does not qualify for the exception. But the jury charge tracked the language of the second and fifth exceptions. The charge correctly described the misconduct that cannot be covered by a no-damages-for-delay provision.

[86]  *Fairfield Ins. Co. v. Stephens Martin Paving, LP,* 246 S.W.3d 653, 687 (Tex.2008) (Hecht, J., concurring); *Crowell v. Hous. Auth. of Dallas,* 495 S.W.2d 887, 889 (Tex.1973); *see also Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 219–222 (Tex.2002) (suggesting that, generally, a tariff or contract provision including a pre-injury waiver of liability for gross negligence or willful misconduct may be so unreasonable as to violate public policy). Zachry also points out that we have noted that the courts of appeals have "found a pre-injury release of gross negligence invalid as against public policy". *Memorial Med. Ctr. of E. Tex. v. Keszler,* 943 S.W.2d 433, 435 (Tex.1997).

[87]  RESTATEMENT (SECOND) OF CONTRACTS § 195(1) (1981).

[88]  *Argee Corp. & Seaboard Sur. Co. v. Solis,* 932 S.W.2d 39, 52–53 (Tex.App.-Beaumont 1995), *rev'd on other grounds sub nom. Green Int'l, Inc. v. Solis,* 951 S.W.2d 384 (Tex.1997); *see also Alamo Cmty. College Dist. v. Browning Constr. Co.,* 131 S.W.3d 146, 162 (Tex.App.-San Antonio 2004, pet. dism'd by agr.); *City of Houston v. R.F. Ball Constr. Co., Inc.,* 570 S.W.2d 75, 77 (Tex.Civ.App.-Houston [14th Dist.] 1978, writ ref'd n.r.e.); *Hous. Auth. of Dallas v. Hubbell,* 325 S.W.2d 880, 884–885, 890–891 (Tex.Civ.App.-Dallas 1959, writ ref'd n.r.e.).

[89]  *See, e.g., U.S. Steel Corp. v. Mo. Pac. R.,* 668 F.2d 435, 438–439 (8th Cir.1982) (Arkansas law); *Dynalectric Co. v. Whittenberg Constr. Co.,* No. 5:06–CV–00208–JHM, 2010 WL 4062787, at \*8 (W.D.Ky. Oct. 15, 2010); *Law Co. v. Mohawk Const. & Supply Co., Inc.,* 702 F.Supp.2d 1304, 1325–1327 (D.Kan.2010); *Kiewit Constr. Co. v. Capital Elec. Constr. Co.,* No. 8:04 CV 148, 2005 WL 2563042, at \*7–8 (D.Neb. Oct. 12, 2005); *Pellerin Constr., Inc. v. Witco Corp.,* 169 F.Supp.2d 568, 583–587 (E.D.La.2001); *RaCON, Inc. v. Tuscaloosa Cnty.,* 953 So.2d 321, 339–340 (Ala.2006); *Tricon Kent Co. v. Lafarge N.A., Inc.,* 186 P.3d 155, 160–161 (Colo.App.2008); *White Oak Corp. v. Dept. of Transp.,* 217 Conn. 281, 585 A.2d 1199, 1203 (1991); *Wilson Contracting Co. v. Justice,* No. 508 CIV.A.1974, 1981 WL 377680, at \*1–2 (Del.Super.Ct. Jan. 22, 1981); *Blake Constr. Co. v. C.J. Coakley Co.,* 431 A.2d 569, 578–579 (D.C.1981); *Newberry Square Dev. Corp. v. S. Landmark, Inc.,* 578 So.2d 750, 752 (Fla.Dist.Ct.App.1991); *MElectric Corp. v. Phil–Gets Int'l Trading Corp.,* No. CVA12–014, 2012 WL 6738260, at \*9–11 (Guam Dec. 27, 2012); *Grant Constr. Co. v. Burns,* 92 Idaho 408, 443 P.2d 1005, 1012 (1968); *J & B Steel Contractors, Inc. v. C. Iber & Sons, Inc.,* 162 Ill.2d 265, 205 Ill.Dec. 98, 642 N.E.2d 1215, 1222 (1994); *Owen Constr. Co. v. Iowa St. Dept. of Transp.,* 274 N.W.2d 304, 306–307 (Iowa 1979); *State Highway Admin. v. Greiner Eng'ng Sciences,* 83 Md.App. 621, 577 A.2d 363, 372 (1990); *Phoenix Contractors, Inc. v. Gen. Motors Corp.,* 135 Mich.App. 787, 355 N.W.2d 673, 676–677 (1984); *Tupelo Redev. Agency v. Gray Corp.,* 972 So.2d 495, 511–512 (Miss.2007); *J.A. Jones Constr. v. Lehrer McGovern Bovis, Inc.,* 120 Nev. 277, 89 P.3d 1009, 1014–1016 (2004); *Edwin J. Dobson, Jr., Inc. v. State,* 218 N.J.Super. 123, 526 A.2d 1150, 1153 (N.J.Super.Ct.App.Div.1987); *Corinno Civetta Constr. Corp. v. New York,* 67 N.Y.2d 297, 502 N.Y.S.2d 681, 493 N.E.2d 905, 909–910 (1986); *Daniel E. Terreri & Sons, Inc. v. Mahoning Cty. Bd. of Comm'rs,* 152 Ohio App.3d 95, 786 N.E.2d 921, 928 (2003); *Guy M. Cooper, Inc. v. E. Penn Sch. Dist.,* 903 A.2d 608, 613–614 (Pa.Commw.Ct.2006); *Ayers–Hagan–Booth, Inc. v. Cranston Hous. Auth.,* No. C.A. 74–2897, 1975 WL 174130, at \*2–5 (R.I.Super. Nov. 24, 1975); *U.S. v. Metric Constructors, Inc.,* 325 S.C. 129, 480 S.E.2d 447, 448–451 (1997); *Thomas & Assoc. v. Metro. Gov't of Nashville,* No. M2001–00757–COA–R3–CV, 2003 WL 21302974, at \*14 (Tenn.Ct.App. June 6, 2003); *English v. Fischer,* 660 S.W.2d 521, 522 (Tex.1983); *W. Eng'rs, Inc. v. State Road Comm'n,* 20 Utah 2d 294, 437 P.2d 216, 217 (1968); *John E. Gregory & Son, Inc. v. A. Guenther & Sons Co.,* 147 Wis.2d 298, 432 N.W.2d 584, 586 (1988). *But see Wes–Julian Constr. Corp. v. Commonwealth,* 351 Mass. 588, 223 N.E.2d 72, 76–77 (1967). *See generally* Maurice T. Bruner, Annotation, *Validity and Construction of "No Damage" Clause with Respect to Delay in Building or Construction Contract,* 74 A.L.R.3d 187, 201 § 2[a] (1976) ("it is well established, apart from a single jurisdiction, that there are certain exceptions" to NDFD clauses).

[90]  *English v. Fischer,* 660 S.W.2d 521, 522 (Tex.1983).

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

[91]     *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 129 (Tex.2004); *accord Sonny Arnold, Inc. v. Sentry Sav. Ass'n,* 633 S.W.2d 811, 815 (Tex.1982) (recognizing "the parties' right to contract with regard to their property as they see fit, so long as the contract does not offend public policy and is not illegal"); *Curlee v. Walker,* 112 Tex. 40, 244 S.W. 497, 498 (1922) ("The law recognizes the right of parties to contract with relation to property as they see fit, provided they do not contravene public policy and their contracts are not otherwise illegal."); *James v. Fulcrod,* 5 Tex. 512, 520 (1851) ("That contracts against public policy are void and will not be carried into effect by courts of justice are principles of law too well established to require the support of authorities.").

Accordingly, we conclude that the no-damages-for-delay provision, Section 5.07 of the parties' contract, was unenforceable.

## IV

Several issues remain.

[15] *First:* Zachry's contends that it is entitled to recover the $2.36 million that the Port withheld as liquidated damages for Zachry's failure to meet deadlines. For each progress payment, Zachry executed a document entitled "Affidavit and Partial Release of Lien", which contained the following language:

> [Zachry] hereby acknowledges and certifies that [the Port Authority] has made partial payment to [Zachry] on all sums owing on Payment Estimate Number [——] and that it has no further claims against [the Port Authority] for the portion of the Work completed and listed on the Schedule of Costs in Payment Estimate Number [——].

Zachry contends that the releases covered only liens. The Port counters that the releases covered all claims for payment. The trial court concluded that the release language was ambiguous on the issue and charged the jury to determine its effect. The jury failed to find that the release language covered Zachry's claims for liquidated damages withheld by the Port. The court of appeals held that the releases unambiguously covered Zachry's claim for liquidated damages and reversed.[92] We agree that the releases are unambiguous, but we conclude that they do not cover Zachry's claim.

[92]     377 S.W.3d 841.

Section 6.07 of the contract conditioned the Port's obligation to make progress payments on Zachry's execution of "waivers and releases of liens" providing "that all amounts due and payable" to Zachry and all subcontractors and suppliers "have been paid in full" and that Zachry "waives, releases and relinquishes any lien ..., security interest and claim for payment". The Port argues that the releases must be construed in light of this requirement because the contract and releases are related contracts and must be read together.[93] While Section 6.07 could be read to require Zachry to release its claims for liquidated damages withheld by the Port in order to obtain progress payments, that is not the issue. Had the Port insisted on express language to that effect, and had Zachry refused, the interpretation of Section 6.07 would be important. Now, however, the issue is not what releases Zachry was contractually required to execute, but the effect of the releases Zachry actually did execute.

[93]     *City of Keller v. Wilson,* 168 S.W.3d 802, 811 (Tex.2005).

The release forms were captioned "Affidavit and Partial Release of Lien". In the form language, Zachry acknowledged "partial payment ... on all sums owing" on a specified invoice and stated that it had "no further claims against [the Port] for the portion of the Work completed and listed on" the invoice. The release plainly refers only to claims for work completed,

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

not for **\*119** liquidated damages withheld for delays—work *not* completed. Furthermore, Zachry actively disputed the Port's right to withhold liquidated damages from the first time the Port did so, and that dispute was never resolved. The purpose of progress payment releases is to ensure that the contractor will not accept payment for work performed and then insist on additional payment for that work. Zachry's releases can no more be interpreted to extend to its claim for liquidated damages the Port withheld than to its claim for delay damages. The jury failed to find that the releases *in fact* covered Zachry's claim. We agree, as a matter *of law*.

*Second:* The trial court did not award Zachry the entirety of the $2.36 million in withheld payments because the jury found that the Port was entitled to an offset of $970,000 as damages for Zachry's use of defective wharf fenders. Zachry contends that the evidence is legally insufficient to support the jury's finding.

To prove its claim for the offset, the Port submitted evidence that the wharf fenders, which protect vessels from damage during the mooring process, were supposed to last for 30 years but became corroded after only 90 days. The Port's expert witness testified that this occurred because the fenders were improperly sealed and, as a result, "the aluminum pores [ ] remain[ed] open [and] filled with sea water." A lab analysis and tests that a structural fabrication company conducted supported the expert's conclusion. Zachry contends that the evidence does not establish that it breached the contract because the sealing or coating on the fenders was "thinned" at 25% in accordance with the contract specifications, and if more thinning was required then the blame lies with the specifications and not with Zachry. Even if there were a breach of contract, Zachry argues that the evidence does not establish that the fenders were in fact defective or that the breach caused the damages that the jury awarded.

[16] Viewing the evidence in the light most favorable to the verdict, we cannot agree that the evidence was legally insufficient to support the jury's verdict. Although Zachry submitted evidence that tended to contradict the Port's evidence, we conclude that there was "more than a mere scintilla" of evidence on which a reasonable jury could find that Zachry breached its obligation to provide fenders that were supposed to last 30 years by providing fenders that began corroding within 90 days, and that the Port sustained damages in the amount of $970,000 as a result, entitling it to an offset against the damages recovered by Zachry.

*Third:* The contract provided that "[i]f [Zachry] brings any claim against the Port Authority and [Zachry] does not prevail with respect to such claim, [Zachry] shall be liable for all attorney's fees incurred by the Port Authority as a result of such claim." The jury found that the Port incurred $10.5 million in attorney fees as a result of Zachry's claim for delay damages, plus additional fees on appeal. Separately, the jury found that the Port incurred $80,250 in attorney fees as a result of Zachry's claim to recover the payments that the Port withheld as liquidated damages, plus additional fees on appeal. In light of our holdings that Zachry prevails on both its claims for delay damages and to recover part of the withheld payments, we reverse the court of appeals' judgment awarding the Port attorney fees.

\* \* \* \* \* \*

We hold that Zachry's claim for delay damages is not barred by immunity or by the no-damages-for-delay provision of the contract. We also hold that Zachry is entitled to recover the liquidated damages **\*120** withheld by the Port, but that there is evidence to support the jury's award of an offset. We conclude that the court of appeals erred in awarding the Port attorney fees. We reverse the court of appeals' judgment, and because the Port has raised a number of other issues, we remand the case to that court for further consideration.

Justice BOYD filed a dissenting opinion, in which Justice JOHNSON, Justice WILLETT, and Justice LEHRMANN joined.

Justice BOYD, joined by Justice JOHNSON, Justice WILLETT, and Justice LEHRMANN, dissenting in part.

Chapter 271 of the Texas Local Government Code waives a local governmental entity's immunity against suits for breach of written contracts for goods and services, but it does so only to allow contractors to recover "*the balance due and owed* by the local governmental entity *under the contract.*" TEX. LOCAL GOV'T CODE § 271.153(a)(1) (emphases added). The Court holds that this waiver allows Zachry Construction Corporation to recover common law delay damages that are not part of

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

"the balance due and owed ... under the contract" it entered into with the Port Authority of Houston. In fact, in this contract, Zachry expressly agreed that the Port Authority would never owe damages for costs that Zachry incurred due to any delay or hindrance. The Court invalidates this no-damages-for-delay clause for public policy reasons. But even after striking that clause, the contract does not provide for or in any way contemplate that the Port Authority would pay for Zachry's delay costs. Because delay costs are not part of "the balance due and owed by [the Port Authority] under [this] contract," I would hold that Chapter 271 does not waive the Port Authority's immunity against Zachry's claim for delay damages, and I would dismiss that claim for lack of jurisdiction. Because governmental immunity bars Zachry's claim for delay damages, I would not reach the issue of whether the no-damages-for-delay clause is void for public policy reasons. I therefore respectfully dissent in part.[1]

---

[1]    For the reasons the Court explains, I agree with its holding in Part II(A) that section 271.153's limitation on recoverable damages is jurisdictional because chapter 271 "does not waive immunity from suit on a claim for damages not recoverable under Section 271.153." *Ante* at 110. I would not reach the public policy issue in Part III of the Court's opinion. In Part IV of its opinion, the Court holds that Zachry can recover on its separate claim for $2.36 million that the Port Authority withheld as liquidated damages, less a $970,000 offset for damages resulting from Zachry's use of defective wharf fenders. *Ante* at 119. I agree with this portion of the Court's opinion, for the reasons the Court has explained. The funds that the Port Authority withheld as liquidated damages were part of the monthly progress payments that the Port Authority agreed to make for Zachry's services and were part of "the balance due and owed ... under the contract." Section 271.153 thus waives the Port Authority's immunity against Zachry's claim to recover those funds, and the courts have jurisdiction to resolve that claim. The mere fact that the Port Authority denies *liability* on the claim does not negate the statute's waiver of *immunity* from suit for damages that are provided for or clearly contemplated under the contract. *See* TEX. LOCAL GOV'T CODE §§ 271.152–.153.

## I.

### Governmental Immunity Against Contract Actions

As a local governmental entity, the Port Authority "enjoy[s] governmental immunity from suit, unless immunity is expressly waived." *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.,* 320 S.W.3d 829, 836 (Tex.2010). Governmental immunity **\*121** includes both immunity from liability, "which bars enforcement of a judgment against a governmental entity, and immunity from suit, which bars suit against the entity altogether." *Tooke v. City of Mexia,* 197 S.W.3d 325, 332 (Tex.2006). A governmental entity that enters into a contract "necessarily waives immunity from liability, voluntarily binding itself like any other party to the terms of agreement, but it does not waive immunity from suit." *Id.* Unlike immunity from liability, immunity from suit deprives the courts of jurisdiction and thus completely bars the plaintiff's claim. *Wichita Falls State Hosp. v. Taylor,* 106 S.W.3d 692, 696 (Tex.2003).

While most damages awards justly impose the financial consequences of a party's wrongdoing on the wrongdoer, a damages award against a governmental entity imposes the financial consequences on innocent third parties: taxpayers. Thus, although "[t]he doctrine of governmental immunity arose hundreds of years ago from the idea that 'the king can do no wrong,' ... it remains a fundamental principle of Texas law, intended 'to shield the public from the costs and consequences of improvident actions of their governments.' " *Lubbock Cnty. Water Control & Improvement Dist. v. Church & Akin, L.L.C.,* 442 S.W.3d 297, 300 (Tex.2014) (quoting *Tooke,* 197 S.W.3d at 331–32). In some circumstances, however, justice may demand that the government compensate innocent injured parties even though innocent taxpayers must pay the bill. The challenge is in deciding which circumstances justify a waiver of immunity to allow for such compensation.

Because this decision "requires balancing numerous policy considerations, we have consistently deferred to the Legislature, as the public's elected representative body, to decide whether and when to waive the government's immunity." *Lubbock Cnty.,* 442 S.W.3d at 301. The Legislature may waive the government's immunity, and thereby "consent to suit[,] by statute or by legislative resolution." *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 405 (Tex.1997). The Legislature has declared that we cannot construe a statute to waive immunity "unless the waiver is effected by clear and unambiguous language." TEX. GOV'T CODE § 311.034; *see also Tooke,* 197 S.W.3d at 328–29 (agreeing that statutory waiver of immunity must be "by

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

clear and unambiguous language"). If a statute seeks to waive immunity, it "must do so beyond doubt." *Wichita Falls State Hosp.,* 106 S.W.3d at 697.

For the first 154 years of Texas' existence, parties who contracted with the government could not recover for the government's breach unless they first convinced the Legislature to pass a special resolution waiving immunity for their specific claim. *See Fed. Sign,* 951 S.W.2d at 408 (reaffirming previous holdings that "the State is immune from suit arising from breach of contract suits"); TEX. CIV. PRAC. & REM.CODE §§ 107.001–.005 (governing resolutions granting permission to sue the State). Not surprisingly, this often made it difficult for governmental entities to find qualified contractors who were willing to provide goods and services. In 1999, the Legislature enacted Chapter 2260 of the Texas Government Code, providing an administrative procedure through which parties to certain contracts with a State agency or department could recover damages for the agency's breach. *See* TEX. GOV'T CODE §§ 2260.001–.108. Chapter 2260 did not waive the State's immunity, *id.* § 2260.006, but instead provided an alternative administrative process through which the contractor could seek relief. *See id.* The statute provides this option only for parties to certain kinds of contracts, and it limits the administrative award to $250,000 unless the Legislature **\*122** separately authorizes a higher award in a specific case. *See id.* § 2260.105.[2]

[2]       Under chapter 2260, an administrative law judge can only award up to $250,000 for a valid breach of contract claim. *See* TEX. GOV'T CODE § 2260.105. Valid claims above $250,000 are referred to the Legislature to decide, in light of appropriate policy considerations, whether to authorize additional funds for payment of the claim. *See id.* § 2260.1055; *Gen. Servs. Comm'n v. Little–Tex Insulation Co., Inc.,* 39 S.W.3d 591, 596 (Tex.2001).

Although Chapter 2260 provides a limited avenue of relief for those who contract with State agencies and departments,[3] it provides no remedy at all for those who contract with a local governmental entity. The Legislature first addressed local governmental entities in 2003, when it enacted a limited waiver of immunity for certain breach of contract suits against Texas counties. *See* TEX. LOCAL GOV'T CODE § 262.007. Then, in 2005, the Legislature enacted the provisions of Chapter 271 that are at issue in this case, providing the same limited waiver for certain breach of contract suits against all other types of local governmental entities. *See id.* §§ 271.151–.160. Most recently, in 2013, the Legislature enacted Chapter 114 of the Texas Civil Practice & Remedies Code, providing the same limited waiver of immunity from suits for certain contract claims against State agencies. *See* TEX. CIV. PRAC. & REM.CODE §§ 114.001–.013.

[3]       *See* TEX. GOV'T CODE § 2260.001(4) (defining "unit of state government").

As it had done in Chapter 2260, the Legislature strictly limited the immunity waivers in Chapters 262, 271, and 114, not only in terms of the types of *contracts* under which a party can sue, but also in terms of the types and amounts of *damages* the party can recover. *See* TEX. LOCAL GOV'T CODE §§ 262.007(b), (c), 271.153; TEX. CIV. PRAC. & REM.CODE § 114.004. Thus, the Legislature has only recently acted to waive immunity for contract claims, and each time it has done so, it has strictly limited the scope of that waiver. Respectful of the Legislature's prerogative to decide whether, when, and how to waive the State's immunity, and mindful of our obligation to find waivers only in "clear and unambiguous language" that leaves "no doubt," we must carefully and strictly construe and apply these statutory limitations. I dissent in this case because the Court's holding that Zachry's delay damages are recoverable under section 271.153 ignores the statute's limitations.

## II.

### Section 271.153

Section 271.153 is entitled "*LIMITATIONS* ON ADJUDICATION AWARDS." *Id.* § 271.153 (emphasis added).[4] Consistent **\*123** with its title, subsection (a) of section 271.153 identifies three exclusive categories of damages that a contractor *can*

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

recover in a breach of contract suit against a local governmental entity, and subsection (b) lists three categories of damages that contractors *cannot* recover. *See* TEX. LOCAL GOV'T CODE § 271.153(a), (b). Specifically, contractors *can* recover:

[4]    All references and citations to section 271.153 in this opinion are to the version of the statute applicable to this suit, as it existed before amendments in 2009, 2011, and 2013. *See* Act of May 20, 2005, 79th Leg., R.S., ch. 604, § 1, 2005 Tex. Gen. Law 1548, 1548–49 (codified at TEX. LOCAL GOV'T CODE § 271.153(a)(1), (2) & (4)). The 2009 amendments added a fourth category of amounts that could be included in the "total amount of money awarded" under subsection (a): "reasonable and necessary attorney's fees that are equitable and just." Act of May 21, 2009, 81st Leg., R.S., ch. 1266, § 8, 2009 Tex. Gen. Law 4006, 4007 (codified at TEX. LOCAL GOV'T CODE § 271.153(a)(3)). The 2011 amendments added the phrase "including interest as calculated under Chapter 2251, Government Code" after "interest as allowed by law." Act of May 17, 2011, 82nd Leg., R.S., ch. 226, § 1, 2011 Tex. Gen. Law 809, 809 (codified at TEX. LOCAL GOV'T CODE § 271.153(a)(4)). And the 2013 amendments created an exception to this limitation on damages, permitting recovery of "[a]ctual damages, specific performance, or injunctive relief" in certain contracts involving the sale or delivery of reclaimed water. Act of May 22, 2013, 83rd Leg., R.S., ch. 1138, § 3, 2013 Tex. Gen. Law ——, —— (codified at TEX. LOCAL GOV'T CODE § 271.153(c)). None of these amendments relate to or affect the issue in this case.

(1) the balance due and owed by the local governmental entity under the contract as it may have been amended, including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration;

(2) the amount owed for change orders or additional work the contractor is directed to perform by a local governmental entity in connection with the contract; and

(3) interest as allowed by law.

*Id.* § 271.153(a) (stating that "total amount of money" recoverable "is limited to" these three categories of damages). Conversely, contractors cannot recover:

(1) consequential damages, except as expressly allowed under Subsection (a)(1);

(2) exemplary damages; or

(3) damages for unabsorbed home office overhead.

*Id.* § 271.153(b).
The Court holds that subsection (a)(1) authorizes Zachry to recover its delay damages. While I agree that delay damages *can* be part of "the balance due and owed by [a] local governmental entity under [*some* ] contract[s]," I do not agree that they are part of "the balance due and owed by [the Port Authority] under [*this* ] contract." To the contrary, this contract expressly provided that the Port Authority would have no liability for any delay damages. And while I agree that "the balance due and owed ... under the contract" can include "compensation for ... owner-caused delays," compensation for owner-caused delays are not part of the balance due and owed under *this* contract, which stated that the contractor "shall receive no financial compensation for delay or hindrance to the Work ... EVEN IF SUCH DELAY OR HINDRANCE RESULTS FROM, ARISES OUT OF OR IS DUE, IN WHOLE OR IN PART, TO THE NEGLIGENCE, BREACH OF THE CONTRACT OR OTHER FAULT OF THE PORT AUTHORITY."

**A. The Balance Due and Owed Under the Contract**

Chapter 271 does not define or describe what constitutes "the balance due and owed ... under the contract." When a statute does not give words a specific definition or technical meaning, we use their common, ordinary meaning. *City of Rockwall v. Hughes,* 246 S.W.3d 621, 625–26 (Tex.2008). Typically, we look to dictionaries to determine the common meaning of words.[5] *See Epps v. Fowler,* 351 S.W.3d 862, 873 (Tex.2011) (Hecht, J., dissenting) ("The place to look for the ordinary meaning of words is ... a dictionary."). When a word has multiple common meanings, we give it the meaning most consistent

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

with the statutory context **\*124** in which it is used. *State v. $1,760.00 in U.S. Currency,* 406 S.W.3d 177, 180–81 (Tex.2013); *see also* TEX. GOV'T CODE § 311.011(a).

5      *See, e.g., Morton v. Nguyen,* 412 S.W.3d 506, 512 (Tex.2013); *State v. $1,760.00 in U.S. Currency,* 406 S.W.3d 177, 181 (Tex.2013); *City of Hous. v. Bates,* 406 S.W.3d 539, 547 (Tex.2013); *In re Nalle Plastics Family Ltd. P'ship,* 406 S.W.3d 168, 171–72 (Tex.2013); *Tex. Dep't of Transp. v. Perches,* 388 S.W.3d 652, 656 (Tex.2012); *Traxler v. Entergy Gulf States, Inc.,* 376 S.W.3d 742, 747 (Tex.2012).

In the context of payment obligations, the term "balance" means "the difference between the debits and credits of (an account)." BLACK'S LAW DICTIONARY 170 (10th Ed.). The term "due" means (1) "payable; owing; constituting a debt," when used in relation to a "fact of indebtedness," or (2) "immediately enforceable," when used in relation to "the time of payment." Bryan A. Garner, A DICTIONARY OF MODERN LEGAL USAGE, 298–99 (2nd ed.); *see also* Black's Law Dictionary 609 (10th Ed.). The Dictionary of Modern Legal Usage notes that the second definition, "immediately enforceable," is "almost invariably the applicable one" today. DICTIONARY OF MODERN LEGAL USAGE at 299. And the term "owing" means "[t]hat is yet to be paid; owed; due." BLACK'S LAW DICTIONARY 1279 (10th Ed.); *see also* DICTIONARY OF MODERN LEGAL USAGE at 633 (noting that "owed" is the preferred modern usage, over "owing"). The difference between the terms "due" and "owed" is reflected in the fact that something can be owed but not yet due because the date for payment or the contingency on which payment is conditioned has not yet come to pass. *See* DICTIONARY OF MODERN LEGAL USAGE at 299. A "balance" that is both "due" and "owed" is thus an amount by which an account's debits exceed its credits that is yet to be paid and immediately enforceable. Stated another way, a balance due and owed is a mature debt. This understanding of the phrase is consistent with both the statutory context, which relates to recoverable monetary obligations under a contract, and with our prior use of the phrase "due and owed" or "due and owing," both in our construction of this statute and more generally.[6]

6      *See, e.g., Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.,* 320 S.W.3d 829, 840 (Tex.2010) ("The existence of a balance 'due and owed' is thus incorporated within the contract—a balance that would come due when voters approve payment in a bond election."); *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.,* 308 S.W.3d 909, 922 (Tex.2010) ("After rigorous analysis, the trial court found that the alleged misrepresentation on each bill—an amount due and owing for a municipal charge—'is uniform to all members of the class....' "); *Bailey v. Cherokee Cnty. Appraisal Dist.,* 862 S.W.2d 581, 587 (Tex.1993) ("There is little question that debts, including ad valorem taxes, that are due and owing by an individual during his lifetime are liabilities of that individual.") (emphasis omitted); *Summers v. Consol. Capital Special Trust,* 783 S.W.2d 580, 581 (Tex.1989) ("On October 1, 1983, the Sill note became due and owing."); *Sherman v. First Nat. Bank in Ctr., Tex.,* 760 S.W.2d 240, 241 (Tex.1988) ("In December of 1981, Sherman received a letter from the Bank demanding the payment of several notes, including the $75,000 real estate note which was not due and owing at that time."); *Inwood N. Homeowners' Ass'n, Inc. v. Harris,* 736 S.W.2d 632, 641 (Tex.1987) ("The developer, or the association, is a general creditor who ... must stand in line along with [other creditors] for payment of sums due and owing.").

Importantly, section 271.153 modifies the phrase "the balance due and owed" with the prepositional phrase "under the contract." TEX. LOCAL GOV'T CODE § 271.153(a)(1). Under the "rules of grammar," *see* TEX. GOV'T CODE § 311.011, a preposition (here, "under") imposes a relationship between its object (here, "the contract") and its antecedent (here, "the balance due and owed"). *See, e.g.,* THE CHICAGO MANUAL OF STYLE § 5.173, at 248 (16th ed.); Bryan A. Garner, THE REDBOOK: A MANUAL ON LEGAL STYLE, 176 (2nd ed.). As a result, section 271.153(a)(1) does not allow recovery of *all* amounts that may be "due and owed by the local governmental entity," but instead limits the recovery to a due-and-owed balance that arises "under" the written contract for goods and services **\*125** to which the statute applies. *See* TEX. LOCAL GOV'T CODE §§ 271.151(2)(A), 271.153(a)(1). Thus, under section 271.153(a)(1), the amount recoverable "is limited to" the amount of all mature debts owed under a qualified contract, less any credits due.

The Court, by contrast, concludes that "[a] 'balance due and owed ... under the contract' is simply the amount of damages for breach of contract payable and unpaid." *Ante* at 111. I do not agree that a "balance due and owed ... under a contract" includes all common law damages regardless of whether they are contemplated in the parties' contract. When a payment is not provided for under the contract, but instead arises under the common law, that payment may later be due and owed *under the cort's jud* Aent, MMs not part of "the balance due and owed ... *under the contract.*" *See* TEX. LOCAL GOV'T CODE § 271.153(a)(1) (emphasis added).

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

The Court's construction of the statute is contrary to the statute's language and its structure. First, the Court's construction separates the phrase "balance due and owed" from the phrase "under the contract," and then alternatively reads each of them out of the statute. On the one hand, the Court equates the phrase "the balance due and owed" with the phrase "damages ... payable and unpaid," *ante* at 111, and by doing so ignores the statute's actual words. On the other hand, the Court treats the phrase "under the contract" as if it said "under a court's judgment," but does so only by relying on court opinions that address *damages* under a contract, not a "balance due and owed ... under a contract." *Ante* at 111 n. 62, 64. We must read the two phrases together, just as they appear in the statute, and the Court's alternatives for each simply are not equivalents. By equating "the balance due and owed ... under the contract" with "the amount of damages for breach of contract payable and unpaid," the Court shifts the focus from the mature debt that exists "under the contract" when suit is filed to prospective liability that a Court may impose in a breach of contract action.

Second, by holding that "a 'balance due and owed ... under the contract' is simply the amount of damages for breach of contract payable and unpaid," the Court renders subsection (a)(1) a tautology. Under the Court's construction, the amount of damages that is recoverable for a breach of contract is "limit [ed]" to the amount of damages that is recoverable for a breach of contract. Under that construction, the amount of damages is not "limit[ed]" at all.[7]

[7] In response, the Court contends that the statute does "limit [ ] recovery" because "damages are but one item in a list that includes attorney's fees and interest, even if not provided for in the contract." *Ante* at 113 n. 66. But section 271.153(a) places "*LIMITATIONS* ON ADJUDICATION AWARDS" by authorizing courts to award only amounts that fall within the expressly enumerated categories, which under the current version of the statute include:

- certain types of *damages:* "the balance due and owed ... under the contract" under section 271.153(a)(1) and "the amount owed for change orders or additional work" under (a)(2);
- certain types of *attorney's fees:* "reasonable and necessary attorney's fees that are equitable and just" under (a)(3); and
- all *interest* allowed by law under (a)(4).

See TEX. LOCAL GOV'T CODE § 271.153. The Court's reading of section (a)(1) does not alter the scope of recoverable attorney's fees or interest, it simply expands the scope of authorized damages to include all recoverable damages. Therefore, it does not limit recoverable damages at all.

Third, the Court's construction of subsection (a)(1) renders subsection (a)(2) superfluous. Subsection (a)(2) expressly authorizes the recovery of "the amount owed **\*126** for change orders or additional work the contractor is directed to perform by a local governmental entity in connection with the contract." TEX. LOCAL GOV'T CODE § 271.153(a)(2). If, as the Court holds, subsection (a)(1) authorizes the recovery of all common law damages recoverable for breach of the contract, then subsection (a)(1) already authorizes recovery of amounts owed for change orders and additional work, and subsection (a)(2) adds nothing to the mix.[8] But if, as I contend, subsection (a)(1) only authorizes recovery of the amounts actually provided for or contemplated within the contract (that is, "the balance due and owed ... under the contract"), then subsection (a)(2) adds to that any amounts owed for change orders and additional work that were not originally provided for or contemplated in the parties' contract.

[8] The Court responds that its construction does not render subsection (a)(2) superfluous because subsection (a)(2) "clarifies that change orders can be the basis for recovery, even if it were argued that they were not 'under the contract.' " *Ante* at 113 n. 66. But this is exactly the point: under the Court's construction, there is no need for such clarification because *everything* that the law permits to be a basis for recovery in a breach of contract action (the *only* claim that can be brought under the statute) can be the basis for recovery under the 271.153(a), regardless of whether it is "under the contract."

Finally, under the Court's construction of subsection (a)(1), the exception to the exclusion of consequential damages in subsection (b)(1) would completely swallow the rule. Subsection (b)(1) provides that recoverable damages may not include "consequential damages, except as expressly allowed under Subsection (a)(1)." *Id.* § 271.153(b)(1). As the Court notes, "[d]elay damages are consequential damages." *Ante* at 114 n. 71. If subsection (a)(1) authorizes the recovery of all common law damages for breach of contract, then consequential damages, which are recoverable for a breach of contract, are "expressly allowed under Subsection (a)(1)." And in that case, subsection (b)(1) would not exclude *any* consequential damages. *See* TEX. LOCAL GOV'T CODE § 271.153(a)(1), (b). In short, under the Court's construction, subsection (a), which says recoverable amounts are "limited" to those specified in subsections (a)(1) through (a)(4), does not in fact "limit"

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

anything; and subsection (b), which says recoverable amounts "may not include" those listed in subsection (b)(1), does not in fact exclude anything.

In addition to the language of the statute, the Court's holding contradicts our precedent on this very point. We have addressed section 271.1 53(a)(1) in three prior decisions, and in each of them we have held, or at least indicated, that a "balance" is "due and owed ... under the contract" only if it is "stipulated," "provided for," or at least "contemplated" within the parties' written agreement. *See Sharyland Water Supply Corp. v. City of Alton,* 354 S.W.3d 407, 413 (Tex.2011) ("The kind of damages sought by Sharyland were not those provided for or contemplated in the Water Supply Agreement and are not a 'balance due and owed' under that contract."); *Kirby Lake,* 320 S.W.3d at 840 (holding that the damages sought were part of the balance due and owed under the contract because "the Agreements do stipulate the amount of reimbursement owed upon approval of bond funds"); *Tooke,* 197 S.W.3d at 346 (holding that lost profits from additional work "are consequential damages excluded from recovery under the statute").

In *Tooke,* the Court held that the claimants could not recover after the City of Mexia prematurely terminated their service contract because they "claim [ed] only lost profits on additional work they should have been given," which "are consequential **\*127** damages excluded from recovery under the statute." 197 S.W.3d at 346; *see* TEX. LOCAL GOV'T CODE § 271.153(b)(1). If, as the Court holds today, "a 'balance due and owed ... under the contract' is simply the amount of damages for breach of contract payable and unpaid," *ante* at 125, the Tookes should have been able to recover lost profits under section 271.153(a)(1), and they should not have been excluded as consequential damages under subsection (b)(1) because they fall within the exception for consequential damages expressly authorized under subsection (a)(1). In short, the lost profits in *Tooke* were consequential damages not authorized under the parties contract, just as the Court recognizes Zachry's delay damages to be. Yet we held that the Tookes' lost profits were not recoverable even though they, like Zachry's delay damages, were "damages ... payable and unpaid" and recoverable under the common law for breach of contract.

Similarly, in *Sharyland,* the contractor, the Sharyland Water Supply Corporation, sought to recover its "increased cost to perform" its contractual duty to repair and maintain a water system, which allegedly resulted from the City of Alton's breach of its own contractual duties. 354 S.W.3d at 413. We held that section 271.153(a)(1) did not authorize Sharyland to recover its increased repair and maintenance costs because "[t]he kind of damages sought by Sharyland were not those provided for or contemplated in the Water Supply Agreement and are not a 'balance due and owed' under that contract." *Id.*[9]

[9] The Court notes that, in the next sentence in *Sharyland,* the Court stated: "Nor were these costs the 'direct result of owner-caused delays or acceleration....' " *Ante* at 113 n. 69 (quoting *Sharyland,* 354 S.W.3d at 413). The Court asserts that, by this sentence, we treated the "including" clause at the end of subsection 271.153(a)(1) "as stating independently that delay damages are recoverable," and "we suggested that if [the damages sought had been for owner-caused delays], they would have been recoverable even if neither 'due and owed under' nor 'provided for or contemplated in' the contract." *Id.* The Court reads far too much into this language. What we actually said in *Sharyland* was:

> The kind of damages sought by Sharyland were not those provided for or contemplated in the Water Supply Agreement and are not a "balance due and owed" under that contract. Nor are these costs the "direct result of owner-caused delays or acceleration," or the "amount owed for change orders or additional work the contractor [was] directed to perform by [the] local governmental entity in connection with the contract."

*Sharyland,* 354 S.W.3d at 413. We thus addressed all provisions of subsections (a)(1) and (a)(2), demonstrating that there was no possible basis on which any of them could have authorized the recovery of the repair and maintenance costs that Sharyland sought. *See id.* Sharyland did not argue that its damages were independently recoverable as "owner-caused delay damages," and we did not address the issue for which the Court now cites this language. *See id.* Instead, we simply explained that the damages Sharyland sought did not fit within any of the descriptions in subsection (a)(1) or (a)(2). *See id.* And, consistent with *Tooke* and *Kirby Lake,* we equated "the balance due and owed ... under the contract" with the amounts "provided for or contemplated" in the parties' agreement. *See id.* I address the issue of whether the "including" clause at the end of subsection (a)(1) authorizes delay damages that are not "due and owed ... under the contract" in the next section.

In *Kirby Lake,* by contrast, we held that the damages the claimant sought were recoverable as "the balance due and owed ... under the contract" because "the Agreements *do stipulate the amount of reimbursement owed* upon approval of bond funds." 320 S.W.3d at 840 (emphasis added). Consistent with the language of the statute and our precedent, I would hold that section 271.153 does not authorize Zachry to recover its delay damages because those damages are not provided for or contemplated in the parties' agreement, **\*128** which instead expressly bars recovery of delay costs, and thus are not part of "the balance due and owed by the [Port Authority] under the contract." *See* TEX. LOCAL GOV'T CODE § 271.153(a)(1).

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

**B. "Including Any Amount Owed as Compensation for the Increased Cost to Perform...."**

Relying on the language at the end of section 271.153(a)(1), the Court asserts that "Section 272.153(a)(1) does not require the 'balance due and owed ... under the contract' to be ascertainable from the contract because, for one thing, this Section expressly includes 'any amount owed as compensation ... for owner-caused delays,' an amount which cannot be determined in advance, when the contract is executed." *Ante* at 111. To the extent the Court is arguing that the statute authorizes recovery of amounts that are not *quantified* in the contract or ascertainable at the time of contracting, I agree. Amounts need not be quantified in the contract or ascertainable at the time of contracting to be "due and owed ... under the contract." Delay costs, in particular, cannot be quantified at the time of contracting because the parties cannot predict the length of the delay or how the delay will impact the contractor's work. But parties can, and sometimes do, agree that the owner will compensate the contractor for owner-caused delays, and when they do, the delay costs are recoverable under the statute. Here, however, the parties did not agree that the Port Authority would compensate Zachry for owner-caused delays; instead, they expressly agreed that Zachry would receive "no financial compensation for delay or hindrance to the Work ... EVEN IF SUCH DELAY OR HINDRANCE" was owner-caused.

The Court misconstrues the language at the end subsection (a)(1) to independently authorize recovery of "any amount owed as compensation ... for owner-caused delays," even if that amount is not part of "the balance due and owed ... under the contract." *Ante* at 111. In doing so, the Court overlooks the key word that connects these two phrases: "including." The word "including" in this subsection does not expand the meaning of the words that come before it ("the balance due and owed"); rather, it limits the meaning of the words that come after it ("any [owner-caused delay damages]") to "include" only those owner-caused delay damages that are in fact "due and owed." *See* BLACK'S LAW DICTIONARY at 766 (defining "include" to mean "contain as part of something"). The Court thus reads subsection (a)(1) as authorizing recovery of the balance due and owed ... under the contract *and* (or *plus)* any delay damages, when in fact the statute authorizes recovery of "the balance due and owed ... under the contract ..., *including any amount owed* " as damages for owner-caused delays. TEX. LOCAL GOV'T CODE § 271.153(a)(1) (emphasis added).

For example, if a franchise agreement authorized a franchisee to operate "in any Texas city, including Athens," the agreement would permit operations in Athens, Texas, but not in Athens, Greece, or Athens, Georgia. The word "including" is not a synonym for the word "and." It does not expand the meaning of "any Texas city" to include Athens, Greece, or Athens, Georgia, merely because those cities are also named "Athens." Instead, it limits the scope of the reference to "Athens" to the "Texas city" by that name.[10] In the **\*129** same way, the word "including" in subsection 271.153(a)(1) does not mean "and." It does not expand the meaning of "the balance due and owed ... under the contract" to include "owner-caused delay damages" that are not due and owed under the contract. Instead, it limits the scope of the reference to "owner-caused delay damages" to those "owner-caused delay damages" that are part of "the balance due and owed ... under the contract."

[10]     Or, to use the Court's "more apt example," *see ante* at 112 n. 65, the phrase "a city, including any named Athens," includes any city named Athens, which (as the Court notes) is "a longer list," but it still only "includes" *cities* named Athens. It would not include a corporation, or person, or pet named "Athens," because the word "including" limits the second word "Athens" to those that fit within the first word "city." In the same way, the word "including" in section 271.153(a)(1) limits the second phrase "delay damages" to those that fit within the first phrase "balance due and owed ... under the contract." Any delay damages that are not part of the balance due and owed under the contract are not "included" in the statute's waiver.

The language the Legislature used in its most recent statutory waiver of immunity for breach of contract suits further confirms this point. *See* TEX. CIV. PRAC. & REM.CODE § 114.004. In this statute, through which the Legislature waived immunity for certain contract claims against state agencies just last year, the Legislature used the same language it used in section 271.153, but added a final clause to further clarify that the amount recoverable "is limited to":

> the balance due and owed by the state agency under the contract as it may have been amended, including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration *if the contract expressly provides for that compensation....*

**Zachry Const. Corp. v. Port of Houston Authority of Harris County, 449 S.W.3d 98 (2014)**

57 Tex. Sup. Ct. J. 1378

*Id.* § 114.004(a)(1) (emphasis added). While the Court contends that the inclusion of the emphasized language gives this statute a meaning that is different than the meaning of section 271.153(a)(1), which does not include the emphasized language, that contention is unsupportable within this context. The language of sections 114.004 and 271.153 (and, for that matter, 262.007) are in all material respects the same, demonstrating that the Legislature intended to follow a uniform approach in strictly limiting the scope of these statutory waivers of immunity. More importantly, by using the same "including" language that appears in section 271.153, section 114.004 confirms that both statutes only permit recovery of owner-caused delay damages that are "included" within "the balance due and owed ... under the contract." If anything, section 114.004(a)(1) narrows the scope of recoverable damages by requiring that the contract "*expressly* provide[ ] for" the payment of such compensation.

Parties to construction contracts often allocate unquantified costs between themselves, just as Zachry and the Port Authority did with delay costs. Zachry and the Port Authority allocated all of Zachry's delay-related expenses and losses to Zachry, even if the Port Authority was at fault for the delay. But parties to construction contracts sometimes choose a different allocation, obligating an owner to reimburse the contractor for some or all owner-caused delay costs. *See, e.g., MasTec N. Am., Inc. v. El Paso Field Servs., L.P.,* 317 S.W.3d 431, 452 (Tex.App.-Houston [1st Dist.] 2010) (involving construction contract in which owner agreed to compensate contractor for certain owner-caused delays) *rev'd,* 389 S.W.3d 802 (Tex.2012) (holding that contract allocated all risk of unknown obstructions in construction path to contractor); *Shintech Inc. v. Group Constructors, Inc.,* 688 S.W.2d 144, 148 (Tex.App.-Houston [14th Dist.] 1985, no writ) (involving contract that allocated to the owner's account undue expenses incurred by the contractor as a result of owner-caused delays). If this contract had **\*130** included such a clause, I would agree that whatever portion of the delay costs the Port Authority had agreed to pay would constitute a balance due and owed by the Port Authority under the contract, and would thus be recoverable under section 271.153(a)(1). But since the Port Authority did not agree to pay any of Zachry's delay damages, and the contract does not provide for or contemplate the Port Authority's payment of such damages, those damages are not part of "the balance due and owed ... under the contract" and thus are not recoverable under section 271.153.

## III.

### Conclusion

I agree with the Court that Zachry's claim to recover installment payments that the Port Authority withheld as liquidated damages are recoverable under section 271.153 and that Zachry did not unambiguously release that claim, but I would hold that section 271.153 does not waive the Port Authority's immunity against Zachry's claim for delay damages. Based on the language and our prior constructions of the statute, I would hold that section 271.153 permits an award of delay damages only if those damages are provided for or contemplated in the agreement and are thus part of "the balance due and owed ... under the contract." Because this contract did not provide for or contemplate the Port Authority's payment of Zachry's delay damages, I would hold that Zachry's delay damages are not part of "the balance due and owed ... under the contract"; section 271.153 therefore does not authorize an award of those damages in this case; and thus section 271.152 does not waive the Port Authority's immunity against Zachry's suit for such damages.

**Parallel Citations**

57 Tex. Sup. Ct. J. 1378

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**TAB 4**

**Charge of the Court and Verdict dated January 14, 2010
(CR59:17386-409)**

CAUSE NO. 2006-72970

| | | |
|---|---|---|
| ZACHRY CONSTRUCTION | § | IN THE DISTRICT COURT OF |
| CORPORATION n/k/a Zachry Industrial, | § | |
| Inc. | § | |
| | § | |
| v. | § | HARRIS COUNTY, T E X A S |
| | § | |
| PORT OF HOUSTON | § | |
| AUTHORITY OF HARRIS | § | |
| COUNTY, TEXAS | § | 151ST JUDICIAL DISTRICT |

**CHARGE OF THE COURT**

LADIES AND GENTLEMEN OF THE JURY:

This case is submitted to you by asking questions about the facts, which you must decide from the evidence you have heard in this trial. You are the sole judges of the credibility of the witnesses and the weight to be given their testimony, but in matters of law, you must be governed by the instructions in this charge. In discharging your responsibility on this jury, you will observe all the instructions which have previously been given you. I shall now give you additional instructions which you should carefully and strictly follow during your deliberations.

1.      Do not let bias, prejudice or sympathy play any part in your deliberations.

2.      In arriving at your answers, consider only the evidence introduced here under oath and such exhibits, if any, as have been introduced for your consideration under the rulings of the court, that is, what you have seen and heard in this courtroom, together with the law as given you by the court. In your deliberations, you will not consider or discuss anything that is not represented by the evidence in this case.

3.      Since every answer that is required by the charge is important, no juror should state or consider that any required answer is not important.

4.      You must not decide who you think should win, and then try to answer the questions accordingly. Simply answer the questions, and do not discuss nor concern yourselves with the effect of your answers.

5.      You will not decide the answer to a question by lot or by drawing straws, or by any other method of chance. Do not return a quotient verdict. A quotient verdict means that the jurors agree to abide by the result to be reached by adding together each juror's figures and dividing by the number of jurors to get an average. Do not do any trading on your answers; that is, one juror should not agree to answer a certain question one way if others will agree to answer another question another way.

1

: 17386

6.    Unless otherwise instructed, you may answer a question upon the vote of ten or more jurors. If you answer more than one question upon the vote of ten or more jurors, the same group of at least ten of you must agree upon the answers to each of those questions.

These instructions are given you because your conduct is subject to review the same as that of the witnesses, parties, attorneys and the judge. If it should be found that you have disregarded any of these instructions, it will be jury misconduct and it may require another trial by another jury; then all of our time will have been wasted.

The presiding juror or any other who observes a violation of the court's instructions shall immediately warn the one who is violating the same and caution the juror not to do so again.

When words are used in this charge in a sense that varies from the meaning commonly understood, you are given a proper legal definition, which you are bound to accept in place of any other meaning.

Answer "Yes" or "No" to all questions unless otherwise instructed. A "Yes" answer must be based on a preponderance of the evidence unless you are otherwise instructed. If you do not find that a preponderance of the evidence supports a "Yes" answer, then answer "No." The term "preponderance of the evidence" means the greater weight of credible evidence admitted in this case. A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true. Whenever a question requires an answer other than "Yes" or "No," your answer must be based on a preponderance of the evidence unless you are otherwise instructed.

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

A party's conduct includes the conduct of another who acts with the party's authority or apparent authority. A party's knowledge includes facts known to the party acting with the other party's authority, and which are material to the duties of the party acting with the other party's authority.

Authority for another to act for a party must arise from the party's agreement that the other act on behalf and for the benefit of the party. If a party so authorizes another to perform an act, that other party is also authorized to do whatever else is proper, usual, and necessary to perform the act expressly authorized.

Apparent authority exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to

2

: 17387

his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists.

The following definitions apply in this charge.

"The Contract" means the Bayport Terminal Complex Phase 1A Wharf and Dredging Contract. Unless otherwise specified, sections of the Contract that are used in this Charge are from the General Conditions of the Contract. The Contract consists of the Contract Documents as defined in §1.10 of the Contract.

"Port" means the Port of Houston Authority of Harris County, Texas.

"Zachry" is the Contractor under the Contract with the Port. Before January 1, 2008, it was called Zachry Construction Corporation. From and after January 1, 2008, it is called Zachry Industrial, Inc.

"New Zachry" is Zachry's subcontractor under the Management Services Agreement, PX 643, from and after January 1, 2008. From and after January 1, 2008, New Zachry is called Zachry Construction Corporation.

After you retire to the jury room, you will select your own presiding juror. The first thing the presiding juror will do is to have this complete charge read aloud and then you will deliberate upon your answers to the questions asked.

It is the duty of the presiding juror—

1. to preside during your deliberations,

2. to see that your deliberations are conducted in an orderly manner and in accordance with the instructions in this charge,

3. to write out and hand to the bailiff any communications concerning the case that you desire to have delivered to the judge,

4. to vote on the questions,

5. to write your answers to the questions in the spaces provided, and

6. to certify to your verdict in the space provided for the presiding juror's signature or to obtain the signatures of all the jurors who agree with the verdict if your verdict is less than unanimous.

You should not discuss the case with anyone, not even with other members of the jury, unless all of you are present and assembled in the jury room. Should anyone attempt to talk to you about the case before the verdict is returned, whether at the courthouse, at your home, or elsewhere, please inform the judge of this fact.

3

: 17388

When you have answered all the questions you are required to answer under the instructions of the judge and your presiding juror has placed your answers in the spaces provided and signed the verdict as presiding juror or obtained the signatures, you will inform the bailiff at the door of the jury room that you have reached a verdict, and then you will return into court with your verdict.

JAN 2 1 2010          JUDGE PRESIDING

4

17389

**Question No. 1**

Did the Port fail to comply with Change Order 4?

It is your duty to interpret the language of Change Order 4 and the Scope, Time, and Price Modifications to Specifications and Proposal attached to Change Order 4.

You must decide its meaning by determining the intent of the parties at the time of the agreement. Consider all the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties.

In answering this question only, you are not being asked to decide whether the Port failed to comply with § 5.10 of the Contract.

Furthermore, in answering this question, you are instructed that nothing in § 5.41 gave the Port the right to issue its October 11, 2005 response to the September 9, 2005 frozen cutoff wall design.

Answer "yes" or "no."

Answer: _YES_

5

: 17390

## Question No. 2

Did the Port fail to comply with § 5.10 of the General Conditions?

In answering this question, it is your duty to interpret §§ 5.10 and 5.22 and the terms contained therein.

You must decide the meaning of these provisions of the Contract by determining the intent of the parties at the time of the agreement. Consider all the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties.

In determining the meaning of these provisions, you may also consider a trade custom or usage, if any, if you find that such trade custom or usage existed. However, a trade custom or usage, if any, cannot vary, control, impair, restrict or enlarge the express language of the Contract. A trade custom or usage exists if it is a practice so generally or universally well known and used in the industry that the parties to a contract are charged with knowledge of its existence to such an extent as to raise the presumption that the parties contracted with reference to it.

Furthermore, in answering this question, you are instructed that nothing in § 5.41 gave the Port the right to issue its October 11, 2005 response to the September 9, 2005 frozen cutoff wall design.

Answer "yes" or "no."

Answer: YES

6

: 17391

If you answered "yes" to Question No. 1 and/or 2, then answer the following question. Otherwise, do not answer the following question.

## Question No. 3

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Zachry for its damages, if any, that resulted from the Port's failure to comply?

Consider the following elements of damages, if any, and none other.

A.    The balance due and owed by the Port, if any, under the Contract, including any amount owed as compensation for any increased cost to perform the work as a direct result of Port-caused delays, and

B.    The amount owed, if any, for additional work that Zachry was directed to perform by the Port in connection with the Contract.

You may consider amounts, if any, owed as compensation for increased cost to perform the work as a direct result of Port-caused delays, if any, only if you find that such increased costs were a natural, probable, and foreseeable consequence of the Port's failure to comply.

In determining the balance due and owed for the increased cost to perform the work under A (above), if any, and the amount owed for additional work under B (above), if any, you should include Reimbursable Costs as defined in Section 1.1 of the Management Services Agreement (PX 643), incurred by New Zachry to perform Zachry's obligations under the Contract.

You are instructed that Zachry was not required to take any of the following actions to be able to recover damages for the Port's failure to comply: (1) obtain a written Construction Change Directive or a fully executed Change Order from the Chief Engineer under § 5.41 or under § 5.52 to the extent it imposes requirements consistent with §5.41; or (2) provide notice that a Contract interpretation by the Port constituted a change to the Contract under § 5.42 and that Zachry was entitled to an adjustment in the Contract Time and Price. You are instructed that you may consider §§ 5.41, 5.42, and 5.52 to the extent it imposes requirements consistent with §5.41, only in assessing a party's state of mind.

You are instructed that § 5.07 of the Contract precludes Zachry from recovering delay or hindrance damages, if any, unless you find that the delay or hindrance damages, if any, resulted from a delay or hindrance that was the result of the Port's actions, if any, that constituted arbitrary and capricious conduct, active interference, bad faith and/or fraud.

"Arbitrary and capricious" means willful and unreasoning action without due consideration and in disregard of the facts, circumstances, and rights of other parties involved.

7

: 17392

"Active interference" means affirmative, willful action that unreasonably interferes with the other party's compliance with the contract. "Active interference" requires more than a simple mistake, error in judgment, lack of total effort, or lack of complete diligence.

"Bad faith" is conscious doing of a wrong for a dishonest purpose.

"Fraud" occurs when

1.    a party makes a material misrepresentation,

2.    the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion,

3.    the misrepresentation is made with the intention that it should be acted on by the other party, and

4.    the other party suffers injury as a result of its reliance on the misrepresentation.

"Misrepresentation" means a promise of future performance made with an intent, at the time the promise was made, not to perform as promised, and the promise of future performance is that the Port would comply with the terms of Change Order 4.

Do not add any amount for interest on damages, if any.

Do not include in your answer any amount that you find that the Port proved, by a preponderance of the evidence, that Zachry could have avoided by the exercise of reasonable care.

Answer: $ 18,602,697

8

: 17393

If you answered Question No. 3 with any amount greater than zero, then answer the following question. Otherwise do not answer the following Question.

## Question No. 4

What percentage of the damages that you found in your answer to Question No. 3 was for delay or hindrance damages?

Answer with a percentage from 0% to 100%

Answer: __58.13__ %

: 17394

If you answered Question No. 3 with a number greater than zero, then answer the following Question. Otherwise do not answer the following Question.

## Question 5

What amount of damages that you found in Question No. 3, if any, was for Reimbursable Costs as defined in Section 1.1 of the Management Services Agreement (PX 643), incurred by New Zachry to perform Zachry's obligations under the Contract?

Answer in dollars and cents, if any.

Answer: $8,578,712

: 17395

If you answered "yes" to Question Nos. 1 and/or 2, then answer the following question. Otherwise, do not answer the following question.

## Question No. 6

Was the Port's failure to comply excused?

Answer "yes" or "no" for each of the following:

A.     Waiver

Failure to comply by the Port is excused if compliance was waived by Zachry. Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

Answer "yes" or "no."

Answer:     _____no_____

B.     Equitable estoppel

Failure to comply by the Port is excused if Zachry is equitably estopped from asserting that failure to comply. Equitable estoppel is established if all of the following circumstances occurred:

1.     Zachry
   a.     by words or conduct made a false representation or concealed material facts when there was a duty to disclose,
   b.     with knowledge of the facts or with knowledge or information that would lead a reasonable person to discover the facts, and
   c.     with the intention that the Port would rely on the false representation or concealment in acting or deciding not to act; and

2.     The Port
   a.     did not know and had no means of knowing the real facts and
   b.     relied to its detriment on the false representation or concealment of material facts.

A duty to disclose may arise when (1) a person voluntarily discloses partial information but fails to disclose the whole truth; (2) a person makes a representation but fails to disclose new information that makes the earlier representation misleading or untrue; or (3) a person makes a partial disclosure and conveys a false impression.

11

: 17396

Answer "yes" or "no."

Answer: ___No___

C.    Quasi-estoppel

Failure to comply by the Port is excused if the doctrine of quasi-estoppel applies. Quasi-estoppel bars a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by that party. This doctrine applies when it would be unconscionable to allow a party to maintain a position inconsistent with one in which it had acquiesced, or from which it had accepted a benefit.

Answer "yes" or "no."

Answer: ___No___

D.    Release

Failure to comply by the Port is excused if you find Zachry released its claims that the Port failed to comply.

In answering this Subsection D of this Question, you must decide the meaning of Exhibits DX1112.013 and PX884.0141 (re Payment Estimate 21); DX1113.013 and PX884.0150 (re Payment Estimate 22); DX1114.012 and PX884.0159 (re Payment Estimate 23); DX1115.017 and PX884.0168 (re Payment Estimate 24); DX1116.012 and PX884.0177 (re Payment Estimate 25); DX1117.013 and PX884.0185 (re Payment Estimate 26); DX1117.011 and PX884.0193 (re Payment Estimate 27); DX1118.013 and PX884.0203 (re Payment Estimate 28); DX1120.020 and PX884.0213 (re Payment Estimate 29); DX1121.013 and PX884.0223 (re Payment Estimate 30); DX1122.047 and PX884.0233 (re Payment Estimate 31).

You must decide the meaning of the above-listed exhibits by determining the intent of the parties at the time of the agreement. Consider all the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties.

In determining the meaning of an agreement, you may also consider a trade custom or usage, if any, if you find that such trade custom or usage existed. However, a trade custom or usage, if any, cannot vary, control, impair, restrict or enlarge the express language of the Contract. A trade custom or usage exists if it is a practice so generally or universally well known and used in the industry that the parties to a contract are charged with knowledge of its existence to such an extent as to raise the presumption that the parties contracted with reference to it.

12

: 17397

Answer "yes" or "no."

Answer: _____ *No* _____

17398

If you answered "yes" to Question No. 1, then answer the following question. Otherwise, do not answer the following question.

## Question No. 7

Was the Port's failure to comply found by you in Question No. 1 excused by Zachry's fraudulent inducement, if any, of Change Order 4?

For purposes of this question, fraudulent inducement occurs when—

1. a party makes a material misrepresentation, or a party who has a duty to disclose fails to disclose a material fact within the knowledge of that party,

2. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, or the party knows that the other party is ignorant of the undisclosed fact and does not have an equal opportunity to discover the truth,

3. the misrepresentation is made with the intention that it should be acted on by the other party, or the party intends to induce the other party to take some action by failing to disclose the fact, and

4. the other party suffers injury as a result of its reliance on the misrepresentation or as a result of acting without knowledge of the undisclosed fact.

For purposes of this question, "misrepresentation" means a false statement of fact or a promise of future performance made with an intent, at the time the promise was made, not to perform as promised.

A duty to disclose may arise when (1) a person voluntarily discloses partial information but fails to disclose the whole truth; (2) a person makes a representation but fails to disclose new information that makes the earlier representation misleading or untrue; or (3) a person makes a partial disclosure and conveys a false impression.

Answer "yes" or "no."

Answer: ___No___

14

: 17399

If you answered "yes" to Question No. 7, then answer the following question. Otherwise, do not answer the following question.

## Question No. 8

Is the Port barred from asserting its defense of fraudulent inducement?

The Port is barred from asserting its defense of fraudulent inducement if the doctrines of waiver, quasi-estoppel, and/or ratification apply.

Answer "yes" or "no" for each of the following:

A. Waiver

Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

Answer "yes" or "no."

Answer: _____

B. Quasi-Estoppel

Under the doctrine of quasi-estoppel, a party may not assert, to another's disadvantage, a right inconsistent with a position previously taken by that party. This doctrine applies when it would be unconscionable to allow a party to maintain a position inconsistent with one in which it had acquiesced, or from which it had accepted a benefit.

Answer "yes" or "no."

Answer: _____

C. Ratification

Ratification is the adoption or confirmation by a person, with full knowledge of the fraud, and of all material facts, and with the intention, clearly manifested, of abiding by the contract and waiving all right to assert the deception.

15

Answer "yes" or "no."

Answer: _____

: 17401

## Question No. 9

Did the Port fail to comply with the Contract by withholding, from the Port's payment on amounts invoiced by Zachry, the $600,000 for dredging?

Answer "yes" or "no."

Answer:      **No**

17

: 17482

If you answered "yes" to Question No. 9, answer the following question. Otherwise, do not answer the following question.

## Question No. 10

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Zachry for its damages, if any, that resulted from such failure to comply?

Consider the following element of damage, if any, and none other:

The balance due and owing by the Port, if any, under the Contract, resulting from the failure to comply that you found in Question 9.

Do not add any amount for interest on damages.

Answer in dollars and cents.

Answer: _____

18

: 17483

If you answered Question No. 9 "yes," then answer the following Question. Otherwise, do not answer the following Question.

## Question No. 11

Was the Port's failure to comply excused?

The Port's failure to comply is excused if you find, by a preponderance of the evidence, that Zachry released its claim with respect to that failure to comply.

In answering this question, you must decide the meaning of DX1114.012 and PX884.0159 (re Payment Estimate 23); DX1115.017 and PX884.0168 (re Payment Estimate 24); DX1116.012 and PX884.0177 (re Payment Estimate 25); DX1117.013 and PX884.0185 (re Payment Estimate 26); DX1117.011 and PX884.0193 (re Payment Estimate 27); DX1118.013 and PX884.0203 (re Payment Estimate 28); DX1120.020 and PX884.0213 (re Payment Estimate 29); DX1121.013 and PX884.0223 (re Payment Estimate 30); DX1122.047 and PX884.0233 (re Payment Estimate 31).

You must decide the meaning of the above-listed exhibits by determining the intent of the parties at the time of the agreement. Consider all the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties.

In determining the meaning of an agreement, you may also consider a trade custom or usage, if any, if you find that such trade custom or usage existed. However, a trade custom or usage, if any, cannot vary, control, impair, restrict or enlarge the express language of the Contract. A trade custom or usage exists if it is a practice so generally or universally well known and used in the industry that the parties to a contract are charged with knowledge of its existence to such an extent as to raise the presumption that the parties contracted with reference to it.

Answer "yes" or "no."

Answer: _____

19

: 17404

The Court has determined that the Port failed to comply with the Contract by failing to pay Zachry $2.36 million that the Port withheld as liquidated damages.

Was the Port's failure to comply excused, in whole or in part for any of the following reasons?

A.    Offset and/or Withholding

       (i)    You may find excuse if you find, by a preponderance of the evidence, that the Port is entitled to withhold for fenders under § 6.05 of the General Conditions of the Contract and/or that the Port is entitled to offset for fenders under § 6.17 of the General Conditions of the Contract.

The Port is entitled to withhold and/or offset for fenders under these provisions if you find, by a preponderance of the evidence, that, with respect to the fenders, Zachry failed to comply with the Contract resulting in a loss to the Port.

Answer "yes" or "no."

Answer:  ___YES___

      (ii)    If you answered "yes" to the prior question A(i), then answer the following question. Otherwise, do not answer the following question.

To what extent, in dollars and cents, is the Port's failure to comply excused by offset and/or withholding?

Answer in dollars and cents, if any.

Answer:  ___970,000.00___

B.    Release

      i.    You may also find excuse if you find, by a preponderance of the evidence that Zachry released its claim for the failure to comply.

In answering this question, you must decide the meaning of DX1114.012 and PX884.0159 (re Payment Estimate 23); DX1115.017 and PX884.0168 (re Payment Estimate 24); DX1116.012 and PX884.0177 (re Payment Estimate 25); DX1117.013 and PX884.0185 (re Payment Estimate 26); DX1117.011 and PX884.0193 (re Payment Estimate 27); DX1118.013 and PX884.0203 (re Payment Estimate 28); DX1120.020 and PX884.0213 (re Payment Estimate 29); DX1121.013 and PX884.0223 (re Payment Estimate 30); DX1122.047 and PX884.0233 (re Payment Estimate 31).

20

: 17405

You must decide the meaning of the above-listed exhibits by determining the intent of the parties at the time of the agreement. Consider all the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties.

In determining the meaning of an agreement, you may also consider a trade custom or usage, if any, if you find that such trade custom or usage existed. However, a trade custom or usage, if any, cannot vary, control, impair, restrict or enlarge the express language of the Contract. A trade custom or usage exists if it is a practice so generally or universally well known and used in the industry that the parties to a contract are charged with knowledge of its existence to such an extent as to raise the presumption that the parties contracted with reference to it.

Answer "yes" or "no."

Answer: __No__

(ii)   If you answered "yes" to the prior question B(i), then answer the following question. Otherwise, do not answer the following question.

To what extent, in dollars and cents, is the Port's failure to comply excused by release?

Answer in dollars and cents, if any.

Answer: __0__

21

## Question No. 13

What is a reasonable fee for the necessary services of the Port's attorneys, stated in dollars and cents?

Consider the following factors in determining the reasonableness of an attorney's fees award:

a. the time and labor involved, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly;

b. the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer;

c. the fee customarily charged in the locality for similar legal services;

d. the amount involved and the results obtained;

e. the time limitations imposed by the client or the circumstances;

f. the nature and length of the professional relationship with the client;

g. the experience, reputation, and ability of the lawyer or lawyers performing the services; and

h. whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

Answer with an amount for each of the following:

**(A) Attorney's Fees as to Zachry's Claim Relating to Change Order 4 and/or §5.10 of the Contract.**

(1) For preparation and trial with respect to Zachry's claim for the Port's failure, if any, to comply with Change Order 4 and/or §5.10 of the Contract.

Answer: $ 10,500,000.00

(2) For an appeal to the Court of Appeals with respect to Zachry's claim for the Port's failure, if any, to comply with Change Order 4 and/or §5.10 of the Contract.

Answer: 90,000.00

22

(3) For an appeal to the Supreme Court of Texas with respect to Zachry's claim for the Port's failure, if any, to comply with Change Order 4 and/or §5.10 of the Contract.

Answer: $ 22,500.00

**(B) Attorney's Fees as to Zachry's Claim for Withholding the $2.36 million as liquidated damages and the $600,000 for dredging.**

(1) For preparation and trial with respect to Zachry's claims for the Port's failure, if any, to comply with the Contract by withholding, from the Port's payments on amounts invoiced by Zachry, the $2.36 million withheld as liquidated damages and the $600,000 withheld for dredging.

Answer: $ 80,250.00

(2) For an appeal to the Court of Appeals with respect to Zachry's claims for the Port's failure, if any, to comply with the Contract by withholding, from the Port's payments on amounts invoiced by Zachry, the $2.36 million withheld as liquidated damages and the $600,000 withheld for dredging.

Answer: $ 3750.00

(3) For an appeal to the Supreme Court of Texas with respect to Zachry's claims for the Port's failure, if any, to comply with the Contract by withholding, from the Port's payments on amounts invoiced by Zachry, the $2.36 million withheld as liquidated damages and the $600,000 withheld for dredging.

Answer: $ 1,250.00

23

: 17488

## Certificate

We, the jury, have answered the above and foregoing questions as herein indicated, and herewith return same into court as our verdict.

(To be signed by the presiding juror if the jury is unanimous.)

_Charles Terry Huckaby_
PRESIDING JUROR

_Charles Terry Huckaby_
Printed Name of Presiding Juror

(To be signed by those rendering the verdict if the jury is not unanimous.)

Jurors' Signatures | Jurors' Printed Names

Rob Dombrowski

Chad Barnes

Johnny Ortiz

Jose A. Valera.

Jane Castro

Criselda C. Randall

Chris L. West Jr.

Vikki Merritt

Kevin Nusham

Terry Huckaby

24

17489

**TAB 5**

**Order on Zachry's 11 Part Motion for Pretrial Determination of Issues of Law (Rule 166(g) Motion) dated October 5, 2009 (CR46:13296-309)**



P-14
ENTZ

CAUSE NO. 2006-72970

ZACHRY CONSTRUCTION          §          IN THE DISTRICT COURT OF
CORPORATION                  §
                             §          HARRIS COUNTY, T E X A S
v.                           §
                             §
PORT OF HOUSTON AUTHORITY    §
OF HARRIS COUNTY, TEXAS      §          151ST JUDICIAL DISTRICT

### ORDER ON ZACHRY'S 11 PART MOTION FOR
### PRETRIAL DETERMINATION OF ISSUES OF LAW

Came on for consideration Zachry Construction Corporation's (Zachry) 11 Part Motion for Pretrial Determination of Issues of Law. The Court, having considered the Motion, Defendant Port of Houston Authority's (PHA) Response, Zachry's Reply, and PHA's Sur-Reply, as well as various follow-up letter briefs, is of the opinion that Zachry's Motion should be GRANTED IN PART and DENIED IN PART.

Issue 1:    The Court believes it has an understanding of this issue having heard the arguments of counsel at the Friday, September 11, 2009 hearing. Separate and apart from the allegation that the PHA breached the main contract's section 5.10 (means and methods), Zachry contends that Change Order 4 (hereinafter "CO4") gave it a contractual right to, in general, use the freeze cutoff wall construction method. Zachry then contends that PHA breached CO4 by later rejecting Zachry's use of the freeze cutoff wall construction method. The Court finds that within the documents that comprise the CO4 contract, there is an ambiguity as to what is meant by the term "construction methods" in paragraph 1, and "similar methods" in paragraph 9 of the "Scope, Time and Price Modifications to Specifications and Proposal" incorporated into CO4. Therefore, the Court **DENIES** Plaintiff Zachry's Motion as to Issue 1 without prejudice, and as of this writing, intends to submit the issue to the jury.

**FILED**
Loren Jackson
District Clerk

OCT - 5 2009
Time: 1:23 PM
By _____
Harris County, Texas
Deputy

1

Issue 2: By this issue, Plaintiff asks the Court for a pretrial determination that there was no fraudulent inducement. The Court hereby **GRANTS** this request in part and **DENIES** in part. The Court finds that is able to determine as a matter of law that PHA's agent CH2M Hill had the September 9, 2009 frozen cutoff wall design in hand for at least two weeks before PHA signed CO4. The Court hereby **GRANTS** a pretrial determination ONLY that there was no fraudulent inducement as to the September 9, 2009 frozen cutoff wall design by Plaintiff Zachry.[1] The Court hereby **DENIES** the remainder of the request for pretrial determination as to fraudulent inducement by Plaintiff Zachry (including, but not limited to, alleged misrepresentations about Zachry's ability to certain meet time deadlines).

Issue 3: By this issue, Zachry asks for a pretrial determination as a matter of law that "[n]o provision in the contract gives the port a right to reject or to require revision and resubmittal of the contractor's means and methods." This is an exceedingly broad request by Zachry that could render meaningless several provisions of the contract that may be read to limit Zachry's choices of means and methods, at least in part. PHA's response on page 40 asks the Court to find that "the Port had the express right under the Contract to issue the 'revise and resubmit' response." PHA's point seems to be that it was free to *ask* Zachry to revise and resubmit, but it did not order Zachry to do so and had no power to do so, and therefore it could not have breached the contract by simply asking, nicely, that Zachry do so. The Court stated at the hearing on Friday, September 11, 2009, that it did not find this line of argument by PHA persuasive. Moreover, this line of argument seems to be consistent with, and NOT contrary to,

---

[1] The Court does not believe its findings in Issues 1 and 2 are inconsistent. Issue 1 asked about a pretrial determination of whether, as a matter of law, CO4 gave Plaintiff Zachry the unambiguous right to employ the frozen cutoff wall construction methodology. The Court finds that it did not unambiguously allow for a specific design. The Court believes, at this moment, that a jury could find reasonably find either way on this issue. Issue 2 asked for a pretrial determination as a matter of law as to, among other things, whether Plaintiff Zachry fraudulently induced PHA by misrepresenting the *design* of the frozen cutoff wall. The Court finds as a matter of law that there was no reliance on any alleged misrepresentation about the design because a specific design was in CH2M Hill's hands for two weeks before PHA signed CO4.

2

Zachry's position that the contract prohibited PHA from "rejecting" the use of the frozen cutoff wall design (a particular means and method) under section 5.10.[2] That is, Zachry claims that PHA was not allowed to do so, and PHA says it never tried to. To that extent, at least, those two positions seem to line up in logical agreement to the Court.

The Court is unwilling to rule, at this time, that no other provision of the contract gave PHA the right to prevent Zachry from conducting itself in a particular way, and some of the provisions that PHA cites on pages 38 and 39 of its Response may in fact have allowed something akin to at least partial rejection. The Court will have to hear more evidence about those proposed bases for rejection (though this is not intended to undo any prior ruling by this Court regarding any particular clause of the contract). The Court hereby **DENIES** Zachry's request for a determination as a matter of law at this time that NO provision of the Contract gave PHA the right to reject or otherwise command Zachry to conduct itself in a particular way. Even if no provision allowed PHA to completely reject the frozen cutoff wall, there may be other provisions cited by PHA that gave PHA the right to otherwise limit Zachry's conduct at the project in whole or in part. At this point, the Court is not willing to say, as a matter of law, that, one or more of the provisions listed in the bottom paragraph of page 39 of PHA's Response could not be read to limit Zachry's operations under the contract to some extent. The Court does not affirmatively find that they do, but will not, by a Rule 166(g) Motion find that they do not as a matter of law prior to trial.

This is a different finding than whether or not PHA had the right under the contract to issue a revise and resubmit (as opposed to reject) response under sections 5.22 and 5.25. The Court does not make such a determination as a matter of law under this Order.

---

[2] This discussion leaves aside the separate breach of CO4 alleged by Zachry, and focuses only on the alleged breach by PHA under section 5.10 (means and methods) and 5.22 (submittals) of the main contract.

Issue 4: By this issue, Zachry asks for a pretrial determination as a matter of law that the frozen cutoff wall design was not a submittal under section 5.22 of the contract. The Court hereby **DENIES** this request. The Court finds that the original contract section 5.22 to be ambiguous on this point as a matter of law and will submit a definition to the jury as appropriate.

Issue 5: By Issue 5, Zachry asks for a pretrial determination that none of Zachry's breach of contract claims are barred by untimely notice. Previously, this Court denied PHA's Motion for Summary Judgment that was based on section 5.42 of the main contract. That section provides for a five day notice period for Zachry after any interpretation of the Contract Documents by any agent of PHA if Zachry considered such an interpretation to be a change to the contract. PHA argued that section 5.42 applied to the claims asserted by Zachry and Zachry argued that the section did not govern its claims in this lawsuit, and that the section was void under Texas Civil Practice and Remedies Code section 16.071. The Court entered an order in March 2009 denying the Motion for Summary Judgment, and finding that PHA was not entitled to summary judgment because it was not clear that the section was applicable to the facts of this case. The Court further found that the section was void under section 16.071 if it was applicable.

The basis for not finding that the section was applicable as a matter of law in March 2009 was that the Court felt that the matter was controlled by *B.F. & C.M. Davis Co. v. W.E. Callaghan Const. Co.*, 298 S.W. 273, 279 (Tex. Comm'n App. 1927). In its briefing and at the September 11, 2009 hearing, PHA argued that the *Davis Co.* case is neither on point nor controlling because it applies to a situation where the contractor could be required to perform changes in the work, and the owner could unilaterally determine any adjustment in the contract price to account for such changes. In contrast, in this case, PHA argues, the provision is merely a notice provision, not a unilateral change in the scope or quantity of work provision.

4

The Court did not articulate this well at the September 11, 2009 hearing, but upon further reflection and re-reading of the *Davis Co.* case, it now understands the point that PHA was making: PHA's point is that the *Davis Co.* case's "radical change" issue did not have to do with whether a contractual *notice* period applied to a radical change in the scope of the work, but rather, whether the radical change could be unilaterally imposed in the scope of the work with little or no change in the amount of the compensation. That is, the *Davis Co.* case, according to PHA, only stands for the proposition that an owner cannot impose radically more work upon the contractor for the same price, but rather, such unilateral prerogative clauses only apply to minor changes to the scope or amount of work. That, argues PHA, distinguishes *Davis Co.* from this case.

The Court does not see it that way. The Court still finds *Davis Co.* to be applicable to this case because the clause at issue here, section 5.42, is a roundabout way of getting to the same place. PHA argues that section 5.42 is different than the facts of *Davis Co.* as section 5.42 only allows for an equitable adjustment if there is a change order, which, by definition, must be agreed to by Zachry. That is to say, in the second paragraph of section 5.42, the clause states that if Zachry gives the notice regarding the perceived change to the contract, the Chief Engineer of PHA will conduct an investigation and determine whether the change will necessitate a modification to the contract, and if so, whether to go forward. If, and only if, the Chief Engineer determines that it is a change that will require a modification, and decides to go forward, then the Chief Engineer will (perhaps) issue a construction change directive, or recommend to the Commission an equitable adjustment to the Contract Price as applicable. However, if the Chief Engineer determines that the contractor is wrong and the change perceived by the contractor is not actually a change requiring modification, the Chief Engineer then will contact the contractor and "the determination by the Chief Engineer in such respect shall be final and conclusive." In

Certified Document Number: 43524125 - Page 5 of 14

other words, in the end, it *is* a unilateral determination by PHA whether a change, large or small, is a change requiring modification to the contract. PHA's argument that a change to the contract price requires a change order that is, by definition, agreed to by Zachry has little meaning if it is the PHA's Chief Engineer that retains sole decision-making authority over whether a change perceived by Zachry requires a modification to the contract price in the first place. That is why the Court believes that the *Davis Co.* case is, if not controlling, at least persuasive, analogous authority here. A section like section 5.42 can only apply to non-radical changes, otherwise, just as in the *Davis Co.* case, it would allow the owner to unilaterally change the scope of the work in significant ways without affording any rights to the contractor.[3]

Further, the Court continues to find that even if section 5.42 applies to this case, it is void under Texas Civil Practice and Remedies Code section 16.071. PHA argues strenuously that the Court erroneously applied section 16.071 to this section and that the Texas Supreme Court's decision in *American Airlines Employees Federal Credit Union v. Martin*, 29 S.W.3d 86, 97-98 (Tex. 2000) dictates that section 5.42 is not void. The Court had previously read and carefully considered the *American Airlines* case in reaching its earlier decision that section 16.071 applied to make section 5.42 void. The Court has now re-read the decision and still believes that that case is not controlling here.

First, in *American Airlines*, the Court was interpreting the Uniform Commercial Code, and in particular, section 4.406(d) which requires a customer who receives a statement and believes a payment was not authorized to notify the bank "promptly." Thus, there was a separate statutory policy requiring notice being given effect and a statutory prohibition on recovery. Indeed, the Supreme Court held that because notice was untimely, the claimant's recovery for

---

[3] This raises another point. Whether or not *Davis Co.* applies or controls section 5.42, Zachry has argued that it is not interpreting PHA's alleged rejection of the frozen cutoff wall methodology as a "change." Rather, it is interpreting the alleged rejection as a breach of the contract. Because the Court finds section 5.42 inapplicable and void, the Court makes no ruling on this issue.

6

unauthorized payments was barred by UCC section 4.406. *American Airlines*, 29 S.W.3d at 98. The Court stated that section 16.071 on its face did not apply because the notice requirement was not a requirement to give notice for a claim for damages. Likewise, in *Community Bank & Trust, S.S.B. v. Fleck*, 107 S.W.3d 541, 542 (Tex. 2002) the Supreme Court reaffirmed its holding in *American Airlines*. It noted that under Texas Business and Commerce Code section 4.103(a) a bank and its customers may agree to a specific, shorter, reasonable period within which a customer must give notice of unauthorized payments. *Id.* The Court reiterated that section 16.071 did not apply to bank deposit agreements because the notice was not notice of a claim for damages, but rather, notice of the unauthorized transactions. *Id.*

In contrast, in this case, there is clearly a clause in section 5.42 that requires notice of an interpretation of the contract that the contractor believed to be a change in the contract. That section states that "[a]ny notice not timely made by the Contractor shall be deemed a waiver by the Contractor of its right to assert *a claim* in respect of such interpretation." It is not analogous to the *American Airlines* or *Fleck* cases cited above. As a practical matter, what this clause says is that PHA can totally rewrite the requirements of the contract and if Zachry does not like it, Zachry has to give notice of its disapproval within 5 days, and the failure to do that under the language quoted above bars their claim. That is not practically different than saying that PHA can *breach* the contract and Zachry would have to give notice of the breach within five days. That is precisely how PHA is treating section 5.42: as a defense to Zachry's claim that the rejection of the frozen cutoff wall design was a breach. It is, to the Court, a distinction without a difference.

Moreover, the clause does not really have some other salutary effect as described in the *American Airlines* case because the Chief Engineer, and therefore PHA, has the final say on

7

whether he or she thinks the "change" to the contract is significant. In contrast, in *American Airlines*, the statutory purpose for the notice was to try to prevent further unauthorized charges. In this case, a "change" to the contract and a breach of the contract may well be indistinguishable, and thus the section could be read (indeed, *is* being read by PHA) to require notice of Zachry's claim for damages for breach within five days.

While ostensibly the notice requirement concerns notice of a perceived change to the contract, that does not negate the plain language quoted above. To follow PHA's argument, any time a clause has a notice requirement for any purpose in addition to a claim for damages, it would be outside of section 16.071. That is not what is intended by section 16.071, nor how it has been interpreted for the last 85 years. In *Citizens' Guaranty State Bank of Hutchins v. National Surety Co.*, 258 S.W. 468, 470 (Tex. Comm'n. App. 1924) the court stated, in construing the predecessor statute to section 16.071:

> The company contends that the bond in this case requires, as a condition precedent to suit, merely a notice 'of any loss in respect of which liability of the company is claimed,' and that this is less than notice of a 'claim,' or cause of action, for damages. It may be; but if the force of the statute is to be avoided by requiring notice, not of the cause of action itself, but of necessary and component parts of the cause of action, its purpose can be too readily defeated. For instance, instead of using in a provision the exact words of the law, 'notice * * * of * * * claim for damages,' a surety company, assuming contractual liabilities and duties, might reach exactly the same result by stipulating either for 'notice of defalcation' on the one hand, or for 'notice of damage' on the other . Neither element would constitute the entire cause of action, but requiring notice of either would be as effective a limitation as requiring notice of the whole cause of action. The spirit of the statute is a liberal public policy, and excludes an evasion of that nature, however unconscious on the part of the company, and regardless of questions of expediency in a particular line of business. It does not permit a tendency to relaxation, but demands strict obedience.

In *Latham v. Mountain States Mut. Cas. Co.*, 482 S.W.2d 655, 658-59 (Tex. Civ. App.— Houston [1st Dist.] 1972, writ ref'd n.r.e.), an insured under an automobile policy was required to file a sworn statement with the company stating that he has a cause of action for damages arising from an accident with an uninsured vehicle within 31 days. The insurer argued that this clause

8

was a non-waivable part of the *definition* of a hit and run vehicle. *Id.* at 658. The court, quoting the language from *Citizens Guaranty Bank* above, concluded that regardless of the fact that it was ostensibly part of a definitional paragraph, it was nevertheless a condition precedent to a claim for damages that was void under the predecessor to section 16.071. *Id.* at 659. Of course, a purpose of the notice requirements in insurance policies is, as in this case and in *American Airlines*, to allow the non-claimant to investigate the matter. Nevertheless, under *Latham*, that notice requirement also acted as a condition precedent to a claim for damages, and was found to be void. Likewise, the language regarding waiver of a claim if notice is not provided under section 5.42 is void. Were that not so, then artful scriveners could too easily avoid the constraints of section 16.071.

Finally, the Court has also read and considered *St. Paul Mercury Ins. Co. v. Tri-State Cattle Feeders, Inc.*, 638 S.W.2d 868 (Tex. 1982). That case and its progeny, dealing with notice of a loss in the insurance context, have created a distinction between notice of a claim for damages and "notice of the happening of an event upon which liability may or may not result." *Ridglea Estate Condominium Ass'n v. Lexington Ins. Co.*, 415 F.3d 474, 478-79 (5th Cir. 2005). Here, however, the facts are different, and section 5.42 is not analogous to an insurance policy provision requiring notice of an event of loss or damage. Section 5.42 is more akin to making a claim against one's insurance company after it has denied coverage under one's policy. Section 5.42 is actually being read in this case by PHA to equate what Zachry perceives as a breach of the contract as a "change" in the contract requiring notice of the alleged "breach" to have been given within five days. Thus, it is not notice of the happening of an event upon which liability may or may not result. Rather, it is being employed by PHA to require notice of the claim for liability in breach. Because section 5.42 may be read, and is being read, to bar a claim for an alleged breach of contract by PHA if notice of the alleged breach itself is not given within five

9

Certified Document Number: 43524125 - Page 9 of 14

days, the section is void under section 16.071. For these reasons, the Court will GRANT Zachry's Rule 166(g) motion for pretrial determination as a matter of law on this Issue as well. To be clear, the Court hereby finds section 5.42 **INAPPLICABLE** to the facts of this case, and **VOID** under Texas Civil Practice and Remedies Code section.16.071.

Issue 6: This question seems easier to the Court than this issue of the applicability of section 5.42. The Court hereby **ORDERS** as a matter of law that section 5.41 of the original contract did NOT permit PHA to reject the use of the frozen cutoff wall design because that section only allowed unilateral changes by the Chief Engineer if they were minor changes in the Work.

Issue 7: Zachry asks for a pretrial determination as a matter of law that any alleged pre-contractual statements are not, as a matter of law, part of the Contract and cannot, therefore, be the basis for any prior material breach. Further, Zachry asks for a pretrial determination that any such alleged pretrial statements cannot be the basis for any fraudulent inducement defense by PHA. The Court hereby **GRANTS** Zachry's request on the prior material breach aspect of Issue 7 because PHA states in footnote 25 on page 59 of its Response that it never contended that any prior misrepresentations by Zachry are part of its prior material breach defense. The Court, consistent with its ruling on Issue 2, above, hereby **DENIES** Zachry's request in this Issue pertaining to fraudulent inducement despite the alleged presence of a merger clause.[4]

Issue 8: By this Issue, Zachry argues that PHA cannot assert its prior material breach defense(s) because PHA elected to treat the contract as continuing after Zachry's alleged prior breach. PHA argues that because the original contract contains a no-waiver clause, even upon electing to treat the contract as continuing, it may still assert its prior material breach

---

[4] The Court is concerned that several of the statements listed in footnote 29 on page 27 of Zachry's Motion appear to be puffery and potentially, therefore, not actionable. Nevertheless, without more context, it is difficult to determine whether they rise to the level of being actionable, and the Court will, as of this moment, therefore, defer to the jury on the issue of fraudulent inducement.

defense(s). Zachry, in turn, argues that the concepts of election and waiver are distinct, and that the non-waiver provision of the contract does not save the prior breach defense(s) for PHA as a result of PHA's election. Zachry argues that PHA is not entitled to be excused from performance, and that by deciding to go forward with the contract after the alleged breach(es) by Zachry, it may not now assert its prior material breach defense. Thus, argues Zachry, "in order to avail itself of this prior material breach defense and excuse its own nonperformance, the Port needed to have terminated the Contract after any such alleged breach by Zachry."

Without penning a treatise, the Court will attempt to reconcile the two concepts very briefly based upon its reading of the authorities cited by the parties. At first, the two concepts seem somewhat contradictory, but this is how the Court understands them: In *Long Island Savings Bank, FSB v. U.S.*, 503 F.3d 1234, 1253-54 (Fed. Cir. 2007), the Court stated, "[w]e have held that through its continued performance of the contract, [a non-breaching party] [may waive] any claim for prior material breach." (citing *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1383 (Fed. Cir 2004)). But, in *Gupta v. Eastern Idaho Tumor Institute, Inc.*, 140 S.W.3d 747, 757 n. 7 (Tex. App—Houston [14th Dist.] 2004, pet. denied), the court noted that "[t]he election affects only whether the non-breaching party itself is then required to perform fully." (citing *Chilton Ins. Co v. Pate & Pate Enters., Inc.*, 930 S.W.2d 877, 887-88 (Tex. App.—San Antonio 1996, writ denied)).

Here is how the Court understands these concepts to work under the allegations in this case (which may or may not be correct statements of the facts, and are presented for illustrative purposes only):

*Step 1: Zachry allegedly breaches the contract for failing to, for example, adhere to the standard of care requirements of the contract.*

*Step 2: PHA elects at that time to continue to require Zachry to perform.*

11

*Step 3: Because of this election, the case law seems to indicate that PHA may now only sue for damages caused by the partial breach by Zachry.*

*Step 4: PHA, by having elected to continue to require performance, cannot now claim that it is under no requirement to continue to perform as it elected to continue to require Zachry to perform.*

*Step 5: PHA allegedly breaches by violating section 5.10 or breaching Change Order 4.*

*Step 6: Zachry can sue for breach by PHA.*

*Step 7: However, despite its election, PHA can still claim prior material breach by Zachry (the earlier alleged breach for failing to adhere to the standards of care under the contract, for example) because of non-waiver clause and potentially other fact issues on waiver.*

Thus, as a great simplification, the Court believes that in light of the non-waiver provision in the original contract, the Court cannot find as a matter of law that PHA waived its right to assert its prior material breach defense by continued acceptance (and requirement) of performance by Zachry. PHA is permitted to claim that Zachry's damages for breach are precluded by Zachry's alleged prior material breach.

The election issue does not seem to bar the prior material breach defense to Zachry's claim for breach and damages. Rather, the election issue pertains to whether PHA can affirmatively claim a total breach by Zachry, or whether it can claim only damages caused by Zachry's alleged partial breach. That is, under the case law, the election issue does not seem to pertain to PHA's right to assert a prior material breach by Zachry as a defense to its own breach. In fact, case law cited by PHA states the opposite- that if a non-waiver provision is present, allowing continued performance by the breaching party is not necessarily a waiver by the non-breaching party. The election issue seems limited to PHA's right to claim a total breach or a partial breach and its ability to seek damages relating only to the partial breach.

12

The Court has not seen a case that stands squarely for the proposition that, in the face of a non-waiver clause the *election* by the alleged second-breaching party to continue with the contract eliminates its ability to assert a prior material breach as a defense to its own later breach as a matter of law. The Court is not certain whether it has a firm grasp of how these two concepts interrelate, and is open to reconsidering this issue later, but for now, believes Zachry is not entitled to an "as a matter of law" finding that any election by PHA precludes the assertion of its prior material breach defense given the presence of the non-waiver clause. The Court hereby **DENIES** Zachry's Motion on this Issue.

Issue 9: The Court hereby **GRANTS** a pretrial determination as a matter of law that Zachry owed no fiduciary duty to PHA as PHA has repeatedly stated that it did not claim a fiduciary duty was owed to it by Zachry. The Court hereby **DENIES** Zachry's Motion to the extent it contends, otherwise, that as a matter of law it owed no duty of full disclosure under other concepts of law including, but not necessarily limited to, concepts like partial disclosure, voluntary disclosure, and/or contractual duties of disclosure.

Issue 10: Zachry contends that the reformation clause is invalid in that it is an unenforceable agreement to agree in the future. PHA argues, in connection with section 5.42 of the contract, that it should be reformed. First, as stated above in connection with Issue 5, the Court finds that section 5.42 is inapplicable to the alleged rejection of the frozen cutoff wall design. Second, the Court hereby **ORDERS** that the reformation clause is an unenforceable agreement to agree even if section 5.42 were applicable to the rejection of the frozen cutoff wall, and therefore, the Court hereby **GRANTS** Issue 10 in Zachry's *favor as a matter of law*. Finally, the Court hereby **DENIES** Zachry's Motion to the extent it seeks a ruling as a matter of law that the reformation clause is barred by public policy.

13

Issue 11: The Court finds that section 5.06, the liquidated damages provision, is an unenforceable penalty because it does not make clear that the liquidated damages are in lieu of other damages. This is a question of law for the Court, and the Court finds that *Nexstar Broadcasting, Inc. d/b/a KBTV NBC 4 v. Gray*, N. 09-07-364-CV, 2008 WL 2521967, *2-*3 (Tex. App.—Beaumont June 26, 2008, no pet.) is controlling. The purpose of a liquidated damages provision is to allow a party to recover damages where, at the time of contracting, it is difficult or impossible to ascertain an amount of damages as a reasonable forecast of just compensation. *Id.* at *3. The contract has to make clear that the amount of liquidated damages will be in lieu of other damages. *Birdwell v. Ferrell*, 746 S.W.2d 338, 340 (Tex. App.—Austin 1988, no writ). This one does exactly the opposite by allowing the liquidated damages to be a minimum, and allowing PHA to seek its actual damages instead if they *exceed* the liquidated damages amount. Section. 5.06. There is no practical distinction between the contract in this case, and the contract in *Nexstar* even though in *Nexstar* the contract used the term "additional compensatory and consequential damages." Though unstated in this case, the language in section 5.06 permits the exact same approach by PHA. The Court grants Zachry's request in Issue 11 as a matter of law, and hereby **ORDERS** that the liquidated damages clause in section 5.06 is unenforceable as a matter of law.

All other relief specifically requested in Zachry's Motion for Pretrial Determination of Issues of Law and not specifically granted herein is hereby DENIED.

Signed this ___-5___ day of October, 2009.

_____
Judge Mike Engelhart

14

**TAB 6**

**Order Granting in Part and Denying in Part Plaintiff's Motion
to Strike the Port's Offset and Withholding Defenses
dated October 16, 2009
(CR51:14948-52)**

STPLZ

CAUSE NO. 2006-72970

| | | |
|---|---|---|
| ZACHRY CONSTRUCTION CORPORATION | § § § | IN THE DISTRICT COURT OF |
| | § | HARRIS COUNTY, T E X A S |
| v. | § § | |
| | § | **F I L E D** |
| PORT OF HOUSTON AUTHORITY OF HARRIS COUNTY, TEXAS | § § | Loren Jackson District Clerk 151ST JUDICIAL DISTRICT |

OCT 16 2009

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO STRIKE PLAINTIFF'S MOTION TO STRIKE THE PORT'S OFFSET AND WITHHOLDING DEFENSES**

Came on for consideration Plaintiff Zachry Construction Corporation's (Zachry) Motion to Strike the Port's Offset and Withholding Defenses. The Court, having considered Zachry's Motion, PHA's Response, PHA's supplemental brief and Zachry's response to that supplemental brief, as well as the arguments of counsel, is of the opinion that Zachry's Motion should be GRANTED IN PART and DENIED IN PART.

The Court will not go into the timeline of events, as those are spelled out in minute detail in the parties' briefs on this issue. The Court will only generally note that, in sum, PHA only listed ANY amounts (other than the $600,000.00 dredging issue) of its actual damages that it proposed to serve as an offset in late July 2009. However, the legal theory under which those quantities were listed was ONLY the proportionality of its liquidated damages offset claim to actual damages. Additionally, PHA had timely disclosed $600,000.00 in actual damages much earlier as part of an offset claim pertaining to certain dredging costs.

To this day, PHA has not enunciated in any discovery response any *legal theory* that it was seeking to defensively offset or recoup ANY actual damages other than the $600,000.00 amount. Zachry allegedly only learned of PHA's apparent attempt to inject first $8 million and then $10.5 million in actual damages (as opposed to liquidated damages) as a defensive claim for offset informally, and not through any supplementation of discovery, such as a supplement to a

request for disclosure under Rule 194.2(e). The Court stated at a hearing that the surprise to Zachry was not that PHA was seeking an offset, but that it was seeking to offset a long list of itemized actual damages as opposed to liquidated damages. It is important to note, again, that in quantifying its "harms" in July 2009, PHA was not stating that it would actually be seeking to recover those quantities for those specific categories of harms as an offset.[1]

PHA enunciates a plausible theory in its supplemental brief that it could only know about the fender resurfacing costs of approximately $1 million somewhat more recently, and also points to costs for clearing and grubbing of roughly $25,000.00. The Court believes that in addition to the $600,000.00 dredging issue, PHA ought to be able to put on evidence to seek to show it was entitled to offset these amounts only.

It is well understood, in the Court's view, that TRCP 194.2(d) applies to both affirmative claims for damages, as well as to quantifiable defensive theories. If this had been a car accident case, and the defendant was seeking to offset or recoup some amount against the plaintiff's affirmative claims for medical expenses, pain and suffering, disfigurement, etc., the defendant would not be able to simply list "harms" or categories of offsets (like "property damage") but would have to actually list the amounts and how those amounts were calculated. Zachry has pointed out that comment 2 to the 1999 change to Rule 194 applies to defensive theories of liability and damages as well. The same is true in this more complex case.

PHA argues that this Court's March 2009 ruling denying Plaintiff's motion for summary judgment on the enforceability of the liquidated damages clause of the contract excused it from pleading and enunciating in its disclosure responses this alternative theory of actual damages. The Court wants to be fair, as always, but if anything, the suggestion by Zachry by its motion

---

[1] Indeed, PHA also argues that it stated that its $2.3 million in liquidated damages that it had been enunciating throughout the case would continue to accrue. But, PHA did not even do the math on that figure as the Court believes is required by Rule 194.2(d).

that the liquidated damages clause may not be enforceable should have alerted PHA that it needed to plead this theory and enunciate it in terms of the legal theory and amounts in its disclosure responses. Further, Zachry again sought to eliminate the liquidated damages claim by its Rule 166g Motion on or about July 31, 2009, and PHA still has not amended its Rule 194.2(c) disclosure response to enunciate an actual damages theory of offset or recoupment, nor sought leave to do so, to the Court's knowledge. PHA's inclusion, long ago, of the $600,000.00 actual damages figure as part of its offset claim also highlights that PHA should have included all of the other categories and quantities of offsets well before the discovery cutoff.

The Court, at the October 9, 2009 hearing, brought up the idea that the Court's October 5 ruling striking PHA's liquidated damages claim changed the landscape, and that therefore, perhaps, as a matter of equity, PHA ought to be able to assert its actual damage claim. The Court has thought and thought about this, and concludes that, at this point, the equities are not on PHA's side for the reasons discussed above. Further, there is too much evidence--as suggested by what is NOT said in PHA's supplemental response of Wednesday, October 14, 2009 on this issue--that PHA knew of both the existence of these actual damages, and their approximate, if not exact, dollar amounts no later than 2008.

The Court disagrees that Zachry was obligated to move to strike PHA's "claim" for actual damages as offset by the dispositive motion deadline. See, *Hooper v. Chittaluru*, 222 S.W.3d 103, 110 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (holding, in a discovery supplementation dispute, that the plaintiff could not have supplemented discovery with the other side's expert's opinions until those opinions were given to the plaintiff by the other side's expert

3

: 14950

– the plaintiff is not required to do the impossible). Analogously, here, Zachry could not move to strike PHA's actual damages offset claim until that claim was "made."[2]

PHA makes an interesting argument that Rule 193.5(b), which governs supplementation of discovery, required them to amend or supplement their discovery responses only reasonably promptly after they discovered the necessity for such a response. That is, PHA argues that they did not know of the need to enunciate that they would be seeking actual damages as an offset, nor the amount of those actual damages because of this Court's denial of Zachry's Motion for Summary Judgment in March 2009. Further, in light of that denial, PHA contends that it did not know that its liquidated damages claim would be eliminated until October 5, 2009 when this Court struck their liquidated damages clause as invalid. The Court has largely dealt with these arguments above, but will reiterate: The filing of the Motion for Summary Judgment, at the latest, put PHA on notice that its liquidated damages clause in the contract was not ironclad. The filing of the (essentially) renewed motion to eliminate the liquidated damages claim on or about July 31, 2009 should have caused PHA to amend their discovery responses to specifically enunciate an actual damages offset claim, at least as an alternative. PHA's contention that they basically disclosed this theory of offset (actual damages) in July 2009 is just not factually or legally correct. PHA disclosed a quantity of actual damages in late July 2009 that they were NOT going to submit to the jury as an offset. They never have disclosed a defensive claim for offset of those actual damages to date.

The bottom line is that to inject $10.5 million in actual damages for offset or recoupment well after all discovery deadlines have passed would dramatically change the landscape of what promises to be a lengthy and complicated trial. It is not fair to ask either side to engage in what the Court perceives would be extensive discovery (including document production, depositions,

---

[2] Again, a specific claim for actual damages as an offset or recoupment has, to date, only informally been made, and not specifically plead or presented in a supplemented disclosure response.

4

and potentially additional expert witnesses) on the evidentiary bases for the amounts sought to be offset by PHA. The results of that discovery will not be known until long after voir dire and opening statements, and the trial Court will not allow that much fluidity and uncertainty into this trial.

It is therefore ORDERED that, with the exception of the $600,000.00 amount for the dredging matter, the $1 million or so for the fender refurbishing, and the $25,000.00 or so for the clearing and grubbing, PHA's offset "harms" or categories, as well as the amounts of those alleged offsets are hereby EXCLUDED from the trial of this cause. And, as with any other claims, the Court does not hereby decide that said claims will, in fact, end up being submitted to the jury—just that PHA may put on evidence of them.

It is further ORDERED that PHA will immediately supplement its pleadings and discovery responses to the extent that it has not disclosed an actual-damages defensive theory of offset or recoupment.

It is further ORDERED that Zachry will promptly propose to the Court reasonable discovery that it wishes to conduct on these theories and amounts of offset or recoupment.

Signed this ___16___ day of October, 2009.

_Judge Mike Engelhart_

5

**TAB 7**

**Order on PHA's Request that the Court Reconsider Its November 12, 2009 Open-the-Door Ruling Regarding the Port's Actual Harms (1SCR6:1112-17)**

FILED P-6
Loren Jackson
District Clerk REHRY

CAUSE NO. 2006-72970

DEC 11 2009

ZACHRY CONSTRUCTION
CORPORATION

§
§
§

IN THE DISTRICT COURT OF

By

v.

§
§
§

HARRIS COUNTY, TEXAS

PORT OF HOUSTON AUTHORITY
OF HARRIS COUNTY, TEXAS

§
§
§

151ST JUDICIAL DISTRICT

## ORDER ON PHA'S REQUEST THAT THE COURT RECONSIDER ITS NOVEMBER 12, 2009 OPEN-THE-DOOR RULING REGARDING THE PORT'S ACTUAL HARMS

Came on for consideration Defendant PHA's Request that the Court Reconsider its November 12, 2009 Open-the-Door Ruling Regarding the Port's Actual Harms. The Court, having considered PHA's Request, Plaintiff's December 10, 2009 Response, as well as PHA's Supplement to its Request and the arguments of counsel, is of the opinion that PHA's Request should be DENIED.

The issue in this Request is the application of Texas Rule of Evidence 107. Underlying the request, generally speaking, is the following aspect of this trial. Under prior rulings by this Court, Zachry has to prove one or more common law exceptions to the no damages for delay clause contained in the Wharf and Dredge contract made the basis of this suit in order to defeat that clause. One of those common law exceptions is referred to loosely in this record as the "bad faith exception," and Zachry contends that a certain promise that PHA's Mark Vincent allegedly made in an internal PHA e-mail, and which PHA then allegedly breached, is evidence of bad faith on PHA's part. The promise, according to Zachry, was essentially that, as of May 2005, PHA would not charge liquidated damages if PHA suffered no actual losses or harms by the time the Chinese crane ship--scheduled for first February 2006 and later May 2006--arrived.

In contrast, PHA contends that if any such promise was made, it related not to the date for the Chinese crane ship's arrival, but to a broader, more onerous Milestone A deadline, and

Certified Document Number: 44109860 - Page 1 of 6

: 01112

potentially, the final completion deadline. That is. PHA's position is that if any "promise" was made regarding liquidated damages, it was that no LDs would be charged if PHA suffered no actual damages or harms *through the Milestone A deadline* or, possibly, the eventual final completion date of January 2009. It was not, PHA argues (if any promise was made), limited to the date of arrival of the Chinese crane ship arrival.

Thus, PHA's position is that the discussion by Zachry of the alleged "promise" not to charge liquidated damages at all, coupled with (1) the Andy Anderson April and May 2005 letters which mention the final completion deadline, as well as the "milestone" deadline, and (2) Mr. Abiasi's recent testimony about ships routinely docking at the wharf during 2006 and 2007 (and possibly later), have opened the door to the introduction of evidence by PHA of all of the alleged "harms" (actual expenses and losses) allegedly suffered by PHA. This discussion, PHA contends, is necessary to rebut Zachry's bad faith argument by showing that, in fact, there *were* actual harms suffered by PHA. Therefore, the argument continues, even if the jury believes that the promise related to the crane ship arrival or the Milestone A deadline (which PHA argues is a much later date), PHA did in fact suffer actual harms. Thus, PHA contends, they did not breach any alleged promise because they indeed *had* actual harms. Indeed, they argue, if there was any promise, they lived up to it.

### Texas Rule of Evidence 107 – Rule of Optional Completeness

Under the case law pertaining to TRE 107. the Court believes that the door was opened as to the discussion of actual harms up to the date of the May 15, 2006 letter in which PHA communicated that it would charge liquidated damages. It is logical to conclude that it was on that date, at the very latest. that PHA decided it would charge liquidated damages, and at that therefore, under either version of the alleged promise (whether it was the date of the Chinese crane ship arrival, or the date of Milestone A completion), it had suffered actual harms at that

2

time, or reasonably anticipated such actual harms to necessarily flow from the alleged delay. Otherwise, it would not have decided to charge liquidated damages at that time in light of either alleged version of the alleged promise (if there was any promise at all).

Given this, the Court believes that the discussion of (1) the Andy Anderson letters of the Spring of 2005, and (2) Mr. Vincent's e-mail as the basis of the alleged promise not to charge liquidated damages, and (3) Mr. Abiasi's discussion of the ships arriving regularly after the Chinese crane ship's arrival, is the *same subject matter* as PHA's alleged harms that were both actually incurred, and reasonably expected to be incurred as of the date it sent the May 15, 2006 letter charging liquidated damages. *See*, *Williams v. State*, No. 12-01-00201-CR, 2003 WL 356010, *5 (Tex. App.—Tyler February 19, 2003, pet. ref'd) (not designated for publication). The Court also believes that the discussion of the promise and the other ships' arrival after the Chinese crane ship's arrival could have left the jury with the misimpression that PHA suffered *no actual harms* that underlie their decision to charge liquidated damages on or about May 15, 2006. *Id.* Thus, the test under TRE 107 would seem to be satisfied.[1]

It is important to note that in response to the Court's earlier "open-the-door" oral ruling, in which the Court stated that Zachry had opened the door allowing PHA to discuss evidence of **"any harms that occurred up to the date of the crane ship arrival,"** PHA stated that it had no dollar amounts of any harms it had actually suffered as of the date that the Chinese crane ship had arrived. Very recently, however, PHA began to argue that while it had not suffered out of

---

[1] Further, though PHA's counsel has pointed out that this reasoning does not seem to underpin case law pertaining to TRE 107 (but rather, it applies to case law regarding trial by consent), it is worth noting that the evidence of the ships regularly arriving at the wharf during the ongoing construction that Zachry adduced through Mr. Abiasi is relevant to rebut PHA's allegation that Zachry took far too long to complete its work. Zachry says the evidence of ships arriving during construction, and Zachry's accommodation of those arriving ships, explains some or all of the delays. Thus, to be fair, the evidence was arguably not adduced to show that PHA suffered no harms because ships could arrive at the wharf. Rather, it was adduced, in Zachry's view, to explain the delays of which it was accused by PHA. So therefore, argues Zachry, it did not really open the door because the evidence has relevance to something other than PHA's alleged harms. PHA nonetheless argues that it does not matter why it was introduced, but that the only consideration is the jury's potential misapprehension.

3

Certified Document Number: 44109860 - Page 3 of 6

pocket losses or harms as of the date of the Chinese crane ship's arrival, it knew at that time that it would necessarily suffer actual harms that would actually be incurred after that date. Why PHA did not ask for clarification of the Court's oral ruling to determine whether anticipated harms of which it was aware as of the date of the Chinese crane ship arrival date were included in that ruling is unclear. Nevertheless, it is possible there is evidence of reasonably anticipated actual harms of which PHA was aware as of the May 15, 2006 letter charging liquidated damages. The Court has not heard this evidence as of the date of this Order.

To be clear, however, the Court believes that the door has only been opened to a degree. It has only been opened to the extent that, if the Court were to allow the evidence to come in, it would only do so to the point where PHA could discuss discrete categories of actual harms. However, the Court would not allow PHA to discuss the specific dollar amounts or quantities of those alleged harms. Eliciting evidence of the types or categories of actual harms, the Court believes, would allow PHA to correct any misimpression held by the jury that PHA suffered no actual harms which would underlie or support its May 15, 2006 decision to charge liquidated damages. There is no need to go the additional step of discussing the actual amounts of those alleged harms.

### Texas Rule of Evidence 403

Now, despite having opened the door to the discussion of the actual harms either actually incurred as of the date of the May 15, 2006 liquidated damages letter, or those reasonably anticipated as of that date which necessarily would have flowed from the alleged delays up to that date, the Court believes the evidence should nevertheless be excluded under Texas Rule of Evidence 403. Zachry has also expressly objected to this evidence on Rule 403 grounds.

First, the Court, at the outset of the trial, ruled that other than 3 specific categories of actual harms, because of late or no-supplementation of discovery, PHA would not be permitted

4

to discuss 8 to 10 million dollars worth of alleged actual harms. Without modifying that ruling, the main reason for that decision was that the Court did not want to—at the last minute—fundamentally alter the nature of the trial by adding many days or weeks of testimony about whether those alleged harms were actually suffered, and in what amounts. Moreover, the Court did not want to disrupt the trial by having the parties have to undertake substantial amounts of discovery in the middle of what already promised to be a lengthy trial. At bottom, it would have been unfair to inject all of that evidence of about $10 million worth of an offset claim by PHA into the trial at the last moment. The Court does not believe that there is any basis to change that ruling.

Second, under Rule 403, the Court believes that any probative value of injecting all of the evidence of alleged harms into the trial would be substantially outweighed by the danger of (1) unfair prejudice to Zachry, and (2) considerations of undue delay. In particular, not only would it take a lot of time for the information to be elicited in the first place from a PHA witness, it would necessarily require a lengthy cross-examination. That cross-examination could very quickly devolve into a lengthy battle over not only the nature of the alleged harms, but their cause and quantification. As stated above, the reason this information was kept out in the first place was because of deficiencies in PHA's discovery responses. For Zachry to then have to cross-examine on this issue when it has not had a chance to conduct discovery of any significance on these issues would certainly be highly prejudicial. And, all of this testimony would take a lot of time – we are now in the 8th week of testimony in this trial as of this writing.

Texas Rule of Evidence 107 is subject to Rule 403. *Walters v. State*, 247 S.W.3d 204, 218 (Tex. Crim. App. 2007); *Whipple v. State*, 281 S.W.3d 482, 500 (Tex. App.— El Paso 2008, pet. ref'd).

5

Certified Document Number: 44109860 - Page 5 of 6

: 01118

It is therefore ORDERED, ADJUDGED and DECREED that PHA's Request that the Court Reconsider its November 12, 2009 Open-the-Door Ruling Regarding the Port's Actual Harms is hereby DENIED.

Signed this ___11___ day of December, 2009.

_____
Judge Mike Engelhart

6

Certified Document Number: 44109860 - Page 6 of 6

: 01117

**TAB 8**

**Plaintiff's Fourth Amended Petition and First Amended Answer
to PHA's Counterclaim for Attorneys' Fees
(CR29:08131-48)**

4-28-09

CAUSE NO. 2006-72970

| | | |
|---|---|---|
| ZACHRY CONSTRUCTION CORPORATION n/k/a Zachry Industrial, Inc. | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | HARRIS COUNTY, T E X A S |
| | § | |
| PORT OF HOUSTON AUTHORITY OF HARRIS COUNTY, TEXAS | § | 151ST JUDICIAL DISTRICT |

## PLAINTIFF'S FOURTH AMENDED PETITION AND
## FIRST AMENDED ANSWER TO PHA'S COUNTERCLAIM FOR ATTORNEYS' FEES

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW ZACHRY CONSTRUCTION CORPORATION n/k/a Zachry Industrial, Inc. ("Zachry"), Plaintiff herein, and files this its Fourth Amended Petition and First Amended Answer against the PORT OF HOUSTON AUTHORITY OF HARRIS COUNTY, TEXAS ("PHA"), and in support thereof would show the Court the following:

### I. Discovery Control Plan

Zachry intends to conduct **Level III discovery** in this case pursuant to Texas Rule of Civil Procedure 190.4. Plaintiff demands a **trial by jury**, and has tendered the requisite fee to the Clerk of this Court.

### II. Parties

1. Plaintiff Zachry is a Delaware corporation, with its principal place of business in San Antonio, Bexar County, Texas.

2. Defendant PHA is a Texas navigation district established under Article XVI, Section 59 of the Texas Constitution, with its principal place of business in Houston, Harris County, Texas. Defendant PHA has appeared in this lawsuit and may be served through its

1

counsel of record, David H. Brown, Brown & Kornegay LLP, 2777 Allen Parkway, Suite 977, Houston, Texas 77019; Karen T. White, Vinson & Elkins, L.L.P., 1001 Fannin, Suite 2500, Houston, Texas 77002; J. Clark Martin, Kelly Hart & Hallman, 1000 Louisiana, Suite 4700, Houston, Texas 77002; and Lawrence J. Fossi, Fossi & Jewell LLP, 4203 Yoakum Blvd, Suite 100, Houston, Texas 77006.

### III. Venue

3.     Venue is proper in this Court as Harris County is the county "in which all or substantial part of the events . . . giving rise to [this] claim occurred." TEX. CIV. PRAC. & REM. CODE ANN. § 15.002(a)(1).   Venue is also proper as Harris County is the county of PHA's "principal office in this state."  TEX. CIV. PRAC. & REM. CODE ANN. § 15.002(a)(3).   Finally, venue is proper in this Court because Harris County is the county in which the parties have "contracted in writing to perform an obligation," expressly naming Harris County in that writing. TEX. CIV. PRAC. & REM. CODE ANN. § 15.035(a).

### IV. Jurisdiction

4.     Jurisdiction is proper in this Court as the amount in controversy is in excess of the minimal jurisdictional requirements of this Court.  Further, this Court has personal jurisdiction over Defendant as it is a Texas navigation district located in Harris County, Texas.

5.     This court has jurisdiction over this suit against PHA because the Texas legislature has waived sovereign immunity from suit with respect to breach of contract claims against navigation districts such as PHA.  TEX. LOC. GOV'T CODE ANN. § 271.151, et seq. Further, it is well settled that when the State or a political subdivision contracts with private citizens, as PHA has done, it waives sovereign immunity from liability.  *See Tooke v. City of*

2

*Mexia*, 197 S.W.3d 325, 332 (Tex. 2006); *Gen. Servs. Comm'n v. Little-Tex. Insulation Co., Inc.*, 39 S.W.3d 591, 594 (Tex. 2001). This suit involves claims for PHA's breach of a written contract within the Texas Legislature's express waiver of sovereign immunity. TEX. LOC. GOV'T CODE ANN. § 271.152; Bayport Phase 1A Wharf and Dredging Contract ("Wharf and Dredge Contract").[1] Based on the facts alleged below, Zachry seeks to recover damages under §§ 271.153(a)(1) and (a)(2) of the Texas Local Government Code. Accordingly, PHA may not assert sovereign immunity from suit or from liability with respect to the claims asserted herein.

## V. Background

6. On or about June 1, 2004, after soliciting proposals and awarding the project to Zachry, PHA and Zachry executed the Wharf and Dredge Contract. Pursuant to the written Wharf and Dredge Contract, Zachry was to construct a 1660-foot wharf facility in Pasadena, Texas. Under the original terms of the Wharf and Dredge Contract, construction was to be completed by June 1, 2006. In addition, by February 1, 2006, Zachry was to meet an interim deadline by which a portion of the wharf PHA had designated ("Milestone A") would be sufficiently completed supposedly to allow the delivery of certain large ship-to-shore cranes that were to be delivered by ship from China.

7. Shortly thereafter, Zachry began construction of the wharf. At the outset, and as PHA understood before it awarded Zachry the contract, Zachry's chosen construction methodology and construction plans involved the construction of a temporary frozen shoring

---

[1] Because the Wharf and Dredge Contract is too voluminous to physically attach to this petition, Zachry hereby expressly incorporates by reference the copy of the Wharf and Dredge Contract filed by Defendant PHA as Exhibit B to its Plea to the Jurisdiction and to its First Special Exceptions.

3

: 88133

wall (a "freeze wall") along the channel side of the wharf. The freeze-wall construction methodology involved building a large berm along the channel side of the wharf, placing pipes into the berm, circulating a sub-freezing brine solution through the pipes, and freezing the earthen berm into a frozen soil mass or wall. The resulting freeze wall would allow Zachry to excavate the earth between the channel and the forthcoming wharf, under the wharf deck, and among the wharf's piers in dry conditions without having to resort to more difficult and more costly mechanical dredging and "wet" excavation techniques. Based upon this known plan, Zachry proceeded to build the earthen berm, gather and place the pipes necessary to create the freeze wall into the berm, drive support piles, and generally work toward fulfilling its contractual obligations by executing its construction methodology.

8.      In or before March 2005, because PHA's contractual design underestimated the wharf length necessary to meet its own wharf demand, PHA notified Zachry that it needed to increase the size of the wharf Zachry was then building. PHA's original wharf design (for which PHA had contracted with Zachry to build and which Zachry was building at the time) was not long enough to accommodate the volume and/or type of ship traffic that was expected to call at Bayport upon the facility's opening.[2] Due to its own error, PHA requested that Zachry submit a proposal to construct a longer wharf than the one for which the parties had originally contracted in the Wharf and Dredge Contract. Specifically, PHA requested that Zachry provide a proposal to add an additional 332 feet in length of wharf to the existing design, thereby substantially increasing the size of the wharf and the amount of remaining work. In addition, because PHA

---

[2] The determination of the wharf length for which the Port contracted in the original Wharf & Dredge Contract was a matter solely within PHA's control.

4

had also underestimated the size of the Chinese crane-delivery ship, PHA also later requested a substantial increase in the size of Milestone A so that the cranes used to operate the facility could be docked and unloaded.[3]

9. PHA's immediate need for an additional 332-foot section of wharf required Zachry to rework its construction methodology. In early April 2005, in response to PHA's solicitation of Zachry for a proposal to perform the additional work PHA needed, Zachry described to PHA the construction methodology modification that it would need to perform the work. Specifically, PHA's new design necessitated a critical modification to Zachry's freeze wall construction methodology—the addition of a freeze wall that would run perpendicular to the original freeze wall (the perpendicular wall being referred to herein as the "frozen cutoff wall"). The frozen cutoff wall was needed so that Zachry could simultaneously accomplish three main objectives: (1) completing Milestone A on time; (2) allowing the Chinese ship carrying the cranes to dock, unload, and depart; and, critically (3) maintaining the remainder of the wharf (i.e., the non-Milestone A portion of the wharf) in the dry so that Zachry's construction methodology could continue to be implemented. On April 13, 2005, Zachry provided a written proposal to perform the additional work PHA needed for a certain price. Zachry's price was expressly conditioned on Zachry's "[u]se of a freeze wall-cutoff wall, encompassing one (1) 'B' row piling," which was exactly what Zachry had previously described to PHA.

10. In August 2005, PHA informed Zachry that it intended to issue a change order authorizing the additional work PHA had requested. However, PHA—while continuing to

---

[3] The designation of the length of the Milestone A portion of the wharf was a matter solely within PHA's control.

5

: 00195

request that Zachry construct the additional wharf section—simultaneously informed Zachry that until it issued that change order, Zachry would proceed at its own risk. On or about September 12, 2005, at PHA's request, Zachry presented PHA with a detailed design of the frozen cutoff wall that Zachry planned to use in connection with the change order work as provided under its proposal. That design was consistent with Zachry's prior description of the frozen cutoff wall.

11. On September 27, 2005, two weeks after Zachry had provided its frozen cutoff wall design, PHA executed Change Order Number 4, officially agreeing that Zachry was to perform the additional work under the terms set forth in Zachry's proposal, unless otherwise specified in the modifications to the April 13 proposal that were made in the change order. Change Order 4 never modified Zachry's April 13 proposal to exclude the use of the frozen cutoff wall and, thus, the frozen cutoff wall was approved in Change Order Number 4. Change Order Number 4 clearly and expressly contemplated the use of the frozen cutoff wall design in the completion of the wharf—indeed, it was the explicit basis for the negotiation of pricing and scheduling under Change Order Number 4. But just two weeks after executing Change Order Number 4, PHA changed course and precluded Zachry from implementing its proposed, contractually approved frozen cutoff wall design. PHA rejected that design.[4]

12. PHA's rejection of Zachry's frozen cutoff wall, which actively interfered with Zachry's work, was done in bad faith, arbitrarily, capriciously, and without any legitimate or reasonable basis.[5] Moreover, despite recognizing this immediately as a geotechnical problem,

---

[4] Stated another way, PHA impermissibly precluded Zachry from implementing the design.

[5] PHA's bad faith, arbitrary, and capricious conduct, which interfered with Zachry's work, is described in greater detail in Zachry's discovery responses.

6

: 28198

PHA did not bother to engage its geotechnical engineer, GeoTest, until after PHA had rejected the frozen cutoff wall. Moreover, nothing in GeoTest's report would support a rejection of the frozen cutoff wall. In addition, PHA's own Chief Engineer, who had the ultimate responsibility at PHA for resolving all engineering questions on the project, admitted that PHA did not have enough information to judge whether or not the freeze wall violated the standard of care. He also admitted that no one at PHA had concluded that there would be an adverse impact or that the cutoff wall design in any way violated the standard of care. Further demonstrating the Port's bad faith, arbitrary, and capricious conduct regarding the rejection, Zachry's freeze wall experts, GeoEngineers, provided additional research demonstrating that there was no adverse affect to freezing the soil around the drilled shafts. Consistent with the freeze wall expert's opinions at the time, PHA's Construction Manager, CH2MHILL, provided the frozen cutoff wall design to its own in-house geotechnical engineering experts, who returned comments confirming that the proposed frozen cutoff wall design did not pose any issue. PHA's own expert in this lawsuit has likewise testified that the frozen cutoff wall was a viable and safe design and that he had no basis to believe it would have any negative impact on the structure.

13.    Another example of the Port's bad faith, arbitrary, and capricious conduct is the fact that PHA expressly charged and designated its Construction Manager, CH2MHILL, to act on its behalf on this critical cutoff wall issue despite the fact that PHA knew and understood that CH2MHILL had a poor record and was ill-equipped to deal with such an issue. Indeed, PHA had previously admitted that CH2MHILL responded to project and design issues in a "CYA" mode rather than appropriately addressing the issues. This CYA approach was evidenced again when even after identifying any issues concerning freezing as geotechnical in nature, even after

7

: 98137

receiving CH2MHILL's senior geotechnical engineering experts' opinions stating they did not see a problem, and even after receiving Zachry's freeze wall expert's follow-up analysis re-confirming there was not a problem CH2MHILL—PHA's designated agent on this cutoff wall issue—communicated several problems from a "structural engineering perspective," none of which were viable concerns, none of which were assessed prior to the Port's rejection, and all of which were simply designed to divert any potential liability from CH2MHILL. On October 10—despite the unanimous approval from freeze wall experts on both sides and notwithstanding the fact that PHA had not even hired its own geotechnical engineer to look at this issue (much less received the result of any such review), PHA rejected the freeze wall.

14. PHA's rejection of the frozen cutoff wall constituted a breach of both Change Order 4 and the General Conditions of the Wharf & Dredge Contract.[6] Notwithstanding PHA's "bait and switch" tactics—including PHA's delay in approving Change Order Number 4 and subsequent improper rejection of the frozen cutoff wall methodology stated in Change Order Number 4—PHA remarkably continued to insist that Zachry complete the expanded project within the parameters set forth in Change Order Number 4.

15. Moreover, when it executed Change Order 4, PHA had no present intent to perform its requirement that Zachry be permitted the right to use the frozen cutoff wall. Texas law clearly provides that when one enters into an agreement that it has no present intent to perform, this constitutes fraud. Here, on September 27, 2005 PHA executed a contract that permitted Zachry to use the frozen cutoff wall. PHA induced Zachry to agree this contract at a

_____

[6] Alternatively, to the extent PHA contends that it only required Zachry to "revise and resubmit" its frozen cutoff wall design, such conduct also constituted a breach of Change Order

8

price and schedule based on a particular frozen cutoff wall design. PHA then rejected the very design that formed the basis for the contract only days after signing the agreement because it never intended to allow Zachry to use the frozen cutoff wall. To this day PHA denies that it ever intended to approve Zachry's use the frozen cutoff wall when executing Change Order 4.[7]

16.    Zachry, unable to implement the agreed-upon frozen cutoff wall construction method due to PHA's conduct, found itself short on time because the work needed to be completed under the freeze wall approach, the Port had precluded the use of that approach, and there was a crane ship that was to arrive from China in the near future. Thus, after a review of the alternative proposed solutions, Zachry ultimately decided it would have to forego the entire freeze-wall construction method in order to prepare the wharf in a manner that would allow the Chinese crane ships to dock and unload. Zachry therefore was forced in large part to complete the wharf using unanticipated "wet" excavation techniques. In doing so, Zachry incurred substantial additional costs. The completion of interim Milestone A and the entire project was delayed as a result, as well.

17.    Even though the delays were caused by PHA's breach of the Wharf and Dredge Contract, PHA has withheld and threatens to further withhold liquidated damages based on an unenforceable penalty provision in the contract. First, because the purported liquidated damages provision attempts to enforce liquidated damages while simultaneously allowing (and, indeed calling for) the recovery of actual damages, it is void as a matter of Texas law. Second, the liquidated damages provision is unenforceable because PHA suffered no harm. Third, the

Number 4 and the General Conditions of the Contract.

[7] PHA's bad-faith, fraudulent, arbitrary, and capricious conduct actively interfered with

9

liquidated damages provision is unenforceable because Zachry's compliance with the contractual deadlines was precluded by PHA's own errors and misconduct.

18. By its conduct, PHA has breached the Wharf and Dredge Contract in several respects. In particular by precluding Zachry from implementing its frozen cutoff wall construction methodology and ultimately the entire freeze wall construction methodology, PHA has breached Change Order 4 and Section 5.10 of the Wharf and Dredge Contract. *See* Change Order Number 4 to Wharf and Dredge Contract; Wharf and Dredge Contract ¶ 5.10. PHA has further breached the Wharf and Dredge Contract by wrongfully withholding as "liquidated damages" sums otherwise due Zachry under the Wharf & Dredge Contract pursuant to an unenforceable penalty clause and for time overruns that were themselves caused by PHA's conduct. *See* Wharf and Dredge Contract, ¶ 5.05, ¶ 5.06, Addendum No.8 (III-15) (purporting to provide PHA the right to recover liquidated damages as a damage "floor," while also purporting to allow recovery of actual damages if they exceed the liquidated-damages amount). PHA is obligated to pay Zachry the Contract price. PHA is wrongfully withholding sums as purported liquidated damages in breach of the Contract. In addition, PHA has also wrongly withheld approximately $600,000 from Zachry under a purported claim of offset. PHA has no right to offset these damages under the Contract and is wrongfully withholding this $600,000 which is due and owed to Zachry as part of the Contract price in further breach of the Contract. *See* Wharf and Dredge Contract at pages 1-2[8], ¶¶ 6.02, 6.05, and 6.17. Other material breaches for which

Zachry's chosen (and approved) means and methods of executing the work under the contract.

[8] "The Port of Houston Authority agrees to pay the Contractor for the obligations of this Contract the estimated sum of Sixty-Two Million Four Hundred Eighty-Five Thousand Seven Hundred Thirty-Three and 00/100 ($62,485, 733.00) in accordance with the terms and conditions

10

Zachry is not seeking economic damages are set forth in Zachry's Seventh Amended Response to Interrogatory No. 16.

19. In addition, PHA has also recently failed to pay sums due and owed to Zachry under the Contract for the agreed upon Contract price in further breach of the Wharf and Dredge Contract, including Zachry's Invoice Number 39 in the amount of $470,807.94. This is a breach of pages 1-2 and paragraph 6.02 of the Contract. Zachry seeks recovery of these additional actual damages.

20. The consequences of PHA's misconduct have caused Zachry significant damage. PHA's bad faith conduct, at its core, derives from PHA's bureaucratic mentality, incompetence, and desire to punish Zachry for asserting its legal rights. This is evidenced by, in addition to the matters pleaded above, PHA's racking up of excessive, unreasonable, and unnecessary legal fees as a means of attempting to manufacture a meritless counterclaim, delay the payment of its obligations under the Wharf & Dredging Contract, and avoid the payment of its debt by spending Zachry into submission. PHA's bad faith pattern of conduct has persisted up until the present, including PHA's recent additional bad faith steps at the end of the project done in order to squeeze its contractor. This bad faith conduct includes PHA's apparent decision to stop paying Zachry's invoices (including Invoice Number 39), PHA's failure to declare that the status of Zachry's work under the Wharf & Dredge contract is complete despite (a) that fact that it is complete, and (b) its contractual obligation to determine the status of the Work, and PHA's failure to permit an assignment of the contract without a legitimate basis to the affiliated Zachry

of the Contract Documents." *Id.* at 2. The Contract Price agreed to was later modified by Change Orders 1 - 23, for a total agreed Contract Price of $ 77,982,892.38.

11

entity that completed the project (using the same people that previously performed the work).[9]

## VI. Cause of Action: Breach of Contract

21. All prior and subsequent paragraphs are incorporated by reference. The Wharf and Dredge Contract, including without limitation all Change Orders and Addenda to the Wharf and Dredge Contract, is a legally binding written agreement within the meaning of Texas Local Government Code Section 271.152. Zachry has performed and continues to perform its obligations under the Wharf and Dredge Contract, or alternatively, was prevented from performing certain obligations by PHA's material breach of contract. Zachry has met all conditions precedent to recovery.[10] As detailed above, the Wharf and Dredge Contract has not

---

[9] On December 12, 2007, Zachry notified PHA that the remaining work on the project (as of January 1, 2008) would be completed by the same personnel, but that the personnel would be employed by a sister Zachry affiliate due to a Zachry corporate reorganization. On January 18, 2008, PHA indicated that it was "prepared to approve such assignment" to the Zachry affiliate that finished the project work as of January 1, 2008, but under certain conditions. Given PHA's lack of consent to the assignment, Zachry did not assign the contract. Instead, it completed the project as it had described to PHA in December 2007. On April 7, 2009, with the conditions PHA previously stated satisfied by the completion of the work and/or by additional Zachry assurances provided, Zachry again requested the assignment of the Contract; PHA has not responded and, thus, not permitted the Contract's assignment. Accordingly, given PHA's recent bad faith conduct with regard to its lack of consent to assignment and in an abundance of caution, Zachry has entered into a pass-through agreement with its affiliate. Under that agreement, Zachry would be entitled to recover the damages incurred by and through its affiliate (approximately $8,578,712 of the damages alleged by Zachry) because Zachry would be liable to its affiliate for damages sustained by the subcontractor pursuant to the pass-through agreement. *See Interstate Contracting Corp. v. City of Dallas*, 135 S.W. 3d 605, 607 (Tex. 2004). Under that agreement, Zachry is obligated to remit certain recoveries to its affiliate. *Id.* at 619-20. Under Texas law, PHA has waived its sovereign immunity for such claims. *See Hensel Phelps Const. Co. v. Dallas/Forth Worth Intern. Airport Bd.*, 2005 WL 1489932, * 4 (N.D. Tex. 2005) ("[W]hen a governmental entity-owner waives immunity from liability by entering into a contract with a contractor, it also waives immunity from liability with respect to all pass-through claims that the contractor may lawfully assert under the contract.").

[10] Without limitation, any applicable notice requirement under the Wharf & Dredge Contract was satisfied by Zachry's performance or, alternatively, under the doctrines of election

12

: 08142

been honored by PHA, and damage to Zachry has resulted from PHA's material breaches of the Wharf and Dredge Contract. Therefore, Zachry seeks damages relating to, and stemming from, PHA's breaches of the Wharf and Dredge Contract. Pursuant to Texas Rule of Civil Procedure 47, Zachry states that, based upon its current analysis and subject to the reservation of Zachry's right to further amend and supplement its damages calculations, the maximum amount claimed is $31,355,417, excluding pre-judgment interest, post-judgment interest, and costs.[11]

22.     As detailed above, Zachry's alleged damages have been disclosed in Section (d) of its Sixth Amended Rule 194 Disclosures. Those damages generally include the following categories of damages: (1) the difference between the cost that Zachry would have incurred had it been allowed to complete the wharf "in the dry" (i.e., using the frozen cutoff wall) and the actual cost Zachry incurred in completing the wharf "in the wet" (i.e., without the frozen cutoff wall), (2) liquidated damages and penalties wrongfully withheld by PHA, in the amount of approximately $2,360,000, (3) damages in the amount of approximately $600,000 that has been wrongfully withheld by PHA as a purported "offset," and (4) damages for the remainder of the Contract Price, which the Port has refused to pay. Zachry is also entitled to interest as allowed by law, including pre- and post-judgment interest.

23.     In regards to the first category of damages listed above, Zachry has designated an expert witness, Gary W. Draper, to analyze and report on matters pertaining to the amount of

of remedies, waiver, estoppel, and ratification. Zachry denies that it breached the Wharf & Dredge Contract. In the alternative, to the extent PHA alleges that Zachry committed any material breach of the Wharf & Dredge Contract, PHA has deprived itself of the defense of prior material breach because it elected to treat the Wharf & Dredge Contract as continuing and, in addition, insisted that Zachry perform the Wharf & Dredging Contract.

[11] Because construction of the wharf facility is ongoing, Zachry's total damages are

13

: 001143

Zachry's economic damages and the method by which those damages have been calculated. The amount and manner in which these damages have been calculated are set forth in Mr. Draper's report. This category of claimed damages by Zachry concerns the damages directly flowing from owner-caused delays and hindrances resulting from the Port's breach. Alternatively, it includes damages flowing from the additional work that Zachry was directed to perform by the Port. This additional work was Zachry having to construct the wharf in the wet rather than in the dry after the Port rejected the cutoff wall. This category of damages is recoverable under both § 271.153(a)(1) and (a)(2) of the Texas Local Government Code.

24.     As to the remaining categories of damages, they are recoverable under § 271.153(a)(1) of the Texas Local Government Code as amounts due and owed to Zachry under the Contract.

## VII. General Denial

25.     Pursuant to Rule 92 of the Texas Rules of Civil Procedure, Zachry generally denies PHA's allegations, including without limitation PHA's Counterclaim for Attorneys' Fees.

## VIII. Defenses

26.     All prior and subsequent paragraphs are incorporated by reference.

27.     To the extent PHA alleges in its Second Amended Answer and Counterclaim that it can avoid liability based on the defenses listed therein, PHA is not entitled to avoid its liability for breach of contract due to the doctrine of estoppel.

28.     To the extent PHA alleges in its Second Amended Answer and Counterclaim that it can avoid liability based on the defenses listed therein, PHA is not entitled to avoid its liability

_____

estimated and remain subject to change.

14

for breach of contract due to the doctrine of ratification.

29. To the extent PHA alleges in its Second Amended Answer and Counterclaim that it can avoid liability based on the defenses listed therein, PHA is not entitled to avoid its liability for breach of contract due to the doctrine of waiver.

30. To the extent PHA alleges in its Second Amended Answer and Counterclaim that it can avoid liability based on the defenses listed therein, PHA is not entitled to avoid its liability for breach of contract due to its election of remedies.

31. To the extent PHA alleges in its Second Amended Answer and Counterclaim that it can avoid liability based on the defenses listed therein, PHA is not entitled to avoid its liability for breach of contract due to the doctrine of unclean hands.

32. To the extent PHA alleges in its Second Amended Answer and Counterclaim that it can avoid liability based on the defenses listed therein, PHA is not entitled to avoid its liability for breach of contract due to the doctrine of quasi-estoppel.

33. To the extent PHA alleges in its Second Amended Answer and Counterclaim that it can avoid liability based on the defenses listed therein, PHA is not entitled to avoid its liability for breach of contract as a result of PHA's own negligent misrepresentations, fraudulent inducement, fraud, bad-faith, arbitrary and capricious acts, and active interference with respect to Zachry's work.

34. To the extent PHA alleges in its Second Amended Answer and Counterclaim that it can avoid liability based on the defenses listed therein, PHA is not entitled to avoid its liability for breach of contract because any alleged notice provision in the Contract is inapplicable to Zachry's claims, and even if such a provision was applicable, any such provision would be void

15

: 081145

under Section 16.071(a) of the Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.071(a) ("[a] contract stipulation that requires a claimant to give notice of a claim for damages as a condition precedent to the right to sue on the contract is not valid unless the stipulation is reasonable. A stipulation that requires notification within less than 90 days is void.")

35. Zachry denies that it made any misrepresentation to PHA. In the alternative, to the extent PHA alleges Zachry falsely represented any matter (either affirmatively or by non-disclosure), any such defense is barred by PHA's actual knowledge of falsity.

36. To the extent PHA alleges in its Second Amended Answer and Counterclaim that it is entitled to recover its attorneys' fees, recovery is barred by the doctrine of ripeness.[12]

37. To the extent PHA alleges in its Second Amended Answer and Counterclaim that it is entitled to recover its attorneys' fees, recovery is barred because the fees PHA seeks to recover are excessive, not reasonable, and unnecessary.

## IX. Prayer

38. Zachry, after full trial on the merits before a jury of its peers, requests a final judgment against Defendant as follows:

    a.    Damages as allowed by law and to the extent proven at trial, which exceed the minimum jurisdictional requirements of this Court;

    b.    Interest as provided by law, including pre- and post-judgment interest;

    c.    Costs of suit; and

---

[12] Because PHA's counterclaim for attorneys' fees is not ripe, Zachry specifically reserves the right to allege offsetting counterclaims for which PHA's sovereign immunity has been waived. *See Reata Construction Corp. v. City of Dallas*, 197 S.W.3d 371 (Tex.2006).

16

d. Such other and further relief to which Zachry may be justly entitled.

Respectfully submitted,

GIBBS & BRUNS, L.L.P.

By: _____

Robin C. Gibbs
Texas Bar No. 07853000
Brandon T. Allen
Texas Bar No. 24009353
Sydney G. Ballesteros
Texas Bar No. 24036180
Michael R. Absmeier
Texas Bar No. 24050195
1100 Louisiana, Suite 5300
Houston, Texas 77002
Telephone: 713/650-8805
Telecopier: 713/750-0903

**ATTORNEYS FOR PLAINTIFF ZACHRY CONSTRUCTION CORP.**

17

: 001147

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing instrument has been served upon all counsel of record on this 28th day of April 2009, in the manner so stated:

*Via electronic mail*
Karen T. White
Seth A. Russell
Vinson & Elkins, L.L.P.
1001 Fannin, Suite 2500
Houston, Texas 77002

*Via electronic mail*
David H. Brown
Brown & Kornegay LLP
2777 Allen Parkway, Suite 977
Houston, Texas 77019

*Via electronic mail*
J. Clark Martin
Kelly Hart & Hallman
1000 Louisiana, Suite 4700
Houston, Texas 77002

*Via electronic mail*
Lawrence J. Fossi
Fossi & Jewell LLP
4203 Yoakum, Suite 100
Houston, Texas 77006

Brandon T. Allen

18

**TAB 9**

**Third Amended Original Answer
and Counterclaim for Attorneys' Fees
(CR45:13008-35)**

| | | |
|---|---|---|
| ZACHRY CONSTRUCTION CORPORATION, | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| V. | § § | HARRIS COUNTY, T E X A S |
| THE PORT OF HOUSTON AUTHORITY | § § § | |
| Defendant. | § § | 151ST JUDICIAL DISTRICT |

## THIRD AMENDED ORIGINAL ANSWER AND COUNTERCLAIM FOR ATTORNEYS' FEES

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW The Port of Houston Authority of Harris County, Texas (the "Port Authority" or "Port"), Defendant, and, subject to its Plea to the Jurisdiction, files its Third Amended Original Answer and Counterclaim for Attorneys' Fees, and respectfully shows the Court as follows:

### IMMUNITY

1. The Port Authority is a political subdivision of the State of Texas and is therefore protected by the sovereign or governmental immunity doctrine. The Port Authority is immune from suit and from liability for all causes of action and damages except as provided by Subchapter I of Chapter 271 of the Texas Local Government Code.

### GENERAL DENIAL

2. Pursuant to Rule 92 of the Texas Rules of Civil Procedure, the Port Authority generally denies the allegations of Plaintiff Zachry Construction Corporation ("Zachry").



EXHIBIT
15

## STATEMENT OF THE FACTS

3. The Port Authority is charged with owning, building, and operating the publically owned portions of the Port of Houston. Among the land owned and operated by the Port Authority is the vast Bayport Terminal Complex ("Bayport"). In 1998, the Port Authority began developing a master plan for Bayport that includes some 7,000 linear feet of wharf, modern ship-to-shore cranes for rapid loading and unloading of cargo, 380 acres of container yards, and a cruise terminal. These facilities are being developed over time, with the design and timing of each phase determined by market demand, availability of funds, and environmental permitting limitations.

4. By 2003, the Port Authority was ready to begin building what is known as Phase 1A of Bayport, which included 1,660 linear feet of wharf, dredging, an adjoining container yard, and related facilities. The engineering design called for the wharf to be supported by more than 1,100 concrete piers drilled to various depths (some to a depth of 120' below sea level).

5. The Port Authority solicited competitive sealed proposals for the contract. Zachry, while not the low proposer, submitted a proposal with several attractive features. These included, most prominently, Zachry's proposal to build the wharf by using unconventional means by first drilling the piers and installing the wharf deck on dry land and then excavating under the wharf deck and among the piers "in the dry."

6. Zachry proposed to create the dry environment for its work beneath the wharf deck by use of a freeze wall. The freeze wall would be created by installing a network of hundreds of "freeze pipes" in an earthen berm or cofferdam along the wharf's entire channelside length. Zachry would then circulate sub-freezing brine through the freeze pipes, creating a wall of frozen soil strong enough to stand without other structural support and strong enough to hold

2

back the bay water while Zachry excavated beneath the wharf deck and around the wharf. Zachry did not propose to use a freeze wall on the land side of the excavation; it planned to use conventional dewatering techniques to deal with groundwater infiltration from the land side. Once the excavation was complete, Zachry would remove the freeze pipes, thaw and breach the wall to admit the bay waters, and dredge away the soil.

7. Zachry's freeze wall proposal offered the Port Authority a creative way in which to meet federal standards regarding emissions of nitrogen oxides. In seeking the award of the contract, Zachry made other representations that were attractive to the Port Authority. Zachry pledged to involve small business enterprises in the project and to work with the Port Authority in a cooperative spirit. It touted itself as a large and experienced construction company that had successfully undertaken other novel and complex projects, and represented that would undertake appropriate due diligence to determine how to capably and competently prosecute the Phase 1A work. It promised that it would place in charge of the Phase 1A project the experienced senior manager who had taken the lead in presenting Zachry's proposal to the Port Authority. Zachry assured the Port Authority that the Port could rely on Zachry as a team player, and that Zachry would work with the Port in a straightforward manner and not engage in any "claims game."

8. Regrettably, all of these representations, on which the Port Authority relied, proved to be untrue. At the time, however, persuaded by these representations, the Port Authority entered into negotiations with Zachry which culminated in the Phase 1A Wharf and Dredging Contract dated June 1, 2004 (the "Contract"). Early in the Project and in response to the Port Authority's concerns regarding freezing the soil, Zachry assured the Port that the freezing would remain far enough away from the piers that it would not compromise the wharf's structural integrity. The Port Authority's concern was well justified; the drilled piers' ability to

3

bear weight comes mostly from "skin friction" at the interface of the soil and pier down the length of the pier. Freezing the earth near the piers could decrease their load-bearing capacity. In addition, the expanded volume of the soil from freezing could even move, bend, or break the piers. Zachry, which had a contractual duty to protect the completed portions of the wharf structure while it was prosecuting its work, promised that it would maintain at least nine feet between the frozen soil and the surface of the piers.

9. The Contract included two crucial deadlines and stipulated that time was of the essence regarding performance of the Work. The first was February 1, 2006 (a date defined in the Contract as the "Milestone A" date), by which Zachry agreed to have one portion of the wharf fully completed. The Port Authority needed that portion of the wharf completed by the Milestone A date so that four huge cranes, which were being fabricated in China and were to arrive in Houston by ship, could be delivered and assembled, and then the crane operators trained on the cranes, in time for the completion of the remainder of the wharf. The second was the "Final Completion" date of June 1, 2006, by which the wharf facilities and dredging work were to be completely finished.

10. At the outset, Zachry fell behind schedule. Among other things, it was late in mobilizing its on-site work force, submitting its concrete mix formulation, and preparing its concrete batch plant. The start of both concrete work and the freeze wall installation were significantly delayed. Further, there was a series of blunders involving the freeze wall. Most of the blunders have their origin in the character and decisions of Zachry's construction manager, Harold (Andy) Anderson.

11. Anderson was not even a Zachry employee when the Contract was signed. Zachry hired him several weeks later, after a short and hasty search. Although the freeze wall

4

was a centerpiece of Zachry's construction plan, Anderson did not want to use it. Rather than immediately moving forward with the freeze wall, he spent months fruitlessly searching for an alternative, putting the freeze wall behind schedule. He even delayed entering into a subcontract with the freeze wall subcontractor whom Zachry had chosen – RKK SoilFreeze Technologies ("RKK"). Indeed, Zachry finally signed the RKK subcontract, and thus freed RKK to submit a freeze wall design, only *after* the date on which Zachry had planned to have the freeze wall completely installed.

12. Anderson compounded his mistakes and delays by compromising Zachry's ability to properly perform the freeze wall installation. For example, RKK had spent a substantial amount of time working with Farmer Foundation, Zachry's drilling subcontractor which was to install both the piers and the freeze pipes, to assure that Farmer Foundation was acquainted with the precise techniques and tolerances necessary in placing and installing freeze pipes. After all this preparation work, Anderson gave the task of installing the freeze pipe to another, cheaper subcontractor. The replacement subcontractor's work was abysmal; it seldom drilled the pipe in the location or at the angles specified, and as a consequence the freeze wall design had to be amended to include additional freeze pipes to fill in numerous gaps. In another ill-advised cost saving effort, Anderson bought used and dirty freeze pipe instead of new pipe. Ultimately, after much time was wasted, approximately 70% of the used pipe was determined to be defective, and had to be replaced.

13. In February of 2005, having concluded that Zachry was behind schedule and in danger of being unable to satisfy the Milestone A obligation (but having failed to so advise the Port Authority), Anderson began planning to use a "cut-off wall" running perpendicular from the freeze wall to the land. Under his plan, Zachry would attempt to divide the project in two. It

5

Certified Document Number: 43477151 – Page 5 of 28

: 13012

would first excavate beneath the wharf on one side of the cut-off wall, and after so excavating would breach the main freeze wall on that side so the ship carrying the cranes could dock and unload. Then, Zachry would excavate on the other side of the cut-off wall to complete the remainder of its work.

14. Several weeks after Zachry determined that it likely would need a cut-off wall, the Port Authority advised Zachry that the Port was considering extending the wharf's length by 332 feet. Zachry appreciated that the extension would not merely be a valuable piece of work, but also would offer an opportunity to have the Port Authority pay for whatever cut-off wall Zachry ultimately would build. Zachry urged the Port Authority not to put the wharf extension out for proposals by other contractors, but instead to add the work to Zachry's Contract. Although it knew better, Zachry assured the Port that it was on schedule under the existing Contract and could build the wharf extension and still meet the Milestone A date.

15. On April 5, 2005, Anderson briefly explained a concept for a cut-off wall at a meeting with the Port Authority's consultants. He promised that Zachry would soon furnish the Port Authority with a proposed design for the cut-off wall. Aware of the Port's concern about freezing near piers, he promised that freezing was not an issue.

16. After several months of negotiations, during which Zachry continued to provide the Port Authority with inaccurate schedules and to give other assurances that it remained on schedule, the parties agreed on the terms of the wharf extension work in Change Order 4 to the Contract. The change order, which added approximately $13 million to the Contract price and extended the Milestone A date by 15 days, was approved by the Port Commission in late July of 2005. The Port Authority prepared the change order paperwork and delivered it to Zachry on August 10. By then, Zachry already had authorized its subcontractors to begin working on the

6

extension. Zachry held the change order for several weeks while it tried to negotiate added benefits under the change order. Finally, on August 29, 2005, Zachry delivered the signed change order to the Port Authority.

17. Later, on or about September 12, 2005, Zachry finally submitted a draft design for the cut-off wall. Like the original freeze wall design, the draft cut-off wall design was prepared by RKK's engineering firm, GeoEngineers. The late delivery date of this design was another instance of inexcusable delay by Zachry. Despite having known since at least February that it would need a cut-off wall, and despite having repeatedly promised the Port Authority that the design was underway, Zachry waited until August to authorize the design work.

18. Consistent with Zachry's earlier statements that it intended to provide the Port Authority with a cut-off wall design for review and comment, Zachry's submittal of the design expressly invited such review and comment. GeoEngineers noted that its design was merely a draft and would be made final only after GeoEngineers incorporated comments from the Port Authority's consultants. Zachry's transmittal message underlined this point, stating that the draft was intended to give the Port Authority "the ability to see what will be happening and gather questions they might have for the engineer."

19. The draft design, which was supplemented on September 28, 2005, showed that the cut-off wall would include freezing in and around the piers to a much greater extent and at greater depths than Zachry had disclosed in discussions in April. Contrary to Zachry's representations during the negotiation of Change Order 4, freezing was indeed an issue in the submitted design; the design showed freezing at greater depths, and affecting many more piers, than Zachry had represented. The Port Authority had no objection either to the use of a cut-off wall or to the use of freeze wall technology in the cut-off wall. However, it was concerned about

7

the proximity of the freezing to the drilled piers and the resultant risk to the structure. Thus, the Port Authority responded to the draft design on October 11, 2005 by noting its concern over the proposed freezing near the piers and by instructing Zachry to "revise and resubmit" the draft design by presenting either an alternative cutoff wall design or an "alternative means of mitigating risk to the structural integrity of the wharf."

20. The Port Authority delivered its response at an October 11, 2005 meeting at the Bayport site. After the Port Authority explained its concern, Anderson promised that Zachry would work with the Port Authority to come up with acceptable design modifications. The Port Authority believed Zachry. GeoEngineers already had told one of the Port Authority's consultants that GeoEngineers could easily modify his design, or create an alternative design, to address the Port's concerns.

21. Within a few weeks, GeoEngineers did prepare a modified design which, while continuing to use freeze technology, avoided any freezing in and among the drilled piers. When GeoEngineers showed the modified design to the Port Authority's consultant, he stated that if Zachry submitted the modified design, he would approve it without delay.

22. By that point, however, Zachry's massive scheduling problems overwhelmed all other considerations, including the cut-off wall. In early October of 2005, after submission of the draft cutoff wall design and prior to the Port Authority's response to the draft cutoff wall design, Zachry revealed to the Port Authority that it would be 35 days late in meeting the Milestone A date – the very date to which Zachry had just agreed in Change Order 4. The Port Authority, surprised by this revelation, demanded that Zachry present a schedule recovery plan in accordance with the Contract.

Certified Document Number: 43477151 - Page 8 of 28

: 13015

23. For the first time, Zachry finally began to attempt to detail the freeze wall and cutoff wall activities in its schedules. It quickly discovered that 35 days late was a gross underestimate; in early November Zachry prepared detailed schedules (which it concealed from the Port Authority) reflecting that Milestone A would not be achieved until December 30, 2006. As Zachry further refined its schedules, matters only became worse. By mid-November, Zachry's schedules showed that with a freeze wall, it would not achieve Milestone A until May of 2007. Moreover, those schedules predicted it could achieve Milestone A and Final Completion much sooner by abandoning the freeze wall.

24. When Anderson saw the refined schedules, which showed Zachry desperately behind schedule, he determined that the only way Zachry could hope to have the wharf prepared to land the cranes would be to abandon the freeze wall, dig as deeply as possible without a freeze wall, and then work in the wet. (Even at that, Zachry would not be able to perform all the dredging and excavation required by the Contract as part of the Milestone A work, and would have to defer such work until after the cranes were unloaded.) On November 3, 2005, Anderson gave orders to cancel all orders for freeze wall materials and to slowly remove Zachry personnel from the freeze wall area.

25. Amazingly, Anderson did not advise the Port Authority or RKK that he had given these instructions. Instead, he confected lies to Zachry's management to explain why he was abandoning a freeze wall in which Zachry already had invested some $9 million. He reported to his supervisors that chillers needed to cool the brine that would circulate through the freeze pipes had been "commandeered" by FEMA in consequence of Hurricanes Rita and Katrina. He then attempted to enlist RKK in this fraud, urging RKK to report a chiller shortage so Anderson could forward the false report to the Port Authority. Anderson threatened RKK with financial harm if

9

it refused. RKK, however, did refuse. In fact, a few weeks later, RKK reported Anderson's attempt to Zachry's management. Zachry's management, however, never bothered to investigate this shocking report. To the contrary, Zachry's management continued to rely on Anderson for information about what was happening at the Bayport job site.

26. Appreciating that his lie about commandeered chillers would not find support, Anderson modified the lie by reporting to Zachry management that some chillers were available, but not enough to operate the freeze wall adequately, and in consequence the freezing would take much longer than planned.

27. Anderson also invented a second lie to Zachry management: that sheet pile required for the alternative cut-off wall design was unavailable, and would remain unavailable for months. Anderson told this lie despite knowing that the sheet pile was available for immediate delivery from several different suppliers; RKK had confirmed this fact to Anderson.

28. In making the decision to abandon the freeze wall, Zachry had not prepared any cost or engineering analysis to determine whether its revised construction plan, which Zachry has sometimes referred to as "Plan B," was sensible or, indeed, even feasible. It had not evaluated whether its estimated excavation rates or other production rates were realistic. It had not determined how it would excavate beneath the wharf deck. It had not determined how deeply it could safely excavate with an unfrozen berm. It had not addressed the problems created by groundwater infiltration. It had, in short, no reliable way of evaluating the time required for, the costs entailed by, or the risks and benefits of Plan B, and no reliable way of comparing the time, costs, risks, and benefits of Plan B with those of the freeze wall.

29. Representatives of Zachry and the Port Authority had a series of meetings and phone conversations in October, November, and December of 2005 to discuss the scheduling

10

Certified Document Number: 43477151 - Page 10 of 28

: 13047

issues. Zachry told the Port that it had determined to abandon the main freeze wall because it was out of time to implement the freeze wall and still meet the contractually required completion dates for Milestone A and Final Completion. Zachry told the Port Authority that more water was flowing from the land side than Zachry had anticipated and that it could not freeze the soil quickly enough. Zachry said its schedules showed that abandoning the freeze wall and proceeding instead with Plan B – working in the dry behind a non-frozen berm to a certain depth and then working in the wet thereafter – would result in the earliest practicable achievement of the Milestone A and Final Completion dates.

30. At no point during any of the many meetings or conversations in late 2005 did Zachry ever state or even suggest, as it much later would claim in this lawsuit, that its decision to abandon the freeze wall was connected with any supposed "rejection" of the draft cut-off wall design, as Zachry now claims in this lawsuit. Zachry made no such suggestion because the modifications that the Port Authority requested to the submittal of the draft design played no role in Zachry's decision to abandon the freeze wall.

31. Had Zachry asserted in any of the conversations in late 2005, as it later would in this lawsuit, that it was abandoning the freeze wall as a result of the Port Authority's revise and resubmit response to the draft cut-off wall design submittal, that abandonment of the freeze wall was going to delay Zachry's completion of the project and increase Zachry's cost to complete, and that the Port was somehow responsible for the resulting delay and increased costs to Zachry, then there is no doubt that the entire tenor of those conversations would have changed, and that the Port Authority promptly would have, at a minimum, instructed Zachry to delete the wharf extension from the scope of its work under the Contract.

11

32.     Zachry's planning, estimating, and execution have proved to be no better since it abandoned the freeze wall than before it did so. Through no fault of the Port Authority, Zachry failed to execute the work in accordance with any of the numerous schedules it prepared for completing the project using the Plan B construction method. Zachry did not declare final completion of its work until January of 2009.

33.     Unbeknownst to the Port Authority, the "Zachry" entity with which the Port Authority contracted apparently ceased performing the Work on the Contract. Instead, Zachry changed its name and Zachry's parent company created a new company to assume Zachry's name – the name Zachry Construction Corporation. In late 2007, Zachry asked the Port Authority for its consent to an assignment of the Contract. The Port Authority responded that it would consent to the assignment upon satisfaction by Zachry of several reasonable conditions. Zachry did not agree to or satisfy the conditions. In fact, Zachry ignored the Port Authority's response. Instead of responding to the Port Authority or satisfying the conditions, on information and belief, on January 1, 2008 and without knowledge of the Port Authority, the new company apparently began performing Zachry's obligations under the Contract. Zachry assigned its obligations under the Contract to the new company in breach of Section 3.13, apparently ceased to employ on-site supervision in breach of Section 5.16, and apparently ceased self-performing the Work and engaged a subcontractor not disclosed to the Port Authority in breach of Section 5.11 of the General Conditions.

34.     Apparently, the new company (which did not have a contract with the Port Authority but had assumed the name of Zachry) with Zachry's knowledge and at Zachry's instruction submitted invoices for Work and signed releases to induce the Port Authority to make payment. Zachry thereafter represented to the Port Authority that the claims in this litigation

12

Certified Document Number: 43477151 - Page 12 of 28

: 13919

were Zachry's claims and that all costs which it sought as damages were incurred by Zachry. Even Zachry's damages documentation – disclosed to the Port Authority only after order of the Court – states that all costs were incurred by Zachry. They were not.

35. On April 27, 2009, Zachry entered into agreements with the new company – back dating the effective dates of the agreements to January 1, 2008 – in which the new company agreed to perform the Work for no payment from Zachry, other than what the Port Authority paid to Zachry. In the event the payments from the Port Authority were less than the amounts incurred by the new company, the new company agreed that Zachry had no liability to the new company. Zachry also granted the new company (which had no contract with the Port Authority) the right to pursue and control this litigation, all in the name of Zachry.

## DEFENSES

36. The Port Authority pleads the following defenses to Zachry's pleaded causes of actions and to Zachry's purported defenses to defenses earlier pled by the Port Authority:

37. Zachry is not entitled to recovery against the Port Authority for breach of the Contract because the Port Authority acted in accordance with the Contract provisions, including, but not limited to the right to withhold payments (Sections 6.05, 6.17, 5.05, and 5.06 of the General Conditions), the right of the Chief Engineer to demand a recovery plan (Section 5.09 of the General Conditions), the right to review and respond to submittals (Section 5.22 of the General Conditions), the right to require schedules, reports and other additional information (Section 5.25 of the General Conditions), and in the event it has an instruction contrary to the Contract, the right to change the Contract (Sections 5.41 and 5.42 of the General Conditions).

38. Zachry's allegations do not constitute a breach of any of the provisions of the Contract by the Port Authority. The Port Authority's request that Zachry mitigate the risks to the

13

Certified Document Number: 43477151 - Page 13 of 28

Port Authority drilled shafts by revising and resubmitting the September 9, 2005 draft cutoff wall design was not a breach of Section 5.10 of the Contract or of Change Order 4; the Port Authority's withholding of liquidated damages was not a breach of the Contract; and the Port Authority's payment of Zachry's invoices, which Zachry characterizes as "failing to pay Zachry the money that it was periodically entitled to be paid under the Contract as it has come due," was not a breach of the Contract.

39. Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry has not complied with all conditions precedent to its alleged right to recover for such alleged breaches, such as Zachry's failure to provide notice of such claims within the time, in the form, or to the person required by the Contract, including but not limited to the notice required by Sections 5.08, 5.18, and 5.42 of the General Conditions. Zachry did not timely provide notice as required by the Contract with respect to any of its claims, namely, Zachry's claims: [a] that the Port Authority's request that Zachry mitigate the risks to the Port Authority drilled shafts by revising and resubmitting the September 9, 2005 draft cutoff wall design constituted a breach of Section 5.10 of the General Conditions of the Contract; [b] that the Port Authority's request that Zachry mitigate the risks to the Port Authority drilled shafts by revising and resubmitting the September 9, 2005 draft cutoff wall design constituted a breach of Change Order 4; [c] that the Port Authority's withholding of liquidated damages constituted a breach of Section 5.05 of the Contractor and A the Specification and Proposal, Page III-8 (Addenda No. 8) of the Contract; [d] that the Port Authority's instruction in accordance with Section 5.09 of the General Conditions of the Contract explain to the Port Authority how Zachry intended to complete the Project within the Contract Time or other exercise of the Port Authority's right under the Contract constituted a

14

breach; or [e] that the Port Authority breached the Contract, Section 6.02, 6.05 or 6.17 of the General Conditions, or some unidentified provision of the Contract in its payment of or failure to pay Zachry's invoices, in whole or in part or within any particular time, including any breach which Zachry characterizes as "failing to pay Zachry the money that it was periodically entitled to be paid under the Contract as it has come due." Each of the requirements in the Contract that Zachry timely and properly present its claims for more money or more time is both (1) a substantive contractual condition precedent to Zachry's right to recover money or additional time with respect to the Contract, and (2) jurisdictional under the Texas Constitution, statutes, and common law of Texas applicable to the Port Authority's immunity from suit and/or immunity from liability.

40.     Moreover, to the extent any of provisions of the Contract are or have been held void or unenforceable, Section 3.12 of the General Conditions of the Contract, which the Port Authority hereby affirmatively pleads in its entirety, requires that any such provision be severed from the Contract, the balance of the Contract enforced, and the stricken provision reformed and replaced with a valid provision. Specifically, Section 3.12 provides that the "parties further agree to reform [the] Contract to replace any stricken portion, clause or provision with a valid portion, clause or provision that comes as close as possible to the intent of the stricken portion clause or provision." Therefore, the Port Authority pleads that the Court enforce the severance and reformation terms of the Contract with respect to any provision of the Contract that is held to be void or unenforceable, including without limitation the second paragraph of Section 5.42 and Section 5.05 in combination with Section 5.06 of the General Conditions of the Contract, such that they are enforceable and reflect the intent of the parties.

: 13022

Certified Document Number: 43477151 - Page 16 of 28

41. Zachry's allegations that the Port Authority has improperly withheld payment and failed to pay Zachry does not constitute breach of Contract as alleged by Zachry. The Port Authority paid Zachry in accordance with the terms of the Contract and applicable law. Moreover, Zachry agreed to a Milestone A date and a Final Completion date. Zachry agreed to liquidated damages in the event it failed to meet these dates. Zachry failed to meet the Milestone A date and the Final Completion date. In addition, Zachry failed to properly perform Work and the Port Authority had to pay another contractor to correct or mitigate harm caused by Zachry's defective Work. The Port Authority's withholding of monies from payments to Zachry is supported by enforceable provisions of the Contract, including the right to withhold payments (Section 6.05 of the General Conditions), the right of offset (Section 6.17 of the General Conditions), the right to liquidated damages (Section 5.05 of the General Conditions), the right to actual damages in lieu of liquidated damages (Section 5.06 of the General Conditions), and the Specification and Proposal (setting forth the concept of reduction of the contract price for late performance). The liquidated damages withheld were a reasonable forecast of just compensation because the Contract provided for liquidated damages in lieu of actual damages and because the Port Authority sustained actual damages in an amount that was not disproportionate to the liquidated damages.

41. Zachry is not entitled to recover any damages from the Port Authority as a result of the Port Authority's alleged breach of the Contract because Zachry is barred by the express, enforceable provisions of the Contract from recovering for the losses and damages that Zachry alleges. Some of these risk-allocating contractual provisions that bar Zachry's recovery include, but are not limited to:

16

: 13923

Certified Document Number: 43477151 - Page 17 of 28

a. Assumption of the risk by Zachry for any lack of completeness in the Wharf and Dredging Contract Documents, including the Drawings and the Specifications, and the risk of those documents not being sufficiently detailed and comprehensive. Contract, General Conditions § 2.06. Zachry failed to timely raise any concerns with the Contract Documents and cannot now complain about their condition.

b. A no-damages-for-delay or hindrance provision. Contract, General Conditions § 5.07. Zachry cannot recover damages associated with delay in the Project or hindrance of its performance. This provision precludes Zachry's asserted "exceptions."

c. No entitlement to an increase in the Contract Price except under limited circumstances. Contract, General Conditions §§ 5.41, 5.42, 5.43, 5.49 and 5.50. Zachry did not timely and properly assert a claim under any of those provisions.

d. A specific and limited force majeure provision. Contract, General Conditions § 1.18. No entitlement to an extension of time except when the circumstance constitutes an event of Force Majeure and is on the critical path. Contract, General Conditions § 5.08. Zachry has not established an event of Force Majeure entitling it to any additional time.

e. The definition of Concurrent Delay. Contract, General Conditions § 1.08. No entitlement to an extension of time if there is also an event of Concurrent Delay. Contract, General Conditions § 5.08(b)(6). Zachry caused Concurrent Delays further preventing it from being entitled to an extension of time.

17

: 13824

f.     Waiver of claims for an extension of time by failure to timely and properly file a request for time extension. Contract, General Conditions § 5.08. Zachry failed to timely or properly seek any extensions of time.

g.     Waiver of claims for changed conditions or contract interpretations that are not timely and properly asserted. Contract, General Conditions § 5.42. Zachry failed to timely or properly assert any claim for changed conditions or contract interpretations constituting a change to the Contract.

The Port Authority has not modified or waived any of these provisions and is not estopped from relying on any of these provisions. Contract, General Conditions §§ 3.09 and 5.52.

42.     Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry failed to meet the Standard of Care required in Section 1.37 of the General Conditions of the Wharf and Dredging Contact, which provides that Zachry shall use ". . . . [its] best skill and attention, in a good and workmanlike manner and in the best and most expeditious and economical manner consistent with the interests of the Port Authority, shall exercise the degree of care, skill and diligence in the performance of the Work in accordance with and consistent with industry standards for similar circumstances, shall utilize its best skill, efforts and judgment in furthering the interests of Port Authority, and shall furnish efficient business administration and supervision."

43.     Zachry is not entitled to recover any damages from the Port Authority as a result of the Port Authority's alleged breach of the Contract because Zachry failed to comply with its affirmative contractual obligation under the Contract to timely and accurately provide contractually required information to the Port Authority, including but not limited to, the

18

information required by Sections 1.37, 5.03 and 5.04 of the General Conditions, the progress of the work, and the Schedules for completing the Work.

44. Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry is barred by the "first breach" doctrine because Zachry first materially breached the Contract, including but not limited to Sections 5.03, 5.04, 5.09, 5.10 (including 1.37), 5.14 and 5.22 of the General Conditions of the Contract.

45. The Port Authority denies that any oral statement purporting to change or modify the Contract Documents is binding on either the Port Authority or Zachry. The Port Authority denies that any written statement purporting to change or modify the Contract Documents, other than one from the Chief Engineer that complies with the express provisions for change in the Contract Documents, is binding on either the Port Authority or Zachry.

46. The Port Authority denies that Change Order 4 includes as a term that a cutoff wall must be used by Zachry to perform its Work, and denies that Change Order 4 includes any term that some particular design of a cutoff wall must be used by Zachry to perform its Work. Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract, as amended by Change Order 4, as a result of any modification to Zachry's September 9, 2005 draft cutoff wall design requested by the Port Authority.

47. Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry did not perform its obligations under the Contract in a timely fashion. Zachry did not complete the applicable portions of the Work by Milestone A or the Final Completion dates required by the Contract. Zachry did not timely and properly request extensions of time of such dates.

19

Certified Document Number: 43477151 - Page 19 of 28

: 13926

Certified Document Number: 43477151 - Page 20 of 28

48. Zachry is not entitled to recover any damages from the Port Authority as a result of the Port Authority's alleged breach of the Contract because Zachry failed to properly mitigate its alleged damages.

49. Zachry is not entitled to recover any damages from the Port Authority as a result of the Port Authority's alleged breach of the Contract because Zachry owed the Port Authority a duty of full disclosure under the law, which duty of full disclosure was breached by Zachry.

50. Zachry is not entitled to recover any damages from the Port Authority as a result of the Port Authority's alleged breach of the Contract because Zachry committed fraud and fraud in the inducement. In connection with entering into the Contract, and at various times during the performance of its work under the Contract, including during negotiation of Change Order 4, and during its meetings and conversations with the Port Authority about scheduling in late 2005, Zachry made representations and promises which were material, were false, and which Zachry knew were false and/or knew it had no intention of fulfilling, or made the representations recklessly without knowledge of their truth. Such false representations and promises were made for the purpose of inducing the Port Authority to take actions (such as entering into Change Order 4) or refrain from taking actions (such as refraining from either terminating the Contract or deleting the wharf extension from the scope of Zachry's work under the Contract). In taking or refraining from taking such actions, the Port Authority relied on such false representations and promises, causing the Port Authority injury. Such behavior by Zachry constitutes fraud, and is a complete defense and bar to Zachry's claims in this lawsuit.

51. Zachry is not entitled to recover any damages from the Port Authority as a result of the Port Authority's alleged breach of the Contract because Zachry committed fraud by non-disclosure. In connection with entering into the Contract, and at various times during the

20

: 13827

performance of its work under the Contract, including during negotiation of Change Order 4, and during its meetings and conversations with the Port Authority about scheduling in late 2005, Zachry, in violation of both the Contract and of a common law duty to disclose, concealed from or failed to disclose material information to the Port Authority. Zachry had a duty to disclose the facts to the Port Authority, but was deliberately silent when it had a duty to speak. Zachry concealed such material information, knowing that the Port Authority was ignorant of the facts and did not have an equal opportunity to discover the facts, in order to induce the Port Authority to take actions (such as entering into Change Order 4) or refrain from taking actions (such as desisting from either terminating the Contract or deleting the wharf extension from the scope of Zachry's work under the Contract). In taking or refraining from taking such actions, the Port Authority was induced by such concealment. The Port Authority relied on Zachry's non-disclosure, and was injured as a result of acting without knowledge of the undisclosed facts. Such behavior by Zachry constitutes fraud by non-disclosure, and is a complete defense and bar to Zachry's claims in this lawsuit.

52. Alternatively, Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because of Zachry's negligent misrepresentations.

53. Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Change Order 4 is an accord and satisfaction of any "claims" that Zachry had at that time that Change Order 4 was executed. All prior "claims" of Zachry were merged into, subsumed by, and extinguished through Change Order 4.

Certified Document Number: 43477151 - Page 21 of 28

: 13628

Certified Document Number: 43477151 - Page 22 of 28

54. Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because the damages sought by Zachry are consequential damages and thus barred by statute and by principles of governmental immunity.

55. Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry ratified the Port Authority's alleged actions and inactions.

56. Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry waived the complaints it makes in this action and any right that it may have had to lodge a claim for the Port Authority's alleged breach of the Contract.

57. Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry is equitably estopped from lodging any such claim for alleged breach of Contract.

58. Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry is barred by its own inequitable conduct and acts of coercion that threaten the larger public interest.

59. Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry is barred by the doctrines of promissory estoppel and quasi-estoppel based on Zachry's actions and inactions.

60. Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry's claims are barred by the defense of release.

22

61. Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry's claims are barred by the defense of payment. The account describing and itemizing the payments made by the Port Authority on the Contract (the breach of which forms the basis of Zachry's claim) is attached to this pleading, labeled Exhibit A, and incorporated herein by reference.

62. Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry's claims are barred by the defense of offset.

63. Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry acted as a volunteer, voluntarily changing its position, not due to any force or other conduct by the Port Authority.

64. Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry's claims are barred by the defense of unclean hands.

65. Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry's claims are barred by Zachry's own bad faith conduct, arbitrary and capricious acts and omissions, and conduct lacking any reasonable basis.

66. Zachry is not entitled to recover from the Port Authority because any damages of Zachry were caused or contributed to by its own breach of duty, fault, or misconduct, or the breach of duty, fault, or misconduct of others for whom Zachry is responsible in law.

67. Zachry is not entitled to recover from the Port Authority by virtue of Zachry's treatment of the Contract as continuing and, in addition, insisting that the Port Authority perform

23

Certified Document Number: 43477151 - Page 23 of 28

the Contract, precluding any claim by Zachry of any defense of prior material breach, under the doctrine of election of remedies.

68.     Zachry is not entitled to recover from the Port Authority by reason of Zachry's conduct that actively interfered with (a) the work of Zachry's subcontractors, and (b) the Port Authority's rights under the Contract, including Zachry's obligation to provide accurate and timely information, as required by the Contract.

69.     The Port Authority denies that it made any misrepresentations to Zachry. In the alternative, to the extent that Zachry alleges the Port Authority falsely represented any matter (either affirmatively or by non-disclosure), any such defense is barred by Zachry's actual knowledge of falsity.

70.     Zachry is not entitled to recover from the Port Authority on the basis of any alleged "pass-through" claim. The alleged injured party (a Zachry "affiliate" now known as Zachry Construction Corporation) did not exist at the time of the alleged breach by the Port Authority and was not injured by any action or inaction of the Port Authority. Further, there is no claim the alleged injured party is entitled to assert against Zachry or for which Zachry is liable that forms the basis of the "pass-through" claim.

71.     Zachry is not entitled to recover from the Port Authority on the basis of any alleged "pass-through" claim because Zachry assigned its obligations under the Contract to the "affiliate" in violation of Sections 3.13, Zachry and/or Zachry's parent company transferred control of Zachry in violation of 3.15, Zachry ceased to employ on-site supervision in violation of 5.16, and Zachry ceased self-performing any of the Work and engaged a subcontractor not disclosed to the Port Authority in violation of Section 5.11 of the General Conditions.

72. Alternatively, the Port Authority's immunity from suit and liability precludes Zachry from recovering damages for or on behalf of any other party or entity, including without limitation those Zachry seeks pursuant to its belatedly disclosed and pled "pass-through" claim.

73. Alternatively, the Zachry "affiliate" on behalf of whom Zachry asserts a "pass-through" claim acted as a volunteer, voluntarily changing its position, not due to any force or other conduct by the Port Authority.

74. The Port Authority respectfully reserves the right to file an amended answer in this Cause in the manner authorized by the Texas Rules of Civil Procedure.

## COUNTERCLAIM FOR ATTORNEYS' FEES

75. COMES NOW the Port Authority and respectfully asserts this counterclaim for attorneys' fees pursuant to Section 3.10 of the General Conditions of the Contract, for which a filing fee has been tendered.

## JURY DEMAND

76. The Port Authority hereby demands a trial by jury.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, The Port of Houston Authority of Harris County, Texas, Defendant, prays that the Court enter judgment that Plaintiff take nothing, that Plaintiff's claims be dismissed with prejudice, and that Defendant be granted judgment for its attorneys' fees and costs of court. Further, to the extent that the Court determines that any provision of the Contract is unenforceable as written, Defendant prays that the Court reform such provision in accordance with the Contract, and that Defendant be granted all other and further relief, at law or in equity, to which Defendant may show itself entitled.

25

Certified Document Number: 43477151 - Page 25 of 28

: 13832

Respectfully submitted,

David H. Brown
Brown & Kornegay, LLP
Texas Bar No. 03109200
2777 Allen Parkway, Suite 977
Houston, Texas 77019
713.528.3703 phone
713.528.3701 fax
Email: dbrown@bkllp.com

Of Counsel:
J. Clark Martin
Texas Bar No. 13090000
Kelly Hart & Hallman
1000 Louisiana, Suite 4700
Houston, Texas 77002
Tel: 713.654.4600
Fax: 713.521.5925
Email: clark.martin@khh.com

Co-Counsel:
Karen T. White
Texas Bar No. 20274500
Seth A. Russell
Texas Bar No. 24027943
VINSON & ELKINS L.L.P.
2500 First City Tower
1001 Fannin St.
Houston, Texas 77002
Phone: 713.758.2388
Fax: 713.615.5902
Email: kwhite@velaw.com

Lawrence J. Fossi
Texas Bar No. 07280650
FOSSI & JEWELL LLP
4203 Yoakum Blvd # 100
Houston, Texas 77006
Phone: (713) 529-4000
Fax: 713-529-4094
Jfossi@fossijewell.com

ATTORNEYS FOR DEFENDANT
THE PORT OF HOUSTON AUTHORITY

26

Certified Document Number: 43477151 - Page 26 of 28

: 13833

# VERIFICATION

STATE OF TEXAS

COUNTY OF HARRIS

Before me the undersigned Notary Public, personally appeared Erik A. Eriksson, who, being first duly sworn, did state that he is authorized to sign Verification on behalf of the Port Authority, that he has read the foregoing Third Amended Original Answer and Counterclaim for Attorneys' Fees, and in accordance with Texas Rule of Civil Procedure 93 hereby verifies the truth of the matters set forth in Paragraphs 39, 42, and 46 above.

Erik A. Eriksson,
General Counsel,
The Port of Houston Authority of Harris County, Texas

Sworn to and subscribed before me this __2__ day of June, 2009.



Notary Public in and for the State of Texas

FRAN RIGHTMER
Notary Public, State of Texas
My Commission Expires
February 4, 2013

27

## CERTIFICATE OF SERVICE

I hereby certify that on this **3rd** day of June, 2009, a true and correct copy of the Port Authority's above Third Amended Original Answer and Counterclaim for Attorneys' Fees was served on the following counsel for Zachry Construction Corporation in accordance with the Texas Rules of Civil Procedure.

Brandon Allen, Esq.
Gibbs & Bruns, LLP
1100 Louisiana, Suite 5300
Houston, TX 77003

_____
Seth A. Russell

Houston 4022466v.1

28

**TAB 10**

**Excerpts from The Port of Houston Authority's Second Amended Response to Plaintiff's Request for Disclosure (CR46:13036-77)**

Cause No. 2006-72970

| | | |
|---|---|---|
| ZACHRY CONSTRUCTION CORPORATION, | § § § | In the District Court of |
| Plaintiff | § § § | |
| v. | § § § | Harris County, Texas |
| THE PORT OF HOUSTON AUTHORITY | § § § § | |
| Defendant | § | 151st Judicial District |

### THE PORT OF HOUSTON AUTHORITY'S
### SECOND AMENDED RESPONSE TO
### PLAINTIFF'S REQUEST FOR DISCLOSURE

To:   Zachry Construction Corporation
      By and through its attorney of record
      Robin C. Gibbs, Esq.
      Gibbs & Bruns, LLP
      1100 Louisiana, Suite 5300
      Houston, Texas 77002

COMES NOW, THE PORT OF HOUSTON AUTHORITY (the "Port Authority"),

Defendant in the above styled and numbered cause, and pursuant to TEX. R. CIV. P. 194 files this

its *Second Amended Response to Plaintiff's Request for Disclosure.*

(a)   The correct names of the parties to the lawsuit.

Response:

The correct name of Defendant is Port of Houston Authority of Harris County, Texas.

Defendant understands that the correct name of Plaintiff is now Zachry Industrial, Inc.,

formerly known as Zachry Construction Corporation. It appears that the entity formerly known

as Zachry Construction Corporation engaged in transactions such that it no longer performed the

Work under the Phase 1A Wharf and Dredging Contract, without the prior knowledge of



EXHIBIT
16

Certified Document Number: 43477152 – Page 1 of 55

Defendant and in breach of the Contract. Defendant has not had an opportunity to conduct discovery on this issue, and has only limited knowledge of the transactions. Defendant has no contract with the new entity that apparently is now known as Zachry Construction Corporation. No entity has a right to make claim against Defendant, or to prosecute this lawsuit against Defendant, other than the entity with which Defendant originally contracted.

(b)     The name, address, and telephone number of any potential parties.

Response:

None, except that Defendant maintains that the entity against which it originally counterclaimed remains a party to this lawsuit and is responsible for Defendant's attorneys' fees.

(c)     The legal theories and, in general, the factual basis of the Defendant's claims or defenses.

Response:

The Port Authority's legal theories are pleaded in its *Third Amended Original Answer*, as follows:

The Port Authority is a political subdivision of the State of Texas and is therefore protected by the sovereign or governmental immunity doctrine. The Port Authority is immune from suit and from liability for all causes of action and damages except as provided by Subchapter I of Chapter 271 of the Texas Local Government Code.

Zachry is not entitled to recovery against the Port Authority for breach of the Contract because the Port Authority acted in accordance with the Contract provisions, including, but not limited to the right to withhold payments (Sections 6.05, 6.17, 5.05, and 5.06 of the General Conditions), the right of the Chief Engineer to demand a recovery plan (Section 5.09 of the General Conditions), the right to review and respond to submittals (Section 5.22 of the General Conditions), the right to require schedules, reports and other additional information (Section 5.25

Certified Document Number: 43477152 - Page 2 of 55

: 13837

of the General Conditions), and in the event it has an instruction contrary to the Contract, the right to change the Contract (Sections 5.41 and 5.42 of the General Conditions).

Zachry's allegations do not constitute a breach of any of the provisions of the Contract by the Port Authority. The Port Authority's request that Zachry mitigate the risks to the Port Authority drilled shafts by revising and resubmitting the September 9, 2005 draft cutoff wall design was not a breach of Section 5.10 of the Contractor of the Contract or of Change Order 4; the Port Authority's withholding of liquidated damages was not a breach of the Contract; and the Port Authority's payment of Zachry's invoices, which Zachry characterizes as "failing to pay Zachry the money that it was periodically entitled to be paid under the Contract as it has come due," was not a breach of the Contract.

Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry has not complied with all conditions precedent to its alleged right to recover for such alleged breaches, such as Zachry's failure to provide notice of such claims within the time, in the form, or to the person required by the Contract, including but not limited to the notice required by Sections 5.08, 5.18, and 5.42 of the General Conditions. Zachry did not timely provide notice as required by the Contract with respect to any of its claims, namely, Zachry's claims: [a] that the Port Authority's request that Zachry mitigate the risks to the Port Authority drilled shafts by revising and resubmitting the September 9, 2005 draft cutoff wall design constituted a breach of Section 5.10 of the General Conditions of the Contract; [b] that the Port Authority's request that Zachry mitigate the risks to the Port Authority drilled shafts by revising and resubmitting the September 9, 2005 draft cutoff wall design constituted a breach of Change Order 4; [c] that the Port Authority's withholding of liquidated damages constituted a breach of the Contract; [d] that the Port Authority's instruction

Certified Document Number: 43477152 - Page 3 of 55

in accordance with Section 5.09 of the General Conditions of the Contract explain to the Port Authority how Zachry intended to complete the Project within the Contract Time or other exercise of the Port Authority's right under the Contract constituted a breach; or [e] that the Port Authority breached the Contract, Section 6.02, 6.05 or 6.17 of the General Conditions, or some unidentified provision of the Contract in its payment of or failure to pay Zachry's invoices, in whole or in part or within any particular time, including any breach which Zachry characterizes as "failing to pay Zachry the money that it was periodically entitled to be paid under the Contract as it has come due." Each of the requirements in the Contract that Zachry timely and properly present its claims for more money or more time is both (1) a substantive contractual condition precedent to Zachry's right to recover money or additional time with respect to the Contract, and (2) jurisdictional under the Texas Constitution, statutes, and common law of Texas applicable to the Port Authority's immunity from suit and/or immunity from liability.

Moreover, to the extent any of provisions of the Contract are or have been held void or unenforceable, Section 3.12 of the General Conditions of the Contract, which the Port Authority hereby affirmatively pleads in its entirety, requires that any such provision be severed from the Contract, the balance of the Contract enforced, and the stricken provision reformed and replaced with a valid provision. Specifically, Section 3.12 provides that the "parties further agree to reform [the] Contract to replace any stricken portion, clause or provision with a valid portion, clause or provision that comes as close as possible to the intent of the stricken portion clause or provision." Therefore, the Port Authority pleads that the Court enforce the severance and reformation terms of the Contract with respect to any provision of the Contract that is held to be void or unenforceable, including without limitation the second paragraph of Section 5.42 and

Certified Document Number: 43477152 - Page 4 of 55

Section 5.05 in combination with Section 5.06 of the General Conditions of the Contract, such that they are enforceable and reflect the intent of the parties.

Zachry's allegations that the Port Authority has improperly withheld payment and failed to pay Zachry does not constitute breach of Contract as alleged by Zachry. The Port Authority paid Zachry in accordance with the terms of the Contract and applicable law. Moreover, Zachry agreed to a Milestone A date and a Final Completion date. Zachry agreed to liquidated damages in the event it failed to meet these dates. Zachry failed to meet the Milestone A date and the Final Completion date. In addition, Zachry failed to properly perform Work and the Port Authority had to pay another contractor to correct or mitigate harm caused by Zachry's defective Work. The Port Authority's withholding of monies from payments to Zachry is supported by enforceable provisions of the Contract, including the right to withhold payments (Section 6.05 of the General Conditions), the right of offset (Section 6.17 of the General Conditions), the right to liquidated damages (Section 5.05 of the General Conditions), the right to actual damages in lieu of liquidated damages (Section 5.06 of the General Conditions), and the Specification and Proposal (setting forth the concept of reduction of the contract price for late performance). The liquidated damages withheld were a reasonable forecast of just compensation because the Contract provided for liquidated damages in lieu of actual damages and because the Port Authority sustained actual damages in an amount that was not disproportionate to the liquidated damages.

Zachry is not entitled to recover any damages from the Port Authority as a result of the Port Authority's alleged breach of the Contract because Zachry is barred by the express, enforceable provisions of the Contract from recovering for the losses and damages that Zachry

Certified Document Number: 43477152 - Page 5 of 55

: 13242

Certified Document Number: 43477152 - Page 6 of 55

alleges. Some of these risk-allocating contractual provisions that bar Zachry's recovery include, but are not limited to:

- Assumption of the risk by Zachry for any lack of completeness in the Wharf and Dredging Contract Documents, including the Drawings and the Specifications, and the risk of those documents not being sufficiently detailed and comprehensive. Contract, General Conditions § 2.06. Zachry failed to timely raise any concerns with the Contract Documents and cannot now complain about their condition.

- A no-damages-for-delay or hindrance provision. Contract, General Conditions § 5.07. Zachry cannot recover damages associated with delay in the Project or hindrance of its performance. This provision precludes Zachry's asserted "exceptions."

- No entitlement to an increase in the Contract Price except under limited circumstances. Contract, General Conditions §§ 5.41, 5.42, 5.43, 5.49 and 5.50. Zachry did not timely and properly assert a claim under any of those provisions.

- A specific and limited force majeure provision. Contract, General Conditions § 1.18. No entitlement to an extension of time except when the circumstance constitutes an event of Force Majeure and is on the critical path. Contract, General Conditions § 5.08. Zachry has not established an event of Force Majeure entitling it to any additional time.

- The definition of Concurrent Delay. Contract, General Conditions § 1.08. No entitlement to an extension of time if there is also an event of Concurrent Delay. Contract, General Conditions § 5.08(b)(6). Zachry caused Concurrent Delays further preventing it from being entitled to an extension of time.

- Waiver of claims for an extension of time by failure to timely and properly file a request for time extension. Contract, General Conditions § 5.08. Zachry failed to timely or properly seek any extensions of time.

- Waiver of claims for changed conditions or contract interpretations that are not timely and properly asserted. Contract, General Conditions § 5.42. Zachry failed to timely or properly assert any claim for changed conditions or contract interpretations constituting a change to the Contract. The Port Authority has not modified or waived any of these provisions and is not estopped from relying on any of these provisions. Contract, General Conditions §§ 3.09 and 5.52.

Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry failed to meet the Standard of Care required in Section 1.37 of the General Conditions of the Contact, which provides that Zachry shall use ". . . [its] best skill and attention, in a good and workmanlike manner and in the best and most expeditious and economical manner consistent with the interests of the Port Authority, shall exercise the degree of care, skill and diligence in the performance of the Work in accordance with and consistent with industry standards for similar circumstances, shall utilize its best skill, efforts and judgment in furthering the interests of Port Authority, and shall furnish efficient business administration and supervision."

Zachry is not entitled to recover any damages from the Port Authority as a result of the Port Authority's alleged breach of the Contract because Zachry failed to comply with its affirmative contractual obligation under the Contract to timely and accurately provide contractually required information to the Port Authority, including but not limited to, the

Certified Document Number: 43477152 - Page 7 of 55

Certified Document Number: 43477152 - Page 8 of 55

information required by Sections 1.37, 5.03 and 5.04 of the General Conditions, the progress of the work, and the Schedules for completing the Work.

Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry is barred by the "first breach" doctrine because Zachry first materially breached the Contract, including but not limited to Sections 5.03, 5.04, 5.09, 5.10 (including 1.37), 5.14 and 5.22 of the General Conditions of the Contract.

The Port Authority denies that any oral statement purporting to change or modify the Contract Documents is binding on either the Port Authority or Zachry. The Port Authority denies that any written statement purporting to change or modify the Contract Documents, other than one from the Chief Engineer that complies with the express provisions for change in the Contract Documents, is binding on either the Port Authority or Zachry.

The Port Authority denies that Change Order 4 includes as a term that a cutoff wall must be used by Zachry to perform its Work, and denies that Change Order 4 includes any term that some particular design of a cutoff wall must be used by Zachry to perform its Work. Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract, as amended by Change Order 4, as a result of any modification to Zachry's September 9, 2005 draft cutoff wall design requested by the Port Authority.

Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry did not perform its obligations under the Contract in a timely fashion. Zachry did not complete the applicable portions of the Work by Milestone A or the Final Completion dates required by the Contract. Zachry did not timely and properly request extensions of time of such dates.

Zachry is not entitled to recover any damages from the Port Authority as a result of the Port Authority's alleged breach of the Contract because Zachry failed to properly mitigate its alleged damages.

Zachry is not entitled to recover any damages from the Port Authority as a result of the Port Authority's alleged breach of the Contract because Zachry owed the Port Authority a duty of full disclosure under the law, which duty of full disclosure was breached by Zachry.

Zachry is not entitled to recover any damages from the Port Authority as a result of the Port Authority's alleged breach of the Contract because Zachry committed fraud and fraud in the inducement. In connection with entering into the Contract, and at various times during the performance of its work under the Contract, including during negotiation of Change Order 4, and during its meetings and conversations with the Port Authority about scheduling in late 2005, Zachry made representations and promises which were material, were false, and which Zachry knew were false and/or knew it had no intention of fulfilling, or made the representations recklessly without knowledge of their truth. Such false representations and promises were made for the purpose of inducing the Port Authority to take actions (such as entering into Change Order 4) or refrain from taking actions (such as refraining from either terminating the Contract or deleting the wharf extension from the scope of Zachry's work under the Contract). In taking or refraining from taking such actions, the Port Authority relied on such false representations and promises, causing the Port Authority injury. Such behavior by Zachry constitutes fraud, and is a complete defense and bar to Zachry's claims in this lawsuit.

Zachry is not entitled to recover any damages from the Port Authority as a result of the Port Authority's alleged breach of the Contract because Zachry committed fraud by non-disclosure. In connection with entering into the Contract, and at various times during the

Certified Document Number: 43477152 - Page 9 of 55

performance of its work under the Contract, including during negotiation of Change Order 4, and during its meetings and conversations with the Port Authority about scheduling in late 2005, Zachry, in violation of both the Contract and of a common law duty to disclose, concealed from or failed to disclose material information to the Port Authority. Zachry had a duty to disclose the facts to the Port Authority, but was deliberately silent when it had a duty to speak. Zachry concealed such material information, knowing that the Port Authority was ignorant of the facts and did not have an equal opportunity to discover the facts, in order to induce the Port Authority to take actions (such as entering into Change Order 4) or refrain from taking actions (such as desisting from either terminating the Contract or deleting the wharf extension from the scope of Zachry's work under the Contract). In taking or refraining from taking such actions, the Port Authority was induced by such concealment. The Port Authority relied on Zachry's non-disclosure, and was injured as a result of acting without knowledge of the undisclosed facts. Such behavior by Zachry constitutes fraud by non-disclosure, and is a complete defense and bar to Zachry's claims in this lawsuit.

Alternatively, Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because of Zachry's negligent misrepresentations.

Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Change Order 4 is an accord and satisfaction of any "claims" that Zachry had at that time that Change Order 4 was executed. All prior "claims" of Zachry were merged into, subsumed by, and extinguished through Change Order 4.

Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because the damages sought by Zachry are consequential damages and thus barred by statute and by principles of governmental immunity.

Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry ratified the Port Authority's alleged actions and inactions.

Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry waived the complaints it makes in this action and any right that it may have had to lodge a claim for the Port Authority's alleged breach of the Contract.

Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry is equitably estopped from lodging any such claim for alleged breach of Contract.

Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry is barred by its own inequitable conduct and acts of coercion that threaten the larger public interest.

Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry is barred by the doctrines of promissory estoppel and quasi-estoppel based on Zachry's actions and inactions.

Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry's claims are barred by the defense of release.

Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry's claims are barred by the defense of payment.

Certified Document Number: 43477152 - Page 11 of 55

The account describing and itemizing the payments made by the Port Authority on the Contract (the breach of which forms the basis of Zachry's claim) is attached to this pleading, labeled Exhibit A, and incorporated herein by reference.

Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry's claims are barred by the defense of offset.

Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry acted as a volunteer, voluntarily changing its position, not due to any force or other conduct by the Port Authority.

Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry's claims are barred by the defense of unclean hands.

Zachry is not entitled to recover from the Port Authority based on any alleged breach by the Port Authority of the Contract because Zachry's claims are barred by Zachry's own bad faith conduct, arbitrary and capricious acts and omissions, and conduct lacking any reasonable basis.

Zachry is not entitled to recover from the Port Authority because any damages of Zachry were caused or contributed to by its own breach of duty, fault, or misconduct, or the breach of duty, fault, or misconduct of others for whom Zachry is responsible in law.

Zachry is not entitled to recover from the Port Authority by virtue of Zachry's treatment of the Contract as continuing and, in addition, insisting that the Port Authority perform the Contract, precluding any claim by Zachry of any defense of prior material breach, under the doctrine of election of remedies.

Zachry is not entitled to recover from the Port Authority by reason of Zachry's conduct that actively interfered with (a) the work of Zachry's subcontractors, and (b) the Port Authority's

Certified Document Number: 45477152 - Page 12 of 55

rights under the Contract, including Zachry's obligation to provide accurate and timely information, as required by the Contract.

The Port Authority denies that it made any misrepresentations to Zachry. In the alternative, to the extent that Zachry alleges the Port Authority falsely represented any matter (either affirmatively or by non-disclosure), any such defense is barred by Zachry's actual knowledge of falsity.

Zachry is not entitled to recover from the Port Authority on the basis of any alleged "pass-through" claim. The alleged injured party (a Zachry "affiliate" now known as Zachry Construction Corporation) did not exist at the time of the alleged breach by the Port Authority and was not injured by any action or inaction of the Port Authority. Further, there is no claim the alleged injured party is entitled to assert against Zachry or for which Zachry is liable that forms the basis of the "pass-through" claim.

Zachry is not entitled to recover from the Port Authority on the basis of any alleged "pass-through" claim because Zachry assigned its obligations under the Contract to the "affiliate" in violation of Sections 3.13, Zachry and/or Zachry's parent company transferred control of Zachry in violation of 3.15, Zachry ceased to employ on-site supervision in violation of 5.16, and Zachry ceased self-performing any of the Work and engaged a subcontractor not disclosed to the Port Authority in violation of Section 5.11 of the General Conditions.

Alternatively, the Port Authority's immunity from suit and liability precludes Zachry from recovering damages for or on behalf of any other party or entity, including without limitation those Zachry seeks pursuant to its belatedly disclosed and pled "pass-through" claim.

Certified Document Number: 43477152 - Page 13 of 55

Alternatively, the Zachry "affiliate" on behalf of whom Zachry asserts a "pass-through" claim acted as a volunteer, voluntarily changing its position, not due to any force or other conduct by the Port Authority.

In the event Zachry does not prevail on its claim, the Port Authority is entitled to recover its attorneys' fees pursuant to Section 3.10 of the General Conditions of the Contract.

In general the factual basis for the Port Authority's defenses are as follows:

The wharf and dredging work under the Phase 1A Wharf and Dredging Contract (the "Project") is one of the various projects planned by the Port Authority for the Bayport Terminal Complex ("Bayport"). Bayport is being constructed over a period of years and in several phases. The various phases of Bayport are planned to result in approximately 7,000 feet of wharf, 380 acres of container yards, multiple gate facilities and other infrastructure and improvements, including a cruise terminal. The precise nature of each phase and the timing of its construction depend upon a variety of factors, including availability of funds, environmental permitting limitations, and the changing demands of the Port Authority's customers. Phase 1A was the initial phase for Bayport. The Phase 1A wharf was originally 1,660 linear feet. A 332-foot extension of the dock was later added by Change Order No. 4.

In 2003, the Port Authority requested Competitive Sealed Proposals for its Phase 1A Wharf and Dredging Contract ("Contract"). Zachry decided to pursue the work for its own business purposes, in an effort to move into a new line of work, namely, the marine construction business. Zachry submitted a response and actively sought the Contract from the Port Authority.

In seeking the Contract, Zachry made many and varied representations to the Port Authority regarding its ability to meet, attitude toward, and commitments to the Port Authority's goals in connection with the Project. Zachry represented to the Port Authority that it would do

everything necessary to ensure that the Bayport facility was constructed properly. Zachry promised the Port Authority that, "Your Vision is Our Purpose"; "We . . . stand by our financial commitment; 'A deal is a Deal!'"; "We aspire to a partnership that focuses on our Customer . . . therefore, we meet our commitments"; "We are committed to a true partnership with the Port . . . and small businesses"; "We avoid the claims game." Although the Port Authority relied on these representations and promises in making the decision to award the Contract to Zachry, Zachry soon abandoned them.

Zachry identified two of the Port Authority's primary goals with respect to the Phase 1A activities: [1] supporting and mentoring regional small businesses, and [2] complying with the NOx emission limitations that the Port Authority was required to meet under the permit issued by the U.S. Government. Zachry's goal was to convince the Port Authority that Zachry, better than any other contractor, would achieve those goals. Zachry's management at the highest levels, including David Zachry, made promises to the Port Authority about what Zachry would do to achieve the Port Authority's goals. Zachry promised that it would meet the NOx emissions limitations through such construction methods as using conveyor systems to move materials and constructing the wharf "in the dry" by constructing a large berm or dike around the work area, freezing the berm, and then removing the soil beneath the wharf. Although Zachry had no experience with these novel construction methods, Zachry represented that it possessed the expertise to effectively utilize these technologies. But Zachry failed to perform the necessary investigation, scheduling and due diligence analysis of the methods and technologies it was promising. For example, Zachry had no plan for excavating "in the dry" the materials under the deck and among the hundreds of piers. Zachry concealed its deficiencies from the Port Authority, which relied on Zachry's assertions.

Certified Document Number: 43477152 - Page 15 of 55

Although Zachry's base price was $3.5 million above the low proposal, Zachry's proposal was selected as the preferred proposal and the process of negotiating a specific contract began. As a result of these negotiations, under the Contract, Zachry agreed to contractual provisions that assigned the risk and responsibility for loss resulting from events and problems that might arise during Zachry's work on Project. In effect, Zachry agreed that it could handle and would bear those risks. Zachry conveyed that the "Zachry way" of doing business would minimize the possibility of that risks might occur.

The Contract included Scope, Time and Price Modifications. The Scope, Time and Price Modifications contained specifically negotiated provisions providing additional benefits to Zachry for particular risks assumed by Zachry, such as an increase of $2.4 million over Zachry's originally proposed Contract Price for increases in the prices of materials and an additional $50,000 for project management overtime.

Some of the more important risk-allocating contractual provisions contained in the Contract include:

- Zachry accepted entirely the risk of there being any lack of completeness in the Contract Documents, including the Drawings and the Specifications, and the risk of those documents not being sufficiently detailed and comprehensive. Section 2.06 of the Contract's General Conditions.

- Zachry accepted the risk of all circumstances affecting performance of its Work, Section 2.06 of the Contract's General Conditions. Zachry's complaints, such as, its claim that the Work turned out to be more difficult, expensive and time-consuming than it expected because of the hardness of the Beaumont clay under the dock and among the piers, for example, is a risk that Zachry assumed.

Certified Document Number: 43477152 – Page 16 of 55

- Zachry accepted the risk of working around the Port Authority ships that might be using the wharf. Sections 4.15 and 5.14 of the General Conditions.

- With respect to monetary losses or damages that Zachry might sustain in performing the Work, Zachry agreed to a no-damages-for-delay or hindrance provision. This means that Zachry is not entitled to recover for damages from the Port Authority for delays or hindrances that occur in connection with the Work, even if the delays or hindrances are caused by the Port Authority; Zachry's remedy for delays or hindrances was to seek an extension of time. Sections 5.07 and 5.14 of the General Conditions. All of Zachry's claims are delay or hindrance damage claims and, therefore, are barred.

- Zachry agreed that it is not entitled to any increase in the Contract Price except under limited circumstances. Section 5.43 of the Contract's General Conditions specifies that the only sections of the Contract that allow Zachry to seek an adjustment in the Contract Price are Sections 5.41 (extra work directed by the Port Authority), 5.42 (changed conditions or, independently thereof, contractual interpretations which effect a change in the Contract that requires a modification), 5.49 (suspension of the Work by the Port Authority) and 5.50 (acceleration of the work by the Port Authority for reasons other than delays caused by or attributable to Zachry). Zachry's claims do not entitle it to a Contract Price adjustment.

- With respect to an extension of the Contract Time, Zachry accepted the risk of increased time being required to perform the Work under all circumstances, except when the circumstance constitutes an event of force majeure — and Zachry also agreed to a limited force majeure provision. Sections 1.18 and 5.08 of the General

Certified Document Number: 43477152 - Page 17 of 55

: 13052

Conditions. Moreover, if the event constitutes a force majeure event, Zachry accepted the risk of the delay, except where the delayed activities are on the critical path (Section 5.08(b)(1) of the General Conditions), and even then Zachry is not entitled to any extension of time if there is also occurring an event of Concurrent Delay. Section 5.08(b)(6) of the General Conditions.

- Zachry agreed that, for all events for which it chose to seek an extension of the Contract Time, it must timely file a claim meeting the requirements of the Contract. Zachry agreed that it waived any right to a time extension if it failed to timely file a request for a time extension that met the requirements of the Contract. Section 5.08 of the General Conditions. Zachry's alleged claims for breach of the Contract are barred because Zachry did not timely file requests for a time extension.

- Zachry agreed to achieve certain interim milestones and final completion by specified dates. Zachry agreed that if it failed for any reason to meet the completion milestones specified in Section 10 of the Special Conditions, or failed to complete the Work within the agreed time, the Contract Price would be reduced by certain specified amounts, *i.e.*, liquidated damages. Specification and Proposal, Page III-15 (Addendum No. 8). Zachry failed to meet the deadlines, making the Port Authority entitled to liquidated damages. Specification and Proposal, Page III-15 (Addendum No. 8) and Sections 5.05 and 5.06 of the General Conditions.

Because of its desire to obtain this Work, Zachry made special promises that are embodied in Sections 5.10 and 1.37 of the Contract's General Conditions. In Sections 5.10 and 1.37, Zachry agreed and promised that it would perform the Work using Zachry's best skill and attention, in a good and workmanlike manner, and in the best and most expeditious and

Certified Document Number: 43477152 - Page 18 of 55

: 13953

economical manner consistent with the interests of the Port Authority, and would utilize its best skill, efforts and judgment in furthering the interests of Port Authority. This promise and the other various promises made by Zachry to the Port Authority in order to obtain the Wharf and Dredging Contract created a special contractual relationship, giving rise to a duty to disclose owed by Zachry to the Port Authority. Given this relationship, Zachry's duties to the Port Authority included a duty of honesty, candor and disclosure of material facts, including facts as to schedule and Zachry's intent and beliefs, as respects matters impacting the Port Authority's interests.

The Contract is a "time is of the essence" contract, and originally called for completion of "Area A" by an interim Milestone Date of February 1, 2006 in order to accommodate the arrival of the four Chinese container cranes and to provide sufficient time for the Port Authority to unload, erect and trouble-shoot the cranes, train the operators, and perform all of the other attendant crane-related tasks so that the wharf could be fully operational by the final completion date of July 1, 2006.

One of the Zachry representatives involved in pursuing the Contract was Gary Kuhn ("Kuhn"). Zachry represented to the Port Authority that, if the Port Authority awarded the Contract to Zachry, Kuhn would be Zachry's Project Manager or Project Sponsor and closely involved with the Project. Kuhn participated in making the promises that Zachry made to obtain the Contract; Kuhn had stated that he believed in carrying-out those promises, that he believed in "partnering" with the Port Authority and Zachry's subcontractors, and that he believed in applying the construction principles known as Lean Construction. During pre-construction meetings, Kuhn realized that because of Zachry's decision to construct a berm around the wharf and work in the dry, Zachry would have to largely complete its Work by the time the crane ship

arrived or else Zachry would later find itself working in the wet. Kuhn represented to the Port Authority that Zachry would achieve this objective. Kuhn also was aware of the Port Authority's concerns that Zachry's chosen soil freeze method of construction might place the Port Authority's drilled shafts at risk and agreed that Zachry would address that concern.

Before Zachry and the Port Authority signed the Contract, Kuhn convinced the Port Authority to also award the Phase 1A Container Yard Contract to Zachry. This fact so impressed Zachry's San Antonio management that Zachry decided to remove Kuhn from his position of Project Manager or Sponsor for the Contract and the Container Yard Contract, bring him back to San Antonio and assign him a business development role. Zachry concealed this decision from the Port Authority for weeks.

In removing Kuhn as Project Manager or Sponsor, Zachry removed a person who directly participated in persuading the Port Authority of Zachry's ability to perform the Contract, who Zachry touted as having the background and experience necessary to manage a project of this magnitude, and who expressed the intention of carrying-out those promises.

Zachry's decision to remove Kuhn left the Contract without a Project Manager or committed Sponsor. Zachry made this decision solely for its own benefit, knowing that there was no other qualified person within the entire Zachry organization who was available to perform the duties of Project Manager. Zachry was forced to quickly find a replacement for Kuhn. Zachry hired Harold "Andy" Anderson ("Anderson"), an individual without the background, experience or skills necessary to manage a project of this nature and magnitude.

Anderson, from the inception of his involvement, did not believe in soil freeze technology, nor did he believe in the principles of Lean Construction, nor did he believe in establishing a "partnering" relationship among the subcontractors, nor did he believe in using,

Certified Document Number: 43477152 - Page 20 of 55

supporting and mentoring the small business subcontractors. Anderson's position was that, if he had his way, most of the subcontractors would be fired and Zachry would self-perform the Work. Anderson did not believe in open lines of communication and dialogue with the Port Authority. Anderson told his subcontractors that they were prohibited from talking to the Port Authority. Anderson did not believe in fostering a working relationship with the Port Authority. Anderson considered the Port Authority and the Construction Manager, CH2M Hill, to be the "enemy." Anderson told his staff that he "wanted to see all of the heads of the Port's employees on stakes lining Port Road." Anderson instructed his staff and subcontractors to "crush the Port." Anderson believed in "playing the claims game." When Anderson learned of the promises that Zachry had made to the Port Authority to get the Contract, Anderson ridiculed Kuhn for making such promises. Anderson barred Kuhn from coming on the job site and referred to him as "Lord Voldemort," the man in the Harry Potter stories who is so evil that his name cannot be spoken aloud. Anderson was not truthful. Virtually all of this was concealed from the Port Authority by Zachry.

Although Anderson was the wrong choice for the position of Project Manager, Zachry put him in charge of the Contract and left him in charge and largely unsupervised for eighteen months. The person at Zachry who was Anderson's direct report, Greg McVey, did little to supervise or control Anderson. Fred Lueck, to whom McVey reported, was largely uninvolved. It was only at the insistence of the Port Authority that Anderson was eventually removed from the Project, after the harm that he caused became apparent. Nevertheless, Zachry resisted removing Anderson from the Project, and although Zachry later told Anderson to quit or he would be fired, and told McVey that he too needed to leave as Zachry had lost faith in him, Zachry's corporate attitude even today prevents Zachry from admitting that it made a mistake in

Certified Document Number: 43477152 - Page 21 of 55

placing Anderson in the position of Project Manager; Zachry's management has stated that, given the chance, it would place Anderson in charge of the Project all over again.

Early on in the Project, when the Port Authority learned that Zachry proposed to work "in the dry" and accomplish that task by constructing a large berm and freezing it, the Port Authority expressed its concern that frozen soil could adversely impact the Port Authority's drilled shafts. Zachry agreed to keep the frozen soil away from the piers in order to eliminate this risk. Zachry now makes the specious claim that the Port Authority had an obligation extending back to 2003 to somehow analyze and re-engineer its dock to accommodate the soil freeze technology that Zachry decided to use on this Project. While the Port Authority does not have the right to select or prescribe Zachry's methods and means of construction, the Port Authority does have the right, under the Contract, to require Zachry to "revise and resubmit" or to reject Zachry's methods and means of construction if those methods and means, or if Zachry's order of work, or time, manner and methods of prosecution, are not in compliance with Zachry's Standard of Care, or place in jeopardy Zachry's Work or the wharf, or would violate other terms of the Contract Documents, such as, for example, the Technical Specifications for Temporary Facilities and the Technical Specifications for Shoring Systems. The Port Authority accepted Zachry's representation that Zachry was capable of making the soil freeze methodology a success. And, when Zachry agreed that the freezing effects of the main freeze wall would not get within nine feet of any drilled shaft, the effects of the freezing on the Port Authority's drilled shafts became a non-issue. Accordingly, there was no need for the Port Authority to have its designers and geotechnical engineers analyze the impact of possible freezing of the soil around the drilled shafts.

Certified Document Number: 43477152 - Page 22 of 55

: 13957

Zachry engaged in various acts and omissions that had the effect of delaying and hindering its performance of its own Work under the Contract, as reflected by the following examples:

Zachry was five weeks late in complying with the Contract requirement for the creation of the initial Baseline Schedule. Discovery in this case has revealed that Zachry's Project scheduler was inexperienced in the creation and management of schedules for complex projects and that Zachry itself concluded its Baseline Schedule was inadequate and did not reflect Zachry's work plan.

From the outset, setting the concrete batch plant was on the critical path of the schedule. Zachry was significantly late in the completion of the setting of the batch plant. Completing the concrete mix design was also on the critical path of the schedule. Zachry was also significantly late completing the mix design. These delays at the start of the Work impacted the timeliness of Zachry performance in causing delays that negatively impacted the entirety of Zachry's performance.

From the outset, Zachry knew of the possibility of a concrete material shortage during the term of the Contract. The concrete shortage issue was addressed at Zachry "what-if" meetings shortly after Zachry occupied the site. Zachry could have acted to reduce the risk of concrete material shortages (such as, for example, by constructing a silo in which to store the concrete materials), but Zachry decided not to take any of those actions in order to save money. Later, when the anticipated concrete material shortage occurred, Zachry claimed that it was "beyond its control" and claimed it was entitled to an extension of the Contract Time – even though it was clear the anticipated concrete material shortages were not an event that would entitle Zachry to

Certified Document Number: 43477152 - Page 23 of 55

an extension of the Contract Time. The delays in Zachry's Work caused by these concrete material shortages were entirely the responsibility of Zachry.

Some of Zachry's work with respect to the drilled shafts was defective. In 2005, Zachry spent a substantial number of days reworking some of the drilled shafts it had already installed and addressing necking and pier caps issues. This work delayed and hindered Zachry's construction of the wharf deck in the areas of those drilled shafts until the repair work was completed.

Zachry's work on the under-side of the deck itself was defective in many areas. Zachry engaged in underdeck patching to repair drilled shafts, bullnoses and voids under the deck, thereby limiting and delaying underdeck excavation. Zachry began correcting this defective work in late 2005 and the repairs continued for months. All of this repair work delayed and hindered Zachry's underdeck excavation.

Zachry was late in providing required submittals to the Port Authority for review by the Port Authority and its consultants. Even when Zachry provided the submittals, many of the submittals were incomplete or defective. This failure by Zachry caused delays in Zachry's work.

Zachry made the decision, in order to save money, that it would retain its soil freeze subcontractor, RKK SoilFreeze, only to freeze around three sides of the excavation area. Zachry decided that it would self-perform the cutoff of the water flowing from the fourth side, that is, the land side. But Zachry took no action to determine how much water was flowing from the land side into the excavation area. By early 2005, RKK SoilFreeze and its consultant, GeoEngineers, were warning Zachry that Zachry must determine the amount of water that was flowing from the land side into the excavation area and figure out how to control it. But Zachry did not do so until early November, 2005, almost ten months later.

Certified Document Number: 43477152 - Page 24 of 55

For almost a year, Zachry's dredge work – an important component of its Work – was little to non-existent. Zachry itself was not capable of performing the needed dredging, so it subcontracted that work to Continental Dredging. Continental Dredging's equipment was frequently broke down, and, as a result, dredging fell far behind schedule. Zachry eventually terminated Continental Dredging, commandeered its equipment, and filed in a lawsuit against Continental Dredging.

Zachry failed to timely implement its chosen means and methods of using a freeze wall to construct a frozen berm that would allow Zachry to excavate in the dry. Zachry delayed until February 24, 2005 to even sign its Subcontract with its freeze wall subcontractor, RKK SoilFreeze. This delay was solely Zachry's decision and fault. It was not until March 15, 2005 that Zachry provided the submittal for the main freeze wall to the Port Authority.

Zachry then decided, for its own benefit, i.e., to cut its costs, that it would replace its qualified subcontractor, Farmer Foundation, which had been trained by RKK SoilFreeze in the installation of the freeze pipe, with an unqualified – but less expensive – subcontractor, BoMac.

It was not until Spring of 2005 that Zachry finally began installing freeze pipe in the freeze wall. In order to save some money, Zachry decided to install used, corroded and thin freeze pipes into the earthen berm – pipe that did not meet RKK SoilFreeze's or Zachry's own specifications. This decision was made by Zachry solely for its own benefit.

Zachry not only installed defective pipe, but Zachry, though its subcontractor, BoMac, did not install the freeze pipe in a good and workmanlike manner, in accord with the requirements of the freeze wall design. Instead, the pipe was installed improperly, with pipe that was too short or out of alignment. Some pipes were installed in the wrong location or at the incorrect inclination; some pipes were damaged in the installation process. Eventually, over

Certified Document Number: 43477152 - Page 25 of 55

70% of the freeze pipe failed and had to be replaced. It was not until mid to late October, 2005, that Zachry completed the task of removing and replacing the defective pipe. Moreover, although RKK insisted that before any part of the freeze wall was activated, Zachry must vouch for the proper installation of the freeze pipe, Zachry insisted that RKK certify to the proper installation. Apparently, neither would certify.

As a result of these and other omissions and failures, which delayed Zachry's work, Zachry fell so far behind schedule that it was too late for Zachry both to utilize the freeze wall and meet the interim milestone date for Area A. As the result of its own errors and mistakes, Zachry made the decision to abandon the freeze wall, excavate to the extent possible "in the dry," and then excavate in the wet. Zachry terminated RKK SoilFreeze's contract, and gave false explanations for this decision. Zachry engaged in an arbitration, a private lawsuit, with RKK SoilFreeze, at one point threatening the President of RKK SoilFreeze that Zachry would bankrupt RKK.

Zachry attempted to conceal from the Port Authority the truth as to Zachry's schedule problems, and what was occurring and was not occurring on the site. When the Port Authority asked about the status of the project, Zachry represented to the Port Authority that "everything is fine," "we will not only meet the milestone dates, but we will finish early," and "we will provide whatever resources are necessary to meet our obligations; after all, we are Zachry." Zachry continued to send progress schedules to the Port Authority misrepresenting that Zachry was on schedule and that Zachry would meet the required interim milestone date of February 1, 2006 and the final completion date of June 1, 2006. These representations were false.

The undisclosed truth was that by late-February or early-March of 2005, Zachry realized that it was so far behind in its Work it could not meet the interim milestone date of February 1,

Certified Document Number: 43477152 - Page 26 of 55

2006. At that time, Zachry conceived the idea of dividing the work into two components through the use of a "cut-off" wall. Zachry initiated a dialogue with RKK SoilFreeze, and its geotechnical engineer, GeoEngineers, about designing such a cutoff wall for Zachry, which would be paid for by Zachry as part of its construction means and methods. Zachry instructed RKK SoilFreeze and GeoEngineers not to discuss these issues with the Port Authority.

Under the Contract as awarded, the dock component of was comprised of five sections of 332 feet each, referred to as Sections 1 through 5, for a total of 1660 feet. By early 2005, with Zachry reporting NOx emissions that were less than those allocated by the applicable environmental permit, with funding available, and with Zachry falsely reporting that Zachry's progress was on schedule to meet the Contract's Milestone A and final completion dates, the Port Authority began considering the possibility of adding a Section 6.

In early 2005, the Port Authority discussed with Zachry the fact that the Port Authority essentially had two options with respect to a possible Section 6: the Port Authority could either (a) solicit competitive proposals for Section 6 (i.e., from interested contractors who might propose to do the work, including Zachry, if it was interested), or (b) negotiate a change order to the Contract to add Section 6 to the scope of Zachry's work.

The Port Authority has learned that Zachry was overjoyed to learn there was a possibility Zachry might convince the Port Authority to award Zachry a change order that would result in the Port Authority paying $13 Million for a cut-off wall that Zachry needed in any event, whether or not the Section 6 extension was added to the Contract. Thus, behind schedule to a degree unknown to the Port Authority, Zachry affirmatively sought out the dock extension, and continued to misrepresent through its schedule updates the true status and likely Milestone A and final completion dates of the Project.

Certified Document Number: 43477152 - Page 27 of 55

In this time frame, Andy Anderson told RKK SoilFreeze and GeoEngineers to develop a concept for a cutoff wall. Eventually, they developed several concepts. One concept was a cutoff wall that would employ two sheet pile walls eight feet apart and would be frozen in-between the sheet pile walls, with the freezing surrounding one pier on Row B. Both RKK SoilFreeze and GeoEngineers told Zachry that the Port Authority would have concern about any use of the soil freeze methodology near the Port Authority's drilled shafts. They told Zachry there were other concepts they could develop that would not cause as much concern for the Port Authority. Zachry told them to proceed with the 8-foot wide sheet pile, frozen wall concept and that Zachry "would run it down the Port Authority's throat." Zachry instructed RKK SoilFreeze and GeoEngineers not to discuss these issues with the Port Authority or its consultants.

As of April 5, 2005, RKK SoilFreeze and GeoEngineers had not created a design for the proposed cutoff wall. GeoEngineers had not, at that time, yet purchased the software that would allow it to develop the design. GeoEngineers had not determined how the cut-off wall would be installed or later removed. Indeed, at this time GeoEngineers had not concluded that a cutoff wall would even work. Nonetheless, on April 5, 2005, Anderson appeared at a Construction Coordination meeting and, without any prior announcement, minimized the potential impact of a cutoff wall concept for which Zachry then had no design. Anderson sketched on a white board, and promptly erased, what Zachry has since disingenuously called the "exact design" or the "very design" for the cut off wall, when in fact Zachry did not submit a draft design until some five months later. Anderson represented to the Port Authority's consultants in attendance that "freezing was not an issue" and that 40 to 50 feet of the Row B piling would be unaffected by the freezing. This turned out to be inaccurate, given the content of the subsequent cut-off wall draft design. Zachry made these statements in an effort to induce the Port Authority to proceed with a

Certified Document Number: 43477152 - Page 28 of 55

13984

change order for the $13 Million dock extension. Zachry knew that, if it told the Port Authority the truth, it would not be awarded the 332' dock extension.

On April 13, 2005, Zachry submitted a price quote to the Port Authority for the construction of the 332-feet of wharf that would comprise Section 6. In that price quote, Zachry represented to the Port Authority that "a freezewall -- cutoff wall" would be used that would encompass only one (1) piling on row "B" out of the hundreds of piers under the wharf deck. Zachry's price quote provided no other written detail about its preliminary, conceptual cutoff wall concept, and, if the cutoff wall bore any relationship to the preliminary "whiteboarded" concept discussed 8 days earlier, the price quote provided no clarification as to the myriad engineering and constructability issues that would be detailed for the first time only some five months later in Zachry's September 12, 2005 submittal of a draft cutoff wall design. In any event, at the time of the price quote, the Port Authority's consultants thought that Zachry might be able to mitigate the freezing risk to just one of the piers, as long as whatever formal submittal Zachry eventually provided for a cutoff wall design was acceptable. In the April 5, 2005 Construction Coordination meeting, CH2MHill, the Port Authority's Construction Manager, asked for the cut-off design so that it could be reviewed, and Zachry committed to providing the design. Indeed, Zachry repeatedly promised, falsely, that it would soon furnish a detailed design for the Port Authority's review. Thus, the Port Authority continued negotiations for awarding the 332' extension to Zachry.

Thereafter, Zachry submitted a document to the Port Authority in which Zachry stated nine (9) advantages to the Port Authority if the Port Authority were to award the change order work to Zachry under the existing Contract, rather than the Port Authority seeking competitive proposals and possibly awarding the work to another contractor. One of Zachry's

Certified Document Number: 43477152 - Page 29 of 55

representations to the Port Authority was that Zachry would perform its existing work and the change order work such that Zachry would achieve an "uninterrupted flow of work."

After submitting its April 13, 2005 price proposal, Zachry stopped work on a cutoff wall design, even though Zachry needed to use a cutoff wall whether or not it was awarded the dock extension. A competent contractor would have proceeded to develop a cutoff wall design, timely provided the design to the Port Authority and its consultants, and worked through the any concerns of the Port Authority or its consultants to arrive at a solution.

Zachry now makes the specious claim that the Port Authority had an obligation, after the April 5, 2005 meeting to: [1] stop the construction process and spend hundreds of thousands of dollars re-designing the Port Authority's facilities in order to make the design of the facility comport with Zachry's potential methods and means of construction; and [2] spend the time and money to retain consultants to review the preliminary, white-boarded concept. However, under the Contract, Zachry had the obligation to utilize methods and means of construction that comported with the Port Authority's design, not the other way around. Moreover, if Zachry wished to seek a change in the Port Authority's design, e.g., lengthening the drilled shafts, it was Zachry's obligation to submit the proposed change to the Port Authority, which Zachry did not do. Zachry makes this false claim to conceal the fact that Zachry misrepresented the facts to the Port Authority during the April 5, 2005 meeting about a proposed cutoff wall, and the fact that Zachry wrongfully delayed action to develop the cutoff wall design for the Port Authority to review.

Throughout the period of time extending from late April through mid-August of 2005, Zachry repeatedly represented to the Port Authority that the design for a proposed cutoff wall

Certified Document Number: 43477152 - Page 30 of 55

: 13065

was in progress. In fact, during this same timeframe, Zachry had not authorized RKK SoilFreeze and GeoEngineers to proceed with the creation of a design.

On May 18, 2005, Zachry submitted a revised quote to the Port Authority of $12,572,000 for the 332' dock extension. Once again, in spite of the many uncertainties and unknowns surrounding Zachry's use of the freezewall and "a freezewall – cut off wall," Zachry expressly represented to the Port Authority that Zachry would achieve an "uninterrupted work process." Once again, Zachry expressly represented to the Port Authority that Zachry would utilize Zachry's "current construction method." Once again, Zachry expressly represented to the Port Authority that "a freezewall – cutoff wall" would encompass only one "B" row pier. Zachry did not articulate any schedule concerns, or impose any time limit on the Port Authority's acceptance of the quote, and provided no further detail as to the preliminary, conceptual and unsubmitted "design" for "a freezewall – cut off wall."

On July 11, 2005, Zachry sent a letter to the Port Authority in which Zachry for the first time offered certain important clarifications and additions to the change order being negotiated. Zachry's letter omitted mention of the still unsubmitted "design" for "a freezewall – cut off wall." Zachry stated that pricing was based on "ZCC having a working design and drawings for drill shafts no later than August 12, 2005" and "ZCC having a working design and drawings for the Wharf Deck no later than November 25, 2005." Previously, Zachry had not asserted any such conditions. In its July 11, 2005 letter, Zachry simply stated that if the Port Authority met the two milestones enumerated above, then Zachry would meet the modified date of February 15, 2006 for the area required for Milestone A and that Zachry would meet the final completion date of June 1, 2006 for the original 1,660 feet of wharf (i.e., Sections 1-5) and the new final completion date of July 15, 2006 for the 332 feet of wharf (i.e., Section 6). Zachry expressed no

other schedule or timing concerns. The Port Authority met the two deadlines expressed by Zachry in its July 11, 2005 letter.

On July 25, 2005, the Port Authority Commission approved Change Order No. 4, and on August 8, 2005, the Port Authority sent a letter to Zachry stating, "This letter is to serve notice to ZCC of PHA's intent to proceed with this change at the agreed upon cost and scope of work." The next day, Zachry commenced performing the work under Change Order No. 4 — and the Port Authority became obligated, as Zachry's management understood, to pay Zachry for that work. The Port Authority noted that the Change Order had been approved by the Port Authority Commission in the amount of $12,962,800, that the Change Order would be in Zachry's San Antonio office by August 10, 2005 for execution, and that the Change Order was being expedited by the Port Authority. On August 9, 2005 the Port Authority sent Change Order No. 4 to Zachry's San Antonio office.

Zachry's belated, made-for-litigation contention that the Port Authority took an unreasonably long time to decide to award the change order Work to Zachry under Change Order No. 4 is false. In reality, the amount of time required to enter into Change Order No. 4 was reasonable. There were many discussions between representatives of the Port Authority and Zachry concerning the logistics of the proposed Change Order. The extension (*i.e.*, Section 6) was not even designed when Zachry and the Port Authority began discussion of the proposed Change Order, and Zachry was aware of this fact. Port Authority Commission approval was required to proceed with the design for the new Section 6 and then Section 6 had to be designed. The Port Authority and Zachry then needed to negotiate the terms of a Change Order and, if agreement was reached, the Port Authority Commission would then need to approve the Change Order.

Zachry's April 13, 2005 price quote was just that – a price quote, which the Port Authority had no obligation to accept. If Zachry thought it took too long to agree upon terms for a change order, Zachry had no obligation to accept the change by signing and binding itself to Change Order No. 4. But Zachry did so, foreclosing any such complaint. On August 29, 2005, Zachry finally signed Change Order No. 4 and its attendant Scope, Time and Price Modifications. Zachry signed Change Order No. 4 and the Scope, Time and Price Modifications without any reservations of rights, without any conditions or limitations of any type, and with complete knowledge of the length of time it took to finalize Change Order No. 4, and with complete knowledge of all of the events and actions that would be required of Zachry by Change Order No. 4 and the accompanying Scope, Time and Price Modifications. Any and all claims that Zachry might have had or wished to assert for money or time as a result of the amount of time it took to effect Change Order No. 4, or as a result of the changes required of Zachry to perform the change specified by Change Order No. 4, or changes in the methods that Zachry contemplated with respect to its original work under the Contract as a result of the work agreed to in Change Order No. 4, were subsumed and precluded by Change Order No. 4 and the accompanying Scope, Time and Price Modifications.

During the negotiations for Change Order No. 4, Zachry knew that it could not achieve the dates it was agreeing to in Change Order No. 4, namely, completion of Area A by February 15, 2006 and final completion of all of Zachry's work by July 15, 2006. Yet, Zachry concealed this information from the Port Authority, internally discussing when to come clean with the Port Authority, but unwilling to speak truthfully until it knew whether the Port Authority would award Zachry more work. Had the Port Authority known the truth, it would not have entered Change Order No. 4. In fact, Zachry misrepresented to the Port Authority during the

negotiations what Zachry could accomplish. Zachry did so to induce the Port Authority into granting the change order work to Zachry, so that Zachry would be paid $12.9 Million for a task that Zachry needed anyway.

It was not until September 12, 2005 – after the Port Commission approved the award of the Change Order Work to Zachry, after the Port Authority issued its letter for Zachry to proceed with the Work, after Zachry in fact commenced the Work, and after Zachry executed Change Order No. 4 – that Zachry first submitted any details of a draft design for a cut-off wall to the Port Authority's Construction Manager, CH2M Hill. This was GeoEngineers' September 9, 2005 draft cutoff wall design.

Zachry pleads that the design that Zachry submitted to the Port Authority on September 12, 2005 was "consistent with its prior description of the frozen cutoff wall." This assertion is false. In comparison to the draft design submitted on September 12, Zachry's prior explanation to the Port Authority as to the cut-off wall was misleading. Specifically, the September 2005 submittal showed a north/south cutoff wall that laterally froze far more than the one "B" row pier and froze to significantly greater depths than had been represented by Zachry in connection with negotiating Change Order No. 4. Zachry's September 12, 2005 submittal required freezing the soil around up to 23 of the wharf's piers and froze soil close to the bottoms of many of the piers. Moreover, Zachry's contentions that the September 12, 2005 draft design was "the explicit basis" for Change Order 4 and "approved by" the Port Authority when it executed Change Order 4, such that the Port Authority "breached" Change Order 4 or the Contract by responding that Zachry must "revise and resubmit" the submitted draft design, are incorrect as a matter of law as well as of fact.

The Port Authority's Construction Manager on September 14, 2005 forwarded the submittal to Jeff Ely of CH2M Hill to commence review of Zachry's draft cutoff wall design. Shortly thereafter, Hurricane Rita threatened the City of Houston and the Project site, resulting in a 9-day extension of time later being granted to Zachry. On September 28, 2005, Zachry's frozen soil wall designer, GeoEngineers, submitted a supplemental memorandum containing incorrect assumptions, thus heightening CH2MHill's concern as to whether Zachry's draft cutoff wall design placed the Port Authority's drilled shafts at risk.

On October 3, 2005 – more than a week before the Port Authority's October 11th "revise and resubmit" response to Zachry's submittal of the draft cut-off wall design – Zachry disclosed its inability to meet its Baseline Schedule. Specifically, Zachry projected missing the Milestone A date by 35 days, despite having agreed to the February 15, 2006 Milestone A date only a month before, when Zachry signed the Change Order.

In its pleadings, Zachry characterizes the Port Authority's October 11th response that Zachry "revise and resubmit" its September 12, 2005 submittal and protect the integrity of the Port Authority's wharf, as "bait and switch." By this accusation, Zachry accuses the Port Authority of conduct committed in fact by Zachry. Thus, as part of Zachry's "bait-and-switch" strategy, after Zachry knew the Port Authority was bound to pay Zachry almost $13 Million for Change Order 4, Zachry submitted its so-called "August" progress schedule showing that Zachry could not complete Area A until March 22, 2006, 35 days after the February 15, 2006 date Zachry had committed to meet in order to obtain the dock extension. If Zachry had disclosed during negotiation of Change Order No. 4 that it intended to freeze the soil around multiple piers closer and at greater depths than Zachry had represented in connection with negotiating Change

Certified Document Number: 43477152 - Page 35 of 55

Order No. 4, thereby placing the piers at risk, the Port Authority would not have entered into Change Order No. 4 with Zachry.

On October 11, 2005, in an effort to proceed on parallel paths of both (a) examining whether the risks associated with Zachry's September 12 draft cutoff wall design could be mitigated, and (b) investigating whether Zachry could provide an alternative cutoff wall design, the Port Authority informed Zachry that its September 12, 2005 submittal presented unacceptable risks to the Port Authority's wharf, specifically certain of the wharfs' piers, and asked Zachry to submit a revised proposal for the cutoff wall that would not place the wharf at risk or would mitigate the risk posed by the current proposal. The October 11th "revise and resubmit" response was reasonable under the circumstances.

On the same day – October 11, 2005 – at a Construction Coordination meeting, Zachry represented it would work with the Port Authority to address the Port Authority's concerns, a statement on which the Port Authority and its representatives relied. But Zachry did not do so. Instead, Zachry secretly made the decision not to formally present an alternative proposal to the Port Authority or explain to the Port Authority how Zachry would mitigate the risks of the submitted design.

On October 14, 2005, in light of Zachry's disclosure that it would not meet the Area A completion date it had just agreed to in Change Order 4, the Port Authority instructed Zachry to provide the Port Authority with a schedule recovery plan. From October 14, 2005 onward, the cutoff wall was an after-thought in Zachry's thinking. The issue Zachry was analyzing was: "can we make the required completion dates by using the main freeze wall." Zachry resurrected the cutoff wall as an "issue" only several months later, after Zachry began looking for ways to shift to the Port Authority the financial consequences of Zachry's managerial failures.

Certified Document Number: 43477152 - Page 36 of 55

: 13072

Zachry knew at the time it decided to abandon the freeze wall that the changes to the draft cutoff wall design needed to mitigate the risks to the Port Authority's drilled shafts could have been accomplished relatively quickly and simply. Also, Zachry could have offered an explanation as to how Zachry's draft cutoff wall design would protect the drilled shafts. Zachry did not attempt to implement either an available alternative cut-off wall design or to provide an explanation attempting to justify the September 12th design.

As a result of the Port Authority's October 14, 2005 request for a recovery plan, Zachry for the first time attempted to prepare realistic schedules. Those schedules, printed out by Zachry on or around October 31 and November 1, 2005, showed that if Zachry continued to use the main freeze wall, Zachry could not achieve the required Milestone A date. In fact, Zachry's schedules showed that, if Zachry continued with the main freeze wall, the earliest it could have Area A ready was December 30, 2006 — almost ten months late. In this time frame, Zachry learned that the delivery of the crane ship could not be delayed that long. Zachry also learned that the Port Authority expected Zachry to construct the facility that Zachry had to agreed to construct, that is, that the Port Authority was not going to accept a dock as to which Zachry performed only part of the agreed work by performing only part of the agreed excavation. Also, in this time frame, Zachry's efforts to coerce its subcontractors to make false statements about the unavailability of chillers, in order to obtain an extension of the Contract Time, had failed. At the same time, Zachry learned it would take longer to freeze-down and then thaw the main freeze wall than Zachry had assumed. Zachry also recognized that completing the main freeze wall and then freezing it would be expensive. Indeed, it is likely that Zachry believed at the time it would cost less to work in the wet than to continue to construct the main freeze wall and pay to freeze it and keep it frozen while doing its underdeck work. Zachry also recognized that it had not yet

taken the steps necessary to control the water flowing into the excavation area from the land side of the facility. At the same time, Zachry was concerned that there was no guarantee the freeze wall would work in a safe manner, or indeed would work at all. So, for these many reasons, for its own economic advantage, and in an effort to minimize its own potential liability under the Contract, Zachry determined to abandon the use of the main freeze wall.

In late 2005, Zachry represented to the Port Authority that Zachry would complete the Work by specified dates using what has been referred to as Plan B, namely, a hybrid approach involving working both in the dry and in the wet. These statements made by Zachry were either knowingly false or were made recklessly. The Port Authority relied on these representations to its detriment. At the time, Zachry did not say to the Port Authority that Zachry's decision to switch to "Plan B" and eliminate use of the freezewall in its entirety had anything to do with the Port Authority asking Zachry to "revise and resubmit" Zachry's draft cutoff wall design submittal. In executive meetings, Zachry did not state that Zachry's decision to abandon use of the main freeze wall was caused by the actions or inactions of the Port Authority.

Zachry's hybrid construction method (Plan B) was not properly engineered or scheduled. In fact, Plan B did not work within the time frames represented by Zachry. When Zachry's alternative Plan B turned out to require more time and expense than Zachry hoped, Zachry sought to blame the Port Authority for the resulting cost overrun.

At various times in its Work under the Contract, Zachry proposed changes to the Plans and Specifications that were not for the Port Authority's advantage and presented risk to the facility but were for Zachry's own benefit -- in order to make Zachry's Work easier, or to reduce the scope of the Work, or to reduce the cost to Zachry of the Work. Some of the changes would have resulted in the Port Authority receiving less under the Contract than Zachry had agreed to

provide. These proposed changes were not for the benefit of the Port Authority. The Port Authority expended substantial time and effort analyzing some of these proposed changes in an effort to respond in a reasonable way.

Throughout its Work under the Contract and extending into October of 2006, Zachry executed partial releases in favor of the Port Authority without reserving any right to present further claims. In each of these partial releases, which were additive to each other, Zachry released the Port Authority from any and all further claims with the respect to the portions of the Work completed as of the date specified in the partial release. In its October 23, 2006 partial release, Zachry released the Port Authority from any and all further claims with respect to any portion of the Work performed on or before August 31, 2006. Beginning in 2008, apparently a different company began signing and submitting releases and inducing and accepting payment from the Port Authority.

Zachry's losses on the Phase 1A Wharf and Dredge project result entirely from its own managerial incompetence and ineptitude. Quite simply, the Port Authority's "revise and resubmit" response did not cause Zachry damages.

(d)    The amount and any method of calculating economic damages.

Response:

Performance of the work under the Contract was completed in January of 2009. The Port Authority cannot know the precise nature and extent of its damages caused by Zachry's failure to timely meet the Milestone A deadline and failure to timely complete the project. The Port Authority's harm includes, without limitation, additional program management consultant and

Certified Document Number: 43477152 - Page 39 of 55

: 13675

engineering design fees, additional time spent and resources devoted by the Port Authority's engineering department, lost business, and loss of use of construction materials.

The difficulty of quantifying and proving such actual damages is one of the reasons the parties included liquidated damages provisions in the Contract. The liquidated damages continued to be assessable until final completion in 2009, although the Port Authority has not assessed them beyond 2006. The liquidated damages provisions are enforceable terms and provisions of the Contract, and the Port Authority is entitled to withhold and/or offset the liquidated damages. The liquidated damages were a reasonable forecast of just compensation because the Contract provided for liquidated damages in lieu of actual damages and because the Port Authority sustained actual damages in an amount that is not disproportionate to the liquidated damages.

The Port Authority has withheld reasonable amounts, calculated based upon the parties contractually agreed rates for liquidated damages, from payments made to Zachry to justly compensate the Port Authority for actual losses suffered as a result of Zachry's delayed completion of work.

The Port Authority has also been harmed by Zachry's advance cruise dredging, which was defectively performed pursuant to a change order to the Contract. The Port Authority has withheld reasonable amounts, calculated based upon the cost to correct the defective dredging work and its consequences from payments made to Zachry to justly compensate the Port Authority for actual loss suffered as a result of the defective work.

The Port Authority is entitled to recover attorneys' fees incurred in defending against Plaintiff's claims. The Port Authority has produced documents showing its attorneys' fees accrued through March, 2009, and has designated an expert who has submitted reports regarding

Certified Document Number: 43477152 - Page 40 of 55

the Port Authority's attorneys' fees. The full amount of the Port Authority's attorneys' fees will not be know until the trial of this matter is near conclusion.

(e)     The name, address, and telephone number of persons having knowledge of relevant facts, and a brief statement of each identified person's connection with the case.

Response:

Advanced Technology Science Engineering Research ("ATSER")
1150 Richcrest Dr.
Houston, Texas 77060
Phone:  (281) 999-9961

    McKinney, Gary – Lead Inspector

CenterPoint Energy
Galveston, Texas
Phone: (409) 765-4086
Cell Phone: (281) 382-8578

    Maxwell, Mike – CenterPoint employee with whom Zachry communicated regarding electrical requirements for freezewall. Mr. Maxwell may be contacted through CenterPoint's attorney, Ms. Judy Liu, at (713) 207-5465.

CH2M Hill
7600 West Tidwell Road
Suite 600
Houston, TX 77040
Phone: (713) 462-0161
Fax: (713) 462-0165

    Byers, Ron – Engineering Design Manager, formerly with CH2M Hill, now believed to be with Moffatt & Nichol in Vancouver

    Curtiss, Steve – Construction Manager, formerly with CH2M Hill, now believed to be with Parsons Brinkerhoff in Virginia

    Ely, Jeff – Engineering Project Manager

    Johnson, Bob – Program Manager, formerly with CH2M Hill, now believed to be with Klotz

    Sethness, Doug – Program Manager

Certified Document Number: 43477152 - Page 41 of 55

: 13977

**TAB 11**

**The Port of Houston Authority's Objections and Responses to
Zachry's Fourth Set of Interrogatories and
Fourth Request for Production
(CR46:13105-16)**

| | | |
|---|---|---|
| ZACHRY CONSTRUCTION CORPORATION, | § § § | IN THE DISTRICT COURT OF |
| Plaintiff | § § § | |
| v. | § § § § | HARRIS COUNTY, TEXAS |
| THE PORT OF HOUSTON AUTHORITY | § § | |
| Defendant | § | 151ST JUDICIAL DISTRICT |

## THE PORT OF HOUSTON AUTHORITY'S OBJECTIONS AND RESPONSES TO ZACHRY'S FOURTH SET OF INTERROGATORIES AND FOURTH REQUEST FOR PRODUCTION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Defendant, The Port of Houston Authority (the "Port of Houston"), and respectfully serves its Objections and Responses to the Fourth Set of Interrogatories and Fourth Request for Production served by the Plaintiff, Zachry Construction Corporation n/k/a Zachry Industrial, Inc. ("Zachry"), as follows:

## FOURTH SET OF INTERROGATORIES

### INTERROGATORY NO.1:

In Your Second Amended Response to Disclosures, You state that "[t]he Port Authority's harm includes, without limitation, additional program management consultant and engineering design fees, additional time spent and resources devoted by the Port Authority's engineering department, lost business, and loss of use of construction materials . . .[and] The Port Authority has also been harmed by Zachry's advance cruise dredging, which was defectively performed pursuant to a change order to the Contract."

Please list and describe each and every way that You contend You have been harmed by Zachry in regards to the performance of the Contract. In particular, please describe:

1



Certified Document Number: 43477155 - Page 1 of 12

Certified Document Number: 43477155 - Page 2 of 12

(i)    The specific harm you claim You suffered as a result of Zachry's alleged misconduct and the date/dates that such alleged harm occurred;

(ii)    the amount of damages sustained for each of the claimed harms You allege resulted from Zachry's alleged misconduct;

(iii)    the amount of program management and engineering design fees You contend You have expended as a result of Zachry's alleged misconduct;

(iv)    the amount of additional time spent and resources devoted by the Port Authority's engineering department that You contend were spent as a result of Zachry's alleged misconduct;

(v)    what "lost business" PHA sustained, when, and the value of such lost business You contend was a result of Zachry's alleged misconduct;

(vi)    what "loss of use of construction materials" You contend was a result of Zachry's alleged misconduct, and the value of such claimed loss;

(vii)    how You have been harmed by Zachry's dredging and the damages sustained as a result of that alleged harm;

(viii)    the total amount of damages that You claim to have sustained to date as a result of Zachry's alleged misconduct.

## OBJECTIONS AND RESPONSE:

The Port of Houston objects to the interrogatories as discovery that was propounded after the close of the discovery period of this case and without leave of Court having been requested or granted.

The Port of Houston objects to each interrogatory to the extent that it is vague ("Vague"), unduly burdensome ("Unduly Burdensome"), overly broad ("Overly Broad") or seeks to impose obligations or burdens on the Port of Houston beyond those imposed by the Texas Rules of Civil Procedure, including without limitation the Rules of Civil Procedure applicable to discovery of magnetic or electronic data. (Each of these objections, individually or collectively, "Beyond the Rules."). The Port of Houston specifically objects to Interrogatory No.1 as Vague with respect to the term "value" and the phrase "in regards to performance of the Contract."

The Port of Houston objects to the definition of "Zachry" set forth in paragraph 2 of *Plaintiff's Fourth Set of Interrogatories and Fourth Request for Production* to the Port of Houston as Vague, because the term is defined in relevant part as meaning "Zachry Construction Corporation", a name in fact used by more than one company that was involved on the Project: one is the Port of Houston's counterparty as named, defined and agreed upon in the Bayport Terminal Complex Phase 1A Wharf & Dredging Contract; at least one other is not. Furthermore, the Port of Houston understands that the correct name of Plaintiff is now Zachry Industrial, Inc. It appears that the entity formerly known as "Zachry Construction Corporation" engaged in transactions such that it no longer performed the Work under the Phase 1A Wharf and Dredging Contract, without the prior knowledge of the Port of Houston and in breach of the Contract. The Port of Houston objects to the definition of "Zachry" to the extent that it suggests that the Port of Houston has a contract for the work under the Phase 1A Wharf & Dredging Contract with any entity other than the entity that originally executed the Ph.1A Wharf & Dredging Contract as the "Contractor." The Port of Houston, by its use of the term "Zachry" in these objections and responses, refers to the entity that is the "Contractor" under the Phase 1A Wharf & Dredging Contract.

2

The Port of Houston objects to the definition of "Wharf and Dredge Contract" or "Contract" and each and every interrogatory that includes the term "Wharf and Dredge Contract" or "Contract" to the extent that Zachry intends for the term "Wharf and Dredge Contract" or "Contract" to mean that the Bayport Terminal Complex Phase 1A Wharf and Dredging Contract includes a greater scope of work or authority or discretion for Zachry than, in fact, it does. For example, Zachry's definition states that the contract is for the "design, construction and procurement" of a wharf facility, but, in fact, the Phase 1A Wharf and Dredging Contract is not a design build contract or an engineer, procure and construct contract as implied by the definition. Zachry's scope of work is set forth in the Phase 1A Wharf and Dredging Contract and the Port of Houston will respond in accordance with the actual scope of the Phase 1A Wharf and Dredging Contract.

The Port of Houston further objects to the interrogatories to the extent they would require information protected or exempted from discovery by any applicable privilege or immunity. In all instances, the Port of Houston intends to preserve and claim, where applicable, the attorney/client privilege, the work product immunity, the common interest privilege, the consulting expert privilege, the executive session privilege pursuant to Sections 551.104 and 551.146, Texas Government Code, of the Texas Open Meetings Act, the maritime security privilege pursuant to 49 U.S.C. 114 and 49 C.F.R. pt. 1520, and any other privilege, immunity or other legal principle or rule that protects or exempts from disclosure documents or other information requested by the Plaintiff.

Pursuant to Texas Rule of Civil Procedure 197.1 and its comment no. 1, parts (i) and (vii) of the interrogatories are expressly objected to to the extent that the interrogatories would require the Port of Houston to state all of its factual assertions about its subject matter. The Port of Houston assumes that in propounding the interrogatories, Zachry is not asking the Port of Houston to marshal the evidence with respect to the subject matters addressed by the interrogatory and the Port of Houston, pursuant to Texas Rule of Procedure 197.1 and its comment no. 1, objects to any request or demand by Zachry that the Port of Houston so marshal.

Pursuant to Texas Rule of Civil Procedure 197.2(c), to the extent the answer to the interrogatories may be derived or ascertained from the Port of Houston's business records that have been or will be produced in this case, the Port of Houston objects on the basis that the burden for deriving or ascertaining the answer is substantially the same for the Port of Houston as it is for Zachry.

Subject to its objections and based on the stated assumptions, the Port of Houston answers Zachry's Fourth Set of Interrogatories as follows:

Under the Contract, Zachry was required to complete Area A by February 15, 2006 and the entirety of the Work by July 15, 2006. Both deadlines were subsequently extended 9 days for Hurricane Rita. Zachry failed to meet either deadline. Zachry did not declare completion of the Work under the Contract until January of 2009 and continued to work on Area A until that time. The Work, however, still is not complete, a point of discussion between the parties.

The Port of Houston does not know the universe of work that may not have been properly performed by Zachry or the universe of Zachry's failure to comply with the Contract. Moreover, Zachry has continuing warranty obligations that apply to any work that was not properly

3

performed by Zachry and the Port of Houston expects that Zachry will comply with such obligations. The Port of Houston's knowledge of deficient Work by Zachry, however, includes deficient crane rail installation, deficiencies in the fender coatings, deficiencies in the pavement striping, deficient dust plan, and deficiencies in advanced cruise dredging. Furthermore, the Port of Houston has been harmed by Zachry's failure to pay for overtime inspections and the Port of Houston's various concessions in an effort to facilitate Zachry's completion of the work. These concessions include agreeing to allow Zachry to install fabric formed revetment in lieu of the articulated block mat Zachry was contractually required to install. In addition, the Port of Houston incurred significant costs in evaluating proposals from Zachry in Zachry's effort to provide the Port of Houston with less than it had agreed to provide, such as Zachry's proposal to revise the under wharf slope.

The Port of Houston cannot know the precise nature and extent of damages caused by Zachry's failure to timely meet the Milestone A deadline, failure to timely complete the Project, failures to properly perform the Work, and fraud. In addition to the readily quantifiable harm Zachry caused the Port of Houston, Zachry harmed the Port of Houston in ways that are very difficult to quantify.

Subject to the foregoing, the estimated costs associated with the above identified known deficiencies in Zachry's Work include the following:

- Cost to correct defective fender coating: estimated as $509,312.48

- Cost to install fenders: estimated as $478,450.00

- Failure to complete clearing and grubbing on the South side of Port Road: $25,200.00 (to be deducted from amounts due Zachry per agreement with Zachry)

- Deficient crane rail installation: inspection cost $7,460.00; future cost unknown at this time

- Defective striping: approximately $180,000.00

- Deficient dust plan: approximately $10,000.00

- Cost for Work outside of normal hours: at least $73,536.22

- Investigate means of removing soil from under wharf deck: at least $24,900.00

- Cost to evaluate fabric formed revetment: at least $30,246.77

- Decrease in cost to Zachry for substitution of fabric formed revetment: at least $450,000.00

- Increase in cost to Port of Houston for maintenance of fabric formed revetment: Not yet determined

- Cost to evaluate alternative anchor design: at least $7,500.00

4

- Cost to evaluate elimination of revetment: at least $20,170.73

- Cost to evaluate various under wharf deck slopes: at least $245,491.58

- Cost to inspect and review proposed repair of defective drilled shafts: at least $26,195.00

With respect to Zachry's defective dredging under Change Order No. 1 to the Contract, *i.e.* the "advanced cruise dredging" work, Zachry dredged outside of the dredge profile of the Contract, destabilizing the adjacent shoreline and altering the condition of the site as advertised in bid proposal documents for the Cruise Wharf and Dredging Contract. Zachry's failures necessitated the Port of Houston having the contractor of the Cruise Wharf and Dredging Contract, Orion, mitigate and repair the harm caused by Zachry. The amount of such payments to Orion is $600,000.00.

The Port of Houston's harm due to Zachry's failure to timely complete Milestone A and the entire Project includes, without limitation, additional program management consultant and engineering fees, additional time spent and resources devoted by the Port of Houston's engineering department, lost business, and loss of use of construction materials. The difficulty of quantifying and proving such actual damages is one of the reasons the parties agreed to the Contract price reduction and liquidated damages provisions in the Contract. The full amount of harm caused by the delay is unknown.

Subject to the foregoing, the Port of Houston incurred at least the following additional costs for additional consultant services performed through January 2009 as a result of Zachry's failure to timely complete the work:

- $46,970.85 for Geotest;

- $1,118,953.24 for CH2M Hill;

- $130,750.00 for Overland Assessments; and

- $74,617.29 for DMJM

In addition, the Port of Houston paid $172,871.82 to Paradigm for services after July 2006 in connection with both the Phase 1A Wharf & Dredging Project and the Container Yard project. A portion, which can be determined from the documents produced in discovery, is associated with the Zachry caused delay on the Phase 1A Wharf & Dredging Project.

Zachry also caused the Port of Houston's engineering department to expend an additional approximately 3,299 man hours on the Phase 1A Wharf & Dredging Project from August 2006 through January 2009, which represents an expense to the Port of Houston of $220,044.98. Other Port of Houston personnel were required to expend additional time on the Phase 1A Wharf & Dredging Project as well, but do not keep track of their time, so a readily quantifiable amount representing the additional increased expense to the Port of Houston on the Phase 1A Wharf & Dredging for their time is not currently available.

5

In addition to the additional expense incurred on the Phase 1A Wharf & Dredging Project for extended personnel time, the time spent by the Port of Houston personnel on the Phase 1A Wharf & Dredging Project during this time period would have been spent on other projects, resulting in additional losses to the Port of Houston. These losses of are difficult to quantify.

Zachry's failure to timely complete the Work of the on the Phase 1A Wharf & Dredging Project precluded Port of Houston customers from using the Bayport Terminal Complex as soon as they otherwise could have. The steamship lines that moved from Barbours Cut Terminal to Bayport collectively increased container volume from 77,586 vessel lifts in 2006 to 102,413 vessel lifts in 2007 (an increase of 32%). At the same time, steamship lines remaining at Barbours Cut Terminal filled the void left by the relocation of carriers to Bayport, and Barbours Cut Terminal containerized cargo still increased by 3% over the previous year. The Port of Houston believes that the same full capacity use would have occurred if the wharf had opened on time in July 2006. Thus, the Port of Houston lost over six months of cargo resulting in an estimated $620,000 decrease in revenue as a result of late completion of the entirety of the work. In addition, when the first customer began using Bayport, the customer leased a portion of the container yard. The Port of Houston believes that it would have leased the container yard earlier had the project been completed on time in July 2006, resulting in a loss of lease revenue of $210,000.

Because Zachry did not complete the dredging in a timely manner using mechanical means, Zachry was allowed to utilize hydraulic dredging in the fall of 2006, after the project completion deadline, to complete the dredging so that the Port of Houston could utilize the facility upon Zachry's sufficient completion of a portion of the wharf (albeit still incomplete). The estimated harm to the Port of Houston as a result of Zachry's use of hydraulic dredging due to its failure to complete the dredging within the contract time is at least $2,500,000. The harm includes the cost to manage the hydraulic dredge material and close the hydraulic dredge ponds to prepare for future construction.

Moreover, Zachry's failure to timely dredge material from the Bayport channel and to excavate material from beneath the wharf deck deprived the Port of Houston of the opportunity to have the materials available as fill as soon as the materials should have been for use on other projects. Thus, fill material that should have been provided from one or both of such sources, because of Zachry's delays, had to be obtained from borrow pits at an estimated cost of $470,000.

The full amount of the harm to the Port of Houston as a result of Zachry's failure to timely meet the Milestone A deadline, failure to timely complete the Project, and failures to properly perform the Work is difficult to quantify. The Port of Houston has suffered at least $8,079,799 in quantifiable damages, but the total harm to the Port of Houston is higher.

6

## REQUESTS FOR PRODUCTION

GENERAL OBJECTIONS TO REQUESTS FOR PRODUCTION:

With respect to Zachry's Fourth Request for Production, the Port of Houston hereby objects as follows:

1.  The Port of Houston objects to each and every request to the extent that such request would require information protected or exempted from discovery by any applicable privilege or immunity. In all instances, the Port of Houston intends to preserve and claim, where applicable, the attorney/client privilege, the work product immunity, the common interest privilege, the consulting expert privilege, the executive session privilege pursuant to Sections 551.104 and 551.146, Texas Government Code, of the Texas Open Meetings Act, the maritime security privilege pursuant to 49 U.S.C. 114 and 49 C.F.R. pt. 1520, and any other privilege, immunity or other legal principle or rule that protects or exempts from disclosure documents or other information requested by the Plaintiff. The foregoing objection is referred throughout the below objections as "Privileged."

2.  The Port of Houston objects to each and every request to the extent that it is vague ("Vague"), unduly burdensome ("Unduly Burdensome"), overly broad ("Overly Broad") or seeks to impose obligations or burdens on the Port of Houston beyond those imposed by the Texas Rules of Civil Procedure, including without limitation the Rules of Civil Procedure applicable to discovery of magnetic or electronic data (each of these objections, individually or collectively, "Beyond the Rules.")

3.  The Port of Houston objects to the definition of "Zachry" set forth in paragraph 2 of *Plaintiff's Fourth Set of Interrogatories and Fourth Request for Production to the Port of Houston* as Vague, because the term is defined in relevant part as meaning "Zachry Construction Corporation", a name in fact used by more than one company that was involved on the Project: one is the Port of Houston's counterparty as named, defined and agreed upon in the Bayport Terminal Complex Phase 1A Wharf & Dredging Contract; at least one other is not. Furthermore, the Port of Houston understands that the correct name of Plaintiff is now Zachry Industrial, Inc. It appears that the entity formerly known as "Zachry Construction Corporation" engaged in transactions such that it no longer performed the Work under the Phase 1A Wharf & Dredging Contract, without the prior knowledge of the Port of Houston and in breach of the Contract. The Port of Houston objects to the definition of "Zachry" to the extent that it suggests that the Port of Houston has a contract for the work under the Phase 1A Wharf & Dredging Contract with any entity other than the entity that originally executed the Phase 1A Wharf & Dredging Contract as the "Contractor." The Port of Houston, by its use of the term "Zachry" in these objections, refers to the entity that is the "Contractor" under the Phase 1A Wharf & Dredging Contract.

4.  The Port of Houston objects to the definition of "Wharf and Dredge Contract" or "Contract" and each and every request that includes the term "Wharf and Dredge Contract" or "Contract" to the extent that Zachry intends for the term "Wharf and Dredge Contract" or "Contract" to mean that the Bayport Terminal Complex Phase 1A Wharf and Dredging Contract includes a greater scope of work or authority or discretion for Zachry than, in fact, it does. For example, Zachry's definition states that the contract is for the "design, construction and

7

procurement" of a wharf facility, but, in fact, the Phase 1A Wharf and Dredging Contract is not a design build contract or an engineer, procure and construct contract as implied by the definition. Zachry's scope of work is set forth in the Phase 1A Wharf and Dredging Contract and the Port of Houston will respond in accordance with the actual scope of the Phase 1A Wharf and Dredging Contract. The foregoing objection is referred to below as "Contract."

5.     The Port of Houston objects to the definition of "document" in paragraph 7 under the Definitions and Instructions heading of *Plaintiff's Fourth Set of Interrogatories and Fourth Request for Production* to the extent that the definition (i) inaccurately characterizes or seeks to expand Tex. R. Civ. P. 192.3(b), (ii) could be construed to require the Port of Houston to locate or produce documents no longer in its possession, custody, or control, (iii) would result in any obligation or burden that is Beyond the Rules, and (iv) calls for documents that can be obtained from some other source that is more convenient, less burdensome, or less expensive than demanding these documents from the Port of Houston.

6.     The Port of Houston objects to the definition of "document" in paragraph 7 under the Definitions and Instructions heading of *Plaintiff's Fourth Set of Interrogatories and Fourth Request for Production* as Unreasonably Burdensome, duplicative, Vague and Beyond the Rules to the extent that the definition could be construed to require the Port of Houston to produce both paper and electronic versions of the same identical document, notwithstanding use of the term "non-identical" in the definition.

7.     The Port of Houston objects to the definition of "document" in paragraph 7 under the Definitions and Instructions heading of *Plaintiff's Fourth Set of Interrogatories and Fourth Request for Production* and the phrase "care, custody or control" as used therein to the extent Plaintiff seeks to expand the scope of the Port of Houston's obligation to produce documents beyond Tex. R. Civ. P. 192.3(b) and 192.7(b) or that is otherwise Beyond the Rules.

8.     The Port of Houston objects to paragraph 11 under the Definitions and Instructions heading of *Plaintiff's Fourth Set of Interrogatories and Fourth Request for Production* to the extent it seeks to require a privilege log that is Beyond the Rules or to require the Port of Houston to provide a privilege log sooner than required by the Texas Rules of Civil Procedure.

9.     The Port of Houston objects to paragraph 12 under the Definitions and Instructions heading of *Plaintiff's Fourth Set of Interrogatories and Fourth Request for Production* to the extent it seeks to impose obligations upon the Port of Houston that are Beyond the Rules, including without limitation obligations in excess of those imposed by Tex. R. Civ. P. 196.4.

10.    The Port of Houston objects to paragraph 13 under the Definitions and Instructions heading of *Plaintiff's Fourth Set of Interrogatories and Fourth Request for Production* to the extent it seeks to impose obligations upon the Port of Houston that are Beyond the Rules.

11.    The Port of Houston objects to Zachry's Fourth Requests for Production as duplicative ("Duplicative").

Certified Document Number: 43477155 - Page 8 of 12

12. The foregoing objections are hereby incorporated by reference into each other and into each individual response below. The foregoing objections and the objections lodged below should be construed as supplementing and not as conflicting with one another.

Subject to such general objections, the Port of Houston specifically objects and responds to each request as set forth below.

REQUEST NO. 1:

All documents or communications concerning, relating, or regarding any harm You contend that You have suffered as a result of Zachry's alleged misconduct in connection with its performance of the Contract, including but not limited to all documents or communications regarding your contention that "[t]he Port Authority's harm includes, without limitation, additional program management consultant and engineering design fees, additional time spent and resources devoted by the Port Authority's engineering department, lost business, and loss of use of construction materials . . .[and] The Port Authority has also been harmed by Zachry's advance cruise dredging, which was defectively performed pursuant to a change order to the Contract." This request includes, but is not limited to, any and all documents evidencing and quantifying each such alleged harm.

RESPONSE AND OBJECTIONS:

The Port of Houston objects to the request as discovery that was propounded after the close of the discovery period of this case and without leave of Court having been requested or granted.

Subject to the foregoing objection, the Port of Houston incorporates the general objections stated above and specifically objects as follows: Privileged, Vague with respect to the term "suffered," Contract, and Duplicative.

Subject to the foregoing objections, the Port of Houston responds as follows: The Port of Houston has produced relevant, non-privileged, non-objected to responsive documents sought by this request. To the extent additional relevant, non-privileged, non-objected to responsive documents are located, the Port of Houston will produce them.

REQUEST NO. 2:

To the extent not previously produced, please produce any and all documents which constitute information requested by or relied upon to formulate or which otherwise relate to your answers to *Zachry's Fourth Set of Interrogatories, Interrogatory No. 1 above*.

RESPONSE AND OBJECTIONS:

The Port of Houston objects to this request as discovery that was propounded after the close of the discovery period of this case and without leave of Court having been requested or granted.

Certified Document Number: 43477155 - Page 10 of 12

Subject to the foregoing objection, the Port of Houston incorporates the general objections stated above and specifically objects as follows: Unduly Burdensome, Overly Broad, and Unlimited Scope, in the sense that the information requested is not limited to the period of time during the negotiation or performance of the Phase 1A Wharf and Dredging Contract, Privileged, and Duplicative.

Subject to the foregoing objections, the Port of Houston responds as follows: The Port of Houston has produced relevant, non-privileged, non-objected to responsive documents sought by this request. To the extent additional relevant, non-privileged, non-objected to responsive documents are located, the Port of Houston will produce them.

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of July, 2009, a true and correct copy of the *Port of Houston's Objections to Zachry's Fourth Set of Interrogatories and Fourth Request for Production* was served on the following counsel for Zachry Construction Corporation in accordance with the Texas Rules of Civil Procedure.

Brandon T. Allen, Esq.
Gibbs & Bruns, LLP
1100 Louisiana, Suite 5300
Houston, TX 77003

4059719v.4

11

STATE OF TEXAS

COUNTY OF HARRIS

Before me the undersigned Notary Public, personally appeared Mark E. Vincent, who, being first duly sworn, did state that he is authorized to sign these *Objections and Responses to Zachry's Fourth Set of Interrogatories* on behalf of the Port of Houston Authority, that he has read the foregoing answers to the Interrogatories and that the facts stated therein are based upon the information reasonably available to him or obtained from persons thought to be knowledgeable with respect thereto, and are true and correct to the best of his knowledge, information and belief.

Mark E. Vincent

Sworn to and subscribed before me this 23d day of July, 2009.

Notary Public in and for the State of Texas

ROSA L. VILLELA
Notary Public, State of Texas
My Commission Expires
FEBRUARY 20, 2012

**TAB 12**

**Defendant Port of Houston Authority's**
**Proposed Draft Jury Charge filed September 9, 2007**
**(CR43:12401-20)**

Filed 09 September 17 A11:52
Loren Jackson - District Clerk
Harris County
ED101J015517175
By: Wanda Chambers

CAUSE NO. 2006-72970

| | | |
|---|---|---|
| ZACHRY CONSTRUCTION CORPORATION. | § § § | IN THE DISTRICT COURT OF |
| Plaintiff | § § | |
| V. | § § | HARRIS COUNTY, T E X A S |
| THE PORT OF HOUSTON AUTHORITY. | § § § | |
| Defendant | § | 151ST JUDICIAL DISTRICT |

## DEFENDANT PORT OF HOUSTON AUTHORITY'S
## PROPOSED DRAFT JURY CHARGE

COMES NOW. Defendant THE PORT OF HOUSTON AUTHORITY (the "Port Authority"). and files its preliminary proposed draft charge of the Court. A copy of the Port Authority's preliminary draft charge is attached hereto. The Port Authority expressly reserves the right to change. revise. add to. and/or delete instructions and/or questions as it may deem appropriate. Moreover. by submitting this preliminary draft charge. the Port Authority is not admitting that the attached questions and/or instructions should be submitted to the jury and is not admitting that there is any evidence to support the submission of the attached questions and/or instructions to the jury. The Port Authority expressly reserves the right to assert any objections and to make any requests (including. without limitation. no evidence objections) to the charge submitted to the jury by the Court.

Respectfully submitted,

VINSON & ELKINS L.L.P.

Of Counsel:
J. Clark Martin
Texas Bar No. 13090000
KELLY HART & HALLMAN
1000 Louisiana, Suite 4700
Houston, Texas 77002-6760
Phone: 713.654.4600
Fax: 713.521.5925
E-Mail: clark.martin@khh.com

/s/  Marie R. Yeates
Marie R. Yeates
Texas Bar No. 22150700
Karen T. White
Texas Bar No. 20274500
Bill Sims
Texas Bar No. 18429500
Seth A. Russell
Texas Bar No. 24027943
2500 First City Tower
1001 Fannin St.
Houston, Texas 77002
Phone: 713.758.2388
Fax: 713.615.5902
Email: kwhite@velaw.com
bsims@velaw.com
srussell@velaw.com

Lawrence J. Fossi
Texas Bar No. 07280650
Fossi & Jewell LLP
4203 Yoakum Blvd., Suite 100
Houston, Texas 77006
Phone: 713.529.4000
Fax: 713.529.4094
E-mail: lfossi@fossijewell.com

David H. Brown
Texas Bar No. 03109200
BROWN & KORNEGAY LLP
2777 Allen Parkway, Suite 977
Houston, Texas 77019
Phone: 713.528.3703
Fax: 713.528.3701
Email: dbrown@bkllp.com

ATTORNEYS FOR DEFENDANT
THE PORT OF HOUSTON AUTHORITY

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of September, 2009, a true and correct copy of the foregoing instrument was served on the following counsel for Zachry Construction Corporation in accordance with the Texas Rules of Civil Procedure.

Robin C. Gibbs
Gibbs & Bruns, LLP
1100 Louisiana, Suite 5300
Houston, TX 77002

/s/ Karen T. White
Karen T. White

## Preliminary Instructions

"The Contract" means the Bayport Terminal Complex Phase 1A Wharf and Dredging Contract executed by The Port of Houston Authority and Zachry Construction Corporation on or about June 1, 2004, and includes all "Contract Documents" as that term is defined §1.10 of the General Conditions of the Contract.

"Zachry" means Zachry Construction Corporation, now known as Zachry Industrial Inc.

"Port" means The Port of Houston Authority

Question No. 1

Did the Port fail to comply with the Contract in any of the following respects by the October 11, 2005 response to Zachry's September 9, 2005 Frozen Soil Shoring Draft Cutoff Wall Design?

In answering this Question, consider all of the provisions of the Contract.

Answer "Yes" or "No" as to each of the following:

(a)     Change Order 4

Answer:_____

(b)     § 5.10 of the General Conditions

Answer:_____

If your answer to Question No. 1(a) or Question 1(b) is "Yes," then answer the following the corresponding subparts of this Question. Otherwise, do not answer the following Question.

Question No. 2

Was the Port's failure to comply excused?

Answer "Yes" or "No" for each of the following:

A.   Conditions precedent

Failure to comply by the Port is excused by Zachry's previous failure, if any, to satisfy a condition precedent to its right to recovery pursuant to the agreement. "Conditions precedent" are acts or events that are to occur after the contract is made and that must occur before there is a right to immediate performance and before there can be a breach of contractual duty.

(a) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 1(a)

Answer:_____

(b) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 1(b)

Answer:_____


B.   Waiver

Failure to comply by the Port is excused if compliance was waived by Zachry. Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

(a) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 1(a)

Answer:_____

(b) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 1(b)

Answer:_____

C. Equitable estoppel

Failure to comply by the Port is excused if Zachry is equitably estopped. Equitable estoppel is established if all of the following circumstances occurred:

1. Zachry

   a. by words or conduct made a false representation or concealed material facts,

   b. with knowledge of the facts or with knowledge or information that would lead a reasonable person to discover the facts, and

   c. with the intention that the Port would rely on the false representation or concealment in action or deciding not to act; and

2. The Port

   a. did not know and had no means of knowing the facts and

   b. relied to its detriment on the false representation or concealment of material facts.

(a) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 1(a)

Answer:_____

(b) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 1(b)

Answer:_____

D. Quasi-estoppel

Failure to comply by the Port is excused if Zachry acquiesced to the earlier situation; Zachry's present position is inconsistent with its earlier position when it acquiesced to the situation; and it would be unconscionable to allow Zacrhy to maintain its present position, which is to the Port's disadvantage.

(a) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 1(a)

Answer:_____

(b) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 1(b)

Answer:_____

E.  Accord and satisfaction

Failure to comply by the Port is excused if a different performance was accepted by Zachry as full satisfaction of performance of the original obligations of the agreement.

(a) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 1(a)

Answer:_____

(b) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 1(b)

Answer:_____


F.  Ratification

Failure to comply by the Port is excused if Zachry ratified the Port's failure to comply, if any. Ratification is the adoption or confirmation by a person, with knowledge of all material facts, of a prior act. Ratification may be express or implied. Implied ratification occurs if a party, though it may have been unaware of unauthorized conduct taken on its behalf at the time it occurred, retains the benefits of the transaction involving the unauthorized conduct after it acquired full knowledge of the unauthorized conduct. Implied ratification results in the ratification of the entire transaction.

(a) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 1(a)

Answer:_____

(b) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 1(b)

Answer:_____

G.  Payment

Failure to comply by the Port is excused if the Port paid Zachry all of the amounts due and owed under the Contract.

(a) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 1(a)

Answer:_____

(b) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 1(b)

Answer:_____

: 12488

H.    Volunteer

Failure to comply by the Port is excused if Zachry acted as a volunteer, voluntarily changing its position, not due to any force or other conduct by the Port.

(a) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 1(a)

Answer:_____

(b) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 1(b)

Answer:_____


I.    Release

Failure to comply by the Port is excused if Zachry released the claims asserted by it in this lawsuit against the Port.

(a) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 1(a)

Answer:_____

(b) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 1(b)

Answer:_____

J.    Fraudulent inducement

Failure to comply by the Port is excused if Zachry fraudulently induced the Port to enter into the Change Order 4. Fraudulent inducement occurs when –

1.    a party makes a material misrepresentation or a party fails to disclose a material fact within the knowledge of that party,

2.    the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion or the party knows or the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,

3.    the misrepresentation is made with the intention that it should be acted on by the other party or the party intends to induce the other party to take some action by failing to disclose the fact, and

4.    the other party suffers injury as a result of its reliance on the misrepresentation or as a result of acting without knowledge of the undisclosed fact.

"Misrepresentation" means a false statement of fact; or a promise of future performance made with an intent, at the time the promise was made, not to perform as promised.

A duty to disclose may arise when (1) a person voluntarily discloses partial information but fails to disclose the whole truth; (2) a person makes a representation but fails to disclose new information that makes the earlier representation misleading or untrue; or (3) a person makes a partial disclosure and conveys a false impression.

(a) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 1(a)

Answer:_____

K.      Prior material breach

Failure to comply by the Port is excused by Zachry's previous failure, if any, to comply with a material obligation of the Contract.

(a) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 1(a)

Answer:_____

(b) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 1(b)

Answer:_____

If your answer to Question No. 1(a) or Question 1(b) is "Yes," then answer the following Question. Otherwise, do not answer the following Question.

Question No. 3

With respect to the failure to comply, if any, found by you in Question 1(a) and/or Question 1(b), did Zachry fail to give the required notice, if any, within five (5) days as set out in §5.42 of the General Conditions of the Contract?

Answer "Yes" or "No" for each of the following:

(a)     Change Order 4

Answer:_____

(b)     § 5.10 of the General Conditions

Answer:_____

If you answered Question No. 1(a) or Question No. 1(b) "Yes," and answered "No" to every corresponding subpart of Question No. 2, then answer the following Question. Otherwise do not answer the following question.

## Question No. 4

What sum of money, if any, paid now in cash, would fairly and reasonably compensate Zachry for its damages, if any, that resulted from such failure to comply?

Consider the following elements of damages, if any, and none other.

(1) the balance due and owed by the Port, if any, under the Contract, including any amount owed as compensation for increased cost to perform the work as a direct result of owner-caused delays;

(2) the amount owed, if any, for change orders or additional work Zachry is directed to perform by the Port in connection with the Contract.

Do not add any amount for interest on damages, if any.

Do not include in your answer any amount that you find that Zachry could have avoided by the exercise of reasonable care.

Do not add any amounts for delay or hindrance damages, if any, unless you find that the delay or hindrance damages resulted solely from the Port's fraud, bad faith, arbitrary and capricious conduct, or active interference, if any.

Fraud occurs when –

a party makes a material misrepresentation,

the misrepresentation is made with knowledge of its falsity,

the misrepresentation is made with the intention that it should be acted on by the other party, and

the other party relies on the misrepresentation and thereby suffers injury.

"Misrepresentation" means a false statement of fact.

Bad faith means conscious doing of a wrong for dishonest or malicious purpose.

In deciding whether delay or hindrance damages, if any, resulted solely from the Port's bad faith, if any, do not consider evidence of the Port's attorneys' fees.

Arbitrary and capricious means willful and unreasoning action without due consideration and in disregard of the facts, circumstances, and the rights of other parties involved.

: 12412

Active interference means affirmative, willful action, taken to unreasonably interfere with the other party's compliance with the terms of the contract. Active interference does not mean a simple mistake, error in judgment, lack of total effort, or lack of complete diligence.

A party does not unreasonably interfere by doing what that party had a right to do under the contract.

A party does not unreasonably interfere if the party takes action with an objectively well-grounded and justifiable good faith belief that the party had the right to engage in that action.

Answer separately in dollars and cents, if any, for each element.

(a) the balance due and owed by the Port, if any, to Zachry under the Contract, including any amount owed as compensation to Zachry for increased cost to perform the work as a direct result of owner-caused delays

(i)     Sustained before January 1, 2008:

Answer:$_____

(ii)     Sustained on or after January 1, 2008:

Answer:$_____

(b)  the amount owed, if any, to Zachry for change orders or additional work Zachry is directed to perform by the Port in connection with the Contract.

(i)     Sustained before January 1, 2008:

Answer:$_____

(ii)     Sustained on or after January 1, 2008:

Answer:$_____

If you answered with any amount in Question No. 4(a)(i), 4(a)(ii), 4(b)(i) and/or 4(b)(ii), then answer the corresponding subpart in the following Question. Otherwise, do not answer the following Question.

## Question No. 5

What percentage of the damages, if any, found by you in Question No. 4(a)(i), 4(a)(ii), 4(b)(i) and/or 4(b)(ii) above were delay or hindrance damages?

Answer each subpart below with a percentage from 0% to 100%. Do not divide 100% among the four subparts below, but rather answer each subpart separately by considering a percentage up to and including 100% for each subpart. The sum of the answers to the four subparts below may not total more than 400%.

(a) the balance due and owed by the Port, if any, including any amount owed as compensation for increased cost to perform the work as a direct result of owner-caused delays

(i)     Sustained before January 1, 2008:

Answer:_____% as to delay or hindrance damages

(ii)    Sustained on or after January 1, 2008:

Answer:_____% as to delay or hindrance damages

(b) the amount owed, if any, for change orders or additional work Zachry is directed to perform by the Port in connection with the Contract.

(i)     Sustained before January 1, 2008:

Answer:_____% as to delay or hindrance damages

(ii)    Sustained on or after January 1, 2008:

Answer:_____% as to delay or hindrance damages

Question No. 6

Did the Port fail to comply with the Contract by withholding, from amounts invoiced by Zachry, any of the following?

In answering this Question, consider all the provisions of the Contract.

Answer "Yes" or "No" for each of the following:

(a)     amounts withheld that the Port labeled on the Estimates for Contract Payment as $600,000 offset

Answer:_____

(b)     amounts withheld that the Port labeled on the Estimates for Contract Payment as "liquidated damages"

Answer:_____

: 12415

If your answer to Question No. 6(a) and/or Question No. 6(b) is "Yes," then answer the corresponding subpart of following Question. Otherwise, do not answer the following Question.

Question No. 7

Was the Port's failure to comply excused?

A.  Conditions precedent

Failure to comply by the Port is excused by Zachry's previous failure, if any, to satisfy a condition precedent to its right to recovery pursuant to the agreement. "Conditions precedent" are acts or events that are to occur after the contract is made and that must occur before there is a right to immediate performance and before there can be a breach of contractual duty.

(a) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 6(b)

Answer:_____

B.  Waiver

Failure to comply by the Port is excused if compliance was waived by Zachry. Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

(a) Answer "Yes" or "No" " as to the failure to comply, if any, that you found in Question 6(a)

Answer:_____

(b) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 6(b)

Answer:_____

C.  Prior material breach

Failure to comply by the Port is excused by Zachry's previous failure, if any, to comply with a material obligation of the Contract.

(a) Answer "Yes" or "No" " as to the failure to comply, if any, that you found in Question 6(a)

Answer:_____

(b) Answer "Yes" or "No" " as to the failure to comply, if any, that you found in Question 6(b)

Answer:_____

D.    Release

Failure to comply by the Port is excused if Zachry released the claims asserted by it in this lawsuit against the Port.

(a) Answer "Yes" or "No" " as to the failure to comply, if any, that you found in Question 6(a)

Answer:_____

(b) Answer "Yes" or "No" " as to the failure to comply, if any, that you found in Question 6(b)

Answer:_____


E.    Payment

Failure to comply by the Port is excused if the Port paid Zachry all of the amounts due and owed under the Contract.

(a) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 6(a)

Answer:_____

(b) Answer "Yes" or "No" as to the failure to comply, if any, that you found in Question 6(b)

Answer:_____

If you answered Question No. 6(a) and/or Question No. 6(b) "Yes," and answered "No" to any corresponding subpart of Question No. 7, then answer the corresponding part of the following question. Otherwise do not answer the following question.

## Question No. 8

What sum of money, if any, paid now in cash, would fairly and reasonably compensate Zachry for its damages, if any, that resulted from such failure to comply?

Consider only the balance due and owed by the Port, if any, under the Contract.

Do not add any amount for interest on damages, if any.

Do not include in your answer any amount that you find that Zachry could have avoided by the exercise of reasonable care.

Answer in dollars and cents, if any, for each of the following:

(a)     amounts withheld that the Port labeled on the Estimates for Contract Payment as $600,000 offset

Answer:$_____

(b)     amounts withheld that the Port labeled on the Estimates for Contract Payment as "liquidated damages"

Answer:$_____

: 12418

Question No. 9

What is a reasonable fee for the necessary services of the Port's attorneys, stated in dollars and cents?

Consider the following factors in determining the reasonableness of an attorney's fees award:
- the time and labor involved, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly;
- the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer;
- the fee customarily charged in the locality for similar legal services;
- the amount involved and the results obtained;
- the time limitations imposed by the client or the circumstances;
- the nature and length of the professional relationship with the client;
- the experience, reputation, and ability of the lawyer or lawyers performing the services; and
- whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

Answer with an amount with respect to each of the following:

(a)  For preparation and trial with respect to the failure to comply, if any, inquired about in Question No. 1

Answer: $_____

(b)  For preparation and trial with respect to the failure to comply, if any, inquired about in Question No. 6

Answer: $_____

(c)  For an appeal to the Court of Appeals with respect to the failure to comply, if any, inquired about in Question No. 1

Answer: $_____

(d)  For an appeal to the Court of Appeals with respect to the failure to comply, if any, inquired about in Question No. 6

Answer: $_____

(e)  For an appeal to the Supreme Court of Texas with respect to the failure to comply, if any, inquired about in Question No. 1

Answer: $_____

(f)     For an appeal to the Supreme Court of Texas with respect to the failure to comply, if any, inquired about in Question No. 6

Answer: $_____

# TAB 13

## Contract, General Conditions
## (DX1-1.0177-235)

## PORT OF HOUSTON AUTHORITY
## GENERAL CONDITIONS
## FOR CONSTRUCTION WORK ON PORT PROPERTY

### TABLE OF CONTENTS

**SECTION 1.**    DEFINITIONS OF TERMS

1.01    Addenda

1.02    Applicable Law

1.03    Bid/Proposal

1.04    Bid/Proposal Documents

1.05    Bonds

1.06    Change Orders

1.07    Chief Engineer

1.08    Concurrent Delay

1.09    Construction Change Directive

1.10    Contract Documents

1.11    Contract Price

1.12    Contract Time

1.13    Contractor

1.14    Design Consultant

1.15    Drawings

1.16    Environmental Laws

1.17    Equipment and Materials

1.18    Force Majeure

1.19    Governmental Authority

1.20    Harris County Auditor

1.21    Hazardous Substances

1.22    Inspectors

1.23    Insurance Certificates

1.24    Modification

DX 0001-1.0177

1.25    Own Forces

1.26    Port of Houston Authority

1.27    Port of Houston Authority Commission or Commission

1.28    Port Authority Indemnitees

1.29    Product Data

1.30    Project

1.31    Purchase Orders

1.32    Purchasing Manager

1.33    Request for Information or RFI

1.34    Samples

1.35    Shop Drawings

1.36    Specifications

1.37    Standard of Care

1.38    Subcontractors

1.39    Submittals

1.40    Supplier

1.41    Taxes

1.42    Work

**SECTION 2.    CONTRACT DOCUMENTS**

2.01    Intent of Drawings and Specifications

2.02    Precedence of Contract Documents

2.03    Interpretation of Contract Documents

2.04    Reference Specifications

2.05    Special Conditions

2.06    Examination of Drawings, Specifications, Special Conditions and Site of Work

2.07    Subsurface Data and Bid/Proposal Quantities

2.08    Supporting Documents – Performance & Payment Bonds

2.09    Harris County Auditor's Approval

DX 0001-1.0178

2.10 Port of Houston Authority Purchase Order

SECTION 3.    GENERAL PROVISIONS

3.01 Tax Exemption

3.02 Conflicts of Interest

3.03 Prevailing Wage Scale

3.04 Assignment of Antitrust Causes of Action

3.05 Small Business Development Program

3.06 Contractor's Insurance Requirements

3.07 Proof of Insurance By Contractor

3.08 Indemnification By Contractor

3.09 No Estoppel or Waiver

3.10 Recovery of Attorney's Fees

3.11 Contractor's Qualifications

3.12 Severability

3.13 Successors and Assigns

3.14 No Third Party Beneficiaries

3.15 Change of Control

3.16 Governing Law

SECTION 4.    REGULATORY AND SAFETY REQUIREMENTS

4.01 Laws to be Observed --

4.02 Code Regulations.

4.03 Permits and Licenses

4.04 Barricades, Warning Lights and Warning Signs

4.05 Sanitary Facilities

4.06 Site Health and Safety Coordinator

4.07 Health and Safety

4.08 Accident Reporting

4.09 Fill Material Policy

General Conditions
(Rev'd November 1, 2002)                                VIII - iii - vii

DX 0001-1.0179

4.10    Spill Prevention Plan

4.11    Cultural Resources

4.12    Use of Explosives

4.13    Burning

4.14    Permit for Welding and Cutting

4.15    Interference with Port Operations and Navigation

4.16    Misplaced Materials

4.17    Work On or Around Port Authority Grain Elevators

4.18    Work On or Around Railroad Tracks

4.19    Discovery of Hazardous Substances

4.20    Disposal of Excavated Materials and Certain Other Waste

4.21    Characterization of Waste Materials

4.22    Environmental Management System

SECTION 5.    PROSECUTION OF THE PROJECT

5.01    Commencement of Work

5.02    Start Date for Field Work

5.03    Planning of Work and Progress Schedule

5.04    Submittal of Updated Progress Schedule

5.05    Time of Completion and Liquidated Damages

5.06    Actual Damages in Lieu of Liquidated Damages

5.07    No Delay Damages

5.08    Time Extensions

5.09    Lack of Satisfactory Progress

5.10    Independent Contractor

5.11    Subcontractors and Material Suppliers

5.12    Port as Third Party Beneficiary of Subcontracts

5.13    Port and Surety as Assignees of Subcontracts

5.14    Cooperation with the Port Authority and Others

DX 0001-1.0180

5.15    Lines and Grades

5.16    Contractor's Superintendent

5.17    Contractor's Local Office

5.18    Notice

5.19    Character and Conduct of Workmen

5.20    Drawings and Specifications Furnished by the Port Authority

5.21    Requests for Information

5.22    Submittals to be Furnished by the Contractor after Award

5.23    As-Built Drawings

5.24    Progress Photographs

5.25    Additional Schedules and Reports

5.26    Material Storage

5.27    Material Furnished by the Port Authority

5.28    Tools and Equipment Furnished by the Contractor

5.29    Water for Construction

5.30    Electrical Connections

5.31    Contractor's Field Office

5.32    Field Office for Port Authority Personnel

5.33    Contractor's Obligation to Maintain a Clean Work Site

5.34    Material Testing

5.35    Inspection Required at Stages of Work

5.36    Discovery of Latent Defective Work

5.37    Test Cuts by the Port Authority

5.38    Costs of Inspections by the Port Authority

5.39    Inspection Outside of Working Day

5.40    Substandard Material or Workmanship

5.41    Changes or Modifications

5.42    Claims for Changed Conditions or Contract Interpretations

DX 0001-1.0181

5.43    Calculations of Costs of Changes or Modifications

5.44    Limitations on the Costs of Changes or Modifications

5.45    Intellectual Property Rights

5.46    Partial Utilization by the Port Authority

5.47    Termination for Convenience of the Port of Houston Authority

5.48    Termination for Cause

5.49    Right of Port Authority to Suspend the Work

5.50    Right of Port Authority to Accelerate Work

5.51    Protection against Claims of Subcontractors, Laborers, Materialmen and Furnishers of Machinery, Equipment and Supplies

5.52    Allegations of Change or Waiver of Contract Terms

5.53    Warranty

5.54    Progress Meetings

5.55    Dispute Resolution, Submission to Jurisdiction, Waiver of Right to Remove and Venue

**SECTION 6.    PAYMENT**

6.01    Schedule of Costs

6.02    Progress Payments

6.03    Inspector's Approval of Billings

6.04    Nonpayment for Unincorporated Material

6.05    Right to Withhold

6.06    Overpayment for Defective or Over Estimated Work

6.07    Contractor's Submittal of Affidavit

6.08    Supporting Documents for Progress Payments

6.09    Final Inspection by the Contractor

6.10    Final Inspection by the Port Authority

6.11    A Finding of Incomplete Work

6.12    Conditions to Final Payment

6.13    Payment and Retainage

DX 0001-1.0182

6.14    Title to Work

6 15    Payment Not Waiver or Acceptance of Work

6.16    Right to Audit

6.17    Offset

DX 0001-1.0183

## GENERAL CONDITIONS
### FOR CONSTRUCTION WORK ON PORT AUTHORITY PROPERTY

### SECTION 1. DEFINITIONS OF TERMS

Whenever in these General Conditions and in the other Contract Documents, the following terms are used, the intent and meaning shall be interpreted as set out below.

**1.01    Addenda:**

Documents issued by the Port Authority after the initial Bid/Proposal Documents have been issued to bidders/proposers and prior to the acceptance of bids/proposals, which documents are part of the Bid/Proposal Documents.

**1.02    Applicable Law:**

Any and all federal, state and local statutes, laws, rules, regulations, ordinances, codes and rules of common law pertaining to the Contractor's services, the site, the Contractor's employees and Subcontractor's employees and/or the Work, including, without limitation (i) Environmental Laws, (ii) those pertaining to equal opportunity, affirmative action and discrimination, and (iii) those pertaining to health or safety, including without limitation, the Occupational Safety and Health Act of 1970 (84 U.S. Statutes 1590) as amended and any applicable state programs, rules and regulations approved or provided thereunder.

**1.03    Bid/Proposal:**

The Contractor's bid/proposal submitted in connection with the Work, as such bid/proposal may be modified and agreed to or ordered by the Port.

**1.04    Bid/Proposal Documents:**

Those documents issued by the Port Authority soliciting bids/proposals, as applicable, including any Addenda and the documents submitted by the Contractor which comprise the Contractor's Bid/Proposal.

**1.05    Bonds:**

The performance and payment bonds that the Contractor is required to furnish to the Port pursuant to Section 2.08.

**1.06    Change Orders:**

A modification of or change to the Contract Documents agreed to and executed by the Port Authority and Contractor after Contract execution and in accordance with the Contract Documents to revise, add to, or delete from the Work or to adjust the Contract Price or Contract Time

**1.07    Chief Engineer.**

The Chief Engineer is an employee of the Port of Houston Authority. The only person in the Port of Houston Authority Engineering Department with authority to resolve engineering questions or problems, agree to modifications or changes, and to - resolve' disputes involving Contracts or Bid/Proposals originating from the Port of Houston Authority Engineering Department, where the Port of Houston Authority is specifically given such authority in this Contract, is the Chief Engineer. No other

DX 0001-1.0184

employee of the Port of Houston Authority Engineering Department has such authority. Any such resolutions must be in writing and signed by the Chief Engineer.

**1.08    Concurrent Delay:**

Delays caused in whole or in part, or contributed to by any primary, concurrent or contributorily negligent acts or omissions by the Contractor, its Subcontractors or Suppliers, or which arise from any other failures by Contractor or its Subcontractors or Suppliers to perform their respective obligations in accordance with the Contract Documents. This limitation shall apply EVEN IF THE PORT AUTHORITY OR ANY OF THE PORT AUTHORITY'S OTHER CONTRACTORS OR ANY OTHER PERSONS OR ENTITIES FOR WHOM THE PORT AUTHORITY IS RESPONSIBLE ARE CONCURRENTLY OR CONTRIBUTORILY NEGLIGENT WITH RESPECT TO ITS OR THEIR OWN ACTS OR OMISSIONS.

**1.09    Construction Change Directive:**

A document issued by the Chief Engineer directing the Contractor to make a minor change in the Work, which change shall not require any modification of the Contract Price.

**1.10    Contract Documents:**

The Contract Documents are composed of the Contract agreement signed by the Port Authority and Contractor, Addenda (if any), Contractor's Bid/Proposal (including documentation accompanying the Bid/Proposal and any post-Bid/Proposal documentation submitted and agreed to by the Port Authority prior to commencement of Work), the Bonds, Insurance Certificates, these General Conditions, Special Conditions, Specifications and Drawings, the Purchase Order, and Modifications. The Contract Documents form the Contract. This Contract represents the entire and integrated agreement between the parties hereto and supersedes all prior negotiations, representations or agreements, either written or oral. The Contract Documents shall not be construed to create any contractual relationship of any kind between the Port Authority and any Subcontractor or Supplier or between any persons or entities other than the Port Authority and Contractor.

**1.11    Contract Price:**

The amount set forth in the Contract agreement, as such amount may be modified by Change Order, which the Contractor is entitled to receive for full and complete performance of the Work in accordance with the Contract Documents.

**1.12    Contract Time:**

The time period set forth in the Contract for the Contractor to finally complete the Work. The Contract Time may be expressed in number of calendar days or number of working days or by reference to the date of completion. If the Contract Time is measured by calendar days, each and every calendar day shall be counted against the Contract Time. If the Contract Time is measured by working days, Saturdays, Sundays, A.G.C. holidays and approved time extensions shall not be counted against the Contract Time.

**1.13    Contractor:**

Contractor means the independent contractor which is named in the Contract agreement and is responsible for the construction of the Work. The Contractor is an independent contractor and not an employee or agent of the Port Authority.

DX 0001-1.0185

**1.14   Design Consultant:**

Design Consultant means an independent architect or engineer with responsibility for design of the Work. The Design Consultant is an independent contractor and not an employee or agent of the Port Authority.

**1.15   Drawings:**

The graphic and pictorial portions of the Contract Documents showing the design, location and dimensions of the Work, which Contract Documents may include without limitation elevations, sections, details, schedules or diagrams.

**1.16   Environmental Laws:**

Any and all applicable federal, state or local statutes, laws, rules, regulations, ordinances, codes and rules of common law now in effect (including any amendments now in effect) and any current judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree, or judgment, relating to the environment, Hazardous Substances or exposure to Hazardous Substances, including without limitation the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601, et seq.; The Hazardous Materials Transportation Act, 49 U.S.C. §§ 1801, et seq.; The Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901, et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1201, et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601, et seq.; the Clean Air Act, 42 U.S.C. §§ 7401, et seq.; the Safe Drinking Water Act, 42 U.S.C. §§ 3808, et seq.

**1.17   Equipment and Materials:**

The equipment and materials to be supplied by the Contractor, its Subcontractors and Suppliers and to be incorporated into or otherwise used in connection with the Work.

**1.18   Force Majeure:**

Fire, flood, act of God, earthquakes, epidemic, war, riot, civil disturbance, sabotage, terrorism or judicial restraint, but only to the extent such event (i) is beyond the control of and cannot be reasonably anticipated by or the effects alleviated by the Contractor and (ii) prevents the performance of the Work. Events not specifically listed herein shall not constitute events of Force Majeure. By way of example only, weather which is not abnormal, even if such weather could not be reasonably anticipated and even if such weather prevents the performance of the Work, shall not be an event of Force Majeure.

**1.19   Governmental Authority:**

Governmental Authority means (a) the United States of America or any foreign country, (b) any state, county, municipality or other governmental subdivision within the United States of America or any foreign country, and (c) any court or any governmental department, commission, board, bureau, agency or other instrumentality of the United States of America or any foreign country, or of any state, county, municipality or other governmental subdivision within the United States of America or any foreign country.

**1.20   Harris County Auditor:**

The auditing official of Harris County.

General Conditions
(Rev'd November 1, 2002)

VIII - 3 – 52

DX 0001-1.0186

## 1.21 Hazardous Substances:

(i) Any hazardous materials, hazardous wastes, hazardous substances, solid waste and toxic substances as those or similar terms are defined under any Environmental Laws;

(ii) Any asbestos or any material which contains any hydrated mineral silicate, including chrysolite, amosite, crocidolite, tremolite, anthophylite and/or actinolite, whether friable or non-friable;

(iii) Any polychlorinated-biphenyls ("PCBs"), or PCB-containing materials, or fluids;

(iv) Radon;

(v) Any other hazardous, radioactive, toxic or noxious substance, material, pollutant, or solid, liquid or gaseous waste;

(vi) Any pollutant or contaminant (including petroleum, petroleum hydrocarbons, petroleum products, crude oil or any fractions thereof, any oil or gas exploration or production waste, any natural gas, synthetic gas or any mixture thereof) which in its condition, concentration or area of release could have a significant effect on human health, the environment, or natural resources;

(vii) Any substance that, whether by its nature or its use, is subject to regulation under any Environmental Law or with respect to which any Environmental Law or Governmental Authority requires environmental investigation, monitoring or remediation; and

(viii) Any underground storage tanks, as defined in 42 U.S.C. Section 6991(1)(A)(I) (including those defined by Section 9001(1) of the 1984 Hazardous and Solid Waste Amendments to the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq.; the Texas Water Code Annotated Section 26.344; and Title 30 of the Texas Administrative Code Sections 334.3 and 334.4), whether empty, filled or partially filled with any substance.

## 1.22 Inspectors:

The individuals assigned by the Chief Engineer (which individuals may be third party contractors) to make detailed inspections of any or all portions of the Work and materials or equipment involved in the Contract are the Inspectors. Inspectors have no authority to change any of the terms and conditions of the Contract. This authority is reserved for the Chief Engineer alone.

## 1.23 Insurance Certificates:

The insurance certificates that the Contractor is required to furnish to the Port pursuant to the Contract Documents.

## 1.24 Modification:

A Modification is (1) a written amendment to the Contract signed by both the Contractor and the Port, (2) a Change Order, (3) a Construction Change Directive, or (4) a written interpretation of the Contract Documents issued by the Chief Engineer.

## 1.25 Own Forces:

Actual field labor performed at the site by employees of the Contractor under the immediate supervision of Contractor's field superintendent. By way of example only, the following is not Work performed by Contractor's Own Forces:

General Conditions
(Rev'd November 1, 2002)

DX 0001-1.0187



a.    Work performed by Subcontractors or contract laborers; or

b.    Work performed in the Contractor's office or anywhere other than in the field at the site, even if performed by the Contractor's employees.

**1.26    Port of Houston Authority:**

The Port of Houston Authority of Harris County, Texas is a political subdivision of the State of Texas and a body politic. The terms Port of Houston Authority, Port Authority, Port of Houston, PHA and Port are synonymous with the Port of Houston Authority of Harris County, Texas. The Port is independent and not a part of the government of Harris County, Texas or the City of Houston.

**1.27    Port of Houston Authority Commission or Commission:**

The Port of Houston Authority is governed by the Commission which meets monthly and is comprised of a chairman and six commissioners. The Commission is the ultimate governing authority of all Port of Houston operations. The Contractor is hereby advised that approval by the Commission is required for certain matters.

**1.28    Port Authority Indemnitees:**

The Port of Houston Authority and its Commissioners, directors, officers, agents and employees.

**1.29    Product Data:**

Manufacturers' standard schematic drawings, catalog sheets, brochures, diagrams, schedules, performance charts, illustrations, Material Safety Data Sheets (MSDS) or any other descriptive items.

**1.30    Project:**

The total Port construction project of which the Work performed under the Contract Documents may be the whole or a part and which may include construction by the Port Authority or by separate contractors.

**1.31    Purchase Orders:**

A written and fully-executed purchase order covering the Work and issued to the Contractor in accordance with the Contract Documents.

**1.32    Purchasing Manager:**

The purchasing manager of the Port of Houston Authority.

**1.33    Request for Information or RFI:**

A written request from the Contractor to the Chief Engineer requesting information in respect of or an interpretation of a requirement or provision of the Contract Documents. Neither an RFI nor a response to an RFI is a Contract Document.

**1.34    Samples:**

Physical examples which illustrate Materials, Equipment or workmanship and establish standards by which the Work will be judged.

General Conditions
(Rev'd November 1, 2002)                                                    VIII - 5 – 52

DX 0001-1.0188

**1.35    Shop Drawings:**

Drawings, diagrams, schedules and other data specially provided for the Work by the Contractor, its Subcontractors or Suppliers to illustrate how certain specific Work components fit together and will be located in relation to each other.

**1.36    Specifications:**

The Specifications are that portion of the Contract Documents consisting of the written requirements for Materials, Equipment, construction systems, standards and workmanship for the Work and performance of related services. Specifications may be separate or set forth on the Drawings, or both.

**1.37    Standard of Care:**

The requirement that the Contractor shall supervise and direct the Work, using the Contractor's best skill and attention, in a good and workmanlike manner and in the best and most expeditious and economical manner consistent with the interests of the Port Authority, shall exercise the degree of care, skill and diligence in the performance of the Work in accordance with and consistent with industry standards for similar circumstances, shall utilize its best skill, efforts and judgment in furthering the interests of Port Authority, and shall furnish efficient business administration and supervision.

**1.38    Subcontractors:**

Any person having a direct or indirect contract with the Contractor, at any tier, for design or engineering, or for the supply and erection of Equipment or Materials, or for the performance of a portion of the Work, in each case forming part of the Work. No Subcontractor shall have any beneficial interest in or be a third party beneficiary to any Port Authority contract (including without limitation this Contract).

**1.39    Submittals:**

Shop Drawings, Product Data, Samples and other information provided by the Contractor for approval of proposed Equipment, Materials, means or methods. Submittals are not Contract Documents.

**1.40    Supplier:**

A person having a direct or indirect contract with the Contractor, at any tier, only for the supply of Equipment or Materials forming part of the Work.

**1.41    Taxes:**

All taxes, duties, fees or other charges levied or imposed by any country, state or any political subdivision thereof, including but not limited to income, capital, sales, excise and use taxes, customs duties, stamp duties, fees or charges, levies in respect of social welfare, health, workers' compensation, pension, unemployment or other similar insurances or programs, whether imposed by withholdings or otherwise, and except as otherwise expressly provided, whether existing at the date of this Contract or created and imposed at a later date.

General Conditions
(Rev'd November 1, 2002)                                    VIII - 6 - 52

DX 0001-1.0189

**1.42    Work:**

The construction and services required by the Contract Documents, whether commenced or not, or completed or partially completed, and all labor, Materials, Equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations pursuant to the Contract Documents. The Work may constitute the whole or a part of the Project.

**END OF GENERAL CONDITIONS SECTION 1**

DX 0001-1.0190

## SECTION 2. CONTRACT DOCUMENTS

### 2.01 Intent of Drawings and Specifications:

The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work. These General Conditions, in conjunction with the other Contract Documents, all of which constitute a part of this Contract, are each intended to be cooperative; a provision occurring in one is as binding as though occurring in all, and when read together are intended to describe and provide for a finished piece of work, complete in every detail. Work not covered in the Contract Documents will be required to the extent it is consistent therewith and is reasonably inferable therefrom as being necessary to produce the intended results consistent with the scope of Work as expressed in the Contract Documents. The organization of the specifications into divisions, sections and articles, and the arrangement of the Drawings shall not control the Contractor in dividing the Work among Subcontractors or in establishing the extent of Work to be performed by any trade. Unless otherwise stated or defined in the Contract Documents, words that have well-known technical or construction industry meanings are used in the Contract Documents in accordance with such recognized meanings.

### 2.02 Precedence of Contract Documents:

(a)     If there is an irreconcilable conflict between Contract Documents, the document highest in precedence shall control, but except in such event and to avoid such conflict, every construction of provisions shall be that each is in aid to, or supplementary to or complementary of, each other provision, to control and secure for the Port Authority the completion of the entire Work in an expeditious, orderly and coordinated manner. The precedence, from highest to lowest, shall be in the following order:

1.     Permits for the Work from Governmental Authorities as may be required by law;

2.     Special Conditions;

3.     General Conditions;

4.     Specifications;

5.     Drawings.

Change Orders and approved revisions to Drawings or other Contract Documents shall take precedence over Items 2 through 5 above. Detailed Drawings shall take precedence over general Drawings.

(b) Should there be an irreconcilable conflict of terms within the Drawings or within the Specifications, the Contractor shall be obligated to provide the most expensive combination of quality and quantity of Work indicated. The Chief Engineer will clarify the Project requirements in the event of an above mentioned conflict that affects the Contractor. In general,

1.     figures take precedence over scale measurements;

2.     large scale details take precedence over smaller scale details;

3.     architectural Drawings take precedence in regard to dimensions, when in conflict with mechanical and structural Drawings, except for the size of the structural members;

4.     specifically titled Drawings and sections of the Specifications take precedence over indication of the item in a collateral way;

DX 0001-1.0191

5.    existing conditions take precedence over Drawings and Specifications for dimensions.

2.03    Interpretation of Contract Documents:

The Port Authority and Contractor recognize the possibility that errors, omissions and discrepancies exist in the Contract Documents. Before starting each portion of the Work, the Contractor shall carefully study and compare the various Drawings and other Contract Documents relating to that portion of the Work, as well as the information furnished by the Port Authority, shall take field measurements of any existing conditions related to that portion of the Work and shall observe any conditions at the site affecting such Work. Any errors, omissions or inconsistencies discovered by the Contractor shall be reported promptly to the Port Authority as an RFI in such form as the Port Authority may require.

Any such problem in the Contract Documents not brought to the attention of the Chief Engineer prior to Contractor's submission of its Bid/Proposal will be resolved by the Chief Engineer in a manner solely within the discretion of the Chief Engineer. Any such resolution shall not give rise to any claim for additional compensation or claim for damages by the Contractor.

In the execution of the Work, the Drawings shall be accurately followed to scale giving preference in all cases to figured dimensions over scale measurements and to details over general Drawings. Where any discrepancy occurs between figured dimensions and scale or between details and general Drawings, the Contractor shall provide notice of such discrepancy in an RFI, which RFI shall set forth the facts constituting such discrepancy in a degree of detail acceptable to the Port, to the Inspector who shall provide explanation and instructions as to which is to govern before the Contractor proceeds with the Work at issue. In the event there is a Design Consultant for the Project, the Contractor shall send the RFI to the Design Consultant, with a copy of the transmittal letter to the Inspector and the Chief Engineer. Departure from the Contract Documents in the execution of the Work without the Chief Engineer's prior written order or consent will be at the Contractor's sole risk and expense and the Contractor will be responsible for all costs attributable thereto, including without limitation all costs associated with design professionals, and liable for all damages caused thereby.

The Contractor shall not take advantage of any error or omission in the Contract Documents. Instructions suitable to the Chief Engineer will be given by the Chief Engineer to the Contractor when such error or omission is discovered by the Chief Engineer or when reasonably requested of the Chief Engineer by the Contractor. At all times, the Contractor shall retain the duty to detect or discover any errors and omissions and make appropriate request in respect thereof. If the Contractor performs any Work when it knew or should have known it involves an error, inconsistency or omission in the Contract Documents without submitting such request to the Port Authority and receiving a written order or consent to proceed, the Contractor shall be responsible for all costs attributable to such performance, including without limitation all costs associated with design professionals, and liable for all damages caused thereby.

All Materials to be incorporated in the finished Work shall be new, of the highest quality and of the best grade of standard manufacture. When more than one Material, brand or process is specified for a particular item of Work, the choice shall be the Contractor's. The final selection of color and pattern shall be made from the range available within the choice selected by the Contractor, unless the item is specified to match a specific color or sample furnished. Where Materials or Equipment are specified by brand name, trade name, or manufacturer, only products of those named manufacturers are acceptable unless equal Materials or Equipment of other manufacturers are approved in writing by the Chief Engineer **before** submittal of Bids/Proposals. The Contractor shall not be allowed to supply equal or alternative Materials or Equipment not so approved. The judgment of the equality of Materials, Equipment or products rests solely with the Chief Engineer, and its decision shall be final. Specified architectural, construction or equipment details may not be regularly included as part of the named manufacturer's standard items or Equipment, but shall be provided by the manufacturer as required for the Project or the proper functioning of

DX 0001-1.0192



the Equipment. Indicated and specified performance and Material requirements are minimum, and are required in addition to standard performance and accessories provided by the manufacturer.

**2.04    Reference Specifications:**

(a) The following codes, standards, pamphlets and specifications are hereby incorporated into this Contract by reference as if each were set forth in full herein, except to the extent otherwise set forth in Section 2.04(b).

| | |
|---|---|
| AAMA | Architectural Aluminum Manufacturers Association. |
| AAN | American Association of Nurserymen. |
| AAR | Association of American Railroads. |
| AASHTO | American Association of State Highway and Transportation Officials. |
| ACI | American Concrete Institute |
| AFBMA | Anti-Friction Bearing Manufacturers Association, Inc. |
| AGC | Associated General Contractors of America. |
| AIA | American Institute of Architects. |
| AISC | American Institute of Steel Construction. |
| AISI | American Iron and Steel Institute. |
| ANSI | American National Standards Institute. |
| API | American Petroleum Institute. |
| AREA | American Railway Engineering Association. |
| ASCE | American Society of Civil Engineers. |
| ASHRAE | American Society of Heating, Refrigeration and Air Conditioning Engineers. |
| ASME | American Society of Mechanical Engineers. |
| ASTM | American Society for Testing and Materials. |
| AWWA | American Water Works Association. |
| AWS | American Welding Society. |
| CI | Cast Iron Pipe Institute. |
| CS | Commercial Standards. |
| FS | Federal Specifications. |
| IEEE | Institute of Electrical and Electronic Engineers. |
| ISA | Instrument Society of America. |
| MBMA | Metal Building Manufacturers Association. |
| NBS | National Bureau of Standards. |
| NEC | National Electrical Code. |
| NEMA | National Electrical Manufacturers Association. |
| NFPA | National Fire Protection Association. |
| NBFU | National Board of Fire Underwriters. |
| OSHA | Occupational Safety and Health Administration. |
| SAE | Society of Automotive Engineers. |
| SSPC | Steel Structures Painting Council. |
| TxDOT | Texas Department of Transportation. |
| UL | Underwriters Laboratories. |

These and all other specifications of trade associations, technical societies, or of manufacturers, refer to the latest edition of each which is effective on the date of "Invitation to Bidders" or on the date of "Invitation to Proposers." Manufacturers' specifications and recommendations shall be construed to mean those printed on container labels or in published manuals, catalogues, or instruction sheets.

(b) The codes, standards, pamphlets, specifications and recommendations set forth above shall not apply to the extent:

General Conditions
(Rev'd November 1, 2002)

DX 0001-1.0193



1.  that they provide requirements less stringent than those set forth in the Contract Documents, the requirements of which apply as minimums only. For the avoidance of doubt, such codes, standards, pamphlets, specifications and recommendations do not supersede more stringent requirements set forth in the Contract Documents;

2.  that they include exclusions, limitations or waivers that are inconsistent with the Contract Documents.

**2.05    Special Conditions:**

Should any construction, work or condition which is not covered by these General Conditions be anticipated on any proposed Work, Special Conditions for such Work will be attached to and shall be a part of the Contract.

**2.06    Examination of Drawings, Specifications, Special Conditions and Site of Work:**

In entering into the Contract, the Contractor represents and warrants that it has and shall be deemed to have carefully examined and inspected the site and its surroundings and satisfied itself as to the condition of all circumstances affecting the site and the Work, including without limitation the location and nature of the Work, nature of the geotechnical conditions, ground and subsoil, the form and nature of the site, the subsurface conditions of the site (both man made and natural), the location and character of existing or adjacent work or structures, the Contract Documents, the extent and nature of the Work and Materials necessary for carrying out and completing the Work, the general character and accessibility of the site, Applicable Law (including without limitation labor laws), any accommodations the Contractor may require, other general and local conditions which might affect the Work or performance of the Work, and in general all risks and contingencies influencing or affecting the Work, and, subject to the right set forth below to rely upon specified Port Authority supplied information, that the Contractor has assumed the risk of such conditions and will, regardless of such conditions, the expense, or difficulty of performing the Work, fully complete the Work for the stated Contract Price without further recourse to the Port Authority.

The Contractor fully accepts any lack of completeness of the Contract Documents, including the Drawings and Specifications, and verifies that such documents were sufficiently detailed and comprehensive to enable Contractor to have reliably estimated and established the Contract Price and to perform the Work within the Contract Time.

The Contractor shall not be entitled to any extensions of the Contract Time or to any adjustment of the Contract Price on grounds that it misinterpreted or misunderstood any matter assumed by the Contractor pursuant to this Section 2.06, nor shall it be released from any of the risks accepted or obligations undertaken by it under the Contract Documents, or on the grounds that it did not or could not reasonably have foreseen any matter which affects the execution of the Work.

The Port Authority makes no representation or warranty, and hereby disclaims any such warranty, that any information provided to the Contractor by or on behalf of the Port Authority in connection with the Work is accurate, correct, complete, fit for its intended purpose or can be used without infringing any patent, copyright, trademark, trade secret or other intellectual property rights of third parties under any intellectual property rights of the world.

Notwithstanding the foregoing, in instances in which the Port Authority has supplied the Contractor with geotechnical reports or in which the Special Conditions specify that the Contractor is entitled to rely upon other information provided by the Port Authority, the Contractor is entitled to rely upon such information in submitting its bid and performing the Work except to the extent that the Contractor knows or should know in the exercise of its Standard of Care that such information is inadequate, insufficient or incorrect.

General Conditions
(Rev'd November 1, 2002)                                                                     VIII - 11 – 52

DX 0001-1.0194

## 2.07 Subsurface Data and Bid/Proposal Quantities:

The quantities shown on the Specifications and other Bid/Proposal Documents are estimates and are for comparison of Bids/Proposals only, and while such quantities are believed to be reasonably accurate, the Port Authority does not guarantee their accuracy.

The Contractor must make its own take-off and base its price or prices on the results thereof. No Change Order shall be issued on account of any excess or deficiency with respect to such information whether absolute or relative in relation to quantities stated in the Specification or other Bid/Proposal Documents.

Without limiting the foregoing, any information given in regard to soil data, subsurface data, test borings, and similar conditions is to be considered approximate.

## 2.08 Supporting Documents - Performance & Payment Bonds:

Unless otherwise provided in the Special Conditions, each Contract at its inception shall be covered by a performance bond and a payment bond, each for 100% of the value of the Contract. Bonds must be furnished with the executed Contract. The cost of such bonds shall be borne by the Contractor and shall be prorated over all units of the Work. No lump sum payment will be made for such costs by the Port Authority. Front end loading to recover such costs will not be allowed. Such bonds must be furnished on the Port Authority forms. No other forms are acceptable. Such bonds must remain in full force for one year after final acceptance of the completed Work and cover all obligations of the Contractor during such one year period, specifically including all warranty obligations of the Contractor. Performance and payment bonds must meet all criteria of Texas law and both must be executed by the same corporate surety which shall be (i) duly authorized and admitted to do business in the State of Texas, (ii) licensed by the State of Texas to issue surety bonds and (iii) listed in the current issue of the Federal Register Department of the Treasury list. Moreover, such surety must show adequate bonding capacity for the size of the proposed Project. The Port Authority will not accept bonds from surplus lines or Texas Lloyds Plan insurance companies. The Port Authority shall be the sole judge of the validity and adequacy of any bonds submitted.

## 2.09 Harris County Auditor's Approval:

No Contract shall become effective or binding upon the Port of Houston Authority until the Harris County Auditor, the appropriate financial officer for the Port Authority, certifies that funds are or will be available to meet the Contract pay requirements when due.

## 2.10 Port of Houston Authority Purchase Order:

The Purchasing Manager shall prepare a Purchase Order on the form prescribed by the Port and mail or otherwise deliver the same along with one fully executed copy of all other Contract Documents to the Contractor. The Contractor's authorization to begin Work under the Contract Documents is subject to the Port issuing a fully executed Purchase Order. If Contractor begins work prior to issuance of a fully executed Purchase Order, it does so at its own risk and agrees to assume all responsibility therefor, to bear all costs attributable thereto, including without limitation all costs associated with design professionals, and to be liable for all damages caused thereby.

**END OF GENERAL CONDITIONS SECTION 2**

DX 0001-1.0195

# SECTION 3. GENERAL PROVISIONS

## 3.01   Tax Exemption:

The Port of Houston Authority, being a political subdivision of the State of Texas, is exempt from all sales taxes on material purchased in Texas and incorporated into a Project. The Contractor and any Subcontractor or Supplier must have or obtain all necessary permits and certificates to purchase and furnish all material incorporated into the Project on a tax free basis.

## 3.02   Conflicts of Interest:

The Contractor and its officers, directors, shareholders, members, partners, employees or agents are positively forbidden from giving or lending money, or any other thing of value, to the Port Authority, any Port Authority Commissioner, or to any Port officer, director, employee or agent or to any member of the family of any of the foregoing.

Should any of the above enumerated persons connected with the Port Authority have a direct or indirect monetary interest in the Contractor's company or parent company, then such person must disclose in writing the nature and extent of such interest to the Port Authority with any Bid/Proposal submitted.

## 3.03   Prevailing Wage Scale:

All onsite employees and employer's delivery persons shall be paid no less than the wages shown and, where shown, fringe benefits shown on the Port Authority's Prevailing Wage Rate schedule, a copy of which is included in the Contract Documents. See such schedule for further details. However, where there is a contract between the employer and his employees or their respective representatives governing fringe benefits, the fringe benefits shall be paid in accordance with such contract. Contractor should be aware that Texas Government Code Chapter 2258, Prevailing Wage Rates, provides, among other things, that:

1.  If the Contractor or a Subcontractor violates this law by underpayment of wages, the Contractor must pay to the Port Authority $60.00 for each worker employed for each calendar day or part of the day that the worker is paid less than the wage rates required by the this Contract. This money becomes the property of the Port Authority.

2.  The Contractor and each of its Subcontractors must keep a record showing:

    (a)   the name and occupation or each worker employed by the Contractor or Subcontractor in the construction of the Project; and

    (b)   the actual per diem wages paid to each worker.

    These records must be open to inspection by the Port Authority at all reasonable hours.

3.  Within 30 days of receipt of a complaint, the Port Authority shall make a determination whether good cause exists to believe that the Contractor or Subcontractor has committed a violation of the law. If good cause is found to exist that a violation has been committed, the law requires the Port Authority to retain any amounts due under the Contract pending a final determination.

4.  If the Contractor or Subcontractor and the affected worker(s) do not reach agreement within 14 days of notice of the Port Authority's determination, the issues must be submitted to binding arbitration in accordance with the Texas General Arbitration Act.

DX 0001-1.0196

5.  Any awards made by the arbitrator in favor of the worker(s) shall be paid out of the Contractor's funds held by the Port Authority. If the amounts held by the Port Authority are insufficient, the worker has a right of action against the Contractor or Subcontractor and the surety of the Contractor or Subcontractor to recover the amount owed, reasonable attorney's fees and court costs.

6.  The Port Authority is not a party to the arbitration proceedings.

7.  No officer, agent or employee of the Port Authority is liable in a civil action for any act or omission implementing or enforcing the applicable law unless the action is made in bad faith.

8.  The Contractor is entitled to rely on a certificate by a Subcontractor as to the payment of all sums due to those working for and under that Subcontractor until the contrary has been determined.

### 3.04    Assignment of Antitrust Causes of Action:

By submitting a Bid/Proposal or entering into a Contract with the Port Authority, the Contractor offers and agrees to assign to the Port Authority all causes of action it may have under the Antitrust Laws of Texas and/or Antitrust Laws of the United States. Such assignments shall be made and become effective when the Port Authority tenders final payment to the Contractor without any further action or acknowledgement by the parties.

### 3.05    Small Business Development Program:

The Port Authority has a Small Business Development Program which was created to help implement the Port Authority's objectives of promoting economic development and business opportunities for all sectors of the local economy. Contractor is required to use good-faith efforts to use certified small business participation goals. Contractor shall provide information regarding its small business participation in the form and at the times requested by the Port Authority.

The Small Business Development Program is administered by its Policies and Procedures (most recent version). Contractor should be aware of the contents of the Small Business Development Program Policy and Procedures. Specifically, Contractor should know that its failure to adhere to the requirements of the Small Business Development Program may result in a default and termination of the contract.

In additional to other provisions of the Small Business Development Program, Contractor should be expressly aware of the obligations to:

1.  adhere to Port of Houston Authority's Non-Discrimination Mandate:

2.  submit utilization reports to the Port of Houston Authority on small business participation;

3.  make good-faith efforts to meet a contract small business participation goal or to maintain small business participation; and

4.  adhere to the dispute resolution mechanisms of the Small Business Development Program.

General Conditions
(Rev'd November 1, 2002)                                                 VIII - 14 - 52

DX 0001-1.0197

## 3.06 Contractor's Insurance Requirements·

The Contractor shall, at all times during the performance of Work under this Contract and though the expiration of the warranty period set forth in Section 5.53, provide and require all Subcontractors to provide insurance coverage with companies lawfully authorized to do business in Texas and acceptable to the Port Authority, which coverage will protect the Contractor from claims set forth below which may arise out of or result from the Contractor's operations under the Contract Documents and for which the Contractor may be legally liable, whether such operations are by the Contractor or a Subcontractor or by anyone directly or in directly employed by any of them, or by anyone for whose acts any of them may be liable, and meeting not less than the minimum requirements shown below. Such insurance is to be provided at the sole cost of the Contractor and all Subcontractors.

Any additional coverage in kind or limits will be set out in the Special Conditions.

### Kinds of Claims:

1. claims under workers' or workmen's compensation, disability benefit and other similar employee benefit acts which are applicable to the Contractor's Work to be performed;

2. claims for damages because of bodily injury, occupational sickness or disease, or death of the Contractor's employees;

3. claims for damages because of bodily injury, sickness or disease, or death of any person other than the Contractor's employees;

4. claims for damages insured by usual personal injury liability coverage which are sustained (1) by a person as a result of an offense directly or indirectly related to employment of such person by the Contractor, or (2) by another person;

5. claims for damages, other than to the Contractor's Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom;

6. claims for damages because of bodily injury, death of a person or property damage arising out of ownership, maintenance or use of a motor vehicle; and

7. claims involving contractual liability insurance applicable to the Contractor's indemnification obligations under the Contract Documents.

### Minimum Insurance Requirements

| Kinds of Insurance: | | Limits of Liability: |
|---|---|---|
| A. | Workers' Compensation Texas Operations | Statutory |
| | Employer's Liability | Accident $500,000 Each Accident Disease $500,000 Each Employee Disease $500,000 Policy Limit |
| B. | U. S. Longshoremen and | Statutory |

DX 0001-1.0198

| Kinds of Insurance: | Limits of Liability: |
|---|---|
| Harbor Workers Act (if exposure exists) | |
| C. Commercial General Liability Including, but not limited to: 1. premises/operations 2. independent contractors' protective 3. products and completed operations 4. personal injury liability with employment exclusion deleted 5. contractual 6. owned, non-owned and hired motor vehicles | $2,000,000 General Aggregate $2,000,000 Products/ Completed Operations Aggregate $1,000,000 Each Occurrence $1,000,000 Personal and Advertising Injury $50,000 Fire Damage Liability |
| D. Business Automobile Liability including All Owned, Hired and Non-owned Automobiles. | $1,000,000 Combined Single Limit Per Occurrence |
| E. Umbrella Liability | $2,000,000 Per Occurrence $2,000,000 Aggregate Bodily Injury and Property Damage |
| F. Builder's Risk On an all risk policy form covering, without limitation, perils of fire and extended coverage and physical loss or damage, including without duplication of coverage, theft, flood, vandalism, malicious mischief, collapse, falsework, temporary buildings and debris removal including demolition occasioned by enforcement of any Applicable Laws, and covering reasonable compensation for the Port Authority's and Design Consultant's services and reasonable expenses of the Port Authority and Design Consultant which are required as a result of such loss. | The initial Contract Price and any subsequent modifications thereto for the entire Work and materials stored at the site, stored offsite or being shipped to the site, on a replacement cost basis without voluntary deductibles. |

### 3.07 Proof of Insurance By Contractor:

The Contractor shall furnish, along with the executed Contract and prior to any equipment or personnel being brought on to the site, fully executed insurance forms approved by the Port of Houston Authority, which executed forms shall provide for thirty (30) days written notice to the Port Authority concerning any change, alteration, cancellation, non-renewal or expiration in coverage contained in the policies or evidenced by such forms.

DX 0001-1.0199

The Port Authority Indemnitees shall be additional insureds under each policy except the Worker's Compensation policy and builders risk policy. Builder's risk shall include the Port Authority as an additional named insured.

All policies must provide for waiver of all subrogation rights against the Port of Houston Authority. Contractor hereby waives all claims it may have against the Port to the extent any of such claims are covered by insurance required to be furnished by Contractor or any Subcontractors hereunder, and EVEN IF SUCH CLAIMS ARISE OUT OF, RELATE TO OR ARE BASED UPON THE PORT'S OWN NEGLIGENCE OR OTHER FAULT.

Upon request, certified copies of original policies shall be furnished to the Port Authority.

If the Contractor fails to purchase and maintain insurance required under the Contract Documents, the Port Authority may, but is not obligated to, purchase such insurance on behalf of the Contractor and shall be entitled, at the Port Authority's election, to offset the costs thereof from amounts due Contractor or to reimbursement by the Contractor upon demand.

When any required insurance, due to the attainment of a normal expiration date or renewal date, shall expire, the Contractor shall, prior to such expiration, supply the Port Authority with certificates of insurance and amendatory riders or endorsements that clearly evidence the continuation of all coverage in the same manner, limits of protection, and scope of coverage as is required by the Contract Documents. Any renewal or replacement policies shall be in form and substance satisfactory to the Port Authority and written by carriers acceptable to the Port Authority.

If any policy required to be purchased pursuant to the Contract Documents is subject to a deductible, self-insured retention or similar self-insurance mechanism which limits or otherwise reduces coverage, the deductible, self-insured retention or similar self-insurance mechanism shall be the sole responsibility of the Contractor in the event of any loss.

### 3.08    Indemnification By Contractor:

To the maximum extent allowed by law, the Contractor shall indemnify and hold harmless Port Authority Indemnitees, from and against any and all claims, demands, suits, causes of action, settlements, liabilities, costs, expenses, fines, and judgments (including, without limitation, reasonable and necessary court costs, experts' fees and attorney's fees) (collectively, "Losses"), whether arising in equity, at common law, or by statute, including without limitation the Texas Deceptive Trade Practices Act (as amended) or similar statute of other jurisdictions, or under the law of contracts, torts (including, without limitation, negligence and strict liability without regard to fault) or property, of every kind or character (including, without limitation, claims for property damage, personal injury (including without limitation emotional distress), and economic loss), arising in favor of or brought by any of the Contractor's employees, agents, Subcontractors, Suppliers or representatives, or by any governmental agency or any other third party, based upon, in connection with, relating to or arising out of the Work, the Contractor's failure to comply with the Contract Documents, or the Contractor's actions or inactions under the Contract Documents, including without limitation any failure to pay taxes or failure to comply with any Applicable Laws, and EVEN IF ANY SUCH LOSSES ARE DUE IN PART TO ANY PORT AUTHORITY INDEMNITEES' CONCURRENT (BUT NOT SOLE) NEGLIGENCE OR OTHER FAULT, BREACH OF CONTRACT OR WARRANTY, VIOLATION OF STATUTE, OR STRICT LIABILITY WITHOUT REGARD TO FAULT; provided, however that Contractor's obligation under this Section 3.08 SHALL NOT extend to the percentage of damages caused by the Port's own negligence or other fault, breach or contract or warranty, violation of statute, or strict liability without regard to fault.

DX 0001-1.0200

The indemnification obligation of this Section 3.08 shall apply regardless of the amount of insurance coverage held by the Contractor, including without limitation any such coverage under any worker's compensation act, disability act, or other act or law which would limit the amount or type of damages, compensation, or benefits payable by or for the Contractor, and shall not be limited by any insurance carried or provided by the Contractor in accordance with the Contract Documents or otherwise.

### 3.09 No Estoppel or Waiver:

The Contractor agrees that the Port Authority shall not be precluded or estopped by any action taken or thing done, written or oral, including, but not limited to, inspections made, payments made, or final completion of the Work, from showing that the true and correct amount and character of the work done and materials or equipment furnished by the Contractor do not in fact conform to the Specifications or other Contract Documents. The Contractor also agrees that the Port Authority shall not be precluded or estopped because of any action taken or not taken, from demanding and recovering from the Contractor any damages resulting therefrom or from the Contractor's other failure to comply with the Contract Documents.

Furthermore, no action or failure to act by the Port Authority shall constitute a waiver of any right or duty afforded to the Port Authority under the Contract or otherwise by law, nor shall any such action or failure to act constitute approval of or acquiescence in any breach thereunder, except as may be specifically agreed to in a writing signed by the Chief Engineer.

### 3.10 Recovery of Attorney's Fees:

If Contractor brings any claim against the Port Authority and Contractor does not prevail with respect to such claim, Contractor shall be liable for all attorneys fees incurred by the Port Authority as a result of such claim.

### 3.11 Contractor's Qualifications:

In entering into this Contract, Contractor represents and warrants that it has sufficient ability, experience and personnel to perform the Work defined herein and that the representative of Contractor executing this Contract is duly authorized to do so.

### 3.12 Severability:

The invalidity, illegality, or unenforceability of any portion, clause or provision of this Contract, or the occurrence of any event rendering any portion, clause or provision of this Contract void, shall in no way affect the validity or enforceability of any other portion, clause or provision of this Contract. Any invalid, illegal, unenforceable or void portion, clause or provision shall be deemed severed from this Contract and the balance of this Contract shall be construed and enforced as if this Contract did not contain the particular portion, clause or provision held to be invalid, illegal, unenforceable or void. The parties further agree to reform this Contract to replace any stricken portion, clause or provision with a valid portion, clause or provision that comes as close as possible to the intent of the stricken portion, clause or provision. This Section 3.12 shall not prevent the entire Contract from being void should a portion, clause or provision which is the essence of this Contract be determined to be invalid, illegal, unenforceable or void.

### 3.13 Successors and Assigns:

(a) The Port and Contractor respectively bind themselves, their partners, successors, assigns and legal representatives to the other party hereto and to partners, successors, assigns and

DX 0001-1.0201

legal representatives of such other party in respect of all covenants, agreements and obligations contained in the Contract Documents.

(b) Contractor shall not assign any rights or obligations under or interest in the Contract Documents without the prior written consent of the Executive Director of the Port or his designee. The Port may assign its rights and obligations under and interest in the Contract Documents in whole or in part without the consent of Contractor.

### 3.14 No Third Party Beneficiaries:

Except as expressly provided herein, none of the provisions of this Contract is intended for the benefit of any other party except for the parties hereto.

### 3.15 Change of Control:

Contractor and any party which holds an equity or voting interest in Contractor shall not sell, assign, convey, encumber or otherwise transfer more than twenty-five percent (25%) of the equity or voting interest, whether it be in the form of stock, partnership interests, membership interests or other unit of ownership, in Contractor without the express prior written consent of the Port.

### 3.16 Governing Law:

This Contract, its interpretation and any disputes relating to, arising out of or connected with this Contract, shall be governed by the laws of the State of Texas, without regard to its conflict of law provisions.

**END OF GENERAL CONDITIONS SECTION 3**

DX 0001-1.0202



## SECTION 4. REGULATORY AND SAFETY REQUIREMENTS

### 4.01 Laws to be Observed:

The Contractor is deemed to have made himself familiar with and at all times shall observe and comply with all Applicable Laws, and shall, in accordance with Section 3.08, indemnify and save harmless the Port of Houston Authority, and its Commissioners, officers, employees and agents against any claim, demand, suit, cause of action, liability, cost, expense, fine, settlement or judgment arising from the violation of, or failure by Contractor its Subcontractors, Suppliers or any of its or their employees, agents or representatives to comply with any such Applicable Laws.

### 4.02 Code Regulations:

Where the requirements of the local building code or other Applicable Laws conflict with the Contract Documents and such requirements are mandatory or more restrictive, such requirements shall be followed to the same extent as if specifically set out herein in full. If the Contractor observes that any Contract Document fails in any respect to conform with Applicable Laws, Contractor shall immediately notify the Port Authority by written RFI and identify any such failures before proceeding with any part of the Work affected thereby. In the event a Design Consultant is utilized for the Project, the Contractor shall send such RFI to the Design Consultant, with a copy of the transmittal letter to the Inspector and Chief Engineer. If the Contractor performs Work that it knows or reasonably should have known to be contrary to or in conflict with Applicable Laws, the Contractor shall assume full responsibility for such Work and shall bear all costs attributable thereto, including without limitation all costs associated with design professionals, and shall be liable for all damages caused thereby.

Provisions of the Contract Documents which are more stringent than the minimum requirements of such codes, regulations or Applicable Laws shall be followed, and no requirements of the Contract Documents may be modified or voided because any such requirements are not specifically required by such codes, regulations or Applicable Laws.

### 4.03 Permits and Licenses:

The Contractor shall procure all permits and licenses, pay all charges and fees, and give all notices necessary and incidental to the prosecution of the Work. This requirement shall not pertain to permits required by the United States Army Corp of Engineers, which permits will be obtained by the Port of Houston Authority.

### 4.04 Barricades, Warning Lights and Warning Signs:

The Contractor shall be solely responsible for furnishing, erecting and maintaining suitable barricades, warning signs, flares, barriers, cones, lights, flags, signals, flagmen and any and all other safety devices which are or may become necessary to adequately protect the Work, Contractor's workers and all other parties coming onto the site.

Upon completion of the Work, all such safety devices and evidence thereof shall be immediately removed.

### 4.05 Sanitary Facilities:

The Contractor shall provide sanitary facilities for use of the workmen, and shall maintain such facilities in a clean and sanitary condition until the expiration or termination of the Contract, at which time they shall be immediately removed.

DX 0001-1.0203



**4.06    Site Health and Safety Coordinator:**

The Contractor shall designate a qualified Site Health and Safety Coordinator (the "SHSC") to ensure that all Applicable Laws pertaining to health and safety are complied with and all health and safety requirements are implemented. The SHSC shall have the authority to terminate work when any such work or condition affecting such work or the Project is found to be unsafe. The name and qualifications of the SHSC shall be furnished to the Chief Engineer for review prior to commencement of Work.

**4.07    Health and Safety:**

The Contractor shall submit five (5) copies of a health and safety plan for the Work to the Chief Engineer for review at least forty-eight (48) hours prior to commencing performance of any Work at the site. Prior to beginning any field work at the site, such plan shall be certified, by signature of the SHSC, that it complies with applicable portions of OSHA standards 29 CFR 1910 and 29 CFR 1926. Such plan shall provide, at a minimum, for safe working practices, medical surveillance, engineering safeguards, personnel protective equipment, training, safe operating procedures, emergency planning, reporting and sanitation. Notwithstanding the Chief Engineer's review of the health and safety plan, the Contractor, and not the Port Authority, shall be responsible for and have control over ensuring the safety of its personnel and its Subcontractors, agents, representatives and any other person who visits the site in connection with the Work.

**4.08    Accident Reporting:**

The Contractor shall immediately report to the Port Authority's Police Department at telephone number (713) 670-2647 and the Chief Inspector of the Port Authority any jobsite accident, injury, illness, or environmental release. The Contractor shall submit to the Chief Inspector of the Port Authority as soon as possible but no later than two (2) working days thereafter, a full written report giving the date, time, location, description (in a degree of detail acceptable to the Chief Engineer), and personnel involved. Such report shall be signed by Contractor's designated SHSC.

**4.09    Fill Material Policy:**

The Port of Houston Authority has adopted a policy regarding the acceptance of fill material to be incorporated into the Port Authority's construction Projects. Material governed by this policy shall include soil, sand for cement stabilized sand and concrete, road base materials, sub-ballast for railroad construction, and any other materials brought onto Port Authority property for construction purposes. It is the intent of this policy to ensure that only clean uncontaminated materials will be placed on Port Authority property and any materials placed on Port Authority property shall be subject to removal by the Contractor at its sole expense if found not to be in compliance with the requirements outlined herein. Testing to determine the suitability of materials to be used on Port Authority property shall be performed by a testing laboratory employed by and paid by the Port of Houston Authority. The following tests shall be performed:

**A.    Total Metals:**

Total metals by volume shall not exceed "background" levels for the following metals as measured by EPA Test Method 6010/7000 series. The associated required method detection limits for each metal, as listed below, must be met by the laboratory.

DX 0001-1.0204

| METAL | DETECTION LIMIT (mg/kg) | METAL | DETECTION LIMIT (mg/kg) |
|---|---|---|---|
| Antimony | 0.5 | Lead | 0.1 |
| Arsenic | 0.5 | Mercury | 0.1 |
| Barium | 0.5 | Nickel | 0.1 |
| Beryllium | 0.1 | Selenium | 0.5 |
| Cadmium | 0.1 | Silver | 0.1 |
| Chromium | 0.5 | Thallium | 0.5 |
| Copper | 0.1 | Zinc | 0.5 |

B.  **Total Petroleum Hydrocarbons:**

TPH shall not exceed the Tier 1 Residential Standards defined on any of the reported fractions as determined by Texas Test Method 1005.

C.  **Reuse of Soils with Concentration above Background:**

If the concentration of naturally occurring metals exceeds determined background levels set forth above or TPH is detected, the soils are then considered as reused as defined in the Texas Risk Reduction Program (30 TAC 350.36). The relocation of soils containing chemicals of concern for reuse purposes must comply with the following requirements:

1.  Soil must be sampled for volatile organic compounds (EPA Method 8260b), Semivolatile organic compounds (EPA Method 8270b) and PCBs (EPA Method 8082).

2.  The excavation of soils containing chemicals above background during construction activities (e.g., installation, repair, removal of telephone lines or other utilities, but not closures, remediations, or PST tank removal actions) and the subsequent replacement of those soils into the same excavation are not considered relocation under the definition in 30 TAC 350.36.

3.  Soils to be reused must meet the residential critical surface or subsurface soil PCLs as applicable for the fill area. The concentration of chemicals in the soil must not exceed the Tier 1 Residential Soil PCLs defined in Table 1 30 TAC 350.

4.  If the soil contains chemicals above background, a representative number of samples must be collected to determine concentration of constituents in fill material.

All sampling and testing required pursuant to this Section 4.09(C) will be conducted by the Port Authority and all testing reports shall be provided to the Port Authority. Contractor shall provide the Port Authority with written notice of its activities sufficiently in advance of such activities so that the Port Authority can conduct such sampling and testing. Contractor shall not be entitled to reuse any soil pursuant to this Section 4.09(C) without prior written approval by the Port Authority. The determination by the Port Authority of whether is will allow reuse of soil pursuant to this Section 4.09 is a matter

DX 0001-1.0205

within the sole discretion of the Port Authority, and the Port Authority reserves the right to refuse the use of any soil.

4.10 **Spill Prevention Plan:**

A. **General:**

At least forty-eight (48) hours prior to commencing performance of any Work at the site, the Contractor shall submit to the Chief Engineer for review and approval a Spill Prevention Control and Counter Measure Plan (SPCC) meeting the requirements of Code of Federal Regulations (CFR) published by the office of the Federal Register National Archives and Records Administration, 40 CFR 112.3 – 112.7. The plan shall be specially designed for the Contractor's planned work methods and procedures. The plan shall be designed to complement all applicable safety standards, fire prevention regulations and pollution prevention policies and procedures. The plan shall include estimates of the quantity and rate of flow should equipment fail, and detail containment and/or diversionary structures to prevent spills from leaving the site or migrating into the Houston Ship Channel or other navigable waters. The plan shall include methods of recovery of spilled materials and all applicable twenty-four (24) hour emergency phone numbers, including without limitation that of the Port police. The Contractor shall not commence any field work prior to approval of such plan by the Chief Engineer.

B. **Reporting:**

(1) The Contractor shall immediately report to the Port Authority's Police Department at telephone number (713) 670-2647 and to the Chief Inspector, any spill or release, whether or not it is associated with this Contract. Thereafter, within two (2) working days after the occurrence of such event, Contractor shall submit a written report describing such event in a degree of detail reasonably acceptable to the Chief Engineer.

(2) If a spill migrates into the Houston Ship Channel or other navigable waters, in addition to the requirements of the foregoing paragraph 4.10(B)(1), the Contractor shall contact the U. S. Coast Guard Response Supervisor at telephone number (713) 671-5121, to review procedures and the SPCC plan and to coordinate activities and schedules, prior to commencement of cleaning activities.

C. **Implementation:**

The Contractor shall immediately respond in accordance with the SPCC plan in the event of a spill.

D. **Disposal:**

The Contractor shall dispose of spilled materials in accordance with EPA and TNRCC regulations and any other Applicable Laws. In connection with such disposals, the Contractor shall use only those transporters and disposal facilities that are approved by the Port of Houston Authority. All cost of collection, containment and disposal of spilled materials shall be the responsibility of the Contractor.

DX 0001-1.0206

## 4.11  Cultural Resources:

The Contractor shall not remove or disturb, or cause or permit to be removed or disturbed, any historical, archaeological, architectural, or other cultural artifacts, relics, vestiges, remains, or objects of antiquity. If any such items are discovered on the premises, the Contractor shall immediately notify the Chief Engineer of such discovery, and the site and the items discovered shall be protected by the Contractor from further disturbance until a professional examination of them can be made or until clearance to proceed is authorized by the Chief Engineer.

## 4.12  Use of Explosives:

The use of explosives on Port Authority property is prohibited. Any exemption to this rule will be noted in the Special Conditions. If not so noted, prior approval for the use of explosives must be obtained in writing from the Chief Engineer.

## 4.13  Burning:

Burning of materials or setting of any fires on Port property is strictly prohibited. Any exception to this rule will be noted in the Special Conditions. If not so noted, prior approval for burning or fires must be obtained in writing from the Chief Engineer.

## 4.14  Permit for Welding and Cutting:

A "hot work" Permit must be obtained from the Port Authority's Marine and Fire Department prior to commencement of any welding or cutting on Port Authority property. Prior to commencement of such hot work, the Contractor shall also contact other applicable local fire departments to determine the need for any other permits which may be required by such departments. Once the hot work Permit is executed and issued to the Contractor by the Port Authority's Marine and Fire Department, the Contractor must notify such department by telephone at (713) 670-2636 each day before a day during which such activity is scheduled to take place.

Prior to any "hot work" being performed on a barge, platform, or other floating facility, Contractor must obtain a permit from the U. S. Coast Guard. The Contractor must contact the U. S. C. G. Captain of the Port at (713) 672-6639 for details.

## 4.15  Interference with Port Operations and Navigation:

The Contractor shall conduct its Work in such a manner so as to not hinder the flow and navigation of ships, barges, cargoes and other vessels to and from the Port Authority's facilities, so as to minimize interference with any other operation or work and so as to provide safe conditions at and around the site.

Federal, state, U.S. Coast Guard and local statutes, laws, rules, regulations, ordinances, codes and rules of common law concerning navigation shall be complied with, and public advertisement, warning signs, buoys or other such requirements shall be complied with at the Contractor's expense.

## 4.16  Misplaced Materials:

The Contractor shall diligently prevent any material or other matter from falling into the Houston Ship Channel or other navigable waters. Any such material which, in the opinion of the Chief Engineer, may be dangerous to or obstruct navigation or future dredging, shall be removed with utmost dispatch. The Contractor shall give immediate notice to the Chief Engineer of such potential danger or obstruction and when ordered to by the Chief Engineer the Contractor shall mark or buoy such obstructions until they are removed. If the Contractor refuses, neglects or unduly delays compliance with this Section 4 16, such

DX 0001-1.0207

obstruction or potential danger may be removed or otherwise dealt with by the Port Authority. The Port has the right to offset all costs incurred in connection with such removal or other effort by the Port, including without limitation all costs associated with design professionals, against any amounts due the Contractor. Furthermore, if Contractor is not at that time owed any amounts by the Port and Contractor fails or refuses to pay such costs, such costs may be recovered from the Contractor's surety under the Contractor's performance bond.

### 4.17   Work On or Around Port Authority Grain Elevators:

If any Project involves Work in or around grain elevators, special safety measures will be required. Any requirements for such Work will be set out in the Special Conditions.

### 4.18   Work On or Around Railroad Tracks:

If any Project involves Work on or around the Port Authority's rail systems, special safety measures must be taken. Any requirements for such Work will be set out in the Special Conditions.

### 4.19   Discovery of Hazardous Substances:

In the event the Contractor encounters on the site material reasonably believed to be Hazardous Substances that has not been rendered harmless, the Contractor shall immediately stop Work in the affected area and report in writing the facts of such encounter to the Chief Engineer, the Port Police, the Environmental Affairs Manager of the Port Authority and the Inspector. Work in the area affected shall not thereafter be resumed except by written order of the Chief Engineer unless and until the material is determined not to be Hazardous Substances or such Hazardous Substances are rendered harmless.

The Contractor shall be responsible for identification, abatement, cleanup, control, removal, remediation and disposal of any Hazardous Substances in or on the site brought to the site by the Contractor or any Subcontractor or Supplier (other than any Hazardous Substances that are required by the Contract Documents to be used in connection with the Work). Contractor shall obtain any and all permits necessary for the legal and proper handling, transportation, and disposal of such Hazardous Substances and shall, prior to undertaking any such abatement, cleanup, control, removal, remediation and disposal, notify the Port Police, the Chief Engineer and the Environmental Affairs Manager such that they may observe such activities; provided that it shall be Contractor's sole responsibility to comply with Applicable Law governing any such activities.

### 4.20   Disposal of Excavated Materials and Certain Other Waste:

The Port of Houston Authority's Environmental Department will perform all the necessary tests for all unstable excavated materials and all excess unsuitable earthen, trash and debris materials. The Contractor shall submit to the Port's Environmental Department the names of all Subcontractors transporting such materials and locations of all disposal sites where such materials will be disposed of and shall provide copies of any permits required for such Subcontractors to so transport and dispose of such materials. Such Subcontractors must be approved by the Port of Houston prior to the removal of any such material from the site. All such material must be disposed of at the approved location(s) and the Contractor shall provide documentation to the Port of Houston Authority evidencing to the satisfaction of the Port the final disposition of all such materials.

### 4.21   Characterization of Waste Materials:

With respect to materials requiring disposal off-site, prior to Contractor removing any such materials from the site, all such materials shall be characterized by the Port Authority Environmental Group and its determination as to the characterization of such materials shall be final and conclusive.

General Conditions
(Rev'd November 1, 2002)

DX 0001-1.0208

## 4.22   Environmental Management System:

The Port of Houston Authority (PHA) has developed an Environmental Management System (EMS).   As part of the EMS, the PHA has adopted an environmental compliance policy and has developed environmental management programs.  Contractor shall adhere to such policy and programs and provide information to the Port Authority in the form and at the times requested by the Port Authority in furtherance of such policy and programs.

**END OF GENERAL CONDITIONS SECTION 4**

DX 0001-1.0209



## SECTION 5. PROSECUTION OF THE PROJECT

### 5.01   Commencement of Work:

Work shall be commenced by the Contractor only after a fully executed written Purchase Order has been issued by the Port Authority. In the event the Contractor begins performance of the Work prior to issuance of such a Purchase Order, the Contractor proceeds at its own risk and shall bear all responsibility therefor and all costs attributable thereto, including without limitation all costs associated with design professionals, and be liable for all damages caused thereby. The Contractor acknowledges that the Port Authority has no liability to or obligation to pay the Contractor for any Work performed in connection with the Project prior to the issuance of such a Purchase Order.

### 5.02   Start Date for Field Work:

A preconstruction meeting will be held prior to commencement of any field operations at a location and time to be determined by the Port.

In most instances, the start date for field work will not be set out in the Bid/Proposal Documents. After award of the Contract by the Commission and before the Purchase Order being issued, the parties shall agree on the start date for field work. If the parties cannot agree to such a date, the Chief Engineer will determine the start date for field work. The Chief Engineer's decision shall be final and binding on the Contractor.

In some instances, the Bid/Proposal Documents will provide the start date for field work and/or the completion date or number of days during which period of time the Work must be completed. In such an instance, the Contract Price shall include all labor costs (including without limitation any overtime, shift work and weekend work) necessary for the Contractor to meet the Contract Time. Time extensions will be granted on such Projects only for events of Force Majeure.

### 5.03   Planning of Work and Progress Schedule:

Within ten (10) working days after the Contractor has been notified of the award of Contract and before any field work begins, the Contractor shall furnish for review and approval by the Chief Engineer five (5) copies of its proposed Progress Schedule covering prosecution of the Work, which Progress Schedule is to be prepared on a working day basis unless the Contract Time is set forth in the Bid/Proposal Documents, in which case the Progress Schedule shall be prepared on a calendar day basis.

A working day is defined as a calendar day, excluding Saturdays, Sundays and the A. G. C. holidays for the applicable year when Work can be performed for a period of not less than seven (7) hours between 7:00 AM and 6:00 PM. A. G. C. holidays falling on Sunday are observed on Monday. Holidays falling on Saturday are not observed. The foregoing definitions of working days and holidays are not intended to dictate the times during which a Contractor may perform Work or apply to situations in which the Contract Time is established by the Bid/Proposal Documents. If Contractor wants or intends to work during times other than between 7:00 AM and 6:00 PM on a working day as defined herein, then Contractor must submit a proposed schedule setting forth the intended days and hours during which it intends to work to and obtain prior written consent from the Chief Engineer to the schedule.

The Contractor shall provide the Progress Schedule in bar graph form as well as critical path form. The Progress Schedule shall be dated and designated as the baseline schedule. In addition to a hard copy, if requested by the Port Authority, the Contractor shall provide the Port Authority a diskette containing an electronic copy of the Progress Schedule (and any revisions and updates thereto as such revisions and updates are made from time to time), including all resource loading and logic diagrams.

DX 0001-1.0210

The Progress Schedule shall state the sequence of operations and shall show start/finish dates for all critical and non-critical path construction activities. The Progress Schedule shall include all activities necessary for effective planning, procurement, construction, construction management and timely completion of the Work within the Contract Time, including, but not limited to: start of construction, completion, permit dates, procurement dates, estimated dates that fabrication of items of Equipment or other Work will commence and be completed, dates for delivery thereof to the jobsite, dates required for reviews and approvals by the Port Authority for the Contractor to maintain the Progress Schedule (which dates shall provide for a sufficient time for such review), and the dates for the Port Authority to supply Port Authority furnished materials, if any. Furthermore, the Progress Schedule shall designate sources of supply of all Materials and points of manufacture and fabrication of Equipment or other work to be manufactured or fabricated offsite.

Such Progress Schedule shall be subject to approval by the Chief Engineer, and, once approved, no changes to the Progress Schedule may be made without approval of the Chief Engineer. In the event Contractor believes a change in the Progress Schedule is appropriate, the Contractor shall submit to the Chief Engineer a signed writing which sets forth the reason for such changes and warrants that such changes or deviations are necessary.

Contractor shall issue revised Progress Schedules to the Port Authority promptly after Change Orders or Construction Change Directives affecting the Contract Time have been finalized, but in no event later than ten (10) calendar days after the date that the relevant Change Orders or Construction Change Directives are finalized. Each revised Progress Schedule shall be dated and identified as a "Revised Progress Schedule" and shall bear the appropriate revision number. Each Revised Progress Schedule shall clearly demonstrate all changes in resource loading and/or the planned start and finish dates for all critical and non-critical path numbered Work activities as compared to the most recent Progress Schedule approved by the Chief Engineer. Revised Progress Schedules are subject to the approval of the Chief Engineer, and, once approved, no changes may be made thereto without approval of the Chief Engineer. In the event Contractor believes a change in the Revised Progress Schedule is appropriate, the Contractor shall submit to the Chief Engineer a signed writing which sets forth the reason for such changes and warrants that such changes are necessary.

No extension of the Contract Time and resulting modification to the Progress Schedule may occur without a Change Order or Construction Change Directive that modifies the Contract Time.

5.04    Submittal of Updated Progress Schedule:

The Contractor shall provide the Port Authority with Progress Schedule updates (i) on a monthly or more frequent basis as the Port Authority requests, and (ii) in between such periodic updates if nonprogress or slow progress is such as to render the previously submitted and approved Progress Schedule inaccurate. Such Progress Schedule updates shall reflect accurate conditions, identify and inform the Port Authority of all deviations in every numbered as-planned activity contained in the latest Progress Schedule approved by the Chief Engineer and explain the basis for such deviations as well as the Contractor's plan to bring the schedule back into compliance with the latest approved Progress Schedule. Each Progress Schedule update shall be dated and identified as a "Progress Schedule Update" or in the event of an update to a Revised Progress Schedule a "Revised Progress Schedule Update", in each instance noting the appropriate update number. Each Progress Schedule update shall clearly demonstrate all changes in resource loading and/or the planned start and finish dates for all critical and non-critical path numbered Work activities as compared to the most recent Progress Schedule approved by the Chief Engineer.

5.05    Time of Completion and Liquidated Damages:

TIME IS OF THE ESSENCE OF THE CONTRACT. The Contractor understands and agrees that if the Contractor fails to acceptably complete its contractual obligation to the Port Authority within the

DX 0001-1.0211

Contract Time, the Port Authority will be damaged. Since damages to the Port Authority for failure of the Contractor to complete the Work within the Contract Time are anticipated at the inception of the Contract, the Contractor shall and hereby does waive any claims that such failure failed to damage the Port Authority and hereby agrees that the Port's rights to such damages are absolute.

If the Contract Documents provide for payment of liquidated damages, the Contractor understands and agrees that the exact amount of damages to the Port Authority as a result of failure of the Contractor to complete the Work within the Contract Time is and will be difficult to determine. The Port Authority and the Contractor recognize the delays, expense, and difficulties involved in proving in a legal or mediation proceeding the actual loss suffered by the Port Authority if the Work is not completed within the Contract Time. Accordingly, instead of requiring any such proof, the Port Authority and the Contractor agree that as liquidated damages for delay (but not as a penalty), the Contractor (or its surety) shall pay the Port Authority, for each **CALENDAR** day (not work day) the Work remains uncompleted, the sum set out in the Contract Documents as liquidated damages for the Project. The Contractor agrees that such sum is a fair and reasonable estimate of the amount of damages the Port Authority will incur if the Project is not completed within the Contract Time. The number of calendar days comprising the period of time over which liquidated damages accrue shall not be reduced for any reason, including without limitation, by (i) any period of time that Work is not performed by reason of a termination pursuant to Section 5.48, or (ii) in a case where the Contractor's surety elects to complete the Contract, by the period of time it takes such surety to complete the Contract. The Contractor (and its surety) specially binds and obligates itself to pay such damages to the Port Authority on demand or, at its option, the Port Authority may withhold from the Contractor or its surety or offset such damages against any amounts due the Contractor or its surety under the Contract or otherwise under Applicable Law. In case full payment for the Work shall have been made, the Port Authority shall have the right to recover from the Contractor and its surety the amount of such liquidated damages as determined under the Contract.

### 5.06    Actual Damages in Lieu of Liquidated Damages:

The parties' agreement as to liquidated damages constitutes only an agreement between the parties as to the **minimum** amount of damages suffered by the Port Authority in the event the Contractor fails to complete the Work within the Contract Time. If the Port Authority suffers damages in excess of such minimum amount due to the Contractor's failure to complete the Work within the Contract Time, the Port Authority shall have the right to recover its actual damages. Such damages may be withheld from the Contractor or its surety or offset against any monies owed the Contractor or its surety by the Port Authority or the Port Authority may collect such damages from the Contractor and the surety on the Contractor's performance and payment bonds.

### 5.07    No Delay Damages:

The Contractor shall receive no financial compensation for delay or hindrance to the Work. In no event shall the Port Authority be liable to the Contractor or any Subcontractor or Supplier, any other person or any surety for or any employee or agent of any of them, for any damages arising out of or associated with any delay or hindrance to the Work, regardless of the source of the delay or hindrance, including events of Force Majeure, AND EVEN IF SUCH DELAY OR HINDRANCE RESULTS FROM, ARISES OUT OF OR IS DUE, IN WHOLE OR IN PART, TO THE NEGLIGENCE, BREACH OF CONTRACT OR OTHER FAULT OF THE PORT AUTHORITY. The Contractor's sole remedy in any such case shall be an extension of time.

### 5.08    Time Extensions:

(a)    If during the progress of the Work, weather conditions, events of Force Majeure, or other causes of delay which are solely outside the control of the Contractor occur such that, in the Contractor's reasonable opinion, the Contractor is entitled to have such day not count against the Contract Time, it

DX 0001-1.0212

shall file with the Chief Engineer on the first working day after the week in which such event first occurs, a request for a time extension. Such request must contain, at a minimum, the following information:

1. the latest Revised Schedule where a change in the Contract Time was previously approved by formal Change Order and/or Construction Change Directive, along with any Change Orders and Construction Change Directives upon which Contractor is relying;

2. the latest Schedule Update which must reflect actual as-built start/finish dates of all relevant activities and be without any constraints, logic changes, hiatuses or other interruptions or deviations;

3. graphic analyses comparing the Contractor's as-planned base-line schedule (or latest as-planned Revised Schedule, if applicable) versus Schedule Update showing actual as-built conditions, either by computer-generated graphics or by similar presentations, which comparison must identify all relevant critical path changes;

4. written cause and effect narratives which identify each critical path activity by: (a) activity number; (b) the specific calendar dates when the critical path delay occurred; (c) the cause of such delay; and (d) the specific contractual provisions being relied upon by the Contractor to establish the Port Authority's responsibility for each proposed, pending or disputed change in the Contract Time, including the contractual provisions which establish whether the claimed delay entitles the Contractor to an extension of time;

5. written explanation which clearly depicts and explains all instances of Concurrent Delay to the critical path;

6. written explanation of any constraints, logic changes, critical path changes, hiatuses, interruptions or similar deviations, including all underlying assumptions relating to any such changes made by the Contractor in compiling the delay analyses required by the Contract Documents; and

7. written statement describing in a degree of detail acceptable to the Chief Engineer all steps taken and being taken by Contractor to mitigate against the cause of the relevant adverse schedule impact.

(b) **No extensions will be allowed for any of the following occurrences:**

1. when the principal units of Work and tasks on the critical path are not in progress or are not delayed by the event of delay or hindrance;

2. when at least seven (7) hours of available working time remain out of the working day or calendar day, as applicable;

3. while materials are drying and it is possible for the Contractor to enclose the area and use drying devices;

4. when an event of delay or hindrance occurs on a Saturday, Sunday or AGC holiday, unless Contract Time is set forth in the Bid/Proposal Documents;

5. when an event of delay or hindrance occurs after the expiration of the Contract Time;

6. when events of Concurrent Delay overlap the claimed delay; and

DX 0001-1.0213

7.   for Contracts with the Contract Time set forth in the Bid/Proposal Documents, when an event of delay other than an event of Force Majeure occurs.

(c)   Failure to timely file requests for time extensions as required in this Section 5.08 shall constitute a waiver of any rights the Contractor may have had to such time extensions.

(d)   Approval or disapproval of time extensions shall be made in the sole discretion of the Chief Engineer and such decision shall be final. Any extension of time shall not release the Contractor or its surety from their obligations under the Contract Documents, all of which shall remain in full force until completely discharged.

## 5.09   Lack of Satisfactory Progress:

If the Contractor receives notice from the Port Authority that the Port is concerned with the rate of progress of the Work, the Contractor shall, whether or not it disputes responsibility for the delay, provide the Chief Engineer with a written narrative setting forth in a degree of detail acceptable to the Port a plan of recovery to overcome or mitigate the delay. Moreover, if in the opinion of the Chief Engineer the rate of progress of the Work is not satisfactory, is not rapid enough to ensure completion within the Contract Time, or the Contractor's proposed recovery plan is inadequate to achieve such recovery, the Chief Engineer shall have the right, but not the obligation, to order the Contractor to (i) employ additional people, (ii) increase its plant or (iii) prosecute the Work by working longer hours on any portion of the Work which is deemed by the Chief Engineer to be behind schedule, and the Contractor shall forthwith comply with any such orders without additional compensation. Alternatively, the Port Authority may make good any such deficiencies, offset the reasonable cost thereof, including, without limitation, the Port's expenses and compensation for any professional services (including without limitation any professional architectural or engineering design services and any attorneys fees) made necessary thereby, from any amount due the Contractor or its surety from the Port Authority.

## 5.10   Independent Contractor:

It is agreed between the parties that the Contractor is and shall be an independent contractor. Nothing in the Contract Documents shall create a relationship of employer and employee or principal and agent between the Port Authority, on the one hand, and the Contractor or any of its employees, Subcontractors, Suppliers or agents of any thereof, on the other hand. Neither the Contractor nor any of its employees, Subcontractors, Suppliers or agents shall have the ability to bind or obligate the Port Authority for any purpose whatsoever.

The Port Authority shall not have the right to control the manner in which or prescribe the method by which the Contractor performs the Work. As an independent Contractor, the Contractor shall be solely responsible for supervision of and performance of the Work and shall prosecute the Work at such time and seasons, in such order or precedence, and in such manner, using such methods as Contractor shall choose; provided, however, that the order, time, manner and methods of prosecution shall be in compliance with Contractor's Standard of Care and Work shall be completed within the Contract Time and in accordance with the Contract Documents.

The Contractor shall not be relieved of its obligations to timely perform the Work in accordance with the Contract Documents either (i) on account of activities or duties of the Chief Engineer, Inspectors, or Port Authority or Design Consultant relating to administration of the Contract, or (ii) because tests, inspections or approvals were required from or performed by a person other than the Contractor and such person did not timely perform such inspection or test or issue such approval.

General Conditions
(Rev'd November 1, 2002)                                    VIII - 31 – 52

DX 0001-1.0214



**5.11    Subcontractors and Material Suppliers:**

The Contractor must perform at least twenty-five percent (25%) of the total dollar value of the portion of the Contract Price attributable to the Work performed in the field with its Own Forces. The existence and extent of such forces will be verified by certified payrolls submitted in accordance with the Prevailing Wage Rate section of the Contract Documents and as required under these General Conditions.

The Contractor shall not utilize any Subcontractor or Supplier other than those disclosed on the Subcontract Sheet submitted to the Port as part of Contractor's Bid/Proposal without prior written approval from the Port Authority.

The Contractor shall be responsible to the Port Authority for acts and omissions of the Contractor's employees, Subcontractors and Suppliers, and their agents and employees, and other persons performing portions of the Work pursuant to an agreement with the Contractor.

The Contractor shall promptly, out of the amount paid to the Contractor on account of such person's portion of the Work, pay each Subcontractor, Supplier and other persons supplying labor, Materials or Equipment in the performance of the Work upon receipt of payment from the Port Authority.  The Contractor shall, by appropriate agreement with each Subcontractor and Supplier, require each such Subcontractor and Supplier to make payments in a similar manner to those providing labor, Materials and Equipment in connection with the Work.  The Port Authority shall have no obligation to pay, or see to the payment of, any monies to such parties.

By an appropriate written agreement, the Contractor shall require each Subcontractor and Supplier, to the extent of the Work to be performed by such Subcontractor or Supplier, to be bound to the Contractor by the terms and conditions of the Contract Documents, and to assume toward the Contractor all of the liabilities, obligations and responsibilities that the Contractor, by the Contract Documents, assumes toward the Port Authority.  Each subcontract agreement shall preserve and protect the rights of the Port Authority under the Contract Documents with respect to the Work to be performed by Subcontractors or Suppliers so that the subcontracting of such Work will not prejudice such rights.   Contractor shall require all Subcontractors to (i) carry appropriate insurance as required under the Contract Documents, (ii) indemnify the Port Authority Indemnitees to the same extent that the Contractor is required to indemnify the Port under the Contract Documents, and (iii) assign all Intellectual Property Rights to the Port Authority to the same extent that the Contractor is required to assign such rights to the Port under the Contract Documents.

**5.12    Port as Third Party Beneficiary of Subcontracts:**

Each subcontract entered into between Contractor and a Subcontractor or Supplier shall provide that the Port is and shall be a third party beneficiary thereof.  Notwithstanding any failure of Contractor to comply with the foregoing sentence, the Port shall be and hereby is deemed to be a third party beneficiary of each such subcontract.

**5.13    Port and Surety as Assignees of Subcontracts:**

Each subcontract entered into between Contractor and a Subcontractor shall provide that, in the event of a termination of this Contract, such subcontract shall be assignable to the Port and/or the Contractor's surety without the need for any further action on the part of any party hereto or thereto.  Notwithstanding any failure of Contractor to comply with the foregoing sentence, the Port and the Contractor's surety shall be and hereby are deemed to be permitted assignees with respect to any such subcontract.

General Conditions
(Rev'd  November 1, 2002)                                                                      VIII - 32 – 52

DX 0001-1.0215



## 5.14 Cooperation with the Port Authority and Others:

The principal business of the Port Authority in the movement of cargoes will take precedence over all other considerations in conflicts of scheduling of operations including without limitation those operations of the Contractor. The Contractor shall cooperate with the Port Authority and with other contractors and each will so arrange its schedule such that the entire Work is completed most expeditiously.

The Port Authority shall have the right, but not the obligation, to assist the Contractor and any other party involved with the Project in scheduling Work.

The Contractor understands and accepts that the Port Authority will have other contractors performing Work on the Project or on Port Authority property. The Contractor shall cooperate with the Port Authority and such other contractors and coordinate its Work with the work of other contractors. The Contractor may not make or enforce any claim against the Port Authority for any delay or interference caused by the failure of the Contractor to observe and perform its obligations of cooperation and coordination in accordance with this Section 5.14.

The Contractor shall be responsible for inspecting and accepting the work of any separate Port Authority contractor and determining whether such work its suitable to receive Contractor's Work. The Contractor shall, prior to proceeding with any portion of the Work that requires proper performance of work by other Port Authority contractors, promptly report to the Port Authority any apparent discrepancies or defects in such other work that would render it unsuitable for such proper performance. Failure of the Contractor to so report shall constitute an acknowledgment that the Port Authority's separate contractor's completed or partially completed work is fit and proper to receive the Contractor's Work. Contractor shall bear the costs of correcting Work attributable to its failure to comply with this Section 5.14, including without limitation any costs associated with design professionals, and shall be liable for all damages caused thereby. If the Contractor causes damage to the work or property of any other Port Authority contractor, the Contractor shall pay for all costs attributable thereto, including without limitation any costs associated with design professionals, and shall resolve any claims of any such other contractor immediately.

## 5.15 Lines and Grades:

The Port Authority will establish base lines and benchmarks for control with respect to alignment and elevation of Work. The Contractor shall provide and maintain accurate lines and grades at all times. The Port Authority may, but is not obligated to, check lines and grades periodically and may pursuant thereto advise the Contractor of any errors found, and the Contractor shall immediately correct any such errors; provided, however, that the Contractor shall be solely responsible for the accuracy of the Work and its conformance to the Contract Documents.

## 5.16 Contractor's Superintendent:

The Contractor shall have at all times during which the Work is in progress a competent and reliable English-speaking superintendent on the site. Such superintendent shall be in the direct employ of the Contractor. No Subcontractor shall perform any Work at the site unless the such superintendent is present. The name, address and home telephone number of such superintendent shall be submitted to the Port Authority in writing prior to commencement of on-site work. Such superintendent shall not be changed during the Contract Time without prior written approval of the Chief Engineer. Contractor shall request such approval by providing written notice of its desire to make such change, which notice shall set forth the reason therefor and the name and qualifications of a proposed replacement. The Contractor's superintendent shall be authorized to receive notices given by the Port Authority, Chief Engineer (or its representative), Design Consultant or the Inspector. Notice given to such superintendent by the Port Authority shall constitute notice to the Contractor.

General Conditions
(Rev'd November 1, 2002)                                               VIII - 33 – 52

DX 0001-1.0216

The Port shall have the right to require the Contractor to replace such superintendent, if in the discretion of the Chief Engineer such superintendent is unsatisfactory. Exercise of such right of the Port to require the Contractor to replace its superintendent shall not give rise to any claim for compensation or damages against the Port or any of its employees.

## 5.17    Contractor's Local Office:

The Contractor shall have an office or agent in the greater Houston area during the period of construction. The mailing address, telephone number and FAX number of this office must be on file with the Chief Engineer prior to the start of any Work.

## 5.18    Notice:

For purposes of the Contract, it is agreed to and understood by the parties that written notice to the Contractor shall be deemed to have been received on the day when such notice is delivered in person or by FAX to the Contractor's superintendent or the Contractor's local office. Notices sent by U. S. mail shall be deemed to have been received on the third postal delivery day after the date postmarked on the envelope containing such notice.

Notice to the Port Authority shall be ineffective unless given in writing and shall be deemed to have been received on the date it is received by the Chief Engineer (unless the Contract Documents provide that notice be given to another official of the Port in which case such notice shall be deemed to have been received on the date it is received by such person). Notice to the Port Authority shall be addressed as follows:

> The Port of Houston Authority
> ATTN:   Chief Engineer (or such other employee of the Port required to be notified as provided in the Contract Documents)
> 111 E. Loop North
> Houston, Texas 77029-4327

## 5.19    Character and Conduct of Workmen:

The Contractor shall at all times enforce strict discipline and good order among its employees and other persons performing the Work and shall not employ on the Work any person known to be unfit or any person known to be unskilled with respect to the task assigned to him. Only skilled superintendents and workers shall be employed on work requiring special qualifications and skills. Common laborers are not skilled workers.

The Contractor shall remove from the site any person who in the discretion of the Chief Engineer commits trespass, is disorderly, works in an unsafe manner, appears to be under the influence of alcohol or drugs, exhibits incompetence or is otherwise unsatisfactory. Such person or persons shall not be employed again on any portion of the Work. Exercise of the Port's rights under this Section 5.19 shall not give rise to any claim for compensation or damages against the Port Authority or any of its employees.

## 5.20    Drawings and Specifications Furnished by the Port Authority:

The Contractor will be furnished five (5) sets of the Drawings and Specifications at no cost. One complete set of each, including approved Shop Drawings, shall be maintained by the Contractor in good order and condition and the Port shall have constant access to such complete set at the site. If additional copies of the Drawings and Specifications are desired by the Contractor, such additional copies will be furnished after reasonable request and the Port's receipt of payment by the Contractor for the cost of reproduction.

General Conditions
(Rev'd  November 1, 2002)                                                                VIII - 34 – 52

DX 0001-1.0217

All Drawings, Specifications, other documents prepared by the Design Consultant, Port Authority, Contractor, Subcontractors, Suppliers, or any other contractor and any copies thereof are and shall remain the Port Authority's property upon creation (collectively, "Work Product") provided, however, that Work Product shall not include pre-existing proprietary information of the Contractor, its Subcontractors and Suppliers ("Contractor Proprietary Information"). To this end, Contractor agrees and does hereby assign, grant, transfer and convey to the Port Authority, its successors and assigns, Contractor's entire right, title, interest and ownership in and to such Work Product, including, without limitation, the right to secure copyright registration. Contractor confirms that the Port Authority and its successors and assigns shall own Contractor's right, title and interest in and to, including without limitation the right to use, reproduce, distribute (whether by sale, rental, lease or lending, or by other transfer of ownership), to perform publicly, and to display, all such Work Product, whether or not such Work Product constitutes a "work made for hire" as defined in 17 U.S.C. Section 201(b). In addition, the Contractor hereby grants the Port Authority a fully paid-up, royalty free, perpetual, assignable, non-exclusive license to use, copy, modify, create derivative works from and distribute to third parties Contractor Proprietary Information in connection with the Port Authority's exercise of its rights in the Work Product, operation, maintenance, repair, renovation, expansion, replacement and modification of the Project or otherwise in connection with Port Authority property (whether by the Port Authority or a third party). Contractor shall obtain assignments, confirmations and licenses substantially similar to the provisions of this paragraph from all of its Subcontractors and Suppliers. The Work Product is to be used by the Contractor only with respect to this Project and is not to be used on any other project. The Contractor, Subcontractors and Suppliers are granted a limited, nonexclusive, non-transferable, revocable license during the term of their respective agreements under which each is obligated to perform Work to use and reproduce applicable portions of the Work Product appropriate to and for use in the execution of Work. Submission or distribution to comply with official regulatory requirements or for other purposes in connection with the Project and not otherwise in contravention of the Contract Documents is not to be construed as publication in derogation of the Port Authority's copyright or other reserved rights. Contractor shall deliver all copies of the Work Product to the Port Authority upon the earliest to occur of the Port Authority's request, completion of the Work, or termination of the Contract.

### 5.21 Requests for Information:

If the Contractor desires any information or any interpretation in respect of a provision or requirement of the Contract Documents, then the Contractor shall prepare an RFI, setting forth in reasonable detail the matters as to which the Contractor desires such information or interpretation, and submit such writing to the Chief Engineer. In situations in which a Design Consultant is utilized for this Project, the Contractor shall send the RFI to the Design Consultant and a copy of the transmittal letter to the Chief Engineer and Inspector. The Chief Engineer (or Design Consultant, if appropriate) shall review such RFI and issue an answer in response thereto, which response shall be final and conclusive as to the matters addressed therein.

### 5.22 Submittals to be Furnished by the Contractor after Award:

The Contractor shall prepare, or cause to be prepared, and submit to the person indicated below for such person's review (which review shall be conducted with reasonable promptness so as not to delay the Work), complete design and detailed Shop Drawings, Product Data, Samples and other pertinent information showing all Materials and details of Work to be incorporated into the Project. Contractor shall submit such Submittals:

(a)     if there is no Design Consultant responsible for checking Submittals in connection with the Work, to the Chief Engineer with a copy of the transmittal letter transmitted therewith to the Inspector; or

General Conditions
(Rev'd November 1, 2002)                                                    VIII - 35 – 52

DX 0001-1.0218

(b)     if there is a Design Consultant responsible for checking Submittals in connection with the Work, to such Design Consultant with copies of the transmittal letter transmitted therewith to the Chief Engineer and the Inspector.

Submittals of a non-technical nature, such as the Contractor's health and safety plan, spill prevention plan, and appointment of Contractor's superintendent, shall always be submitted to the Chief Engineer or such other individual specified in the Contract Documents as responsible for reviewing such documents.

Submittals shall be reviewed, approved, checked, stamped "Checked" and signed by the Contractor before being submitted for review as set forth herein. The Contractor shall be solely responsible for the accuracy and correctness of Submittals whether furnished by himself or by others. Contractor's submission of Submittals to the Chief Engineer (or Design Consultant, if appropriate) shall constitute Contractor's representation, with respect to each Submittal, that Contractor has determined and verified all Materials, field measurements and field construction criteria related thereto, that Contractor has checked and coordinated the information contained within such Submittal with the requirements of the Work and the Contract Documents, and that such Submittal satisfies all such requirements. No portion of the Work requiring Submittals or any Equipment or Material shall be ordered or fabricated before review of the applicable Submittals by the Chief Engineer (or Design Consultant, if appropriate).

Submission of Submittals shall be made not less than 20 days (or such longer period of time as may be required to maintain the orderly progress of the Work) prior to the time that Contractor expects to incorporate the work covered by such Submittal into the Work and in such sequence that the person reviewing such Submittals will have the information necessary for such review. The person reviewing Submittals will return them to the Contractor marked to indicate whether the Contractor may proceed with the Work based on the Submittal as is or with specified changes, whether the Contractor must make changes to the Submittal and resubmit it, or whether the Submittal is rejected and the Contractor must submit another Submittal. The review and/or acceptance of any Submittals shall not relieve the Contractor of its full responsibility for proper functioning, fit and conformity with the Contract Documents.

Product Data and Shop Drawings shall be submitted in seven (7) copies, two of which will be returned to the Contractor. Samples shall be submitted in two (2) copies, one (1) of which will be returned to the Contractor. Prints for field use or fabrication shall be made from the reviewed and accepted Shop Drawings.

All Submittals shall be made on reproducible paper or in such other medium as will permit clear and permanent reproduction. Each Shop Drawing shall be labeled to show such drawing was prepared by or for the Contractor and shall be identifiable by serial numbers and a descriptive title thereon. The seal of a Registered Professional Engineer, licensed in the State of Texas, shall be affixed to each Shop Drawing when such Shop Drawing reflects an engineering design.

The Contractor shall make the necessary changes on Submittals returned and marked indicating that changes are required and, with respect to such returned Submittals, submit revised Submittals for another review following the same procedure as set forth above. The Contractor shall call the reviewer's specific attention to, in a writing attached to or by writing on such resubmitted Submittals, any revisions other than those required by the reviewer pursuant to a prior review.

The time required for revision and/or resubmission of Submittals shall not entitle the Contractor to any extension of time.

Submittals marked indicating that the Submittal is accepted or is accepted with noted corrections may be used for performance of the Work and fabrication prior to the reviewer's further review, unless specific instructions are given otherwise by such reviewer. Submittals marked in any other manner,

DX 0001-1.0219

including those indicating that they must be resubmitted for any reason, may not be used for performance of the Work or fabrication prior to the reviewer's further review and acceptance.

The Chief Engineer, Design Consultant and Contractor shall be responsible for obtaining their own copies of Submittals for office and/or field use. The Contractor shall be responsible for furnishing Subcontractors and Suppliers with all Submittals as may be necessary for the coordination of the activities of all Subcontractors and Suppliers.

If at any time before final completion of the Work changes are made that necessitate revising reviewed Submittals, then the Contractor shall make such revisions and resubmit the affected Submittals to the reviewer, following the same procedure set forth above, for additional review, such review to be conducted prior to effecting the changes involved.

Contractor shall maintain at the site one complete set of all reviewed Submittals. The Contractor shall, at the end of the job, make all corrections to the tracings or other applicable documentation of its Submittals so that they reflect the finished Work as built and shall deliver to the Chief Engineer either the tracings or reproducible prints thereof on translucent paper.

Submittals are not and, notwithstanding any review and acceptance thereof by the Port or any Design Consultant, shall not be construed to be Contract Documents.

The purpose of review and acceptance of Submittals by the Port Authority or Design Consultant is merely an effort on the part of the Port to determine whether the Contractor is complying with the requirements of the Contract Documents and shall in no way operate as a waiver of any right of the Port or any obligation of Contractor hereunder, nor in any way relieve Contractor of any of its obligations hereunder. Review and acceptance of Submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems, all of which remain the responsibility of the Contractor as required by the Contract Documents. The Port Authority's and/or Design Consultant's review and acceptance of the Contractor's Submittals shall not constitute approval of safety precautions or of any construction means, methods, techniques, sequences or procedures. The Port Authority's and/or Design Consultant's review and acceptance of a specific item shall not indicate review and approval of an assembly of which the item is component.

5.23    **As-Built Drawings:**

Contractor shall maintain at the site one set of Drawings showing as-built conditions (including without limitation any conditions discovered to be at variance with the information as indicated on the original Drawings), locations and details of any and all Work which is installed under this Contract. Such set shall include mark ups of the latest approved Drawings and shall indicate actual locations of utilities and all changes in the Work which occurred during the course of the construction. Two (2) sets of Drawings and Specifications with neat and legible as-built drawings (indicating changes in red) shall be returned to the Chief Engineer within thirty (30) days following the final inspection.

In addition, Contractor shall provide one complete set of white background prints of all plumbing, mechanical and electrical Drawings, and all other systems requiring concealed piping, conduit or utilities which form a part of the Work. Immediately after such Work is installed, the Contractor shall carefully draw on these prints, in red ink, the as-built condition of any and all Work which is installed under this Contract. In marking such as-built conditions, Contractor shall indicate by measured dimension to building corners or other permanent monuments, exact locations of all piping, conduit or utilities concealed in concrete slabs, behind walls, within ceilings or below grade. Such prints shall also indicate exact locations of valves, pull boxes and similar items as required for maintenance or repair service.

DX 0001-1.0220

### 5.24    Progress Photographs:

On the first day or within the first three (3) days of each calendar month, the Contractor shall have taken by a professional photographer four (4) separate photogr: hic views of the Project as directed by the Port Authority's Inspector, which photographic views shall sh:./ the status of the Work as of the dates taken. By the seventh day of that month, two 8 inch by 10 inch enlargements of each such photographic view (for a total of eight (8) such enlargements) shall be delivered to the Port Authority's Inspector. All photographs shall be in color and shall be of high resolution, clarity and sharpness. Such photographs shall be taken by a professional photographer with at least five years of professional experience. The name and address of such photographer shall appear on the reverse side of each photograph. The minimum negative size of such photographs shall be 2¼ inches by 2¼ inches. The face of each such enlargement shall be annotated with the name of the Contractor, the name of the Project, the view and the date on which the photographs were taken. The Port Authority shall be the sole judge of the quality of the finished product.

### 5.25    Additional Schedules and Reports:

The Contractor shall submit to the Chief Engineer schedules, payrolls, reports, estimates and records, and such other data relating to the Work as the Chief Engineer may from time to time require. Such information shall be submitted in such form and detail as the Chief Engineer may direct.

### 5.26    Material Storage:

Materials for use in the Work shall be stored at the site in such a manner that prevents damage and deterioration. Materials that have been damaged or in any way become unfit for use will not be accepted in the Work.

Materials shall, to the satisfaction of the Chief Engineer, be neatly, safely and compactly piled or stacked so as to minimize hazard, interference, inconvenience and damage to property owners, users of Port Authority property or facilities, Port Authority employees and the general public. Such stacks or piles shall be no closer than three feet from any fire hydrant and shall not block or interfere with public and private accessways, drives and streets.

Shade trees, improvements and other structures shall be protected from any damage by personnel, equipment, machinery, stone, earth or other materials. Injuries and damage to accessways, drives, streets improvements or other property must be made good by the Contractor at its sole expense. Prior to final completion of the Work, all unused materials and storage facilities shall promptly be removed by the Contractor.

### 5.27    Material Furnished by the Port Authority:

If any material is to be furnished by the Port Authority, a listing of all such material will be set out in the Special Conditions.

### 5.28    Tools and Equipment Furnished by the Contractor:

The Contractor shall provide and use approved tools and equipment in sufficient qualities and quantities to facilitate diligent prosecution of the Work to the end that the Work will be completed within the Contract Time and otherwise in accordance with the Contract Documents. If at any time the equipment or tools being used, in the opinion of the Chief Engineer, are faulty or inadequate, or will prevent the Work from being completed in accordance with the Contract Documents or within the Contract Time, such equipment or tools shall be replaced or supplemented with tools and equipment satisfactory to the Chief Engineer.

DX 0001-1.0221



**5.29**   **Water for Construction:**

Water for construction purposes may or may not be available from the Port Authority's fire hydrants. Whether water will be available from such hydrants will be stated in the Special Conditions. If available, Contractor shall use only reasonable amounts and must install a meter. The Contractor shall furnish all temporary connections therefor at its own cost.   Unless stated otherwise in the Special Conditions, the Contractor shall not be charged for water provided by the Port Authority.

**5.30**   **Electrical Connections:**

The Contractor shall make its own arrangements and pay for electrical service at the jobsite unless otherwise stated in the Special Conditions.

**5.31**   **Contractor's Field Office:**

The Contractor shall provide a temporary field office building at the site, at a location approved by the Chief Engineer, which building shall be the Contractor's own jobsite headquarters, unless stated otherwise in the Special Conditions.  Such building shall be weatherproof and equipped with adequate door and window locks for security of its contents.  Such building shall also be equipped with adequate electrical power and illumination, heating facilities, and telephone service.  Contractor shall maintain such building in a clean, sanitary and orderly condition throughout the Contract Time and shall immediately remove such building from the site upon completion of the Work.

**5.32**   **Field Office for Port Authority Personnel:**

Unless stated otherwise in the Special Conditions, the Contractor shall not be required to furnish a field office for the exclusive use of Port Authority personnel.  However, Port Authority personnel shall have the right to use the Contractor's buildings and facilities at the site as needed at no additional cost to the Port Authority.

**5.33**   **Contractor's Obligation to Maintain a Clean Work Site:**

The Contractor shall at all times during the Contract Time maintain the site and structures in such a manner that eliminates accumulations of waste materials, debris or rubbish.  Prior to final completion of the Work or such sooner time as may be required by the Port the Contractor shall completely remove from the site all waste matter, rubbish and debris as well as all unused materials, temporary facilities, tools and the like, leaving the area "broom clean."

If Contractor fails to maintain the site as required and fails to timely complete appropriate clean up and removal activities prior to final completion or within twenty-four (24) hours after the Port Authority's direction to do so, the Port Authority shall have the right (but not the obligation) without further notice to the Contractor to perform such clean up and removal activities at Contractor's expense and to offset, pursuant to Section 6 17, the amount so expended by the Port Authority against any amounts due the Contractor or its surety or recover such amount from either of them.

The Contractor shall ensure that trucks which have delivered materials to the Contractor, including without limitation concrete trucks, shall be cleaned either: (1) at a location within the site designated by the Chief Engineer, or (2) off the property of the Port Authority.  At a time convenient to the Contractor but prior to final completion, any residue from such cleaning operations shall be completely removed from the property of the Port Authority

DX 0001-1.0222

## 5.34    Material Testing:

The testing and inspection of materials as required by the Specifications, or as deemed advisable by the Chief Engineer, unless provided otherwise herein, shall be performed by a commercial laboratory hired by and paid directly by the Port Authority.

The Contractor shall cooperate with such laboratory to ensure that all required testing is accomplished without delay to or interference with the Work. The Contractor at its own expense shall provide such laboratory with all test specimens required by the Contract Documents. The Contractor shall provide the Inspectors with advance written notice of the time and place when all tests and inspections will be performed such that the Inspectors may at their discretion observe such tests and inspections.

Such laboratory shall perform tests required for and shall have the power to stop and require correction of concrete work, shall test earth fill material for compliance with the Specifications and for optimum moisture content, shall make density tests of compacted fill and shall perform any other material tests the Chief Engineer directs. All certificates of such testing, inspection or approvals issued by such laboratory shall be delivered to the Inspector with a copy to the Contractor.

The costs of laboratory services required to establish mix designs for Portland Cement concrete shall be borne by the Contractor. The Contractor shall pay for the costs of analyzing aggregates, fixing gradations, preparing and testing of design cylinders or specimens and other such services required to establish mix design, or to redesign any mix when required due to any change in source of materials or other conditions.

The expense of tests necessary to qualify welders shall be borne by the Contractor.

## 5.35    Inspection Required at Stages of Work:

Types of construction work that are performed in stages must be inspected at each stage of such Work. If the Contractor proceeds with such Work without timely calling for an inspection at each such stage, the Contractor does so at its own peril and shall be responsible for all costs of every nature attributable thereto, including without limitation any costs associated with design professionals, and liable for all damages caused thereby. The Port shall have the right, but not the obligation, to require the Contractor to break out or otherwise uncover any such Work for proper inspection. Repair or replacement of Work uncovered or broken out must be performed at the sole expense of the Contractor.

## 5.36    Discovery of Latent Defective Work:

No inspection or testing, failure to inspect or test, or approval by a laboratory or Inspector shall be construed as an acceptance of defective or nonconforming Work. Defective or nonconforming Work shall be rebuilt or properly repaired or replaced at the Contractor's sole cost whenever discovered, whether during the Contract Time or during the warranty period, and the Contractor shall be responsible for all costs of every nature incurred in connection with such discovery, repair and replacement, including without limitation costs associated with design professionals, and liable for all damages caused by the defective or nonconforming Work. If the Contractor fails to repair or replace such Work, the Port Authority may, but is not obligated to do so, repair or replace such Work and offset the cost and expense of every nature incurred in connection with such repair or replacement, including without limitation costs associated with design professionals, from any amounts due the Contractor or its surety or recover such costs from either of them.

DX 0001-1.0223



**5.37    Test Cuts by the Port Authority:**

Prior to Contractor covering any Work, Contractor must provide written notice sufficiently in advance thereof such that the Port shall first have the opportunity (but not the obligation) to inspect such Work prior to such covering; moreover, the Chief Engineer has the right, when it deems necessary, to make test cuts at any place that the Chief Engineer desires to determine the conformity of materials or workmanship or to check dimensions. If material or workmanship are found to comply with the Contract Documents, the Port Authority will bear all costs incurred by such test cut and test. If material or workmanship is found not to comply with Contract Documents, the Contractor shall bear all cost incurred by such test cut and test and all cost necessary to bring the Work into compliance with the Contract Documents, including without limitation costs associated with design professionals.

**5.38    Costs of Inspections by the Port Authority:**

All materials furnished and Work performed shall be subject to rigid inspection.  The Chief Engineer and the Inspectors shall at all times have access to all parts of any facility where material or equipment is being manufactured. All expenses of inspections performed more than fifty (50) miles from the Port Authority's Executive Office shall be borne by the Contractor.  With respect to trips of Port representatives made by automobile, such trips shall be charged to the Contractor in amounts equal to the maximum amount that an employee the Port Authority would be entitled to be reimbursed by the Port Authority, as permitted by the Internal Revenue Service and then current Port Authority policies, if such employee drove his or her own vehicle. All other costs shall be borne by the Contractor at the cost thereof plus fifteen (15) percent. The Chief Engineer shall have full control of all matters concerning such inspections and its decision as to such matters shall be final.

**5.39    Inspection Outside of Working Day:**

Whenever the Contractor is permitted to do work at night, on weekends, or on holidays, or is permitted to vary the period during which Work is normally conducted, the Contractor shall give the Chief Engineer twenty-four (24) hours written notice prior to beginning such Work such that such Work may be observed and inspected.  Contractor shall perform such Work without extra compensation to the Contractor and in compliance with regulations furnished in writing by the Chief Engineer.

**5.40    Substandard Material or Workmanship:**

All Work shall be subject to the approval of the Chief Engineer who shall have the right to condemn any part thereof that is not strictly in compliance with the Contract Documents.  The Chief Engineer shall have the right to order the removal of any material which in its judgment is not fit to be used in the Work.  Immediately upon the rejection by the Chief Engineer of any material or Work, the Contractor shall remove such condemned material or Work from the site, and shall proceed to dismantle the Work rejected, and, solely at its own expense, replace such Work with Material and workmanship of the quality and character required by the Contract Documents.  If however, any defective material or workmanship is incorporated into construction, which defect in itself is not of such a nature as to require removal or reconstruction, the Chief Engineer shall have the right to determine the reduction in value as is commensurate with the reduction in quality or in workmanship, and, pursuant to Section 6.17, shall have the right to offset the amount of such reduction against amounts owing to the Contractor or its surety or to recover such amount from either of them

**5.41    Changes or Modifications:**

The Chief Engineer reserves the right to make such changes or modifications to the Contract Documents within the general scope of the Work as the Chief Engineer may deem necessary or appropriate and without notice to the surety. The Contractor shall not proceed with such changes without a written Construction Change Directive or fully executed Change Order from the Chief Engineer.  Such

General Conditions
(Rev'd November 1, 2002)                                                                    VIII - 41 – 52

DX 0001-1.0224

Construction Change Directives or Change Orders shall stipulate the Work to be performed under the changed, modified or altered conditions, any difference in time allowance and, with respect to Change Orders, any difference in Contract Price, whether such price is increased or decreased pursuant thereto. The Contractor shall under no circumstances have the right to modify the Work to be performed under this Contract, nor shall any claim for extra work be allowed or entertained, regardless of whether such modification would be with respect to Contract Time or Contract Price or both, unless such modification shall have been ordered in the same manner as required in this Section 5.41.

### 5.42    Claims for Changed Conditions or Contract Interpretations:

Subject to the Contractor's representations and warranties set forth in Section 5.53, if conditions are encountered at the site that amount to (1) subsurface or otherwise concealed physical conditions that differ materially from those indicated in the Contract Documents or otherwise discoverable by the Contractor from the Contract Documents or a review of the site and surrounding area, or (2) unknown physical conditions of an unusual nature, which conditions differ materially from those originally found to exist at the site and from those normally expected to be inherent in construction activities of the character provided for in the Contract Documents, then the Contractor shall give notice to the Port Authority promptly before such conditions are disturbed and in no event later than five (5) calendar days after first observing such conditions. If the Contractor believes it is entitled to an adjustment in the Contract Time, Contract Price or both as a result of such conditions, it shall state the basis for the adjustment and the amount of the adjustment in such notice. Any such claim not timely made by the Contractor shall be deemed waived by the Contractor. After receiving such notice the Chief Engineer will promptly investigate such conditions and, if the Chief Engineer agrees with Contractor's assessment of such conditions, the Chief Engineer shall cause an appropriate adjustment (whether an increase or a decrease) to the Contract Time, and will recommend to the Commission that an equitable adjustment (whether an increase or decrease) be made to the Contract Price. If the Chief Engineer determines that the conditions at the site are not materially different from those indicated in the Contract Documents and/or that no change to the terms of the Contract is justified, the Chief Engineer shall so notify the Contractor and such determination by the Chief Engineer in this respect shall be final and conclusive.

If the Contractor believes that any interpretation of the Contract Documents by the Inspectors, Chief Engineer or other agent of the Port Authority constitutes a change to the Contract, the Contractor shall immediately notify the Chief Engineer in a signed writing, and in any event such notice shall be given within five (5) calendar days after such interpretation. If the Contractor believes it is entitled to an adjustment in the Contract Time, Contract Price or both as a result of such interpretation, it shall state the basis for the adjustment and the amount of the adjustment in such notice. IN NO EVENT SHALL CONTRACTOR BEGIN PERFORMING THAT PORTION OF THE WORK AFFECTED BY SUCH INTERPRETATION PRIOR TO GIVING SUCH WRITTEN NOTICE TO THE CHIEF ENGINEER. Any notice not timely made by the Contractor shall be deemed a waiver by the Contractor of its right to assert a claim in respect of such interpretation. The Chief Engineer will promptly conduct an investigation pursuant to such notice and, if the Chief Engineer agrees that such interpretation is a change which will necessitate a modification of the Contract, the Chief Engineer will determine whether to proceed with such interpretation and, if so, issue a Construction Change Directive or recommend to the Commission an equitable adjustment to the Contract Price, as applicable. If the Chief Engineer determines that such interpretation does not necessitate a modification, the Chief Engineer shall so notify the Contractor and the determination by the Chief Engineer in such respect shall be final and conclusive.

### 5.43    Calculations of Costs of Changes or Modifications:

If any changes or modifications are ordered pursuant to Section 5.41 or allowed due to changed conditions or Contract interpretations pursuant to Section 5.42, or if extra costs are incurred in connection with suspension of Work ordered pursuant to Section 5.49, incurred in connection with acceleration of Work ordered pursuant to Section 5.50 or otherwise incurred and allowed in compliance with the Contract Documents, such changes or modifications shall be paid for on the basis of the Chief Engineer's

DX 0001-1.0225

 

computation of the increase or decrease attributable thereto to the aggregate of labor, materials and equipment rental in the performance of the Work. Such computation by the Chief Engineer in this respect shall be final and conclusive. If the Contractor desires to make any claim for compensation in addition to the amount so computed by the Chief Engineer, such claim must be made in a signed writing within five (5) calendar days after the Contractor is informed of the Chief Engineer's computation. Any claim not so timely made by the Contractor shall be deemed waived by the Contractor.

Deductions from or additions to the Contract Price shall be determined by one of the following methods:

| Method A | By computation based upon an agreed unit price if a unit price for such Work is not included in the original Bid/Proposal; or |
|---|---|
| Method B | By computation based upon an agreed lump sum; or |
| Method C | If neither Method A or B are agreed upon before extra Work is commenced, then the Contractor shall be paid the "actual field cost" of the Work (with respect to such cost the Port shall be entitled to conduct an audit pursuant to Section 6.16), plus a ten percent (10%) mark-up. |

The Chief Engineer may specify the form in which accounts of the "actual field cost" shall be kept and furnished to the Port Authority. The Chief Engineer may set prior limitations on the type and kind of machinery and equipment to be used, in the absence of which limitations such matters shall be determined by the Contractor.

### 5.44 Limitations on the Costs of Changes or Modifications:

The original Contract Price may not be increased by more than twenty-five percent (25%) or decreased by more than eighteen percent (18%) without the consent of the Contractor. The execution of a Change Order by the Contractor for amounts in excess of such limitations shall constitute consent.

### 5.45 Intellectual Property Rights:

If the Contractor uses any design, material, or process covered by trade secrets, letters patent or copyright of any third party, the Contractor shall lawfully acquire the right to such use from the appropriate owner thereof. Pursuant to Section 3.08, the Contractor shall indemnify and save harmless the Port of Houston Authority from any and all claims of infringement brought by any third party based upon, arising out of or relating to any such use.

### 5.46 Partial Utilization by the Port Authority:

Acceptance or use by the Port Authority of any part of the Work which (a) has specifically been identified in the Contract Documents as constituting or, (b) the Port Authority and the Contractor agree constitutes, a separately functioning and usable part of the Work which part can be used by the Port Authority for its intended purpose without significantly interfering with the Contractor's performance of the remainder of the Work, may occur prior to final completion. Such acceptance or usage shall not be cause for any partial release of retainage.

General Conditions
(Rev'd November 1, 2002)

DX 0001-1.0226

## 5.47  Termination for Convenience of the Port of Houston Authority:

The Port of Houston Authority may terminate this Contract at any time without cause by written notice to Contractor. Upon receipt of such notice, the Contractor shall immediately stop all Work. Within thirty (30) calendar days after receipt of such notice, the Contractor shall submit a statement showing, in the form normally required for applications for payment or such other form required by and in a degree of detail satisfactory to the Chief Engineer, the Work properly in place and performed under the Contract to the date of termination. The Port Authority shall then pay the Contractor that proportion of the Contract Price which the properly performed in place Work bears to the total Work called for under the Contract, less any payments previously made and less any costs of any nature whatsoever, including without limitation costs associated with design professionals, to the Port Authority associated with any defective or improper Work by the Contractor or other damages to the Port Authority for which the Contractor is liable . This is the only compensation to which the Contractor is entitled upon termination for convenience by the Port Authority. The Contractor shall ensure that all subcontracts contain a similar termination provision. The Contractor is hereby advised and agrees that the Port Authority will not pay and will not be required to compensate the Contractor for any loss of profits, loss of work, termination or additional payment to Subcontractors or Suppliers, or any other damage or out of pocket costs incurred or resulting from such termination and that no payment will be made by the Port for any portion of the Work not in place or not in strict compliance with the Contract Documents or materials (ordered, delivered, on hand, or otherwise) not incorporated into the Work. In the event the amount due the Contractor is less than the amount the Port Authority is entitled to deduct from such payment, the Contractor shall pay the Port Authority the difference.

## 5.48  Termination for Cause:

The Port Authority may, in the event of: (i) failure of the Contractor to perform in accordance with the terms of the Contract Documents, or (ii) insolvency of or filing of bankruptcy or commencement of bankruptcy proceedings by or against the Contractor, terminate this Contract. Upon the occurrence of one or both of such events, the Port Authority may, upon one (1) days' written notice to the Contractor, terminate, in whole or in part, the Contractor's right to continue with performance of the Contract or the Contract itself. In either instance, the Port Authority shall not be obligated to complete the Contract. If the Port Authority exercises such right of termination, the Port Authority shall have the right, but not the obligation, to (i) make demand upon the surety of the Contractor's performance bond to complete the Contract, or (ii) elect to complete the Contract itself or have it completed by another contractor. If the Port Authority so makes demand upon the surety, the surety shall have the right and privilege, within seven (7) calendar days after receipt of written notice from the Port Authority making such demand, to assume control of the Contract and all Work performed thereunder and thereafter and to sublet or complete the Work in strict conformity with the Contract. Failure of the surety to do so within such seven (7) calendar days will result in an immediate forfeiture of all rights under such surety's bond and otherwise at law, in which event the Port Authority shall have the right to take the prosecution of the Work out of the hands of the Contractor and such surety and to appropriate or use any or all Materials and Equipment as may be suitable and acceptable, and enter into an agreement for the completion of the Contract according to its terms and provisions or to use such other methods as in the Port Authority's opinion may be required or desirable for the completion of the Work. Under no circumstances shall the Port Authority be obligated to let all or any portion of the incomplete Work for rebid.

All costs incurred by the Port Authority in terminating pursuant to this Section 5.48, including without limitation any costs associated with design professionals, court costs, attorneys' fees and experts' fees, together with the costs of completing the Work, shall be deducted from any money due or which may become due to the Contractor or its surety. If such cost is less than the sum which would have been payable under the Contract had it been completed by the Contractor, then the Contractor or its surety shall be entitled to receive the difference. If such cost exceeds such sum, then the Contractor and its surety shall be liable to and shall pay the Port of Houston Authority the amount of such excess. If the Port Authority elects to complete the Contract, regardless of whether the surety or the Port Authority is

DX 0001-1.0227



responsible for completing the Contract, neither the Contractor nor its surety shall be entitled to any further payment until the Work has been finally completed and finally accepted by the Port Authority.

**5.49    Right of Port Authority to Suspend the Work:**

The Port Authority may at any time, with or without cause, suspend performance of all or any portion of the Work by giving Contractor written notice specifying which portion of the Work is to be suspended and the effective date of such suspension. Contractor shall continue to diligently perform any remaining Work that is not suspended and shall take all actions necessary to maintain and safeguard all materials, equipment, supplies and Work in progress affected by the suspension.

In the event of suspension for convenience of the Port Authority, the Contractor shall be entitled to additional compensation as follows:

(a)    Extra costs determined in accordance with Section 5.43 which are incurred by Contractor, its Subcontractors and Suppliers as a result of continuing to maintain dedicated personnel, materials and equipment at the Site at the Port Authority's request during any suspension period, including for the purpose of safeguarding all material, equipment, supplies and Work in progress; and

(b)    Other reasonable and unavoidable extra costs determined in accordance with Section 5.43 which are directly related to any subsequent re-mobilization of the suspended Work.

Payment of such additional costs shall be full and complete compensation for the suspension and Contractor shall not be entitled to payment of any additional costs or damages associated with such suspension.

**5.50    Right of Port Authority to the Accelerate Work:**

In the event the Port Authority desires to accelerate the Work from the latest approved Schedule for reasons other than delays caused by or attributable to the Contractor, Owner shall so notify the Contractor in writing. Upon receipt of such written instruction, Contractor shall require its personnel and its Subcontractors and Suppliers to work such overtime hours and/or to increase their respective work forces as may be reasonably necessary to meet the Port Authority's acceleration goals. In the event such an acceleration is ordered by the Port Authority, the Contractor shall be entitled to an adjustment in the Contract Price to the extent of the Contractor's extra costs as determined in accordance with Section 5.43.

**5.51    Protection against Claims of Subcontractors, Laborers, Materialmen and Furnishers of Machinery, Equipment and Supplies:**

Pursuant to Section 3.08, the Contractor shall indemnify and save harmless the Port Authority Indemnitees from all claims arising out of related to or connected with the demands of Subcontractors, Suppliers, laborers, workmen, mechanics, materialmen and furnishers of machinery and parts thereof, equipment, power tools and all supplies incurred in the performance of the Contract. When requested by the Port Authority, the Contractor shall furnish evidence satisfactory to the Port Authority that any or all obligations owing to any of the foregoing have been paid, discharged or waived.

**5.52    Allegations of Change or Waiver of Contract Terms:**

Any claim by the Contractor that any terms or conditions of the Contract Documents have been changed or waived must be evidenced by an agreement in writing approved and signed by the Chief Engineer.

DX 0001-1.0228

## 5.53 Warranty:

Notwithstanding any provision in the Contract Documents to the contrary, the Contractor shall be obligated to replace or correct, without cost to the Port of Houston Authority, any Work which is improperly performed, defective or not in full compliance with the Contract Documents for a minimum of one year after final completion upon receiving notice thereof from the Port. When performing such replacement or correction Contractor shall also make good all damage to other work caused by such replacement or correction and be liable for all costs of every nature associated therewith, including without limitation costs associated with design professionals. If the Contractor fails to replace or correct the Work, the Contractor or its surety shall reimburse the Port Authority for all costs and damages of every nature incurred by the Port Authority in connection with such replacement or correction, including without limitation costs associated with design professionals, or the Port Authority may elect to offset all such costs and damages against any amounts due the Contractor or its surety.

Additional warranties for specific items may also be required by the Specifications. The Contractor shall submit such warranties to the Port Authority for its approval before final payment will be made to the Contractor. Such warranties shall be assigned to the Port Authority.

The Contractor shall supply the Port Authority with original copies of all warranties made to the Contractor by Suppliers or Subcontractors and shall assign such warranties to the Port Authority. Such assignments will not relieve the Contractor of its responsibility in case of a Supplier's or Subcontractor's failure to fulfill its warranty obligations. If the Contractor is prevented for any reason from making any such assignment, the Contractor hereby consents to the Port Authority's enforcing any and all such nonassignable warranties in the Contractor's name and the Contractor agrees that the Port Authority shall be entitled to any benefits derived therefrom without the need for any further action on the part of either the Contractor or the Port.

This Section 5.53 shall not be construed to limit any other obligations of Contractor pursuant to this Contract, which obligations by their terms are intended to be binding for periods of time longer than those of the warranty periods set forth in this Section 5.53. For the avoidance of doubt the warranty periods set forth in this Section relate only to the specific obligation of the Contractor to replace or correct the Work and have no relationship to the time period during which the Contractor shall be obligated to comply with its other obligations under the Contract Documents. With respect to such other obligations, the Contractor agrees that the Port may seek to enforce this Contract or establish Contractor's liability with respect thereto for as long as permitted by this Contract or Applicable Law.

The Contractor covenants, represents and warrants that it will perform the Work in accordance with its Standard of Care. The Contractor represents and warrants to the Port Authority that all items of the Work: (a) are merchantable, safe, and fit for their intended purpose; (b) are new and of good quality, and free from all defects in workmanship and materials; and (c) conform to all Submittals and requirements, provisions, and special instructions in the Contract Documents. The Contractor shall reperform any Work or portion thereof which fails to satisfy the Standard of Care or the warranties of the foregoing sentence, such that after such reperformance such Work or portion thereof satisfies the Standard of Care and such warranties. All costs incurred by the Contractor or the Port Authority, including without limitation all costs associated with design professionals, in connection with any such reperformance shall be at the Contractor's sole expense. If the Contractor is either incapable of reperforming such corrections or incapable of performing such corrections in time to meet any requirements of the Port Authority, the Port Authority may have such Work reperformed by a third party, and the Contractor or its surety shall reimburse the Port Authority for the expense of such reperformance, including without limitation all costs associated with design professionals, or the Port Authority may offset such expenses from any amount due the Contractor or its surety.

## 5.54 Progress Meetings:

General Conditions
(Rev'd November 1, 2002)                                                    VIII - 46 - 52

DX 0001-1.0229

Contractor shall schedule and conduct progress meetings on a regular basis during which meetings the Port Authority, Design Consultant, Contractor and Subcontractors may discuss such matters as Work procedures, progress, scheduling and coordination. Contractor shall prepare in advance of each such meeting a written agenda outlining the topics of discussion for such meeting and shall distribute copies thereof prior to the beginning of each such meeting. Contractor shall be responsible for taking accurate notes reflecting, to the satisfaction of the Port, the minutes of such meetings and, within two (2) working days after each such meeting, Contractor shall distribute to the Port Authority, Design Consultant and any other attendees of such meetings, copies of such minutes, which shall at a minimum include a list of resulting action items, responsible parties and dates necessary to timely complete such action items such that the Contractor maintains the progress of the Work in accordance with the latest approved Schedule.

5.55    Dispute Resolution, Submission to Jurisdiction, Waiver of Right to Remove and Venue:

In the event of any dispute connected to, arising out of or relating to the implementation of or performance of this Contract which the Port and Contractor have been unable to resolve within thirty (30) days after such dispute arises, a senior representative of the Contractor shall meet with the Chief Engineer at a mutually agreed upon time and place not later than forty-five (45) days after such dispute arises to attempt to resolve such dispute. In the event the Chief Engineer and senior representative of the Contractor are unable to resolve any such dispute within fifteen (15) days after such meeting, either party may, by written notice to the other, submit such dispute to non-binding mediation before a mutually agreeable mediator. If the parties are unable to agree upon a mediator within twenty (20) days after such written notice of submission to mediation, the American Arbitration Association shall be empowered to appoint a qualified mediator. If the dispute is technical in nature, the mediator appointed by the American Arbitration Association shall be qualified by at least ten (10) years experience in construction, engineering, and/or port operations. The mediation shall be conducted within thirty (30) days of the selection or appointment of the mediator, as applicable. The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held at a mutually agreeable location in Houston, Texas. If the parties are unable to agree upon a location, the mediation shall be held at the offices of the American Arbitration Association in Houston, Texas. Participation in non-binding mediation in accordance with this paragraph shall be a condition precedent to Contractor having the right to file any legal or equitable action against the Port Authority or any of its commissioners, officers, directors, employees or agents.

Subject to the Contractor's obligation to comply with the requirements of the foregoing paragraph as a condition precedent to the Contractor having any right to file any legal or equitable action against the Port Authority or any of its commissioners, officers, directors, employees or agents, for purposes of all legal or equitable proceedings arising out of, relating to or connected with this Contract, the Contractor hereby agrees that this Contract is performable in whole or in part in Houston, Harris County, Texas, and hereby submits to the jurisdiction of the state courts within Houston, Harris County, Texas, and agrees that such jurisdiction shall be exclusive with respect to any such proceeding filed by Contractor. For the avoidance of doubt the Contractor hereby expressly, clearly and unequivocally agrees that the Port has the right to choose the forum in which any legal or equitable proceeding arising out of, relating to or connected with this Contract shall be heard; and, having so agreed, the Contractor hereby irrevocably waives its right to remove any such proceeding to any federal court should the Port choose to bring any proceeding in any state court of Texas. Furthermore, to the fullest extent permitted by law, Contractor hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any proceeding arising out of, relating to or connected with this Contract in any state court residing in Houston, Harris County, Texas. Finally, Contractor hereby irrevocably waives any claim which it may now or hereafter have that any such proceeding brought in any state court in Houston, Harris County, Texas, has been brought in an inconvenient forum.

<center>END OF GENERAL CONDITIONS SECTION 5</center>

DX 0001-1.0230

## SECTION 6. PAYMENT

### 6.01 Schedule of Costs:

The Contractor, after being notified of award of the Contract and before commencing any Work, shall submit to the Chief Engineer a schedule in such form as required by the Port Authority allocating the Contract Price to the various items of the Work. For Contracts on a unit price basis such schedule shall show quantities of materials, items of machinery and equipment, and other items which are to be incorporated into the Work and shall reflect the cost to install each such item in place. Such schedule shall be in a degree of detail acceptable to the Port and the costs reflected therein shall be substantiated by estimates of the Contractor prepared for its Bid/Proposal and shall reflect such other data as the Port Authority may request. Upon approval by the Chief Engineer, such schedule (the "Schedule of Costs") shall be the basis for the preparation and submission of monthly estimates.

The Port Authority reserves the right to reject all or any portion of the Schedule of Costs which does not accurately reflect the Work in reasonable detail or does not accurately reflect an appropriate cost, allocation or proportion of the Work. No Schedule of Costs will be approved if it is unbalanced or front end loaded. The cost of bonds and insurance shall not be listed therein as a separate item, but rather shall be spread over all units of Work. If a Schedule of Costs has been initially approved and subsequently used, but later found improper for any reason, sufficient funds shall be withheld from future billings to ensure an adequate reserve (exclusive of normal retainage) to complete the Contractor's Work.

### 6.02 Progress Payments:

One month after commencement of field construction the Contractor shall estimate the value of Work performed as of that time using as a basis therefor the Schedule of Costs and approved pursuant to Section 6.01. If the method of payment for the Contract is lump sum or partial lump sum, the Contractor's invoice shall reflect the percentage of completion in place of such lump sum Work. The Contractor shall have no right to request payment for any Work prior to actual in place performance thereof nor shall the Contractor have the right to invoice the Port any more frequently than once per month. In connection with each invoice, the Contractor shall provide to the Port Authority, and such other persons as the Port Authority may designate, a copy of certified payrolls as set forth in Section 6.08 and a certificate to the effect that:

    (a)    the Work is progressing in accordance with the latest approved Project Schedule (except as set forth in such certificate);

    (b)    the quality of all Work performed and included in such invoice is in compliance with the terms of the Contract Documents;

    (c)    the Contractor is entitled to payment of the amount requested on such invoice; and

    (d)    the Contractor has paid, in accordance with Applicable Law, the applicable Subcontract, and the Contract Documents, all Subcontractors and Suppliers for Work previously invoiced, and the Work which is covered by such invoice and all Work which is covered by previous invoices is free and clear of all liens.

The Contractor shall provide with each invoice the waivers and releases of liens required pursuant to Section 6.07 and such other information as reasonably required by the Port Authority.

### 6.03 Inspector's Approval of Billings:

Prior to submitting each estimate for the purpose of substantiating any partial payment, the Contractor shall submit a proposed invoice to the Inspector for preliminary approval. The Contractor

General Conditions
(Rev'd November 1, 2002)

VIII - 48 – 52

DX 0001-1.0231

understands and agrees that such monthly estimates will be approximate only and that the Port will make no attempt to verify exact measurements or quantities therein. As such, such preliminary estimates even if approved by the Inspector are not binding on the Chief Engineer or Port Authority and any invoices or payments based on such preliminary estimates are subject to adjustment and correction as set forth in the Contract Documents.

### 6.04    Nonpayment for Unincorporated Material and Work Not in Place:

The Port Authority will make no partial payments for Material or Equipment not incorporated into the Work, even if such Material or Equipment is stored at the site, and no partial payment will be made for specially fabricated material unless and until it is incorporated into the Work. Similarly, the Port Authority will make no partial payments for Work not physically in place at the site, including without limitation Work associated with submittals, subcontractor oversight, and the like. Exceptions to this rule, if any, will be noted in the Special Conditions.

### 6.05    Right to Withhold:

The Port Authority shall have the right but not the obligation to withhold all or any part of payment requested on any invoice to protect the Port Authority from loss because of:

(a)    Work that is defective or not in complete compliance with this Contract when such Work has not been remedied pursuant to this Contract;

(b)    any failure of the Contractor to perform Work in accordance with the provisions of this Contract;

(c)    third party suits, stop notices or liens for which the Contractor is responsible pursuant to this Contract, including without limitation pursuant to any indemnification obligation hereunder, asserted or filed against any Port Authority Indemnitee or the Work, the site or the Project, or any portion thereof;

(d)    uninsured damage to the Port Authority, any Subcontractor, Supplier or Port Authority Indemnitee which results from the Contractor's failure to obtain or maintain the insurance required by this Contract or from any action or inaction by the Contractor or any Subcontractor or Supplier which excuses any insurer from liability for any loss or claim which would, but for such action or inaction, be covered by insurance;

(e)    failure of the Contractor to pay any Subcontractor or Supplier, or of Contractor to otherwise pay for any labor, materials or equipment;

(f)    any other damage to the Port Authority, including, without limitation, any additional costs associated with design professionals;

(g)    failure of the Contractor to submit proper invoices with all required attachments and supporting documentation; or

(h)    failure of the Contractor to comply with any requirement of the Contract.

### 6.06    Overpayment for Defective or Over Estimated Work:

If investigation or inspection reveals that any Work was not performed in compliance with the Contract Documents, and either (i) the value of such Work was included in the current or a prior monthly estimate or (ii) such Work was previously paid for by the Port Authority, then the Contractor shall not include the value of such Work in any subsequent estimate or be entitled to any further payment therefor

DX 0001-1.0232

and the Port Authority shall be entitled to withhold payment therefor from any payment due from the Port Authority to the Contractor or its surety.

## 6.07 Contractor's Submittal of Affidavit:

As a condition precedent to the obligation of the Port Authority to make payment on any invoice, the Contractor shall supply the Port Authority with waivers and releases of liens (including without limitation all mechanics' and materialmens' liens and any other type of security interest) in the form acceptable to the Port Authority, which waivers and releases shall be duly executed and acknowledged by the Contractor and each Subcontractor and Supplier expecting payment from Contractor in respect of such invoice in order to assure an effective release of all such liens to the maximum extent permitted by Applicable Law. The waivers and releases of liens shall provide, at a minimum, that all amounts due and payable to the Contractor and each such Subcontractor and Supplier, as of the date of such invoice and as of the date of the last payment received by the Contractor and each such Subcontractor and Supplier, as applicable, the Contractor and each such Subcontractor and Supplier have been paid in full and that the Contractor and each such Subcontractor and Supplier waives, releases and relinquishes any lien (including without limitation any mechanic's or materialman's lien), security interest and claim for payment to the extent set out in the preceding sentence.

The Contractor shall submit with its final invoice the Port Authority's standard affidavit in respect of final payment for the Contractor and each Subcontractor and Supplier which sets out the amount of the final payment and acknowledges that such payment is full and final payment, provides that the Contractor and each Subcontractor and Supplier releases the Port Authority from any and all present or future claims against the Port Authority and provides that the Contractor and each Subcontractor and Supplier has fully paid all financial obligations in connection with the Project.

## 6.08 Supporting Documents for Progress Payments:

All documents required by the Contract to be submitted with each invoice including, without limitation, certified payrolls of Contractor's employees and documentation evidencing appropriate insurance coverage shall be, and each must indicate on its face that it is, effective through the invoicing period with respect to which the Contractor is requesting payment. The Port Authority shall have no obligations to make any or all progress payments until the Contractor meets this requirement.

## 6.09 Final Inspection by the Contractor:

On final completion of the Contract, all portions of the Work must be carefully reviewed and inspected by the Contractor personally and by the owner(s) or principal(s) thereof (or functional equivalent thereof) and the chief executive officer thereof (or functional equivalent thereof). Such persons shall satisfy themselves that every item of the Work is finally completed and all defects have been made good, and that all surplus materials, refuse, dirt and rubbish have been cleaned up and removed from the site or properly disposed of, and that the entire Work is in a finished, satisfactory and neat condition, and ready in all respects for final acceptance by the Port Authority.

## 6.10 Final Inspection by the Port Authority:

After written certification by the Contractor to the Port Authority that all of the terms and conditions of the Contract have been completely fulfilled and the Work is finally complete, the Port Authority shall make its own inspection and shall determine the status of the Work. For Projects with a Contract Price based on unit costs, the Port Authority shall determine the actual final quantities of the Work and give to the Contractor a copy of such final quantities at which time the Contractor shall revise its Schedule of Costs accordingly and resubmit such revised Schedule of Costs to the Port with the Contractor's final invoice.

DX 0001-1.0233

 

### 6.11    A Finding of Incomplete Work:

If inspections by the Port Authority pursuant to Section 6.10 reveal that the Work is incomplete or lacking in any manner, the Port shall prepare a "punch list" and the Contractor shall immediately cure all deficiencies itemized therein without delay. No final invoice shall be submitted to or approved by the Port Authority until all such punch list items are cured by the Contractor and approved by the Port Authority.

### 6.12    Conditions to Final Payment:

As a condition precedent to the Contractor having any right to receive, and to the Port having any obligation to pay, final payment, all requirements in the Contract Documents for final payment must have been met by the Contractor. Such requirements include, but are not limited to, the following:

(a)    all "punch list" items must have been cured to the satisfaction of the Port;

(b)    as-built drawings must have been delivered to the Port;

(c)    all warranties in respect of Work performed by Subcontractors or Suppliers shall have been assigned to the Port;

(d)    all lien releases and waivers shall have been delivered to the Port;

(e)    operation and maintenance manuals shall have been delivered to the Port; and

(f)    all other requirements of the Contract Documents shall have been met.

### 6.13    Payment and Retainage:

Payment of the Contract Price and payment of the value, net of credits, pursuant to any Change Orders, constitutes full compensation to the Contractor for the performance and completion of the Work and the performance and observance by the Contractor of its obligations under this Contract, except to the extent otherwise stated expressly in this Contract. Based on the monthly estimates approved by the Director of Facilities for the Port Authority, the Port shall withhold five (5) percent of each approved invoice, and such retainage shall apply notwithstanding any Change Orders. The Port Authority shall have the right to retain the last five (5) percent of monies earned under the Contract until the terms and conditions of the Contract are completely met and final acceptance of the entire Project is achieved.

### 6.14    Title to Work:

Title to all Work, Materials and Equipment covered by each application for payment shall pass to the Port Authority no later than the time of payment therefor. Notwithstanding the passage of title, risk of loss or damage shall remain with Contractor until the Port Authority finally accepts the Work.

### 6.15    Payment Not Waiver or Acceptance of Work:

No payment made by the Port Authority pursuant to this Contract shall constitute a waiver of any claim or right (including without limitation claims or rights of the Port in respect of warranty rights or indemnification obligations of the Contractor) the Port Authority may have against the Contractor, any Subcontractor or Supplier at that time or thereafter. No payment made by the Port Authority under this Contract shall be considered or deemed to represent that the Port Authority has inspected the Work or in any way checked the quality or quantity of the Work or that the Port Authority knows or should know or has ascertained how or for what purpose the Contractor has used sums previously paid to it by the Port Authority, nor shall any such payment be deemed to be or construed as an approval or acceptance of any Work or as a waiver of any claim or right the Port Authority may have under this Contract. All payments

DX 0001-1.0234



(including without limitation final payment), withholdings and offsets shall be subject to correction and adjustment in subsequent progress reviews and payments or by offset or withholding.

### 6.16 Right to Audit:

If the method of payment of the Contract or any portion thereof is one other than lump sum (*e.g.*, unit price or cost plus), then the Port shall have the right, but not the obligation, to audit, during business hours upon reasonable notice to Contractor, the Contractor's books and records, including without limitation any documentation which proves to the reasonable satisfaction of the Port the Contractor's actual cost of pay items. Without limiting the foregoing, the Port shall also have the right to request that the Contractor provide such information to the Port upon the Port providing a notice to the Contractor requesting such information and in such event the Contractor shall be obligated to provide such information to the Port within two (2) working days of the Port making such request.

### 6.17 Offset:

The Port Authority, without waiver or limitation of any of its other rights or remedies under this Contract and Applicable Law, shall have the right but not the obligation to from time to time deduct from any amounts due or owing by the Port Authority to the Contractor or its surety any and all amounts owed by the Contractor or its surety to the Port Authority.

**END OF GENERAL CONDITIONS SECTION 6**

**END OF GENERAL CONDITIONS**

1001195_1.DOC

General Conditions
(Rev'd November 1, 2002)                                                VIII - 52 – 52

DX 0001-1.0235

# TAB 14

**Contract, Technical Specifications, Section 02161**
**Trench Excavation and Shoring Safety Plan**
**(DX1-1.0324-29)**


## SECTION 02161
## TRENCH EXCAVATION AND SHORING SAFETY PLAN

### PART 1    GENERAL

### 1.1    SECTION INCLUDES

A.    Subject to the General and Special Conditions, this Section includes the furnishing of a Trench Excavation and Shoring Safety Plan, including detailed plans and specifications for a trench safety system and requirements for a safety program for the trench system (including a plan for ingress and egress of the trenches, manholes and structures), to be incorporated into the bid documents and the Construction Contract, and all labor and materials for installation, inspection, and maintenance of trench safety system.

B.    Application

For any trench excavation at a depth of 5 feet or greater, provide a trench safety system. Trench safety system is not required when (a) CONTRACTOR's geotechnical engineer determines that the trench excavation is to be made in stable rock; or (b) excavations are less than five (5) feet in depth and examination of the ground by a competent person on behalf of the CONTRACTOR provides no indication that a cave-in should be expected. Trench safety system to be in accordance with details shown on CONTRACTOR's Trench Excavation and Shoring Safety Plan.

C.    Modifications

All modifications to the CONTRACTOR'S Trench Excavation and Shoring Safety Plan or the detailed plans and specifications necessitated by the site conditions, CONTRACTOR'S trench construction means, methods, techniques or procedures and CONTRACTOR'S equipment to be used in construction of project facilities to be submitted to the Chief Engineer. All such modifications to be signed and sealed by a Registered Professional Engineer licensed in the State of Texas and a statement provided stating that the modified plan and/or the modified detailed plans and specifications for the trench safety system are designed in compliance with the Contractor's Standard of Care and is in conformance with appropriate OSHA standards. Such modifications to CONTRACTOR'S plan and/or the CONTRACTOR'S detailed plans and specifications for the trench safety system to thereafter be incorporated into the Construction Contract.

DX 0001-1.0324


## 1.2    REFERENCES

The publications listed below form a part of this specification to the extent referenced. The publications are referred to in the text by basic designation only.

AMERICAN SOCIETY OF TESTING AND MATERIALS (ASTM)

ASTM A36/A36M     1997 Standard Specification for Carbon Structural Steel

ASTM A307     1997 Revision A-Standard Specification for Carbon Steel Bolts and Studs, 60,000 psi Tensile Strength

ASTM A328/A328M 1996 (REV) Standard Specification for Steel Sheet Piling

ASTM A572/A572M 1997 Standard Specification for High-Strength Low-Alloy Columbium-Vanadium Steels of Structural Quality

ASTM A588/A588M 1997 Standard Specification for High-Strength Low-Alloy Structural Steel With 50 ksi (345 MPa) Minimum Yield Point to 04 in. (100 mm) thick

ASTM A690/A690M 1994 Standard Specification for High-Strength Low-Alloy Steel H-Pipes and Sheet Piling for Use in Marine Environments

AMERICAN WELDING SOCIETY, INC. (AWS)

AWS D1.1     1998 Structural Welding Code - Steel

OCCUPATION SAFETY AND HEALTH ADMINISTRATION (OSHA)

29 CFR Part 1926     1993 (Revised as of July 1, 1996 or latest Edition or revision to) Subpart P Excavations and Applicable Subparts

## 1.3    SUBMITTALS

The successful Contractor to submit its Proposed Trench Excavation and Shoring Safety Plan after the Award of the Contract. The plan to incorporate detailed PLANS and Specifications for a trench safety system conforming to OSHA standards that accounts for project site conditions, CONTRACTOR's trench construction means, methods, techniques or procedures, the relationship of spoil to edge of trench, and CONTRACTOR's equipment to be used in construction of project facilities requiring trench system(s). CONTRACTOR to provide a statement signed and sealed by a Registered Professional Engineer licensed in the State of Texas stating that the Trench Excavation and Shoring Safety Plan and the detailed plans and specifications for the trench safety system are designed in compliance with the Contractor's Standard of Care

DX 0001-1.0325

and is in conformance with appropriate OSHA standards. CONTRACTOR's plan and the detailed PLANS and SPECIFICATIONS for the trench safety system to be incorporated into the bid documents and the Construction Contract.

1.4    QUALITY ASSURANCE

Trench safety systems to be accomplished in accordance with the detailed Specifications set out in the provisions 29 CFR, Part 1926, Subpart P. Legislation that has been enacted by the Texas Legislature [(H.B. No. 1569)] with regard to Trench Safety Systems, is also hereby incorporated, by reference, into these Specifications.

## PART 2      PRODUCTS

2.1    MATERIALS AND/OR EQUIPMENT

A.     Materials

1.     Timber
       Trench sheeting materials to be full size, a minimum of 2 inches in thickness, solid and sound, free from weakening defects such as loose knots and splits.
2.     Sheet Piling
       Steel sheet piling to conform to one or more of ASTM A328/328M, ASTM A572/A572M/ ASTM A690/690M material requirements.
3.     Steel for stringers (wales) and cross braces to conform to ASTM A588.
4.     Steel trench Boxes to be constructed of steel conforming to ASTM A36/A36M. Connecting bolts to conform to ASTM A307. Welds to conform to the requirements of AWS D1.1.
5.     Miscellaneous Materials: Miscellaneous materials to be utilized to conform to applicable ASTM standards.

## PART 3      EXECUTION

3.1    GENERAL

Trench safety system to be constructed, installed, and maintained in accordance with the Trench Excavation and Shoring Safety Plan as outlined in Paragraph 3.5A of this Section.

3.2    ERECTION/INSTALLATION/APPLICATION AND/OR CONSTRUCTION

A.     Timber Sheeting

Timber sheeting and size of uprights, stringers (wales), and cross bracing to be installed in accordance with the CONTRACTOR'S plan. Place cross braces in true horizontal position, spaced vertically, and secured to prevent sliding, falling,

DX 0001-1.0326



or kickouts. Cross braces to be placed at each end of stringers (wales), in addition to other locations required. Cross braces and stringers (wales) to be placed at splices of uprights, in addition to other locations required.

B.    Steel Sheet Piling

Steel sheet piling of equal or greater strength may be used in lieu of timber trench shoring shown in the OSHA tables (proposed standards). Drive steel sheet piling to at least minimum depth below trench bottom as recommended by CONTRACTOR'S Registered Professional Engineer providing design. Place cross braces in true horizontal position, spaced vertically and secured to prevent sliding, falling, or kickouts. Cross braces to be placed at each end of stringers (wales), in addition to other locations required.

C.    Trench Boxes

Portable trench box may be used in lieu of timber trench shoring shown in the OSHA tables and to be designed to provide equal or greater protection than timber trench shoring shown in the OSHA tables. In cases where top of portable trench box will be below top of trench, the trench must be sloped to the maximum allowable slope for the soil conditions existing on the Project. In areas where a sloped trench will affect the integrity of existing structures, CONTRACTOR to protect structures prior to sloping trench.

D.    Trench Jacks

When trench jacks are used for cross bracing and/or stringers (wales), the trench jacks to provide protection greater than or equal to the timber cross bracing shown in the OSHA tables (proposed standards). Trench jacks to be placed at each end of stringers (wales) in addition to other locations required.

3.3   REPAIR/RESTORATION

Bed and backfill pipe to a point at least one (1) foot above top of pipe or other embedded items prior to removal of any portion of trench safety system. Bedding and backfill to be in accordance with other applicable SPECIFICATION Sections.

Backfilling and removal of trench supports to be in accordance with CONTRACTOR'S Trench Excavation and Shoring Safety Plan. Removal of trench safety system to be accomplished in such a manner to cause no damage to pipe or other embedded items. Remove no braces or trench supports until all personnel have evacuated the trench. Backfill trench to within 5 feet of natural ground prior to removal of entire trench safety system.

DX 0001-1.0327

## 3.4 FIELD QUALITY CONTROL

A. Supervision

Provide competent supervisory personnel at each trench while work is in progress to ensure CONTRACTOR'S methods, procedures, equipment, and materials pertaining to the safety systems in this Section are sufficient to meet requirements of OSHA Standards.

B. Inspection

CONTRACTOR to make daily inspection of trench safety system to ensure that the system meets OSHA requirements. Daily inspection to be made by competent personnel. If evidence of possible cave - ins or slides is apparent, all work in the trench is to cease until necessary precautions have been taken to safeguard personnel entering trench. CONTRACTOR to maintain permanent record of daily inspections.

## 3.5 PROTECTION

A. Maintenance of Safety System

The safety system to be maintained in the condition as shown on the Trench Excavation and Shoring Safety Plan as designed by the CONTRACTOR's Registered Professional ENGINEER. The CONTRACTOR to take all necessary precaution to ensure the safety systems are not damaged during their use. If at any time during its use a safety system is damaged, personnel to be immediately removed from the trench excavation area and the safety system repaired. The CONTRACTOR is to take all necessary precautions to ensure no loads, except those provided for in the plan, are imposed upon the trench safety system.

## 3.6 MEASUREMENT AND PAYMENT

A. Measurement

Measure "Trench Safety System" by linear foot of trench protected. Shoring of trench at manholes and other line structures to be included in the lineal foot cost.

B. Payment

Pay for "Trench Safety System" measured as stated and as shown on Proposal. Payment to be full compensation for all work described herein. There will be no increase in the Contract price because of the incorporation of CONTRACTOR'S Trench Excavation and Shoring Safety Plan or CONTRACTOR'S detailed plans and specifications for the trench safety system into the proposal documents and the Construction Contract. There will be no increase in the Contract price because

DX 0001-1.0328

of modifications to CONTRACTOR'S plan and/or the CONTRACTOR'S detail plans and specifications for the trench safety system, whether or not the result of unforeseen or differing site or soil conditions.

C.    Pay for "Design of Trench Excavation and Shoring Safety Plan" by lump sum as shown on Proposal. Payment to be full compensation for all professional services relating to the CONTRACTOR's Trench Safety System.

**END OF SECTION**

DX 0001-1.0329

**TAB 15**


**Contract, Technical Specifications, Section 01500**
**Temporary Facilities and Controls**
**(DX1-1.0271-82)**

## SECTION 01500
## TEMPORARY FACILITIES AND CONTROLS

PART 1    GENERAL

1.1    SUMMARY

A.    Subject to the General and Special Conditions, this Section describes temporary facilities and necessary controls for the project including utilities, - telecommunications, sanitary facilities, field office, storage sheds and building, safety requirements, first aid equipment, fire protection, security measures, protection of the Work and property, access roads and parking, environmental controls, disposal of trash, debris, and excavated material, pest and rodent control, - water runoff and erosion control.

B.    The facilities and controls specified in this section are considered minimum for the Project. The CONTRACTOR may provide additional facilities and controls for the proper execution of the Work and to meet CONTRACTOR'S responsibilities for protection of persons and property.

1.2    CONTRACTOR'S RESPONSIBILITY

Comply with applicable requirements specified in other sections of the Specifications.

1.    Maintain and operate temporary facilities and systems to assure continuous service.
2.    Modify and extend systems as Work progress requires.
3.    Completely remove temporary materials and equipment when their use is no longer required.
4.    Restore existing facilities used for temporary services to specified or to original condition.

1.3    TEMPORARY UTILITIES

A.    Obtaining Temporary Service.

1.    Make arrangements with utility service companies for temporary services.
2.    Abide by rules and regulations of the utility service companies or authorities having jurisdiction.
3.    Be responsible for utility service costs until the Work is substantially complete. Included are fuel, power, light, heat, and other utility services necessary for execution, completion, testing, and initial operation of the Work.

DX 0001-1.0271

B.  Water

    1.  Provide water required for and in connection with Work to be performed and for specified tests of piping, equipment, devices, or for other use as required for proper completion of the Work.

    2.  Provide and maintain an adequate supply of potable water for domestic consumption by the CONTRACTOR personnel and Port of Houston Authority (Port Authority) and its representatives.

C.  Telecommunications

    1.  Provide emergency telephone service at the CONTRACTOR'S office for use by CONTRACTOR personnel and others performing work or furnishing services at the site.

    2.  Provide field office telephone system with number of incoming lines, equal to that specified for telephone type described in Part 1.4.C.8 and one separate line for fax machine, described in Part 1.4.D.14. Provide five, separate T1 lines for computer modem connections and electronic data information (EDI) communications; one line for each of the closed offices and two lines, one each, in the main reception and conference room areas. Provide all appropriate jacks, wiring and equipment, required for a complete telecommunications (voice, fax and EDI) system. Cost for local calls and other project-related calls made by such individuals and their representatives shall be paid for by the CONTRACTOR.

D.  Sanitary Facilities

    1.  Provide and maintain sanitary facilities, in compliance with state and local health authorities, for persons on the job site.

    2.  Enforce the use of sanitary facilities by construction personnel at the job site. Such facilities shall be enclosed. Pit-type toilets will not be permitted. No discharge will be allowed from these facilities. Collect and store sewage and waste so as not to cause a nuisance or health problem; have sewer and waste hauled off-site and properly disposed, in accordance with applicable regulations.

    3.  Locate toilets near the Work site and secluded from view insofar as possible. Keep toilets clean and supplied throughout the course of the Work.

DX 0001-1.0272

1.4    FIELD OFFICE

    A.    Furnish and Locate

        1.    Furnish, install, and maintain a field office for the exclusive use of the Port Authority. Provide main reception area, conference room (12'x20') for project meetings and three separate closed offices (8'x10' each) for the Chief Engineer, Construction Manager and Inspector. Locate the office near the Site or in a place approved by the Chief Engineer. Office to be leveled, blocked, tied down, skirted and relocated, if necessary. Office to be provided on proper foundations. Provide proper surface water drainage and connections to all utility services. Raise grade under field office, as necessary, to an elevation adequate to avoid flooding.

        2.    Provide office space ready for occupancy ten (10) days after date fixed in Notice to Proceed Office to remain on the site for a minimum of 30 working days after the final acceptance of the Project Work.

        3.    Provide a minimum of 100 square feet of hard stand, all weather field office entrance and parking area to accommodate parking for 10 vehicles. Provide a hard stand, all weather walkway from parking area to field office trailer.

    B.    Minimum Construction

        1.    Completely weather-tight with insulated roof and walls.
        2.    Exterior finish and interior finish acceptable to Chief Engineer.
        3.    Stairs or walkway with handrail and entrance platform (4' x 4') with a mud scraper at door
        4.    Resilient floor covering
        5.    Screened windows with an area equal to approximately 10 percent of floor area sufficient for light, view, and ventilation. Provide windows with operable sash. Provide blinds or drapes on all windows.
        6.    Provide two secure, lockable exterior doors with dead bolt cylinder locks, keyed alike. Provide six sets of keys.

    C.    Minimum Services

        1.    Security bars on doors and windows
        2.    Exterior light at entrance
        3.    Interior fluorescent, 110 volt lighting of 50 foot-candles at desktop height
        4.    Electric automatic heating to maintain 65°F in winter
        5.    Electric automatic cooling to maintain 75°F in summer
        6.    Electric power service

DX 0001-1.0273


7. Minimum of two duplex ,110 volt electric wall outlets in each closed office space and four duplex 110 volt electric wall outlets in each common area space.

8. Six telephones with intercom line, three incoming/outgoing lines. touch-tone, conference speaker and 12-foot coiled handset cord. One telephone will be located in each closed office area; and one telephone, each, in the main reception and conference room areas. One telephone instrument will be kept, as a spare, in case of installed equipment breakdown.

9. Bottled water service with cooler capable of producing hot and cold water

10. Separate sanitary facilities with one water closet and one-lavatory and medicine cabinet

11. Plumbing and sewers as required, protected from freezing

D. Minimum Furnishings

1. Six, steel 5-drawer desks, 30 inches by 60 inches with desk surface located 29 inches from floor

2. Six, five castor base; adjustable seat height; adjustable, height and angle, locking seat back; adjustable arms; swivel desk chairs

3. One drafting table, three feet by six feet, with two drafting stools and light

4. Three plan racks with racks to hold eight racks of drawings

5. Nine, locking, 4-drawer steel, legal file cabinets

6. Book shelving or three bookcases with a minimum of 45 feet of shelf space

7. Six waste baskets

8. Two tack board, 30 inches by 36 inches

9. Two carbon dioxide (10 pound) fire extinguishers

10. Identifying exterior sign acceptable to Chief Engineer

11. Two first-aid kit

12. Six (6) protective helmets (hard hats) for use by Port Authority and visitors

13. Conference table , 36 inches by 96 inches and 10 steel folding chairs

14. Fax machine with connecting cables

15. Paper cup dispenser with cups

16. Two paper towel dispenser with towels

17. Telephone answering machine with connecting cables

18. Duplicator; dry type, self-feeding; capable of providing 8 ½ by 11 inch, 8 ½ by 14 inch and 11 by 17 inch copies; collating 10 multiple copies; reduction and enlargement capabilities; including maintenance service agreement for project duration

19 Two clothes racks

20. Other furnishings at CONTRACTOR's option

DX 0001-1.0274



E.  Maintenance

    1.  Schedule continuous maintenance of office, walkways, and services. Office to be cleaned not less than once per week.

    2.  Provide soap, paper towels, cleansers, janitorial service and appurtenances.

    3.  Immediately repair any damage, leaks, or defective service.

F.  Provide adequate space for one set of Contract Documents in the office for ready reference.

## 1.5 STORAGE SHEDS AND BUILDINGS

A.  As may be necessary provide adequately ventilated, watertight storage facilities with floor above ground level for materials and equipment susceptible to weather damage.

B.  Storage of materials not susceptible to weather damage may be on blocks off the ground.

C.  Store materials in a neat and orderly manner. Place materials and equipment to permit easy access for identification, inspection, and inventory.

D.  Fill and grade site for temporary structures to provide drainage away from temporary and existing buildings.

## 1.6 SAFETY REQUIREMENTS

A.  Submit and follow a safety program.

B.  Conduct operations in strict accord with applicable federal, state and local safety codes and statutes and with good construction practice. The CONTRACTOR is fully responsible and obligated to establish and maintain procedures for safety of all work, personnel, and equipment involved in the Project.

C.  Observe and comply with all applicable law governing health and safety including without limitation the Texas Worker's Health and Safety Act (Ch.411 of the Texas Labor Code) and with all safety and health standards promulgated by Secretary of Labor under Section 107 of Contract Work Hours and Standards Act, published in 29 CFR Part 1926 and adopted by Secretary of Labor as occupational safety and health standards under the Williams-Steiger Occupational Safety and Health Act of 1970, and observe and comply with any other legislation enacted for safety and health of CONTRACTOR's employees. Such safety and health standards apply to subcontractors and their employees as well as to the CONTRACTOR and its employees.

DX 0001-1.0275

D.  Observance of, and compliance with, applicable law shall be solely and without qualification the responsibility of the CONTRACTOR without reliance or superintendence of, or direction by, the Port Authority, or any Port Authority representative. Immediately advise the Chief Engineer of investigation or inspection by federal safety and health inspectors of the CONTRACTOR or subcontractor's work or place of work on the job site under this Contract, and after such investigation or inspection, advise the Chief Engineer of the results.

E.  Safety measures, including but not limited to safety personnel, first-aid equipment, ventilating equipment, and safety equipment, in the specifications and shown on the Drawings, are obligations of the CONTRACTOR.

F.  Maintain required coordination with local police and fire departments during the entire period covered by the Contract.

1.7  FIRST AID EQUIPMENT

A.  Provide a first-aid kit throughout the construction period. List telephone numbers for physicians, hospitals, and ambulance services in each first-aid kit.

B.  Have at least one person thoroughly trained in first aid procedures present on the site whenever Work is in progress.

1.8  FIRE PROTECTION

A.  Fire Protection Standards

1.  Conform to specified fire protection and prevention requirements as well as to those which may be established by federal, state, or local governmental agencies.

2.  Provide portable fire extinguishers, rated not less than 2A or 5B in accordance with NFPA Standard No. 10, Portable Fire Extinguishers, for each temporary building, and for every 3000 square feet of floor area of facilities under construction.

3.  Locate portable fire extinguishers within 50 feet maximum from any point in the Project area in which work is being performed.

B.  Fire Prevention and Safety Measures.

1.  Prohibit smoking in hazardous areas. Post suitable warning signs in areas which are continuously or intermittently hazardous.

2.  Use metal safety containers for storage and handling of flammable and combustible liquids.

DX 0001-1.0276


1.9   SECURITY MEASURES

    A.   Protect all Work materials, equipment, and property from loss, theft, damage, and vandalism. CONTRACTOR's duty to protect property includes Port Authority's property and all other property used in connection with the performance of the Contract.

    B.   If existing fencing or barriers are breached or removed for purposes of construction, provide and maintain temporary security fencing equal to existing.

1.10   PROTECTION OF UNDERGROUND UTILITIES AND PIPELINES

    A.   Prevent damage to existing utilities during construction. Give owners of existing utilities at least 48 hours notice before commencing Work in the area, for locating the utilities during construction, and for making adjustments or relocation of the utilities when they conflict with the proposed Work.

    B.   Utilize the Lone Star Notification Center, telephone number, 713-223-4567, which must be called 48 hours in advance. The toll free telephone number is 800-669-8344.

1.11   PROTECTION OF THE WORK AND PROPERTY

    A.   Preventive Actions.

        1.   Take precautions, provide programs, and take actions necessary to protect the Work and public and private property from damage.

        2.   Take action to prevent damage, injury or loss, including, but not be limited to, the following:

            a.   Store apparatus, materials, supplies, and equipment in an orderly, safe manner that will not unduly interfere with progress of the Work or of the work of any other contractor, any utility service company, or the Port Authority's operations.

            b.   Provide suitable storage for materials, which are subject to damage by exposure to weather, theft, breakage, or otherwise.

            c.   Place upon the Work or any part thereof only such loads as are consistent with the safety of that portion of the Work.

            d.   Frequently clean up refuse, rubbish, scrap materials, and debris caused by construction operations, keeping the Project site safe and orderly.

            e.   Provide safe barricades and guard rails around openings, for scaffolding, for temporary stairs and ramps, around excavations, elevated walkways, and in other hazardous areas.

DX 0001-1.0277

3. Notify the Chief Engineer and provide to Chief Engineer copies of written consent from proper parties before entering or occupying with workers, tools, materials or equipment, privately owned land except on easements provided for construction.

4. Assume full responsibility for the preservation of public and private property on or adjacent to the site. If any direct or indirect damage is done by, or on account of, any act, omission, neglect, or misconduct in execution of the Work by the CONTRACTOR, it is to be restored by the CONTRACTOR to a condition equal to or better than that existing before the damage was done.

B. Tree, Plant, and Wetland Protection. Conform to requirements specified in Section 01015 Contractor Use of Facilities.

C. Protection of Existing Structures

1. Underground Structures:

   a. Underground structures are defined to include, but not be limited to, sewer, water, gas, and other piping; and manholes, chambers, electrical and signal conduits, tunnels, and other existing subsurface installations located within or adjacent to the limits of the Work.

   b. Known underground structures, including water, sewer, electric, and telephone service connections are shown on the Drawings. This information is only approximately shown for the assistance of the CONTRACTOR, and is not guaranteed to be correct or complete.

   c. Explore ahead of trenching and excavation work and uncover obstructing underground structures sufficiently to determine their location, to prevent damage to them, and to prevent interruption of utility services. Restore to original condition damages to underground structure at no additional cost to the Port Authority.

   d. Necessary changes in location of the Work may be made by the Chief Engineer to avoid unanticipated underground structures.

   e. If permanent relocation of an underground structure or other subsurface installation is required and not otherwise provided for in the Contract Documents, the Chief Engineer will direct the CONTRACTOR in writing to perform the Work, which is to be paid for under the provisions for changes in the Contract Price as described in Section VIII - General Conditions.

2. Surface Structures:

   Surface structures are defined as existing buildings, structures and other constructed installations above the ground surface. Included with such structures are their foundations or any extension below the surface. Surface structures include, but are not limited to buildings, tanks, walls,

DX 0001-1.0278


bridges, roads, dams, channels, open drainage, piping, poles, wires, posts, signs, markers, curbs, walks, guard cables, fencing, and other facilities that are visible above the ground surface.

3. Protection of Underground and Surface Structures:

a. Support in place and protect from direct or indirect damage underground and surface structures located within or adjacent to the limits of the Work. Install such supports carefully and as required by the party owning or controlling such structure.

b. Before installing structure supports, CONTRACTOR shall satisfy the Chief Engineer that the methods and procedures to be used have been approved by the owner of the structure.
Avoid moving, or in any way changing, the property of public utilities or private service corporations without prior written consent from a responsible official authorized by that service or public utility to give such consent. Representatives of these utilities reserve the right to enter within the limits of this project for the purpose of maintaining their properties, or of making such changes or repairs to their property that may be considered necessary by performance of this Contract.

c. Notify the owners and/or operators of utilities and pipelines of the nature of construction operations to be performed and the date or dates on which those operations will be performed. When construction operations are required in the immediate vicinity of existing structures, pipelines, or utilities, give a minimum of 5 working days advance notice. Probe and flag the location of underground utilities prior to commencement of excavation. Keep flags in place until construction operations reach and uncover the utility.

d. CONTRACTOR assumes risks attending the presence or proximity of underground and surface structures within or adjacent to the limits to the Work, including but not limited to, damage and expense for direct or indirect injury caused by this Work to any structure. Immediately repair damage caused, to the satisfaction of the owner of the damaged structure.

D. Protection of Installed Products.

1. Provide protection of installed products to prevent damage from subsequent operations. Remove protection facilities when no longer needed, prior to completion of Work.

2. Control traffic to prevent damage to equipment, materials, and surfaces.

DX 0001-1.0279



1.12    ROADS AND PARKING

A.    Designate temporary parking areas to accommodate construction personnel.
When site space is not adequate, provide additional off-site parking. Locate as
approved through the submittal process.

B.    Minimize use by construction traffic of existing streets and driveways.

1.13    ENVIRONMENTAL CONTROLS

A.    Provide and maintain methods, equipment, and temporary construction as
necessary for controls over environmental conditions at the construction site and
adjacent areas.

B.    Comply with statutes, regulations, and ordinances which relate to the proposed
Work for the prevention of environmental pollution and preservation of natural
resources, including but not limited to the [National Environmental Policy Act of
1969, PL 91-190, Executive Order 11514.]

C.    The Port Authority recognizes that construction of projects should have minimum
impact to the surrounding environment. The CONTRACTOR shall adopt
construction procedures that do not cause unnecessary excavation and filling of
the terrain, indiscriminate destruction of vegetation, air or stream pollution, nor
the harassment or destruction of wildlife.

D.    Recognize and adhere to the environmental requirements of the Project.
Disturbed areas shall be strictly limited to boundaries established by the Contract
Documents. Particularly avoid pollution of on-site streams, sewers, wells, or
other water sources.

E.    Burning of rubbish, debris, or waste materials is not permitted.

1.14    POLLUTION CONTROL

A.    Provide methods, means, and facilities required to prevent contamination of soil,
water or atmosphere by discharge of noxious substances from construction
operations.

B.    Provide equipment and personnel to perform emergency measures required to
contain any spillage, and to remove contaminated soils or liquids. Excavate and
dispose of any contaminated earth off-site and replace with suitable compacted fill
and topsoil.

C.    Take special measures to prevent harmful substances from entering public waters.
Prevent disposal of wastes, effluents, chemicals, or other such substances

DX 0001-1.0280

PORT OF HOUSTON ⟨ ⟩THORITY       ⎯      ¹ECP ᵞᴬᴸ Sᵖᴇᴄᵢᴘᵢᴄᴬᵗᵢᴜᵞˢ
BAYPORT TERMINA ⟨ ⟩PLEX PHASE 1A         ⟨ ⟩PORARY FACILITIES
                                                                AND CONTROLS

adjacent to streams, or in sanitary or storm sewers. Limit discharge of suspended solid from Disposal Area to 300 mg/L maximum.

D. Provide systems for control of atmospheric pollutants.

1. Prevent toxic concentrations of chemicals.
2. Prevent harmful dispersal of pollutants into the atmosphere.

E. Use equipment during construction that conforms to current federal, state, and local laws and regulations.

1.15 NOISE CONTROL

A. Provide vehicles, equipment, and construction activities that minimize noise to the greatest degree practicable. Noise levels shall conform to the latest OSHA standards and applicable regulations and in no case will noise levels be permitted which interfere with the operations of the Port Authority or create a nuisance in the surrounding residential neighborhoods.

B. Conduct construction operations during working hours, in accordance with the General Conditions, except as approved by Chief Engineer.

C. Select construction equipment to operate with minimum noise and vibration. If in the opinion of the Chief Engineer, objectional noise or vibration is produced by equipment, rectify such conditions without additional cost to the Port Authority. The Sound Power Level (PWL) of any equipment shall not exceed 85 dbA (re: 10-12 watts) measured 5 feet from the piece of equipment, or the levels prescribed by local regulations, whichever is lower. Explicit equipment noise requirements are specified with equipment specifications.

1.16 DUST CONTROL

Control objectionable dust caused by operation of vehicles and equipment. Apply water or use other methods, subject to approval through the submittal process, which will control the amount of dust generated. Comply with requirements specified in Section 01532-General Source Controls.

1.17 WATER RUNOFF AND EROSION CONTROL

A. Where required, the CONTRACTOR is to comply with the National Pollutant Discharge Elimination System (NPDES) permit as stated in the [Federal Register, Vol 57, No. 175.]

DX 0001-1.0281

PORT OF HOUSTON AUTHORITY      TECHNICAL SPECIFICATIONS
BAYPORT TERMINAL COMPLEX PHASE IA      TEMPORARY FACILITIES
AND CONTROLS

B.     In addition to the NPDES requirements, the CONTRACTOR is to:

1.     Provide methods to control surface water, runoff, subsurface water, and water from excavations and structures to prevent damage to the Work, the site, or adjoining properties.

2.     Control fill, grading, and ditching to direct water away from excavations, pits, tunnels, and other construction areas; and to direct drainage to proper runoff courses so as to prevent any erosion, sedimentation, or damage.

3.     Provide, operate, and maintain equipment and facilities of adequate size to control surface water.

4.     Dispose of drainage water in a manner to prevent flooding, erosion, or other damage to any portion of the site or to adjoining areas and in conformance with environmental requirements.

5.     Retain existing drainage patterns external to the construction site by constructing temporary earth berms. sedimentation basins, retaining areas, and temporary ground cover as needed to control conditions.

6.     Plan and execute construction and earth work by methods to control surface drainage from cuts and fills, and from borrow and waste disposal areas, to prevent erosion and sedimentation.

     a.     Keep to a minimum the area of bare soil exposed at one time.
     b.     Provide temporary control measures, such as berms, dikes, and drains.

7.     Construct fills and waste areas by selective placement to eliminate surface silts or clays, which will erode.

8.     Inspect earthwork periodically to detect any evidence of the start of erosion. Apply corrective measures as required to control erosion.

1.18     PAYMENT

No separate payment for the work specified in this section. Such work to be considered incidental, and payment will be included as part of the appropriate lump sum and/or unit prices specified in the Proposal.

PART 2      PRODUCTS - (NOT USED)

PART 3      EXECUTION - (NOT USED)

END OF SECTION

DX 0001-1.0282

**TAB 16**

**Contract, Special Conditions, §12**
**(DX1-1.0244)**

| Sheet | Title |
|---|---|
| U-105 | 8" Potable Waterline Plan –5 |
| U-106 | Typical Wharf Section with Potable Waterline Details |
| U-107 | Potable Water Details |

### 12.   Construction Manager:

(a)      **Independent Contractor:** The Project will be administered by a Construction Manager. The Port of Houston Authority has hired CH2M HILL as the Construction Manager for this Project. The Construction Manager is an independent contractor, and not an agent or employee, of the Port. Accordingly, the Construction Manager cannot, among other things, enter into agreements on behalf of, make agreements on behalf of, or bind the Port. The CH2M Hill representative shall be:

### Stephen A. Curtis, P.E.

(b)      **Inspector:** The Construction Manager shall be the Inspector for the Work and have all authority delegated to the Inspector by the Contract Documents.

(c)      **Paper Flow:** One of the duties of the Construction Manager is to coordinate all paper flow for the Project. Accordingly, all paper work (including, but not limited to, Submittals, RFIs, and Change Order documentation) required to be submitted by the Contractor to the Chief Engineer, other Port employees or to the Design Consultant pursuant to the Contract Documents shall be submitted to the Construction Manager, attention of the CH2M Hill individual designated above, for distribution to the Chief Engineer, other Port employee, and Design Consultant, as appropriate. The Contractor shall submit the appropriate number of originals and copies of the paper work to the Construction Manager, with copies of transmittal letters directly to the Chief Engineer and other required individuals. Responses from the Chief Engineer, other Port employees, and Design Consultant will be provided to the Construction Manager who, in turn, will distribute the responses to the Contractor and other appropriate individuals. The Contractor should take into account in scheduling the Work the role of the Construction Manager and the time required for the paper to flow through the Construction Manager.

Notwithstanding the foregoing, any notices to the Port Police or Coast Guard (including, but not limited to, reports pursuant to General Conditions Sections 4.08, 4.10, 4.14, and 4.19) shall be made directly to the designated individuals as set forth in the General Conditions, with a copy to the Construction Manager.

(d)      **Chief Engineer and Changes:** The Construction Manager does not have the authority of the Chief Engineer. For example, the Construction Manager has no authority to resolve disputes, issue Construction Change Directives, or change any of the terms and conditions of the Contract, including, without limitation, issuing Modifications or ruling on or granting time extensions or Change Orders. The Construction Manager will make recommendations to the Chief Engineer, when requested, regarding any disputes, changes or Modifications.

(e)      **Responses to RFIs:** The Construction Manager shall review RFIs and, in instances in which the response to the RFI does not require a response from the Design Consultant or a Modification of any Contract Documents, respond directly to RFIs. The authority of the Construction Manager to respond to RFIs shall specifically include RFIs regarding discrepancies, errors, conflicts or omissions in the Contract Documents and shall specifically include the authority to otherwise clarify the Contract Documents and to make decisions regarding issues which arise in the field, in each instance so long as such responses, clarifications and decisions do not involve a Modification in the Contract Documents.

The authority of the Design Consultant to respond to RFIs and submittals is as set forth in the General Conditions. Such responses shall be made through the Construction Manager.

Special Conditions
(rev'd August 1, 2002)                                                                                    X - 6 of 9

DX 0001-1.0244

**TAB 17**

**Contract, Addendum No. 8**
**(DX1-1.0021)**

### D. SMALL BUSINESS PARTICIPATION:

Small business participation for purposes of this Contract is defined as the dollar amount of the Contract, which will be performed by one or more, approved or certified small businesses. A small business for purposes of this Contract is a firm for which the gross revenues or number of employees averaged over the past three (3) years, inclusive of any affiliates as defined by 13 United States Code of Federal Regulations Section 121.103, does not exceed the size standards as defined pursuant to Section 3 of the Small Business Act (15 U.S. Code, Chapter 14A) and for which the net worth of each owner does not exceed $750,000, excluding residence and the value of the small business.

Please check the appropriate statement(s):

1. ___ I certify that _____ is a small business as defined above.
(Name of Proposer)

2. ✓ I certify that the subcontractors shown on the sub-contract sheet above as certified small businesses will perform work on this contract for $ 22,536,000 (dollar amount of the Contract which will be performed) of the total contract price, or 34 % of the contract work.

3. ___ I certify that _____ (name of Proposer) has made a good-faith effort to use certified small businesses for this contract and has been unable to do so.

### E. PERSONAL PROPERTY:

The above TOTAL AMOUNT PROPOSED contains $ 11,162,700 worth of tangible personal property which is authorized by law to be purchased tax free and which will be incorporated into the completed project.

### F. CERTIFICATION OF PROPOSAL:

**The above TOTAL AMOUNT PROPOSED price shall remain firm for One Hundred Fifty (150) calendar days after the Proposal opening date.**

The undersigned agrees, if awarded the Contract, to begin the Work within ten (10) working days after issuance of a fully executed Purchase Order by the Port Authority, and to complete such Work within Seven Hundred and Thirty (730) calendar days after receipt of the Port Authority's purchase order; and further agrees that, should the undersigned fail to complete the Work within the agreed time, the Contract Price will be reduced by Five Thousand Dollars ($5,000.00) for each and every CALENDAR day thereafter until completion of the Work. See Sections 5.05 and 5.06 of the General Conditions.

The undersigned further agrees to meet the completion milestones specified in Section 10 of the Special Conditions on or before the time indicated, and should the undersigned fail to complete the Work within the agreed time the Contract Price will be reduced by the following amounts:

- Area "A": Twenty Thousand Dollars ($20,000.00) for each and every CALENDAR day thereafter until completion of the Work in Area "A".
- Area "1": Four Thousand Dollars ($4,000.00) for each and every CALENDAR day thereafter until completion of the Work in Area "1".
- Area "2": Six Thousand Dollars ($6,000.00) for each and every CALENDAR day thereafter unit completion of the Work in Area "2".

The reductions in the Contract Price set forth in paragraph 2 and 3 above shall be assessed independently of one another and shall be additive.

The undersigned deposits with this proposal a Cashier's Check or Certified Check, or a Bid/Proposal Bond on the Port Authority's form executed by a responsible corporate surety authorized to do business in Texas, in the amount of Five Percent (5%) of the Greatest Dollars ($ 5% ) in accordance with the Instructions to Proposers. Cashiers or Certified Check must be drawn on a bank that is a member of the Federal Deposit Insurance Corporation mount Bid by Principal

DX 0001-1.0021

**TAB 18**

**Email from Thiess to Anderson dated August 1, 2004
(PX84)**

## Larry Applegate

**From:** Andrew.Thiess@CH2M.com
**Sent:** Sunday, August 01, 2004 5:45 AM
**To:** ANDERSONHE@zachry.com
**Subject:** Freeze Wall



Tech Memo
003 - Freeze Wal

Andy,

I have brought this issue up to Gary Kuhn but have not received a response, and so I will forward it to you now that you are on board.

Regarding the freeze wall, we have no requirement for a submittal as it was not anticipated by the designers. However, the Port and the engineering team are very concerned about the freeze wall and the question has come up what kind of submittal we should ask for, if any, and whether we should review the design, etc.

Gary Kuhn and the freeze wall guys, when they were here, indicated that they had expected to provide a detailed submittal anyway.

Attached is a document that outlines the way I would like to approach the freeze wall submittal. Please review and let me know if you have any concerns with this approach. In particular, note that the signature of a Texas PE would be required. I have discussed this with the Port and they believe this requirement cannot be avoided. Please let me know if you think the approach or the Texas PE signature will be a problem.

Note that this document is only a draft for your review and not an official directive at this time.


Andrew W. Thiess, PE, PMP
CH2M HILL
7600 W. Tidwell Rd., Suite 600
Houston, TX 77040-5719
Tel: (713) 462-0161
Direct: (713) 462-0169, ext. 311
Fax: (713) 462-0165
Mobile: (832) 250-2899
athiess@ch2m.com



EXHIBIT
Anderson
13
12/16/07 CJenes

No. 2006-72970
ZCC EXHIBIT
84

RKK 000314

*Andy Anderson — Project Manager*
*Brad Johnson — Business Manager*
*John Ghaslo*

## Issues/Concerns Pertaining to Freeze Wall Technology

Responses from GeoEngineers, Inc. (GEI) and RKK-SoilFreeze Technologies, LLC (RKK).

1) Recognizing the large clay stratums that exist in the soil, particularly at the toe of the wall, raises concern due to the lack of water in clay soils. How will this be dealt with?

Clay actually has more moisture in its pore spaces than does sand. Because the water is held very tightly, clay may appear to have less moisture, but the water content tests verify that it has more than enough to freeze solid. We plan to do our own testing of samples from the new borings to verify frozen strength and freezing parameters, but the data available thus far indicates that freezing should be no problem at this site given the conservative assumptions underlying the preliminary SoilFreeze wall design. (GEI)

2) In the case of storms/hurricanes, explain how the structural integrity will be maintained?

One issue is the integrity of the SoilFreeze wall during a large storm or hurricane. The frozen wall will actually be embedded within the unfrozen fill that Zachry will place in the water soon. There will be a 20 to 30 foot wide buffer of unfrozen soil between the frozen wall and the water. The height of this new fill has not yet been determined. However, based on recent discussion in Houston, it appears that a height of 4 to 6 feet above normal sea level will be adequate for most storms. The wall itself should be quite adequately protected from water action. (GEI)

*Late June — Dec. 05*

The protection of above-ground system components (manifold lines, pumps, chillers, electrical supply) is of critical importance. During SoilFreeze wall formation a loss of power or damage requiring repairs to the brine-circulation system should be avoided if at all possible, but the impact will be on schedule and not on the structural integrity of the SoilFreeze wall. After the SoilFreeze wall is formed, regardless of the status of excavation at the time of a loss of power or system damage requiring repairs, such events will not affect the structural integrity of the SoilFreeze wall over a period of a few days, assuming the whole shoreline is not washed away. The restoration of full system function will bring soil temperatures and wall integrity back to their previous state within a week or so. The protection of the refrigeration hardware is obviously important, particularly from a cost standpoint. As the design of the SoilFreeze wall gets underway, we will work with the fabricators and leasers of the equipment (both in Texas and familiar with Houston weather conditions) on a detailed plan that allows for quick disassembly and demobilization of the chillers.. (RKK)

3) Please explain how the freeze point of the wall will be identified for excavation that will need to take place between the wall and the wharf pilings? If this point is compromised, what will be the effect on the integrity of the wall?

RKK 000315

We have done some preliminary engineering that indicates that the extent of freezing can be kept at least 3 shaft diameters (9 feet) from the pilings. Of course, the proximity of the freezing will depend on the final location of the SoilFreeze wall, which has not been decided. We will have 50 or so devices in and near the wall that will monitor soil temperature the full depth of the wall (110 to 120 feet deep) on a daily basis, or more frequently if necessary. Freezing is slow and we will have plenty of notice regarding the rate of freezing. During the design we will analyze the rate and extent of freezing with TEMP/W, a finite difference program that we have used on dozens of projects with great prediction of actual freeze behavior.

We also plan to perform a freeze/thaw strength test to determine the actual reduction in strength of the soil after it thaws out. Based on the literature of previous testing, the reduction after one cycle should not be significant. We also have the capability of evaluating the impacts of a reduced soil strength some distance from the pilings using finite element programs. However, based on our extensive experience with soil strengths, we do not feel that this will be necessary. We do not feel that our wall will have any significant impact on the integrity of the drilled shafts. (GEI)

    4) During the thawing process and dredging of the wall, how will we be assured that there will be no shifting or settling of the first row/rows of pilings?

Again referring to the response to Item 3, we will perform strength tests on thawed samples and perform engineering analyses to verify that thawing of the frozen wall will not have an adverse effect on the drilled pilings. If necessary, the pace of thawing will be adjusted to manage this interface between the SoilFreeze wall and the wharf structure and avoid any adverse impacts of thawing on the pilings. (GEI)

    5) Earlier conversations indicated that a 15-20ft wide road would be needed on the outside of the wall for inspection. Is this still the case?

The actual amount of space needed will need to be worked out during the SoilFreeze wall design. Ways to reduce the width of the access road (and thereby the volume of fill placement in the water) include putting the chillers on frames built above the SoilFreeze wall. (GEI)

Please refer to our response to Item 7. (RKK)

    6) How much time is required for thawing before the material can be dredged out and what is the process for removal of the tubes?

After talking with Marvin, it appears that relatively little time will be needed since he feels he can dredge out frozen soil without thawing. The wall will start to warm up (and thereby loose strength) immediately after the freeze system is decommissioned. As we have said, it is possible to design the SoilFreeze wall so that the brine-circulation system is decommissioned in segments rather than all at once. It may be possible to start dredging within a week or two after the end of freezing and freeze pipe removal (GEI)

2

RKK 000316

0084.0003

7) We understand that there may be as many as 40 chillers required for the initial freeze. How much area will be required for these and what will you need in terms of electrical connections?

The chilling capacity required for the formation of the SoilFreeze wall to the engineer's design specifications depends on the total number of linear feet of steel pipe in the ground, the tightness of the placement of these pipes and other characteristics of the final design. The design of the above-ground components (manifolds, pumps, chillers, etc.) will match the details of the engineer's requirements and conform to the overall schedule, array of methods and performance standards of the job. With that being said, the following is our best guess at chiller requirements at this time.

The conceptual design submitted to Zachry and used as the basis for all discussions in the last nine months assumes that there will be 168,000 LF of underground pipe, and that initial freezedown will require the equivalent of 94 mobile refrigeration units in our own inventory. Each of these has a 6 x 12-ft. footprint and weighs between 4,500 and 5,000 lb. Each of these units will require an estimated 82 amps during the first week of freeze-down (50 amps after the first four weeks and 30 amps beginning in the ninth week). Of course the SoilFreeze system at Bayport will use fewer, more powerful and, when fully integrated, more efficient chillers. Again, the number, refrigeration tonnage and weight of the chillers in the overall system configuration and the number of electrical panels will depend on the engineer's design. The placement of the chillers will take into account the requirements of the SoilFreeze system while being fully compatible with other considerations, e.g. noise mitigation. (RKK)

*Each of these responses can be given in elaborate detail. Some of them raise other issues which are no doubt worth discussing again now that subcontract negotiations and the start of work are imminent.*

*For clarification and further discussion, please contact*

*James Quitslund*
*RKK-SoilFreeze Technologies, LLC*
*(425) 861-6084        mobile (425) 766-1162*
*jquitslund@soilfreeze.com*

3

RKK 000317

0084.0004

**TAB 19**

**Acceptance for Records of Main Freeze Wall Plan
(PX88)**



| | Submittal Item | |
|---|---|---|
| **Project** | [C70-1A-D01] - Bayport Ph. 1A - Wharf and Dredging | **View Date** 4/4/2007 |
| **Wharf and Dredging** | C70-1A-D01 | |

Nathelyne A. Kennedy & Assoc.
6100 Hillcroft
Suite 710
Houston, TX 77081
Phone: (713) 988-0145

**Submittal Item No.** 00700-014

## General Information

| | | | |
|---|---|---|---|
| **Item No.** | 00700-014 | **Revision** | 0 |
| **Package No. Rev.** | 00700.0 | | |
| **Description** | Soil Freeze Wall Plan | | |
| **CSI Code** | 00700 - General Conditions | **Submitting Company** | Zachry Construction Corporation |
| **Reference No.** | | **Copies Required** | |
| **Status** | Received | **Item Type** | |
| **Responsible Team Member** | Rich Klassen (Zachry Construction Corporation) | | |
| **Item Notes** | | | |
| **Primary Response** | Accepted for Records | | |
| **Submission Notes** | | | |

## Dates

| | |
|---|---|
| **Material Required on Site** | **Required Lead Time (days)** |
| **Approved Submittal Required By** | **Required Review Time (days)** 20 |
| **Submission Due** | |

## Linked Documents

| Document Type | Document | Description | Date |
|---|---|---|---|
| Doc | C70-1A-D01-00278 | Tech Memo WD003 - Freeze Wall Submittal Require... | 8/12/2004 |
| Doc | C70-1A-D01-00838 | Tech Memo WD009 Freeze Wall Noise and Air Issues | 1/17/2005 |
| Doc | C70-1A-D01-00987 | Soil Freeze Wall - RKK info | 3/9/2005 |



No. 2006-72970
**ZCC EXHIBIT**
**88**

0088.0001

# TAB 20

## Transcript of April 5, 2005 Meeting
## (PX8)

NO. 2006-72970

| | | |
|---|---|---|
| ZACHRY CONSTRUCTION | ) | IN THE DISTRICT COURT |
| CORPORATION, | ) | |
| Plaintiff | ) | |
| VS. | ) | HARRIS COUNTY, TEXAS |
| THE PORT OF HOUSTON | ) | |
| AUTHORITY, | ) | |
| Defendant. | ) | 151ST JUDICIAL DISTRICT |

****************************

TRANSCRIPTION EXCERPT

CONSTRUCTION COORDINATION MEETING

APRIL 5, 2005

Minutes: 16:35 to 32:20

***********************************

Transcribed By: Keva Van Slyke

No. 2006-72970
ZCC EXHIBIT
8

Date: April 5, 2005

Minutes: 16:35 to 32:20

Requested Portion of Construction Coordination Meeting

(Andy Thiess helped identify the speakers and some inaudible portions of this transcription.)

MR. THIESS: Okay. Anyone have other issues with the wharf?

MR. ANDERSON: Yeah I have two items I want to bring up. We need to get like an official okay about bringing this ship in on the west end of the wharf. We have talked about it. We put it in, I think the last time Mark was going to look at whether or not there was a conflict with the electrical service that went to the west. We haven't heard back. We've always been - - since the beginning, we've been moving on the basis that the ship would come in on the west end rather than the east.

MR. ELY: You're talking about the barge to unload the cranes?

MR. ANDERSON: Yeah.

MR. ELY: Okay.

MR. THIESS: Now, with this new potential section it's really critical.

MR. ANDERSON: Yeah with the 330-foot

extension, it now almost mandates that the ship come in on the west end. So we need to get something concrete from the Port that says it's okay. Because under the contract, I'm required to give you the east end. I just need to get that clarified.

MR. THIESS: I think the best way would be to get an RFI in and get it on the clock.

MR. ANDERSON: I think - did we not put one in already?

MR. ROGERS: No. We were - -

MR. ANDERSON: I know we were talking about doing it. All right. Let's get one in and let's put some verbiage in it about the fact that with this upcoming 330-foot extension it mandates that the ship come in on the west end. The last - if I remember the conversation the last time, I think even Mark said that even if they unloaded at the west end it still wasn't an issue because if they had to move the crane, they could always tow it -

MR. GLASGOW: Tow it down.

MR. ANDERSON: Yeah, they could always tow it wherever they needed to go. And from what I understand, once the cranes are on the track, it's just a commissioning issue. So they really don't have to move anywhere. And so that's the - - that's the big.

issue that I have, is getting that clarified.

MR. THIESS: Okay.

MR. ELY: Hang on just a second. If we did that, if we pushed all the cranes - - how many cranes are we getting, four?

MR. THIESS: Four.

MR. ELY: If we pushed all of the cranes over to the west side, would we be able to hook up temporary power to do the commissioning?

MR. ANDERSON: Oh, I would think so.

MR. ELY: Okay. Because I think that's probably the only issue, right? Because the cables are not going to reach that far. And so if we could run just a temporary conduit across the deck, and I can get power to the cranes, then I don't see any issue.

MR. ANDERSON: I don't see that being a problem. We've come up with a design that we'll be proposing to you guys on the freeze wall, where - - you know, in this 330-foot extension, we are going to design in a cutoff wall that will allow us to reach the freeze wall and open 900 feet of it up while we continue to work towards the east end. All right.

There, is one upcoming issue that we are going to have that we have - we believe we have found a

solution to. We'll probably, once we finalize it, we'll give it to you formal, but you may as well know about it now.

There is -- the cutoff wall involves a sheet pile bin wall structure being built about 8 feet wide that the soil between the bin walls will be frozen. This encompasses one B row piling right in the middle of it. Now, the freezing is not the issue, because the pile goes 40 feed deep or 50 feet deeper than the soil that's being frozen --

MR. THIESS: Andy, I'm sorry. One thing with that -- how deep is the wall?

MR. ANDERSON: About 100 feet.

MR. THIESS: How deep is the pile?

MR. ANDERSON: Well, actually, it's 90 feet below zero, so 90 feet cuz elevation's plus 10 at the top.

MR. THIESS: And the B row pile is --

MR. ANDERSON: About 130.

MR. THIESS: Okay. So it's about 30 feet below --

MR. ANDERSON: Yeah, there's 30 or 40 feet of piling below the freezing matrix.

MR. THIESS: Yeah, but you still have about 40 or 50 feet of affected skin friction of the

pile?

MR. ANDERSON: Yes.

MR. THIESS: All right.

MR. ANDERSON: Now, but that's not the - - that's not our concern. The biggest concern is that in the excavation process, eventually they're going to have unequal pressure against that bin wall because we are going to remove it on one side and you're to have the dirt pushing on it. And then eventually it's going to be reversed. You're going to have water and air on the other side. So there is a deflection in this - - in this bin wall. And first blush says that the deflection will be somewhere in the vicinity of 4 to 6 inches.

That was only done it based on a two-dimensional model, so they are - - right now they have new software we're programming on a three-dimensional model to see if we can get a more accurate look at the deflection.

The idea that we're using is that that one specific pile will be drilled and cased to probably 42 or 48 inches, and then we'll establish a casing at 36 inches, in the middle of this secondary casing. That will allow this casing to deflect with the wall and not put any lateral pressure against the piling. Our

biggest concern is not the freezing, it's the lateral pressure - -

MR. THIESS: Preloading - -

MR. ANDERSON: Yeah, preloading the pile. And - - but I think that that, you know, I think that that will solve the problem. I am fairly comfortable with what I saw, if we can keep the movement contained within that secondary casing, we should be okay.

MR. FARHAT: Do you have a sketch of what you are talking about?

MR. ANDERSON: Well, I can draw it on the board for you if you want to see it.

MR. ELY: How low would the casing go down?

MR. ANDERSON: The casing is - - the 42 inch will go down as - - probably as deep as the - - what do you call it - - how deep do we want?

MR. ELY: Would it go all the way to the bottom of the sheet pile? Probably not, right?

MR. ANDERSON: No, it doesn't have to go that deep.

MR. ELY: Right.

MR. ANDERSON: And that has to be - - and obviously, once the - -

MR. ELY: See that's a design mod

basically. Is that what you're saying? Right?

MR. ANDERSON: Yeah. And what we'll do is, when it comes time to remove it, divers are going to have to go down and cut the casing off the outer casing.

MR. ELY: You can't pull it, you mean?

MR. ANDERSON: Well, see, no, we can't because we're continuing to build the deck over this - -

MR. ELY: Oh, you're going to leave it in place?

MR. ANDERSON: Yes.

MR. ELY: Oh, I see.

MR. ANDERSON: Yeah, it's - - we intend - - this cutoff wall is being designed in such a fashion that we're still going to be able to build the subdeck while the freeze wall stands there.

MR. ELY: I gotcha.

MR. ANDERSON: So even that freeze wall, what we are going to do is when it comes time to do the excavation, we'll do all of the excavation that we need to do on it. And then eventually, divers are going to go down and they are going to cut through the sheeting off -

MR. ELY: (Inaudible) or whatever.

MR. ANDERSON: Yeah, a couple of feet

below the mud line, and we're going to cut the sheeting wall down. All right. And then in that, we're then going to cut the outer casing of the pile and be right back to what we need.

MR. ELY: Could you back fill that casing with some kind of hard material that - -

MR. ANDERSON: Sure. I mean, we - -

MR. ELY: Lean concrete or something.

MR. ANDERSON: I was going to say we can pour - - we can pour concrete in the casing for all that matters, in order to fill that void up. That would be a no-brainer. We could easily do that.

MR. ELY: Okay. That's something our Geotech will have to look at.

MR. ANDERSON: And we're not done on the calculations, but I wanted to give you a head's-up. Jerry, did you want me to show you what it - -

MR. FARHAT: Okay. Maybe - -

MR. ANDERSON: - - what we're going to do is this (inaudible). We're looking at if this is the freeze wall here, and we have the wharf face here, and of course we have the piles here, and then we have B row that sits in through here. All right. The bin wall that we're talking about building is actually shaped about like this, and runs all the way back to H

row, all right, and cut off here. What this does is, this ties up into the freeze wall in this fashion which gives it its stability.

This is the piling that is in question right here. And what we want to do is, we want to put an outer casing around that piling to allow this bin wall to deflect as as needed. Because eventually, when this is all excavated out, of course you've got this - - you've got soil - - the worst case is when we've excavated this side, and you haven't excavated this side, and you have all this pressure of the soil laying against this bin wall.

All right. So this whole thing is going to be frozen, along with this. Eventually, what we would have here is in the slope matrix, you've got the B row piling that goes down here with the deck up above it. The sheathing is going to be installed in the freeze wall at this level. It's going to be well under the deck by several feet. And this casing will more than likely come into play in here, just enough depth to be able to protect it from the deflection. Because once we get into the soil, the bin wall is not going to move.

You know, once you get into the soil, the soil is going to act as shoring to hold it in place anyway. The deflection is going to occur primarily at close to

the top.

MR. FARHAT: Do you have only one bin wall or just so many of them?

MR. ANDERSON: Just one. All this is is that in the complete matrix of the freeze wall what we've done now - - it used to be that the freeze wall was going to end at this point. But now, with this 330-foot extension, it's going to be extended out. Under our current schedule, we have to finish the entire subdeck before I can breach the freeze wall to bring the ship in. It doesn't work if I got another three or four months' worth of work. So at about - - at about the 900 foot mark, at this point, we are going to put the cutoff wall so that I can take this freeze wall out when necessary, whenever we're there.

MR. McKENNEY: You're going to drive that casing in first and then drill it in?

MR. ANDERSON: Well, I think we'll drive - - we're probably gonna end up drilling it.

MR. ELY: No, we can't drive it. Our permit doesn't allow it.

MR. ANDERSON: No, we can drive it.

MR. ELY: You can?

MR. ANDERSON: There's nothing in the permit that says I can't drive it .

MR. ELY: Really? Okay.

MR. ANDERSON: In fact, the sheeting - - it's about two days' worth of work to drive the sheeting, so there's going to be a myriad of phone calls and complaints and bitches while we are doing this for two days. And then you guys can yell at me and slap my hand and say bad contractor, and I say, okay, we won't do it anymore. But - -

MR. THIESS: Well, the only thing is, I remember when the GeoEngineers were talking about this at the Port, they said that they might lose like 5 to 10 percent shear strength on the soil. So we might just have to make that B row pile a little deeper, huh?

MR. ELY: There's going to be - - some more discussion is going to occur, because the testing that they've done shows there's no degradation after that cycle.

MR. THIESS: Oh, really?

MR. ELY: But, you know, nobody is sure if they believe that yet, so...

MR. ANDERSON: Okay. One of the things we had talked about is taking that one particular piling another 10, 20 feet deeper in order to pick up that skin friction. And if that's what it's going to take for you guys to get comfortable with it, I have no problem,

we'll take it down another 20 feet, you know, just to get it. How much end bearings do you have on these pilings? What percentage of end bearings on it?

MR. FARHAT: Oh, I don't know. They may be 40 percent end bearing. I have to check.

MR. ANDERSON: Because, you know, as we Get deeper in there, that soil becomes much, much more stable, and you're going to pick up some additional end bearing if I take it another 20, 30 feet, plus the additional skin friction. Okay? So I just - - like I said, this is just the first blush to give you an idea of what's coming when we give you the - - when we get this pricing together for the 330-footer, that - -

MR. THIESS: It's going to include that.

MR. ANDERSON: - - it's going to include the cost of this. RKK is already working on the engineering calculations and stuff to be able to make sure that we're not - - that this piling is not going to cause us a problem. All right.

MR. THIESS: So what we will have is stamped engineering on that pile.

MR. ANDERSON: Yes, yes.

MR. THIESS: Okay.

MR. McKENNEY: If he drills that in there , how's Bobby gonna have - - is he going to still

have a 36 inch shaft?

MR. ANDERSON: He's going to set another casing inside the - - yes. It will be a double-cased pile.

MR. ELY: Just make sure when they do that, when they do the analysis, make sure they include the stiffness of the shaft - -

MR. ANDERSON: Okay.

MR. ELY: Because I mean, a lot of times what people will do is, they go down and say, oh, the deflection is pretty small down here, so we're not going to include that. But make sure they include that stiffness. Because even a small deflection below ground will cause a lot of stress in concrete piles.

MR. ANDERSON: Yes. Yeah, we're going to take the casing probably down to the relief point. And it - - it isn't - -

MR. ELY: The (inaudible) point you mean? Well, okay (inaudible.)

MR. ANDERSON: Yes, yes. And I don't believe that the point is going to be very deep into the soil, because it's pretty damned stiff as you start dropping down to that level. Remember, in the B row piling, we're actually into that 45-foot sand strata, all right, and that's going to give us some pretty good

holding force.

MR. THIESS: Okay. All right. Anyone else? Is that it, Andy? Is there anything else? Anyone else comments on the wharf? I have one comment I'd like to - - we have one outstanding submittal on the welding. And it's for - - for the wharfside for the supplies. The QC or the welding rod, electrodes, we need to get that and finish out. Otherwise you're not - - you're not 100 percent passing your welding - -

MR. ANDERSON: What do you need, just the (Inaudible) the rods?

MR. THIESS: No, we need the QC procedures, the dry control box, the storage - -

MR. ANDERSON: Oh, oh. Yeah, yeah. Gotcha.

MR. THIESS: Like to have that. Okay. That's it. If no one else has anything on the wharf, we'll move to the container yard.

(End of requested portion of
Construction Coordination Meeting.)

STATE OF TEXAS)

COUNTY OF HARRIS)

REPORTER'S CERTIFICATE

I, Keva L. Van Slyke, Certified Shorthand Reporter, in and for the State of Texas, hereby certify that the foregoing is a correct transcription from the audio recordings furnished to me by counsel.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this recording was taken. Further, I am not a relative or employee or any attorney of record in this cause, nor do I have a financial interest in the action.

Certified by me this the 14th day of August, 2009.

_____
Keva L. Van Slyke, CSR
Texas CSR#3481
Expiration Date 12-31-09

Sunbelt Reporting & Litigation Services
6575 West Loop South, Suite 580
Bellaire, Texas  77401
(713) 667-0763

**TAB 21**

**April 13, 2005 Proposal for Wharf Extension**
**(PX9)**

 **ZACHRY**

April 13, 2005

Port of Houston Authority
Mr. Mark Vincent, P.E.
Bayport Project Engineer
P.O. Box 2562
Houston Texas, 77252-2562

Correspondence #72340405004

Re Contract: Bayport Terminal Complex Phase 1A
　　　　　　　Wharf and Dredging Contract

Subject: Price Quote – 330 foot Wharf and Dredging Extension

Dear Mr. Vincent,

As per your request we offer The Port of Houston Authority the following price quote for the 330 foot Wharf extension.

　　　　　Lump Sum Price　　　　　　　$12,872,000.00 **

　　　　　　　　** Price is based on:
- Current design
- Uninterrupted work process
- Current construction methods
- Delivery of the gantry cranes at the west end of the wharf
- Use of a freeze wall - cut off wall, encompassing one (1) "B" row piling
- No outfall structure is included
- Wet Dredging will be at a unit price based on 80,000 cubic yards, actual yardage will be determined by pre-dredge survey and adjusted at $8.89 per cubic yard
- Wet Dredge Placement will be based on 80,000 cubic yards, actual yardage will be determined by pre dredge survey and adjusted at $4.50 per cubic yard

Should the POH approve the use of the Geostar Fabri-form revetment system for the entire wharf length (1990 lf) a deduction of $892,281.00 for the entire wharf length (1990lf) can be taken, for an adjusted lump sum price of $11,979,719.00

If you have any questions, please do not hesitate to contact me.

Sincerely,

Harold "Andy" Anderson
Project Manager

cc:　Fred Lueck
　　　Greg McVey
　　　File

**No. 2006-72970**
**ZCC EXHIBIT**
**9**



**EXHIBIT**
Anderson
6/16/07

ZCC-34-050410

0009.0001

**TAB 22**

**May 18, 2009 Proposal for Wharf Extension
(PX179)**

 **ZACHRY**

May 18, 2005

Port of Houston Authority
Mark Vincent, P.E.
Bayport Project Engineer
P.O. Box 2562
Houston Texas, 77252-2562

<u>Correspondence # 723405008</u>

Re Contract: Bayport Terminal Complex Phase 1A
                 Wharf and Dredging Contract

Subject: Price Quote – 330 foot Wharf and Dredging Extension

Dear Mark,

      As per your request we have reviewed our offer for the 330 foot Wharf extension, Zachry Construction Corporation would like to thank you for the opportunity to review our quote for this additional work, however after our review we have concluded that the original offer is our best price.

      Lump Sum Price              $12,572,000.00 **

           ** Price is based on:

- Current design
- Uninterrupted work process
- Current construction methods
- Delivery of the gantry cranes at the west end of the wharf
- Use of a freeze wall - cut off wall, encompassing one (1) "B" row piling
- No outfall structure is included
- Wet Dredging will be at a unit price based on 80,000 cubic yards, actual yardage will be determined by pre-dredge survey and adjusted at $8.89 per cubic yard
- Wet Dredge Placement will be based on 80,000 cubic yards, actual yardage will be determined by pre dredge survey and adjusted at $4.50 per cubic yard

Should the POH approve the use of the Geostar Fabri-form revetment system for the entire wharf length (1990 lf) a deduction of $592,281.00 for the entire wharf length (1990lf) can be taken, for an adjusted lump sum price of $11,979,719.00

If you have any Questions please do not hesitate to contact me.

Harold "Andy" Anderson
Project Manager

Cc: File, Fred Lueck, Greg McVey

<div style="border:2px solid black; display:inline-block; padding:8px; text-align:center;">
No. 2006-72970<br/>
<b>ZCC EXHIBIT</b><br/>
<b>179</b>
</div>

Zachry Construction Corporation

P.O. Box 1968 • La Porte, TX 77572 • (281) 474-3176 • (281) 474-4925, fax • www.zachry.com

ZCC23 000488

0179.0001

**TAB 23**

**July 11, 2005 Proposal for Wharf Extension and Ditch K
(PX219)**



# ZACHRY

July 11, 2005

Port of Houston Authority
Jim McQueen, P.E.
Bayport Project Engineer
P.O. Box 2562
Houston Texas, 77252-2562

Re Contract: Bayport Terminal Complex Phase 1A
Wharf and Dredging Contract

Subject: 332 foot Extension and Ditch "K"

Dear Mr. McQueen,

Based on our meeting of July 8, 2005 the following additions and clarifications are offered to the pending change order for the 332 foot extension and Ditch "K".

- The total linear feet of drill shafts in the 332 foot extension shall not exceed 21,266.50.
- Any additional length of drill shaft in excess of 21,266.5 shall be billed at a rate of $82.00 per liner foot.
- Any reduction in the total length of drill shafts less than 21,266.5 shall be a credit to POHA at a rate of $43.00 per linear foot.
- Price is based on ZCC having a working design and drawings for drill shafts no later that 8/12/05.
- Price is based on ZCC having a working design and drawings for the Wharf Deck no later than 11/25/05.
- The contract completion deadline for the Bayport Terminal Complex Phase 1A Wharf and Dredging Contract shall be extended to 8/15/06.
- Price is based on a drill shaft design diameter no greater than 36"; any increase in the design diameter over 36" will be subject to a re-quote.
- ZCC's quoted price for the 332 foot extension shall be increased $5,500.00 to cover the construction of a temporary drainage swell along the south face of the extension.
- ZCC'S quoted price for the 332 foot extension shall be increased $10,000.00 to cover the installation of an 8' high chain link fence along the South face of the extension.
- The dredging quantity shall be based on 110,000 cubic yards.
- ZCC's adjusted base price for dredging shall be $1,446,500.00 based on a unit price of $13.15 per cubic yard on a base dredging quantity of 110,000 cubic yards.
- Any quantity dredged in excess of the base quantity of 110,000 cubic yards shall be at a rate of $13.15 per cubic yard.
- Any quantity dredged short of the base quantity of 110,000 cubic yards, the remaining balance of the yardage to equal 110,000 cubic yards shall be paid to ZCC at a rate of $0.54 per cubic yard; this equals a credit to POHA at a rate of $12.61 per cubic yard on the under dredge quantity.



ZCC23 001492

No. 2006-72970
**ZCC EXHIBIT**
**219**

0219.0001



- Work hours for all associated work on Ditch "K" shall be 12 hours per day, 5 days per week
- Completion time for Ditch "K" shall be 5 months from receipt of the signed change order.
- All costs associated with inspectors and testing labs for the extended work hours for Ditch "K" shall be the responsibility of POHA.

Based on the above clarifications our quote changes as follows:

| | |
|---|---|
| • Lump sum price for Ditch "K" | $ 2,215,702.00 |
| • Lump sum price excluding drill shafts and dredging is | $ 9,772,447.00 |
| • Drill shafts add 21,266.5 liner feet at $82.00 per liner foot | $ 1,743,853.00 |
| • Dredging add 110,000 cubic yards at $13.15 per cubic foot | $ 1,446,500.00 |
| Total value | $15,178,502.00 |

Sincerely,

Harold "Andy" Anderson
Project Manager

cc:  Fred Lueck
Greg McVey
File

ZCC23 001493

0219.0002

**TAB 24**

**Request for Port Commission Action for Execution of
Change Order 4 Signed by Port Facilities Director
James Jackson and Chief Engineer Steve DeWolf
with origination date of July 18, 2005
(PX224)**

## Request for Port Commission Action

**To: Executive Director**

| Subject: Execute a Change Order to Zachry Construction Corporation for Bayport Terminal Complex Phase 1A Wharf and Dredging – Wharf Extension | Category G Award | Page 1 of 1 | Minute # |
|---|---|---|---|
| **From (Department or Other Point of Origin):** Engineering Department | **Origination Date:** July 18, 2005 | **Agenda Date:** July 25, 2005 | |
| **Director's Signature:** J. B. Jackson | **Department Affected:** Operations Division | | |
| **For Additional Information Contact:** Steven H. DeWolf Ext. 2466/rj | **Date and Type of Prior Authorizing Commission Action:** Minute 2004-0524-013 Award | | |

**Recommendation: (Summary)** Recommendation for Authority to Execute a Change Order to Zachry Construction Corporation for Bayport Terminal Complex Phase 1A Wharf and Dredging in the Estimated Amount of $12,962,800

| **Amount of Funding:** Estimated $12,962,800 | **Executive Director Signature:** |
|---|---|

**Recommendation:**

By Minute 2004-0524-013, the Port Commission awarded a contract in the estimated amount of $62,485,733 to Zachry Construction Corporation for Bayport Terminal Complex Phase 1A Wharf and Dredging.

The initial contract provides for a 1,660-foot wharf. Projected increases in demand for containerized cargo will require two 1,000-foot berths at terminal opening. Extending the wharf 332 feet under the current contract is feasible and will assure the required berths are available. Construction of the extension can only be conducted within the schedule by the present Wharf and Dredging contractor because of construction structures currently in place which cannot be removed or relocated without adversely affecting on-going wharf construction. Additionally, the current contractor's unique method of construction is the only practicable means of achieving strict emissions requirements for this contract. The contractor has submitted a proposal in the estimated amount of $12,962,800 for the 332 foot wharf extension. The Engineering Department and the Phase 1A Program Manager have reviewed the contractor's proposal and found it to be fair and reasonable.

It is therefore recommended that the Port Commission at its July 25, 2005 meeting authorize a change order in the estimated amount of $12,962,800 to the Zachry Construction Corporation contract for Bayport Terminal Complex Phase 1A Wharf and Dredging and that such action further authorize the Executive Director to do any and all things in his opinion reasonable or necessary to give effect to the foregoing.

Vincent

EXHIBIT NO. 122

10-19-07 JH

006.016.038262

PHA0014992

No. 2006-72970
ZCC EXHIBIT
224

0224.0001

## Change Order to Zachry Construction Corporation for
## Bayport Terminal Complex Phase 1A Wharf and Dredging-Wharf Extension

**Description:** Staff recommends construction of a 332' wharf extension to the current contract. Additional work is necessary because of projected demand for the terminal and anticipated ship size requires two 1,000-berths, and the current contract provides only 1,660 feet of total wharf length. Because of the current construction of the freeze wall and other Zachry construction processes, a wharf extension cannot feasibly be performed by another contractor working concurrently. Additionally, Zachry's method of constructing the wharf in the dry significantly reduced project emissions; construction of the wharf by another contract using typical methods would not reduce emissions to a level that would enable this and subsequent contracts to proceed as scheduled. Estimated cost of the wharf extension is $12,962,800.

**Engineer:** DMJM-Harris, (Non-SBE) $2,233,611

**Action Requested:** Execute a Change Order to Zachry Construction Corp.

**Change Order Estimate:**

| | | |
|---|---|---|
| Original Contract: | $62,485,733.00 | |
| Change Order No. 1: | $ 3,645,320.00 | (Cruise Dredging) |
| Change Order No. 2: | $ 28,111.12 | (Reinforcement) |
| Change Order No. 3: | $ 154,898.82 | (Bull nose) |

# For HTK Only

006.016.038263

PHA0014993

0224.0002

**TAB 25**

**September 9, 2005 Frozen Cutoff Wall Design
(PX10)**


PLAZA 600 BUILDING, 600 STEWART STREET, SUITE 1420, SEATTLE, WA 98101, TELEPHONE: (206) 728-2674, FAX: (206) 728-2732    www.geoengineers.com

| TO: | Larry Applegate – SoilFreeze Technologies<br>Charles Rogers – Zachry Construction | |
| --- | --- | --- |
| FROM: | Daniel Mageau, P.E. – GeoEngineers | No. 2006-72970<br>**ZCC EXHIBIT**<br>**10** |
| DATE: | September 9, 2005 | |
| FILE: | 6700-014-03 | |
| SUBJECT: | Houston Bayport Phase IA Wharf<br>FROZEN SOIL SHORING<br>Draft Cutoff Wall Design | |

GEI Seattle: P:/6700014/02/Memos/Cutoff Wall Design-Draft-9-905.doc

## INTRODUCTION

The purpose of this memo is to present our draft design for a temporary cutoff wall near the middle of the Phase IA wharf for the Houston Bayport project. The cutoff wall will allow Zachry to complete the excavation and construction of the two-third (approximate) of the wharf so that this portion can be ready for the Port in February 2006. The remaining eastern portion, as well as the 330-foot extension, will then be completed after that time with the cutoff wall separating the east and west portions. The cutoff wall will be comprised of a combination of frozen soil and steel sheet piles to provide retention of soil and groundwater during construction and excavation. This wall will then be removed from the final grade up, in the same fashion as the primary frozen soil shoring wall that runs east-west in front of the wharf. However, the wharf deck will cover most of the cutoff wall and therefore, wall removal will need to be accomplished in water by divers after both sides are excavated out. As this design is draft and presented to the construction team for comments, some refinement of the details presented herein may be appropriate. A final version, together with a drafted set of plans will be prepared after comments from the construction team and Port consultants, as appropriate, have been incorporated.

## CUTOFF WALL DESCRIPTION

The cutoff wall will be located perpendicular to the wharf at drilled shaft line no. 59.5 (Station ~81+50), as shown on the attached plan, Figure 1. Zachry has left this portion of the pile caps and decking open to allow access for installing the cutoff wall. After the cutoff sheet piles and freeze pipe system are in place, Zachry will complete the closure section of the decking.

At its deepest point near A-Line, the cutoff wall will need to retain soil and groundwater from the design water level elevation of +8 feet MLLW to the bottom of the excavation (-53 feet Elevation after the keyway is backfilled), for a total free-face height of 61 feet. South of A-Line, the height of the wall will reduce at a rate of 2H:1V, following the final grade of the slope as shown in Figure 2. The south wall will end about 4 inches from the from the H-line piles. The north end will be embedded within the primary frozen soil shoring wall.

The sheet sheets will be AZ26 steel sections driven to depths ranging from about 6 to 15 feet below the bottom of excavation (~9 to 18 feet below the bottom of final grade). The soil in between the two sheets will be frozen using primarily 2 to 3 rows of freeze pipes in the 8-foot-wide wharf area plus additional rows in the wider area between the wharf and the primary frozen soil shoring wall. A detail plan view of the sheet pile

DISCLAIMER: Any electronic form, facsimile or hard copy of the original document (email, text, table, and/or figure), if provided, and any attachments are only a copy of the original document. The original document is stored by GeoEngineers, Inc. and will serve as the official document of record.

ZCC-40-009166

**0010.0001**

sections and the freeze pipe layout for the 8-foot zone is shown in Figure 3. These freeze pipes will extend down to depths of 80 to 100 feet, as shown on Figure 2 to provide additional lateral support and to cut off groundwater within the dense sand layer encountered in borings between about 55 and 75 feet in depth. The top of the frozen ground in between the steel sheets will be at Elevation +8 feet, the same as the primary frozen soil shoring wall. The top of the steel sheets will be at Elevation +9 feet, one foot above the soil inside, to provide a buffer from waves and to contain brine manifold lines. A whaler consisting of a W12x79 section will be attached to the top of the wall. Steel ties located just below the ground surface and spaced at 8 feet on center will be installed through the two sheets and whaler to provide a positive connection of the two sheets at the top. A detail cross section at the top of the wall is shown in Figure 4.

## ENGINEERING ANALYSIS

One of the key elements of this design is to limit the horizontal wall deformation, and therefore deformation of the soil retained behind it, to a small amount such that this movement will not adversely affect the structural integrity of the drilled shafts that support the wharf. A second key element is to limit the growth of the frozen soil such that it does not freeze these same drilled shafts.

We completed dozens of thermal and structural finite-element analyses to evaluate the expected deformation of the frozen soil/sheet pile cutoff wall. To optimize the thermal aspects, we used TEMP/W, a 2D finite element thermal model program. To evaluate the deformation of the wall under various loading conditions, we used both 2D and 3D versions of PLAXIS, a finite element soil/structure model. The 2D TEMP/W and the 2D PLAXIS programs are discussed in more detail in our report for the primary frozen soil shoring wall, dated February 4, 2005. The cutoff wall is a high, wide, stiff structural element that is essentially fixed at each end (the frozen soil shoring wall at the north and the slope at the south). Without the embedment at the wall ends, our 2D analyses indicate that wall horizontal movement after one side is excavated in the dry will likely be excessive. The end effects of this wall can only be evaluated using a 3D model as discussed in a subsequent section.

### THERMAL ANALYSES

We analyzed numerous freeze pipe layouts and brine temperatures using TEMP/W to evaluate the impact on 1) the average temperature of the soil within the steel sheets and 2) the extent of frozen soil into the ground relative to the wharf piles. The two goals are opposite. Colder brine and more freeze pipes freezes the soil colder, which results in stronger and stiffer ground and very small wall movements, however, frozen soil extends outward past the sheets over 5 feet, the approximate distance to the wharf piles, after 3 or 4 months of freezing. Warmer brine and less freeze pipes and limits the extent of frozen ground so that it does not reach the existing wharf piles, however, the frozen soil is less strong and wall movements will increase. Our thermal analyses were completed to optimize the freeze system to satisfy both constraints.

Our analyses indicate that the optimal layout of freeze pipes is as shown approximately on Figure 5. These results from TEMP/W show a close-up view of an 8-foot-wide section of wall beneath the wharf that includes seven freeze pipes, the steel sheet and one of the existing drilled shafts. The overall layout of freeze pipes is shown in Figure 1 and includes freeze pipe locations in the wider zone of the wall north of the wharf. Most of the 8-foot section has 2 rows of freeze pipes spaced at ~4 feet (4.13 feet = 1 per 2 AZ26 sheets) that extend down 80 to 100 feet in depth to cut off groundwater in the dense sand and provide adequate structural stability. Five extra freeze pipes are to be installed as a third row in the highest part of the wall between A and D lines. Our plan is to freeze down the soil in between the freeze pipes as quickly as practical using cold brine in all three rows of freeze pipes. After 2 months or so of freezing, the outside rows will be maintained

0010.0002

to about +20F while the inside row is maintained at -20F. This limits frozen soil growth to more than 1 foot from the wharf piles after 6 months of freeze, as shown in Figure 5. The extent of frozen ground is progressively less with less time of freezing. To accomplish this zoned type of freeze control, SoilFreeze will need to install two separate freezing systems for this wall. The colder freeze section will be applied to those freeze pipes encircled on Figure 1. The single black dots on Figure 1 represent pipes connected to a variable freeze system. The average ground temperature inside the sheet piles is maintained below 20F, even in the warmer freeze section, which is needed to provide sufficient wall stiffness and strength, discussed more in the following section.

Some modification of the brine temperatures will be needed during the project, the extent of which will depend on the specific ground response to freezing. As with the primary wall, ground temperatures will be monitored throughout the process so that we can change the brine temperatures as appropriate to maintain cold temperatures inside the cutoff wall while limiting frozen soil growth outside.

After the first (west) side of the wharf is excavated, the west side of the sheet pile wall will be exposed. At this time it will be necessary to spray the surface of the steel with foam insulation. The insulation is needed to prevent the soil inside the wall from melting when this west side is filled with water.

## PLAXIS STRUCTURAL ANALYSES

The frozen soil temperatures obtained from TEMP/W, discussed above, were used to obtain frozen soil strength and stiffness values for use as input to PLAXIS 3D. The problem is quite complex to model and required nearly 10,000 elements as illustrated in Figure 6, which represents the 3D grid for this analysis. We completed several dozen computers run varying wall geometry, frozen soil strength, sheet pile sections and other variables in order to develop a solution that results in little wall movement and moderate wall thickness and depth. We also performed a series of 2D PLAXIS analyses to evaluate the relationship between wall/soil movement and the impact on the drilled shafts. These 2D analyses indicate that up to about 2 inches of soil deflection near the piles before the onset of plastic hinging. The results of the PLAXIS 3D analyses indicate the maximum horizontal wall movement will be on the order of 1 inch for an eight foot wide wall that utilizes AZ26 sections embedded as shown in Figure 2. This results in a factor of safety against plastic hinging of 2. This deformation estimate is considered to be a conservative estimate because we did not include the positive effect of the numerous concrete piles or the whaler on reducing soil movement in our modeling. Based on these analyses, it is our opinion that the cutoff wall should retain soil and groundwater after excavation on one side is completed with little wall movement which should not impact the existing wharf piles.

The cutoff wall is located in between pile rows 59 and 60, which are 20.5 feet apart. The steel sheets will be located about 5 feet from the wharf piles along these rows. Line B has additional piles so that one of Line B piles is located within the cutoff wall, as seen on Figure 1. To reduce the impact of the cutoff wall on this one pile, we have included a 42" to 48" diameter casing to be installed around the Line B pile before the start of freezing. The purpose of the casing is to protect the Line B pile as the wall moves during excavation. If it was embedded in frozen soil, the very rigid cutoff wall movement may exert undue forces on this pile. The collar will extend to the bottom of the excavation. The annulus between the pile and the casing will be cleaned out by Zachry and air will remain in the annulus throughout the life of the cutoff wall. As the cutoff wall moves laterally the estimated 1 inch during excavation, the Line B pile will remain vertical and untouched by the wall within the zone above the excavation depth.

ZCC-40-009168

Attachments:    Figure 1 – Plan View of Cutoff Wall
                 Figure 2 – Section View of Cutoff Wall
                 Figure 3 – Detail of Freeze Pipes and Sheet Pile Wall
                 Figure 4 – Section Detail near Top of Cutoff Wall
                 Figure 5 – Typical results from TEMP/W Analyses
                 Figure 6 – Grid of PLAXIS 3-D Model

**0010.0004**



PLANVIEW
CUTOFF WALL

FIGURE 1

ZCC-40-009170

**0010.0005**



ELEVATION
VIEW
CUTOFF WALL

FIGURE 2

ZCC-40-009171

0010.0006



DETAILS OF FREEZE PIPES
AND SHEET PILES

SCALE: 1" = 3'

FIGURE 3

ZCC-40-009172

0010.0007



EL. +9'

AZ36

W12×79

WELDED TOP AND BOTTOM

GROUND SURFACE (EL. + 8'F7)

3/4"ø STEEL ROD WITH THREADED ENDS. TIGHTEN NUTS TO PRACTICAL RESISTANCE BY HAND.

← FREEZE PIPES →

SECTION DETAIL NEAR TOP OF CUTOFF WALL

FIGURE 4

SCALE: 1" = 2'


GeoEngineers
Earth Science + Technology

ZCC-40-009173

0010.0008



Description: Houston Wharf - Frozen Soil Wall
Comments: 6700-014-01
File Name: Houston-Divider Wall -Frost Penetration-3 Rows.tez
Last Saved Date: 9/9/2005
Last Saved Time: 2:56:00 PM
Analysis Type: Transient
Analysis View: 2-D

HOUSTON BAYPORT PHASE IA - CUTOFF WALL
FROZEN SOIL GROWTH AFTER 6 MONTHS OF FREEZING
3 Rows of Freeze Pipes
Inside Row Kept @-20F and 2 Outside Rows at +20F after 2 months

FIGURE 5.

ZCC-40-009174

0010.0009

CUTOFF WALL

PRIMARY FROZEN
SOIL WALL

UNFROZEN SOIL
NEAR/IN CHANNEL

Deformed Mesh
Extreme total displacement 54.01*10$^{-3}$ m
(displacements at true scale)

| Project description | | | | Houston - Cutoff Wall - 2m | |
|---|---|---|---|---|---|
| Project name | | Step | Date | User name | |
| 6700-014-03 | | 23 | 09/09/05 | GeoEngineers, Inc. | |

PLAXIS
Finite Element Code for Soil and Rock Analyses
Version 1.1.3.16

FIGURE 6
ZCC-40-009175
0010.0010

**TAB 26**

**Transcript of September 13, 2005**
**Weekly Construction Coordination Meeting**
**(PX274)**

IN THE JUDICIAL DISTRICT COURT OF
HARRIS COUNTY, TEXAS

ZACHRY CONSTRUCTION
CORPORATION,                    )
                                )
          Plaintiff,            )
                                )
v.                              )
                                )
PORT OF HOUSTON                 )      CAUSE NO.
AUTHORITY,                      )      2006-72970
                                )
          Defendant.            )
                                )
                                )
                                )
                                )

Weekly Construction Coordination Meeting

Date:    September 13, 2005

Minutes:  05:00 - 5:34

No. 2006-72970
ZCC EXHIBIT
274


Audio Reporting Transcribed by:

JENNIFER HAYNIE
ALPHA REPORTING CORPORATION
236 Adams Avenue
Memphis, Tennessee 38103
901.523.8974

Proper names and inaudibles or undiscernible testimony was provided Andy Anderson.

Date: September 13, 2005

Minutes: 5:00 - 5:34

(Requested portion of weekly Construction Coordination Meeting.)

ANDY THIESS: All right. The next issue the pile redesign for the cut off wall. I saw that y'all put that in yesterday. So we'll get that sent off to the designers. Jim, do you see any issues if the designers are okay with things? This isn't going to be an approval type thing, it's gonna be a --

JIM MCQUEEN: No. Uh-huh. Just whatever the designer wants.

ANDY THIESS: Okay. So that's in progress. We'll leave that open.

(End of requested portion of Weekly Construction Coordination Meeting.)

**TAB 27**

**Email string between Andy Thiess and Jeff Ely and others
dated September 14, 2005
(PX11)**

**From:** Ely, Jeff/HOU
**Sent:** Wednesday, September 14, 2005 12:26 PM
Johnson, Robert/HOU; Emsley, Laurence/HOU
**ject:** FW: Sub. Item No. 00700-015.0 Cutoff Wall Design

Bob/Laurence:

Forgot to CC you on this.

-----Original Message-----
From: Ely, Jeff/HOU
Sent: Wednesday, September 14, 2005 1:26 PM
To: Thiess, Andrew/HOU
Subject: RE: Sub. Item No. 00700-015.0 Cutoff Wall Design

Andy:

We need to talk about this a little and decide how to proceed. As we talked about last week, this is mostly a geotechnical problem, so I think Geotest should probably take the lead, but I'm not sure if they have any budget available.

The first thing we need to do is verify the freeze wall won't reduce the capacity of the permanent piers. We for sure need Geotest for that.

Jeff


-----Original Message-----
From: Andrew Thiess [mailto:system@constructware.com]
nt: Wednesday, September 14, 2005 10:06 AM
Ely, Jeff/HOU
ject: Sub. Item No. 00700-015.0 Cutoff Wall Design

Jeff,
Please review and coordinate response to this submittal.
We may not need to approve this, but we need due diligence to identify and communicate any technical issues we may have.
Due from designers Sep 28.

No. 2006-72970
ZCC EXHIBIT
**11**



EXHIBIT NO. _189_
11-06-07 JH

CH2MHILL034723

**TAB 28**

**Memorandum dated September 14, 2005 from Port Facilities
Director Jackson to Port Executive Director Kornegay
recommending approval of Change Order 4
(PX3)**

## INTER-OFFICE MEMORANDUM

Date: September 14, 2005
File: 2004-0187

To: Mr. H. T. Kornegay

From: James B. Jackson

Subject: Recommendation for Approval of Change Order No. 4 in the Estimated Amount of $12,962,800 to Zachry Construction Corporation for Bayport Terminal Complex Phase 1A Wharf and Dredging

By Minute 2004-0524-13, the Port Commission awarded a contract in the estimated amount of $62,485,733 to Zachry Construction Corporation (ZCC) for Bayport Terminal Complex Phase 1A Wharf and Dredging.

The initial contract provides for a 1,660-foot wharf. Projected increases in demand for containerized cargo will require two 1,000-foot berths at terminal opening. Extending the wharf 332 feet under the current contract is feasible and will assure the required berths are available. Construction of the extension can only be conducted within the schedule by the present Wharf and Dredging contractor because of construction structures currently in place which cannot be removed or relocated without adversely affecting ongoing wharf construction. Additionally, the current contractor's unique method of construction is the only practicable means of achieving strict emissions requirements for this contract. The contractor has submitted a proposal in the estimated amount of $12,962,800 for the 332-foot wharf extension. The Engineering Department and the Phase 1A Program Manager have reviewed the contractor's proposal and found it to be fair and reasonable.

By Minute 2005-0725-18, the Port Commission authorized the issuance of a change order in the estimated amount of $12,962,800 to Zachry Construction Corporation for the above described changes. Accordingly, please sign the attached change order and return it to the Engineering Department for further handling.



Director of Facilities

JBJ/SHD/MV:rj

Attachment

C: Mr. Andrew Thiess, P.E. – CH2M HILL, Inc.
Mr. Forbes Baker
Mr. James Turner
Mr. Mark Vincent, P.E.
Mr. Jim McQueen, P.E.



No. 2006-72970
**ZCC EXHIBIT**
**3**

Δ π EXHIBIT 654

Deponent_____
1-14-09
Date_____Rptr.____
WWW.DEPOBOOK.COM

005.011.020969

PHA0013572

0003.0001

**TAB 29**

**McQueen email to Thiess dated September 15, 2005
(PX280)**

| | |
|---|---|
| To: | Andrew.Thiess@CH2M.com <Andrew.Thiess@CH2M.com> |
| From: | James McQueen |
| Cc: | 'Robert.Johnson@CH2M.com' <Robert.Johnson@CH2M.com> |
| Bcc: | |
| Received Date: | 2005-09-15 06:42:00 CST |
| Subject: | ZCC SCHEDULE |

ZCC will be paid for july even though they show late and not in accordance w/Extension Agreement. Our management is afraid ZCC will back out of the extension agreement. Do as you do on any schedule you do not agree with Andy.



No. 2006-72970
ZCC EXHIBIT
280

P-Ele006033

**TAB 30**

**Change Order 4
(PX12)**

County Auditor's Form 5107

Harris County, Texas (Rev. 2/91)

# Port of Houston Authority

## Change Order No. 4

| Increase : X | Decrease : | No Change : |
|---|---|---|

To : Zachry Construction Corporation     Contract No. : 2004-0187

Address : 527 Logwood San Antonio, TX 78221-1738     Date : 8/9/05

Subject : Project – Bayport Terminal Complex Phase 1A Wharf and Dredging Contract

Gentlemen :
The change set out below was not contemplated in the subject contract dated___5/24/2004_____, but is necessary for the orderly completion of the project. You are authorized to proceed with the modification on the basis of payment below.

Description of Change :

Construct a 332' wharf extension to the previously specified 1,660' wharf, in accordance with the attached Scope, Time and Price Modifications.

**Basis of Payment :**

Original Contract Amount :    $62,485,733.00 (Est.)

Previous Change Orders :    $3,683,331.12 (Est.)

| Item | Unit | Unit Price | Quantity | Total |
|---|---|---|---|---|
| Perform the above described additional work in accordance with your proposal dated July 11, 2005, for the following consideration: | | | | |
| 1 . Construct 332' of Wharf Extension | NTE | $12,962,800.00 | 1.00 | $12,962,800.00 |

Port Commission Authorization When Applicable :

Minute Number: 2005-0725-18

Total This Change :    $12,962,800.00

New Contract Amount :    $79,131,864.12 (Est.)

Accepted : Zachry Construction Corporation

By:

Date : 08/29/05

Title   Fred Lueck, Vice President

Approvals :

Chief Engineer

Funds are or will be available to meet this Obligation.

Auditor

Purchase Order No. : 88501

Director of Facilities

Bond Fund: CP    Account Number: 379-13310-7723

Managing Director (If Over $5,000)
Executive Director (If Over $10,000)

No. 2006-72970
**ZCC EXHIBIT**
**12**

27 SEP '05 RCVD

Distribution:    Contractor    Auditor    Central File    Engineering File    Accounts Payable    Purchasing    T.Lenoir    Inspector

005.010.019067

PHA0012045

0012.0001

CHANGE ORDER

ROUTING MEMORANDUM

CONTRACTOR:     Zachry Construction Corporation

FILE NUMBER:    2004-0187

PROJECT NAME:   Bayport Terminal Complex Phase 1A Wharf and
                Dredging Contract

CHANGE ORDER NO: 4

     The attached Change Order has been signed by the Contractor and
returned to us for Port Authority Execution. Please follow the
routing order as outlined below by inserting the date on the line
containing your name or initials and passing on to the person listed
in the "TO" column.

*Bobby King*
Contracts Specialist

ROUTING

| DATE | FROM | | TO | |
|------|------|------|------|------|
| | Dept. | Name | Dept. | Name |
| 9/13/05 | Eng. | Bobby King | Eng. | Engineer - MV |
| 9/14/05 | Eng. | Engineer - JCM | Eng. | Secretary - RJ |
| 9/14/05 | Eng. | Secretary - RJ | Eng. | S. H. DeWolf |
| 9-14-05 | Eng. | S. H. DeWolf | Eng. | Secretary RJ |
| 9-15-05 | Eng. | Secretary - RJ | Eng. | Bobby King |
| 9/15/05 | Eng. | Bobby King | Eng. | J. B. Jackson |
| 9/16/05 | Eng. | J. B. Jackson | Eng. | Bobby King |

(IF OVER $10,000, MUST GO TO EXECUTIVE)

| | | | | |
|------|------|------|------|------|
| 9/16/05 | Eng. | Bobby King | Exec. | H.T. KORNEGAY ~~W. M. Battles~~ |
| 9/27/05 | Exec. | H T. KORNEGAY ~~W. M. Battles~~ | Eng. | Bobby King |
| 9/27/05 | Eng. | Bobby King | Auditor | Dick Rhoads |
| 9/27/05 | Auditor | Dick Rhoads | Eng. | Bobby King |
| 9/27/05 | Eng. | S. H. DeWolf | Contractor | |

005.010.019068

PHA0012046

0012.0002

Date: September 14, 2005
File: 2004-0187

To: Mr. H. T. Kornegay

From: James B. Jackson

Subject: **Recommendation for Approval of Change Order No. 4 in the Estimated Amount of $12,962,800 to Zachry Construction Corporation for Bayport Terminal Complex Phase 1A Wharf and Dredging**

By Minute 2004-0524-13, the Port Commission awarded a contract in the estimated amount of $62,485,733 to Zachry Construction Corporation (ZCC) for Bayport Terminal Complex Phase 1A Wharf and Dredging.

The initial contract provides for a 1,660-foot wharf. Projected increases in demand for containerized cargo will require two 1,000-foot berths at terminal opening. Extending the wharf 332 feet under the current contract is feasible and will assure the required berths are available. Construction of the extension can only be conducted within the schedule by the present Wharf and Dredging contractor because of construction structures currently in place which cannot be removed or relocated without adversely affecting ongoing wharf construction. Additionally, the current contractor's unique method of construction is the only practicable means of achieving strict emissions requirements for this contract. The contractor has submitted a proposal in the estimated amount of $12,962,800 for the 332-foot wharf extension. The Engineering Department and the Phase 1A Program Manager have reviewed the contractor's proposal and found it to be fair and reasonable.

By Minute 2005-0725-18, the Port Commission authorized the issuance of a change order in the estimated amount of $12,962,800 to Zachry Construction Corporation for the above described changes. Accordingly, please sign the attached change order and return it to the Engineering Department for further handling.

Director of Facilities

JBJ/SHD/MV:rj

Attachment

C: Mr. Andrew Thiess, P.E. – CH2M HILL, Inc.
Mr. Forbes Baker
Mr. James Turner
Mr. Mark Vincent, P.E.
Mr. Jim McQueen, P.E.

005.010.019069

PHA0012047

0012.0003

**SCOPE, TIME, AND PRICE MODIFICATIONS
TO SPECIFICATIONS AND PROPOSAL
Bayport Phase 1A Wharf and Dredging Contract**

**PORT OF HOUSTON AUTHORITY
P. O. Box 2562
Houston, Texas 77252-2562**

Pursuant to Texas Education Code § 44.039 (f), options for a scope or time modification and any price change associated with the modification were discussed by the PHA and Contractor. As a result of negotiation, the following scope, time, and price modifications were made to Proposer's Specifications and Proposal dated April 13, 2005, as amended by Proposals for 330 feet Wharf Extension and as further amended by Proposer's Supplemental Proposal dated July 11, 2005 except Ditch K construction will not be part of this agreement.

1. Contractor shall construct 332 linear feet of Wharf utilizing the same construction methods outlined in the original 1,660 linear feet of wharf, for a total price of $12,962,800.

2. The Proposal price includes incorporation of change orders, RFI's to the original 1,660 linear feet of wharf incorporated through July 25, 2005.

3. PHA will furnish pile depths not later than August 12, 2005. PHA shall furnish remaining wharf design documents by November 25, 2005.

4. Change order includes construction of an additional 332 linear feet of chain link fencing with three-strand anti-climb bars installed and a drainage swell at the East end of the wharf extension to connect to the existing drainage, for an inclusive cost not to exceed $15,500.

5. The basis of drilled shaft construction is 21,266.5 linear feet of drilled shafts at a unit cost of $82/LF for a total cost not to exceed $1,743,853, included in the change order price. Adjustments to shaft length will be made at a rate of $82 per linear foot of increased shaft length or cost reduction of $43 per linear foot of shaft length reduction.

6. The 332-feet Wharf Extension Construction and all other components of the contract shall be completed by July 15, 2006. The interim completion date to accommodate the ship-to-shore crane arrival, as per the original contract is revised to February 15, 2006, and the length of wharf available at that time is changed to 850 linear feet, along with associated dredging to receive the crane transport vessel. The February 15, 2005 milestone completion date requires that the permanent power components as described in the contract documents be provided for the Ship to Shore Cranes. The original 1660 linear feet of wharf main deck and drilled piers shall be completed by June 1, 2006.

7. The contractor's proposal originally assumed only 80,000 cubic yards of dredge material. The dredge quantity was revised from 80,000 to 110,000 cubic yards based upon actual survey. The Contractor will dredge and place 110,000 cubic yards of material in designated disposal areas at a rate of $13.15/cubic yard, for an increase of $1,446,500 inclusive in the change order price. Any quantity dredged short of the base quantity of 110,000 cubic yards, the remaining balance of the yardage to equal 110,000 cubic yards shall be paid to ZCC at a rate of $ 0.54 per cubic yard, this equals a credit to POHA at a rate of $12.61 per cubic yard on the under dredge quantity. Any quantity dredged in excess of 110,000 cubic yards will be paid at the unit rate of $13.15 / cy.

8. The contractor will pay for all Construction Management Services to support the contractors work on the wharf extension change outside the work days as defined in General Condition 5.03.

9. The Contractor shall construct the 332-feet wharf extension using similar methods employed in the original contract with the effect of minimizing General Conformity emissions. Contractor shall be constrained to the General Conformity emissions, as documented by the PHA Emissions Calculator, as follows:

**Quarterly Summary**

**Emissions (tons)**

**Scope, Time, and Price Modifications
to Specifications and Proposal
(August 1, 2002)**

005.010.019070

PHA0012048

0012.0004

| | Q1 | Q2 | Q3 | Q4 | Q5 | Q6 | Q7 | Q8 | Q9 |
|---|---|---|---|---|---|---|---|---|---|
| Dredging | 0.00 | 2.25 | 3.27 | 4.88 | 2.17 | 3.03 | 2.73 | 2.73 | 1.71 |
| Wharf Construction | 0.03 | 0.13 | 0.19 | 0.49 | 0.63 | 0.63 | 0.63 | 0.63 | 0.44 |
| Backlands | 0.00 | 0.09 | 1.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total | 0.03 | 2.47 | 4.61 | 5.37 | 2.80 | 3.66 | 3.36 | 3.36 | 2.15 |
| | | | | | | | | | |
| Rolling 4 Qtrs | 0.03 | 2.50 | 7.11 | 12.48 | 15.25 | 16.44 | 15.19 | 13.18 | 12.53 |

**Annual Summary (tons per year)**

| Project Year | Dredging | Wharf | Backlands | Total |
|---|---|---|---|---|
| Year 1 | 10.40 | 0.84 | 1.24 | 12.48 |
| Year 2 | 10.66 | 2.52 | 0.00 | 13.18 |
| Year 3 | 1.71 | 0.44 | 0.00 | 2.15 |
| Year 4 | 0.00 | 0.00 | 0.00 | 0.00 |
| Year 5 | 0.00 | 0.00 | 0.00 | 0.00 |
| Year 6 | 0.00 | 0.00 | 0.00 | 0.00 |
| Year 7 | 0.00 | 0.00 | 0.00 | 0.00 |
| Year 8 | 0.00 | 0.00 | 0.00 | 0.00 |

10. The all contract provisions and instructions remain in effect except as changed herein.

Zachry Construction Corporation
Typed Name of Proposer

Signature

Fred Lueck
Typed Name of Signator

Vice President
Typed Title of Signator

08/29/05
Date

**If Proposer is a Corporation:**

Attest: 
Signature of Corporate Secretary

Jaclyn M. Golson, Assistant Secretary
Typed Name of Corporate Secretary

**Scope, Time, and Price Modifications
to Specifications and Proposal
(August 1, 2002)**

005.010.019071

PHA0012049

0012.0005

Witness: ____N/A_____
                    Signature of Witness

____N/A_____
Typed Name of Witness

APPROVED AS TO CONTENT:                    **PORT OF HOUSTON AUTHORITY**

_____               _____
Director of Facilities                     Executive Director

**APPROVED AS TO FORM:**

_____
Port Authority Counsel

**Scope, Time, and Price Modifications
to Specifications and Proposal
(August 1, 2002)**

005.010.019072

PHA0012050

0012.0006

**TAB 31**

**Mageau Report on Effect of Freezing and Thawing of Cutoff Wall
on Drilled Shafts dated September 28, 2005
(PX14)**

 **GeoEngineers**

PLAZA 600 BUILDING, 600 STEWART STREET, SUITE 1420, SEATTLE, WA 98101, TELEPHONE: (206) 728-2674, FAX: (206) 728-2732    www.geoengineers.com

| **TO:** | Larry Applegate – SoilFreeze Technologies |
| | Andy Thiess – CH2M-Hill |
| **FROM:** | Daniel Mageau, P.E. – GeoEngineers |
| **DATE:** | September 28, 2005 |
| **FILE:** | 6700-014-03 |
| **SUBJECT:** | Houston Bayport Phase 1A Wharf |
| | **FROZEN SOIL SHORING** |
| | Effect of Freezing and Thawing of Cutoff Wall on Drilled Shafts |

No. 2006-72970
**ZCC EXHIBIT**
**14**

GEI Seattle: P:/6700014/03Memos/Cutoff Wall – Freeze-Thaw-9-28-05.doc

We ran a number of finite element analyses using 2-dimensional and 3-dimensional PLAXIS computer runs to evaluate the potential impact of strength reduction in the soil around the drilled shafts after the ground thaws out. Using the design load (250 tons) and shaft embedment shown on DMJM Harris drawings and the unfrozen soil strength data presented in Geotest's report, we had the program calculate the shaft settlement and factor of safety (FS) for 4 cases: 1) no soil strength reduction (current condition), 2) 10% strength reduction, 3) 20% strength reduction and 4) 30% strength reduction. Keep in mind that the shafts extend below the bottom of the freezing, so the lower portion will not be impacted at all by freezing. **To be conservative we assumed that the entire soil mass around the shaft between final slope grade and the 100-foot depth was frozen and then thawed, not just up to 1 foot away as shown in our submittal.**

The results are as follows:

| CASE | FS | Settlement at Design Load |
|------|----|----|
| 1. No reduction in soil strength | 3.2 | 0.14" |
| 2. 10% reduction in soil strength | 3.1 | 0.15" |
| 3. 20% reduction in soil strength | 2.9 | 0.16" |
| 4. 30% reduction in soil strength | 2.5 | 0.17" |

I also calculated the average unfrozen and thawed strength of the clay soil from the Houston Bayport project from the data presented in our 2/25/05 soils report. As it turns out the average unfrozen compressive strength (no freezing) from a total of 3 tests is ~7 ksf while the average thawed strength for the same samples is ~9 ksf, which indicates an increase instead of a decrease in strength due to freezing and thawing. This probably isn't real and is likely due to the natural scatter in soil properties. I would expect that we would see some minor reduction in the average strength after thawing if we completed lots more of the same type of tests. A good article was written about affect of freeze-thaw on strength of soil by Graham and Au in 1985. From many tests, they found that the strength reduction of silt (very similar to our clay) is about 30% after 5 freeze-thaw cycles. Unfortunately, they did not do a test after just one freeze-thaw cycle (like we will have at this project) which should show a higher strength than soil exposed to 5 freeze-thaw cycles. After talking with Dave Sego, other researchers have found similar results. We also have dense sand at depth. The effect of freeze-thaw on the strength of sand is typically less than on clay because of the fact that the sand generally does not develop much ice formation. Based on all this information, we may see no more than about a 10% to 15% reduction in overall strength for the Houston Bayport soil, in my opinion.

Assuming a conservative 15% strength reduction in the soil after thawing and considering the results from PLAXIS shown above, it appears that even if we freeze all the soil around the drilled shafts (not just up to 1 foot away) we will only see a minor reduction in the factor of safety (3.2 to 3.0) and virtually no increase in shaft settlement. From this information, it looks to me as if we really don't need to worry too much about freezing the soil around the shafts.

DISCLAIMER: Any electronic form, facsimile or hard copy of the original document (e̶...........) , if provided, and any attachments are only a copy of the original document. The original document is ............... and will serve as the official document of record.

*Thiess*

EXHIBIT NO. 191
11-06-07 JH

P-Fle015421

0014.0001

Memorandum to Larry Applegate(SoilFreeze) and Charles Rogers (Zachry)
September 9, 2005
Page 2

P-Fle015422

**TAB 32**

**McQueen email to Ely dated October 10, 2005
(PX1)**

| From: | James McQueen |
|---|---|
| Sent: | Monday, October 10, 2005 03:35 PM |
| To: | Ely, Jeff/HOU |
| CC: | Johnson, Robert/HOU; Thiess, Andrew/HOU |
| Subject: | RE: Proposal |

The cut off wall was rejected. We are hoping ZCC comes up w/an alternate method. The fact is everyone knew that ZCC was proposing a freeze cut off wall that included one pile. True we did not know about the possibility of freezing more than one pile. That hard cold fact is we might have a liability in a change? I do not expect an approval or rejection from Geotest since the PHA has no one w/this experience. I would hope for a review that says designer of freeze wall assumptions appear to be reasonable. Then I would have something to take to Steve. Mark is insisting in DMJM involvement which I do not understand what I can expect from DMJM. You know DMJM more than I do. What can I expect?

**From:** Jeff.Ely@CH2M.com [mailto:Jeff.Ely@CH2M.com]
**Sent:** Monday, October 10, 2005 4:16 PM
**To:** James McQueen
**Cc:** Robert.Johnson@CH2M.com
**Subject:** RE: Proposal

Jim:

Regardless of Geotest's proposal, which seems reasonable to me, I'm still concerned that in the end we will get a "maybe" response with a list of qualifications rather than an "approved" or "rejected" response. To me it seems prudent to start preparing for the possibility that the cut off wall proposal may not be approved. Perhaps we should raise this in our weekly meeting with ZCC tomorrow?

Jeff

**From:** James McQueen [mailto:jmcqueen@poha.com]
**Sent:** Monday, October 10, 2005 3:58 PM
**To:** Ely, Jeff/HOU
**Subject:** RE: Proposal

I agree. 2% is reasonable.
Thanks

**From:** Jeff.Ely@CH2M.com [mailto:Jeff.Ely@CH2M.com]
**Sent:** Monday, October 10, 2005 3:11 PM
**To:** James McQueen
**Cc:** Robert.Johnson@CH2M.com; Mark Vincent
**Subject:** RE: Proposal

No. 2006-72970
**ZCC EXHIBIT**
**1**

Jim:

Attached are Geotest's rates from their 1999 contract. The 2001 proposal for load testing did not include a rate schedule. Geotest's current proposal is also attached for your convenience. Please note the following



Vincent
EXHIBIT NO. 133
10-19-07 JH

CH2MHILL031065

0001.0001

rates:

| Classification | 2005 Rate | 1999 Rate |
|---|---|---|
| Principal | 143 | 120 |
| Project Manager | 120 | 100 |
| Support Staff | 25 | 35 |

Composite rate based on hours submitted:

2005: $113.00/hr
1999: $101.67/hr

Based on a six year elapsed period, this boils down to a yearly escalation rate of less than 2%, which seems reasonable.

Jeff

---

**From:** James McQueen [mailto:jmcqueen@poha.com]
**Sent:** Monday, October 10, 2005 9:48 AM
**To:** vgryder@geotesteng.com; Ely, Jeff/HOU
**Cc:** Johnson, Robert/HOU; Mark Vincent
**Subject:** RE: Proposal

The proposal appears fair and reasonable. Jeff please confirm that the hourly rates are as agreed and lets get going.
Jeff please keep DMJM in the loop as Mark wants to make sure they are informed.
Thanks

---

**From:** Vicki Gryder [mailto:vgryder@geotesteng.com]
**Sent:** Friday, October 07, 2005 8:33 AM
**To:** James McQueen
**Subject:** Proposal

Jim,

Per the voice mail I left you, I am attaching the proposal from Dr. Vijay. Please feel free to call him with any questions.

Thanks.

**Vicki Gryder**
Executive Assistant
**Geotest Engineering, Inc.**
5600 Bintliff Drive
Houston, Texas
Tel:    (713) 266-0588
Fax:    (713) 266-2977
e-mail:  vgryder@geotesteng.com

CH2MHILL031066

--
No virus found in this outgoing message.
Checked by AVG Anti-Virus.
Version: 7.0.344 / Virus Database: 267.11.10/119 - Release Date: 10/4/2005

CH2MHILL031067



Zachry's "Plan B" Completion Date was a Moving Target

PIF's Hearing Exhibit 1

Graphic 0110.04

**Sydney Ballesteros**

From: Sydney Ballesteros
Sent: Wednesday, December 09, 2009 7:48 AM
To: 'Lawrence Fossi'
Cc: Sims, Bill; White, Karen; zzz_Brandon Allen
Subject: RE: One more

Thanks Larry.

Abiassi intends to testify that the Aug. 2006 breach in sections 4-6 was not planned; I'm not sure what you are comparing the exc. types demonstrative to, but this is intended to be a general conceptual representation of those areas and Mr. Abiassi can testify as to the general area of B1 as he is familiar with it from personal experience; yes, the Kiewit photos are intended as part of background on Abiassi's work experience -- we are not claiming that these are like the bayport project (although obviously there may be components of the work on these projects such as excavation, berms, sheet pile walls etc. that were part of these jobs that Abiassi has experience with).

As to the animations -- these are based on the Draper model as I understand it. As Draper has not yet testified, we will not offer these demonstratives with Abiassi.

-----Original Message-----
From: Lawrence Fossi [mailto:lfossi@fossijewell.com]
Sent: Wednesday, December 09, 2009 5:27 AM
To: Sydney Ballesteros
Cc: Scott D. Morgan; Sims, Bill; White, Karen
Subject: RE: One more

Answers:

Crick 1 -- OK
Crick 2 -- OK
Crick 3 -- OK
Mow -- OK
Mow-2 -- OK
Mow-3 -- OK
Hydro -- OK
Hydro-2 -- OK
Hydro-3 -- OK
jet -- OK
jet-2 -- OK
Rev -- OK
Rev 2 -- OK
Flood -- OK


PLAINTIFF'S
EXHIBIT
1
Hearing

1

Flood 2 -- Not OK, but will be if you make clear that the flood happened accidentally, overnight

Extypes -- B1 shape is odd & does not resemble other drawings. probably OK but tell us where it's coming from

Underdeck (photo) -- OK

Cricket (photo) -- OK

Ab -- OK*

Ab-2 -- OK*

Ab-3 -- OK*

Ab-4 -- OK*

[*We assume these are to build up Mr. Abiassi with some prior Kiewit projects. If there is to be a claim that these projects are like Bayport, let us know about that as it may pose an issue.]

We have problems with the two movies (excavation and revetment). they lack any predicate. What schedules or testimony will support these before they are played?

---

**From:** Sydney Ballesteros [mailto:sballesteros@gibbsbruns.com]
**Sent:** Tuesday, December 08, 2009 7:55 AM
**To:** Lawrence Fossi
**Cc:** Scott D. Morgan
**Subject:** RE: One more

I'm having Scott bring the two new exhibits I sent you to the courthouse so you can look at them. I'm also having him provide you copies of our demonstratives for Abiassi in hard copy form with the two graphics on a flash drive.

-----Original Message-----
**From:** Lawrence Fossi [mailto:lfossi@fossijewell.com]
**Sent:** Tuesday, December 08, 2009 7:51 AM
**To:** Sydney Ballesteros
**Subject:** Re: One more

Oddly, I didn't get the email (or more likely managed to delete it). Let me have scott run it for me this a.m. thnx

Sent via BlackBerry from T-Mobile

---

**From:** Sydney Ballesteros <sballesteros@gibbsbruns.com>
**Date:** Tue, 8 Dec 2009 07:38:23 -0600
**To:** Lawrence Fossi<lfossi@fossijewell.com>; Scott D. Morgan<smorgan@gibbsbruns.com>; Mike Absmeier<mabsmeier@gibbsbruns.com>; Sims,Bill<bsims@velaw.com>; Gray, Holly<hgray@velaw.com>
**Cc:** Robin C. Gibbs<rgibbs@gibbsbruns.com>; zzz_Brandon Allen<ballen@reynoldsfrizzell.com>; mgreer@trialgraphix.com<mgreer@trialgraphix.com>

2

**Subject:** RE: One more

Larry,

There are two animations in Abiassi's demonstratives that I emailed you. We will provide you those on a disc this morning.

-----Original Message-----
**From:** Lawrence Fossi [mailto:lfossi@fossijewell.com]
**Sent:** Tuesday, December 08, 2009 7:21 AM
**To:** Scott D. Morgan; Mike Absmeier; Sims, Bill; Gray, Holly
**Cc:** Robin C. Gibbs; zzz_Brandon Allen; Sydney Ballesteros; mgreer@trialgraphix.com
**Subject:** RE: One more

Scott, I'm in overwhelm with all the new stuff. print hard copies if you would & bring to court & we'll let you know.

are there movies in the Abiassi stuff, or just hard prints?

also, need a response on DX 590-594

---

**From:** Scott D. Morgan [mailto:smorgan@gibbsbruns.com]
**Sent:** Tuesday, December 08, 2009 7:12 AM
**To:** Mike Absmeier; Sims, Bill; Lawrence Fossi; Gray, Holly
**Cc:** Robin C. Gibbs; zzz_Brandon Allen; Sydney Ballesteros; mgreer@trialgraphix.com
**Subject:** RE: One more

-----Original Message-----
**From:** Mike Absmeier
**Sent:** Monday, December 07, 2009 5:44 PM
**To:** Sims, Bill; 'Lawrence Fossi'
**Cc:** Robin C. Gibbs; zzz_Brandon Allen; Sydney Ballesteros; Scott D. Morgan
**Subject:** One more

Bill/Larry,

We would also propose adding Depo Ex. 115 as a new trial exhibit (I don't believe it's currently in evidence). This would be PX 937. Any objection?

Thanks,

Mike

3

**TAB 33**

**The Port's October 11, 2005 Response to Zachry's
September 9, 2005 Frozen Cutoff Wall Design
(PX266)**



## Submittal Item

| | | |
|---|---|---|
| **Project** | [C70-1A-D01] - Bayport Ph. 1A - Wharf and Dredging | **View Date** 4/28/2006 |
| **Wharf and Dredging** | C70-1A-D01 | |

Nathelyne A. Kennedy & Assoc.
6100 Hillcroft
Suite 710
Houston, TX 77081
Phone: (713) 988-0145

**Submittal Item No.** 00700-015

### General Information

| | | | | |
|---|---|---|---|---|
| **Item No.** | 00700-015 | **Revision** | | 0 |
| **Package No. Rev.** | 00700.0 | | | |
| **Description** | Cutoff Wall Design | | | |
| **CSI Code** | 00700 – General Conditions | **Submitting Company** | | Zachry Construction Corporation |
| **Reference No.** | | **Copies Required** | | |
| **Status** | Returned | **Item Type** | | |
| **Responsible Team Member** | David Griffin (Zachry Construction Corporation) | | | |

**Item Notes** During the proposal for the 332 ft wharf extension, the cutoff wall concept was presented as affecting one "B" row pile that would have to be encased in steel to prevent movement of the pile. ZCC's submittal for the cutoff wall, however, indicates freezing of soil as close as one foot from as many as 14 piles, which is inside the zone of soil that has structural impact on the friction resistance of the piles. However, preliminary indications are that the design may have an indeterminate affect on a significant number of nearby shafts which may present unacceptable risk to the Port of Houston.

Contractor must present alternative cutoff wall design, such as a cellular sheet pile wall or grout wall, that provides the desired cutoff effect with less risk to the structural integrity of the wharf. Or the contractor may present the Port of Houston with an alternate means of mitigating risk to the structural integrity of the wharf.

**Primary Response** Revise and Resubmit

**Submission Notes**

### Dates

| | | |
|---|---|---|
| **Material Required on Site** | **Required Lead Time (days)** | |
| **Approved Submittal Required By** | **Required Review Time (days)** 20 |  |
| **Submission Due** | | |

### Linked Documents

| Document Type | Document | Open | Description | Date |
|---|---|---|---|---|
| Doc | C70-1A-D01-01636 | 🖾 🖳 | Draft Cutoff Wall Design-9-9-05 | 9/12/2005 |



No. 2006-72970
**ZCC EXHIBIT**
**266**

ZCC-EXP-0000073

0266.0001

**Distribution**

| Recipient | Company | Method | Date |
|---|---|---|---|
| Charles Rogers | Zachry Construction Corporation | Email: rogersc@zachry.com | 10/11/2005 |
| David Griffin | Zachry Construction Corporation | Email: griffindg@zachry.com | 10/11/2005 |
| David Griffin | Zachry Construction Corporation | Message | 10/11/2005 |
| Jeff Ely | CH2M HILL | Email: jely1@ch2m.com | 9/14/2005 |
| Jeff Ely | CH2M HILL | Message | 9/14/2005 |
| Rich Klassen | Zachry Construction Corporation | Message | 10/11/2005 |
| Rich Klassen | Zachry Construction Corporation | Email: andersonhe@zachry.com | 10/11/2005 |

ZCC-EXP-0000074

0266.0002

**TAB 34**

**Transcript of October 11, 2005
Weekly Construction Coordination Meeting
(PX314)**

IN THE JUDICIAL DISTRICT COURT OF
HARRIS COUNTY, TEXAS

ZACHRY CONSTRUCTION
CORPORATION,          )
                      )
        Plaintiff,    )
                      )
v.                    )
                      )
PORT OF HOUSTON       )      CAUSE NO.
AUTHORITY,            )      2006-72970
                      )
        Defendant.    )
                      )
                      )
                      )
                      )



Weekly Construction Coordination Meeting

Date:    October 11, 2005

Minutes:  08:40 - 13:29

No. 2006-72970
ZCC EXHIBIT
314

Audio Reporting Transcribed by:

JENNIFER HAYNIE
ALPHA REPORTING CORPORATION
236 Adams Avenue
Memphis, Tennessee  38103
901.523.8974


Proper names and inaudibles or undiscernible testimony was provided Andy Anderson.

Date:   October 11, 2005

Minutes: 8:40 - 13:29

(Requested portion of Weekly Construction Coordination Meeting.)

ANDY THIESS:  Then the pile redesign for the cut off wall.  Here we go.  You got it.  Gave you a response.  You have it in your hand.

ANDY ANDERSON:  Yeah.  Now, the answer to this it says that the contractor -- first of all, this says "no, resubmit."  All right.  There's a number of avenues to go here.  Number one, they ask for an alternative cutoff such as a cellular sheet pile wall.  There is a cellular sheet pile wall between the freeze pipe and the piles.  That's the cut off wall.  That's the structure.

ANDY THIESS:  I understand.

ANDY ANDERSON:  I don't think they understand.

ANDY THIESS:  No.  They understand.

ANDY ANDERSON:  Well, then what are they talking about?  The freeze pipes are contained within the sheet pile wall.

ANDY THIESS:  They're talking about

a cellular meaning like a honeycomb structure.

Some sort of structural sheet pile wall.

ANDY ANDERSON: Okay. Now, we get it.

JOHN GLASGOW: Then we don't have to freeze it.

ANDY THIESS: Correct.

JIM MCQUEEN: Yeah. Yeah. That's the concern.

ANDY THIESS: Or slurry or soil cement or any other -- any other method of putting in this wall that is not such a high risk to the structure.

JOHN GLASGOW: Dan Mageau was supposed to be here today, right?

CHARLES RODGERS: Tomorrow.

JOHN GLASGOW Tomorrow. And Corey was going to bring that up with him and see if it will fly.

ANDY ANDERSON: We will look at it, but two things. Number one, if we want to accept the risk. It's not -- it's not a submittal. It is for information purposes only, okay, and number two, our price is predicated on current construction methods and that was clearly

defined. Now, chances are based on the price of this goddamn cut off wall you know, we can design something and stay within the parameters of what we got.

ANDY THIESS: That's all the Port's asking for.

ANDY ANDERSON: And we will look at that, and we need to look at it very, very quickly.

ANDY THIESS: But I think if y'all design something alternate, if it can be done, it will be real easy --

JIM MCQUEEN: I want you to understand the spirit of this whole thing is that we -- the problem is that it jeopardizes some footings on either side, piers on either side.

There's a possibility of that, okay, and there's a risk. We know that you guys are taking that, but we're not -- we're not necessarily sure that we want you to take that. There's a lot of concern and we're not rejecting it all together as we're not going to do it. We're still throwing money at evaluation, but we would like to know if there's another alternative.

ANDY ANDERSON: We'll look at it. I half way looked at a bin wall early on in this, but to be quite honest with you, I looked at a bin wall for replacement of the freeze wall itself. Not the cut off wall. The problem was in the freeze wall was that the soil has no ability to handle the stress of the bin wall. It would just collapse.

Now, the cut off wall is something a little something different, you know, and I need to look at that. The problem I see with that is we still have to design it so that it runs between the piles and does not encase the pile row because I'm worried about the lateral movement of the wall when pressure is relived on one side and I don't want to side load these piles.

At any rate, a semicircular cell possibly could work. Now I have to, you fucking ruined my whole afternoon, now I'll have to sit down and...

JIM MCQUEEN: Because we heard you were out playing golf.

ANDY ANDERSON: That's tomorrow. But we'll look at it and see what we can do on it, but I want to caution -- the designers need to understand that this is not a submittal that

requires approval, and we are working with you and we'll come up with something else.

JIM MCQUEEN: We understand, or at least I understand, and the latter part too, the cost issue.

ANDY ANDERSON: I do not want to have to have to readdress that issue.

JIM MCQUEEN: I'm not -- no one in our... but we just want you to look.

ANDY ANDERSON: I will look at it very hard. Luckily Mageau is going to be here tomorrow so we may actually be able get something resolved quickly. He's going to be here.

ANDY THIESS: All right.

(End of requested portion of Weekly Construction Coordination meeting.)

**TAB 35**

**Thiess email to Ely dated November 13, 2005
(PX2)**

**From:** Thiess, Andrew/HOU
**Sent:** Sunday, November 13, 2005 06:14 PM
**To:** Ely, Jeff/HOU
**Subject:** RE: cutoff_wall_response.doc

Jeff,

For business risk purposes you might state that during negotiations for the 332 ft extension, we anticipated it being designed according to the criteria of the original freeze wall. Based on designer input prior to design of the original freeze wall, it was expected that the cutoff wall would be designed in a way to avoid compromising any piers by freezing, except for one pier in Row B that was identified by ZCC beforehand. The original freeze wall design accomodated a 6 foot setback from the nearest piers as requested by the designers. Potential freezing of piers resulting in loss of load capacity is the basis for PHA concerns regarding the cutoff wall design. These concerns have not been adequately addressed in the cutoff wall submittal.

I think it would be a good idea to include this in your memo. Zachry has implied that they believe our review and rejection of the cutoff wall design is a breach of their change order contract, as they told us there would be a cutoff wall. They believe this gives them a claim for time. We need to make the point that we anticipated it being designed according to the criteria of the original freezed wall. Otherwise we will have to state this separately in another letter.

**From:** Ely, Jeff/HOU
**Sent:** Friday, November 11, 2005 2:49 PM
**To:** James McQueen; Mark Vincent; Farhat, Jerry; Thiess, Andrew/HOU; Johnson, Robert/HOU
**Cc:** Emsley, Laurence/HOU
**Subject:** cutoff_wall_response.doc

All:

Please provide any comments by COB Monday, November 14. I will send this out first thing Tuesday.

Jeff

No. 2006-72970
**ZCC EXHIBIT**
**2**



Vincent
EXHIBIT NO. 134
10-19-07 JH

CH2MHILL029619

0002.0001

**TAB 36**

**Email string between McQueen, Thiess, Ely, and others
dated March 21, 22, and 28, 2007
(PX504)**

**From:** James McQueen
**Sent:** Wednesday, March 28, 2007 07:26 AM
**To:** Andy Thiess; Ely, Jeff/HOU
**CC:** Gene Norman
**Subject:** RE: Phase 1A Dbl Wal

I discussed w/Jeff and he daid settlement of 1" was nothing to be alarmed about, I just believe it is in PHA best interest to monitor.

Jim McQueen, P.E.
Project Manager
Port of Houston Authority
(713) 670-2837
FAX (713) 670-2837
jmcqueen@poha.com
First in Foreign Tonnage

CONFIDENTIAL COMMUNICATION

This message and attached materials are for the use of the addressee above and may contain confidential information. Please do not disseminate, distribute, or copy this message unless you are the addressee. If you receive this message in error, please immediately notify the sender by replying to this message by phone at (713) 670-2837. Thank you.

---

**From:** Andy Thiess
**Sent:** Wednesday, March 28, 2007 8:24 AM
**To:** Jeff.Ely@ch2m.com; James McQueen
**Cc:** Gene Norman
**Subject:** RE: Phase 1A Dbl Wal

My understanding from earlier "affect of freeze wall discussions" was the entire wharf was anticipated to sink a bit as it initially settled.

**Andrew W. Thiess, PE, PMP**
*Port of Houston Authority*
http://www.portofhouston.com
*832-250-2899 cell*
*713-670-2442 ofc*
*713-670-2448 fax*
*athiess@poha.com*
*The Port Delivers the Goods*
CONFIDENTIAL COMMUNICATION
This message and attached materials are for the use of the addressee above and may contain confidential information. Please do not disseminate, distribute, or copy this message unless you are the addressee. If you received this message in error, please immediately notify the sender by replying to this message or by telephone at (713) 670-2442. Thank you.

---

**From:** Jeff.Ely@ch2m.com [mailto:Jeff.Ely@ch2m.com]
**Sent:** Thursday, March 22, 2007 2:26 PM
**To:** James McQueen
**Cc:** Gene Norman; Andy Thiess



No. 2006-72970
ZCC EXHIBIT
**504**

CH2MHILL030890

**Subject:** RE: Phase 1A Dbl Wal

Jim:

Can someone give me a little more detail; I'm not quite sure where these pictures are taken. However, the doublewal settling 1" or so doesn't seem like a problem to me.

jeff

---

**From:** James McQueen [mailto:jmcqueen@poha.com]
**Sent:** Wednesday, March 21, 2007 4:57 PM
**To:** Gene Norman; Andy Thiess; Ely, Jeff/HOU
**Subject:** FW: Phase 1A Dbl Wal

Gene can you mark measuring locations on the pavement and lets watch for a while. Andy I believe we need to notify ZCC but we would not want them doing anything yet until we know a little more?
Jeff you have any other thoughts?

Jim McQueen, P.E.
Project Manager
Port of Houston Authority
(713) 670-2837
FAX (713) 670-2837
jmcqueen@poha.com
First in Foreign Tonnage

CONFIDENTIAL COMMUNICATION

This message and attached materials are for the use of the addressee above and may contain confidential information. Please do not disseminate, distribute, or copy this message unless you are the addressee. If you receive this message in error, please immediately notify the sender by replying to this message by phone at (713) 670-2837. Thank you.

---

**From:** Gene Norman
**Sent:** Wednesday, March 21, 2007 1:46 PM
**To:** James McQueen
**Subject:** Phase 1A Dbl Wal

Jim,
Please see attached photos. Pictures were taken between H-line & Dbl Wal foundation slabs. It appears to have settled in some areas as much as 1".

CH2MHILL030891

0504.0002

**TAB 37**

**Management Services Agreement
(PX643)**

# MANAGEMENT SERVICES AGREEMENT

This Management Services Agreement ("**Agreement**") is entered into effective as of January 1, 2008 (the "**Effective Date**") by and between ZACHRY INDUSTRIAL, INC., a Delaware corporation, formerly known as Zachry Construction Corporation ("**Zachry**"), and ZACHRY CONSTRUCTION CORPORATION, a Delaware corporation ("**Manager**"). Zachry and Manager may be referred to in this Agreement collectively as the "**Parties**" and individually as a "**Party**."

## RECITALS

A.    Prior to the Effective Date, Zachry had entered into the construction agreements and associated documentation for certain heavy construction and building construction projects, as described on Exhibit "A" attached hereto (the "**Construction Contracts**" or individually a "**Construction Contract**").

B.    On the Effective Date various personnel, equipment and other assets associated with Zachry's former heavy construction division and building construction division were transferred by Zachry to Manager as part of a corporate restructuring of Zachry along industry segment lines ("**Corporate Restructuring**").

C.    The Construction Contracts were not and have not been assigned or transferred to Manager; and Zachry remains fully liable under the Construction Contracts in accordance with their terms.

D.    In conjunction with the Corporate Restructuring, Manager agreed to act as manager for Zachry with respect to the administration, management and performance of the Construction Contracts, each of which were associated with heavy construction and building construction industry segments that were transferred to Manager.

E.    Manager is experienced in the business of construction management and administration, particularly with respect to the type of heavy construction contracts represented by the Construction Contracts.

F.    Zachry and Manager desire to memorialize the terms upon which Manager agrees to provide certain management services with respect to performing Zachry's obligations and work under the Construction Contracts.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Zachry and Manager agree as follows:

No. 2006-72970
ZCC EXHIBIT
**643**

ZCC-40-137656

0643.0001

# ARTICLE 1
## DEFINITIONS AND INTERPRETATION

1.1 **Certain Defined Terms.** Capitalized terms used in this Agreement without other definition herein shall have the following meanings, unless the context requires otherwise:

"**Governmental Authority**" means any national, federal, state or local government, political subdivision, authority, agency, tribunal, court, judicial or other body, public or statutory instrumentality, officer or entity, including any environmental or zoning authority, building inspector, health or safety inspector or fire marshal, any governmental regulatory body or commission, any arbitrator with authority to bind a party at law, or other regulatory bureau, authority, body or entity having legal jurisdiction over the matter or Person in question.

"**Law**" means any federal, state, local, or other constitution, charter, act, statute, law, ordinance, code, rule, or regulation, or legislative or administrative action of any Governmental Authority, or a final decree, judgment or order of a court.

"**Person**" means any natural person, firm, corporation, company, limited liability company, joint stock company, general or limited partnership, trust, incorporated or unincorporated association, joint venture, Governmental Authority or any other entity, whether acting in an individual, fiduciary or other capacity.

"**Reimbursable Costs**" means all costs incurred by the Manager for the proper performance of the Services, including, without limitation, the verifiable actual costs of the following, to the extent allocable to the Services:

    (a)    wages, salaries and overheads for site personnel;

    (b)    all out of pocket expenses paid or payable to third parties;

    (c)    builders risk insurance costs and bond premiums; and

    (d)    field office expenses.

Wages, salaries and overheads for Manager's non-site personnel, legal costs, and other home office overhead are not Reimbursable Costs, except to the extent, and only to the extent directly relating to the Construction Contracts from and after the Effective Date and as approved by Zachry in its sole discretion.

1.2 **Rules of Interpretation.** The following rules of interpretation shall apply to this Agreement: (i) the terms "herein," "herewith" and "hereof" are references to this Agreement, taken as a whole; (ii) the term "includes" or "including" shall mean "including, without limitation;" (iii) references to a "Section," "subsection," "clause," "Article," "Exhibit," "Appendix" or "Schedule" mean a Section, subsection, clause, Article, Exhibit, Appendix or Schedule of this Agreement, as the case may be, unless in any such case the context requires otherwise; (iv) references to a given agreement, instrument or other document shall be a reference to that agreement, instrument or other document as modified, amended, supplemented

ZCC-40-137657

0643.0002

and restated through the date as of which such reference is made; (v) references to a Law includes all amendments or modifications thereto, all rules and regulations promulgated under such Law and all administrative and judicial authority exercisable thereunder; (vi) reference to a Person include its successors and permitted assigns; and (vii) the singular shall include the plural and the masculine shall include the feminine, and vice versa.

## ARTICLE 2
## MANAGER SERVICES

2.1 **Engagement and Services**. Subject to the provisions hereof, Zachry hereby engages and contracts Manager to manage, supervise, administer, direct, control, and perform or cause to be performed on behalf of Zachry all of Zachry's obligations under the Construction Contracts, including the performance of work thereunder, the administration and management of all litigation, and the management and administration of claims, obligations of indemnity, and other matters arising out of the Construction Contracts, and to perform certain other tasks, duties or services as the Parties may from time to time agree (the "**Services**"). Manager hereby accepts such engagement and agrees to perform the Services in accordance with the terms and conditions of this Agreement.

2.2 **Power of Attorney**. The Parties acknowledge that in order to perform the Services, Manager will necessarily need to act for and on behalf of Zachry on various matters in connection with the Construction Contracts. Zachry hereby constitutes and appoints the Manager with full power of substitution as its true and lawful representative and attorney-in-fact, with full power and authority in its name, place and stead, (i) to execute, swear to, acknowledge, deliver, file and record in the appropriate public offices all releases, waivers of lien, or certificates required under such Construction Contracts; (ii) to prepare and deliver certificates or instruments required under the Construction Contracts, prepare and deliver bills to third parties, accept payments, execute amendments and change orders, give warranties and perform all other contractual obligations of Zachry in connection with such Construction Contracts; (iii) to assert any claims, or to file actions, motions, pleadings, responses to discovery, and other instruments in connection with any claims related to such Construction Contracts, and (iv) to perform any other acts that Manager deems appropriate or necessary to perform the Services. Zachry agrees and acknowledges that the acts and decisions of Manager within the scope and authority of this power of attorney and the terms of this Agreement shall bind Zachry.

2.3 **Cooperation.** Zachry shall fully cooperate with Manager in the performance of the Services or in exercising its power of attorney granted in Section 2.3 above, including executing such documents or instruments as Manager may reasonably request from time to time in connection with the Services and the Construction Contracts. The right to abandon, settle, compromise, waive or dismiss any right or claim under the Construction Contracts shall be shared by Zachry and Manager.

2.4 **No Partnership.** This Agreement creates a contract relationship between Zachry and Manager. Nothing in this Agreement shall be deemed to constitute Manager as a partner or joint venturer of Zachry or Zachry's affiliates or vice versa.

ZCC-40-137658

0643.0003

2.5    **No Assignment.** Nothing in this Agreement shall be deemed to be an assignment of the Construction Contracts to Manager. Zachry is and shall remain the contractor under each of the Construction Contracts. As such, Zachry retains all rights, obligations and claims arising from or in connection with the Construction Contracts, any owner under the Construction Contracts, or any subcontractors on the projects covered by the Construction Contracts.

## ARTICLE 3
## PAYMENTS & ACCOUNTING

3.1    **Payments.** Manager has and will continue to incur costs on behalf of Zachry to perform the Services. As consideration to Manager for the performance of the Services hereunder, and for all costs incurred by Manager in connection therewith, Zachry agrees to pay to Manager the Reimbursable Costs. Zachry will pay-over to Manager, or Manager shall have the right to directly receive, all payments from the owners under the Construction Contracts, recoveries for claims thereunder, or other payments arising from the Construction Contracts ("**Contract Payments**"). The timing and schedule for any amounts due hereunder shall be as mutually agreed by the Parties from time to time in light of the particular Services and Construction Contract.

3.2    **Payment Limitation.** Notwithstanding anything in Section 3.1 to the contrary, Zachry shall have no obligation to pay or reimburse Manager for any Reimbursable Costs in excess of the Contract Payments. Therefore, if the Contract Payments received by Manager are less than the Reimbursable Costs, Zachry will have no liability for any such shortfall. If the Contract Payments exceed the Reimbursable Costs, the parties shall confer and agree upon a mutually satisfactory allocation of any such excess amounts between the Parties consistent with the intents and purposes of the Corporate Restructuring.

3.3    **Accounting.** Manager shall keep and maintain, books, records, accounts and other documents sufficient to reflect accurately and completely all Reimbursable Costs incurred pursuant to this Agreement, as well as the Contract Payments received.

## ARTICLE 4
## TERM & TERMINATION

4.1    **Term.** Unless earlier terminated pursuant to Section 4.2, or Section 4.3 hereof, the term of this Agreement shall commence on the Effective Date and continue for a period of five (5) years, and then month-to-month thereafter, unless terminated by either Party on not less than sixty (60) days notice.

4.2    **Termination by Mutual Consent.** The Parties may terminate this Agreement in its entirety, or solely with respect to the Services, at any time upon mutual written consent.

4.3    **Termination by Either Party for Cause.** Either Party (the "**First Party**") may by written notice to the other Party (the "**Second Party**") terminate this Agreement upon or after the occurrence of any of the following events:

(a)    In the event of the bankruptcy of the Second Party; and

ZCC-40-137659

0643.0004

(b)     In the event of a failure by the Second Party to perform its obligations under this Agreement in any material respect, if the Second Party does not cure such failure within fifteen (15) days of the date of a written notice from the First Party demanding such cure (or, if curable, within such longer period of time up to sixty (60) days as is reasonably necessary to accomplish such cure without material adverse effect on the First Party or the performance of the Services).

## ARTICLE 5
## LIMITATION ON LIABILITY

5.1     **Standard of Care.**  In providing the Services, Manager shall use the same degree of care, skill and prudence customarily exercised by it for its own provision of services to itself and its affiliates (and in compliance with applicable Law) to provide, or cause to be provided, the Services.  **Other than as expressly set forth in this Agreement, Manager does not make any other warranty, express or implied, with respect to the Services.**

5.2     **No Warranties or Guarantees.**  Except as expressly provided in this Agreement, none of the Parties makes any warranties or guarantees to any other Party, express or implied, with respect to the subject matter of this Agreement, and Manager hereby expressly disclaims any implied warranty or warranties imposed by Law, including the Implied Warranties of Merchantability and Fitness for a Particular Purpose.

5.3     **No Consequential Damages.**  In no event, whether as a result of breach of contract, breach of warranty, tort liability (including negligence), strict liability, indemnity or otherwise, shall either Party or its agents be liable to the other Party for special, indirect, punitive, exemplary or consequential damages or fiduciary liability of any nature, and each Party hereby releases the other Party and its agents therefrom.

## ARTICLE 6
## MISCELLANEOUS PROVISIONS

6.1     **Joint Effort.**  Preparation of this Agreement has been a joint effort of the Parties and the resulting document shall not be construed more severely against one of the Parties than against the other.

6.2     **Captions.**  The captions contained in this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provision contained herein.

6.3     **Severability.**  The invalidity of one or more phrases, sentences, clauses, Sections or Articles contained in this Agreement shall not affect the validity of the remaining portions of the Agreement so long as the material purposes of this Agreement can be determined and effectuated.

6.4     **No Waiver.**  Any failure of either Party to enforce any of the provisions of this Agreement or to require compliance with any of its terms at any time during the pendency of this Agreement shall in no way affect the validity of this Agreement, or any part hereof, and shall not

ZCC-40-137660

0643.0005

be deemed a waiver of the right of such Party thereafter to enforce any and each of such provisions.

6.5     **Further Assurances.**  Each Party agrees to execute and deliver all further instruments and documents, and take all further action not inconsistent with the provisions of this Agreement that may be reasonably necessary to perform the Services and to effectuate the purposes and intent of this Agreement.  In order to fully realize the benefits of the Contract Payments, Zachry will assign to Manager accounts receivables under the Construction Contracts.

6.6     **No Third Party Beneficiary.**  This Agreement is not intended to, and does not, confer upon any Person other than the Parties any rights or remedies hereunder other than the Parties' respective affiliates.  Without limiting the generality of the foregoing, nothing in this Agreement shall be construed to create any duty to, standard of care with respect to, or any liability to any Person who is not a Party to this Agreement.

6.7     **Governing Law.**  This Agreement shall be governed by and construed under the laws of the State of Texas, without reference to conflicts of laws rules.

6.8     **Entire Agreement.**  This Agreement sets forth the full and complete understanding of the Parties relating to the subject matter hereof as of the date hereof, and supersedes any and all negotiations, agreements, understandings and representations made or dated prior thereto with respect to such subject matter.

6.9     **Amendments.**  No change, amendment or modification of this Agreement shall be valid or binding upon the Parties unless such change, amendment or modification shall be in writing and duly executed by all Parties.

6.10    **Successors.**  This Agreement and the covenants and agreements herein contained shall inure to the benefit of and be binding upon the Parties hereto, their successors and assigns.

6.11    **Counterparts.**  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same Agreement.  In the event that this Agreement is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format date file, such signature shall create a valid and binding obligation of the Party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;*
*SIGNATURES ON FOLLOWING PAGE]*

ZCC-40-137661

0643.0006

IN WITNESS WHEREOF, each of the Parties has caused this Management Services Agreement to be duly executed on this 27th day of April 2009 to be effective as of the Effective Date.

ZACHRY:

**ZACHRY INDUSTRIAL, INC.,**
a Delaware corporation

By: _Kenneth A. Ol_____
Name: _KENNETH A. OLESON_____
Title: _SENIOR VICE PRESIDENT_____

MANAGER:

**ZACHRY CONSTRUCTION CORPORATION,**
a Delaware corporation

By: _David S. Zachry_____
Name: _David S. Zachry_____
Title: _President and Chief Executive Officer_

ZCC-40-137662

0643.0007

# EXHIBIT "A"

## CONSTRUCTION CONTRACTS

1. Contract for Bayport Terminal Complex Phase 1A Wharf and Dredging Contract, dated May 24, 2005, by and between Zachry Construction Corporation and Port of Houston Authority (File Number: 2004-0187).

2. Contract for Bayport Terminal Complex Phase 1A Container Yard, dated June 28, 2004, by and between Zachry Construction Corporation and Port of Houston Authority (File Number: 2004-0225).

3. Contract for Bayport Cruise Terminal Complex Phase 1-Site and Utilities, dated November 28, 2005, by and between Zachry Construction Corporation and Port of Houston Authority (File Number: 2005-0394).

4. Zachry Project 5922 - Project No. 15-2897, Contract No. 5494, Harte Research Institute Building, Texas A&M University - Corpus Christi, Contract Awarded: May 14, 2003.

5. Zachry Job 7634 -- Project No. 16-2931, Contract No. 5567, Kinesiology Facilities Texas A&M International University, Contract Awarded: January 13, 2006.

6. The Comprehensive Development Agreement with an effective date of October 1, 2004, as amended, between Zachry and the Texas Department of Transportation for the development of an approximate 7.4-mile segment of State Highway 45 Southeast, a proposed controlled access transportation facility extending from Interstate Highway 35 at Farm-to-Market 1327 south of Austin to SH 130/US Highway 183 in Travis County.

ZCC-40-137663

0643.0008

# TAB 38

# Pass-through Agreement
# (PX642)

# CLAIMS PASS-THROUGH AGREEMENT

This Claims Pass-Through Agreement ("**Agreement**") is entered into effective as of January 1, 2008 (the "**Effective Date**") by and between ZACHRY INDUSTRIAL, INC., a Delaware corporation, formerly known as Zachry Construction Corporation ("**Zachry**"), and ZACHRY CONSTRUCTION CORPORATION, a Delaware corporation ("**ZCC**"). Zachry and ZCC may be referred to in this Agreement collectively as the "**Parties**" and individually as a "**Party.**"

## RECITALS

A.     Prior to the Effective Date, Zachry entered into a construction contract and associated documentation with the Port of Houston Authority, Harris County, Texas ("**Port of Houston**") for construction work related to a wharf and dredging project at the Bayport Terminal Complex, as such construction contract is described on Exhibit "A" attached hereto (the "**Bayport Contract**").

B.     Zachry and ZCC entered into a Management Services Agreement, as of the Effective Date ("**Management Services Agreement**") pursuant to which Zachry subcontracted with ZCC to perform work and other obligations of Zachry under the Bayport Contract and other construction contracts.

C.     The Port of Houston has materially breached the Bayport Contract and Zachry and ZCC have each suffered damages arising from or in connection with such breach giving rise to the claims set forth in the lawsuit styled *Zachry Construction Corporation n/k/a Zachry Industrial, Inc. vs. Port of Houston Authority of Harris County, Texas, Cause No. 2006-72970 (District Court of Harris County, 151st Judicial District of Texas)* (the "**Claims**").

D.     The Port of Houston's breaches of the Bayport Contract have damaged Zachry before January 1, 2008 and have directly damaged Zachry's subcontractor, ZCC, after January 1, 2008. Zachry and ZCC agree that it is in their mutual best interests for Zachry and ZCC to pursue Claims against the Port of Houston in the name of Zachry. The Claims include those Claims of Zachry before January 1, 2008 ("**Zachry Claims**"), as well as the damages incurred by ZCC from and after January 1, 2008, the effective date of the Management Services Agreement (the "**ZCC Claims**"). The parties desire, therefore, to agree upon a procedure through which they will coordinate the preparation, presentation and prosecution of the Claims against the Port of Houston.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Zachry and ZCC agree as follows:

No. 2006-72970
ZCC EXHIBIT
**642**

ZCC-40-137664

0642.0001

## ARTICLE 1
## PASS-THROUGH AND CLAIMS PROSECUTION

1.1    **Pass-Through.** Zachry agrees, and acknowledges it is liable to ZCC, to present the ZCC Claims and remit any recovery from the Port of Houston to ZCC, in accordance with the terms of this Agreement. ZCC agrees that the liability of Zachry to ZCC is liquidated to the extent of the recovery against the Port of Houston for the ZCC Claims. Zachry agrees to pass any such recovery to ZCC to the extent, and only to extent, of any amount actually recovered from the Port of Houston. ZCC agrees that upon Zachry meeting such obligations it shall have no further liability to ZCC arising from the ZCC Claims.

1.2    **Delegation of Prosecution.** Zachry agrees that ZCC may pursue the Claims against the Port of Houston in Zachry's name. ZCC shall include in the Claims the amount of the Zachry Claims and the ZCC Claims. ZCC shall diligently pursue the Claims. ZCC shall have the responsibility for the preparation of any claim, the presentation and prosecution of any such claim, and the conduct of any litigation.

1.3    **Cooperation.** Zachry shall cooperate fully with ZCC including, but not limited to, passing on the Claims to the Port of Houston and executing such documents that may be required to further the Claims; and ZCC shall cooperate fully with Zachry. Upon request, one party may review and copy or be provided at no cost a copy of any writings, letters, reports, analysis, drawings, schedules, charts, photos or any other documents relating to the Claims in the possession, custody or control of the other party.

1.4    **Settlement.** The right to abandon, settle, compromise or dismiss the Claims shall be shared by ZCC and Zachry. Zachry and ZCC shall each not settle the Claims without the other party's prior written approval.

1.5    **Costs.** All costs, fees and other expenses (including expert and attorney fees) incurred by ZCC in connection with the preparation, prosecution and litigation of the Claims shall be paid by ZCC. ZCC shall have no responsibility for any attorney fees or expenses that Zachry may elect to incur.

1.6    **Witnesses and Documents.** Zachry shall provide, at no cost to ZCC, Zachry employees as witnesses and their respective documents relating to the Claims. Zachry and ZCC will cooperate as fully as possible in regard to witnesses and documents. Zachry will provide any Zachry employees and witnesses, at mutually agreed times and in mutually agreed amounts of time so as not to hinder or delay Zachry's ongoing operations.

1.7    **Claims Payment.** Zachry and ZCC shall direct that any payment on the Claims shall be paid to ZCC in accordance with this Agreement.

1.8    **Services Agreement.** The parties expressly acknowledge that the Management Services Agreement shall remain in full force and effect except to the extent that any provisions of the Management Services Agreement are inconsistent with or superseded by the terms of this Agreement.

ZCC-40-137665

0642.0002

## ARTICLE 2
## MISCELLANEOUS PROVISIONS

2.1 **Joint Effort.** Preparation of this Agreement has been a joint effort of the Parties and the resulting document shall not be construed more severely against one of the Parties than against the other.

2.2 **Severability.** The invalidity of one or more phrases, sentences, clauses, Sections or Articles contained in this Agreement shall not affect the validity of the remaining portions of the Agreement so long as the material purposes of this Agreement can be determined and effectuated.

2.3 **Further Assurances.** Each Party agrees to execute and deliver all further instruments and documents, and take all further action not inconsistent with the provisions of this Agreement that may be reasonably necessary to perform the Services and to effectuate the purposes and intent of this Agreement.

2.4 **No Third Party Beneficiary.** This Agreement is not intended to, and does not, confer upon any Person other than the Parties any rights or remedies hereunder other than the Parties' respective affiliates. Without limiting the generality of the foregoing, Nothing in this Agreement shall be construed to create any duty to, standard of care with respect to, or any liability to any Person who is not a Party to this Agreement.

2.5 **Governing Law.** This Agreement shall be governed by and construed under the laws of the State of Texas, without reference to conflicts of laws rules.

2.6 **Entire Agreement.** This Agreement sets forth the full and complete understanding of the Parties relating to the subject matter hereof as of the date hereof, and supersedes any and all negotiations, agreements, understandings and representations made or dated prior thereto with respect to such subject matter.

2.7 **Amendments.** No change, amendment or modification of this Agreement shall be valid or binding upon the Parties unless such change, amendment or modification shall be in writing and duly executed by all Parties.

2.8 **Successors.** This Agreement and the covenants and agreements herein contained shall inure to the benefit of and be binding upon the Parties hereto, their successors and assigns.

2.9 **Rules of Interpretation.** The terms "herein," "herewith" and "hereof" are references to this Agreement, taken as a whole. The term "includes" or "including" shall mean "including, without limitation." References to a "Section," "subsection," "clause," "Article," "Exhibit," "Appendix" or "Schedule" mean a Section, subsection, clause, Article, Exhibit, Appendix or Schedule of this Agreement, as the case may be, unless in any such case the context requires otherwise. References to a given agreement, instrument or other document shall be a reference to that agreement, instrument or other document as modified, amended, supplemented and restated through the date as of which such reference is made. References to a Law includes all amendments or modifications thereto, all rules and regulations promulgated under such Law and all administrative and judicial authority exercisable thereunder. Reference to a Person

ZCC-40-137666

0642.0003

include its successors and permitted assigns. The singular shall include the plural and the masculine shall include the feminine, and vice versa. References to "days" shall mean calendar days, unless the context specifies otherwise.

2.10 **Counterparts.** This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same Agreement. In the event that this Agreement is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format date file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURES ON FOLLOWING PAGE]*

ZCC-40-137667

0642.0004

IN WITNESS WHEREOF, each of the Parties has caused this Claims Pass-Through Agreement to be duly executed on the 27th day of April 2009, to be effective as of the Effective Date.

ZACHRY:

ZACHRY INDUSTRIAL, INC.,
a Delaware corporation

By: _Kenneth A. Ol_____
Name: _KENNETH A. OLESON_
Title: _SENIOR VICE PRESIDENT_

ZCC:

ZACHRY CONSTRUCTION CORPORATION,
a Delaware corporation

By: _David S. Zachry_
Name: _David S. Zachry_
Title: _President and Chief Executive officer_

ZCC-40-137668

0642.0005

## EXHIBIT "A"

## BAYPORT CONTRACT

    1.    Contract for Bayport Terminal Complex Phase 1A Wharf and Dredging Contract, dated May 24, 2005, by and between Zachry Construction Corporation and Port of Houston Authority (File Number: 2004-0187).

ZCC-40-137669

0642.0006

**TAB 39**

**Excerpts from Construction Management Agreement
(PX57.0001-10, 57.0033)**

*Bayport Terminal Complex*

*Phase 1A*

# Construction Management Plan

Prepared for

**Port of Houston Authority**

Executives Offices
111 East Loop North
Houston, TX 77029

June 1, 2004



No. 2006-72970
ZCC EXHIBIT
**57**

**CH2M**HILL

0057.0001

## Table of Contents

1.0    **Introduction**................................................................................................1
    1.1    Purpose................................................................................2
    1.2    Project Description ............................................................2
2.0    **Staffing Plan**.............................................................................................3
    2.1    Project Organization..........................................................4
    2.2    Construction Manager ......................................................4
        2.2.1    Construction Manager Level of Authority ................4
    2.3    Lead Inspector...................................................................5
    2.4    Civil/Structural/Electrical Inspectors.............................6
    2.5    Office Engineer..................................................................6
3.0    **Communications Plan** ..............................................................................7
    3.1    Community Outreach .........................................................8
    3.2    Complaints..........................................................................8
    3.3    Constructware® ................................................................8
    3.4    Directory of Personnel .....................................................9
    3.5    Flow of Communications ..................................................9
        3.5.1    Formal Communications ...........................................9
        3.5.2    Informal Communications..........................................9
    3.6    Meetings............................................................................10
        3.6.1    Pre-Construction Conference ...................................10
        3.6.2    Pre-Installation Conference .....................................12
        3.6.3    Weekly Construction Coordination Meeting............13
        3.6.4    Monthly Progress Review Meeting ...........................13
        3.6.5    Safety Task Assessments and Tool Box Meetings .....13
        3.6.6    Unscheduled Meetings..............................................13
    3.7    Notifications .....................................................................13
    3.8    Reporting ..........................................................................14
        3.8.1    Weekly Progress Report............................................14
        3.8.2    Monthly Progress Report ..........................................14
    3.9    Stakeholder Communication ...........................................15
    3.10  Third Party Communications ..........................................15
4.0    **Field Work Plan** ......................................................................................16
    4.1    Administrative and Technical Support ...........................17
    4.2    Air Emissions ...................................................................17
    4.3    Audits ................................................................................17
    4.4    Claims................................................................................17
    4.5    Contract Modifications ....................................................18
    4.6    Daily Inspection Diaries...................................................19
    4.7    Deficient Construction Materials and Workmanship.....19
    4.8    Delays and Time Extensions ...........................................19
    4.9    Dispute Resolution ..........................................................20
    4.10  Equipment and Materials.................................................20

I

4.11    Equipment / Material Storage ............................................................................20
4.12    Equipment Start-Up and Testing .......................................................................21
4.13    Field Office ..........................................................................................................21
4.14    Field Orders .........................................................................................................21
4.15    Filing System .......................................................................................................21
4.16    Fill Material Policy ..............................................................................................22
4.17    Forms & Reports .................................................................................................22
4.18    Inspection and Testing .......................................................................................22
4.19    Light .....................................................................................................................22
4.20    Noise ....................................................................................................................23
4.21    Notices to be Posted by Contractor ..................................................................23
4.22    Permits .................................................................................................................23
4.23    Progress Payment Requests ...............................................................................23
4.24    Progress Photographs .........................................................................................24
4.25    Record Drawings .................................................................................................24
4.26    Requests for Information ....................................................................................25
4.27    Safety ....................................................................................................................25
        4.27.1 CM Field Staff Safety ..............................................................................25
        4.27.2 Contractor Safety .....................................................................................26
        4.27.3 Visitor Safety ...........................................................................................27
4.28    Schedule ...............................................................................................................27
        4.28.1 Baseline Progress Schedule ....................................................................27
        4.28.2 Progress Schedule Updates ....................................................................27
        4.28.3 Phase 1A Milestone Schedule .................................................................28
4.29    Spare Parts ...........................................................................................................28
4.30    Submittals ............................................................................................................28
4.31    Surveying Information and Support ...................................................................29
4.32    Staff Training and Start-Up Support ..................................................................29
4.33    Technical Specification Reference Standards ....................................................29
4.34    Visitors Log ..........................................................................................................29
4.35    Warranty / Guarantee Data ...............................................................................30
5.0   **Quality Assurance Plan** ...........................................................................................**31**
5.1    Quality Assurance Procedure for Construction .................................................32
6.0   **Risk Mitigation Plan** ...............................................................................................**33**
6.1    Contract ...............................................................................................................34
        6.1.1   Budget ....................................................................................................34
        6.1.2   Schedule .................................................................................................34
        6.1.3   Scope ......................................................................................................34
6.2    Electronic Data ....................................................................................................34
        6.2.1   Assure-It Database .................................................................................34
        6.2.2   Constructware® .....................................................................................35
6.3    Environmental ......................................................................................................36
        6.3.1   Air ...........................................................................................................36
        6.3.2   Cultural Resources .................................................................................36

0057.0003

| | | | |
|---|---|---|---|
| | 6.3.3 | Hazardous Materials | 36 |
| | 6.3.4 | Light | 37 |
| | 6.3.5 | Noise | 37 |
| | 6.3.6 | Spills | 37 |
| | 6.3.7 | Water Quality | 37 |
| | 6.3.8 | Wildlife | 38 |
| 6.4 | Facilities | | 38 |
| | 6.4.1 | Computers | 38 |
| | 6.4.2 | Electric Carts | 39 |
| | 6.4.3 | Field Office | 39 |
| | 6.4.4 | Personal Digital Assistants | 40 |
| 6.5 | Hard-Copy Data | | 40 |
| | 6.5.1 | Final Redline As-Built Drawings, Submittals and CCD | 40 |
| | 6.5.2 | Operation and Maintenance Manuals | 40 |
| | 6.5.3 | Photos | 41 |
| | 6.5.4 | Product Data and Shop Drawings | 41 |
| | 6.5.5 | Project Vertical Files (Correspondence, Logs, etc.) | 41 |
| 6.6 | Human Resources | | 41 |
| | 6.6.1 | CH2M HILL Program Staff | 41 |
| | 6.6.2 | CM Field Staff | 41 |
| | 6.6.3 | Contractors | 42 |
| | 6.6.4 | Designers of Record | 43 |
| | 6.6.5 | PHA 3rd Party Inspection and Testing Firms | 43 |
| 6.7 | Public | | 44 |
| | 6.7.1 | Activists | 44 |
| | 6.7.2 | Bayport Channel Users | 44 |
| | 6.7.3 | Media | 44 |
| | 6.7.4 | Port Road Users | 44 |
| | 6.7.5 | Terrorism | 45 |
| 6.8 | Stakeholder Management | | 45 |
| 6.9 | Unidentified Risks | | 45 |
| **7.0** | **Closeout Plan** | | **46** |
| 7.1 | Substantial Completion and Punch List | | 47 |
| 7.2 | Final Completion | | 47 |
| 7.3 | Closeout Modification | | 47 |
| 7.4 | Final Payment Request | | 48 |
| 7.5 | Construction Completion Report | | 48 |
| 7.6 | Documents and Records Turnover | | 48 |
| 7.7 | Archives | | 48 |

0057.0004

## Attachments

**Attachment 1 - Construction Management Team Organizational Chart**
**Attachment 2 - CM Field Staff Responsibilities Matrix**
**Attachment 3 – Workflow Charts: Change Orders, RFIs, Submittals**
**Attachment 4 – Weekly and Monthly Progress Report Checklists**
**Attachment 5 – CH2M HILL Construction Claims Manual**
**Attachment 6 – Field File Numbering System and Checklist**
**Attachment 7 – Construction Management Forms and Reports**
**Attachment 8 – Construction Inspection Checklists**
**Attachment 9 – CH2M HILL Bayport Phase 1A Field Safety Instructions**
**Attachment 10 – Quality Assurance Procedure for Construction**

0057.0005

# 1.0 Introduction

0057.0006

## 1.1 Purpose

The purpose of this Construction Management Plan (CMP) is to provide the framework for construction management consistency, continuity, quality control, timeliness and teamwork for successful completion of Phase 1A of the Port of Houston Authority's (PHA) Bayport Terminal Complex.

The CMP will outline common procedures to be utilized by the Construction Management Team (CMT), which consists of CH2M HILL Program and Construction Management (CM) staff, PHA representatives, contractors and the Designers of Record (DOR) for the Phase 1A construction contracts. The CMP will be the reference document providing continuity for all CMT members involved in Phase 1A construction. It will define the construction contracts' specific quality assurance requirements, consolidate current construction management field policy for easy reference and retrieval, and outline the relationships of the various functions to be performed by the CMT members. The CMT members will use the CMP as a guidance document to ensure Phase 1A of the Bayport terminal complex is built to the highest available standards of quality and in accordance with the general and technical provisions of each Phase 1A contract.

## 1.2 Project Description

CH2M HILL is providing Program and Construction Management services to PHA for the initial development phase of the estimated $1.2 billion Bayport Terminal Complex. The Port of Houston is the busiest port origination/destination on the United States Gulf. The Port is the world's sixth largest port and is the number one U.S port in foreign tonnage, transshipping more than 150 million tons of cargo annually. At ultimate build-out, the Bayport Terminal Complex will be the largest container transshipment facility in the United States and include inter-modal rail transfer facilities, cruise terminals and associated commercial developments supporting both the container and cruise terminals.

CH2M HILL acts as the Port's primary contact for the initial project development phase, providing oversight, communication and coordination for multiple facility design and construction contracts. Phase 1A, the initial development, consists of the design and construction of 1,660 linear feet of reinforced concrete container wharf supported by reinforced concrete drilled piers; reinforced concrete tangent bulkhead wall; access/berthing dredging and on-site disposal of dredged materials; clearing, grubbing and earthwork; heavy duty reinforced concrete and asphalt paved container handling, storage and transfer yard; signage and pavement markings; electrical substation, transmission and distribution utilities; elevated water storage tank, fire and potable water transmission and distribution lines; storm water drainage lines and storm water pollution prevention facilities; sanitary sewer, pumping station and force mains; site lighting; site security/monitoring, fire alarm/detection, communications and electronic data utilities; temporary and Amenities buildings; and associated construction activities.

2

# 2.0 Staffing Plan

0057.0008

## 2.1 Project Organization

The Bayport Terminal Complex Phase 1A CMT will serve as the construction administration and management representatives for PHA. The CMT, in this role, will coordinate all construction activities and services required for the successful completion of Phase 1A construction. The on-site CM Field Staff will consist of a Construction Manager (CM), an Office Engineer, a Lead Inspector, and Civil/Structural/Electrical Inspectors. This staff will be provided by CH2M HILL and its sub-consultants. The CMT also includes PHA project management and construction administration staff; Designers of Record (DOR) for each construction contract; CH2M HILL construction administrative and technical support staff; PHA construction materials testing firms; and any other involved parties performing construction related activities and services.

The CM will report directly to PHA's Bayport Project Manager, Chief Engineer, Project Engineer, and Chief Inspector as well as the CH2M HILL Program Manager (PM). The CM will coordinate and oversee the daily activities of the CM Field Staff, 3rd party testing laboratory personnel, 3rd party surveyors, 3rd party inspectors and auditors, and other CMT members involved in the construction work. The CM is directly responsible for the coordination and oversight of the CM Field Staff.

The CMT organizational chart is shown on Attachment 1, "Construction Management Team Organizational Chart." The individual roles and responsibilities of the CM Field Staff are shown on Attachment 2, "CM Field Staff Responsibilities Matrix."

## 2.2 Construction Manager

The CM shall act as the PHA's representative on site during construction of Phase 1A. The CM shall be the Inspector for the work and have all authority delegated to the Inspector by the contract documents. The CM will coordinate the activities of all contractors and DOR performing work on site during Phase 1A construction, and will be responsible for implementation of the Staffing Plan, Communications Plan, Field Work Plan, Quality Assurance Plan, Risk Mitigation Plan, and Closeout Plan as described in this CMP.

### 2.2.1 Construction Manager Level of Authority

As an extension of the PHA staff, the CM will have all authority normally attributed to a CM acting as owner's agent (not at risk) on a construction project. The CM will have the authority to inspect, monitor and control activities on the project site as necessary to protect PHA's liability with regard to project scope, schedule, quality, security, and permit compliance, in accordance with industry-standard practice.

The CM will not have any authority to make changes to any provisions of the PHA-Contractor construction contract documents in regard to costs (increase or decrease in contract price); time for completion (accelerated or extended contract completion

4

time); or quality of in-place work (lessen or increase the contract quality requirements for construction materials and/or workmanship).

The CM will have the authority to control communications and documentation contributing to the permanent project record, clarify and interpret construction contract documents, and make on-site field administrative/engineering/quality assurance decisions, subject to the limitations outlined above. The CM will promote harmonious communication, cooperation and coordination between all contractors and construction activities. The CM will investigate on-site field deficiencies/discrepancies/problems and resolve them, if no changes to the construction contract cost, time for completion and/or construction materials and/or workmanship are required. If the resolution of an on-site field deficiency/discrepancy/problem requires a change to the contract cost, time for completion and/or quality of construction materials and/or workmanship, the CM will investigate and make recommendations to the Port of Houston Authority's Chief Engineer for resolution.

The CM will provide no direction related to the Contractor's construction means, methods, procedures, safety, sequencing and/or techniques. The CM will observe and report on the Contractor's construction safety, workmanship and materials, as it relates to quality assurance and the in-place construction work being in conformance with Construction Contract Documents (CCD) (i.e., construction contract General and Special Conditions, drawings, technical specification sections and approved Contractor submittals).

## 2.3  Lead Inspector

The Lead Inspector will be responsible for the construction documentation and quality assurance of multiple construction contracts awarded for Phase 1A. The Lead Inspector will report to the CM and will oversee and direct the work efforts of the Inspectors. The Lead Inspector will be expected to maintain complete, up-to-date and detailed knowledge of all pertinent construction contract documents; administrative and technical submittals; change orders; field orders; progress schedules; drawings; plans; technical specifications; and administrative status reports. The Lead Inspector will observe and monitor the contractors' planning and execution of the work and perform quality assurance inspections of materials and workmanship to assure compliance with the CCD. The Lead Inspector will act as liaison between the contractors, Inspectors and PHA's construction inspection and materials testing personnel. The Lead Inspector will be responsible for the use and implementation of Personal Digital Assistants (PDA's) for field inspection activities; use of the proprietary Assure-It database for analysis and reporting of QA/QC data; preparation of daily, weekly, and monthly construction progress reports; making recommendations on contractors' progress payment requests and invoices; maintaining a daily log and photos of the contractors' construction activities, staffing, equipment, and materials; documenting contractor performance and safety issues; and resolving on-site construction conflicts.

5

### 4.28.3 Phase 1A Milestone Schedule

The CM Field Staff will create and maintain an overall Phase 1A Milestone Schedule based on the Contractors' approved baseline Progress Schedules.

The CM will use the contractors' accepted Progress Schedule Updates to update the Phase 1A Milestone Schedule on a monthly basis, or more frequently, as requested by the PHA.

# 4.29 Spare Parts

CM Field Staff will take possession of all spare parts to be provided by construction contractors, in accordance with the requirements of the project CCD. Contractors will tag (CH2M HILL Standard Spare Parts Identification Tag-Form No. 399) all spare parts to be turned over to the CM Field Staff. This turnover action will be documented (CH2M HILL Standard Spare Parts Transfer Form-Form No. 289) by the contractor and CM Field Staff. CM Field Staff will prepare and maintain a record (CH2M HILL Standard Spare Parts Transfer Log-Form No. 404) of all spare parts transfers.

# 4.30 Submittals

The Contractor for each Phase 1A construction contract will be responsible for developing a list of submittals required by the CCD. Submittals lists will be reviewed by the CM for completeness. A static electronic copy of each Submittal List will be posted in Constructware®.

All submittals requiring action to be taken by a reviewing/approving party will be submitted by the contractor (PHA General Conditions Section 5.20 "Submittals to be Furnished by the Contractor after Award") to the CM using Constructware®. The Contractor will be responsible for following any electronic submittal with hard copy materials, if any, sent to the appropriate party for review.

The CM will distribute these submittals to the appropriate reviewing party. Once the reviewing party has reviewed, approved or indicated the actions to be taken by the contractor to obtain approval, the submittal will be returned to the contractor through the CM. The reviewing party will electronically annotate all reviewed contractor submittals, indicating action(s) to be taken by the contractor: no exception taken; make corrections noted; rejected; revise and resubmit; or submit specified item. The review notation will include places for the reviewer's electronic signature and date of signature.

Informational submittals will also be submitted by the contractor through the CM in the same manner as described above.

The CM Field Staff will document, distribute, file and log all submittals using Constructware®.

0057.0033

**TAB 40**

**Court's Ruling on Directed Verdict
(71:8-15)**

denied.

MS. YEATES: Thank you, Your Honor.

THE COURT: Now, would you give me a moment with respect to Zachry's motion? I just want to make a couple of quick notes.

Okay. Ms. Greer, or Mr. Gibbs, whoever.

PLAINTIFF'S MOTION FOR DIRECTED VERDICT

MR. GIBBS: Yes, Your Honor. At this time, Your Honor, the Plaintiff, Zachry Construction Corporation reurges its motion for directed verdict at the close of the Defendant's case and the close of all the evidence.

We filed with you our motion on Monday, January the 11th. I think we gave you a copy on January the 11th. And it was filed January the 13th.

And we reurge that motion for instructed verdict, and we also urge the argument Zachry made at the hearing on January the 13th, 2009 (sic) on the record, yesterday, as part of our motion for directed verdict.

THE COURT: All right. I'd like to go through the table of contents of that motion, if you have a copy.

MR. GIBBS: We do, Your Honor.

THE COURT: And also ask that -- if

Ms. Greer wants to -- only because we all worked on the jury charge together -- and the things that I'm prepared to grant with respect to your directed verdict are essentially what's in the jury charge.

And so -- at this point, so if we could go through that, point by point. And you maybe could bring to the Court's attention the ones that you think that are granted by virtue of the current language of the jury charge.

MS. GREER: Do you want me to -- well, I know a couple of things off the top of my head, then maybe can I take half a minute to look through it?

THE COURT: Please.

MS. GREER: Okay. Your Honor, we believe that you have ruled -- or we would ask you to rule on directed verdict that Zachry is entitled as a matter of law to recover the damages sustained by New Zachry on the pass-through claim.

We believe that's what you've instructed the jury, and we would ask you to grant our directed verdict on that issue.

THE COURT: Okay.

MS. YEATES: And obviously, Your Honor, we oppose that motion.

COURT'S RULING

THE COURT: Very good. Okay. And I have ruled on that, and I will grant that aspect of your motion.

MS. GREER: And then, Your Honor, we've also moved for directed verdict on Zachry's failure to comply a claim for the Port's failure to pay $2.36 million in the liquidated damages.

We believe that you have instructed the jury in --

THE REPORTER: Are the mikes on?

MR. GREER: -- Question No. 12 that the Court has determined that the Port failed to comply with the contract by failing to pay Zachry $2.36 million that the Port has withheld of liquidated damages.

THE COURT: Would you grab the microphone, please?

(Discussion off the record)

THE REPORTER: I'm sorry, I'm having a little trouble hearing you, can you speak up?

MR. GREER: Yes.

And we would ask you to grant a directed verdict to Zachry on that basis.

THE COURT: All right. Go ahead, yes.

MS. YEATES: We also oppose that motion, Your Honor.

COURT'S RULING

THE COURT: Very good. What I've put in the jury charge and what I'm prepared to grant is that I have determined that the Port has failed to comply with the contract by failing to pay Zachry $2.36 million that the Port withheld as liquidated damages.

Insofar as you have asked for that in a directed verdict, I'm granting that aspect of your motion.

MS. GREER: Okay. Thank you, Your Honor.

I believe that's all, Your Honor.

THE COURT: All right. I was -- so if you would look at the table of contents with me for a moment. I was looking at -- in the table of contents Roman numeral -- Page Number Roman Numeral II, where you have Roman Numeral V -- 5, where it says, Zachry is entitled to a directed verdict on its right to recover damages sustained by New Zachry.

Is that covered by what I've previously set?

MS. GREER: Yes, Your Honor, that is the portion of the directed verdict motion starts on Page

69, that is the portion, that part, Part 5, Roman V is the part that we believe that you have granted a directed verdict motion on in the jury charge, and we ask that you confirm that you granted directed verdict on the arguments made therein.

THE COURT: All right. It goes on to say in subparts A -- in Subpart A of that -- in the table of contents or in the motion, The direct verdict is proper because the Port has met the burden to prove that Zachry is not liable to New Zachry and has -- and has not met that burden -- excuse me, because the Port has the burden of proof that Zachry is not liable to New Zachry and has not met that burden.

I guess my ruling is as a matter of law that I find that the -- there's a valid pass-through claim and any objections or legal arguments to the contrary by the Port are overruled.

MS. GREER: Okay. Thank you, Your Honor.

THE COURT: Does that satisfy what you're asking for?

MS. GREER: Well, we're asking you to rule as a matter of law that New Zachry, notwithstanding the Port's arguments to the contrary, has the right to -- that Zachry, notwithstanding the

Port's arguments to the contrary, has the right to recover New Zachry's damages as a matter of law in this lawsuit.

THE COURT: Right. I think that's what I've granted. I will grant that part of your motion.

MS. GREER: Thank you, Your Honor.

THE COURT: And I know the Port is opposed to that.

MS. YEATES: (Moving head up and down)

THE COURT: And I've granted with respect -- I indicated with respect to Roman Numeral VI on Page Roman Numeral III with respect to the $2.36 million, and you've moved with respect to the clearing and grubbing, and I'm not speaking for the Port, but it's my understanding that the Port has essentially abandoned that claim in that there was not evidence that the 25,000 or so for clearing and grubbing has been paid?

MS. YEATES: That's correct, Your Honor.

THE COURT: All right. So I'm granting that part of Zachry's motion.

The Port, in our charge conference, we talked about the defense of both release and waiver, and it's my understanding that the Port's contention has been that the waiver argument, not the affirmative

defensive waiver but with respect to I guess the liquidated damages claim?

MS. YEATES: Right, Your Honor. With respect to the liquidated damages, we took away or out of the charge, Your Honor took it out, and we're only arguing release.

THE COURT: All right. So I guess I will grant a directed verdict then with respect to the waiver aspect of the release argument?

MS. GREER: If they're going to abandon it, I think that's sufficient. But --

THE COURT: Are you -- do you want to abandon it on the record or what?

MS. YEATES: No, Your Honor. The point was that we wanted the charge to be submitted as release as opposed to release and waiver. And that's what Your Honor has done with respect to the liquidated damages.

MS. GREER: My understanding was that they aren't seeking submission of waiver because it brought (inaudible) -- well, I'm not going to characterize why they're doing it, but that they are not asking you to submit it is my understanding.

MS. YEATES: Your Honor, I won't be objecting or requesting waiver instruction with respect to liquidated damages.

COURT'S RULING

THE COURT: All right. Then I will make no ruling.

And I believe, unless you would bring my attention to anything else that we've spoken about with respect to the jury charge, the rest of the motion for directed verdict will be denied.

MS. GREER: It is all I can think of right now, Your Honor.

THE COURT: Keep your voice up, please.

MS. GREER: That's all I can think of right now, Your Honor.

MS. YEATES: Your Honor, I think we're ready to do the charge objections.

THE COURT: Okay. Let's hear the charge objections.

(At the bench, on the record)

DEFENDANT'S OBJECTIONS TO THE COURT'S CHARGE

MS. YEATES: Your Honor, the Defendant makes its objections to the Court's charge in the presence of the Court and opposing counsel and the court reporter and before the charge has been read to the jury.

After we finish making our objections, Your Honor, we get a ruling, then we'll be tendering

**TAB 41**

**Objections to the Charge**
**(71:15-73)**

COURT'S RULING

THE COURT: All right. Then I will make no ruling.

And I believe, unless you would bring my attention to anything else that we've spoken about with respect to the jury charge, the rest of the motion for directed verdict will be denied.

MS. GREER: It is all I can think of right now, Your Honor.

THE COURT: Keep your voice up, please.

MS. GREER: That's all I can think of right now, Your Honor.

MS. YEATES: Your Honor, I think we're ready to do the charge objections.

THE COURT: Okay. Let's hear the charge objections.

(At the bench, on the record)

DEFENDANT'S OBJECTIONS TO THE COURT'S CHARGE

MS. YEATES: Your Honor, the Defendant makes its objections to the Court's charge in the presence of the Court and opposing counsel and the court reporter and before the charge has been read to the jury.

After we finish making our objections, Your Honor, we get a ruling, then we'll be tendering

requested instructions to the Court for the Court's consideration.

THE COURT: Yes, ma'am.

MS. YEATES: Our first objection is to the agency instructions and the preliminary instructions in the charge, Your Honor. Because those instructions we believe erroneously include the apparent authority theory.

As Your Honor knows, we believe there's no pleading to support the apparent authority theory and there's been no trial by consent and there's no trial amendment. So we believe that theory should not be in the charge and we object to including it in the charge.

Your Honor, I'll ask you to rule on all of them at the end, Your Honor.

THE COURT: Oh, all right.

MS. YEATES: We believe the apparent authority in the charge is erroneous as a matter of law, Your Honor, because with respect to CH2M Hill's actual authority, Zachry was undisputedly on notice of the limitations of that actual authority.

And under Douglass versus Panama, that means the apparent authority theory cannot apply in this case.

We also object to instructing the jury on apparent authority because the Port is a public entity that can only contract --

THE COURT: Slow down a little bit.

MS. YEATES: Can only contract in writing and therefore apparent authority cannot apply as a matter of law. I believe you've heard all these.

Furthermore, Your Honor, inclusion of the apparent authority theory will improperly allow the jury to believe that CH2M Hill --

THE COURT: Ms. Yeates, you got to slow down just a little.

MS. YEATES: Okay. Well, I'm sorry, Your Honor, my team is anxious.

Inclusion of the apparent authority theory in the charge will improperly allow the jury to believe that CH2M Hill could have apparent authority based on some conduct by the Port that held CH2M Hill out as the Port's agent.

In order, you see, Your Honor, to allow -- so that Zachry can argue that they could recover additional work directed by the Port, which is the Texas 271 -- Section 271 of the government code standard.

THE COURT: Local government code,

right?

MS. YEATES: Right, Your Honor. And I'm bringing that to the Court's attention because that demonstrates the harmful error in including apparent authority instruction in the charge.

THE COURT: Yes.

MS. YEATES: We also object, Your Honor, to the instruction concerning the imputation of knowledge, which is included in the Court's agency instructions.

That's the instruction that starts, A party's knowledge includes facts known to the party, etcetera. The PJC authorizes no such instructions. As Your Honor knows, we found no Texas case that authorizes such an instruction, and so we object to including it in the charge.

Your Honor, we also object to the absence from the charge of an instruction that an agent can be an agent for a party for one purpose but not other purposes.

That instruction is supported by the law and the evidence. We don't believe it's submitted by implication from other instructions. And the addition of that instruction is necessary in order for the Court's instructions on agency to be substantially

correct.

Because in this case, a central fact issue presented is whether CH2M Hill was the Port's agent for certain purposes but not the Port's agent for other purposes. In order properly to answer the question, we believe the jury needs this instruction.

At the conclusion of our objections, the Port will tender Defendant's Requested Instruction No. 1, which would state that that other party may be authorized to act on behalf of a party for some purposes, while not being authorized to act on behalf of that party for other purposes.

And the Port objects to the omission from the Court's charge of that instruction.

The Port also objects to the omission from the charge, Your Honor, of an instruction charging the jury that in this case, authority for another to act for the Port can arise only from a written agreement made by the Port that allows the other party to act on behalf of and for the benefit of the Port.

And again, our argument there, Your Honor, is that the Port can only contract in writing, and therefore it could only can have an agent by writing.

The Port will be tendering Defendant's

Requested Instruction No. 2, which will state in this case, authority for another to act for the Port can arise only from a written agreement made by the Port that allows the other party to act on behalf and for the benefit of the Port.

Furthermore, the Port objects to the inclusion in the charge of apparent authority because as a matter of law that theory cannot apply to the Port given the Port's status as a governmental entity with governmental immunity, and so we object on that basis too, Your Honor.

Moving to the definition of New Zachry, Your Honor, that's in there because of Your Honor's pass-through ruling.

And obviously, we object to the ruling, Your Honor, and to -- well, I'll be objecting to those parts of the charge that go to the ruling because we believe that New Zachry is not the Plaintiff in the case and that Zachry does not have a valid pass-through claim for all the reasons that we argued in our motion to strike, which Your Honor overruled.

And principally, Your Honor, you'll remember that's because New Zachry was created and retained by Zachry to be the subcontractor only after the breach occurred and therefore the Port's breach

could not have caused the damages to New Zachry in this context.

So we object to the New Zachry definition, and we'll be objecting to the other instructions on that basis.

Your Honor, in your instructions, you instruct multiple times concerning ambiguity and trade custom. We've talked about that.

It's our belief that those instructions, because they appear multiple times in the charge, should be in the preliminary instructions one time in the front of the charge.

I'm particularly concerned about this with respect to trade/usage because it's our position that there is no evidence to raise a fact issue on the legal standard from when a trade custom or usage arises.

And that by instructing the jury multiple times on that, the Judge -- the Court improperly comments on the weight of the evidence by nudging or telling the jury that the Court thinks, Well, there must be a trade custom or usage because I'm asking about it several times in the charge.

And we believe that because the trade custom or usage relates to the ambiguity instruction,

the proper thing to do would be to take the ambiguity instruction and trade custom and usage and put them both in the front of the charge.

THE COURT: Slow down. If you want this on the record, you've got to slow down.

MS. YEATES: Okay.

And if you put it in the front of the charge, Your Honor, you would lead the instruction by saying, In answering questions that require you to decide the meaning of an agreement, you must decide the meaning by determining the intent of the parties at the time of the agreement, and then continue with the Court's instructions on ambiguity.

Your Honor, the Port further objects to the inclusion instruction in the charge on trade custom and usage because, as I've stated, Your Honor, there's no evidence to raise an issue on that.

Your Honor, I've talked about the ordering of the questions in the charge and we object to the fact that the charge does not have the excuse questions in each cluster following liability.

We think that's the appropriate, proper way to do it and we object to not doing it that way, Your Honor.

On Question No. 1, I think our only

objection there at this point is that the Port is charging the jury as to what the jury may consider in deciding Question No. 1, and that's the ambiguity instruction. And again, we think that should be in the front of the charge.

Your Honor, moving to Question No. 2 -- oh, I'm sorry, also on Question No. 1, the Court instructs the jury not to consider Section 5.10 with respect to breach of 5.10. And the Port objects to the Court giving that instruction.

THE COURT: I thought we -- didn't we change that?

MS. YEATES: No. It's limited to breach, Your Honor. But remember my position was it shouldn't be in there at all.

That's Ms. Greer's concern that there could be an irreconcilable conflict between the two findings.

THE COURT: How -- did we change the wording of that though? What question is it?

MS. YEATES: It's Question 1.

MS. GREER: 1.

I think what you had in the draft last night was, In answering this question only, you're not being asked to decide whether the Port failed to comply

with Section 5.10 of the contract.

MS. YEATES: And, you know, Your Honor --

THE COURT: Question 1?

MS. YEATES: Right. Well, that's just --

THE COURT: Oh, yeah. Yeah.

MS. YEATES: -- Ms. Greer's concern about irreconcilable findings, Your Honor.

But we believe the instruction will mislead and confuse the jury into believing that the jury cannot consider Section 5.10 in determining whether the Port failed to comply with Change Order 4.

And we believe that's error, Your Honor, erroneous because Change Order 4 incorporates the rest of the contract to the extent the rest of the contract is not in conflict with Change Order 4.

Therefore, at the conclusion of these objections -- well, we object to having the instruction in there at all.

But at the inclusion of the objections, we'll be requesting Defendant's Requested Question No. 3, which states, However, you may consider Section 5.10 in determining whether the Port failed to comply with Change Order 4. You may consider it in deciding

Question 1.

And we think if you're going to give that instruction that's in the charge, Your Honor, that this additional instruction would also be required.

And again, this is something we discussed last night.

MS. GREER: Our response would be a comment on the weight of the evidence.

MS. YEATES: Right.

THE COURT: What?

MS. GREER: Our response to that argument was that it would be a comment on the weight of the evidence designed to nudge the jury.

And in fact, it would tell the jury to adopt the position that Section 2.02, Precedence Provision, as a matter of law does not cause Change Order 4 to trump the general conditions and the technical specifications, 5.10, all those.

MS. YEATES: And of course, our position, Your Honor, is if we're going to point the jury in the instruction you're giving and tell them not to consider whether 5.10 is breached, that that leads the jury to believe they're not supposed to look at 5.10.

THE COURT: I understand.

MS. YEATES: Okay.

Your Honor, on the next instruction I would like to go to under Question 1 is the instruction that states, Furthermore, in answering this question only, you are instructed that nothing in Section 5.41 gave the Port the right to issue its revise and resubmit.

We believe this instruction is erroneous because it's based on an incorrect construction and interpretation of the contract.

It's not -- we don't believe it's a proper -- restatement of what the Court's ruling was intended to go to with respect to your ruling on the meaning of 5.41.

And we thought the Court's ruling was going to the point that Zachry was not required to obtain a written change directive or change order in order to recover. And so we believe this instruction goes beyond what we thought the point of the Court's pretrial ruling was.

Furthermore, we believe it's erroneous as a matter of law as explained in all our previous objections to the Court's instructions concerning 5.41.

And the Court's instruction is based on the erroneous application, we believe, of the so-called

radical change doctrine, and on the Shintech and Columbia Gas line of cases.

And we believe those are inapplicable here because Section 3.09 of the contract, you'll recall, provides that no action or failure to act by the Port can constitute a waiver of a right of the Port under the contract.

Moreover, here, the Port didn't relinquish its contractual procedural rights under Section 5.41 even in the event of a breach because the Port's procedural rights under 5.41 go directly to the breach issue, and that's the legal rationale of the Technip case that we've discussed.

I believe you've heard these arguments, Your Honor.

Also, under the Texas Water Code and other provisions of Texas law, the Port is statutorily prohibited from making any binding contract that's not in writing. And that's exactly what Section 4.1 (sic) is going to when it says, If a contractor is going to do additional work, he has to get a written change order.

MS. GREER: That's --

THE COURT: 4.1 or 5.41?

MS. YEATES: I'm sorry, 5.41. I

apologize, Your Honor.

THE COURT: I just wanted your record to be clear.

MS. YEATES: Thank you, Your Honor.

Furthermore, the Court's instruction is erroneous as a matter of law because the Port has governmental immunity, which is waived only to the extent permitted by Chapter 271 of the Texas Local Government Code.

And we believe Section 5.41 goes directly to whether the amount sought by Zachry comes within that waiver of immunity. The Shintech and Columbia Gas line of cases are not attempting to deal with the situation of governmental immunity.

Even if the radical change doctrine or the Shintech line of law applied, they would not make Section 5.41 relevant to whether the Port had the right to revise and resubmit.

We believe Section 5.41 does not go to that issue, and that is why we believe the instruction given in connection with Question No. 1 is erroneous as a matter of law.

And -- now, Your Honor, it also, the instruction on 5.41 also, we believe, constitutes an impermissible comment --

THE COURT: Slow down.

MS. YEATES: And impermissible comment on the weight of the evidence serving to tilt or nudge the jury to find in Zachry's favor. And the instruction, we believe, is not correct or helpful to the jury.

Your Honor, I would now like to, with respect to Question 1, simply reurge our matter of law arguments that we believe we've made to you previously on why the Port believes that it is correct as a matter of law that Change Order 1 didn't -- Change Order 4 did not entitle Zachry to use the frozen cutoff wall.

And we've argued all those things, Your Honor, in opposition to the Port's Rule 166(g) motion, and so I'm not going to repeat them here. It's just a law argument.

Your Honor, on Question No. 2, we again, have the instruction on ambiguity and trade/usage. And again, we object to including it multiple times in the charge.

The Port objects to the instruction under Question No. 2 telling the jury that it may decide the meaning of Section 5.10 and 5.22 by considering trade usage or custom.

Your Honor, as you know, there's -- the

PJC says it's not even clear, it's an appropriate instruction in the charge. And most importantly, Zachry has not adduced evidence to meet the legal standard to raise a fact issue on whether there's any trade custom or usage. So we would object on that basis.

We further object to this instruction concerning 5.41 given in connection with Question 2. We believe it's based on an incorrect construction and interpretation of the contract. And therefore, is not a proper restatement of the Court's prior rulings with regard to Section 5.41.

We continue to assert all the objections, Your Honor, that we've made during trial to Your Honor's instructions with respect to Section 5.41.

Two hours of sleep last night.

MS. GREER: Quit bragging.

(Laughing)

MS. YEATES: And so I'm not going to repeat all of our arguments that I just made a minute ago about why the Shintech line doesn't support the ruling or why the radical change doctrine doesn't the ruling. I won't repeat any of that.

And we believe again, that this instruction would be an impermissible and harmful

comment on the weight, serving to tilt or nudge the jury to find in favor of Zachry.

And then I would like to go on now to Question No. 3 on the statutory measure of damages, we agree that Your Honor's instruction is correct, that that is the statutory measure.

Our objection here is we believe Zachry's adduced no proof of amounts due and owing under the contract. That's our argument.

And therefore, I want to assert it here that we think it's error to ask Question No. 3 because we believe Zachry has no evidence to raise a fact issue that would allow the submission of the statutory measure of damages.

Your Honor, we also with respect to the statutory measure of damages, Subpart B in the instruction under Question No. 3, the Port objects because, among other reasons, outside of the written executed change order, the Port cannot direct work for Zachry -- cannot direct Zachry to do additional work.

And there is no evidence that Zachry was directed by the Port to do additional work. And therefore, we object to the submission of the second prong of Section 271 because we think there's no evidence to raise the issue and there's no evidence of

a written executed change order.

Your Honor, now we come to the pass-through instructions and I'm not going to repeat all the arguments we made before, Your Honor, but obviously, we believe the pass-through instruction, which is the instruction under Question 3, telling the jury that they should include reimbursable costs incurred by New Zachry.

We believe that instruction is improper because we don't think there is a valid -- legally valid, pass-through claim in this case for all the reasons we stated in our motion to strike the pass-through claim.

Your Honor, we also object to the way -- telling the jury in the pass-through instruction that the jury should include reimbursable costs.

We believe that that's an impermissible comment on the weight, nudging the jury to find for Zachry and we think it should say the jury may include reimbursable costs.

To make the instruction correct, the Court would need to add the following sentence at the end of the instruction.

THE COURT:  This is question?

MS. YEATES:  This is Question 3, the

pass-through instruction.

THE COURT: Okay. Let me get there.

MS. YEATES: The instruction that we think would have to be added is, You may include such reimbursable costs only to the extent that Zachry agreed, in the management service agreement, to pay New Zachry such reimbursable costs.

At the conclusion of the objections, Your Honor, I'll request that instruction as Defendant's Requested Instruction No. 4.

And we believe omitting that instruction makes the pass-through instruction legally defective and erroneous as a matter of law because the fundamental premise of a pass-through claim is that the Plaintiff asserting the claim has to prove the liability of that Plaintiff contractor to the subcontractor.

And we believe that's what our requested instruction goes to.

Your Honor, you have instructions on Section 5.41, 5.42 and 5.52 and that's under Question 3 and that's the instruction which begins, You are instructed that Zachry was not required to take certain actions.

We believe the instruction is incorrect

as a matter of law. I'm going to separately object to this on 5.40 -- as to the extent it goes to 5.41, on the one hand, 5.52, on the other hand and 5.42, on the other hand.

The Port continues to assert and does not waive all the objections that we've previously raised to the Court's instructions concerning -- given to the jury already -- concerning 5.41.

And for all the reasons I've already articulated, Your Honor, concerning how the radical change doctrine doesn't apply, Shintech line of cases doesn't apply, all those arguments I've already made as to why we believe Your Honor's ruling on Section 5.41 is in error, we believe all those reasons make the instructions with respect to this instruction also in error.

And we believe the instructions and impermissible comment on the weight of the evidence, the effect would be to tilt or nudge the jury to find for Zachry.

The Court's instruction concerning 5.41 not requiring a written change order is particularly harmful to the Port because the measure of damages in the charge allows the jury to recover for additional work that Zachry was directed to perform.

And under Section 5.41 the requirement of a written change order before the contractor is entitled to be paid for additional work is precisely what Section 5.41 is designed to require.  And so that is why we believe the instruction and the Court's ruling with respect to 5.41 is harmful error in the case.

And we also believe Your Honor's already charged the jury with respect to what they should consider on 5.41 and that they should not be charged in this instruction again.

Your Honor, with respect to your instruction on 5.52, here under Question 3, it applies 5.52 to the extent 5.52 makes requirements consistent with Section 5.41.

And so, therefore, we would just say all of the same objections that we asserted against the instruction on 5.41 also apply with respect to 5.42 (sic).

And now that takes me to the objections with respect to the instruction on Section 5.42.  And the Port objects to those instructions because again, Your Honor, we believe the Court's ruling on Section 5.42 is erroneous as a matter of law.

We've already explained that we think

the radical change doctrine doesn't apply to 5.42. And we believe that 5.42 is not invalid under Section 16.071 of the Remedies Code because it's not the kind of notice provision that comes within that section under the American Airlines case. And nor does Shintech or Columbia Gas line of cases make 5.42 inapplicable in this case.

So we, for all the reasons we previously have asserted in our objections to Your Honor's instructions given to the jury on Section 5.42, we object to this instruction on 5.42 included in the Court's charge under Question No. 3.

Your Honor, your -- the sentence that you have in the instruction that says, You are instructed that the jury may consider Sections 5.41, 5.42 and 5.52 with respect to assessing a party's state of mind, we believe that that instruction repeats what Your Honor has said during trial.

To the extent the instruction has been expanded to include 5.52, we would just assert against that instruction, Your Honor, all of the objections that we previously have made to Your Honor's instruction given during trial with respect to the instruction.

However -- I think I know where Jenny is

going -- we believe the instruction needs to be in the charge because of the Court's previous instruction given on these provisions under Question 3.

And having decided to instruct the jury under Question 3 with respect to what 5.41, 5.42 and 5.52 do not require Zachry to do to recover damages. We do believe it's necessary at this point for Your Honor to repeat the instruction.

My problem is, the instruction that Your Honor has given earlier, we objected to because we think it's based on an erroneous ruling -- reading and interpretation and error of law as to those sections --

MS. GREER: You're saying you only requested that instruction about state of mind because the Judge is putting in the first instruction --

MS. YEATES: Right. Right. It's necessary in the charge because of the first instruction.

MS. GREER: Okay.

MS. YEATES: Your Honor, on the NDFD exceptions, no damages for delay exceptions, Your Honor, we object to submitting to the jury the instructions concerning those exceptions to the no damages for delay or hindrance provision.

Specifically, those are the instructions

concerning arbitrary and capricious conduct, bad faith, etcetera. Your Honor, Texas doesn't recognize these common law exceptions, and we believe that even if Texas did recognize those exceptions, the language of this particular Section 5.07, no damages for delay clause would preclude application of those exceptions.

And there is no evidence and no legally insufficient evidence of damages resulting from a delay or hindrance that could of possibly have been caused by any conduct, egregious conduct of the Port constituting arbitrary and capricious conduct, bad faith, active interference or fraud as defined in the Court's charge under Question No. 3.

Also, Your Honor, and I mentioned this to you in the informal charge conference, Your Honor, we object to the instruction concerning the no damages for delay provision, Section 5.07 because that instruction omits the requirement that the Port -- any egregious conduct of the Port, arbitrary and capricious, bad faith, active interference or fraud, that that conduct must be the sole cause of any delay or hindrance damages.

A major fact issue in this case is who caused Zachry to be delayed so behind schedule? If -- we believe, under the law, Your Honor, if the delay was

also caused by Zachry, then that delay, even if contributed to by the Port's alleged egregious conduct, cannot constitute an exception to the no damages for delay or hindrance provision.

We believe the Court's instructions are defective because they incorrectly omit the sole cause requirement.

To correct that omission, the language in the Court's instruction under Question 3 should be modified so that the language refers to a delay or hindrance that was solely the result of the Port's actions, if any, that constituted arbitrary and capricious conduct, etcetera.

And we object to the omission of the word solely in the Court's instruction under Question No. 3.

Your Honor, with respect to the active interference definition in Question No. 3, the Port objects to that instruction defining active interference because the instruction omits the words taken to before the words unreasonably interfere.

We believe the instruction should properly be worded, Active interference means affirmative, willful action taken to unreasonably interfere.

We believe those words are necessary because to constitute active interference, a party has to intend to interfere.

MS. GREER: Wait a second. I thought you agreed that it would be to interfere if you got the second sentence of that instruction. That it would be that unreasonably interferes -- let me get back to my question.

I thought the agreement was that you would not object to active interference means affirmative, willful action that unreasonably interferes with the other party's compliance with the contract. You would agree to that, if the Judge submitted active interference requires more than a simple mistake, error in judgment, lack of total effort, or lack of complete diligence.

MS. YEATES: Your Honor, the first sentence, as stated, allows an act that we didn't intend to be interference to constitute interference without scienter intention, and so I have to object to that. I can't let that -- no, I object to that.

Your Honor, the fraud definition includes recklessness in Question No. 3. Your Honor, we talked about this in our informal charge conference.

Our position is that under Texas law

from the Texas Supreme Court, fraud, as a promise with no intent to perform, can only be intentional fraud; and therefore, we believe it's error to include the reckless fraud instruction in that question.

Now, we turn to Question No. 4, and, Your Honor, we asked for this question, we believe it should be in the charge under Casteel. I'm just pointing out that the only reason we asked for it is because Your Honor is allowing Zachry to submit the pass-through damages.

And I don't want my failure to object to that question to somehow waive my argument that we believe there's no valid pass-through claim in that case.

Similarly, Your Honor, with respect to the break out question, I believe I just talked about the pass-through, that's actually break out question -- it's Question No. 5. But I have a similar point to make on Question No. 4, the break out question for delay or hindrance.

We asked for that question but I don't want -- we need it because Your Honor has included delay or hindrance in the damages, but obviously, we don't waive our position that delay or hindrance damages are just not recoverable as a matter of law by

asking Your Honor to give the break out instruction that -- that breaks out under Casteel the dollars that represent the delay or hindrance damages.

Your Honor, I now want to turn to Question No. 6, Subsection D, the release instruction, which again includes the ambiguity and trade custom or usage.

Again, we object to repeating these instructions over and over again in the charge. And particularly with respect to the releases, Your Honor, that we do not believe there's any evidence to raise the legal standard for what constitutes a trade custom or industry usage. And we believe it's an improper comment on the weight of the evidence.

With respect to Question No. 8, which is Zachry's counter-defenses, Your Honor, we talked about this last night. We believe that the waiver instruction, because this is waiver of fraud, should require an additional instruction that would say, With respect to fraud, waiver requires full knowledge of the fraud, and all material facts, and must be made with the intention, clearly manifested, of abiding by the contract and waiving all right to assert deception.

And so we'll be requesting that, Your Honor, as Requested Instruction No. 5. Because we

believe that's necessary to make the definition correct with respect to waiver of fraud.

On quasi-estoppel the Port objects to Question No. 8 to the extent that it inquires whether the Port is barred from asserting fraud in the inducement because of quasi-estoppel.

We believe as a matter of law, the doctrine of quasi-estoppel does not apply to bar the defense of fraudulent inducement. It cannot be, as a matter of law, that it's unconscionable for a party to assert that it was defrauded.

The Port further objects to the instruction on quasi-estoppel given in connection with Question 8 because it fails to tell the jury that the party to be estopped must have taken its previous position with full knowledge of the fraud and all material facts.

We'll be tendering Defendant's Requested Instruction No. 6, which would state that with respect to the fraud, the prior position previously taken by the party to be estopped must have been taken with full knowledge of the fraud and all material facts and must have been taken with the intention, clearly manifested, of abiding by the contract and not asserting the other party's deception.

And we object to the omission of this sentence from the instruction on quasi-estoppel.

Finally, Your Honor, with respect to ratification in the charge, the instruction concerning ratification in Question 8 states -- refers to the Port.

With respect to the counter-defense, the Port is not making an affirmative claim for fraud. And so at the end of that instruction on ratification it currently says, All right to recover for the deception, and what we were doing is asserting a defense.

And so we think it should say, All right to assert the deception, and not all right to recover for the deception since we're not seeking to recover for the deception.

MS. GREER: Your Honor, we would need to change that because Ms. Yeates dictated that instruction to you yesterday for what would be an appropriate instruction for ratification, so we would agree that that should go in there then --

MS. YEATES: And I apologize for this, Your Honor, we caught this in the middle of the night last night. And I think --

THE COURT: So which question?

MS. GREER: Question No. 8.

MS. YEATES:  Question 8, ratification, Subsection C.  We believe it should say, All right to assert the deception, not all right to recover for the deception.

And I'm nearly finished, Your Honor.

THE COURT:  Wait.  Waiving all right to assert?

MS. YEATES:  Assert the deception.

THE COURT:  Assert the thought?

MS. YEATES:  Assert the deception.

THE COURT:  Okay.

MS. YEATES:  Your Honor, the Port further objects to the instruction concerning quasi-estoppel because we believe it's wrong and that if fails to tell the jury -- I did that?  Okay.

And then on Question No. 9 -- oh, we did that already.

Your Honor, on Question No. 11 in the Court's charge, the excuse question, we've objected to instructing multiple times in the charge on ambiguity and trade custom, so we object again here to that.

And the Port -- now, I want to turn to Question No. 12.  The question that tells the jury -- oh, this is the instruction in the Court's charge and Your Honor's directed verdict that the Court has

determined that the Port failed to comply with the contract by failing to pay.

And I just want to make the point there, Your Honor, that obviously, we disagree with the Court's ruling that you made on Sections 5.05 and 5.06. And so we have to object to that instruction, and we do object.

MS. GREER: My understanding is you don't object to the fact that he is giving the instruction, only to the fact --

MS. YEATES: I object to the ruling giving rise to the instruction --

MS. GREER: Exactly.

MS. YEATES: -- and the instruction wouldn't be in the charge but for the ruling. And but for that ruling, Your Honor, we would be submitting -- Your Honor would be submitting in the charge failure to comply questions and damages questions.

MS. GREER: But given his ruling, it's an appropriate way to open the -- the excuse question.

MS. YEATES: Okay. Your Honor, the Port objects --

MS. GREER: Is that correct?

MS. YEATES: Your Honor -- Jenny, I'm not required to stipulate what you want me to say.

The Port objects to instructing the jury -- I didn't object on that basis, you're okay.

The Port objects to instructing the jury in connection with Question 12 on trade custom and usage for the same reasons I've said, Your Honor --

THE COURT:  Slow down.

MS. YEATES:  -- and so I won't repeat them.  The repetition objection and the no evidence to raise trade custom.

Your Honor, can I get a ruling on all of my objections, are they all overruled?

COURT'S RULING

THE COURT:  Yes.

MS. YEATES:  Thank you, Your Honor.

And at the conclusion of the objections, I now need to request and hand to Your Honor Defendant's Requested No. 1 -- Defendant's Requested Instructions No. 1, 2, 3, 4, and 5 and 6.  All of which we discussed in our objections, Your Honor.

And I tender them to Your Honor for ruling and ask Your Honor, If you are going to refuse them, Your Honor, if you would mark them refused and sign each copy for me?

THE COURT:  Okay.  I am refusing these

instructions.  I am marking them refused and signing them and they will be made part of the record.

MS. YEATES:  Okay.  And, Your Honor, could we be permitted to take them to the clerk to be filed or would you get them . . .

THE COURT:  She was here.  I will hand them to Veronica, our clerk, as soon as she comes back and I will ask her to file them and also I will ask her to give copies to both sides.

MS. YEATES:  Thank you, Your Honor.

MS. GREER:  Your Honor, may I speak?

THE COURT:  Yes.

Oh, Carolyn, do you need a break?  You okay?

THE REPORTER:  No, I'm fine.

THE COURT:  Okay.  Just go slow.

PLAINTIFF'S OBJECTIONS TO THE COURT'S CHARGE

MS. GREER:  Your Honor, Zachry Construction Corporation --

THE COURT:  Wait.  I tell you what, move this way and speak louder, please.

MS. YEATES:  Here, let's change places.

MS. GREER:  Your Honor, Zachry Construction Corporation, in the presence of the Court, opposing counsel and before the jury charge has been

read to the jury, presents the following objections to the Court's charge.

First, in the admonitory instructions, Zachry is entitled to instruction that states, A party's knowledge includes knowledge of facts that the party acting with the other party's authority has reason to know and that are material to the duties of the party acting with the other party's authority.

This is from the Restatement of Third of agency, Section 5.03. And the Williams versus Jennings case, 755 S.W.2d 874, 883, that's Houston. 1988, writ denied.

Zachry will separately request its Proposed Issue No. 1 on this issue.

With respect to Question No. 1 pertaining to Change Order 4, Zachry would object that Change Order 4 unambiguously includes an agreement that Zachry could use the frozen cutoff wall design embodied in the September 9, 2005 design.

Accordingly, the issue of the proper interpretation of Change Order 4 should not be submitted to the jury, instead the jury should be instructed as to its meaning.

Specifically, the jury should be instructed in the Court's Question No. 1, You are

instructed that Change Order 4 includes an agreement that Zachry could use the frozen cutoff wall design embodied in the September 9, 2005 design.

Zachry will separately request its Proposed Issue No. 2 on the proper interpretation of Change Order 4.

Furthermore, if the Court does not instruct the jury that Change Order 4 includes an agreement that Zachry could use the frozen cutoff wall design embodied in the September 9, 2005 design, then the jury should be instructed that if they agree with that interpretation, then the general conditions and technical specifications give the Port no right to issue its October 11, 2009 (sic) response.

As a matter of law, if the jury finds that the Port agreed in Change Order 4 that Zachry could use the frozen cutoff wall design embodied in the September 9, 2005 design, then under the order of precedence provision of the contract, change orders take precedence over general conditions and technical specifications. That's General Conditions Section 2.02(a).

The general conditions therefore could not give the Port the right to issue the October 11, 2005 response with respect to a design that it had

already agreed to in Change Order 4.

The Port (sic) should therefore instruct the jury, If you find that Change Order 4 included in agreement that Zachry could use the frozen cutoff wall design embodied in the September 9, 2005 design, then in answering this question only, you are instructed that nothing in the general conditions or the technical specifications of the contract including but not limited to General Conditions Section 5.22, 5.41, 5.42 and 5.52, gave the Port the right to issue its October 11, 2005 response to the September 9, 2005 frozen cutoff wall design.

Zachry will separately request its Proposed Issue No. 3 on this issue.

Alternatively, Zachry would be entitled, consistent with this Court's prior rulings concerning the exclusion of Section 5.42 and 5.52 as well as their inapplicability on their face as a matter of law, to create a right in the Port to issue the October 11, 2009 (sic) response.

Zachry would be entitled to an instruction that adds Section 5.42 and 5.52 to the instruction that the Court is already giving the jury, such that the instruction would now say, In answering this question, you are instructed that nothing in

Section 5.41, 5.42 or 5.52 gave the Port the right to issue its October 11, 2005 response to the September 9, 2005 frozen cutoff wall design.

Zachry objects to the absence of this instruction, and will tender a proposed instruction separately. It will be Proposed Issue No. 4.

Although Zachry has proposed that the prior instructions be included in the Court's Question No. 1, because that is how the Court has stated it will submit Change Order 4 issues.

Zachry believes the issues of the proper interpretation of Change Order 4 and the failure to comply with Change Order 4 should be submitted separately, rather than in one question as submitted by the Court, for the reasons discussed below.

Doing so would simplify the issues and make clear to the jury that there are two separate questions, interpretation and breach, that the jury should answer.

Zachry will separately tender a proposed instruction on these questions. They will be Proposed Instructions Nos. 5 and 6.

Furthermore, combining the interpretation and failure to comply issues into one question obscures the basis for the jury's answers.

That is, Zachry contends that the unambiguous language of Change Order 4 includes an agreement that Zachry could use the frozen cutoff wall design embodied in the September 9, 2005 design.

Zachry has also proven as a matter of law that the Port breached its agreement that Zachry could use the frozen cutoff wall design embodied in the September 9, 2005 design.

And so the issue of whether the Port failed to comply with Change Order 4 should not be submitted either.

If the jury answers no to the Court's Question No. 1, the Court of Appeals will not be able to determine whether one, the jury rejected Zachry's interpretation but found that the Port did not breach Change Order 4, or two, accepted Zachry's interpretation but found that the Port did not breach Change Order 4.

By combining an invalid question, the interpretation of Change Order 4, which should be decided as a matter of law by the Court, with a separate question, whether that agreement was breached, which also should be decided as a matter of law by the Court, the charge obscures the basis for the jury's decision, thus preventing the appellate court from

determining whether the jury based its verdict on an improperly submitted ground.

This is the Crown Life versus Casteel case, 22 S.W.3d 378, pinpoint 390. Under Casteel, when there is uncertainty as to the legal or evidentiary validity of a jury issue, the issue should be submitted separately.

That's Casteel and also Harris County versus Smith, 96 S.W.3d 230, pinpoint 236. Where the Court said, And in a case such as this one, asking the jury to record its verdict as to each element of damages when there is doubt as to the legal sufficiency of the evidence will permit the losing party to preserve error without complicating the charge or the jury's deliberation.

Now, moving to Question No. 2 regarding breach of Section 5.10. As a matter of law, nothing in the unambiguous language of Section 5.10 gave the Port the right to issue its October 11, 2005 response.

The jury should therefore be instructed in Question No. 2 that nothing in Section 5.10 gave the Port the right to issue its October 11, 2005 response. The jury should not be instructed to determine the meaning of Section 5.10.

Zachry will separately request its

Proposed Issue No. 7 on this issue.

As a matter of law, nothing in the unambiguous language of Section 5.22 gave the Port the right to issue its October 11, 2005 response.

The jury should therefore be instructed in Question No. 2 that nothing in Section 5.22 gave the Port the right to issue its October 11, 2005 response. The jury should not be instructed to determine the meaning of Section 5.22.

Zachry will separately request its Proposed Issue No. 8 on this issue.

The burden of proof with respect to the Port's right to issue its October 11, 2005 response under Section 5.22 is erroneously placed on Zachry.

Section 5.22 is an affirmative defense in which the Port bears the burden of proof.

THE COURT: Slow down.

MS. GREER: Sorry.

Texas law is clear that, quote --

THE COURT: Not that slow.

MS. GREER: Huh?

THE COURT: Not that slow.

MS. GREER: Okay. I'm running out of steam.

Quote, the burden of proving the

happening of a contingency which, by the terms of the contract, would discharge the party from liability or any default or refusal to perform on the Plaintiff that would excuse the performance of the Defendant, is on the party who seeks to avoid the contract or excuse a failure to perform it on that ground.

That's the Howell versus Kelly case from the 1st Court of Appeals in Houston, 534 S.W.2d 737, pinpoint 739 to Page 740.

And then from the 14th Court of Appeals case, the Johnson versus McKinney American, Inc. -- I'll give you this.

9 S.W.3d 271, Page 280. The jury charge erroneously places the burden on Zachry to disprove the Port's right to issue its October 11, 2005 revise and resubmit under Section 5.22.

The Section 5.22 should be submitted as an excuse question, placing the burden of proof on the Port.

Alternatively, if the Court refuses to ask about Section 5.22 separately from Section 5.10, as in the Court's charge, the placement of the burden on the Port should be accomplished by instruction.

In Question No. 2, Zachry is entitled, consistent with the Court's prior rulings concerning

the exclusion of Section 5.42 and Section 5.52, as well as their inapplicability on their face as a matter of law to create a right in the Port to issue the October 11, 2009 (sic) response.

Zachry is entitled to an instruction that adds Section 5.42 and 5.52 to the instructions the Court is already giving the jury. Such that it would say, In answering this question, you're instructed that nothing in Section 5.41, 5.42 or 5.52 gave the Port the right to issue its October 11, 2005 response to the September 9, 2005 frozen cutoff wall design.

Zachry objects to the absence of this instruction, and Zachry will separately request its Proposed Issue No. 9 on this issue.

Furthermore, the issue of Section 5.10 and Section 5.22 should be submitted separately. By combining the Port's affirmative defense under Section 5.22 as Zachry's affirmative claim under Section 5.10, the jury charge obscures the basis for the jury's answer.

Zachry has strong arguments as to why as a matter of law the unambiguous language of Section 5.10 and Section 5.22 gave the Port no right to issue its revise and resubmit response.

As well as why the Port's October 11,

2005 -- 9 -- 5, 2005 response violated Section 5.10 and Section 5.22 as a matter of law. And the contract.

Because Zachry's claim for breach of Section 5.10 is combined with the Port's affirmative defense under Section 5.22, and because the question of the proper interpretation and breach of these clauses is part of a single question, the charge obscures the basis for the jury's decision.

Thus preventing the appellate court from determining whether the jury based its verdict on an improperly submitted ground. This is again, the Casteel case I cited earlier and Harris County versus Smith.

It will be difficult to show on appeal, if the jury answers no to Question No. 3 -- Question No. 2, whether it did so based on its interpretation of Section 5.10 or 5.22 or whether it believed there was a right to revise -- issue a revise and resubmit, but that it was not shown that the Port had no reasonable basis on which to exercise that right.

Question No. 3, damages for breach of contract with respect to the frozen cutoff wall breach. Zachry objects to the instruction that you may consider amounts, if any, owed as compensation for increased cost to perform the work as a direct result of

Port-caused delays, if any.

Only if you find that such increased costs were a natural, probable and foreseeable consequence of the Port's failure to comply, if any. The Port has never cited a single case for the proposition that these damages are consequential damages, and the sovereign immunity statute itself in no way supports this proposition.

The element of damages itself in Question No. 3, which is taken from the sovereign immunity statute, Section 271.153, provides that the increased cost to perform the work must be a direct result of Port-caused delays, which shows they must be direct rather than consequential.

Moreover, damages resulting from owner-caused delays are necessarily those which naturally and necessarily flow from a wrongful act and are presumed to have been foreseen or contemplated by the party as a consequence of his wrongful act, and thus are not consequential damages.

That's the Anderson Development Corp. case versus Coastal States Crude Gathering, 543 S.W.2d 402, pinpoint 404 to 405.

Zachry objects to the instruction that you are instructed that you may only consider 5.41,

5.42 and 5.52 to the extent it imposes requirements consistent with Section 5.41 only in assessing a party's state of mind.

This instruction is an instruction that was originally made as a limiting instruction to limit the scope of the admissibility of evidence of these clauses. The purpose of the jury charge is to inform the jury of the controlling law.

As the pattern jury charge makes clear, the Court must instruct the jury as to its resolution of the meaning of any disputed contract provisions. This is Texas Pattern Jury Charge Section 101.7 in the comments.

Nothing authorizes the Court to point out the significance of a particular type of evidence in the jury charge.

By giving this instruction, the Court comments on the weight of the evidence and nudges the jury towards the Port's theory.

In other words, by giving this instruction, the Court embraces the Port's theory that these clauses can somehow be relevant to Zachry's, or for that matter, the Port's state of mind after the rejection of the frozen cutoff wall occurred on October 11, 2009 (sic).

Even though the Court has held that these provisions are inapplicable to bar Zachry's damage claim.

The Court suggests to the jury that these provisions are relevant to the party's state of mind and cause undue attention to the Port's theory of the case.

Furthermore, the instruction is erroneous. The Port's or Zachry's subjective state of mind is irrelevant where, as here, the Court has construed these clauses as a matter of law.

Parole evidence of the party's belief about the meaning of the clauses should not be admitted to vary the Court's construction of these clauses. The instruction simply allows the Port to evade the Court's legal rulings about the inapplicability of these clauses.

Zachry objects to the inclusion in the definition of active interference of the sentence, Active interference requires more than a simple mistake, error in judgment, lack of total effort or lack of complete diligence.

This instruction is repetitive of the first sentence, which states that active interference means affirmative, willful action that unreasonably

interferes with the other party's compliance with the contract.

The second sentence adds nothing as all these matters are covered by the definition of active interference in the first sentence. The addition of the second sentence simply emphasizes the Port's claimed theory of the case to the jury, and is therefore a comment on the weight of the evidence and a nudging instruction designed to encourage the jury to adopt the Port's view of the facts.

Under Texas charge practice, the charge may not define a term like active interference in more general terms and then list specific examples of what the Port believes to be active interference. This is akin to marshaling one's evidence in the jury charge.

Zachary objects to the inclusion of the Port's mitigation defense as well. As the Texas Supreme Court has held, under mitigation principles, the long-standing law of this state requires a claimant to mitigate damages if it can do so with trifling expense or reasonable exertions.

That's the Gunn Infiniti versus O'Byrne case, 996 S.W.2d 854, Page 857 for the pinpoint.

As a result, the jury should be instructed that a party is only required to avoid

damages if it can do so with trifling expense or reasonable exertions.

Zachry will separately request its Proposed Instruction No. 10 on this issue.

Zachry also objects to the definition of bad faith. It imposes too high of a burden. Rather, bad faith in the contract context is dishonesty of believe or purpose.

This is from the Restatement Second of Torts Section 205, comment d and also appears in Black's Law Dictionary 8th edition, Page 149.

Zachry will request its Proposed Instruction No. 11 on this issue.

Question Number 4, percentage delay and hindrance damages. Zachry objects to Question No. 4, which asks about the percentage of Zachry's damages that were due to delay.

The Port has lost its argument that the no damages for delay clause is a complete bar to Zachry's damages. It is not entitled to a question inquiring as to the amount of delay damages just in case they lose at trial but win on appeal.

There are myriad alternative issues that the parties may be curious about, that does not mean they are submitted. Only issues that are raised by the

written pleadings and the evidence, and that's quote, are submitted. That's Texas Rule of Civil Procedure 278.

Furthermore, only controlling issues that are essential to a right or action or defense are submitted. That's Paul Mueller Company versus Alcon Labs, 993 S.W.2d 851, Page 854.

A controlling issue is one that requires a factual determination to render a judgment in the case. And that's also supported by Rule 277, which provides that the Court shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict. Question No. 4 is not such an issue.

Zachry also objects to Question No. 4 because it refers to delay or -- delay and hindrance damages. Section 508 of the general conditions bars delay or hindrance damages.

You know what, this is one that we might want to talk about. I forgot about that.

So to the extent the instruction is given at all, it should track Section 5.08. That is also how it is referred to in Question No. 3.

I'm not sure if that was intentional.

MS. YEATES: Right. Your Honor, we

would agree to change that. On Question No. 4 it should say delay or hindrance damages. Could we change that?

THE COURT: One moment.

All right. I am changing that to delay or hindrance. Question 4.

Okay. How much more?

MS. GREER: I can talk faster. About three pages.

THE COURT: All right.

MS. GREER: She had 25.

Okay. Question No. 5 on reimbursable costs. Okay. Zachry also objects to Question No. 5, which asks what amount of damages the jury found in Question No. 3 were for New Zachry's reimbursable costs.

Again, the Port's not entitled to a question on this issue just in case they lose at trial but win on appeal.

The Court has held that Zachry is entitled to recover New Zachry's reimbursable costs as a matter of law. Accordingly, the amount of this cost is not a controlling issue that should be submitted.

Question No. 6, excuse for the Port's failure to comply. The affidavits and partial releases

of lien are unambiguously only lien releases, and so Zachry objects that the issue should not be submitted at all.

Furthermore, to the extent that the Court concludes that the partial lien releases are ambiguous and that there are other reasonable constructions of the partial lien releases besides Zachry's construction, which Zachry vigorously disputes, then the interpretation of the releases the Port previously advanced is at least one reasonable construction.

And we dispute it's reasonable, but if you think that there's more than our instruction, then it's at least one reasonable construction.

In the Port Authority's motion for partial summary judgment based on partial release executed by Zachry, the Port sought only partial summary judgment to the extent of the damages released.

And contended that the lien releases were only partial releases of liens. If the interpretation of the partial lien releases is submitted to the jury at all, the jury should be given the opportunity to make this finding.

As Question No. 6 is drafted, the jury can only conclude that the release was a complete

release of Zachry's claim or not a release at all. The jury's improperly precluded from finding that it is a partial release and the amount of damages it releases.

Question No. 7, Port's defense of fraudulent inducement to Change Order 4. The instruction regarding fraud is erroneous because it fails to require that the reliance be justifiable. It's the Ernst & Young versus Pacific Mutual Life case, 551 S.W.3d 573, 577, Texas Supreme Court.

The instruction regarding fraud should not be submitted because there is no evidence that Change Order 4 was fraudulently induced because the Port knew the truth, that Zachry was behind on the schedule.

Furthermore, because the Port knew the truth, it could not have relied actually or justifiably.

Legal bars also preclude the assertion of the Port's defense of fraud, including that the Port ratified the fraud, the merger clause bars any reliance by the Port as a matter of law, and the election of remedies doctrine bars the Defense because the Port retains valuable benefits under the contract.

The submission of the fraud question is extreme -- and we've moved for directed verdict, so you

have those arguments but -- the submission of the fraud question is extremely prejudicial to Zachry because its mere presence in the jury charge suggests to the jury that the Court believes there's some evidence that Zachry committed fraud or some potential basis on which the Port could --

THE REPORTER: Some what?

MS. GREER: I'm sorry. Potential basis.

THE COURT: Potential basis.

MS. GREER: On which the Port could recover for fraud against Zachry. Such a perception that Zachry could be a fraudfeasor is highly damaging and --

THE COURT: Fraudfeasor?

MS. GREER: Fraudfeasor. Highly damaging and an improper comment on the weight of the evidence.

Getting close.

THE COURT: Is that a real word?

MS. GREER: Question No. 8 --

(Laughing)

MS. GREER: Zachry's -- Question No. 8, Zachry's defenses to the Port's --

THE COURT: Wait. In Ms. Greer's defense, she probably got about a half an hour of sleep

last night.

MS. GREER: You nailed it.

Okay. Question No. 8, Zachry's defenses to the Port's fraudulent inducement defense. Zachry contends that the Port's fraudulent inducement defense is barred as a matter of law under the election of remedies doctrine and therefore should not be submitted.

However, to the extent that the Court determines that it is not an issue, that it can be decided as a matter of law, then Zachry is entitled to the submission of its election of remedies defense. Zachry objects to its omission.

Zachry will separately request its Proposed Instruction No. 12 on this issue.

Question No. 9, withholding of the $600,000. The instruction regarding the withholding of the $600,000 in payment from Zachry is erroneous because it is incomplete.

The instruction fails to give the jury any guidance as to the basis on which the Port was purportedly entitled to withhold the $600,000. It does not direct the jury to the withholding clause that the question is apparently referring to, Section 6.05.

It does not direct the jury to the

obligation under the contract that Zachry purportedly breached.

Zachry will separately request its Proposed Instruction No. 13 on this issue.

Question No. 9 also erroneously places the burden of proof on Zachry. The burden of proving withholding, like offset, is on the party asserting it.

That's the U.S. versus Use and Benefit of D'Agostino Excavators, Inc., versus Heyward-Robinson Company case that we've previously given you. 430 F2d 1077, 1085 to 86, out of the 2nd Circuit.

And by analogy, offset is an affirmative defense under the Brown versus American Transfer case, 601 S.W.2d 931, pinpoint 936.

And also by analogy, proof of the right to withhold liquidated damages is an affirmative defense under the Borders versus KRLB case, 727 S.W.2d 357, Page 360 pinpoint.

It is a matter of avoidance under Rule 94. Consistent with this law, Section 6.05 and likewise, Section 6.7 by their plain terms impose the burden of proof on the Port.

Indeed, Texas law provides that, as I stated before under the Howell versus Kelly case and the Johnson versus McKinney American case, the burden

of proof on the happening of a contingency that would discharge parties from liability is on the party seeking to avoid liability.

Indeed, the Port -- I'm almost done -- indeed, the Port has previously and repeatedly taken the position that it has the burden of proof on withholding and offset.

And we've cited you the places where they've done that in Plaintiff Zachry Construction Corporation's motion to strike the Port's late-disclosed 10.5 million-dollar offset and withholding defenses and to exclude any evidence in support thereof at Pages 23 through 24 and Footnote 16.

Question No. 11, excuse for the Port's failure to pay $600,000. The affidavits and partial releases of lien are unambiguously only lien releases --

THE COURT: Slow down. Slow down.

MS. GREER: -- and so the issue should not be submitted at all.

Question No. 12, failure to comply by withholding the $2.36 million in liquidated damages.

Question No. 12.A, point, little Roman II should ask the jury what sum of money, if paid now in cash, would fairly and reasonably compensate the

Port for its damages, if any, that resulted from Zachry's failure to comply that you find answer to Question No. 12.A?

The question should then define the element of damages to be considered as the reasonable and necessary cost of repairing the wharf fenders. Otherwise, the jury is receiving no guidance as to what it is they're supposed to determine or how they're supposed to quantify damages.

Zachry will separately submit its Proposed Instruction No. 14 on this issue.

Question No. 13, attorneys' fees. Attorneys' fees should not be submitted at all because Zachry, as a matter of law, will prevail on its breach of contract claim because the releases are unambiguously lien releases.

Accordingly, the Port at most could deduct the sum for the wharf fenders, approximately, 1 million from the $2.36 million in damages. Although Zachry disputes that they should be deducted at all.

Accordingly, regardless, of what happens on the remaining breach of contract theories, Zachry will have a net recovery on its breach of contract claim, and as a matter of law, the Port cannot be the prevailing party.

And for the foregoing reasons, Zachry objects to the Court's charge and would like a ruling on our objections.

COURT'S RULING

THE COURT: Okay. Then aside from the couple of small changes we made as we went, your motion is denied.

MS. GREER: And I'm offering you the --

THE COURT: Or your -- excuse me.

MS. GREER: -- requested instructions, and if they are refused, would you mark them refused?

THE COURT: Yes. And I will make them part of the record and ask that the clerk provide copies.

MS. GREER: Thank you very much, Your Honor.

MS. YEATES: Thank you, Your Honor.

THE COURT: And for the record, according to Black's Law Dictionary fraudfeasor is in fact a word.

MS. GREER: I've heard it before.

THE COURT: All right. So now we are up to -- Carolyn, you probably need a break.

Okay. I'm going to print out the jury charge then and we'll get copies made for the jury.

# TAB 42

**Texas Local Government Code §271.151 through §271.160**
**(Vernon 2005)**

Research References

Treatises and Practice Aids

   Brooks, 23 Tex. Prac. Series § 12.14A, Competitive Bidding-"Best Value" Bidding.

[Sections 271.122 to 271.150   reserved for expansion]

## SUBCHAPTER I. ADJUDICATION OF CLAIMS ARISING UNDER WRITTEN CONTRACTS WITH LOCAL GOVERNMENTAL ENTITIES

### § 271.151. Definitions

In this subchapter:

(1) "Adjudication" of a claim means the bringing of a civil suit and prosecution to final judgment in county or state court and includes the bringing of an authorized arbitration proceeding and prosecution to final resolution in accordance with any mandatory procedures established in the contract subject to this subchapter for the arbitration proceedings.

(2) "Contract subject to this subchapter" means a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity.

(3) "Local governmental entity" means a political subdivision of this state, other than a county or a unit of state government, as that term is defined by Section 2260.001, Government Code, including a:

   (A) municipality;

   (B) public school district and junior college district; and

   (C) special-purpose district or authority, including any levee improvement district, drainage district, irrigation district, water improvement district, water control and improvement district, water control and preservation district, freshwater supply district, navigation district, conservation and reclamation district, soil conservation district, communication district, public health district, emergency service organization, and river authority.

Added by Acts 2005, 79th Leg., ch. 604, § 1, eff. Sept. 1, 2005.

### § 271.152. Waiver of Immunity to Suit for Certain Claims

A local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter.

Added by Acts 2005, 79th Leg., ch. 604, § 1, eff. Sept. 1, 2005.

### Historical and Statutory Notes

Section 2 of Acts 2005, 79th Leg., ch. 604 provides:

"Sections 271.152, 271.153, and 271.154, Local Government Code, as added by this Act, apply to a claim that arises under a contract executed before the effective date [Sept. 1, 2005] of this Act only if sovereign immunity has not been waived with respect to the claim before the effective date of this Act. A claim that arises under a contract executed before the effective date of this Act and with respect to which sovereign immunity has been waived is governed by the law in effect on the date the contract was executed, and the former law is continued in effect for that purpose."

### Library References

Municipal Corporations ⟨⇒254.
Westlaw Topic No. 268.
C.J.S. Municipal Corporations § 946.

## § 271.153. Limitations on Adjudication Awards

(a) The total amount of money awarded in an adjudication brought against a local governmental entity for breach of a contract subject to this subchapter is limited to the following:

(1) the balance due and owed by the local governmental entity under the contract as it may have been amended, including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration;

(2) the amount owed for change orders or additional work the contractor is directed to perform by a local governmental entity in connection with the contract; and

(3) interest as allowed by law.

(b) Damages awarded in an adjudication brought against a local governmental entity arising under a contract subject to this subchapter may not include:

(1) consequential damages, except as expressly allowed under Subsection (a)(1);

(2) exemplary damages; or

(3) damages for unabsorbed home office overhead.

Added by Acts 2005, 79th Leg., ch. 604, § 1, eff. Sept. 1, 2005.

### Historical and Statutory Notes

Section 2 of Acts 2005, 79th Leg., ch. 604 provides:

"Sections 271.152, 271.153, and 271.154, Local Government Code, as added by this Act, apply to a claim that arises under a contract executed before the effective date [Sept. 1, 2005] of this Act only if sovereign immunity has not been waived with respect to the claim before the effective date of this Act. A claim that arises under a contract executed before the effective date of this Act and with respect to which sovereign immunity has been waived is governed by the law in effect on the date the contract was executed, and the former law is continued in effect for that purpose."

### Library References

Municipal Corporations ⟨⇒254.
Westlaw Topic No. 268.
C.J.S. Municipal Corporations § 946.

## § 271.154.   Contractual Adjudication Procedures Enforceable

Adjudication procedures, including requirements for serving notices or engaging in alternative dispute resolution proceedings before bringing a suit or an arbitration proceeding, that are stated in the contract subject to this subchapter or that are established by the local governmental entity and expressly incorporated into the contract or incorporated by reference are enforceable except to the extent those procedures conflict with the terms of this subchapter.

Added by Acts 2005, 79th Leg., ch. 604, § 1, eff. Sept. 1, 2005.

### Historical and Statutory Notes

Section 2 of Acts 2005, 79th Leg., ch. 604 provides:

"Sections 271.152, 271.153, and 271.154, Local Government Code, as added by this Act, apply to a claim that arises under a contract executed before the effective date [Sept. 1, 2005] of this Act only if sovereign immunity has not been waived with respect to the claim before the effective date of this Act. A claim that arises under a contract executed before the effective date of this Act and with respect to which sovereign immunity has been waived is governed by the law in effect on the date the contract was executed, and the former law is continued in effect for that purpose."

### Library References

Municipal Corporations ⊕254.
Westlaw Topic No. 268.
C.J.S. Municipal Corporations § 946.

## § 271.155.   No Waiver of Other Defenses

This subchapter does not waive a defense or a limitation on damages available to a party to a contract, other than a bar against suit based on sovereign immunity.

Added by Acts 2005, 79th Leg., ch. 604, § 1, eff. Sept. 1, 2005.

## § 271.156.   No Waiver of Immunity to Suit in Federal Court

This subchapter does not waive sovereign immunity to suit in federal court.

Added by Acts 2005, 79th Leg., ch. 604, § 1, eff. Sept. 1, 2005.

## § 271.157.   No Waiver of Immunity to Suit for Tort Liability

This subchapter does not waive sovereign immunity to suit for a cause of action for a negligent or intentional tort.

Added by Acts 2005, 79th Leg., ch. 604, § 1, eff. Sept. 1, 2005.

### Library References

Municipal Corporations ⊕723.
Westlaw Topic No. 268.
C.J.S. Municipal Corporations §§ 661 to 663.

## § 271.158. No Grant of Immunity to Suit

Nothing in this subchapter shall constitute a grant of immunity to suit to a local governmental entity.

Added by Acts 2005, 79th Leg., ch. 604, § 1, eff. Sept. 1, 2005.

## § 271.159. No Recovery of Attorney's Fees

Attorney's fees incurred by a local governmental entity or any other party in the adjudication of a claim by or against a local governmental entity shall not be awarded to any party in the adjudication unless the local governmental entity has entered into a written agreement that expressly authorizes the prevailing party in the adjudication to recover its reasonable and necessary attorney's fees by specific reference to this section.

Added by Acts 2005, 79th Leg., ch. 604, § 1, eff. Sept. 1, 2005.

### Library References

Municipal Corporations ⚿254.
Westlaw Topic No. 268.
C.J.S. Municipal Corporations § 946.

## § 271.160. Joint Enterprise

A contract entered into by a local government entity is not a joint enterprise for liability purposes.

Added by Acts 2005, 79th Leg., ch. 604, § 1, eff. Sept. 1, 2005.

[Sections 271.161 to 271.900 reserved for expansion]

## SUBCHAPTER Z. MISCELLANEOUS PROVISIONS

## § 271.901. Procedure for Awarding Contract if Municipality or District Receives Identical Bids

(a) If a municipality or district is required to accept bids on a contract and receives two or more bids from responsible bidders that are identical, in nature and amount, as the lowest and best bids, the governing body of the municipality or district shall enter into a contract with only one of those bidders and must reject all other bids.

(b) If only one of the bidders submitting identical bids is a resident of the municipality or district, the municipality or district must select that bidder. If two or more of the bidders submitting identical bids are residents of the municipality or district, the municipality or district must select one of those bidders by the casting of lots. In all other cases, the municipality or district must select from the identical bids by the casting of lots.

(c) The casting of lots must be in a manner prescribed by the mayor of the municipality or the governing body of the district and must be conducted in the

**TAB 43**

**Texas Civil Practices and Remedies Code §16.071**



**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated <u>Currentness</u>
  Civil Practice and Remedies Code <u>(Refs & Annos)</u>
    Title 2. Trial, Judgment, and Appeal
      Subtitle B. Trial Matters
        <u>Chapter 16</u>. Limitations
          <u>Subchapter D</u>. Miscellaneous Provisions
            ➡➡ **§ 16.071. Notice Requirements**

(a) A contract stipulation that requires a claimant to give notice of a claim for damages as a condition precedent to the right to sue on the contract is not valid unless the stipulation is reasonable. A stipulation that requires notification within less than 90 days is void.

(b) If notice is required, the claimant may notify any convenient agent of the company that requires the notice.

(c) A contract stipulation between the operator of a railroad, street railway, or interurban railroad and an employee or servant of the operator is void if it requires as a condition precedent to liability:

  (1) the employee or servant to notify the system of a claim for damages for personal injury caused by negligence; or

  (2) the spouse, parent, or child of a deceased employee or servant to notify the system of a claim of death caused by negligence.

(d) This section applies to a contract between a federal prime contractor and a subcontractor, except that the notice period stipulated in the subcontract may be for a period not less than the period stipulated in the prime contract, minus seven days.

(e) In a suit covered by this section or <u>Section 16.070,</u> it is presumed that any required notice has been given unless lack of notice is specifically pleaded under oath.

(f) This section does not apply to a contract relating to the sale or purchase of a business entity if a party to the contract pays or receives or is obligated to pay or receive consideration under the contract having an aggregate value of not less than $500,000.

CREDIT(S)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985. Amended by Acts 1991, 72nd Leg., ch. 840, § 3, eff. Aug. 26, 1991.

Current through Chapters effective immediately through Chapter 65 of the 2013 Regular Session of the 83rd Legislature

(c) 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT